RECEIVED
MAR 1 4 2008
U.S.D.C. S.D. N.Y.
CASHIERS

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

WILLIAM A. GROSS CONSTRUCTION : 07-CV-10639-LAK
ASSOCIATES, INC.,

             Plaintiff, :

      -against- :

AMERICAN MANUFACTURERS MUTUAL :
INSURANCE COMPANY,

            Defendant. :

------------------------------------------------------------x

AMERICAN MANUFACTURERS MUTUAL :
INSURANCE COMPANY,

        Third-Party Plaintiff, : **FOURTH-PARTY COMPLAINT**

      -against- :

CAULDWELL-WINGATE COMPANY, LLC, : **JURY TRIAL REQUESTED**

      Third-Party Defendant. :

------------------------------------------------------------x

CAULDWELL WINGATE COMPANY, LLC, :

      Fourth-Party Plaintiff, :

      -against- :

DORMITORY AUTHORITY – STATE OF :
NEW YORK,

      Fourth-Party Defendant. :

------------------------------------------------------------x

     Third-Party Defendant/Fourth-Party Plaintiff Cauldwell Wingate Company, LLC

("Cauldwell Wingate"), by its attorneys, Ingram Yuzek Gainen Carroll & Bertolotti, LLP, for its

Fourth-Party Complaint against the Dormitory Authority – State of New York ("DASNY")

alleges as follows:

272570_1/00926-053

**JURISDICTION**

1.     This Court has jurisdiction over this fourth-party action under 28 U.S.C. § 1367(a). The fourth-party claims are directly related to the claims in the main action and in the third-party action and therefore form part of the same case or controversy.

**THE PARTIES**

2.     Cauldwell Wingate is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 380 Lexington Avenue, New York, New York. Cauldwell Wingate provides construction services, including strategic planning for construction, construction management, general construction and design build.

3.     Upon information and belief, DASNY is a public benefit corporation organized and existing under the Public Authorities Law of the State of New York, with its principal place of business located at 515 Broadway, Albany, New York.

**SUMMARY OF THE CASE**

4.     This action arises from a $47 million construction contract that DASNY awarded to Cauldwell Wingate in December 2002 (the "CW Contract"), one of 17 individual prime contracts DASNY awarded for the construction of the new Bronx County Criminal Court Complex ("BCC").

5.     The BCC consists of a courthouse, known as the Bronx County Hall of Justice (the "Courthouse"), as well as a Jury Assembly Building and Garage/Plaza area.

6.     Upon information and belief, the total value of all of the contracts that DASNY awarded for this massive construction project (the "BCC Project") was $325 million. Also upon

information and belief, the BCC Project had cost overruns of almost $100 million, so that the total cost of the BCC was well over $425 million.

7.     The BCC Project was riddled with major problems from beginning to end. As a result, Cauldwell Wingate was severely handicapped in its efforts to execute the CW Contract successfully and within the original BCC Project schedule. Rather than acknowledge its own accountability for these problems, DASNY continually acted unreasonably with respect to Cauldwell Wingate, demanding, for example, that it adhere to deadlines that were patently unrealistic because of the delays and obstacles created by DASNY's agents and other contractors and that it assume the responsibility for and cost of repair work caused by those agents' errors.

8.     As a result of the problems created by DASNY and DASNY's insistence on maintaining artificial deadlines, Cauldwell Wingate was required to expend enormous additional sums of money. Cauldwell Wingate is entitled to be compensated for those expenditures, and is seeking that relief in this fourth-party action.

9.     Among some of the most significant roadblocks that Cauldwell Wingate encountered were: 1) unforeseen site conditions which not only significantly delayed the originally contemplated start time for the BCC Project but which led to ongoing problems, such as continuing water infiltration, after Cauldwell Wingate had embarked on its work; 2) concrete floor slabs encompassing hundreds of thousands of feet within the Courthouse, that had been so inadequately designed and poured that it affected and delayed virtually every aspect of Cauldwell Wingate's work; and 3) similar, massive, problems with the exterior site conditions, including surface conditions that were totally incompatible for the site and landscaping work for which Cauldwell Wingate had bid and contracted and which necessitated significant extra work that had not been scheduled or budgeted.

10.    These and the many other roadblocks which Cauldwell Wingate encountered are directly attributable both to DASNY's failure to ensure that the unique architectural design of its architect, Rafael Viñoly Architects, P.C. ("RVA"), was coordinated with the associated structural and mechanical, electrical, plumbing and sprinkler ("MEPS") designs and to the failure of DASNY and its agents to manage the work of its many prime contractors so that Cauldwell Wingate's tasks could proceed in a timely and unimpeded manner. Throughout the lifetime of the BCC Project, DASNY not only failed to acknowledge its responsibility in this regard -- in fact, continually ignoring Cauldwell's requests to address major problems -- but also failed to pay promptly for contracted work and for the significant extra work it ordered as its design plans continued to change, in clear breach of its contractual obligations, causing financial strain not only for Cauldwell Wingate but also for its subcontractors.

11.    The lack of adequate plans and supervision also resulted in literally thousands of written change orders and field work directives ("FWDs"), the latter being work orders that DASNY or its agents issued in the field and which Cauldwell Wingate documented on change orders after-the-fact. DASNY failed to process and pay for a substantial number of the change orders in a timely manner, often refusing to pay at all for additional work it had ordered.

12.    Upon information and belief, as the BCC Project dragged on and cost overruns mounted, DASNY sought to recoup some of its losses by "back charging" Cauldwell Wingate for remedial and repair work necessitated by DASNY's own failures properly to plan for and implement this very complex project and by physical damage caused by other contractors, at times even manufacturing claims of defective and incomplete work out of whole cloth.

13.    Toward the end of the BCC Project, DASNY generated new "punch lists" with thousands of items that Cauldwell Wingate had supposedly not completed, when often Cauldwell

Wingate had, in fact, completed the work satisfactorily and it was subsequently damaged by others. DASNY also repeatedly demanded that Cauldwell Wingate complete punch list work for which it was not responsible under the CW Contract. After Cauldwell Wingate agreed to do that work as well, and DASNY agreed to pay for it, DASNY not only reneged on its agreement to pay for that non-Cauldwell Wingate punch list work but then hired others to do it and back charged Cauldwell Wingate for it.

14.    Upon information and belief, DASNY used the existence of these and other back charges, as well as punch list items, to attempt to justify its refusal to pay Cauldwell Wingate the remainder due on its contract and to release retainage, all in breach of the CW Contract.

15.    As explained herein, the actions and inactions of DASNY in this regard went far beyond the routine problems and delays that might be expected on a project of this magnitude, constituting unreasonable and grossly negligent behavior on the part of DASNY.

16.    These myriad problems were further exacerbated by DASNY's unfair and arbitrary treatment of Cauldwell Wingate and its subcontractors, including but not limited to DASNY's refusal to adjust deadlines after major unforeseen interruptions to Cauldwell Wingate's scheduled performance occasioned solely as a result of DASNY's own lack of planning and coordination.

17.    Upon information and belief, although most if not all of the other contractors on the BCC Project experienced similar problems, DASNY, acting in bad faith, at times singled out Cauldwell Wingate for particularly harsh and unreasonable treatment. Upon information and belief, particularly toward the end of the BCC Project, DASNY's bad faith actions toward Cauldwell were generated as a result of the pressures on DASNY to complete the BCC Project

and to compensate for the huge cost overruns, as well as to justify its failings and those of its agents.

18.    Among the unfair actions taken by DASNY aimed specifically at Cauldwell Wingate was its unexplained and unjustified insistence early in 2006 that Cauldwell Wingate remove from the project two of its most key personnel, Paul De Simone, the Project Manager, and Chris Hargrove, its Vice President of Operations and, in 2007, that Cauldwell Wingate remove its field supervisor from the site.

19.    Another example was DASNY's constant threat to assess liquidated damages against Cauldwell Wingate to induce it to perform work for which it was not responsible, and to meet a schedule that had become impossible to achieve because of problems caused by DASNY and it agents.

20.    Yet another example of DASNY's apparent particular animus toward Cauldwell Wingate was its steadfast refusal to approve and process a reduction in retainage when such a reduction was, in fact, granted to other prime contractors on the BCC Project and was called for under the CW Contract.

21.    DASNY further singled out Cauldwell Wingate, as detailed below, when it reduced its plans for bollards (safety barriers) and associated road work and sought to obtain a credit for reducing this item in Cauldwell Wingate's scope of work that was in excess of the amount DASNY had originally agreed to pay.

22.    Upon information and belief, DASNY's unreasonable and unfair actions toward Cauldwell Wingate escalated in 2007, after Cauldwell Wingate submitted a request for an adjustment to the CW Contract because of the significant losses it and its subcontractors had

incurred as a result of unanticipated factors attributable to DASNY's mismanagement and lack of planning.

23.     Among the damages suffered by Cauldwell Wingate as a result of DASNY's actions and inactions, also detailed herein, were: unanticipated increases in the amounts spent by, and thus due to, Cauldwell Wingate and its subcontractors, resulting from delays on the BCC Project caused by entities other than Cauldwell Wingate, including DASNY and its agents; amounts due for approved change orders which DASNY has refused to honor and for unapproved change orders and FWDs which DASNY should have approved but has not; contract balances owed to Cauldwell Wingate for the completion of its work, including retainage which DASNY has refused to release; and damages as a result of DASNY having forced Cauldwell Wingate to constructively accelerate its performance to meet a schedule that had become impossible to achieve through no fault of Cauldwell Wingate. The damages sought here by Cauldwell Wingate total approximately $25.4 million.

24.     The main action, instituted by one of Cauldwell Wingate's subcontractors, William A. Gross Construction Associates, Inc. ("Gross"), against Cauldwell Wingate's surety, American Manufacturers Mutual Insurance Company ("American Manufacturers") arises as a direct result not of any actions by Cauldwell but from DASNY's actions complained of here. Gross's claim constitutes part of the damages sought by Cauldwell Wingate against DASNY.

25.     In addition to RVA, DASNY's principal agents for the BCC Project were Bovis Lend Lease ("Bovis"), the initial construction manager, and Hill International ("Hill"), which DASNY hired very late in the BCC Project to replace Bovis. While the problems complained of here were often the direct result of actions and inactions by RVA, Bovis and Hill, they are attributed to DASNY, since its architect and construction managers are DASNY's agents.

## BACKGROUND

26.    Cauldwell Wingate and DASNY entered into the CW Contract on December 20, 2002. A copy of the CW Contract is annexed hereto as Exhibit A. A copy of the "General Conditions," which comprises part of the CW Contract, is annexed hereto as Exhibit B.

27.    The work to be performed under the CW Contract was described as "General Construction # 2 – Fitout Work." (Ex. A at 1.) The total sum of the CW Contract was $46,995,000, and the scheduled completion date was July 31, 2005. (*Id.*) With undisputed increases in the scope of work, the total of the CW Contract rose to approximately $52 million.

28.    The fitout work to be performed by CW included masonry work; hollow metal and hardware work, including for detention facilities; drywall and ceiling work; architectural metal and glass work; finish painting; tile and marble work; and sidewalk and landscaping work. All of this work was to be carried out by subcontractors engaged by Cauldwell Wingate, with DASNY's approval.

### The Delays Encountered by Cauldwell Wingate

29.    From the outset, Cauldwell Wingate was presented with major, unforeseen factors which delayed both the commencement and the progress of the CW Contract work.

30.    For example, the discovery of unsuitable soil conditions under the Jury Assembly Building resulted in an inability to begin work on the foundation of that building, with its construction put on hold pending a redesign of part of the foundation system.

31.    There were also significant delays to the excavation/foundation work on the Courthouse, resulting from such factors as latent conditions with regard to rock elevations and groundwater levels, and a change in the design from pile foundations to spread footings. The

delays in excavation/foundation work, in turn, led to delays in structural steel and shell construction. All of these delays adversely affected Cauldwell Wingate's ability to start work on the CW Contract.

32.    One of the most significant, unanticipated problems encountered by Cauldwell Wingate related to the concrete slabs, the proper installation of which was a threshold requirement for the various tasks and trades within Cauldwell Wingate's scope of work.

33.    The concrete slabs, as poured, did not provide a suitable substrate for the performance of the various floor finishes, such as marble and terrazzo, which were within Cauldwell Wingates's scope of work. Upon information and belief, some of the slab areas were poured higher than called for, in order to cover shear studs and other structural elements. Also, upon information and belief, DASNY's specifications for cast-in-place concrete were incorrect from the outset, because they were inconsistent with the tolerances for the various floor finishes.

34.    As a result, even before it commenced its interior work, Cauldwell Wingate was confronted with concrete slabs which had many areas of relative high and low points. The lack of a level slab affected scores of details of Cauldwell Wingate's work which required level floors, including the large glass wall assembly at the Courthouse's monumental stairway and numerous doors, as well as floor finishes, which in many cases were incompatible with the slab as poured. Cauldwell Wingate was unable not only to install various finish components, but also even to fabricate them until the details of the remediation work on the concrete slab were worked out, causing further delay. Cauldwell Wingate agreed to assist in that remediation work, even though it was not in its original scope of work.

35.    The problems with the concrete slabs caused massive delays; indeed, all of the slabs, including those for the Jury Assembly Building and the Garage/Plaza, were not completed

until October 4, 2005 -- 25 months later than scheduled, and more than two months after the original scheduled completion date in the CW Contract.

36.    By letter dated May 7, 2004, Cauldwell Wingate formally notified DASNY of its claim for delay in connection with the concrete slab condition.

37.    Another problem which plagued the entire BCC Project, and repeatedly frustrated Cauldwell Wingate's efforts to proceed, was the failure by DASNY and its agents to coordinate the MEPS drawings, either during the design phase or the design review phase.  The MEPS coordination phase, which started early in 2002, was "substantially" completed almost two years later than originally scheduled, yet even then the MEPS installations conflicted repeatedly with the architectural and structural design of the Courthouse.

38.    As a result, for example, even after Cauldwell Wingate had installed ceilings throughout the massive building complex, other prime contractors repeatedly had to go back into the ceilings to change, complete or relocate their previous MEPS (wiring, lighting, piping, sprinklers, etc.) work.  DASNY, in turn, then required Cauldwell Wingate to repair and replace ceiling tiles, to such an extent that even the supply of surplus ceiling tile, which is referred to as "attic stock" and which is required for such a large project, was exhausted, necessitating an expenditure of approximately $50,000 just for additional ceiling tiles.

39.    The long delay in MEPS coordination and the frequent conflict of MEPS plans with architectural elements caused other significant problems for Cauldwell Wingate and its subcontractors.  Work was frequently put on hold to allow for redesign; the planned sequencing of tasks and trades was severely adversely affected; and significant additional work not contemplated in the original CW Contract was required.

40.     The problems that Caulwell Wingate encountered at the outset of its work with the concrete slab were repeated at the back end, with respect to the exterior of the BCC. Gross, the Plaintiff in the main action and Cauldwell Wingate's site work and landscaping subcontractor, encountered serious design deficiencies and ubiquitous uneven ground surfaces, requiring corrective work on the exterior landscape not unlike those required on the interior concrete slab.

41.     Another problem that affected virtually every aspect of Cauldwell Wingate's work, and which resulted from DASNY's failure to provide coordinated drawings, was the need for Cauldwell Wingate and its subcontractors repeatedly to generate Requests for Information ("RFIs") to RVA. Typically, Cauldwell Wingate's subcontractors would submit schedules to RVA for their respective work with a list of questions requiring clarification or confirmation. As often as not, RVA returned the schedules marked "approved," without having responded to any of the submitted questions. That, in turn, generated the need for the RFIs, many of which related to very basic questions which RVA simply had not addressed. Although it did not do so in a timely manner, RVA frequently responded to the RFIs by issuing Architect's Supplemental Instructions ("ASIs"). In many instances, after a particular problem had been resolved in this manner after months of delay, the "solution" proffered by RVA gave rise to yet other problems, resulting in additional cost and delays.

42.     Cauldwell Wingate and its subcontractors experienced other problems with the drawings generated by DASNY's agents. For example, repeated program changes caused not only delays but revisions to elements of Cauldwell Wingate's work that had already been fabricated.

43.     As yet another example, critical details were not always fully developed, and had to be refined during the shop drawing phase to an extent far greater than is typically expected or should have been expected.  The contract documents sometimes called for work which would not have been code compliant and, with respect to fire ratings, work not called for that was required by code.  Very late in the BCC Project, for example, in order to comply with code, DASNY demanded a rated enclosure between the exterior curtain wall and the monumental stairway which had not been contemplated in its original plans, at increased expense to Cauldwell Wingate.

44.     This problem with the fire rating exemplifies the bad faith evidenced by DASNY.  Upon information and belief, because of these code-related issues, DASNY was well aware that it would not obtain its temporary certificate of occupancy by November, 2005, which was its revised deadline for completion.  Yet it nevertheless insisted that Cauldwell Wingate adhere to that deadline, holding the specter of liquidated damages over Cauldwell Wingate to force it to endeavor to work within an obviously unrealistic schedule.

45.     The problems described here are only illustrative of the many problems that resulted in repeated, unforeseen delays for Cauldwell Wingate as well as additional, unanticipated costs.  As delays mounted, and DASNY refused to pay the costs associated with these delays some of Cauldwell Wingate's subcontractors were particularly affected by the lack of additional capital required to complete their work.

46.     In bidding for the CW Contract, Cauldwell Wingate expected -- and had every right to expect -- a complete, coordinated and constructible set of contract documents so that the BCC Project could be built in the sequence planned and the time allotted.  Instead, Cauldwell Wingate's planned work was thrown into virtual chaos, through no fault of its own.

**DASNY'S Refusal to Pay for Extra Work**

47.     As indicated above, the numerous design problems and delays caused by DASNY and its agents resulted in the issuance of numerous change orders by Cauldwell Wingate, for work which DASNY approved and which Cauldwell Wingate's subcontractors performed in good faith. DASNY persistently failed to adhere to industry practice and the CW Contract with respect to honoring these change orders and acted in bad faith in responding to them.

48.     Among other things, DASNY rejected legitimate change orders, delayed the payment of those change orders it accepted by making repeated, unnecessary requests for supporting documentation previously given, and abused the process by taking positions at odds with the relevant facts including, but not limited to, making unsupportable back charge claims against Cauldwell Wingate with no notice, purportedly to justify its non-payment of this extra work. There currently are signed change orders for amounts that DASNY has arbitrarily, inexplicably and unjustly reduced by hundreds of thousands of dollars.

49.     At times, DASNY ignored Cauldwell Wingate's requests for payment of approved change orders for months on end. At other times, particularly when Cauldwell Wingate's subcontractors were unable to or refused to proceed without payment for the extra work, DASNY simply provided Cauldwell Wingate with additional funds unrelated to specific charge orders, admitting to Cauldwell Wingate that it was unable to keep track of its own books and records. It was not unusual for DASNY later to insist on credits for such payments, thus reneging on its obligation to pay for the extra work.

50.     DASNY's record keeping with respect to change orders was so haphazard that in the transition from Bovis to Hill, DASNY claimed to have lost track of approximately $1 million in change orders.

51.    DASNY currently owes $1.4 million in approved but unpaid change orders.

52.    Also as indicated, DASNY orally issued literally hundreds of FWDs to Cauldwell Wingate and its subcontractors.  The extra work performed pursuant to these FWDs was outside the scope of the CW Contract, and often resulted from the poor design coordination as well as the need to patch and repair because of improper sequencing.

53.    As required under the CW Contract, Cauldwell Wingate timely issued written change orders for the work it performed pursuant to DASNY's FWDs.

54.    Cauldwell Wingate's subcontractors performed that extra work, after which DASNY often determined that no extra work had, in fact, been involved, and refused to sign change orders related to that work, with no fair basis for doing so.

55.    The total owed by DASNY on the change orders it has refused to approve is $5.4 million.

**DASNY's Refusal to Pay Retainage and The Contract Balance**

56.    DASNY also has refused to pay amounts still due under the original CW Contract, comprised of both retainage and the unpaid contract balance.

57.    Under Article 17 of the CW Contract, DASNY was entitled to withhold 5% of the periodic requisitions as "retainage."  Once Cauldwell Wingate had substantially completed its work, DASNY was required to reduce the retainage amount, less two times the value of the work remaining to be done.

58.    DASNY has improperly assessed Cauldwell Wingate for certain back charges in order to justify its refusal to pay Cauldwell Wingate the remaining contract balance.  DASNY also has taken the position that it is not obligated to release retainage due because of alleged existing interior and exterior punch list items.

59.    On November 10, 2006, Cauldwell Wingate and Hill reached agreement on the scope of the remaining interior punch list work to be done. Cauldwell Wingate had argued, and DASNY had conceded, that much of the punch list work it was being asked to perform was the responsibility of other prime contractors, and thus was not Cauldwell Wingate's responsibility, and they reached an agreement that Cauldwell Wingate would be paid 46% of every dollar's worth of work it performed on that punch list.

60.    Notwithstanding that agreement, and subsequent completion by Cauldwell Wingate of much of that punch list work, DASNY refused to honor the agreement, by not paying for all of the work.

61.    DASNY also continued to add items to the punch list, creating a "moving target" of items way beyond what Cauldwell Wingate agreed to in November 2006. Many of these items have already been completed and had been accepted by DASNY's agents and many, again, were the responsibility of other contractors and not within Cauldwell Wingate's original scope of work.

62.    In addition, DASNY has levied a back charge against Cauldwell Wingate for the punch list work that it alleges Cauldwell Wingate should have performed, notwithstanding its earlier acknowledgement that the work was not originally Cauldwell Wingate's responsibility. The amount of that back charge is hundreds of thousands of dollars greater than the value of the punch list work the parties agreed to in November 2006, as a result of DASNY continuing to add items to the list and refusing to acknowledge those items already completed.

63.    DASNY thus not only has forced Cauldwell Wingate to do punch list work for which it was not even responsible, but has refused to pay for it *and* now seeks to hold back the amount that work was allegedly worth from the amount still owing under the CW Contract. In

so doing, DASNY has not only breached the CW Contract but has also manifested bad faith with respect to its obligations thereunder.

64.    Among the items clearly not within Cauldwell Wingate's scope of work were those relating to sprinklers, mechanical and electrical work.

65.    DASNY subsequently presented Cauldwell Wingate with a punch list for exterior work, including but not limited to pavement restoration work, but prevented Cauldwell Wingate from carrying out that work and back charged Cauldwell Wingate for the costs associated with the completion of that work by others.

66.    Cauldwell Wingate had attempted to complete the exterior punch list but was thwarted by the actions of DASNY and its agents, including having its subcontractors turned away when they showed up to do the work and having its field supervisor dismissed from the site.

67.    Upon information and belief, DASNY has manufactured outstanding punch list items in order to justify its improper refusal to pay Cauldwell Wingate the remainder due under the CW Contract, including retainage.

68.    Cauldwell Wingate has completed all of the punch list work for which it was responsible, except for the work it was prevented from doing as a result of DASNY's refusal to permit its workers access to the site.

69.    As a result of DASNY's refusal to pay the contract balance and for extra work, Cauldwell Wingate in turn has been unable to pay its subcontractors for all of the contract balances and extra work costs owed to them.

70.    Because Cauldwell Wingate performed all of the work it contracted to perform under the CW Contract, and was prevented by DASNY from finishing any remaining work on

the BCC Project, Cauldwell Wingate has effectively completed all of the work it was required to do under the CW Contract and is entitled to be paid for the contract balance, as well as for retainage.

**Some Specific Problems Encountered by Cauldwell Wingate's Subcontractors**

*Drywall and Ceiling Work*

71.    One of the most significant portions of Cauldwell Wingate's fitout work was drywall and ceiling work, accounting for approximately 30% of the CW Contract. Cauldwell Wingate subcontracted with Component Assembly Systems ("CAS"), one of the premier drywall/acoustic contractors in the New York metropolitan area, for this purpose.

72.    Although it could not start its work on time because of delays on other prime contracts, CAS took great efforts to begin its shop drawing and sample submission process early on, to avoid the coordination problems it had learned of from other contractors. This effort revealed serious conflicts on the contract drawings with regard to CAS's work, and caused CAS to begin its own process of RFI submissions in order to resolve these conflicts. Beginning in February 2003 and continuing through May 2006, Cauldwell Wingate generated more than 350 RFIs on CAS's behalf.

73.    CAS's work was perhaps most affected by the design and coordination problems that were endemic to the BCC Project. Among only some of the problems encountered by CAS were: critical dimensions typically missing on design drawings; at many locations, partitions (both rated and non-rated) fell partially off the concrete slab, based on the dimensions called for; fire ratings of gypsum wallboard ("GWB") compromised by reveals and a recessed terrazzo base; and plan dimensions and ceiling heights resulting in exposed structural steel at many locations throughout the job, forcing the ceiling heights to be lowered. Each time CAS

encountered one of these problems in the field it had to stop work, issue an RFI and wait for a response from RVA.

74.    Not only was CAS significantly delayed in the start of its GWB framing work and forced to perform this work in a fragmented manner, but it also experienced a pattern of damages to completed GWB walls by the MEPS prime contractors starting early in 2004 and continuing until the Courthouse was virtually completed.    This damage consisted of removal and replacement of GWB and outright punching of holes by the MEPS contractors in their efforts to relocate and/or install their equipment within partitions and ceilings, again because of the poor work coordination by DASNY and lack of interface between the MEPS drawings and other aspects of the design.  CAS's work also was affected by repeated flooding in various areas of the building from a variety of sources not caused by Cauldwell Wingate or its subcontractors. CAS's work also was plagued by damage to and the removal of the acoustical tiles it had begun to install, with the knowledge and approval of Bovis, on various floors, again caused by poor coordination and the need by other contractors to access ceiling areas.

*Architectural Metal and Glass Work*

75.    After the drywall and ceiling work, the next largest subcontracted portion of Cauldwell Wingate's fitout work was for architectural metal and glass ("AM&G").

76.    The subcontractor for the AM&G work was UAD Group ("UAD").  As a result of the endless problems that plagued UAD throughout the BCC Project, the costs to Cauldwell Wingate for AM&G work, original subcontracted for at $6.1 million, ballooned to over $10 million.

77.    The AM&G work was a particular challenge because of the highly sophisticated architectural design.  There were endless design modifications throughout the life of the BCC

Project. Indeed, as it modified or changed its design, RVA marked up UAD's shop drawings to such a degree that the contract documents on which Cauldwell Wingate and UAD had based their bids were considered to be merely conceptual in nature, with final design work taking place in the shop drawing phase.

78.     These design changes severely affected UAD's schedule and required numerous revisions to its work, including removal and re-fabrication of various elements within the AM&G scope of work. Cauldwell Wingate generated almost 200 RFIs on behalf of UAD.

79.     UAD, a minority subcontractor, suffered extreme financial hardships as a result of its work on the BCC Project. The length of its work on the BCC Project extended from the original 23 months projected to over 36 months, during which time prices for materials escalated, and DASNY and its agents consistently rejected change orders or failed to pay timely for them. These problems were a particular strain on UAD, because of its limited financial resources.

80.     As a result of these problems, all beyond UAD's and Cauldwell Wingate's control, Cauldwell Wingate petitioned DASNY, through Bovis, on numerous occasions to adjust the work schedule accordingly. Not only did DASNY fail to respond to Cauldwell Wingate's letters, but it directed that certain work be performed which actually delayed and disrupted UAD's field work even further. As just one example, DASNY insisted on the removal of the material hoist and closure of the curtain wall without affording UAD the proper time to deliver its oversized materials, the ordering and fabrication of which had been delayed by RVA re-designs. UAD was forced to deliver glass panels which measured 5' x 15' through a narrow and insufficient gap in the curtain wall and then re-rig these glass panels to the upper floors and, in some cases, walk the glass panels up flights of stairs.

81.    At some point, notwithstanding all of the disruptions and delays, DASNY unilaterally declared that the revised completion date for the project was November 30, 2005. As one of the last of the subcontractors in the sequence of work, and thus with much of its field work still undone, UAD was particularly negatively affected by this rush to finish.

82.    As a result, Cauldwell Wingate took the pro-active step of engaging two additional subcontractors to expedite the remaining AM&G work.  It also provided direct financial assistance to UAD.  Cauldwell Wingate has never been compensated for any of these additional expenditures.   UAD's subcontract was more than $2 million over budget, and Cauldwell Wingate expended approximately $2 million more on AM&G work.

83.    DASNY's actions in accelerating the completion of the AM&G work were particularly unreasonable in light of the fact that DASNY has repeatedly had to extend the completion date, with the Courthouse not even opening until January of 2008.

84.    Upon information and belief, beset with its own delays and overruns, DASNY used UAD and Cauldwell Wingate as scapegoats for one of the BCC Project's major design failures.  DASNY's actions in this regard constitute one of the most egregious examples of its demonstration of bad faith toward Cauldwell Wingate.

85.    In its scope of work, UAD was responsible for constructing the main entrance canopy (the "Canopy") to the Courthouse.  With virtually no notice, in late March 2007, DASNY for the first time raised concerns that the five inch steel plate used to construct the primary connection assemblies was improperly certified and that the welds connecting the five inch plates were cracking and unacceptable.  Less than two months later, DASNY decided to remove the Canopy, and to back charge Cauldwell Wingate approximately $450,000 for that work.

86.    DASNY's decision to remove the Canopy was undertaken in complete disregard of the facts and was at odds with accepted project management and construction practices.

87.    Prior to DASNY's removal of the Canopy, Cauldwell Wingate had provided it with two separate reports by nationally recognized experts concluding that there were no cracks in the Canopy welds. These reports concluded that, instead, the conditions observed by DASNY were the result of incomplete fusion, which occurred during the welding process, which process had been witnessed -- and apparently overlooked -- by DASNY's own materials tester.

88.    In addition, Cauldwell Wingate's expert issued an opinion that the welds used to attach the upper Canopy supports satisfied New York City Building Code and good engineering practices. While DASNY complained that these welds did not conform to the shop drawings, Cauldwell Wingate's expert explained that they were changed from the shop drawings because of a potential deficiency in those drawings associated with the impact of a profile change made by RVA and that, in any event, the welds, as redesigned, satisfied sound engineering practice.

89.    In mid-April 2007, after an inspection of the Canopy, DASNY and its own expert consultants concluded that the best way to confirm the acceptability of the Canopy weld connections would be through a controlled load test. In mid-May 2007 Cauldwell Wingate submitted a plan to DASNY for such testing, to be paid for by Cauldwell-Wingate. Cauldwell Wingage also forwarded to DASNY a remediation plan that would have required only two days of work by a single welder to correct the fusion problems. Inexplicably, DASNY rejected conducting the load test or any remediation, choosing instead to completely dismantle and remove the Canopy.

*Site Work/Landscaping*

90.     Gross, the plaintiff in the main action, was Cauldwell Wingate's subcontractor for the site work and landscaping work. This subcontract was Cauldwell Wingate's third largest, totaling $3,820,000.

91.     The original schedule called for Gross's work to be completed by June 30, 2005. Notwithstanding the many delays encountered by the BCC Project, DASNY refused to adjust that completion date beyond November 2005. While Gross was able to begin a small portion of its work in the Fall of 2004, no meaningful work could even begin until June of 2005.

92.     One of the principal problems affecting Gross's work was DASNY's failure to provide the Approved Builders Pavement Plan needed for Gross to secure required permits. While Cauldwell Wingate requested the Plan as early as May 2004, it still had not been provided by the November 2005 deadline.

93.     One of the issues affecting the issuance of the Approved Builders Pavement Plan had to do with major revisions related to the number of fixed and hydraulic bollards (safety barriers) to be installed around the BCC. The original plans, on which both Cauldwell Wingate and Gross bid, called for over 300 bollards. The City Planning Commission objected to that number, and until the issue was resolved DASNY could not obtain the Approved Builders Pavement Plan which, in turn, was one of the issues which held up the issuance of the temporary certificate of occupancy.

94.     Here again, although DASNY was well aware that it could not possibly complete the BCC Project even on its revised schedule, it continued to insist that Cauldwell Wingate adhere to that schedule and constantly threatened liquidated damages if it did not.

95.     Eventually, DASNY settled on approximately 30 bollards.  Its revised plans called for redesigned bollards and significantly less associated road work around the BCC than originally called for.

96.     While DASNY was entitled to a credit on the original work, it inexplicably insisted on a credit in the amount of $1.1 million, when it was clear from all of the related paper work that Cauldwell Wingate provided that a credit of only approximately $400,000 was in order.  While DASNY eventually reduced the claimed credit amount to about $800,000, that number is not supported by the voluminous documentation that Cauldwell Wingate and Gross have provided to DASNY on this issue.

97.     DASNY acted in bad faith and in a punitive manner in insisting on a larger credit than was warranted or documented.  Upon information and belief, DASNY singled Cauldwell Wingate out for such treatment in part at least to transfer the responsibility for its chronic delays, indecision and cost overruns to one of the few prime contractors that still remained at this point in time.

98.     In addition to being held up by the bollard issue, Gross also experienced the serious design deficiencies encountered by other contractors and subcontractors, requiring over 200 RFIs from late 2003 well into 2006.  One of the most significant problems encountered by Gross was the fact that, notwithstanding that the plans and specifications called for a 2" fill, the underlying surface for which DASNY (not Cauldwell Wingate or Gross) was responsible was not level and completely unsuited for the contracted landscaping work.

99.     Among the other problems encountered by Gross were: missing dimensions and elevations; conflicts between stated dimensions; missing details for critical elements of the work; and conflicts with the work of other prime contracts.

100.    In addition to these design issues, Gross experienced other significant problems and delays in the field, including but not limited to: waterproofing not completed and/or repaired; water ponding at low spots on the Plaza and problems with trench drains; interference from material and man lifts stored by the curtain wall contractor around the Plaza and sidewalks; open electrical issues, such as missing light poles or poles in the wrong location; and the necessity for relocating Bovis's trailers and walkways.

101.    As alleged in the Complaint in the main action, Gross is owed over $2.6 million on its subcontract, including 32 open change orders, pending change orders and extra work orders.

*Masonry Work*

102.    Cauldwell Wingate engaged Commodore Construction ("Commodore") to do the masonry work. While Commodore was able to begin some aspects of its work reasonably on schedule, it was delayed on other aspects as a result, *inter alia*, of the delay in the laying of the concrete floor slabs, which work had to be completed before Commodore could proceed.

103.    After commencing its work, Commodore then encountered numerous problems associated with the uneven floor slab, as well as same design and coordination deficiency problems that all other trades faced. As a result of the design deficiencies, there were more than 50 RFIs over the three-year period it took to do the masonry work.

Commodore encountered other conditions completely beyond its control which negatively affected its schedule including, but not limited to, the constant infiltration of water into the basement levels, caused by the incomplete curtain wall enclosure, and by the failure of DASNY to ensure the provision of temporary heat during the winter of 2003/04.

*Tile and Marble*

104.    Cauldwell Wingate subcontracted with Port Morris Tile & Marble Corp. ("Port Morris") to carry out the ceramic tile, terrazzo tile and stone work.  Here too there were sequencing issues, since Port Morris could not commence its work until completed partitions were in place and floor slabs were properly finished.  Port Morris encountered significant problems with the flatness and levelness of concrete floors, for which another prime contractor was responsible.  Surveys of these floors revealed significant deviations between existing conditions of flatness and levelness and the specified tolerance for much of the finish work to be performed by Port Morris.

105.    As a result, it was necessary to carry out remedial work before Port Morris could even begin.  Because of the remedial work required, Port Morris's work was delayed for up to a year.

Port Morris's work was also affected by the deficiencies and inconsistencies in the design documents, and its work alone generated 40 RFIs.

*Hollow Metal and Hardware Work*

106.    The subcontractor for the general hollow metal and hardware work was Long Island Fireproof Door ("LIFD").  The subcontract with LIFD was one of the earliest that Cauldwell Wingate entered into, because the furnishing of hollow metal frames is critical to drywall partition work, one of the largest elements of Cauldwell Wingate's fitout responsibilities.

107.    Although LIFD submitted schedules for approval by April 7, 2003, RVA did not fully sign off on them until May 30, 2003, still leaving many of LIFD's submitted questions unanswered.  Cauldwell Wingate was thus required to submit almost 60 RFIs on LIFD's behalf, in order to resolve open issues so that the door frames could be put into production.  The

questions included such basic items as missing partition types and thicknesses, clarification of transom panel requirements and fascia locations, and the coordination of hollow metal with the work of other contracts, such as the curtain wall/storefront contract and the electrical/low voltage systems contract.

108.    Problems persisted even after the door frames were ordered and delivered, often because the installed MEPS work prevented the installation of the door frames in their planned location.   The problems affected not only the door frames, but doors and hardware as well because of DASNY's failure to coordinate the schedule for their preparation with the schedule for the preparation of required electronic locks and security hardware.    These problems continued from the time of the first RFI, in July of 2003, to the last RFI, which was generated in June 2006.

109.    Cauldwell Wingate engaged a separate subcontractor, Maximum Security Products ("MSP") for the furnishing and installation of all of the material and equipment for the BCC's detention facilities, including hollow metal and hardware, which is generally more involved than conventional doors and frames.   The special requirements included specialized steel, solid reinforced masonry, sliding steel security doors and grillwork, solid steel ceilings, and the need to comply with security codes.

110.    Here too, although MSP's schedules were submitted for approval on March 12, 2003, they were not approved until May 15, 2003, and then with so many unanswered questions that Cauldwell Wingate had to generate over 70 RFIs on MSP's behalf.

111.    Even then, the design deficiencies of DASNY's detention work became painfully apparent.  As just a few examples, in many instances the cell ceiling heights conflicted with the sliding door housings, requiring a reduction in door heights.  In a great many cases, the cell

masonry openings were too small to accommodate the cell door clear opening size and overall frame width for the slider. Because of these and other problems, none of which was caused by Cauldwell Wingate or its subcontractors, revisions to door sizes, masonry openings or configurations and frame openings -- or some combination of all three -- were required. These problems not only resulted in delays to the completion of the detention hollow metal and hardware work, but also to the start of the masonry work, which could not commence until these metal and hardware issues were resolved.

*Finish Painting*

112.    Cauldwell Wingate subcontracted with L&L Painting Co. ("L&L") for the finish painting, which included taping, spackling and skimcoating as well as finish painting.

113.    By definition, the finish painting work could not be done until much of the other work had been completed. As a result, L&L's work was substantially delayed, particularly as a result of the delays to CAS for its GWB work.

114.    L&L's work was also plagued by many of the same problems that CAS experienced, such as the need for patching and repairing as a result of flooding, and significant damage to walls and ceilings caused by the MEPS trades. L&L performed this additional work, as directed, by DASNY. As a result, L&L's subcontract almost doubled in scope.

**Cauldwell Wingate's Claim for an Equitable Adjustment**

115.    On February 13, 2007, pursuant to project protocol, Cauldwell Wingate submitted to DASNY a Claim for Equitable Adjustment (the "Adjustment Claim"). The Adjustment Claim outlined in both narrative and financial detail the extra costs incurred by Cauldwell Wingate and its subcontractors as a result of the events outlined herein. The claim was for approximately $23.5 million.

116.    DASNY refused to acknowledge any obligation to reimburse Cauldwell Wingate for any costs detailed in the Adjustment Claim.

117.    Approximately three-quarters of the $23.5 million outlined in the Adjustment Claim was the amount due to subcontractors as of the date submitted.

118.    One of the other items included in the Adjustment Claim, which also illustrates the animus and unfair behavior of DASNY toward Cauldwell Wingate, was a claim for almost $600,000 based on Cauldwell Wingate's replacement of precast concrete panels at the site planters, as DASNY's insistence.

119.    Cauldwell Wingate's subcontractor fabricated and installed these panels using a thickness approved by RVA and a concrete design mix used for building panels under another prime contract, and also approved by RVA.

120.    After some of the panels exhibited cracking and some chipping at the edges, both DASNY's and Cauldwell Wingate's experts undertook testing to determine whether these panels satisfied compressive strength requirements.  Notwithstanding results showing that the panels did, in fact, exceed such requirements, and Cauldwell Wingate's offer to replace 110 of the almost 900 panels and to patch chipping, DASNY insisted that *all* of the panels be removed and replaced.

121.    Cauldwell Wingate did so, at a cost of almost $600,000.  Cauldwell Wingate has submitted a proposed change order for this amount, which DASNY has refused to approve.

122.    Upon information and belief, DASNY's malicious conduct toward Cauldwell Wingate escalated as a result of Cauldwell Wingate's submission of the Adjustment Claim and DASNY's unwillingness to acknowledge any responsibility for the facts outlined therein and led to DASNY barring Cauldwell Wingate from the site in August, 2007

## FIRST CLAIM
### (Breach of Contract – Unpaid Balance)

123.    Cauldwell Wingate repeats and realleges the allegations set forth in paragraphs 1 through 122 of this fourth-party complaint with the same force and effect as if set forth at length herein.

124.    The total amount that Cauldwell Wingate was entitled to be paid under the CW Contract, including change orders that DASNY approved, was approximately $52.3 million.

125.    Cauldwell Wingate has completed all of the work required under the CW Contract, except for the work which DASNY prevented it from performing.  Cauldwell Wingate is thus not in breach of the CW Contract, and is entitled to be paid the contract balance as well as the retainage DASNY has withheld.

126.    DASNY has only paid Cauldwell Wingate approximately $48.6 million, and has refused to pay the additional $3.7 million due under the CW Contract, including retainage.

127.    By refusing to pay the contract balance, including retainage, DASNY has breached the CW Contract.

128.    Based on the foregoing, Cauldwell Wingate is entitled to a judgment against DASNY for the unpaid balance of the CW Contract, in the amount to be determined at trial, but no less than $3.7 million.

## SECOND CLAIM
### (Breach of Contract – Extra Work Performed)

129.    Cauldwell Wingate repeats and realleges the allegations set forth in paragraphs 1 through 128 of this fourth-party complaint with the same force and effect as if set forth at length herein.

130.    The CW Contract contemplated that, in addition to the work provided for therein, there would be additional work as well, documented and approved through change orders.

131.    Cauldwell Wingate complied with the requirements of the CW Contract in submitting all change orders to DASNY.

132.    Cauldwell Wingate and its subcontractors also performed work pursuant to written FWDs and other written design changes mandated by DASNY and its agents.  Cauldwell Wingate has submitted written change orders for that work to DASNY, but DASNY has either refused to sign off on the change orders or has improperly rejected them.  The total amount of unapproved change orders for work which Cauldwell Wingate and its subcontractors have performed is approximately $5.4 million.

133.    All of these outstanding change orders include allowances for overhead and profit, as provided in the CW Contract.

134.    By refusing to approve these change orders for work that Cauldwell Wingate performed at DASNY's direction, DASNY has breached the CW Contract.

135.    Based on the foregoing, Cauldwell Wingate is entitled to a judgment against DASNY for the total of all unapproved change orders, in an amount to be determined at trial, but not less than $5.4 million.

### THIRD CLAIM
**(Impact/Delay Claim)**

136.    Cauldwell Wingate repeats and realleges the allegations set forth in paragraphs 1 through 135 of this fourth-party complaint with the same force and effect as if set forth at length herein.

137.    Cauldwell Wingate experienced significant, unforeseen difficulties in completing the CW Contract in a timely manner due to circumstances beyond the control of Cauldwell Wingate or its subcontractors and ultimately attributable to DASNY's acts and omissions.

138.    Those acts and omissions included, but were not limited to, DASNY's failure to ensure that the MEPS plans were properly coordinated with the other design plans, its failure properly to sequence the work of its various prime contractors, and indeed its faulty, incomplete and inaccurate contract documents which, as illustrated, ultimately served only as conceptual guidelines. Cauldwell Wingate and its subcontractors were significantly delayed in the completion of their work on the BCC Project, at significant cost.

139.    DASNY's actions in this regard were willful and malicious.

140.    Alternatively, these acts and omissions constituted grossly negligent conduct by DASNY.

141.    These acts and omissions led to extremely unreasonable delays, which were attributable to DASNY's breach of a fundamental contractual obligation.

142.    DASNY's acts and omissions, and the delays resulting therefrom, could not reasonably have been contemplated by Cauldwell Wingate at the time of its bid on the BCC Project.

143.    Based on the foregoing, Cauldwell Wingate is entitled to a judgment against DASNY for its delay claim in an amount to be determined at trial, but not less than $15.6 million.

## FOURTH CLAIM
### (Constructive Acceleration)

144.    Cauldwell Wingate repeats and realleges the allegations set forth in paragraphs 1 through 143 of this fourth-party complaint with the same force and effect as if set forth at length herein.

145.    Cauldwell Wingate encountered significant, uncontemplated delays directly attributable to DASNY and its agents.

146.    As a result of those delays, Cauldwell Wingate made timely and sufficient requests for an extension of the CW Contract schedule.

147.    DASNY denied Cauldwell Wingate's request for an extension of the CW Contract schedule and, instead, insisted that CW complete its work within a period of time that failed to take into account the delays that had occurred though no fault of Cauldwell Wingate or its subcontractors.

148.    As a result of DASNY's constructive acceleration, Cauldwell Wingate was required to expend additional resources to compensate for the lost time and to remain on schedule including, but not limited to, costs for hiring additional workers, inordinate premium time costs, costs for subsidizing subcontractors who were experiencing extremely significant cash flow difficulties, and Cauldwell Wingate's own overhead and profits and other costs associated with loss of efficiency.

149.    Cauldwell Wingate notified DASNY that its demand to accelerate constituted a constructive change in the CW Contract.

150.    Based on the foregoing, Cauldwell Wingate is entitled to a judgment against DASNY as a result of DASNY's constructive acceleration in an amount to be determined at trial, but no less than $730,000.

### FIFTH CLAIM
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

151.    Cauldwell Wingate repeats and realleges the allegations set forth in paragraphs 1 through 150 of this fourth-party complaint with the same force and effect as if set forth at length herein.

152.    By virtue of its actions and inactions detailed herein, DASNY sought to deprive Cauldwell Wingate of the benefits of the CW Contract.

153.    Among the numerous actions taken by DASNY to deprive Cauldwell Wingate of the benefits of the CW Contract were: its persistent refusal to adjust the artificial deadlines imposed upon Cauldwell Wingate even after DASNY knew that the BCC Project could not possibly be completed within those deadlines; refusal to approve change orders for work which it had orally directed Cauldwell Wingate to perform; its insistence that Cauldwell Wingate perform punch list work on items that had never been Cauldwell Wingate's responsibility under the CW Contract and then, after Cauldwell Wingate had agreed to do that work for an agreed upon amount, refusing to pay for the work and back charging Cauldwell Wingate for that work done by others; its improper refusal to release retainage; its failure to pay Cauldwell Wingate for work properly performed, such as the Canopy, relying on fabricated claims of improper work, and then levying back charges against Cauldwell Wingate for the dismantling work done by others; and its unjustified removal of key Cauldwell Wingate personnel from the BCC Project site.

154.     As a result of these and other actions taken by DASNY, Cauldwell Wingate was deprived of the full benefits to which it was entitled under the CW Contract.

155.     Based on the foregoing, Cauldwell Wingate is entitled to a judgment against DASNY as a result of DASNY's breach of the implied covenant of good faith and fair dealing in an amount to be determined at trial, but no less than $25.4 million.

## DEMAND FOR A JURY TRIAL

Cauldwell Wingate demands trial by jury as to all issues in the above matter.

WHEREFORE, Third-Party Defendant/Fourth-Party Plaintiff, Cauldwell Wingate Company, LLC, demands judgment as follows:

A.     On its first claim, in an amount to be determined at trial but in no event less than the sum of $3.7 million;

B.     On its second claim, in an amount to be determined at trial but in no event less than the sum of $5.4 million;

C.     On its third claim, in an amount to be determined at trial but in no event less than the sum of $15.6 million;

D.     On its fourth claim, in an amount to be determined at trial but in no event less than the sum of $730,000;

E.     On its fifth claim, in an amount to be determined at trial but in no event less than the sum of $25.4 million;

F.     Applicable interest on all claims;

G.    The costs and disbursements of this action; and

H.    Such other and further relief as to the Court appears just and proper.


Dated:  New York, New York
         March 14, 2008


                              INGRAM YUZEK GAINEN CARROLL &
                                BERTOLOTTI, LLP


                              By: _Patricia Hewitt_____
                                    Larry F. Gainen (LG-9351)
                                    Patricia Hewitt (PH-7769)
                              Attorneys for Third-Party Defendant/Fourth-
                                Party Plaintiff Cauldwell Wingate
                                Company, LLC
                              250 Park Avenue
                              New York, New York 10177
                              (212) 907-9600

# EXHIBIT A



**Dormitory Authority
State of New York**

*Gail Hill Gordes, Chair
Maryanne Gridley, Executive Director*

March 4, 2003

Ms. Susan Hayes, President
Cauldwell Wingate Company, LLC
380 Lexington Avenue
53rd Floor
New York, New York 10168

**RECEIVED**
**MAR 0 6 2003**
**CAULDWELL WINGATE**

Dear Ms. Hayes:

Enclosed is your executed contract for the project listed below:

Institution:    Bronx Criminal Court Complex
Work:           General Construction #2 - Fitout Work
Contract No.:   92561, 1380909999/CR58
Amount:         $46,995,000.00

Sincerely,

Jennifer M. Burtch
Contracts Unit

Enclosure

cc:    J. Andrus, Project Manager
       File

Corporate Headquarters
515 Broadway
Albany, New York 12207-2964

Tel 518-257-3000
Fax 518-257-3100

New York Office
One Penn Plaza, 52nd Floor
New York, New York 10119-0098

Tel 212-273-5000
Fax 212-273-5121

Buffalo Office
539 Franklin Street
Buffalo, New York 14202-1109

Tel: 716-884-6790
Fax: 716-884-9757

Web
www.dasny.org

*Cauldwell Wingate*

# BRONX CRIMINAL COURT COMPLEX

## GENERAL CONSTRUCTION #2 - FITOUT WORK

## CAULDWELL WINGATE COMPANY, LLC

## DA# 92561



## DORMITORY AUTHORITY - STATE OF NEW YORK

Main Office
515 Broadway
Albany, New York 12207-2964
(518) 257-3000

New York City Office
One Penn Plaza, 52nd Floor
New York, New York 10119-0098
(212) 273-5000

# CONTRACT



# DORMITORY AUTHORITY - STATE OF NEW YORK

Main Office
515 Broadway
Albany, NY 12207-2964
(518) 257-3000

New York City Office
One Penn Plaza, 52nd Floor
New York, NY 10119-0098
(212) 273-5000

# CONTRACT

This Agreement made as of the 20th day of December 2002, by and between the DORMITORY AUTHORITY -- State of New York, hereinafter referred to as the Owner and

CAULDWELL WINGATE COMPANY, LLC

380 Lexington Avenue, 53rd Floor, New York, New York 10168

hereinafter referred to as the   General Construction

Contractor, for Work at   Bronx Criminal Court Complex

WITNESSETH: That the Owner and the Contractor for the consideration named agree as follows:

1.    The Contractor shall Provide and shall perform all Work of every kind or nature whatsoever required and all other things necessary to complete in a proper and workmanlike manner the General Construction #2 - Fitout Work at Bronx Criminal Court Complex, DA # 92561, 1380909999/CR58 in strict accordance with the Contract Documents as defined in the General Conditions (and of which a listing of specifications and drawings are attached hereto) and in strict accordance with such changes as are ordered and approved pursuant to the Contract, and shall perform all other obligations imposed on such Contractor by the Contract.

2.    a.  The  Contractor agrees to perform all Work and labor required, necessary, proper for, or incidental to the Work, and to Furnish all supplies and materials required, necessary, proper for, or incidental to the Work for the total sum of Forty-Six Million Nine Hundred Ninety-Five Thousand   and 00/100 Dollars ($46,995,000.00), which sum shall be deemed to be in full consideration for the performance by the Contractor of all the duties and obligations of such Contractor under the Contract.

   b.  In the event the Form of Bid includes Alternates for an extended warranty service maintenance agreement, and the Owner's letter of intent accepts those Alternates, funds for said Alternates shall be encumbered upon the execution of said agreement. If the extended warranty service maintenance agreement is not signed concurrent with this Contract, the warranty service provider, by execution of this Contract, agrees that the warranty service provider shall execute the extended warranty service agreement which is included with the Contract Documents for the amounts stated in the accepted Alternates.

3.    The Contractor shall commence Work on the Contract at a time to be specified in a written notice to proceed issued by the Owner and complete the project no later than July 31, 2005.  The Contractor shall pay to the Owner, as liquidated damages, the sum of Ten Thousand   and 00/100 Dollars ($10,000.00) for each

and every day that the Contractor shall be in default after the above time of completion.

IN WITNESS WHEREOF, the parties hereto have executed this Contract as of the day and year first above written.

CAULDWELL WINGATE COMPANY,    DORMITORY AUTHORITY
LLC
CONTRACTOR

By: _____    ⁱ    By: _____

Title: Susan L. Hayes, President    Title: _____ Managing Director of Construction

_____
(Warranty Service Provider - Legal Name)

By: _____

Title: _____

ⁱ    If a corporation, signer must be President, Vice-President or other authorized officer.
    If a Limited Liability Company (LLC), signer must be a member or manager.
    If a Limited Liability Partnership (LLP), signer must be a partner.
    If a Limited Partnership, signer must be an authorized partner.
    If a general partnership, signer must be a partner.
    If a sole proprietorship, signer must be the owner.

May 2002                                    2

ACKNOWLEDGEMENT OF DORMITORY AUTHORITY OFFICER EXECUTING CONTRACT

STATE OF NEW YORK )
                      ) ss:
COUNTY OF ALBANY )

On the 3rd day of _____ in the year 2003 before me personally came DOUGLAS VAN VLECK to me known, who, being by me duly sworn, did depose and say that he resides at 28 Parry Road, Wynantskill, New York 12198, that he is the Managing Director, Construction of Dormitory Authority, the corporation described in and which executed the above instrument; and that he signed his name thereto by order of the Board of Directors of said corporation.

_____
Notary Public

                                    PEARL ELLEN ROCK
                                    Notary Public, State of New York
                                    No. 01RO5023790
                                    Qualified in Albany County
                                    Commission Expires Jan 18, 20 0 6

ACKNOWLEDGEMENT OF CONTRACTOR, IF A PARTNERSHIP, LIMITED LIABILITY
COMPANY OR INDIVIDUAL

STATE OF NEW YORK
                        )
                        ) ss:
COUNTY OF ____ NY       )

On the 30th day of December in the year 2002, before me, the undersigned, a Notary Public in and for said State, personally appeared Susan L Hayes of CAULDWELL WINGATE COMPANY, LLC, personally known or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public

            PATRICK J. HARDY
     Notary Public, State of New York
            No. 31-5052980
     Qualified in New York County
     Commission Expires Dec. 11, 2005

## ACKNOWLEDGEMENT OF WARRANTY SERVICE PROVIDER, IF A CORPORATION

STATE OF NEW YORK          }
                           } ss:
COUNTY OF _____     }

On the ___ ___ day of _____ in the year 20____ , before me personally came

_____ to me known, who, being by me duly sworn, did depose and say that

he/she reside(s) at _____ (include street and street

number, if any); that he/she is the _____ of _____ , the
corporation described in and which executed the foregoing instrument; and that he/she signed his/her name
thereto by authority of the Board of Directors of said corporation.

_____
        Notary Public

## ACKNOWLEDGEMENT OF WARRANTY SERVICE PROVIDER, IF A PARTNERSHIP, LIMITED LIABILITY COMPANY OR INDIVIDUAL

STATE OF NEW YORK          }
                           } ss:
COUNTY OF _____     }

On the _____ day of _____ in the year 20_____ , before me, the undersigned, a Notary Public

in and for said State, personally appeared _____ , personally known or
proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed
to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon
behalf of which the individual(s) acted, executed the instrument.

_____
        Notary Public

## SPECIFICATIONS AND DRAWINGS LISTING

The following is a list of contract specifications and drawings placed for bid; changes, additions, and deletions made by addenda may not be listed, but remain a part of the Contract as referenced in the Form of Bid.

6

## DRAWING LIST
CONTRACT 9 GC No1 Fitout

CONTRACT 16 Architectural Woodwork No. 1
CONTRACT 17 Architectural Woodwork No. 2

| NUMBER | TITLE | ISSUE DATE | REVISION DATE |
|---|---|---|---|
| COVER SHEET | ARCHITECTURAL | | |
| A-001 | SYMBOLS | | 8/19/02 |
| A-002 | SITE SURVEY | 10/17/00 | 8/19/02 |
| A-004 | EXISTING SITE PLAN-BORING LOCATIONS | 3/15/00 | 8/19/02 |
| A-004.1 | ROCK CONTOUR PLAN-RC-1 Class 1-65 20 Ton | NOT ISSUED | |
| A-004.1 | ROCK CONTOUR PLAN-RC-2 Class 4-65 8 Ton | NOT ISSUED | |
| A-004.1 | RECORD OF BORINGS 2345 [B1] | NOT ISSUED | |
| A-004.1 | RECORD OF BORINGS 2345 [B2] | NOT ISSUED | |
| A-004.1 | RECORD OF BORINGS 2542 [B1] | NOT ISSUED | |
| A-004.1 | RECORD OF BORINGS 2487 [B1] | NOT ISSUED | |
| A-004.1 | RECORD OF BORINGS 2487 [B2] | NOT ISSUED | |
| A-004.1 | RECORD OF BORINGS 2906 [B1] | NOT ISSUED | |
| A-004.1 | RECORD OF BORINGS 2935-1 | NOT ISSUED | |
| A-004.1 | RECORD OF BORINGS 2935-2 | NOT ISSUED | |
| A-004.1 | RECORD OF BORINGS 2935-3 | NOT ISSUED | |
| A-004.1 | RECORD OF BORINGS 2935-4 | NOT ISSUED | |
| A-004.1 | RECORD OF BORINGS 2935-5 | NOT ISSUED | |
| A-004.1 | RECORD OF BORINGS 2985-6 | NOT ISSUED | |
| A-004.1 | BORINGS 1 of 3 BY JERSEY BORING & DRILLING | NOT ISSUED | |
| A-004.1 | BORINGS 2 of 3 BY JERSEY BORING & DRILLING | NOT ISSUED | |
| A-004.1 | BORINGS 3 of 3 BY JERSEY BORING & DRILLING | NOT ISSUED | |
| A-004.2 | A-004.2  WATER CONTOUR PLAN (DATA 9/8/2000) | NOT ISSUED | |
| GS-1 | GEOLOGIC SECTION A-A | NOT ISSUED | |
| GS-1 | GEOLOGIC SECTION B-B | NOT ISSUED | |
| GS-1 | GEOLOGIC SECTION C-C | NOT ISSUED | |
| A-006 | SITE LAYOUT PLAN | 2/9/01 | |
| A-007 | SITE MATERIALS PLAN | 2/9/01 | 8/19/02 |
| A-008 | PAVEMENT KEY PLAN | 2/9/01 | 8/19/02 |
| A-008.1 | GROUND FLOOR TOP OF SLAB ELEVATIONS | 10/17/00 | 8/19/02 |
| A-009 | SITE PLANTING PLAN | 2/9/01 | 8/19/02 |
| A-010 | ROOF GARDEN PLANTING PLAN | NOT ISSUED | |
| A-011 | SITE PAVEMENT DETAILS (ON GRADE) | 2/9/01 | 8/19/02 |
| A-012 | SITE PAVEMENT DETAILS (ON STRUCTURE) | 12/11/00 | 8/19/02 |
| A-013 | SITE DETAILS-ARCHITECTURAL ELEMENTS | 10/17/00 | 8/19/02 |
| A-013.1 | SITE DETAILS-ARCHITECTURAL ELEMENTS | 10/17/00 | 8/19/02 |
| A-014 | SITE DETAILS-ARCHITECTURAL ELEMENTS | 10/17/00 | 8/19/02 |
| A-014.1 | SITE DETAILS-ARCHITECTURAL ELEMENTS | 10/17/00 | 8/19/02 |
| A-014.2 | GUARD BOOTH | 5/7/01 | 8/19/02 |
| A-014.3 | GUARD BOOTH - PLAN AND SECTION DETAILS | 1/30/01 | 8/19/02 |
| A-015 | SITE DETAILS-MATERIALS TRANSITIONS | 10/17/00 | 8/19/02 |
| A-015.1 | SITE DETAILS-MATERIALS TRANSITIONS | 10/17/00 | 8/19/02 |
| A-016 | SITE PLAN ENLARGEMENTS | 2/9/01 | 8/19/02 |
| A-017 | SITE PLANTING DETAILS | 2/9/01 | 8/19/02 |

| NUMBER | TITLE | ISSUE DATE | REVISION DATE |
|---|---|---|---|
| A- 018 | SITE FURNISHING DETAILS | 2/9/01 | 8/19/02 |
| A- 019 | DEMOLITION PLAN | NOT ISSUED | |
| A- 020 | BUILDERS PAVEMENT PLAN AND PROFILES | 3/10/00 | 8/19/02 |
| A- 021 | BUILDERS PAVEMENT PLAN AND PROFILES | 7/10/00 | 8/19/02 |
| A- 022 | BUILDERS PAVEMENT PLAN AND PROFILES | 7/10/00 | 8/19/02 |
| A- 023 | BUILDERS PAVEMENT PLAN AND PROFILES | 8/10/00 | 8/19/02 |
| A- 024 | BUILDERS PAVEMENT PLAN AND PROFILES | 8/10/00 | 8/19/02 |
| A- 025 | BUILDERS PAVEMENT PLAN AND PROFILES | 8/10/00 | 8/19/02 |
| A- 026 | BUILDERS PAVEMENT PLAN AND PROFILES | 8/10/00 | 8/19/02 |
| A- 027 | BUILDERS PAVEMENT PLAN AND PROFILES | 8/10/00 | 8/19/02 |
| A- 028 | BUILDERS PAVEMENT PLAN AND PROFILES | 8/10/00 | 8/19/02 |
| A- 040 | SITE DETAILS | 10/17/00 | 8/19/02 |
| A- 041 | SITE DETAILS | 10/17/00 | 8/19/02 |
| ST- 030 | STREETSCAPE DRAWINGS | NOT ISSUED | |
| ST- 031 | STREETSCAPE DRAWINGS | NOT ISSUED | |
| ST- 032 | ST- 032 STREETSCAPE DRAWINGS | NOT ISSUED | |
| ST- 034 | ST- 034 STREETSCAPE DRAWINGS | NOT ISSUED | |
| C- 1 | SITE DRAINAGE PLAN | 8/7/00 | 11/1/01 |
| C- 2 | SITE PLAN UTILITIES | 8/7/00 | 11/1/01 |
| C- 3 | DETENTION BASIN & ORIFICE DETAILS | 8/7/00 | 11/1/01 |
| C- 4 | MISCELLANEOUS DETAILS | 8/7/00 | 11/1/01 |
| C- 5 | FLAGPOLE LIGHTING PLAN | 4/20/01 | 11/1/01 |
| A- 100 | FLOOR PLAN/Level B2-Basement | 10/17/00 | 8/19/02 |
| A- 101 | FLOOR PLAN/Level B1-Basement Mezzanine | 10/17/00 | 2/19/02 |
| A- 102 | FLOOR PLAN/Ground Floor | 10/17/00 | 8/19/02 |
| A- 103 | FLOOR PLAN/Mezzanine Level | 10/17/00 | 11/19/02 |
| A- 104 | FLOOR PLAN/Level 2 | 10/17/00 | 8/19/02 |
| A- 105 | FLOOR PLAN/Level 3 | 10/17/00 | 8/19/02 |
| A- 106 | FLOOR PLAN/Level 4 | 10/17/00 | 8/19/02 |
| A- 107 | FLOOR PLAN/Level 5 | 10/17/00 | 8/19/02 |
| A- 108 | FLOOR PLAN/Level 6 | 10/17/00 | 8/19/02 |
| A- 109 | FLOOR PLAN/Level 7 | 10/17/00 | 8/19/02 |
| A- 110 | FLOOR PLAN/Level 8 | 10/17/00 | 8/19/02 |
| A- 111 | FLOOR PLAN/Level 9 | 10/17/00 | 8/19/02 |
| A- 112 | FLOOR PLAN/Level 10 Roof/Mech. | 10/17/00 | 8/19/02 |
| A- 113 | FLOOR PLAN/Level 11 High Roof | 10/17/00 | 8/19/02 |
| A- 100C | CURB & SLAB EDGE/Level B2-Basement | 12/11/00 | 8/19/02 |
| A- 101C | CURB & SLAB EDGE/Level B1-Basement Mezzanine | 12/11/00 | 8/19/02 |
| A- 102C | CURB & SLAB EDGE/Ground Floor | 12/11/00 | 8/19/02 |
| A- 103C | CURB & SLAB EDGE/Mezzanine Level | 12/11/00 | 8/19/02 |
| A- 104C | CURB & SLAB EDGE/Level 2 | 12/11/00 | 8/19/02 |
| A- 105C | CURB & SLAB EDGE/Level 3 | 12/11/00 | 8/19/02 |
| A- 106C | CURB & SLAB EDGE/Level 4 | 12/11/00 | 8/19/02 |
| A- 107C | CURB & SLAB EDGE/Level 5 | 12/11/00 | 8/19/02 |
| A- 108C | CURB & SLAB EDGE/Level 6 | 12/11/00 | 8/19/02 |
| A- 109C | CURB & SLAB EDGE/Level 7 | 12/11/00 | 8/19/02 |
| A- 110C | CURB & SLAB EDGE/Level 8 | 12/11/00 | 8/19/02 |
| A- 111C | CURB & SLAB EDGE/Level 9 | 12/11/00 | 8/19/02 |
| A- 112C | CURB & SLAB EDGE/Level 10 Roof/Mech. | 12/11/00 | 8/19/02 |
| A- 113C | CURB & SLAB EDGE/Level 11 High Roof | 12/11/00 | 8/19/02 |
| A- 100.1 | AREA 1-LEVEL B2 | 10/17/00 | 2/19/02 |

| NUMBER | TITLE | ISSUE DATE | REVISION DATE |
|--------|-------|-----------|---------------|
| A-100.2 | AREA 2 -LEVEL B2 | 10/17/00 | 8/19/02 |
| A-100.3 | AREA 3 -LEVEL B3 | 10/17/00 | 8/19/02 |
| A-100.4 | AREA 4 -LEVEL B2 | 10/17/00 | 8/19/02 |
| A-101.1 | AREA 1 -LEVEL B1 | 10/17/00 | 8/19/02 |
| A-101.2 | AREA 2 -LEVEL B1 | 10/17/00 | 8/19/02 |
| A-101.3 | AREA 3 -LEVEL B1 | 10/17/00 | 8/19/02 |
| A-101.4 | AREA 4 -LEVEL B1 | 10/17/00 | 8/19/02 |
| A-102.1 | AREA 1 -LEVEL GROUND | 10/17/00 | 10/1/02 |
| A-102.2 | AREA 2 -LEVEL GROUND | 10/17/00 | 8/19/02 |
| A-102.3 | AREA 3 -LEVEL GROUND | 10/17/00 | 8/19/02 |
| A-102.4 | AREA 4 -LEVEL GROUND | 10/17/00 | 8/19/02 |
| A-103.1 | AREA 1 -LEVEL MEZZANINE | 10/17/00 | 8/19/02 |
| A-103.2 | AREA 2 -LEVEL MEZZANINE | 10/17/00 | 8/19/02 |
| A-103.3 | AREA 3 -LEVEL MEZZANINE | 10/17/00 | 8/19/02 |
| A-104.1 | AREA 1 -LEVEL 2 | 10/17/00 | 8/19/02 |
| A-104.2 | AREA 2 -LEVEL 2 | 10/17/00 | 8/19/02 |
| A-104.3 | AREA 3 -LEVEL 2 | 10/17/00 | 8/19/02 |
| A-105.1 | AREA 1 -LEVEL 3 | 10/17/00 | 8/19/02 |
| A-105.2 | AREA 2 -LEVEL 3 | 10/17/00 | 8/19/02 |
| A-105.3 | AREA 3 -LEVEL 3 | 10/17/00 | 8/19/02 |
| A-106.1 | AREA 1 -LEVEL 4 | 10/17/00 | 8/19/02 |
| A-106.2 | AREA 2 -LEVEL 4 | 10/17/00 | 8/19/02 |
| A-106.3 | AREA 3 -LEVEL 4 | 10/17/00 | 8/19/02 |
| A-107.1 | AREA 1 -LEVEL 5 | 10/17/00 | 8/19/02 |
| A-107.2 | AREA 2 -LEVEL 5 | 10/17/00 | 8/19/02 |
| A-107.3 | AREA 3 -LEVEL 5 | 10/17/00 | 8/19/02 |
| A-108.1 | AREA 1 -LEVEL 6 | 10/17/00 | 8/19/02 |
| A-108.2 | AREA 2 -LEVEL 6 | 10/17/00 | 8/19/02 |
| A-108.3 | AREA 3 -LEVEL 6 | 10/17/00 | 8/19/02 |
| A-109.1 | AREA 1 -LEVEL 7 | 10/17/00 | 8/19/02 |
| A-109.2 | AREA 2 -LEVEL 7 | 10/17/00 | 8/19/02 |
| A-109.3 | AREA 3 -LEVEL 7 | 10/17/00 | 8/19/02 |
| A-110.1 | AREA 1 -LEVEL 8 | 10/17/00 | 8/19/02 |
| A-110.2 | AREA 2 -LEVEL 8 | 10/17/00 | 8/19/02 |
| A-110.3 | AREA 3 -LEVEL 8 | 10/17/00 | 8/19/02 |
| A-111.1 | AREA 1 -LEVEL 9 | 10/17/00 | 8/19/02 |
| A-111.2 | AREA 2 -LEVEL 9 | 10/17/00 | 8/19/02 |
| A-111.3 | AREA 3 -LEVEL 9 | 10/17/00 | 8/19/02 |
| A-112.1 | AREA 1 -LEVEL 10 | 10/17/00 | 8/19/02 |
| A-112.2 | AREA 2 -LEVEL 10 | 10/17/00 | 8/19/02 |
| A-112.3 | AREA 3 -LEVEL 10 | 10/17/00 | 8/19/02 |
| A-113.1 | AREA 1 -LEVEL ROOF | 10/17/00 | 8/19/02 |
| A-113.2 | AREA 2 | 10/17/00 | 8/19/02 |
| A-113.3 | AREA 3 | 10/17/00 | 8/19/02 |
| A-150.1 | AREA 1 -LEVEL B2 | 10/17/00 | 8/19/02 |
| A-150.2 | AREA 2 -LEVEL 10 | 10/17/00 | 8/19/02 |
| A-150.3 | A-150.3 AREA 3 | 10/17/00 | 8/19/02 |
| A-150.4 | A-150.4 AREA 4 | 10/17/00 | 8/19/02 |
| A-151.1 | AREA 1 -LEVEL B1 | 10/17/00 | 8/19/02 |
| A-151.2 | AREA 2 -LEVEL B1 | 10/17/00 | 8/19/02 |
| A-151.3 | AREA 3 -LEVEL B1 | 10/17/00 | 8/19/02 |

| NUMBER | TITLE | ISSUE DATE | REVISION DATE |
|---|---|---|---|
| A-151.4 | AREA 4 -LEVEL B1 | 10/17/00 | 8/19/02 |
| A-152.1 | AREA 1 -LEVEL GROUND | 10/17/00 | 8/19/02 |
| A-152.2 | AREA 2 -LEVEL GROUND | 10/17/00 | 8/19/02 |
| A-152.3 | AREA 3 -LEVEL GROUND | 10/17/00 | 10/11/02 |
| A-152a.1 | AREA 1 PLAZA LIGHTING PLAN | 10/17/00 | 8/19/02 |
| A-152a.4 | AREA 4 PLAZA LIGHTING PLAN | 10/17/00 | 8/19/02 |
| A-153.1 | AREA 1 -LEVEL MEZZANINE | 10/17/00 | 8/19/02 |
| A-153.2 | AREA 2 -LEVEL MEZZANINE | 10/17/00 | 8/19/02 |
| A-153.3 | AREA 3 -LEVEL MEZZANINE | 10/17/00 | 10/11/02 |
| A-154.1 | AREA 1 -LEVEL 2 | 10/17/00 | 8/19/02 |
| A-154.2 | AREA 2 -LEVEL 2 | 10/17/00 | 8/19/02 |
| A-154.3 | AREA 3 -LEVEL 2 | 10/17/00 | 8/19/02 |
| A-155.1 | AREA 1 -LEVEL 3 | 10/17/00 | 8/19/02 |
| A-155.2 | AREA 2 -LEVEL 3 | 10/17/00 | 8/19/02 |
| A-155.3 | AREA 3 -LEVEL 3 | 10/17/00 | 8/19/02 |
| A-155a.1 | AREA 1 -LOW ROOMS@COURT FLR 3-6 | 10/17/00 | 8/19/02 |
| A-155a.2 | AREA 2 -LOW ROOMS@COURT FLR 3-6 | 10/17/00 | 8/19/02 |
| A-155a.3 | AREA 3 -LOW ROOMS@COURT FLR 3-6 | 10/17/00 | 8/19/02 |
| A-155b.1 | AREA 1 -JURY ASSEMBLY RAMP ROOF | 10/17/00 | 8/19/02 |
| A-156.1 | AREA 1 -LEVEL 4 | 10/17/00 | 8/19/02 |
| A-156.2 | AREA 2 -LEVEL 4 | 10/17/00 | 8/19/02 |
| A-156.3 | AREA 3 -LEVEL 4 | 10/17/00 | 8/19/02 |
| A-157.1 | AREA 1 -LEVEL 5 | 10/17/00 | 8/19/02 |
| A-157.2 | AREA 2 -LEVEL 5 | 10/17/00 | 8/19/02 |
| A-157.3 | AREA 3 -LEVEL 5 | 10/17/00 | 8/19/02 |
| A-158.1 | AREA 1 -LEVEL 6 | 10/17/00 | 8/19/02 |
| A-158.2 | AREA 2 -LEVEL 6 | 10/17/00 | 8/19/02 |
| A-158.3 | AREA 3 -LEVEL 6 | 10/17/00 | 8/19/02 |
| A-159.1 | AREA 1 -LEVEL 7 | 10/17/00 | 8/19/02 |
| A-159.2 | AREA 2 -LEVEL 7 | 10/17/00 | 8/19/02 |
| A-159.3 | AREA 3 -LEVEL 7 | 10/17/00 | 8/19/02 |
| A-160.1 | AREA 1 -LEVEL 8 | 10/17/00 | 8/19/02 |
| A-160.2 | AREA 2 -LEVEL 8 | 10/17/00 | 8/19/02 |
| A-160.3 | AREA 3 -LEVEL 8 | 10/17/00 | 8/19/02 |
| A-161.1 | AREA 1 -LEVEL 9 | 10/17/00 | 8/19/02 |
| A-161.2 | AREA 2 -LEVEL 9 | 10/17/00 | 8/19/02 |
| A-161.3 | AREA 3 -LEVEL 9 | 10/17/00 | 8/19/02 |
| A-162.1 | AREA 1 -LEVEL 10 | 10/17/00 | 8/19/02 |
| A-162.2 | AREA 2 -LEVEL 10 | 10/17/00 | 8/19/02 |
| A-162.3 | AREA 3 -LEVEL 10 | 10/17/00 | 8/19/02 |
| A-201 | BUILDING SECTION/Looking West | 10/17/00 | 8/19/02 |
| A-202 | BUILDING SECTION/Looking West | 10/17/00 | 8/19/02 |
| A-203 | BUILDING SECTION/Looking West | 10/17/00 | 8/19/02 |
| A-204 | BUILDING SECTION/Looking East | 10/17/00 | 8/19/02 |
| A-205 | BUILDING SECTION/Looking East | 10/17/00 | 8/19/02 |
| A-207 | BUILDING SECTION/Looking East | 10/17/00 | 8/19/02 |
| A-208 | BUILDING SECTION/Looking North | 10/17/00 | 8/19/02 |
| A-210 | BUILDING SECTION/Looking South | 10/17/00 | 8/19/02 |
| A-211 | BUILDING SECTION/Looking South | 10/17/00 | 8/19/02 |
| A-212 | BUILDING SECTION/Looking South | 10/17/00 | 8/19/02 |
| A-213 | BUILDING SECTION/Looking South | 10/17/00 | 8/19/02 |

| NUMBER | TITLE | ISSUE DATE | REVISION DATE |
|---|---|---|---|
| A-214 | BUILDING SECTION/Loading South | 10/17/00 | 8/19/02 |
| A-230 | SIDEWALK CONDITIONS | 10/17/00 | 8/19/02 |
| A-231 | SIDEWALK CONDITIONS | 10/17/00 | 8/19/02 |
| A-232 | SIDEWALK CONDITIONS | 10/17/00 | 8/19/02 |
| A-240 | CON ED VAULT DETAILS | 10/17/00 | 8/19/02 |
| A-241 | CON ED VAULT DETAILS | 10/17/00 | 8/19/02 |
| A-242 | AREAWAY DETAIL | 10/17/00 | 8/19/02 |
| A-251 | BUILDING ELEVATION/South | 10/17/00 | 8/19/02 |
| A-252 | BUILDING ELEVATION/North | 10/17/00 | 8/19/02 |
| A-253 | BUILDING ELEVATION/East | 10/17/00 | 8/19/02 |
| A-254 | BUILDING ELEVATION/West | 10/17/00 | 8/19/02 |
| A-260 | ELEVATIONS GROUND LEVEL | 10/17/00 | 8/19/02 |
| A-261 | ELEVATIONS GROUND LEVEL | 10/17/00 | 8/19/02 |
| A-262 | ELEVATIONS AND PASSAGEWAY | 10/17/00 | 8/19/02 |
| A-263 | EAST AND WEST ELEVATIONS | 10/17/00 | 8/19/02 |
| A-264 | SOUTH ELEVATION | 10/17/00 | 8/19/02 |
| A-265 | PLAZA ELEVATIONS/ LOBBY ENTRY/ LIGHT MONITOR | 6/15/01 | 8/19/02 |
| A-270 | GROUND FLOOR STAIR VENTILATION BUILDING | 10/17/00 | 8/19/02 |
| A-271 | GROUND FLOOR VENTILATION BUILDING | 10/17/00 | 8/19/02 |
| A-272 | JURY ASSEMBLY ELEVATION | 10/17/00 | 8/19/02 |
| A-273 | JURY ASSEMBLY ELEVATION | 10/17/00 | 8/19/02 |
| A-280 | ROOF SECTION/ MECHANICAL PENTHOUSE | 10/17/00 | 8/19/02 |
| A-281 | ROOF SECTION | 10/17/00 | 8/19/02 |
| A-301 | FOLDED WALL /type 1- SCHEDULE | 10/17/00 | 8/19/02 |
| A-301 | FOLDED WALL /type 1- 18'-floor to floor | 10/17/00 | 8/19/02 |
| A-301.1 | FOLDED WALL /type 1- 12' & 15'-floor to floor | 10/17/00 | 8/19/02 |
| A-301.2 | FOLDED WALL /type 1- section details | 10/17/00 | 8/19/02 |
| A-301.3 | FOLDED WALL /type 1- plan details | 10/17/00 | 8/19/02 |
| A-301.4 | FOLDED WALL /type 1- details mechanical penthouse | 10/17/00 | 8/19/02 |
| A-301M | FOLDED WALL /type 1- mock-up | 10/17/00 | 8/19/02 |
| A-301B | FOLDED WALL /type 1- blast mock-up | 10/17/00 | 8/19/02 |
| A-302 | OFFICE WALL /type 2- SCHEDULE | 10/17/00 | 8/19/02 |
| A-302 | OFFICE WALL /type 2- 18'-floor to floor | 10/17/00 | 8/19/02 |
| A-302.1 | OFFICE WALL /type 2- 12'-floor to floor | 10/17/00 | 8/19/02 |
| A-302.2 | OFFICE WALL /type 2- section details | 10/17/00 | 8/19/02 |
| A-302.3 | OFFICE WALL /type 2- plan details | 10/17/00 | 8/19/02 |
| A-302.4 | PUBLIC CORRIDOR /type 2 | 10/17/00 | 8/19/02 |
| A-302.5 | PUBLIC CORRIDOR /type 2 | 10/17/00 | 8/19/02 |
| A-302.6 | OFFICE WALL /type 2 - 18' floor to floor | 2/8/02 | 8/19/02 |
| A-302M | OFFICE WALL /type 2- mock-up | 10/17/00 | 8/19/02 |
| A-302B | OFFICE WALL /type 2- blast mock-up | 10/17/00 | 8/19/02 |
| A-303.2s | JURY ASSEMBLY RAMP WALL /type 3- schedule | 10/17/00 | 8/19/02 |
| A-303.2 | JURY ASSEMBLY RAMP WALL /type 3 | 10/17/00 | 8/19/02 |
| A-303.3s | ENCLOSURE SCHEDULE - type 3- light monitor | 10/17/00 | 8/19/02 |
| A-303.3 | LIGHT MONITOR WALL /type 3/storefront | 10/17/00 | 8/19/02 |
| A-303.4s | ENCLOSURE SCHEDULE - type 3- entry walls | 10/17/00 | 8/19/02 |
| A-303.4 | TYPE 3 - ENTRY WALL/ lobby entry | 10/17/00 | 8/19/02 |
| A-303.4.1 | TYPE 3 - ENTRY WALL/ lobby entry | 10/17/00 | 8/19/02 |
| A-303.4.2 | TYPE 3 - STOREFRONT/ west lobby entry | 10/17/00 | 8/19/02 |

| NUMBER | TITLE | ISSUE DATE | REVISION DATE |
|---|---|---|---|
| A-303.4.3 | TYPE 3 - STOREFRONT/ east lobby entry | 10/17/00 | 8/19/02 |
| A-303.6 | DETAILS/ jury assembly ramp and light monitor | 10/17/00 | 8/19/02 |
| A-303.7 | DETAILS/ light monitors | 10/17/00 | 8/19/02 |
| A-303.8 | ENTRY WALL/type 3 / details | 10/17/00 | 8/19/02 |
| A-303.9 | ENTRY WALL/type 3 / details | 10/17/00 | 8/19/02 |
| A-304s | PUBLIC STAIRS/type 4- schedule | 10/17/00 | 8/19/02 |
| A-304 | PUBLIC STAIRS/type 4 | 10/17/00 | 8/19/02 |
| A-304.1 | PUBLIC STAIRS/type 4- details | 10/17/00 | 8/19/02 |
| A-304.2 | PUBLIC STAIRS/type 4- details | 10/17/00 | 8/19/02 |
| A-304.3 | PUBLIC STAIRS/type 4 | 10/17/00 | 8/19/02 |
| A-304M | PUBLIC STAIRS/type 4 -mock-up | 10/17/00 | 8/19/02 |
| A-305s | SECURE LOBBY WALL/type 5- scope | 10/17/00 | 8/19/02 |
| A-305 | SECURE LOBBY WALL/type 5 | 10/17/00 | 8/19/02 |
| A-306s | SKYLIGHT & SLOPE GLAZING/type 6- schedule | 10/17/00 | 8/19/02 |
| A-306 | SKYLIGHT & SLOPED GLAZING/type 6 plan | 10/17/00 | 8/19/02 |
| A-306.1 | SKYLIGHT & SLOPED GLAZING/type 6- section | 10/17/00 | 8/19/02 |
| A-306.2 | SKYLIGHT & SLOPED GLAZING/type 6- details | 10/17/00 | 8/19/02 |
| A-306.3 | SKYLIGHT/type 6- plans and sections | 10/17/00 | 8/19/02 |
| A-306.4 | SKYLIGHT/type 6- details | 10/17/00 | 8/19/02 |
| A-306.5 | SLOPED GLAZING/sloped glazing over stair - details | 10/17/00 | 8/19/02 |
| A-307s | LOUVERS/type 7- schedule | 10/17/00 | 8/19/02 |
| A-307 | LOUVERS/type 7- ground floor mechanical rooms | 10/17/00 | 8/19/02 |
| A-307.1 | LOUVERS/type 7- louvers mezzanine plan and sections | 10/17/00 | 8/19/02 |
| A-307.2 | LOUVERS/type 7- 7th floor mech. Room | 10/17/00 | 8/19/02 |
| A-307.3 | LOUVERS/type 7- roof mechanical penthouse | 10/17/00 | 8/19/02 |
| A-307.4 | LOUVERS/type 7- sectional details | 10/17/00 | 8/19/02 |
| A-307.5 | LOUVERS/type 7- plan details | 10/17/00 | 8/19/02 |
| A-308s | METAL PANEL /type 8- schedule | 10/17/00 | 8/19/02 |
| A-308 | METAL PANEL /type 8 | 10/17/00 | 8/19/02 |
| A-308.1 | METAL SOFFIT & PANEL /type 8- beam and columns | 10/17/00 | 8/19/02 |
| A-308.2 | METAL PANEL- misc. Sections | 10/17/00 | 8/19/02 |
| A-308.3 | METAL PANEL DETAILS | 10/17/00 | 8/19/02 |
| A-309s | PRECAST FLAT WALL PANELS/type 9- schedule | 10/17/00 | 8/19/02 |
| A-309 | PRECAST CURVED WALL PANELS AT JA RAMP/type 9 | 10/17/00 | 8/19/02 |
| A-309.1 | PRECAST CURVED WALL PANELS/type 9 | 10/17/00 | 8/19/02 |
| A-309.2 | PRECAST CURVED WALL PANELS/type 9- details | 10/17/00 | 8/19/02 |
| A-309.3 | PRECAST CONCRETE PANELS/ type 9 | 10/17/00 | 8/19/02 |
| A-310 | ENTRANCE CANOPY | 10/17/00 | 8/19/02 |
| A-330 | ROOFING - Detail key | 10/17/00 | 8/19/02 |
| A-331 | ROOFING DETAILS | 10/17/00 | 8/19/02 |
| FM - 1 | FAÇADE MAINTENANCE SYSTEM | 10/17/00 | 8/19/02 |
| FM - 2 | FAÇADE MAINTENANCE SYSTEM | 10/17/00 | 8/19/02 |
| FM - 202 | FAÇADE MAINTENANCE SYSTEM | 10/17/00 | 8/19/02 |
| FM - 201 | FAÇADE MAINTENANCE SYSTEM | 10/17/00 | 8/19/02 |
| FM - 251 | FAÇADE MAINTENANCE SYSTEM | 10/17/00 | 8/19/02 |
| FM - 252 | FAÇADE MAINTENANCE SYSTEM | 10/17/00 | 8/19/02 |
| FM - 253 | FAÇADE MAINTENANCE SYSTEM | 10/17/00 | 8/19/02 |
| FM - 254 | FAÇADE MAINTENANCE SYSTEM | 10/17/00 | 8/19/02 |
| A-401 | PLANS ELEVATIONS/Typical Courtroom/Levels 3-6 | 10/17/00 | 8/19/02 |

| NUMBER | TITLE | ISSUE DATE | REVISION DATE |
|--------|-------|-----------|---------------|
| A- 402 | PLANS ELEVATIONS/Typical Grand Jury/Level 7 | 10/17/01 | 8/19/02 |
| A- 403 | PLANS ELEVATIONS/Large Courtroom/Basement | 8/10/00 | 8/19/02 |
| A- 403.1 | PLANS ELEVATIONS/Double Jury Courtroom #264 | 8/10/00 | 8/19/02 |
| A- 403.2 | PLANS ELEVATIONS/Arraignment Courtroom #282 | 8/10/00 | 8/19/02 |
| A- 403.3 | PLANS ELEVATIONS/Typical Arraignment Courtroom #261 | 8/10/00 | 8/19/02 |
| A- 404 | PLANS ELEVATIONS/Arraignment Courtroom/Basement | 8/10/00 | 8/19/02 |
| A- 405 | ELEVATIONS/Typical Courtroom Corridors/Levels 3-6 | 10/17/01 | 10/11/02 |
| A- 405.1 | ELEVATIONS/Typical Courtroom Corridors/Levels 3-6 | 10/17/01 | 10/11/02 |
| A- 405.2 | STAIR/CORRIDOR/Interior Glass Enclosure | 5/7/01 | 8/19/02 |
| A- 405.2.1 | STAIR/CORRIDOR/GW-3 RL-1 | 5/7/01 | 3/19/02 |
| A- 405.3 | ELEVATIONS/Typical Courtroom Corridors/Levels 3-6 | 12/11/00 | 8/19/02 |
| A- 405.4 | COURTROOM PUBLIC CORRIDOR/Elevations Details/ Level B2 | 3/27/01 | 10/11/02 |
| A- 405.5 | INTERIOR ENCLOSURE/Metal Panel Strut Enclosure | 6/18/01 | 8/19/02 |
| A- 405.6 | INTERIOR ENCLOSURE/Jury Assembly Vending Area | 6/18/01 | 8/19/02 |
| A- 406 | ELEVATIONS/OCA Clerk Counter/Level 2 | 10/17/01 | 8/19/02 |
| A- 407 | ELEVATIONS/Typical Justice Suite Corridors/Levels 8-9 | 10/17/01 | 8/19/02 |
| A- 408 | ELEVATIONS / LOBBY INTERIOR | 10/17/01 | 8/19/02 |
| A- 409 | BASEMENT MEZZ/Holding/Interview Rm | 5/7/01 | 8/19/02 |
| A- 410 | PUBLIC TOILETS/ Ground Flr/Mounting Height Schedule | 5/7/01 | 8/19/02 |
| A- 411 | LOCKER ROOMS-plans/elevations /DOC | 10/17/01 | 8/19/02 |
| A- 412 | LOCKER ROOMS-plans/elevations /OCA | 10/17/01 | 8/19/02 |
| A- 413 | LOCKER ROOMS-plans/elevations /DCAS | 10/17/01 | 8/19/02 |
| A- 413.1 | PUBLIC TOILETS Level 2 | 3/27/01 | 8/19/02 |
| A- 414 | PUBLIC TOILETS basement | 8/10/00 | 8/19/02 |
| A- 415 | TOILET ROOMS-plans/elevations | 8/10/00 | 8/19/02 |
| A- 415.1 | TOILET ROOMS-plans/elevations | 3/22/01 | 8/19/02 |
| A- 415.2 | TOILET ROOMS-plans/elevations Levels 7,8,9 | 3/27/01 | 8/19/02 |
| A- 415.3 | TOILET ROOMS-plans/elevations Private | 5/7/01 | 8/19/02 |
| A- 416 | CLERK OFFICE LEVEL 2/elevations | 8/10/00 | 8/19/02 |
| A- 417 | ELEVATIONS Conference Rooms & Judges Suites 8 & 9 | 3/27/01 | 8/19/02 |
| A- 420 | MISCELLANEOUS DETAILS/ wall details | 9/14/01 | 8/19/02 |
| A- 430 | PARTITION TYPES / Schedule | 10/17/00 | 8/19/02 |
| A- 430.1 | PARTITION TYPES /Schedule | 5/7/01 | 8/19/02 |
| A- 431 | CONTROL & EXPANSION JOINT DETAILS | 10/17/00 | 8/19/02 |
| A- 432 | CMU WALLS - DETAILS | 10/17/00 | 8/19/02 |
| A- 433 | PARTITION WALLS - DETAILS | 10/17/00 | 8/19/02 |
| A- 434 | CEILING DETAILS/Courtrooms | 6/18/01 | 8/19/02 |
| A- 434.1 | CEILING DETAILS/Courtrooms | 6/18/01 | 8/19/02 |
| A- 435 | CEILING DETAILS/ | 6/18/01 | 8/19/02 |
| A- 435.1 | CEILING DETAILS/ | 9/14/01 | 8/19/02 |
| A- 436 | CEILING DETAILS/ Metal Soffit | 6/13/01 | 8/19/02 |
| A- 436.1 | CEILING DETAILS/ Metal Soffit | 9/14/01 | 8/19/02 |
| A- 437 | CEILING DETAILS/ | 6/13/01 | 8/19/02 |
| A- 440 | ELEVATOR CORE PLANS / ELEVS, 18-22 | 8/10/00 | 8/19/02 |

Bronx Criminal Court Complex.
Bronx, N.Y.
MD_Drawing List 112B'S CONTRACTS 9,16,17 Record

Page 7 of 23
November 21, 2002

| NUMBER | TITLE | ISSUE DATE | REVISION DATE |
|---|---|---|---|
| A-441 | ELEVATOR CORE PLANS/(E1-E12)/Holding Area Elev. | 6/18/01 | 8/19/02 |
| A-442 | PLAN DETAILS/ Sally Port Area / Detention Details | 6/18/01 | 8/19/02 |
| A-443 | INTERIOR ELEVATIONS/ Sally Port · Holding | 6/18/01 | 8/19/02 |
| A-450 | MISCELLANEOUS DETAILS/Stairs & Ramps / Garage Railings | 9/14/01 | 8/19/02 |
| A-451 | HANDRAIL/GUARDRAIL / Type HRL-1,2,RL-3 | 9/14/01 | 8/19/02 |
| A-452 | HANDRAIL/GUARDRAIL / Type HRL-1,2,RL-4 | 9/14/01 | 8/19/02 |
| A-453 | GUARDRAIL DETAILS/ RL-5 | 11/30/01 | 8/19/02 |
| A-460 | ELEVATOR AT LOBBY/ E1 · E12, 16-17,23 | 10/17/01 | 8/19/02 |
| A-461 | ESCALATOR PLANS | 10/17/01 | 8/19/02 |
| A-471 | FIRE STAIR [#S5]-PLAN & SECTIONS | 8/10/00 | 8/19/02 |
| A-472 | FIRE STAIR [#S6]-PLAN & SECTIONS | 8/10/00 | 8/19/02 |
| A-473 | FIRE STAIR [#S7]-PLAN & SECTIONS | 8/10/00 | 8/19/02 |
| A-474 | FIRE STAIR [#S8]-PLAN & SECTIONS | 8/10/00 | 8/19/02 |
| A-475 | FIRE STAIR [#S1&2]-PLAN & SECTIONS | 8/10/00 | 8/19/02 |
| A-476 | SCISSOR STAIRS [#S9-S10]-PLAN & SECTIONS | 8/10/00 | 8/19/02 |
| A-477 | SCISSOR STAIR | 8/10/00 | 8/19/02 |
| A-479.1 | STAIR DETAILS-Landings/Handrails/Stringers | 8/10/00 | 8/19/02 |
| A-480 | ESCALATOR DETAILS / Plans and Sections | 10/17/01 | 8/19/02 |
| A-481 | ELEVATOR SECTION/DETAILS [E1-E7] | 10/17/01 | 8/19/02 |
| A-482 | ELEVATOR DETAILS [E8-E12] | 8/10/00 | 8/19/02 |
| A-483 | ELEVATOR DETAILS [E14-E17] | 8/10/00 | 8/19/02 |
| A-484 | ELEVATOR DETAILS [E18-E23] | 8/10/00 | 8/19/02 |
| A-485 | ELEVATOR CAB DETAILS | 8/10/00 | 8/19/02 |
| A-485.1 | ELEVATOR CAB DETAILS | 1/26/01 | 8/19/02 |
| A-486 | ELEVATOR LOBBY/Elevations | 8/10/00 | 8/19/02 |
| A-487 | ELEVATOR LOBBY/Elevations | 8/10/00 | 8/19/02 |
| A-488 | ELEVATOR LOBBY/Elevations | 8/10/00 | 8/19/02 |
| A-489 | ELEVATOR LOBBY/Elevations | 1/26/01 | 8/19/02 |
| A-490 | TYPICAL COURTROOM/Millwork Details | 12/11/00 | 8/19/02 |
| A-490A | TYPICAL COURTROOM/Millwork Details | 12/11/00 | 8/19/02 |
| A-491 | TYPICAL COURTROOM/Wood Panel Details | 12/11/00 | 8/19/02 |
| A-492.1 | TYPICAL COURTROOM/Judge's Bench Details | 1/26/01 | 8/19/02 |
| A-492.2 | TYPICAL COURTROOM/Wheelchair Lift | 1/9/01 | 8/19/02 |
| A-493 | TYPICAL COURTROOM/Jury Box Details | 12/11/00 | 8/19/02 |
| A-493.1 | LARGE COURTROOM/Jury Box Details | 6/18/01 | 8/19/02 |
| A-494 | TYPICAL COURTROOM/ Spectator Rail | 6/18/01 | 8/19/02 |
| A-495 | GRAND JURY COURTROOM/ Benches | 6/18/01 | 8/19/02 |
| A-496 | MILLWORK DETAILS / Typical Courtroom | 10/3/01 | 8/19/02 |
| A-497 | MILLWORK / Plans and Wood Cabinets | 10/3/01 | 8/19/02 |
| A-497.1 | MILLWORK / Plans and Wood Cabinets | 10/3/01 | 8/19/02 |
| A-498 | MILLWORK / Lobby | 10/3/01 | 8/19/02 |
| A-498.1 | MILLWORK / Jury Assembly | 10/3/01 | 8/19/02 |
| A-498.2 | SECURITY RAIL/ RL-6 At X-Ray Equipment | 10/3/01 | 8/19/02 |
| A-499 | MILLWORK SCHEDULE | 10/3/01 | 8/19/02 |
| A-520 | DOOR/FRAME TYPES | 10/17/00 | 10/11/02 |
| A-521 | HEAD/JAM/SILL DETAILS | 10/17/00 | 8/19/02 |
| A-522 | ELEVATOR DOOR DETAILS | 1/26/01 | 8/19/02 |
| A-523 | RADIATOR COVERS / Fin Tube Radiator Cover Types | 9/14/01 | 8/19/02 |

Bronx Criminal Court Complex.
Bronx, N.Y.
BHS_Drawing List 14211() CONTRACTS 9,16,17 Record

Page 8 of 23
November 21, 2005

| NUMBER | TITLE | ISSUE DATE | REVISION DATE |
|---|---|---|---|
| A-524 | DETENTION DETAILS / Door/Frame Details - Head/Jamb/Sill | 9/14/01 | 8/19/02 |
| A-530 | FIREPROOFING DETAILS/Schedule | 1/26/01 | 8/19/02 |
| A-531 | FIREPROOFING DETAILS/Sections | 1/26/01 | 8/19/02 |
| | | | |
| ALTERNATES: | | | |
| A-310-ALT | CANOPY/LOBBY ENTRY | 10/17/00 | 8/19/02 |
| A-401-ALT | PLANS ELEVATIONS/Typical Courtroom/Levels 3-6 | 10/17/00 | 8/19/02 |
| A-401-ALT1 | PLANS ELEVATIONS/Typical Courtroom/Levels 3-6 | 10/17/00 | 8/19/02 |
| A-403-ALT | PLANS ELEVATIONS/Large Courtroom (200 seats) Rm#B265 | 8/10/00 | 8/19/02 |
| A-403-ALT1 | PLANS ELEVATIONS/Large Courtroom (200 seats) Rm#B265 | 8/10/00 | 8/19/02 |
| A-403.1-ALT | PLANS ELEVATIONS/Double Jury Courtroom Room#B264 | 10/17/00 | 8/19/02 |
| A-403.1-ALT1 | PLANS ELEVATIONS/Double Jury Courtroom Room#B264 | 10/17/00 | 8/19/02 |
| A-403.2-ALT | PLANS ELEVATIONS/Arraignment Courtroom (Monitor) Rm #B262 | 10/17/00 | 8/19/02 |
| A-403.2-ALT1 | PLANS ELEVATIONS/Arraignment Courtroom (Monitor) Rm #B262 | 10/17/00 | 8/19/02 |
| A-403.3-ALT | PLANS ELEVATIONS/Arraignment Courtroom Rm #B261 | 8/10/00 | 8/19/02 |
| A-403.3-ALT1 | PLANS ELEVATIONS/Arraignment Courtroom Rm #B261 | 8/10/00 | 8/19/02 |
| A-404-ALT | PLANS ELEVATIONS/Arraignment Courtroom (Skylight) Rm #B201 | 8/10/00 | 8/19/02 |
| A-404-ALT1 | PLANS ELEVATIONS/Arraignment Courtroom (Skylight) Rm #B201 | 8/10/00 | 8/19/02 |
| A-405-ALT | ELEVATIONS/Typical Courtroom Corridor / Levels 3-6 | 10/17/00 | 10/11/02 |
| A-405.4-ALT | ELEVATIONS DETAILS / Courtroom Public Corridors / Level B2 | 10/17/00 | 8/19/02 |
| A-406-ALT | ELEVATIONS / Level 2 - OCA Clerk Floor Truss | 10/17/00 | 8/19/02 |
| A-437-ALT | CEILING DETAILS / Elevator Lobbies | 6/8/01 | 8/19/02 |
| A-486-ALT | ELEVATOR LOBBY/Elevations | 8/10/00 | 8/19/02 |
| A-487-ALT | ELEVATOR LOBBY/Elevations | 8/10/00 | 8/19/02 |
| A-488-ALT | ELEVATOR LOBBY/Elevations | 8/10/00 | 8/19/02 |
| A-490-ALT1 | TYPICAL COURTROOM / Millwork Details | 12/11/00 | 8/19/02 |
| A-492.1-ALT | WHEELCHAIR LIFT / Judge's Bench Details | 3/5/01 | 8/19/02 |
| A-522-ALT | ELEVATOR DOOR DETAILS | 1/26/01 | 8/19/02 |
| FL-100.1 | AREA 1 -LEVEL B2 | 10/17/00 | 6/18/01 |
| FL-100.2 | AREA 2 -LEVEL B2 | 10/17/00 | 6/18/01 |
| FL-100.3 | AREA 3 -LEVEL B2 | 10/17/00 | 6/18/01 |
| FL-101.1 | AREA 1 -LEVEL B1 | 10/17/00 | 6/18/01 |
| FL-101.2 | AREA 2 -LEVEL B1 | 10/17/00 | 6/18/01 |
| FL-101.3 | AREA 3 -LEVEL B1 | 10/17/00 | 6/18/01 |
| FL-102.1 | AREA 1 -LEVEL GROUND | 10/17/00 | 6/18/01 |
| FL-102.2 | AREA 2 -LEVEL GROUND | 10/17/00 | 6/18/01 |
| FL-102.3 | AREA 3 -LEVEL GROUND | 10/17/00 | 6/18/01 |
| FL-103.1 | AREA 1 -LEVEL MEZZANINE | 10/17/00 | 6/18/01 |

| NUMBER | TITLE | ISSUE DATE | REVISION DATE |
|---|---|---|---|
| FL-103.2 | AREA 2 -LEVEL MEZZANINE | 10/17/00 | 6/18/01 |
| FL-103.3 | AREA 3 -LEVEL MEZZANINE | 10/17/00 | 6/18/01 |
| FL-104.1 | AREA 1 -LEVEL 2 | 10/17/00 | 6/18/01 |
| FL-104.2 | AREA 2 -LEVEL 2 | 10/17/00 | 6/18/01 |
| FL-104.3 | AREA 3 -LEVEL 2 | 10/17/00 | 6/18/01 |
| FL-105.1 | AREA 1 -LEVEL 3 | 10/17/00 | 6/18/01 |
| FL-105.2 | AREA 2 -LEVEL 3 | 10/17/00 | 6/18/01 |
| FL-105.3 | AREA 3 -LEVEL 3 | 10/17/00 | 6/18/01 |
| FL-106.1 | AREA 1 -LEVEL 4 | 10/17/00 | 6/18/01 |
| FL-106.2 | AREA 2 -LEVEL 4 | 10/17/00 | 6/18/01 |
| FL-106.3 | AREA 3 -LEVEL 4 | 10/17/00 | 6/18/01 |
| FL-107.1 | AREA 1 -LEVEL 5 | 10/17/00 | 6/18/01 |
| FL-107.2 | AREA 2 -LEVEL 5 | 10/17/00 | 6/18/01 |
| FL-107.3 | AREA 3 -LEVEL 5 | 10/17/00 | 6/18/01 |
| FL-108.1 | AREA 1 -LEVEL 6 | 10/17/00 | 6/18/01 |
| FL-108.2 | AREA 2 -LEVEL 6 | 10/17/00 | 6/18/01 |
| FL-108.3 | AREA 3 -LEVEL 6 | 10/17/00 | 6/18/01 |
| FL-109.1 | AREA 1 -LEVEL 7 | 10/17/00 | 6/18/01 |
| FL-109.2 | AREA 2 -LEVEL 7 | 10/17/00 | 6/18/01 |
| FL-109.3 | AREA 3 -LEVEL 7 | 10/17/00 | 6/18/01 |
| FL-110.1 | AREA 1 -LEVEL 8 | 10/17/00 | 6/18/01 |
| FL-110.2 | AREA 2 -LEVEL 8 | 10/17/00 | 6/18/01 |
| FL-110.3 | AREA 3 -LEVEL 8 | 10/17/00 | 6/18/01 |
| FL-111.1 | AREA 1 -LEVEL 9 | 10/17/00 | 6/18/01 |
| FL-111.2 | AREA 2 -LEVEL 9 | 10/17/00 | 6/18/01 |
| FL-111.3 | AREA 3 -LEVEL 9 | 10/17/00 | 6/18/01 |
| BD-000 | COVER SHEET | 9/7/00 | 8/19/02 |
| BD-001 | GENERAL NOTES | 9/7/00 | 8/19/02 |
| BD-100 | EGRESS DIAGRAM/Sub-Cellar (Level B2-Basement) | 9/7/00 | 8/19/02 |
| BD-101 | EGRESS DIAGRAM/Cellar (Level B1-Basement Mezzanine) | 9/7/00 | 8/19/02 |
| BD-102 | EGRESS DIAGRAM/Ground Floor | 9/7/00 | 8/19/02 |
| BD-103 | EGRESS DIAGRAM/Mezzanine Level | 9/7/00 | 8/19/02 |
| BD-104 | EGRESS DIAGRAM/Level 2 | 9/7/00 | 8/19/02 |
| BD-105 | EGRESS DIAGRAM/Level 3 | 9/7/00 | 8/19/02 |
| BD-106 | EGRESS DIAGRAM/Level 4 | 9/7/00 | 8/19/02 |
| BD-107 | EGRESS DIAGRAM/Level 5 | 9/7/00 | 8/19/02 |
| BD-108 | EGRESS DIAGRAM/Level 6 | 9/7/00 | 8/19/02 |
| BD-109 | EGRESS DIAGRAM/Level 7 | 9/7/00 | 8/19/02 |
| BD-110 | EGRESS DIAGRAM/Level 8 | 9/7/00 | 8/19/02 |
| BD-111 | EGRESS DIAGRAM/Level 9 | 9/7/00 | 8/19/02 |
| BD-112 | EGRESS DIAGRAM/Level 10 Roof/Mech. | 9/7/00 | 8/19/02 |
| BD-201 | EGRESS DIAGRAM/Fire Rating Section | 9/7/00 | 8/19/02 |
| COVER SHEET | FOUNDATION/CON EDISON/STRUCTURAL COVER SHEET | | 8/19/02 |
| F 100 | FOUNDATION PLAN - OVERALL Level B2 - Basement | 8/10/00 | 11/1/01 |
| F 100.1 | FOUNDATION PLAN - AREA 1 Level B2 - Basement | 8/10/00 | 11/1/01 |
| F 100.2 | FOUNDATION PLAN - AREA 2 Level B2 - Basement | 8/10/00 | 11/1/01 |
| F 100.3 | FOUNDATION PLAN - AREA 3 Level B2 - Basement | 8/10/00 | 11/1/01 |
| F 100.4 | FOUNDATION PLAN - AREA 4 Level B2 - Basement | 8/10/00 | 11/1/01 |
| F 101 | TYPICAL FOUNDATION DETAILS 1 | 8/10/00 | 11/1/01 |

| NUMBER | TITLE | ISSUE DATE | REVISION DATE |
|---|---|---|---|
| F 102 | TYPICAL FOUNDATION DETAILS 2 | 8/10/00 | 11/1/01 |
| F 103 | TYPICAL FOUNDATION DETAILS 3 | 8/10/00 | 11/1/01 |
| F 104 | TYPICAL FOUNDATION DETAILS 4 | 8/10/00 | 11/1/01 |
| F 200 | FOUNDATION SECTIONS | 8/10/00 | 11/1/01 |
| F 201 | FOUNDATION SECTIONS | 8/10/00 | 11/1/01 |
| F 202 | FOUNDATION SECTIONS | 8/10/00 | 11/1/01 |
| F 203 | FOUNDATION SECTIONS | 8/10/00 | 11/1/01 |
| 324604-0-1 | CON EDISON CO – Transformer Vault Installation | 9/6/00 | 4/16/02 |
| 324605-0-1 | CON EDISON CO – Transformer Vault Installation | 9/6/00 | 4/16/02 |
| 324760-0-00 | CON EDISON CO – Transformer Vault Layout | 9/6/00 | 7/19/02 |
| 324761-0-00 | CON EDISON CO – Transformer Vault Layout | 9/6/00 | 4/11/02 |
| S- 101 | FLOOR FRAMING PLAN OVERALL LEVEL B1 | 10/2/00 | 11/1/01 |
| S- 101.1 | FLOOR FRAMING PLAN AREA 1 LEVEL B1 | 10/2/00 | 11/1/01 |
| S- 101.2 | FLOOR FRAMING PLAN AREA 2 LEVEL B1 | 10/2/00 | 11/1/01 |
| S- 101.3 | FLOOR FRAMING PLAN AREA 3 LEVEL B1 | 10/2/00 | 11/1/01 |
| S- 101.4 | FLOOR FRAMING PLAN AREA 4 LEVEL B1 | 10/2/00 | 11/1/01 |
| S- 102 | FLOOR FRAMING PLAN OVERALL GROUND LEVEL | 10/2/00 | 11/1/01 |
| S- 102.1 | FLOOR FRAMING PLAN AREA 1 GROUND LEVEL | 10/2/00 | 11/1/01 |
| S- 102.2 | FLOOR FRAMING PLAN AREA 2 GROUND LEVEL | 10/2/00 | 11/1/01 |
| S- 102.3 | FLOOR FRAMING PLAN AREA 3 GROUND LEVEL | 10/2/00 | 11/1/01 |
| S- 102.4 | FLOOR FRAMING PLAN AREA 4 GROUND LEVEL | 10/2/00 | 11/1/01 |
| S- 102A | FLOOR FRAMING PLAN PLANTER AREA | 10/2/00 | 11/1/01 |
| S- 103 | FLOOR FRAMING PLAN OVERALL MEZZANINE LEVEL | 10/2/00 | 11/1/01 |
| S- 103.1 | FLOOR FRAMING PLAN AREA 1 MEZZANINE LEVEL | 10/2/00 | 11/1/01 |
| S- 103.2 | FLOOR FRAMING PLAN AREA 2 MEZZANINE LEVEL | 10/2/00 | 11/1/01 |
| S- 103.3 | FLOOR FRAMING PLAN AREA 3 MEZZANINE LEVEL | 10/2/00 | 11/1/01 |
| S- 104 | FLOOR FRAMING PLAN OVERALL LEVEL 2 | 10/2/00 | 11/1/01 |
| S- 104.1 | FLOOR FRAMING PLAN AREA 1 LEVEL 2 | 10/2/00 | 11/1/01 |
| S- 104.2 | FLOOR FRAMING PLAN AREA 2 LEVEL 2 | 10/2/00 | 11/1/01 |
| S- 104.3 | FLOOR FRAMING PLAN AREA 3 LEVEL 2 | 10/2/00 | 11/1/01 |
| S- 105 | FLOOR FRAMING PLAN OVERALL LEVEL 3 | 10/2/00 | 11/1/01 |
| S- 105.1 | FLOOR FRAMING PLAN AREA 1 LEVEL 3 | 10/2/00 | 11/1/01 |
| S- 105.2 | FLOOR FRAMING PLAN AREA 2 LEVEL 3 | 10/2/00 | 11/1/01 |
| S- 105.3 | FLOOR FRAMING PLAN AREA 3 LEVEL 3 | 10/2/00 | 11/1/01 |
| S- 106 | FLOOR FRAMING PLAN OVERALL LEVEL 4 | 10/2/00 | 11/1/01 |
| S- 106.1 | FLOOR FRAMING PLAN AREA 1 LEVEL 4 | 10/2/00 | 11/1/01 |
| S- 106.2 | FLOOR FRAMING PLAN AREA 2 LEVEL 4 | 10/2/00 | 11/1/01 |
| S- 106.3 | FLOOR FRAMING PLAN AREA 3 LEVEL 4 | 10/2/00 | 11/1/01 |
| S- 107 | FLOOR FRAMING PLAN OVERALL LEVEL 5 | 10/2/00 | 11/1/01 |
| S- 107.1 | FLOOR FRAMING PLAN AREA 1 LEVEL 5 | 10/2/00 | 11/1/01 |
| S- 107.2 | FLOOR FRAMING PLAN AREA 2 LEVEL 5 | 10/2/00 | 11/1/01 |
| S- 107.3 | FLOOR FRAMING PLAN AREA 3 LEVEL 5 | 10/2/00 | 11/1/01 |

| NUMBER | TITLE | ISSUE DATE | REVISION DATE |
|---|---|---|---|
| S-108 | FLOOR FRAMING PLAN OVERALL LEVEL 6 | 10/2/00 | 11/1/01 |
| S-108.1 | FLOOR FRAMING PLAN AREA 1 LEVEL 6 | 10/2/00 | 11/1/01 |
| S-108.2 | FLOOR FRAMING PLAN AREA 2 LEVEL 6 | 10/2/00 | 11/1/01 |
| S-108.3 | FLOOR FRAMING PLAN AREA 3 LEVEL 6 | 10/2/00 | 11/1/01 |
| S-109 | FLOOR FRAMING PLAN OVERALL LEVEL 7 | 10/2/00 | 11/1/01 |
| S-109.1 | FLOOR FRAMING PLAN AREA 1 LEVEL 7 | 10/2/00 | 11/1/01 |
| S-109.2 | FLOOR FRAMING PLAN AREA 2 LEVEL 7 | 10/2/00 | 11/1/01 |
| S-109.3 | FLOOR FRAMING PLAN AREA 3 LEVEL 7 | 10/2/00 | 11/1/01 |
| S-110 | FLOOR FRAMING PLAN OVERALL LEVEL 8 | 10/2/00 | 11/1/01 |
| S-110.1 | FLOOR FRAMING PLAN AREA 1 LEVEL 8 | 10/2/00 | 11/1/01 |
| S-110.2 | FLOOR FRAMING PLAN AREA 2 LEVEL 8 | 10/2/00 | 11/1/01 |
| S-110.3 | FLOOR FRAMING PLAN AREA 3 LEVEL 8 | 10/2/00 | 11/1/01 |
| S-111 | FLOOR FRAMING PLAN OVERALL LEVEL 9 | 10/2/00 | 11/1/01 |
| S-111.1 | FLOOR FRAMING PLAN AREA 1 LEVEL 9 | 10/2/00 | 11/1/01 |
| S-111.2 | FLOOR FRAMING PLAN AREA 2 LEVEL 9 | 10/2/00 | 11/1/01 |
| S-111.3 | FLOOR FRAMING PLAN AREA 3 LEVEL 9 | 10/2/00 | 11/1/01 |
| S-112 | ROOF FRAMING PLAN OVERALL LEVEL 10 | 10/2/00 | 11/1/01 |
| S-112.1 | ROOF FRAMING PLAN AREA 1 LEVEL 10 | 10/2/00 | 11/1/01 |
| S-112.2 | ROOF FRAMING PLAN AREA 2 LEVEL 10 | 10/2/00 | 11/1/01 |
| S-112.3 | ROOF FRAMING PLAN AREA 3 LEVEL 10 | 10/2/00 | 11/1/01 |
| S-112A | ROOF FRAMING PLAN OVERALL ABOVE LEVEL 10 | 10/2/00 | 11/1/01 |
| S-112A.1 | ROOF FRAMING PLAN AREA 1 ABOVE LEVEL 10 | 10/2/00 | 11/1/01 |
| S-112A.2 | ROOF FRAMING PLAN AREA 2 ABOVE LEVEL 10 | 10/2/00 | 11/1/01 |
| S-112A.3 | ROOF FRAMING PLAN AREA 3 ABOVE LEVEL 10 | 10/2/00 | 11/1/01 |
| S-113 | ROOF FRAMING PLAN OVERALL LEVEL 11 | 10/2/00 | 11/1/01 |
| S-113.1 | ROOF FRAMING PLAN AREA 1 LEVEL 11 | 10/2/00 | 11/1/01 |
| S-113.2 | ROOF FRAMING PLAN AREA 2 LEVEL 11 | 10/2/00 | 11/1/01 |
| S-113.3 | ROOF FRAMING PLAN AREA 3 LEVEL 11 | 10/2/00 | 11/1/01 |
| S-114 | TYPICAL INTERMEDIATE FRAMING PLAN | 10/2/00 | 11/1/01 |
| S-115 | VENTILATION BUILDING FRAMING | 10/2/00 | 11/1/01 |
| S-200 | SECTIONS JURY ASSEMBLY | 10/2/00 | 11/1/01 |
| S-300 | COLUMN SCHEDULE -1 | 10/2/00 | 11/1/01 |
| S-301 | COLUMN SCHEDULE -3 | 10/2/00 | 11/1/01 |
| S-302 | COLUMN TYPICAL DETAILS | 10/2/00 | 11/1/01 |
| S-400 | TYPICAL SUPERSTRUCTURE DETAILS 1 | 10/2/00 | 11/1/01 |
| S-401 | TYPICAL SUPERSTRUCTURE DETAILS 2 | 10/2/00 | 11/1/01 |
| S-402 | TYPICAL SUPERSTRUCTURE DETAILS 3 | 10/2/00 | 11/1/01 |
| S-500 | WIND/SEISMIC FRAMES | 10/2/00 | 11/1/01 |
| S-501 | WIND/SEISMIC FRAMES | 10/2/00 | 11/1/01 |
| S-502 | WIND/SEISMIC FRAMES | 10/2/00 | 11/1/01 |
| S-503 | WIND/SEISMIC FRAMES | 10/2/00 | 11/1/01 |
| S-504 | WIND/SEISMIC FRAMES | 10/2/00 | 11/1/01 |
| S-505 | WIND/SEISMIC FRAMES | 10/2/00 | 11/1/01 |
| S-600 | GRAVITY TRUSS FRAMES | 10/2/00 | 11/1/01 |
| S-601 | GRAVITY TRUSS FRAMES | 10/2/00 | 11/1/01 |
| S-602 | GRAVITY TRUSS FRAMES | 10/2/00 | 11/1/01 |
| S-603 | GRAVITY TRUSS FRAMES | 10/2/00 | 11/1/01 |
| S-604 | TRUSS AND BRACING SECTIONS | 10/2/00 | 11/1/01 |
| S-605 | TRUSS AND BRACING DETAILS | 10/2/00 | 11/1/01 |
| S-700 | SUPERSTRUCTURE SECTIONS | 10/2/00 | 11/1/01 |

| NUMBER | TITLE | ISSUE DATE | REVISION DATE |
|---|---|---|---|
| S-701 | SUPERSTRUCTURE SECTIONS | 10/2/00 | 11/1/01 |
| S-702 | SUPERSTRUCTURE SECTIONS | 10/2/00 | 11/1/01 |
| S-703 | SUPERSTRUCTURE SECTIONS | 10/2/00 | 11/1/01 |
| S-704 | SUPERSTRUCTURE SECTIONS | 10/2/00 | 11/1/01 |
| S-705 | SUPERSTRUCTURE SECTIONS | 10/2/00 | 11/1/01 |
| S-706 | SUPERSTRUCTURE SECTIONS | 10/2/00 | 11/1/01 |
| S-800 | STAIR FRAMING ELEVATIONS | 10/2/00 | 11/1/01 |
| S-801 | STAIR FRAMING ELEVATIONS | 10/2/00 | 11/1/01 |
| S-802 | STAIR FRAMING PLANS & DETAILS | 10/2/00 | 11/1/01 |
| S-803 | CANTILEVER STAIR | 10/2/00 | 11/1/01 |
| S-804 | CANTILEVER STAIR | 10/2/00 | 11/1/01 |
| COVER SHEET | PLUMBING/MECHANICAL/FIRE PROTECTION COVER SHEET | | 8/19/02 |
| P-100 | PLUMBING, SYMBOLS | 8/29/00 | 11/1/01 |
| P-300A.1 | AREA 1-LEVEL B2 BURIED PIPING | 8/29/00 | 11/1/01 |
| P-300A.2 | AREA 2-LEVEL B2 BURIED PIPING | 8/29/00 | 11/1/01 |
| P-300A.3 | AREA 3-LEVEL B2 BURIED PIPING | 8/29/00 | 11/1/01 |
| P-300A.4 | AREA 4-LEVEL B2 BURIED PIPING | 8/29/00 | 11/1/01 |
| P-300.1 | AREA 1-LEVEL B2 BASEMENT | 8/29/00 | 11/1/01 |
| P-300.2 | AREA 2-LEVEL B2 BASEMENT | 8/29/00 | 11/1/01 |
| P-300.3 | AREA 3-LEVEL B2 BASEMENT | 8/29/00 | 11/1/01 |
| P-300.4 | AREA 4-LEVEL B2 BASEMENT | 8/29/00 | 11/1/01 |
| P-301.1 | AREA 1-LEVEL B1 | 8/29/00 | 11/1/01 |
| P-301.2 | AREA 2-LEVEL B1 | 8/29/00 | 11/1/01 |
| P-301.3 | AREA 3-LEVEL B1 | 8/29/00 | 11/1/01 |
| P-301.4 | AREA 4-LEVEL B1 | 8/29/00 | 11/1/01 |
| P-302.1 | AREA 1-LEVEL GROUND | 8/29/00 | 11/1/01 |
| P-302.2 | AREA 2-LEVEL GROUND | 8/29/00 | 11/1/01 |
| P-302.3 | AREA 3-LEVEL GROUND | 8/29/00 | 11/1/01 |
| P-302.4 | AREA 4-LEVEL GROUND | 8/29/00 | 11/1/01 |
| P-303.1 | AREA 1-LEVEL MEZZANINE | 8/29/00 | 11/1/01 |
| P-303.2 | AREA 2-LEVEL MEZZANINE | 8/29/00 | 11/1/01 |
| P-303.3 | AREA 3-LEVEL MEZZANINE | 8/19/00 | 11/1/01 |
| P-303.4 | AREA 4-LEVEL MEZZANINE | 8/29/00 | 11/1/01 |
| P-304.1 | AREA 1-LEVEL 2 | 8/29/00 | 11/1/01 |
| P-304.2 | AREA 2-LEVEL 2 | 8/29/00 | 11/1/01 |
| P-304.3 | AREA 3-LEVEL 2 | 8/29/00 | 11/1/01 |
| P-305.1 | AREA 1-LEVEL 3 | 8/29/00 | 11/1/01 |
| P-305.2 | AREA 2-LEVEL 3 | 8/29/00 | 11/1/01 |
| P-305.3 | AREA 3-LEVEL 3 | 8/29/00 | 11/1/01 |
| P-306.1 | AREA 1-LEVEL 4 | 8/29/00 | 11/1/01 |
| P-306.2 | AREA 2-LEVEL 4 | 8/29/00 | 11/1/01 |
| P-306.3 | AREA 3-LEVEL 4 | 8/29/00 | 11/1/01 |
| P-307.1 | AREA 1-LEVEL 5 | 8/29/00 | 11/1/01 |
| P-307.2 | AREA 2-LEVEL 5 | 8/29/00 | 11/1/01 |
| P-307.3 | AREA 3-LEVEL 5 | 8/29/00 | 11/1/01 |
| P-308.1 | AREA 1-LEVEL 6 | 8/29/00 | 11/1/01 |
| P-308.2 | AREA 2-LEVEL 6 | 8/29/00 | 11/1/01 |
| P-308.3 | AREA 3-LEVEL 6 | 8/29/00 | 11/1/01 |
| P-309.1 | AREA 1-LEVEL 7 | 8/29/00 | 11/1/01 |
| P-309.2 | AREA 2-LEVEL 7 | 8/29/00 | 11/1/01 |

| NUMBER | TITLE | ISSUE DATE | REVISION DATE |
|---|---|---|---|
| P-309.3 | AREA 3 -LEVEL 7 | 8/29/00 | 11/1/01 |
| P-310.1 | AREA 1 -LEVEL 8 | 8/29/00 | 11/1/01 |
| P-310.2 | AREA 2 -LEVEL 8 | 8/29/00 | 11/1/01 |
| P-310.3 | AREA 3 -LEVEL 8 | 8/29/00 | 11/1/01 |
| P-311.1 | AREA 1 -LEVEL 9 | 8/29/00 | 11/1/01 |
| P-311.2 | AREA 2 -LEVEL 9 | 8/29/00 | 11/1/01 |
| P-311.3 | AREA 3 -LEVEL 9 | 8/29/00 | 11/1/01 |
| P-312.1 | AREA 1 -LEVEL 10 | 8/29/00 | 11/1/01 |
| P-312.2 | AREA 2 -LEVEL 10 | 3/29/00 | 11/1/01 |
| P-312.3 | AREA 3 -LEVEL 10 | 8/29/00 | 11/1/01 |
| P-313.1 | AREA 1 -LEVEL ROOF | 8/29/00 | 11/1/01 |
| P-313.2 | AREA 2 -LEVEL ROOF | 8/29/00 | 11/1/01 |
| P-313.3 | AREA 3 -LEVEL ROOF | 8/29/00 | 11/1/01 |
| P-400 | P-400 PART PLANS - PLUMBING | 8/29/00 | 11/1/01 |
| P-500.1 | SANITARY RISER DIAGRAM | 8/29/00 | 11/1/01 |
| P-500.2 | SANITARY RISER DIAGRAM | 8/29/00 | 11/1/01 |
| P-500.3 | SANITARY RISER DIAGRAM | 8/29/00 | 11/1/01 |
| P-500.4 | SANITARY RISER DIAGRAM | 8/29/00 | 11/1/01 |
| P-500.5 | SANITARY RISER DIAGRAM | 8/29/00 | 11/1/01 |
| P-500.6 | SANITARY RISER DIAGRAM | 8/29/00 | 11/1/01 |
| P-500.7 | SANITARY RISER DIAGRAM | 8/29/00 | 11/1/01 |
| P-501.1 | DOMESTIC WATER RISER DIAGRAM | 8/29/00 | 11/1/01 |
| P-501.2 | DOMESTIC WATER RISER DIAGRAM | 8/29/00 | 11/1/01 |
| P-501.3 | DOMESTIC WATER RISER DIAGRAM | 8/29/00 | 11/1/01 |
| P-502.1 | STORM WATER RISER DIAGRAM | 8/29/00 | 11/1/01 |
| P-502.2 | STORM WATER RISER DIAGRAM | 8/29/00 | 11/1/01 |
| P-600 | PLUMBING DETAILS SHEET #1 | 8/29/00 | 11/1/01 |
| P-601 | PLUMBING DETAILS SHEET #2 | 8/29/00 | 11/1/01 |
| P-602 | PLUMBING DETAILS SHEET #3 | 8/29/00 | 11/1/01 |
| M-1 | HVAC, SYMBOLS AND LEGEND | 8/29/00 | 11/1/01 |
| M-100 | HVAC, SCHEDULE SHEET #1 | 8/29/00 | 11/1/01 |
| M-101 | HVAC, SCHEDULE SHEET #2 | 8/29/00 | 11/1/01 |
| M-102 | HVAC, SCHEDULE SHEET #3 | 8/29/00 | 11/1/01 |
| M-103 | HVAC, SCHEDULE SHEET #4 | 8/29/00 | 11/1/01 |
| M-300.1 | AREA 1 -LEVEL B2 | 8/29/00 | 11/1/01 |
| M-300.2 | AREA 2 -LEVEL B2 | 8/29/00 | 11/1/01 |
| M-300.3 | AREA 3 -LEVEL B2 | 8/29/00 | 11/1/01 |
| M-300.4 | AREA 4 -LEVEL B2 | 8/29/00 | 11/1/01 |
| M-301.1 | AREA 1 -LEVEL B1 | 8/29/00 | 11/1/01 |
| M-301.2 | AREA 2 -LEVEL B1 | 8/29/00 | 11/1/01 |
| M-301.3 | M-301.3 AREA 3 -LEVEL B1 | 8/29/00 | 11/1/01 |
| M-301.4 | M-301.4 AREA 4 -LEVEL B1 | 8/29/00 | 11/1/01 |
| M-302.1 | AREA 1 -LEVEL GROUND | 8/29/00 | 11/1/01 |
| M-302.2 | AREA 2 -LEVEL GROUND | 8/29/00 | 11/1/01 |
| M-302.3 | AREA 3 -LEVEL GROUND | 8/29/00 | 11/1/01 |
| M-302.4 | AREA 4 -LEVEL GROUND | 8/29/00 | 11/1/01 |
| M-303.1 | AREA 1 -LEVEL MEZZANINE | 8/29/00 | 11/1/01 |
| M-303.2 | AREA 2 -LEVEL MEZZANINE | 8/29/00 | 11/1/01 |
| M-303.3 | AREA 3 -LEVEL MEZZANINE | 8/29/00 | 11/1/01 |
| M-304.1 | AREA 1 -LEVEL 2 | 8/29/00 | 11/1/01 |

| NUMBER | TITLE | ISSUE DATE | REVISION DATE |
|---|---|---|---|
| M-304.2 | AREA 2 -LEVEL 2 | 8/29/00 | 11/1/01 |
| M-304.3 | AREA 3 -LEVEL 2 | 8/29/00 | 11/1/01 |
| M-305.1 | AREA 1 -LEVEL 3 | 8/29/00 | 11/1/01 |
| M-305.2 | AREA 2 -LEVEL 3 | 8/29/00 | 11/1/01 |
| M-305.3 | AREA 3 -LEVEL 3 | 8/29/00 | 11/1/01 |
| M-306.1 | AREA 1 -LEVEL 4 | 8/29/00 | 11/1/01 |
| M-306.2 | AREA 2 -LEVEL 4 | 8/29/00 | 11/1/01 |
| M-306.3 | AREA 3 -LEVEL 4 | 8/29/00 | 11/1/01 |
| M-307.1 | AREA 1 -LEVEL 5 | 8/29/00 | 11/1/01 |
| M-307.2 | AREA 2 -LEVEL 5 | 8/29/00 | 11/1/01 |
| M-307.3 | AREA 3 -LEVEL 5 | 8/29/00 | 11/1/01 |
| M-308.1 | AREA 1 -LEVEL 6 | 8/29/00 | 11/1/01 |
| M-308.2 | AREA 2 -LEVEL 6 | 8/29/00 | 11/1/01 |
| M-308.3 | AREA 3 -LEVEL 6 | 8/29/00 | 11/1/01 |
| M-309.1 | AREA 1 -LEVEL 7 | 8/29/00 | 11/1/01 |
| M-309.2 | AREA 2 -LEVEL 7 | 8/29/00 | 11/1/01 |
| M-309.3 | AREA 3 -LEVEL 7 | 8/29/00 | 11/1/01 |
| M-310.1 | AREA 1 -LEVEL 8 | 8/29/00 | 11/1/01 |
| M-310.2 | AREA 2 -LEVEL 8 | 8/29/00 | 11/1/01 |
| M-310.3 | AREA 3 -LEVEL 8 | 8/29/00 | 11/1/01 |
| M-311.1 | AREA 1 -LEVEL 9 | 8/29/00 | 11/1/01 |
| M-311.2 | AREA 2 -LEVEL 9 | 8/29/00 | 11/1/01 |
| M-311.3 | AREA 3 -LEVEL 9 | 8/29/00 | 11/1/01 |
| M-312.1 | AREA 1 -LEVEL 10 | 8/29/00 | 11/1/01 |
| M-312.2 | AREA 2 -LEVEL 10 | 8/29/00 | 11/1/01 |
| M-312.3 | AREA 3 -LEVEL 10 | 8/29/00 | 11/1/01 |
| M-400 | BOILER AND CHILLER PLAN M.E.R., LEVEL B2 | 8/29/00 | 11/1/01 |
| M-401 | HVAC PLAN, BASEMENT MEZZANINE FAN ROOM | 8/29/00 | 11/1/01 |
| M-402 | HVAC PL, LEVEL 1,EAST & MEZZ LVL MECH. RM | 8/29/00 | 11/1/01 |
| M-403 | HVAC PLAN, 7TH FLOOR FAN ROOM | 8/29/00 | 11/1/01 |
| M-404 | HVAC PLAN, 10TH FLOOR FAN ROOM | 8/29/00 | 11/1/01 |
| M-405 | HVAC PLAN, 10TH FLOOR EAST MER | 8/29/00 | 11/1/01 |
| M-406 | HVAC SECTION #1 - LEVEL 7 | 8/29/00 | 11/1/01 |
| M-407 | HVAC SECTION #2 - LEVEL 7 | 8/29/00 | 11/1/01 |
| M-408 | HVAC SECTION, CHILLER MER | 8/29/00 | 11/1/01 |
| M-409 | HVAC CORE PLAN LEVEL 3-6 #1 & #2 | 8/29/00 | 11/1/01 |
| M-410 | HVAC CORE PLAN LEVEL 3-6 #3 & #4 | 8/29/00 | 11/1/01 |
| M-411 | HVAC CORE PLAN LEVEL 3-6 #5 & #6 | 8/29/00 | 11/1/01 |
| M-500 | HVAC, AIR RISER #1 | 8/29/00 | 11/1/01 |
| M-501 | HVAC, AIR RISER #2 | 8/29/00 | 11/1/01 |
| M-502 | HVAC, WATER RISER | 8/29/00 | 11/1/01 |
| M-600 | HVAC, DETAIL SHEET #1 | 8/29/00 | 11/1/01 |
| M-601 | HVAC, DETAIL SHEET #2 | 8/29/00 | 11/1/01 |
| M-602 | HVAC, DETAIL SHEET #3 | 8/29/00 | 11/1/01 |
| M-700 | HVAC, CONTROLS | 8/29/00 | 11/1/01 |
|  |  |  |  |
| FP-100 | FIRE PROTECTION SYMBOLS | 8/29/00 | 11/1/01 |
| FP-300.1 | AREA 1-LEVEL B2 | 8/29/00 | 11/1/01 |
| FP-300.2 | AREA 1-LEVEL B2 | 8/29/00 | 11/1/01 |
| FP-300.3 | AREA 3 -LEVEL B2 | 8/29/00 | 11/1/01 |
| FP-300.4 | AREA 4 -LEVEL B2 | 8/29/00 | 11/1/01 |

Bronx Criminal Court Complex.
Bronx, N.Y.
BTD_Drawing List II23DE-CONTRACTS 9,16,1T Record

Page 15 of 29
November 29, 2004

| NUMBER | TITLE | ISSUE DATE | REVISION DATE |
|---|---|---|---|
| FP-301.1 | AREA 1 -LEVEL B1 | 8/29/00 | 11/1/01 |
| FP-301.2 | AREA 2 -LEVEL B1 | 8/29/00 | 11/1/01 |
| FP-301.3 | AREA 3 -LEVEL B1 | 8/29/00 | 11/1/01 |
| FP-301.4 | AREA 4 -LEVEL B1 | 8/29/00 | 11/1/01 |
| FP-302.1 | AREA 1 -LEVEL GROUND | 8/29/00 | 11/1/01 |
| FP-302.2 | AREA 2 -LEVEL GROUND | 8/29/00 | 11/1/01 |
| FP-302.3 | AREA 3 -LEVEL GROUND | 8/29/00 | 11/1/01 |
| FP-302.4 | AREA 4 -LEVEL GROUND | 8/29/00 | 11/1/01 |
| FP-303.1 | AREA 1 -LEVEL MEZZANINE | 8/29/00 | 11/1/01 |
| FP-303.2 | AREA 2 -LEVEL MEZZANINE | 8/29/00 | 11/1/01 |
| FP-303.3 | AREA 3 -LEVEL MEZZANINE | 8/29/00 | 11/1/01 |
| FP-304.1 | AREA 1 -LEVEL 2 | 8/29/00 | 11/1/01 |
| FP-304.2 | AREA 2 -LEVEL 2 | 8/29/00 | 11/1/01 |
| FP-304.3 | AREA 3 -LEVEL 2 | 8/29/00 | 11/1/01 |
| FP-305.1 | AREA 1 -LEVEL 3 | 8/29/00 | 11/1/01 |
| FP-305.2 | AREA 2 -LEVEL 3 | 8/29/00 | 11/1/01 |
| FP-305.3 | AREA 3 -LEVEL 3 | 8/29/00 | 11/1/01 |
| FP-305a.1 | AREA 1 -LEVEL 3 | 8/29/00 | 11/1/01 |
| FP-305a.2 | AREA 2 -LEVEL 3 | 8/29/00 | 11/1/01 |
| FP-305a.3 | AREA 3 -LEVEL 3 | 8/29/00 | 11/1/01 |
| FP-306.1 | AREA 1 -LEVEL 4 | 8/29/00 | 11/1/01 |
| FP-306.2 | AREA 2 -LEVEL 4 | 8/29/00 | 11/1/01 |
| FP-306.3 | AREA 3 -LEVEL 4 | 8/29/00 | 11/1/01 |
| FP-307.1 | AREA 1 -LEVEL 5 | 8/29/00 | 11/1/01 |
| FP-307.2 | AREA 2 -LEVEL 5 | 8/29/00 | 11/1/01 |
| FP-307.3 | AREA 3 -LEVEL 5 | 8/29/00 | 11/1/01 |
| FP-308.1 | AREA 1 -LEVEL 6 | 8/29/00 | 11/1/01 |
| FP-308.2 | AREA 2 -LEVEL 6 | 8/29/00 | 11/1/01 |
| FP-308.3 | AREA 3 -LEVEL 6 | 8/29/00 | 11/1/01 |
| FP-309.1 | AREA 1 -LEVEL 7 | 8/29/00 | 11/1/01 |
| FP-309.2 | AREA 2 -LEVEL 7 | 8/29/00 | 11/1/01 |
| FP-309.3 | AREA 3 -LEVEL 7 | 8/29/00 | 11/1/01 |
| FP-310.1 | AREA 1 -LEVEL 8 | 8/29/00 | 11/1/01 |
| FP-310.2 | AREA 2 -LEVEL 8 | 8/29/00 | 11/1/01 |
| FP-310.3 | AREA 3 -LEVEL 8 | 8/29/00 | 11/1/01 |
| FP-311.1 | AREA 1 -LEVEL 9 | 8/29/00 | 11/1/01 |
| FP-311.2 | AREA 2 -LEVEL 9 | 8/29/00 | 11/1/01 |
| FP-311.3 | AREA 3 -LEVEL 9 | 8/29/00 | 11/1/01 |
| FP-312.1 | AREA 1 -LEVEL 10 | 8/29/00 | 11/1/01 |
| FP-312.2 | AREA 2 -LEVEL 10 | 8/29/00 | 11/1/01 |
| FP-312.3. | AREA 3 -LEVEL 10 | 8/29/00 | 11/1/01 |
| FP-500 | FIRE PROTECTION, RISER DIAGRAM | 8/29/00 | 11/1/01 |
| FP-600 | FIRE PROTECTION SCHEDULE AND DETAILS | 8/29/00 | 11/1/01 |
| | | | |
| COVER SHEET | ELECTRICAL, COVER SHEET | | 8/19/02 |
| E-001 | ELECTRICAL LEGEND | 8/29/00 | 11/1/01 |
| B-101 | ELECT. PANELBOARD SCHEDS SHEET #1 | 8/29/00 | 11/1/01 |
| B-102 | ELECT. PANELBOARD SCHEDS SHEET #2 | 8/29/00 | 11/1/01 |
| B-103 | ELECT. PANELBOARD SCHEDS SHEET #3 | 8/29/00 | 11/1/01 |
| B-104 | ELECT. PANELBOARD SCHEDS SHEET #4 | 8/29/00 | 11/1/01 |
| B-105 | ELECT. PANELBOARD SCHEDS SHEET #5 | 8/29/00 | 11/1/01 |

| NUMBER | TITLE | ISSUE DATE | REVISION DATE |
|---|---|---|---|
| E-106 | ELECT. PANELBOARD SCHEDS SHEET #6 | 8/29/00 | 11/1/01 |
| E-107 | ELECT. PANELBOARD SCHEDS SHEET #7 | 8/29/00 | 11/1/01 |
| E-108 | ELECT. PANELBOARD SCHEDS SHEET #8 | 8/29/00 | 11/1/01 |
| E-109 | ELECT. PANELBOARD SCHEDS SHEET #9 | 8/29/00 | 11/1/01 |
| E-110 | ELECT. PANELBOARD SCHEDS SHEET #10 | 8/29/00 | 11/1/01 |
| E-111 | ELECT. PANELBOARD SCHEDS SHEET #11 | 8/29/00 | 11/1/01 |
| E-112 | ELECT. PANELBOARD SCHEDS SHEET #12 | 8/29/00 | 11/1/01 |
| E-113 | ELECT. PANELBOARD SCHEDS SHEET #13 | 8/29/00 | 11/1/01 |
| E-114 | ELECT. PANELBOARD SCHEDS SHEET #14 | 8/29/00 | 11/1/01 |
| E-115 | ELECT. PANELBOARD SCHEDS SHEET #15 | 8/29/00 | 11/1/01 |
| E-116 | ELECT. PANELBOARD SCHEDS SHEET #16 | 8/29/00 | 11/1/01 |
| E-117 | ELECT. PANELBOARD SCHEDS SHEET #17 | 8/29/00 | 11/1/01 |
| E-118 | ELECT. LIGHTING RELAY PANEL SCHEDS SHEET #1 | 8/29/00 | 11/1/01 |
| E-119 | ELECT. LIGHTING RELAY PANEL SCHEDS SHEET #2 | 8/29/00 | 11/1/01 |
| E-120 | ELECT. LIGHTING RELAY PANEL SCHEDS SHEET #3 | 8/29/00 | 11/1/01 |
| E-121 | ELECT. LIGHTING RELAY PANEL SCHEDS SHEET #4 | 8/29/00 | 11/1/01 |
| E-300 .1L | LIGHTING PLAN AREA 1 LEVEL B2 | 8/29/00 | 11/1/01 |
| E-300 .1P | POWER PLAN AREA 1 | 8/29/00 | 11/1/01 |
| E-300 .2L | LIGHTING PLAN AREA 2 | 8/29/00 | 11/1/01 |
| E-300 .2P | POWER PLAN AREA 2 | 8/29/00 | 11/1/01 |
| E-300 .3L | LIGHTING PLAN AREA 3 | 8/29/00 | 11/1/01 |
| E-300 .3P | POWER PLAN AREA 3 | 8/29/00 | 11/1/01 |
| E-300 .4L | LIGHTING PLAN AREA 4 | 8/29/00 | 11/1/01 |
| E-300 .4P | POWER PLAN AREA 4 | 8/29/00 | 11/1/01 |
| E-301 .1L | LIGHTING PLAN AREA 1 LEVEL B1 | 8/29/00 | 11/1/01 |
| E-301 .1P | POWER PLAN AREA 1 | 8/29/00 | 11/1/01 |
| E-301 .2L | LIGHTING PLAN AREA 2 | 8/29/00 | 11/1/01 |
| E-301 .2P | POWER PLAN AREA 2 | 8/29/00 | 11/1/01 |
| E-301 .3L | LIGHTING PLAN AREA 3 | 8/29/00 | 11/1/01 |
| E-301 .3P | POWER PLAN AREA 3 | 8/29/00 | 11/1/01 |
| E-301 .4L | LIGHTING PLAN AREA 4 | 8/29/00 | 11/1/01 |
| E-301 .4P | POWER PLAN AREA 4 | 8/29/00 | 11/1/01 |
| E-302 .1L | LIGHTING PLAN AREA 1 GROUND LVL | 8/29/00 | 11/1/01 |
| E-302 .1P | POWER PLAN AREA 1 | 8/29/00 | 11/1/01 |
| E-302 .2L | LIGHTING PLAN AREA 2 | 8/29/00 | 11/1/01 |
| E-302 .2P | POWER PLAN AREA 2 | 8/29/00 | 11/1/01 |
| E-302 .3L | LIGHTING PLAN AREA 3 | 8/29/00 | 11/1/01 |
| E-302 .3P | POWER PLAN AREA 3 | 8/29/00 | 11/1/01 |
| E-302 .4L | LIGHTING PLAN AREA 4 | 8/29/00 | 11/1/01 |
| E-302 .4P | POWER PLAN AREA 4 | 8/29/00 | 11/1/01 |
| E-303 .1L | LIGHTING PLAN AREA 1 MEZZ LEVEL | 8/29/00 | 11/1/01 |
| E-303 .1P | POWER PLAN AREA 1 | 8/29/00 | 11/1/01 |
| E-303 .2L | LIGHTING PLAN AREA 2 | 8/29/00 | 11/1/01 |
| E-303 .2P | POWER PLAN AREA 2 | 8/29/00 | 11/1/01 |
| E-303 .3L | LIGHTING PLAN AREA 3 | 8/29/00 | 11/1/01 |
| E-303 .3P | POWER PLAN AREA 3 | 8/29/00 | 11/1/01 |
| E-304 .1L | LIGHTING PLAN AREA 1 LEVEL 2 | 8/29/00 | 11/1/01 |
| E-304 .1P | POWER PLAN AREA 1 | 8/29/00 | 11/1/01 |
| E-304 .2L | LIGHTING PLAN AREA 2 | 8/29/00 | 11/1/01 |
| E-304 .2P | POWER PLAN AREA 2 | 8/29/00 | 11/1/01 |
| E-304 .3L | LIGHTING PLAN AREA 3 | 8/29/00 | 11/1/01 |

| NUMBER | TITLE | ISSUE DATE | REVISION DATE |
|---|---|---|---|
| E-304 .3P | POWER PLAN AREA 3 | 8/29/00 | 11/1/01 |
| E-305 .1L | LIGHTING PLAN AREA 1 LEVEL 3 | 8/29/00 | 11/1/01 |
| E-305 .1P | POWER PLAN AREA 1 | 8/29/00 | 11/1/01 |
| E-305 .2L | LIGHTING PLAN AREA 2 | 8/29/00 | 11/1/01 |
| E-305 .2P | POWER PLAN AREA 2 | 8/29/00 | 11/1/01 |
| E-305 .3L | LIGHTING PLAN AREA 3 | 8/29/00 | 11/1/01 |
| E-305 .3P | POWER PLAN AREA 3 | 8/29/00 | 11/1/01 |
| E-306 .1L | LIGHTING PLAN AREA 1 LEVEL 4 | 8/29/00 | 11/1/01 |
| E-306 .1P | POWER PLAN AREA 1 | 8/29/00 | 11/1/01 |
| E-306 .2L | LIGHTING PLAN AREA 2 | 8/29/00 | 11/1/01 |
| E-306 .2P | POWER PLAN AREA 2 | 8/29/00 | 11/1/01 |
| E-306 .3L | LIGHTING PLAN AREA 3 | 8/29/00 | 11/1/01 |
| E-306 .3P | POWER PLAN AREA 3 | 8/29/00 | 11/1/01 |
| E-307 .1L | LIGHTING PLAN AREA 1 LEVEL 5 | 8/29/00 | 11/1/01 |
| E-307 .1P | POWER PLAN AREA 1 | 8/29/00 | 11/1/01 |
| E-307 .2L | LIGHTING PLAN AREA 2 | 8/29/00 | 11/1/01 |
| E-307 .2P | POWER PLAN AREA 2 | 8/29/00 | 11/1/01 |
| E-307 .3L | LIGHTING PLAN AREA 3 | 8/29/00 | 11/1/01 |
| E-307 .3P | POWER PLAN AREA 3 | 8/29/00 | 11/1/01 |
| E-308 .1L | LIGHTING PLAN AREA 1 LEVEL 6 | 8/29/00 | 11/1/01 |
| E-308 .1P | POWER PLAN AREA 1 | 8/29/00 | 11/1/01 |
| E-308 .2L | LIGHTING PLAN AREA 2 | 8/29/00 | 11/1/01 |
| E-308 .2P | POWER PLAN AREA 2 | 8/29/00 | 11/1/01 |
| E-308 .3L | LIGHTING PLAN AREA 3 | 8/29/00 | 11/1/01 |
| E-308 .3P | POWER PLAN AREA 3 | 8/29/00 | 11/1/01 |
| E-309 .1L | LIGHTING PLAN AREA 1 LEVEL 7 | 8/29/00 | 11/1/01 |
| E-309 .1P | POWER PLAN AREA 1 | 8/29/00 | 11/1/01 |
| E-309 .2L | LIGHTING PLAN AREA 2 | 8/29/00 | 11/1/01 |
| E-309 .2P | POWER PLAN AREA 2 | 8/29/00 | 11/1/01 |
| E-309 .3L | LIGHTING PLAN AREA 3 | 8/29/00 | 11/1/01 |
| E-309 .3P | POWER PLAN AREA 3 | 8/29/00 | 11/1/01 |
| E-310 .1L | LIGHTING PLAN AREA 1 LEVEL 8 | 8/29/00 | 11/1/01 |
| E-310 .1P | POWER PLAN AREA 1 | 8/29/00 | 11/1/01 |
| E-310 .2L | LIGHTING PLAN AREA 2 | 8/29/00 | 11/1/01 |
| E-310 .2P | POWER PLAN AREA 2 | 8/29/00 | 11/1/01 |
| E-310 .3L | LIGHTING PLAN AREA 3 | 8/29/00 | 11/1/01 |
| E-310 .3P | POWER PLAN AREA 3 | 8/29/00 | 11/1/01 |
| E-311 .1L | LIGHTING PLAN AREA 1 LEVEL 9 | 8/29/00 | 11/1/01 |
| E-311 .1P | POWER PLAN AREA 1 | 8/29/00 | 11/1/01 |
| E-311 .2L | LIGHTING PLAN AREA 2 | 8/29/00 | 11/1/01 |
| E-311 .2P | POWER PLAN AREA 2 | 8/29/00 | 11/1/01 |
| E-311 .3L | LIGHTING PLAN AREA 3 | 8/29/00 | 11/1/01 |
| E-311 .3P | POWER PLAN AREA 3 | 8/29/00 | 11/1/01 |
| E-312 .1L | LIGHTING PLAN AREA 1 LEVEL 10 | 8/29/00 | 11/1/01 |
| E-312 .1P | POWER PLAN AREA 1 LEVEL 10 | 8/29/00 | 11/1/01 |
| E-312 .2L | LIGHTING PLAN AREA 2 | 8/29/00 | 11/1/01 |
| E-312 .2P | POWER PLAN AREA 2 | 8/29/00 | 11/1/01 |
| E-312 .3L | LIGHTING PLAN AREA 3 | 8/29/00 | 11/1/01 |
| E-312 .3P | POWER PLAN AREA 3 | 8/29/00 | 11/1/01 |

| NUMBER | TITLE | ISSUE DATE | REVISION DATE |
|---|---|---|---|
| E-313 .1P | POWER PLAN AREA 3 LEVEL 12 | 8/29/00 | 11/1/01 |
| E-313 .2P | POWER PLAN AREA 2 | 8/29/00 | 11/1/01 |
| E-313 .3P | POWER PLAN AREA 3 | 8/29/00 | 11/1/01 |
| E-500 | ELECTRICAL, SINGLE LINE DIAGRAM | 8/29/00 | 11/1/01 |
| E-501 | ELECTRICAL, LIGHTING/ POWER DIAGRAM | 8/29/00 | 11/1/01 |
| E-502 | ELECTRICAL, FIRE ALARM RISER -AREA 1 | 8/29/00 | 11/1/01 |
| E-503 | ELECTRICAL, FIRE ALARM RISER-AREA 2 | 8/29/00 | 11/1/01 |
| E-504 | ELECTRICAL, FIRE ALARM RISER-AREA 3 & 4 | 8/29/00 | 11/1/01 |
| E-505 | ELECTRICAL, STAIR EXIT LIGHTING RISER | 8/29/00 | 11/1/01 |
| E-506 | ELECTRICAL LIGHTING CONTROL RISER DIAGRAM | 8/29/00 | 11/1/01 |
| E-600 | ELECTRICAL, DETAIL SHEET #1 | 8/29/00 | 11/1/01 |
| E-601 | ELECTRICAL, DETAIL SHEET #2 | 8/29/00 | 11/1/01 |
| E-602 | LIGHTING PROTECTION - GROUND | 8/29/00 | 11/1/01 |
| E-603 | LIGHTING PROTECTION - ROOF | 8/29/00 | 11/1/01 |
| E-604 | ELECTRIC CLOSETS EQUIPMENT LAYOUT | 8/29/00 | 11/1/01 |
| E-605 | FIRE ALARM NOTES & SCH. WIRING DIAGRAM | 8/29/00 | 11/1/01 |
| E-606 | ELECTRICAL SEISMIC SUPPORT DETAILS | 8/29/00 | 11/1/01 |
| E-607 | BASEMENT LEVEL KEY PLAN | 8/29/00 | 11/1/01 |
| E-608 | ELECTRICAL FEEDER ROUTING Sheet No. 1 | 8/29/00 | 11/1/01 |
| E-609 | ELECTRICAL FEEDER ROUTING Sheet No. 2 | 8/29/00 | 11/1/01 |
| E-610 | ELECTRICAL FEEDER ROUTING Sheet No. 3 | 8/29/00 | 11/1/01 |
| E-611 | ELECTRICAL FEEDER ROUTING Section Elevation | 8/29/00 | 11/1/01 |
| E-612 | ELECTRICAL PURGE ZONES & ASSOCIATED EQUIP. | 8/29/00 | 11/1/01 |
| E-613 | ELECTRICAL DETAILS FOR MANHOLE ARR. -Sheet 1 | 8/29/00 | 11/1/01 |
| E-614 | ELECTRICAL DETAILS FOR MANHOLE ARR. Sheet 2 | 8/29/00 | 11/1/01 |
| COVER SHEET | SECURITY/TELECOMMUNICATION/AUDIOVISUAL COVER SHEET | | 3/19/02 |
| ES-000.0 | Reference Sheet | 6/25/01 | 3/27/01 |
| ES-100.1 | Floor Plan - Area 1, Level B2 - Basement | 8/29/00 | 8/19/02 |
| ES-100.2 | Floor Plan - Area 2, Level B2 - Basement | 8/29/00 | 8/19/02 |
| ES-100.3 | Floor Plan - Area 3, Level B2 - Basement | 3/29/00 | 8/19/02 |
| ES-100.4 | Floor Plan - Area 4, Level B2 - Basement | 8/29/00 | 8/19/02 |
| ES-101.1 | Floor Plan - Area 1, Level B1 - Basement Mezzanine | 3/29/00 | 8/19/02 |
| ES-101.2 | Floor Plan - Area 2, Level B1 - Basement Mezzanine | 3/29/00 | 8/19/02 |
| ES-101.3 | Floor Plan - Area 3, Level B1 - Basement Mezzanine | 8/29/00 | 8/19/02 |
| ES-101.4 | Floor Plan - Area 4, Level B1 - Basement Mezzanine | 8/29/00 | 8/19/02 |
| ES-102.1 | Floor Plan - Area 1, Level 1 - Ground Level | 8/29/00 | 8/19/02 |
| ES-102.2 | Floor Plan - Area 2, Level 1 - Ground Level | 8/29/00 | 10/11/02 |
| ES-102.3 | Floor Plan - Area 3, Level 1 - Ground Level | 8/29/00 | 8/19/02 |
| ES-102.4 | Floor Plan - Area 4, Level 1 - Ground Level | 8/29/00 | 8/19/02 |
| ES-103.1 | Floor Plan - Area 1, Mezzanine | 8/29/00 | 8/19/02 |
| ES-103.2 | Floor Plan - Area 2, Mezzanine | 8/29/00 | 8/19/02 |
| ES-103.3 | Floor Plan - Area 3, Mezzanine | 8/29/00 | 8/19/02 |
| ES-104.1 | Floor Plan - Area 1, Level 2 | 8/29/00 | 8/19/02 |
| ES-104.2 | Floor Plan - Area 2, Level 2 | 8/29/00 | 8/19/02 |
| ES-104.3 | Floor Plan - Area 3, Level 2 | 8/29/00 | 8/19/02 |
| ES-105.1 | Floor Plan - Area 1, Level 3 | 8/29/00 | 8/19/02 |
| ES-105.2 | Floor Plan - Area 2, Level 3 | 8/29/00 | 8/19/02 |
| ES-105.3 | Floor Plan - Area 3, Level 3 | 8/29/00 | 8/19/02 |
| ES-106.1 | Floor Plan - Area 1, Level 4 | 8/29/00 | 8/19/02 |
| ES-106.2 | Floor Plan - Area 2, Level 4 | 8/29/00 | 8/19/02 |

| NUMBER | TITLE | ISSUE DATE | REVISION DATE |
|---|---|---|---|
| ES-106.3 | Floor Plan - Area 3, Level 4 | 8/29/00 | 8/19/02 |
| ES-107.1 | Floor Plan - Area 1, Level 5 | 8/29/00 | 8/19/02 |
| ES-107.2 | Floor Plan - Area 2, Level 5 | 8/29/00 | 8/19/02 |
| ES-107.3 | Floor Plan - Area 3, Level 5 | 8/29/00 | 8/19/02 |
| ES-108.1 | Floor Plan - Area 1, Level 6 | 8/29/00 | 8/19/02 |
| ES-108.2 | ES-108.2 Floor Plan - Area 2, Level 6 | 8/29/00 | 8/19/02 |
| ES-108.3 | ES-108.3 Floor Plan - Area 3, Level 6 | 8/29/00 | 8/19/02 |
| ES-109.1 | Floor Plan - Area 1, Level 7 | 8/29/00 | 8/19/02 |
| ES-109.2 | Floor Plan - Area 2, Level 7 | 8/29/00 | 8/19/02 |
| ES-109.3 | Floor Plan - Area 3, Level 7 | 8/29/00 | 8/19/02 |
| ES-110.1 | Floor Plan - Area 1, Level 8 | 8/29/00 | 8/19/02 |
| ES-110.2 | Floor Plan - Area 2, Level 8 | 8/29/00 | 8/19/02 |
| ES-110.3 | Floor Plan - Area 3, Level 8 | 8/29/00 | 11/1/01 |
| ES-111.1 | Floor Plan - Area 1, Level 9 | 8/29/00 | 11/1/01 |
| ES-111.2 | ES-111.2 Floor Plan - Area 2, Level 9 | 8/29/00 | 8/19/02 |
| ES-111.3 | ES-111.3 Floor Plan - Area 3, Level 9 | 8/29/00 | 8/19/02 |
| ES-112.1 | Floor Plan - Area 1, Level 10 | 8/29/00 | 8/19/02 |
| ES-112.2 | Floor Plan - Area 2, Level 10 | 8/29/00 | 8/19/02 |
| ES-112.3 | Floor Plan - Area 3, Level 10 | 8/29/00 | 8/19/02 |
| ES-400 | CCTV Matrix | 8/29/00 | 8/19/02 |
| ES-401 | Door Control Matrix | 8/29/00 | 8/19/02 |
| ES-402 | Door Control Matrix | 8/29/00 | 8/19/02 |
| ES-403 | Duress Matrix | 8/29/00 | 8/19/02 |
| ES-404 | Intercom Matrix | 8/29/00 | 8/19/02 |
| ES-405 | Elevator Matrix | 8/29/00 | 8/19/02 |
| ES-500 | CCTV Riser | 8/29/00 | 8/19/02 |
| ES-501 | Door Control / IDS / Duress Riser | 8/29/00 | 8/19/02 |
| ES-502 | Door Control / IDS / Duress Riser | 8/29/00 | 8/19/02 |
| ES-503 | Intercom Riser | 8/29/00 | 8/19/02 |
| ES-600 | Installation Details | 8/29/00 | 8/19/02 |
| ES-601 | Security Door Details | 8/29/00 | 8/19/02 |
| ES-604 | Terminal Cabinet | 8/29/00 | 8/19/02 |
| ES-700 | Security Console Layouts | 8/29/00 | 8/19/02 |
| ES-701 | Security Console Layouts | 8/29/00 | 8/19/02 |
| ES-702 | Security Console Layouts | 8/29/00 | 8/19/02 |
| ES-703 | Security Console Layouts | NOT ISSUED | NOT ISSUED |
| TC-000 | Drawing & Symbol List, General Notes | 10/17/01 | 8/19/02 |
| TC-100.1 | Telecommunications Distribution Plan, Level B2-Area 1 | 10/17/01 | 8/19/02 |
| TC-100.2 | Telecommunications Distribution Plan, Level B2-Area 2 | 10/17/01 | 8/19/02 |
| TC-100.3 | Telecommunications Distribution Plan, Level B2-Area 3 | 10/17/01 | 8/19/02 |
| TC-101.1 | Telecommunications Distribution Plan, Level B1-Area 1 | 10/17/01 | 8/19/02 |
| TC-101.2 | Telecommunications Distribution Plan, Level B1-Area 2 | 10/17/01 | 8/19/02 |
| TC-101.3 | Telecommunications Distribution Plan, Level B1-Area 3 | 10/17/01 | 8/19/02 |
| TC-102.1 | Telecommunications Distribution Plan, Ground Level-Area 1 | 10/17/01 | 8/19/02 |
| TC-102.2 | Telecommunications Distribution Plan, Ground Level-Area 2 | 10/17/01 | 8/19/02 |
| TC-102.3 | Telecommunications Distribution Plan, Ground Level-Area 3 | 10/17/01 | 8/19/02 |
| TC-103.1 | Telecommunications Distribution Plan, Mezz. Level-Area 1 | 10/17/01 | 8/19/02 |

| NUMBER | TITLE | ISSUE DATE | REVISION DATE |
|---|---|---|---|
| TC-103.2 | Telecommunications Distribution Plan, Mezz. Level-Area 2 | 10/17/01 | 8/19/02 |
| TC-103.3 | Telecommunications Distribution Plan, Mezz. Level-Area 3 | 10/17/01 | 8/19/02 |
| TC-104.1 | Telecommunications Distribution Plan, Level 2-Area 1 | 10/17/01 | 8/19/02 |
| TC-104.2 | Telecommunications Distribution Plan, Level 2-Area 2 | 10/17/01 | 8/19/02 |
| TC-104.3 | Telecommunications Distribution Plan, Level 2-Area 3 | 10/17/01 | 8/19/02 |
| TC-105.1 | Telecommunications Distribution Plan, Level 3-Area 1 | 10/17/01 | 8/19/02 |
| TC-105.2 | Telecommunications Distribution Plan, Level 3-Area 2 | 10/17/01 | 8/19/02 |
| TC-105.3 | Telecommunications Distribution Plan, Level 3-Area 3 | 10/17/01 | 8/19/02 |
| TC-106.1 | Telecommunications Distribution Plan, Level 4-Area 1 | 10/17/01 | 8/19/02 |
| TC-106.2 | Telecommunications Distribution Plan, Level 4-Area 2 | 10/17/01 | 8/19/02 |
| TC-106.3 | Telecommunications Distribution Plan, Level 4-Area 3 | 10/17/01 | 8/19/02 |
| TC-107.1 | Telecommunications Distribution Plan, Level 5-Area 1 | 10/17/01 | 8/19/02 |
| TC-107.2 | Telecommunications Distribution Plan, Level 5-Area 2 | 10/17/01 | 8/19/02 |
| TC-107.3 | Telecommunications Distribution Plan, Level 5-Area 3 | 10/17/01 | 8/19/02 |
| TC-108.1 | Telecommunications Distribution Plan, Level 6-Area 1 | 10/17/01 | 8/19/02 |
| TC-108.2 | Telecommunications Distribution Plan, Level 6-Area 2 | 10/17/01 | 8/19/02 |
| TC-108.3 | Telecommunications Distribution Plan, Level 6-Area 3 | 10/17/01 | 8/19/02 |
| TC-109.1 | Telecommunications Distribution Plan, Level 7-Area 1 | 10/17/01 | 8/19/02 |
| TC-109.2 | Telecommunications Distribution Plan, Level 7-Area 2 | 10/17/01 | 8/19/02 |
| TC-109.3 | Telecommunications Distribution Plan, Level 7-Area 3 | 10/17/01 | 8/19/02 |
| TC-110.1 | Telecommunications Distribution Plan, Level 8-Area 1 | 10/17/01 | 8/19/02 |
| TC-110.2 | Telecommunications Distribution Plan, Level 8-Area 2 | 10/17/01 | 8/19/02 |
| TC-110.3 | Telecommunications Distribution Plan, Level 8-Area 3 | 10/17/01 | 8/19/02 |
| TC-111.1 | Telecommunications Distribution Plan, Level 9-Area 1 | 10/17/01 | 8/19/02 |
| TC-111.2 | Telecommunications Distribution Plan, Level 9-Area 2 | 10/17/01 | 8/19/02 |
| TC-111.3 | Telecommunications Distribution Plan, Level 9-Area 3 | 10/17/01 | 8/19/02 |
| TC-112.1 | Telecommunications Distribution Plan, Level 10-Area 1 | 10/17/01 | 8/19/02 |
| TC-112.2 | Telecommunications Distribution Plan, Level 10-Area 2 | 10/17/01 | 8/19/02 |
| TC-112.3 | Telecommunications Distribution Plan, Level 10-Area 3 | 10/17/01 | 8/19/02 |
| TC-200 | Telecommunications Room Details | 10/17/01 | 8/19/02 |
| TC-201 | Telecommunications LAN/Server | 10/17/01 | 8/19/02 |
| TC-202 | Telecommunications Details | 10/17/01 | 8/19/02 |
| TC-300 | Backbone Pathway & Schematic | 10/17/01 | 8/19/02 |
| TC-301 | Backbone Pathway & Cabling Schematic | 10/17/01 | 8/19/02 |
| AV-00 | Audiovisual General Notes and Symbols | 7/14/01 | 8/19/02 |
| AV-1 | AV Facilities Plan, Typical Courtroom | 8/29/00 | 8/19/02 |
| AV-2 | AV Facilities Plan, Arraignment/Narcotics Courtroom | 8/29/00 | 8/19/02 |
| AV-3 | AV Facilities Plan, Large Trial Courtroom | 8/29/00 | 8/19/02 |
| AV-3B | AV Facilities Plan, Arraignment Courtrooms, B201 & B202 | 8/29/00 | 8/19/02 |
| AV-4 | AV Facilities Plan, Grand Jury Courtroom | 8/29/00 | 8/19/02 |
| AV-5 | AV Facilities Plan, Jury Assembly Room | 8/29/00 | 8/19/02 |
| AV-5A | AV Facilities Plan, Jury Assembly Mezzanine | 8/29/00 | 8/19/02 |
| AV-5B | AV Facilities Plan, Jury Assembly Room, Jury Room Sections | 8/29/00 | 8/19/02 |
| AV-6 | Court Clerk AV Facility/RCP Plan, Level 2 | 8/29/00 | 8/19/02 |
| AV-E1 | Courtrooms AV Electrical Plan, Typical Courtroom | 8/29/00 | 8/19/02 |
| AV-E2 | Courtrooms AV Electrical Plan, Arraignment Courtroom | 8/29/00 | 8/19/02 |
| AV-E3 | Courtrooms AV Electrical Plan, Large Trial Courtroom | 8/29/00 | 8/19/02 |
| AV-E3A | Courtrooms AV Reflected Ceiling Plan, Large Trial Courtroom | 8/29/00 | 8/19/02 |

Bronx Criminal Court Complex.
Bronx, N.Y.
QED_Drawing File 112.102 CONTRACTS] 8,16,17 Revised

Page 21 of 23
November 21, 2002

| NUMBER | TITLE | ISSUE DATE | REVISION DATE |
|---|---|---|---|
| AV-E31 | Courtrooms AV Reflected Ceiling Plan, Courtrooms B201 & B202 | 8/29/00 | 8/19/02 |
| AV-E4 | Courtrooms AV Electrical Plan, Grand Jury Courtroom | 8/29/00 | 8/19/02 |
| AV-E5 | Jury Assembly AV Electrical Plan, Jury Assembly Room | 8/29/00 | 8/19/02 |
| AV-E5A | Jury Assembly Room AV Electrical Plan, Mezzanine Level | 8/29/00 | 8/19/02 |
| AV-E5C | Jury Assembly Room AV RCP Plan, Peripheral rooms | 8/29/00 | 8/19/02 |
| AV-E6 | Court Clerkroom, AV Elect. P/RCP, Level 2 | 8/29/00 | 8/19/02 |
| AV-B7A | PA System, AV Electrical RCP, Level 3-5 West | 8/29/00 | 8/19/02 |
| AV-B7B | PA System, AV Electrical RCP, Level 3-5 East | 8/29/00 | 8/19/02 |
| AV-B8A | PA System, AV Electrical RCP, Level B2 West | 8/29/00 | 8/19/02 |
| AV-B8B | System, AV Electrical RCP, Level B2 East | 8/29/00 | 8/19/02 |
| AV-B9 | System, AV Electrical RCP, Level 7 Library | 8/29/00 | 8/19/02 |
| AV-S1 | AV SYSTEM DIAGRAM, Typ. Courtroom | 8/29/00 | 8/19/02 |
| AV-S2 | AV SYSTEM DIAGRAM, Courtrooms B261, B262, B265, B237, B201 & B202 | 8/29/00 | 8/19/02 |
| AV-S2A | AV SYSTEM DIAGRAM, Courtrooms B261, B262, B201, B237, B265 & B202 | 8/29/00 | 8/19/02 |
| AV-S3 | VIDEO SYSTEM DIAGRAM, Courtroom B264 | 8/29/00 | 8/19/02 |
| AV-S3A | AUDIO SYSTEM DIAGRAM, Courtroom B264 | 8/29/00 | 8/19/02 |
| AV-S4 | AV SYSTEM DIAGRAM, Grand Jury Courtroom | 8/29/00 | 8/19/02 |
| AV-S5 | AV SYSTEM DIAGRAM, Jury Assembly | 8/29/00 | 8/19/02 |
| AV-S6 | AV SYSTEM DIAGRAM, Court Clerk Area | 8/29/00 | 8/19/02 |
| AV-S7 | AV SYSTEM DIAGRAM, Press Room | 8/22/00 | 8/19/02 |
| AV-C1 | AV CONTROL SYSTEM DIAGRAM, Typical Courtroom | 8/29/00 | 8/19/02 |
| AV-C2 | AV CONTROL SYSTEM DIAGRAM, Courtroom B264 | 8/29/00 | 8/19/02 |
| AV-C3 | AV CONTROL SYSTEM DIAGRAM, Courtrooms B237, B261, B201, B202 & B265 | 8/29/00 | 8/19/02 |
| AV-C4 | AV CONTROL SYSTEM DIAGRAM, Grand Jury Courtroom | 8/29/00 | 8/19/02 |
| AV-C5 | AV CONTROL SYSTEM DIAGRAM, Jury Assembly | 8/29/00 | 8/19/02 |
| COVER SHEET | SIGNAGE PROGRAM | 3/8/00 | 8/19/02 |
| SIGNAGE | PREPARED BY | 3/8/00 | 8/19/02 |
| SIGNAGE | TABLE OF CONTENTS | 3/8/00 | 8/19/02 |
| SIGNAGE | BUILDING STANDARD ALPHABET | 3/8/00 | 8/19/02 |
| SIGNAGE | SUMMARY OF SIGN TYPES | 3/8/00 | 8/19/02 |
| SIGNAGE | SIGN TYPE AA1 - Building Name and Main Entrance | 3/8/00 | 8/19/02 |
| SIGNAGE | SIGN TYPE AA2 - Exterior Secondary Entrances | 3/8/00 | 8/19/02 |
| SIGNAGE | SIGN TYPE A1 - Building Directory, Public | 3/8/00 | 8/19/02 |
| SIGNAGE | SIGN TYPE A2 - Building Directory, Staff | 3/8/00 | 8/19/02 |
| SIGNAGE | SIGN TYPE A3 - Department Identifier | 3/8/00 | 8/19/02 |
| SIGNAGE | SIGN TYPE A4 - Building Address | 3/8/00 | 8/19/02 |
| SIGNAGE | SIGN TYPE B - Queue Identifier Numbers | 3/8/00 | 8/19/02 |
| SIGNAGE | SIGN TYPE B1 - Identifier @ Magnometer | 3/8/00 | 8/19/02 |
| SIGNAGE | SIGN TYPE B2 - Service Desk Identifier | 3/8/00 | 8/19/02 |
| SIGNAGE | SIGN TYPE C1 - Directional Sign | 3/8/00 | 8/19/02 |
| SIGNAGE | SIGN TYPE C2/C3 - Floor Directory, Fire Evacuation Map @ Public Elevator | 3/8/00 | 8/19/02 |
| SIGNAGE | SIGN TYPE C2/C3 - Floor Directory, Fire Evacuation Map @ Private Elevator | 3/8/00 | 8/19/02 |

| NUMBER | TITLE | ISSUE DATE | REVISION DATE |
|---|---|---|---|
| SIGNAGE | SIGN TYPE C4 - Floor Serviced Sign @ Public Elevators | 3/8/00 | 8/19/02 |
| SIGNAGE | SIGN TYPE D1 - Door Identifiers / Permanent | 3/8/00 | 8/19/02 |
| SIGNAGE | SIGN TYPE D2 - Door Identifier / Changeable | 3/8/00 | 8/19/02 |
| SIGNAGE | SIGN TYPE D3 - Fire Stairs Sign | 3/8/00 | 8/19/02 |
| SIGNAGE | SIGN TYPE E1 - Electronic Building Directory, Main Lobby | 3/8/00 | 8/19/02 |
| SIGNAGE | SIGN TYPE E2 - Electronic Building Directory, Public Corridors | 3/8/00 | 8/19/02 |
| SIGNAGE | ELEVATION @ COURTROOM ENTRY - F1,F2 | 3/8/00 | 8/19/02 |
| SIGNAGE | SIGN TYPE F1 - Courtroom Identifier over Entry Door | 3/8/00 | 8/19/02 |
| SIGNAGE | SIGN TYPE F2 - Courtroom Identifier / Information | 3/8/00 | 8/19/02 |
| SIGNAGE | SIGN TYPE G - In God We Trust | 3/8/00 | 8/19/02 |
| SIGNAGE | SIGN TYPE J - Judge's Desk Bar | 3/8/00 | 8/19/02 |
| SIGNAGE | SIGN TYPE K - Freestanding Directional | 3/8/00 | 8/19/02 |
| SIGNAGE | SIGN TYPE R1 - Regulatory Signs in Restrooms | 3/8/00 | 8/19/02 |
| SIGNAGE | SIGN TYPE R2 - Regulatory Signs on Glass @ Building Entry | 3/8/00 | 8/19/02 |
| COVER SHEET | SIGNAGE LOCATION PLANS | 3/8/00 | 8/19/02 |
| SLP-LL2 | SIGNAGE LOCATION PLAN - LOWER LEVEL 2 (B2) | 3/8/00 | 8/19/02 |
| SLP-LL1 | SIGNAGE LOCATION PLAN - LOWER LEVEL 1 (B1) | 3/8/00 | 8/19/02 |
| SLP 1 | SIGNAGE LOCATION PLAN - FIRST FLOOR | 3/8/00 | 8/19/02 |
| SLP M | SIGNAGE LOCATION PLAN - MEZZANINE FLOOR | 3/8/00 | 8/19/02 |
| SLP 2 | SIGNAGE LOCATION PLAN - SECOND FLOOR | 3/8/00 | 8/19/02 |
| SLP 3-6 | SIGNAGE LOCATION PLAN - THIRD FLOOR | 3/8/00 | 8/19/02 |
| SLP 7 | SIGNAGE LOCATION PLAN - SEVENTH FLOOR | 3/8/00 | 8/19/02 |
| SLP 8 | SIGNAGE LOCATION PLAN - EIGHTH FLOOR | 3/8/00 | 8/19/02 |
| SLP 9 | SIGNAGE LOCATION PLAN - NINTH FLOOR | 3/8/00 | 8/19/02 |
| SLP 10 | SIGNAGE LOCATION PLAN - TENTH FLOOR | 3/8/00 | 8/19/02 |

SPECIFICATIONS
CONTRACT 9 GC No2 Fitout

CONTRACT 16 Architectural Woodwork No. 1
CONTRACT 17 Architectural Woodwork No. 2

| DIVISION 0 & DIVISION 1 - PROJECT MANUAL | ISSUE DATE | REVISION DATE |
|---|---|---|
| | | 8/19/02 |
| DIVISION 2 - SITE WORK | | |
| | | |
| 02060 Building Demolition | | |
| 02080 Asbestos Removal | | 10/6/00 |
| 02100 Environmental Sampling | | 10/6/00 |
| 02200 Excavation, Filling and Grading | | 11/1/01 |
| 02210 Steel H piles | | 11/1/01 |
| 02230 Site Clearing and Tree Protection | | 11/1/01 |
| 02505 Stabilized Stone Dust Pavement | | 2/8/02 |
| 02515 Patching of Concrete Walks and Curbs (for Demolition use only) | | 8/19/02 |
| 02518 Unit Masonry Pavers | | 6/29/01 |
| 02710 Foundation Drainage | | 8/19/02 |
| 02720 Site Storm Drainage | | 11/1/01 |
| 02725 Site Drainage Pipes | | 11/1/01 |
| 02764 Pigmented Concrete Pavement and Curbs | | 11/1/01 |
| 02790 Site Lighting System | | 3/19/02 |
| 02835 Steel Picket Fence and Gates (formerly 02836) | | 11/1/01 |
| 02840 Traffic Barriers | | 8/19/02 |
| 02870 Site Furnishings | | 3/19/02 |
| 02900 Landscaping | | 8/19/02 |
| 02950 Street Tree Structural Soil & Planting Soil | | 8/19/02 |
| | | 8/19/02 |
| DIVISION 3 - CONCRETE | | |
| | | |
| 03200 Concrete Foundation Work | | 11/1/01 |
| 03300 Cast-In-Place Concrete | | 11/1/01 |
| 03450 Architectural Precast Concrete | | 8/19/02 |
| DIVISION 4 - MASONRY | | |
| | | |
| 04200 Unit Masonry | | |
| 04440 Exterior Stonework (DELETED) | | 2/8/01 |
| DIVISION 5 - METALS | | |

| | | ISSUE DATE | REVISION DATE |
|---|---|---|---|
| 05100 | Structural Steel | | |
| | Attachment No 1: Steel Tolerances | | 11/1/01 |
| 05300 | Metal Decking | | 10/17/00 |
| 05310 | Struct'l Steel & Steel Deck--Testing and Inspection | | 11/1/01 |
| 05500 | Metal Fabrications | | 10/2/00 |
| 05510 | Metal Stairs | | 7/1/02 |
| 05700 | Ornamental Metalwork | | 11/1/01 |
| 05720 | Ornamental Handrails and Railings | | 8/19/02 |
| 05750 | Entrance Canopy | | 8/19/02 |
| 05810 | Expansion Joint Cover Assemblies | | 2/8/02 |
| | | | 2/8/02 |
| **DIVISION 6 - WOOD AND PLASTICS** | | | |
| | | | |
| 06100 | Rough Carpentry | | |
| 06400 | Architectural Woodwork | | 8/19/02 |
| | | | 8/19/02 |
| **DIVISION 7 - THERMAL AND MOISTURE PROTECTION** | | | |
| | | | |
| 07122 | Hot Fluid Applied Waterproofing | | |
| 07131 | Self-Adhering Sheet Waterproofing | | 11/1/01 |
| 07160 | Dampproofing | | 11/1/01 |
| 07165 | Capillary Waterproofing | | 11/1/01 |
| 07180 | Traffic Coatings | | 11/1/01 |
| 07190 | Vapor Retarders | | 11/1/01 |
| 07200 | Building Insulation | | 11/1/01 |
| 07412 | Composite Metal Panel Assemblies | | 2/8/02 |
| 07552 | SBS-Modified Bituminous Membrane Roofing | | 2/8/02 |
| 07610 | Sheet Metal Roofing | | 11/1/01 |
| 07620 | Sheet metal flashing and trim | | 11/1/01 |
| 07700 | Roof Accessories | | 11/1/01 |
| 07811 | Sprayed Fire-Resistive Materials | | 2/8/02 |
| 07841 | Firestop Systems | | 11/30/01 |
| 07900 | Joint Sealers | | 2/8/02 |
| | | | 8/19/02 |
| **DIVISION 8 - DOORS AND WINDOWS** | | | |
| | | | |
| 08111 | Steel Doors and Frames | | |
| 08112 | Steel Framed Glass Partition System | | 2/8/02 |
| 08130 | Detention Hollow Metal | | 8/19/02 |
| 08210 | Flush Wood Doors | | 8/19/02 |
| 08305 | Access Doors | | 7/1/02 |
| 08330 | Overhead Coiling Doors | | 2/8/02 |
| 08361 | Tilt-up Doors | | 2/8/02 |
| | | | 2/8/02 |

| | | ISSUE DATE | REVISION DATE |
|---|---|---|---|
| 08450 | All-Glass Entrances | | 8/19/02 |
| 08451 | Custom All-Glass Entrances | | 10/17/00 |
| 08470 | Revolving Entrance Doors | | 10/17/00 |
| 08525 | Acoustical Windows (DELETED, SEE 08800) | | |
| 08630 | Metal Framed Skylights | | 10/17/00 |
| 08710 | Door Hardware | | 8/19/02 |
| 08800 | Glass and Glazing | | 8/19/02 |
| 08805 | Security Glazing | | 8/19/02 |
| 08900 | Metal and Glass Curtainwall Systems | | 8/19/02 |
| | Attachment No 1: Wind Load Map | | 10/17/00 |
| | Attachment No 2: Structural Deflection Criteria | | 10/17/00 |
| | Attachment No 3: Deflection at Expansion Joint Criteria | | 10/17/00 |
| **DIVISION 9 - FINISHES** | | | |
| | | | |
| 09200 | Plaster and Gypsum Board | | 8/19/02 |
| 09260 | Gypsum Drywall | | 8/19/02 |
| 09265 | Gypsum Shaft Wall Assemblies | | 2/8/02 |
| 09300 | Tile | | 8/19/02 |
| 09400 | Terrazzo | | 7/1/02 |
| 09511 | Acoustical Panel Ceilings | | 8/19/02 |
| 09515 | Luminous Ceiling System (ALTERNATE) | | 2/8/02 |
| 09540 | Security Ceilings | | 7/1/02 |
| 09547 | Linear Metal Ceilings (DELETED, SEE 09511) | | |
| 09600 | Interior Stonework | | 8/19/02 |
| 09640 | Wood Flooring | | 7/1/02 |
| 09650 | Resilient Flooring | | 8/19/02 |
| 09680 | Carpeting | | 2/8/02 |
| 09705 | Resinous Flooring | | 8/19/02 |
| 09841 | Acoustical Wall Panels | | 8/19/02 |
| 09860 | Graffiti Resistant Coating | | 11/1/01 |
| 09900 | Painting | | 10/3/02 |
| **DIVISION 10 - SPECIALTIES** | | | |
| | | | |
| 10160 | Toilet Partitions | | 7/1/02 |
| 10200 | Aluminum Louvers | | 10/17/00 |
| 10265 | Impact-Resistant Wall Protection | | 8/19/02 |
| 10350 | Flagpoles | | 8/19/02 |
| 10426 | Signage and Graphics | | 7/1/02 |
| 10500 | Metal Lockers | | 2/8/02 |
| 10522 | Fire Extinguishers and Cabinets | | 7/1/02 |
| 10620 | Wire Mesh Partitions | | 6/29/02 |

Bronx Criminal Court Complex
Bronx, N.Y.

| | | ISSUE DATE | REVISION DATE |
|---|---|---|---|
| 10750 | Telephone Specialties | | 8/19/02 |
| 10800 | Toilet Accessories | | 7/1/02 |
| | | | |
| **DIVISION 11 - EQUIPMENT** | | | |
| | | | |
| 11010 | Facade Maintenance System | | 8/19/02 |
| 11150 | Parking Control Equipment (DELETED, SEE 02840) | | |
| 11160 | Loading Dock Equipment | | 8/19/02 |
| 11190 | Detention Equipment | | 8/19/02 |
| 11191 | Detention Accessories | | 8/19/02 |
| 11196 | Security Fasteners | | 8/19/02 |
| 11681 | Electronic Display Devices | | 7/1/02 |
| | | | |
| **DIVISION 12 - FURNISHINGS** | | | |
| | | | |
| 12620 | Foot Grilles | | 2/8/02 |
| | | | |
| **DIVISION 13 - SPECIAL CONSTRUCTION** | | | |
| | | | |
| 13130 | Prefabricated Attendant Booth | | 8/19/02 |
| 13700 | General Requirements Electronic Security Systems | | 8/19/02 |
| 13710 | Security Systems Control and Annunciation | | 8/19/02 |
| 13720 | Control Consoles | | 8/19/02 |
| 13730 | Access Control and Alarm Systems | | 8/19/02 |
| 13740 | Closed Circuit Television System (CCTV) | | 8/19/02 |
| 13750 | Security Intercommunication System | | 8/19/02 |
| 13760 | Uninterruptable Power Supply Systems | | 8/19/02 |
| | | | |
| **DIVISION 14 - CONVEYING SYSTEMS** | | | |
| | | | |
| 14211 | Traction Elevators | | 11/1/01 |
| 14212 | Hydraulic Elevator | | 11/1/01 |
| 14420 | Wheelchair Lifts | | 11/1/01 |
| 14700 | Escalators | | 11/1/01 |
| | | | |
| **DIVISION 15 - PLUMBING** | | | |
| | | | |
| 15501 | Plumbing Special Conditions | | 11/1/01 |
| 15502 | Scope of Work | | 11/1/01 |
| 15504 | Access Doors General | | 11/1/03 |
| 15506 | Testing | | 11/1/01 |
| 15508 | Plumbing Basic Materials and Methods | | 11/1/01 |
| 15510 | Piping and Fixing Materials | | 11/1/01 |

| | | ISSUE DATE | REVISION DATE |
|---|---|---|---|
| 15511 | Hangers, Supports, Anchors and Guides | | 11/1/01 |
| 15512 | Valves | | 11/1/01 |
| 15513 | Disinfecting of Water Supply System | | 11/1/01 |
| 15514 | Backflow Prevention | | 11/1/01 |
| 15515 | Plumbing Fixtures and Trim | | 11/1/01 |
| 15516 | Domestic Water Heaters | | 11/1/01 |
| 15517 | Domestic Water System | | 11/1/01 |
| 15519 | Sanitary and Storm Drainage Systems | | 11/1/01 |
| 15521 | Tanks | | 11/1/01 |
| 15524 | Water Meters | | 11/1/01 |
| 15525 | Vibration Isolation | | 11/1/01 |
| 15528 | Insulation | | 11/1/01 |
| 15529 | Natural Gas System | | 11/1/01 |
| 15540 | Pumps | | 11/1/01 |
| 15550 | Electric Heat Tracing | | 11/1/01 |
| | | | |
| DIVISION 16 - HVAC & FIRE PROTECTION | | | |
| | | | |
| 16301 | Fire Protection Special Conditions | | 11/1/01 |
| 16302 | Scope of Work | | 11/1/01 |
| 16304 | Access Doors in General Construction | | 11/1/01 |
| 16306 | Fire Protection Basic Materials and Methods | | 11/1/01 |
| 16310 | Piping and Fitting Materials | | 11/1/01 |
| 16311 | Hangers, Supports, Anchors and Guides | | 11/1/01 |
| 16312 | Valves | | 11/1/01 |
| 16316 | Wet Pipe Sprinkler Systems | | 11/1/01 |
| 16317 | Dry Pipe Sprinkler Systems | | 11/1/01 |
| 16320 | Standpipe and Hose Systems | | 11/1/01 |
| 16340 | Pumps | | 11/1/01 |
| 16500 | Heating, Ventilation & Air Cond Special Conditions | | 11/1/01 |
| 16502 | Scope of Work | | 11/1/01 |
| 16504 | Access Doors in General Construction | | 11/1/01 |
| 16505 | Systems Identification | | 11/1/01 |
| 16506 | Firestopping | | 11/1/01 |
| 16507 | Instruments | | 11/1/01 |
| 16508 | Heating, Ventilating and Air Cond Design Criteria | | 11/1/01 |
| 16509 | Piping and Accessories | | 11/1/01 |
| 16510 | Mechanically Coupled Piping and Accessories | | 11/1/01 |
| 16512 | Hangers, Anchors and Supports | | 11/1/01 |
| 16513 | Valves | | 11/1/01 |
| 16514 | Expansion Compensators | | 11/1/01 |
| 16515 | Pipe Cleaning and Chemical Water Treatment | | 11/1/01 |
| 16516 | Testing, Adjusting and Balancing | | 11/1/01 |

| | | | ISSUE DATE | REVISION DATE |
|---|---|---|---|---|
| | 16526 | Water Specialties | | 11/1/01 |
| | 16530 | Sheet Metal | | 11/1/01 |
| | 16531 | Dampers | | 11/1/01 |
| | 16533 | Vents, Stacks and Breeching | | 11/1/01 |
| | 16540 | Pumps | | 11/1/01 |
| | 16554 | Packaged Fire Tube Boilers | | 11/7/01 |
| | 16590 | Fuel Handling Systems | | 11/1/01 |
| | 16690 | Refrigeration Machines (Water Cooled) | | 11/1/01 |
| | 16710 | Cooling Towers | | 11/1/01 |
| | 16711 | Water Filters and Cleaners | | 11/1/01 |
| | 16780 | Water Cooled Self-Contained Air Cond Units | | 11/1/01 |
| | 16790 | Coils | | 11/1/01 |
| | 16830 | Space Heating Units | | 11/1/01 |
| | 16853 | Factory Assembled Air Handling Units | | 11/1/01 |
| | 16860 | Fans | | 11/1/01 |
| | 16683 | Air Filters and Cleaners | | 11/7/01 |
| | 16920 | Acoustics | | 11/1/01 |
| | 16923 | Vibration Isolation | | 11/1/01 |
| | 16928 | Insulation | | 11/1/01 |
| | 16930 | Air Terminal Units | | 11/1/01 |
| | 16940 | Air Outlets and Inlets | | 11/1/01 |
| | 16945 | Electric Motors | | 11/1/01 |
| | 16946 | Electric Motor Controllers | | 11/1/01 |
| | 16947 | Variable Frequency Controllers | | 11/1/01 |
| | 16950 | Electric Heat Tracing | | 11/1/01 |
| | 16960 | Carbon Monoxide Control Systems | | 11/1/01 |
| | 16970 | Special Conditions for Temperature Controls | | 11/1/01 |
| | 16972 | Identification | | 11/1/01 |
| | 16973 | Testing, Acceptance and Start-up | | 11/1/01 |
| | 16974 | Central Computer Console Hardware | | 11/1/01 |
| | 16975 | Field Hardware and Materials | | 11/1/01 |
| | 16976 | Signal Transmission | | 11/1/01 |
| | 16977 | Central Computer Console Software | | 11/1/01 |
| | 16978 | Installation | | 11/1/01 |
| | 16979 | Sequence of Controls | | 11/1/01 |
| | | | | |
| DIVISION 17 - ELECTRICAL | | | | |
| | | | | |
| | 17001 | Electrical Special Conditions | | 11/1/01 |
| | 17002 | Scope of Work | | 11/1/01 |
| | 17004 | Access Doors in General Construction | | 11/1/01 |
| | 17005 | Systems Identification | | 11/1/01 |
| | 17006 | Testing, Adjusting and Balancing | | 11/1/01 |

| | | ISSUE DATE | REVISION DATE |
|---|---|---|---|
| 17010 | Equipment Connections and Coordination | | 11/1/01 |
| 17030 | Vibration Isolation and Seismic Restraint | | 11/1/01 |
| 17110 | Raceways & Boxes | | 11/1/01 |
| 17115 | Bus Duct | | 11/1/01 |
| 17120 | 600 Volt Wire & Cable | | 11/1/01 |
| 17130 | Wiring Devices | | 11/1/01 |
| 17132 | Poke-Through Floor Outlets | | 11/1/01 |
| 17140 | Installation of Individual Motor Controllers | | 11/1/01 |
| 17145 | Relays and Remote Control Switches | | 11/1/01 |
| 17150 | Disconnect Switches | | 11/1/01 |
| 17160 | Fuses (600 V and Less) | | 11/1/01 |
| 17190 | Panelboards | | 11/1/01 |
| 17190 | Ceiling, Floor, Wall Electrical Penetration Fire Seals | | 11/1/01 |
| 17210 | Engine/Generators & Accessories | | 11/1/01 |
| 17220 | Automatic Transfer Switches | | 11/1/01 |
| 17420 | Switchboards | | 11/1/01 |
| 17430 | Dry Type Transformers | | 11/1/01 |
| 17450 | Grounding System | | 11/1/01 |
| 17460 | Lightning Protection | | 11/1/01 |
| 17470 | Motor Control Centers | | 11/1/01 |
| 17500 | Luminaires & Accessories | | 11/1/01 |
| 17530 | Individual Dimmer Switches | | 11/1/01 |
| 17561 | Occupancy Sensor Lighting Control | | 11/1/01 |
| 17620 | Uninterruptible Power Systems | | 11/1/01 |
| 17721 | Fire Alarm Life Safety System | | 11/1/01 |
| 17740 | Telecommunication Raceways & Accessories | | 11/1/01 |
| 17750 | Telecommunication Cable & Termination equipment | | 8/19/02 |
| 17770 | Audiovisual Systems | | 8/19/02 |
| 17790 | Lighting Control System | | 11/1/01 |
| 17810 | Cable Snow Melting System | | 11/1/01 |
| APPENDIX | | | |
| | Appendix to Volume 1: | | |
| 1.1 | Geotechnical Report & Pump Test Report | | 11/1/01 |
| 1.2 | Door and Hardware Schedule | | 8/19/02 |
| 1.3 | Graphics and Signage Schedule | | 8/19/02 |
| 1.4 | Furniture, Fixtures & Equipment | | 8/13/02 |
| | Appendix to Volume 2: | | |
| 2.1 | Light Fixture Schedule | | 11/1/01 |
| 2.2 | Con Edison Specifications | | 11/1/01 |
| Attachment | Environmental Report (issued with Contract 5 only) | | 11/1/01 |
| | Signage Program (issued with Contracts 9,14,15 only) | | 8/19/02 |

ISSUE DATE          REVISION DATE

Notes for specification responsibility matrix:
"X" means base contract Work in that spec.
"A" means Alternate Work in that spec.
All specs without an "X" or "A" are reference documents for all Contractors.
Some contract Work may be identified in reference documents.

# LABOR AND MATERIAL
## PAYMENT BOND



DORMITORY AUTHORITY – STATE OF NEW YORK

## LABOR AND MATERIAL PAYMENT BOND

Bond No. 3SE030676

KNOW ALL MEN BY THESE PRESENTS:

That   CAULDWELL WINGATE COMPANY, LLC

380 Lexington Avenue, 53rd Floor, New York, New York 10168

as Principal, hereinafter called CONTRACTOR, and

AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY
(Here insert the legal title of Surety)

Three Connell Drive, Berkeley Heights, New Jersey   07922-0608
(Address)

as Surety, hereinafter called Surety, are held and firmly bound unto the Dormitory Authority - State of New York, 515 Broadway, Albany, New York 12207, as Obligee, hereinafter called OWNER, in the amount of Forty-Six Million Nine Hundred Ninety-Five Thousand  and 00/100 Dollars ($46,995,000.00),

WHEREAS, CONTRACTOR has by written agreement dated December 20, 2002 entered into a Contract with OWNER for the General Construction #2 - Fitout Work at Bronx Criminal Court Complex, DA # 92561, 1380909999/CR58 in accordance with the Contract Documents and any changes thereto, which are made a part hereof, and are hereinafter referred to as the Contract.

NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION is such that if the CONTRACTOR shall promptly make payment to all claimants as hereinafter defined, for all labor and material used or reasonably required for use in the performance of the Contract, then this obligation shall be void; otherwise such obligation shall remain in full force and effect, subject, however, to the following conditions:

1.   A claimant is defined as one having a direct Contract with the CONTRACTOR or with a Subcontractor of the CONTRACTOR for labor, material, or both, used or reasonably required for use in the performance of the Contract, labor and material being construed to include that part of water, gas, power, light, heat, oil, gasoline, telephone service or rental of equipment directly applicable to the Contract.

2.   The above named CONTRACTOR and Surety hereby jointly and severally agree with the OWNER that every claimant as herein defined, who has not been paid in full before the expiration of a period of ninety (90) days after the date on which the last of such claimant's work or labor was done or performed, or materials were furnished by such claimant, may sue on this bond for the use of such claimant, prosecute the suit to final judgment for such sum or sums as may be justly due claimant, and have execution thereon. The OWNER shall not be liable for the payment of any costs or expenses of any such suit.

1

3.      No suit or action shall be commenced hereunder by any claimant:

a.      Unless claimant, other than one having a direct contract with the
        CONTRACTOR, shall have given written notice to any two (2) of the
        following: 1) the CONTRACTOR, 2) the OWNER, or 3) the Surety above
        named, within ninety (90) days after such claimant did or performed the
        last of the work or labor, or furnished the last of the materials for which
        said claim is made, stating with substantial accuracy the amount claimed
        and the name of the party to whom the materials were furnished, or for
        whom the work or labor was done or performed.  Such notice shall be
        served by mailing the same by registered mail or certified mail, postage
        prepaid, in an envelope addressed to the CONTRACTOR, OWNER, or
        Surety, at any place where an office is regularly maintained by said
        CONTRACTOR, OWNER, or Surety for the transaction of business, or
        served in any manner in which legal process may be served in the State in
        which the aforesaid project is located, save that such service need not be
        made by a public officer.

b.      After the expiration of one (1) year following the date on which
        CONTRACTOR ceased work of said Contract, however, if any limitation
        embodied in this bond is prohibited by any law controlling the
        construction hereof such limitation shall be deemed to be amended so as to
        be equal to the minimum period of limitation permitted by such law.

c.      Other than in a State court of competent jurisdiction in and for the county
        or other political subdivision of the State in which the project, or any part
        thereof, is situated, or in the United States District Court for the district in
        which the project, or any part thereof, is situated, and not elsewhere.

4.      The penal sum of this Bond is in addition to any other Bond furnished by the
        CONTRACTOR and in no way shall be impaired or affected by any other Bond.

2

5.    The amount of this Bond shall be reduced by and to the extent of any payment or payments made in good faith hereunder, inclusive of the payment by Surety of Mechanics' Liens which may be filed of record against said improvement, whether or not claim for the amount of such lien be presented under and against this Bond.

Signed this ___27th___ day of _____December_____ 2002.

IN THE PRESENCE OF:


CAULDWELL WINGATE                    AMERICAN MANUFACTURERS
COMPANY, LLC                         MUTUAL INSURANCE COMPANY
(Contractor)                         (Surety)



(Signature)                          (Signature)


Susan L. Hayes, President            THERESA J. FOLEY, ATTORNEY-IN-FACT
(Title)                              (Title)

380 Lexington Avenue                 Three Connell Drive
(Address)                            (Address)

New York, New York  10168            Berkeley Heights, New Jersey  07922
(City, State, Zip)                   (City, State, Zip)

(212) 983-7150                       (908) 286-5390
(Telephone Number)                   (Telephone Number)

(212) 983-7275                       (908) 286-5680
(Facsimile Number)                   (Facsimile Number)

5

ACKNOWLEDGEMENT OF CONTRACTOR, IF A PARTNERSHIP, LIMITED LIABILITY
COMPANY OR INDIVIDUAL

STATE OF NEW YORK        )
                         }  ss:
COUNTY OF ___NY___       )

On the _30th_ day of ___December___ in the year 2002, before me, the undersigned, a Notary
Public in and for said State, personally appeared _Susan L. Hayes_ _____ of CAULDWELL WINGATE
COMPANY, LLC, personally known or proved to me on the basis of satisfactory evidence to be the individual(s)
whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the
same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the
person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public

PATRICK J. HARDY
Notary Public, State of New York
No. 31-5052960
Qualified in New York County
Commission Expires Dec. 11, 2005

ACKNOWLEDGEMENT OF SURETY

STATE OF NEW YORK        )
                         }  ss:
COUNTY OF _Nassau_       )

On the _27th_ day of _December_____ in the year 2002 before me personally came _____
_THERESA J. FOLEY_____ to me known, who, being by me duly sworn, did depose and say that
(s)he resides at _____ Levittown, NY _____

_____ that (s)he is the ____Attorney-In-Fact____
___ of AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY, the corporation
described in and which executed the above instrument; and that (s)he signed her/his name thereto by order
of the Board of Directors of said corporation.

_____
Notary Public

GLORIA LOYD
Notary Public, State Of New York
No. 01LO6057745
Qualified In Queens County
Commission Expires April 23, 20 03

4

# POWER OF ATTORNEY

Know All Men By These Presents:

That the Lumbermens Mutual Casualty Company, the American Motorists Insurance Company, and the American Manufacturers Mutual Insurance Company, corporations organized and existing under the laws of the State of Illinois, having their principal office in Long Grove, Illinois (hereinafter collectively referred to as the "Company") do hereby appoint

Fred Nicholson , Theresa J. Foley , Fern Perry , George O. Brewster , Gloria Loya and Nancy Sohnen of JERICHO , NY (EACH)

\* \* \* \* \* \* \* \* \* \* \* \*

their true and lawful agent(s) and Attorney(s)-in-Fact, to make, execute, seal, and deliver from the date of issuance of this power for and on its behalf as surety, and as their act and deed:

Any and all bonds and undertakings

EXCEPTION:  NO AUTHORITY is granted to make, execute, seal and deliver any bond or undertaking which guarantees the payment or collection of any promissory note, check, draft or letter of credit.

This authority does not permit the same obligation to be split into two or more bonds in order to bring each such bond within the dollar limit of authority as set forth herein.

This appointment may be revoked at any time by the Company.

The execution of such bonds and undertakings in pursuance of these presents shall be as binding upon the said Company as fully and amply to all intents and purposes, as if the same had been duly executed and acknowledged by their regularly elected officers at their principal office in Long Grove, Illinois.

This Power of Attorney is executed by authority of resolutions adopted by the Executive Committees of the Boards of Directors of the Company on February 23, 1988 at Chicago, Illinois, true and accurate copies of which are hereinafter set forth and are hereby certified to by the undersigned Secretary as being in full force and effect:

"VOTED, That the Chairman of the Board, the President, or any Vice President, or their appointees designated in writing and filed with the Secretary, or the Secretary shall have the power and authority to appoint agents and attorneys-in-fact, and to authorize them to execute on behalf of the Company, and attach the seal of the Company thereto, bonds and undertakings, recognizances, contracts of indemnity and other writings, obligatory in the nature thereof, and any such officers of the Company may appoint agents for acceptance of process."

This Power of Attorney is signed and sealed and certified by facsimile under and by authority of the following resolution adopted by the Executive Committee of the Boards of Directors of the Company at a meeting duly called and held on the 23rd day of February, 1988:

"VOTED, That the signature of the Chairman of the Board, the President, any Vice President, or their appointees designated in writing and filed with the Secretary, and the signature of the Secretary, the seal of the Company, and certifications by the Secretary, may be affixed by facsimile on any power of attorney or bond executed pursuant to resolution adopted by the Executive Committee of the Board of Directors on February 23, 1988 and any such power so executed, sealed and certified with respect to any bond or undertaking to which it is attached, shall continue to be valid and binding upon the Company."

FR 06 73 (Ed. 06 01)                    Page 1 of 2                    Printed in U.S.A.

In Testimony Whereof, the Company has caused this instrument to be signed and their corporate seals to be affixed by their authorized officers, this November 22, 2002.

Attested and Certified:

Lumbermens Mutual Casualty Company
American Motorists Insurance Company
American Manufacturers Mutual Insurance Company



John K. Conway, Corporate Secretary

Gary J. Tully, Senior Vice President

STATE OF ILLINOIS        SS

COUNTY OF LAKE         SS

I, Maria I. Omori, a Notary Public, do hereby certify that Gary J. Tully and John K. Conway personally known to me to be the same persons whose names are respectively as Senior Vice President and Corporate Secretary of the Lumbermens Mutual Casualty Company, the American Motorists Insurance Company, and the American Manufacturers Mutual Insurance Company, Corporations organized and existing under the laws of the State of Illinois, subscribed to the foregoing instrument, appeared before me this day in person and severally acknowledged that they being thereunto duly authorized signed, sealed with the corporate seals and delivered the said instrument as the free and voluntary act of said corporations and as their own free and voluntary acts for the uses and purposes therein set forth.



Maria I. Omori, Notary Public
My commission expires 9-17-03

CERTIFICATION

I, J. K. Conway, Corporate Secretary of the Lumbermens Mutual Casualty Company, the American Motorists Insurance Company, and the American Manufacturers Mutual Insurance Company, do hereby certify that the attached Power of Attorney dated November 22, 2002 on behalf of the person(s) as listed above is a true and correct copy and that the same has been in full force and effect since the date thereof and is in full force and effect on the date of this certificate; and I do further certify that the said Gary J. Tully, who executed the Power of Attorney as Senior Vice President, was on the date of execution of the attached Power of Attorney the duly elected Senior Vice President of the Lumbermens Mutual Casualty Company, the American Motorists Insurance Company, and the American Manufacturers Mutual Insurance Company.

IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed the corporate seal of the Lumbermens Mutual Casualty Company, the American Motorists Insurance Company, and the American Manufacturers Mutual Insurance Company on this _____ 27th _____ day of ____ December ____ 20 02

  

John K. Conway, Corporate Secretary

This Power of Attorney limits the acts of those named therein to the bonds and undertakings specifically named therein, and they have no authority to bind the Company except in the manner and to the extent herein stated.

Home Office: Long Grove, IL 60049

FK 09 75 (Ed. 09 01)                    Page 2 of 2                    Printed in U.S.A.

AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY
FINANCIAL STATEMENT
DECEMBER 31, 2001

Assets

| | |
|---|---:|
| Cash in banks | |
| Bonds owned | $ 21,607,239 |
| Stocks | 496,844,017 |
| Premiums in course of collection | 3,045,074 |
| Accrued interest and other assets | 140,743,624 |
| | 74,931,749 |
| Total | $737,271,703 |

Liabilities

| | |
|---|---:|
| Reserve for losses and adjusting expenses | |
| Reserve for unearned premiums | $329,394,911 |
| Reserve for taxes, expenses and other liabilities | 100,522,301 |
| | 69,370,582 |
| Total | $499,287,794 |
| Surplus as regards policyholders | 237,983,909 |
| Total | $737,271,703 |

By _____          Attest _____
Vice President of Accounting Services          Secretary

State of Illinois)
                 ) SS
County of Lake)

R. A. Daniel and J. K. Conway, being duly sworn, say that they are Vice President of Accounting Services and Secretary, respectively, of AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY, Illinois; that the foregoing is a true and correct statement of the financial condition of said company, as of December 31, 2001.

Subscribed and sworn to before me

On this 28th day of February, 2002.

_____
Notary Public

"OFFICIAL SEAL"
ANGELA HANSEN
Notary Public, State of Illinois
My Commission Expires 2/18/04

# PERFORMANCE BOND



**DORMITORY AUTHORITY – STATE OF NEW YORK**

# PERFORMANCE BOND

Bond No. 3SE030676

7

KNOW ALL MEN BY THESE PRESENTS:

That   CAULDWELL WINGATE COMPANY, LLC

380 Lexington Avenue, 53rd Floor, New York, New York 10168

as Principal, hereinafter called CONTRACTOR, and

AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY

(Here insert the legal title of Surety)

Three Connell Drive, Berkeley Heights, New Jersey  07922

(Address)

as Surety, hereinafter called Surety, are held and firmly bound unto the Dormitory
Authority - State of New York, 515 Broadway, Albany, New York 12207, as Obligee,
hereinafter called OWNER, in the amount of Forty-Six Million Nine Hundred Ninety-
Five Thousand   and 00/100 Dollars ($46,995,000.00) for the payment whereof
CONTRACTOR and Surety bind themselves, their heirs, executors, administrators,
successors and assigns, jointly and severally, firmly by these presents.

WHEREAS, CONTRACTOR has by written agreement dated December 20, 2002
entered into a Contract with OWNER for the General Construction #2 - Fitout Work at
Bronx Criminal Court Complex, DA # 52561, 1380909999/CR58 in accordance with the
Contract Documents and any changes thereto, which are made a part hereof, and are
hereinafter referred to as the Contract.

1.      If the CONTRACTOR performs the Contract, the Surety and the CONTRACTOR
        shall have no obligation under this Bond, except to participate in conferences as
        provided in Subparagraph 2.1.

2.    If there is no OWNER default, the Surety's obligation under this Bond shall arise after:

    2.1    The OWNER has notified the CONTRACTOR, the Surety at its address described in Paragraph 8. below that the OWNER is considering declaring a CONTRACTOR in default.

    2.2    The OWNER has declared a CONTRACTOR in default and formally terminated the CONTRACTOR's right to complete the Contract.

    2.3    The OWNER has agreed to pay the Balance of the Contract Price to the Surety in accordance with the terms of the Contract or to a CONTRACTOR selected to perform the Contract in accordance with the terms of the Contract with the OWNER.

3.    When the OWNER has satisfied the conditions of Paragraph 2., the Surety shall, at the OWNER's option, promptly and at the Surety's expense take on the following actions:

    3.1    Arrange for the CONTRACTOR, with consent of the OWNER, to perform and complete the Contract; or

    3.2    Undertake to perform and complete the Contract itself, through its agents or through independent contractors; or

    3.3    Obtain bids or negotiated proposals from qualified contractors acceptable to the OWNER for a contract for performance and completion of the Contract, arrange for a contract to be prepared for execution by the OWNER and the CONTRACTOR selected with the OWNER's concurrence, to be secured with performance and payment bonds executed by a qualified Surety equivalent to the bonds issued on the Contract, and pay to the OWNER the amount of damages as described in Paragraph 5. in excess of the Balance of the Contract Price incurred by the OWNER resulting from the CONTRACTOR default.

4.    If the Surety does not proceed with reasonable promptness, the Surety shall be deemed to be in default on this Bond, and the OWNER shall be entitled to enforce any remedy available to the OWNER.

5.    After the OWNER has terminated the CONTRACTOR's right to complete the Contract, and if the Surety elects to act under Subparagraph 3.1, 3.2, or 3.3 above, then the responsibilities of the Surety to the OWNER shall not be greater than those of the CONTRACTOR under the Contract, and the responsibilities of the OWNER to the Surety shall not be greater than those of the OWNER under the Contract. To the limit of the amount of this Bond, but subject to commitment by the OWNER of the Balance of the Contract Price to mitigation of costs and damages on the Contract, the Surety is obligated without duplication for:

2

5.1     The responsibilities of the CONTRACTOR for correction of defective work and completion of the Contract;

5.2     Additional legal, design, professional, and delay costs resulting from the CONTRACTOR's Default, and resulting from the actions or failure to act of the Surety under Paragraph 3.; and

5.3     Liquidated Damages, or if no liquidated damages are specified in the Contract, actual damages caused by delayed performance or non-performance of the CONTRACTOR.

6.     The Surety shall not be liable to the OWNER or others for obligations of the CONTRACTOR that are unrelated to the Contract, and the Balance of the Contract Price shall not be reduced or set off on account of any such unrelated obligations. No right of action shall accrue on this Bond to any person or entity other than the OWNER or its heirs, executors, administrators or successors.

7.     The Surety hereby waives notice of any change, including changes of time, to the Contract or to related subcontracts, purchase orders, and other obligations.

8.     Notice of the Surety and the CONTRACTOR shall be mailed or delivered to the address shown on the signature page. Notice to the OWNER shall be mailed or delivered to the address shown in the preamble.

9.     Definitions:

9.1     Balance of the Contract Price: The total amount payable by the OWNER to the CONTRACTOR under the Contract after all proper adjustments have been made, including allowance to the CONTRACTOR of any amounts received or to be received by the OWNER in settlement of insurance or other claims for damages to which the CONTRACTOR is entitled, reduced by all valid and proper payments made to or on behalf of the CONTRACTOR under the Contract.

9.2     Contract: The agreement between the OWNER and the CONTRACTOR identified on the signature page, including all Contract Documents and changes thereto.

9.3     CONTRACTOR Default: Failure of the CONTRACTOR, which has neither been remedied nor waived, to perform or otherwise to comply with the terms of the Contract.

9.4     OWNER Default: Failure of the OWNER, which has neither been remedied nor waived, to pay the CONTRACTOR as required by the Contract or to perform and complete or comply with the other terms thereof.

3

The penal sum of this Bond is in addition to any other Bond furnished by the CONTRACTOR and in no way shall be impaired or affected by any other Bond.

Any suit under this Bond must be instituted before the expiration of two (2) years from the date on which Final Payment is made under this Contract.

Signed as of this ___27th___ day of _December_____ 2002.

IN THE PRESENCE OF:


CAULDWELL WINGATE
COMPANY, LLC
(Contractor)

X _____
(Signature)

__Susan L. Hayes, President__
(Title)

360 Lexington Avenue
(Address)

New York, New York 10168
(City, State, Zip)

(212) 983-7150
(Telephone Number)

(212) 983-7275
(Facsimile Number)


AMERICAN MANUFACTURERS
MUTUAL INSURANCE COMPANY.
(Surety)

_____
(Signature)

THERESA J. FOLEY, ATTORNEY-IN-FACT
(Title)

Three Connell Drive
(Address)

Berkeley Heights, New Jersey 07922
(City, State, Zip)

(908) 286-5390
(Telephone Number)

(908) 286-5680
(Facsimile Number)

4

ACKNOWLEDGEMENT OF CONTRACTOR, IF A PARTNERSHIP, LIMITED LIABILITY
COMPANY OR INDIVIDUAL

STATE OF NEW YORK     )
                      ) ss:
COUNTY OF   NY        )

On the ___30th___ day of ___December___ in the year _2002_, before me, the undersigned, a Notary Public in and for said State, personally appeared ___Susan C. Staves___ of CAULDWELL WINGATE COMPANY, LLC, personally known or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public

PATRICK J. HARDY
Notary Public, State of New York
No. 31-3052960
Qualified in New York County
Commission Expires Dec. 11, 2005

ACKNOWLEDGEMENT OF SURETY

STATE OF NEW YORK     )
                      ) ss:
COUNTY OF   Nassau    )

On the _27th_ day of _December_ in the year 2002 before me personally came THERESA J. FOLEY _____ to me known, who, being by me duly sworn, did depose and say that (s)he resides at _Levittown, NY_____, that (s)he is the ___Attorney-In-Fact___ of AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY, the corporation described in and which executed the above instrument; and that (s)he signed her/his name thereto by order of the Board of Directors of said corporation.

_____
Notary Public

GLORIA LOYD
Notary Public, State Of New York
No. 01LO6097748
Qualified In Queens County
Commission Expires April 28, 20 03

5

# POWER OF ATTORNEY

Know All Men By These Presents:

That the Lumbermens Mutual Casualty Company, the American Motorists Insurance Company, and the American Manufacturers Mutual Insurance Company, corporations organized and existing under the laws of the State of Illinois, having their principal office in Long Grove, Illinois (hereinafter collectively referred to as the "Company") do hereby appoint

Fred Nicholson , Therese J. Foley , Pam Perry , George O. Brewster , Gloria Loyd and Nancy Schnee
of JERICHO , NY (EACH)

* * * * * * * * * * * *

their true and lawful agent(s) and Attorney(s)-in-Fact, to make, execute, seal, and deliver from the date of issuance of this power for and on its behalf as surety, and as their act and deed:

Any and all bonds and undertakings

EXCEPTION:   NO AUTHORITY is granted to make, execute, seal and deliver any bond or undertaking which guarantees the payment or collection of any promissory note, check, draft or letter of credit.

This authority does not permit the same obligation to be split into two or more bonds in order to bring each such bond within the dollar limit of authority as set forth herein.

This appointment may be revoked at any time by the Company.

The execution of such bonds and undertakings in pursuance of these presents shall be as binding upon the said Company as fully and amply to all intents and purposes, as if the same had been duly executed and acknowledged by their regularly elected officers at their principal office in Long Grove, Illinois.

This Power of Attorney is executed by authority of resolutions adopted by the Executive Committee of the Boards of Directors of the Company on February 23, 1988 at Chicago, Illinois, true and accurate copies of which are hereinafter set forth and are hereby certified to by the undersigned Secretary as being in full force and effect:

"VOTED, That the Chairman of the Board, the President, or any Vice President, or their appointees designated in writing and filed with the Secretary, or the Secretary shall have the power and authority to appoint agents and attorneys-in-fact, and to authorize them to execute on behalf of the Company, and attach the seal of the Company thereto, bonds and undertakings, recognizances, contracts of indemnity and other writings, obligatory in the nature thereof, and any such officers of the Company may appoint agents for acceptance of process."

This Power of Attorney is signed, sealed and certified by facsimile under and by authority of the following resolution adopted by the Executive Committee of the Boards of Directors of the Company at a meeting duly called and held on the 23rd day of February, 1988:

"VOTED, That the signature of the Chairman of the Board, the President, any Vice President, or their appointees designated in writing and filed with the Secretary, and the signature of the Secretary, the seal of the Company, and certifications by the Secretary, may be affixed by facsimile on any power of attorney or bond executed pursuant to resolution adopted by the Executive Committee of the Board of Directors on February 23, 1988 and any such power so executed, sealed and certified with respect to any bond or undertaking to which it is attached, shall continue to be valid and binding upon the Company."

FK 03 76 (Ed. 09 01)

Page 1 of 2

Printed in U.S.A.

In Testimony Whereof, the Company has caused this instrument to be signed and their corporate seals to be affixed by their authorized officers, this November 22, 2002.

Attested and Certified:

Lumbermens Mutual Casualty Company
American Motorists Insurance Company
American Manufacturers Mutual Insurance Company

_John K. Conway_, Corporate Secretary

_Gary J. Tully_, Senior Vice President

STATE OF ILLINOIS    SS

COUNTY OF LAKE    SS

I, Maria I. Omori, a Notary Public, do hereby certify that Gary J. Tully and John K. Conway personally known to me to be the same persons whose names are respectively as Senior Vice President and Corporate Secretary of the Lumbermens Mutual Casualty Company, the American Motorists Insurance Company, and the American Manufacturers Mutual Insurance Company. Corporations organized and existing under the laws of the State of Illinois, subscribed to the foregoing instrument, appeared before me this day in person and severally acknowledged that they being thereunto duly authorized signed, sealed with the corporate seals and delivered the said instrument as the free and voluntary act of said corporations and as their own free and voluntary acts for the uses and purposes therein set forth.

"OFFICIAL SEAL"
MARIA I. OMORI
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 9/17/2003

_Maria I. Omori_
Maria I. Omori, Notary Public
My commission expires 9-17-03

CERTIFICATION

I, J. K. Conway, Corporate Secretary of the Lumbermens Mutual Casualty Company, the American Motorists Insurance Company, and the American Manufacturers Mutual Insurance Company, do hereby certify that the attached Power of Attorney dated November 22, 2002 on behalf of the person(s) as listed above is a true and correct copy and that the same has been in full force and effect since the date thereof and is in full force and effect on the date of this certificate and I do further certify that the said Gary J. Tully, who executed the Power of Attorney as Senior Vice President, was on the date of execution of the attached Power of Attorney the duly elected Senior Vice President of the Lumbermens Mutual Casualty Company, the American Motorists Insurance Company, and the American Manufacturers Mutual Insurance Company.

IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed the corporate seal of the Lumbermens Mutual Casualty Company, the American Motorists Insurance Company, and the American Manufacturers Mutual Insurance Company on this ___27th___ day of ___December___ 20 _02_.



_John K. Conway_, Corporate Secretary

This Power of Attorney limits the acts of those named therein to the bonds and undertakings specifically named therein and they have no authority to bind the Company except in the manner and to the extent herein stated.

Home Office: Long Grove, IL 60049

FK 02 75 (Ed. 09 01)

Page 2 of 2

Printed in U.S.A.

AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY
FINANCIAL STATEMENT
DECEMBER 31, 2001

Assets

| | |
|---|---|
| Cash in banks | $ 21,687,239 |
| Bonds owned | 496,844,017 |
| Stocks | 3,045,074 |
| Premiums in course of collection | 140,743,624 |
| Accrued interest and other assets | 74,951,749 |
| **Total** | **$737,271,703** |

Liabilities

| | |
|---|---|
| Reserve for losses and adjusting expenses | $329,394,911 |
| Reserve for unearned premiums | 100,522,301 |
| Reserve for taxes, expenses and other liabilities | 69,370,582 |
| **Total** | **$499,287,794** |
| Surplus as regards policyholders | 237,983,909 |
| **Total** | **$737,271,703** |

By _____
Vice President of Accounting Services

Attest _____
Secretary

State of Illinois)
            ) SS
County of Lake)

R. A. Daniel and J. K. Conway, being duly sworn, say that they are Vice President of Accounting Services and Secretary, respectively, of AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY, Illinois; that the foregoing is a true and correct statement of the financial condition of said company, as of December 31, 2001.

Subscribed and sworn to before me

On this 28th day of February, 2002

_____
Notary Public

"OFFICIAL SEAL"
ANGELA HANSEN
Notary Public, State of Illinois
My Commission Expires 2/18/04

CWC-BCC
DOC # 200

# EXHIBIT B

# GENERAL CONDITIONS



# DORMITORY AUTHORITY - STATE OF NEW YORK

**Main Office**
515 Broadway
Albany, NY 12207-2964
(518) 257-3000

**New York City Office**
One Penn Plaza, 52ⁿᵈ Floor
New York, NY 10119-0098
(212) 273-5000

THIS SHEET INTENTIONALLY LEFT BLANK.

# Table of Contents
# General Conditions

PAGE

**ARTICLE 1 -- DEFINITIONS** ........................................................................................................ 1

SECTION 1.01 ............................................................................................................................ 1

**ARTICLE 2 -- CONTRACT DOCUMENTS** ................................................................................ 2

SECTION 2.01 - CAPTIONS .................................................................................................... 2
SECTION 2.02 - CONFLICTING CONDITIONS ................................................................... 2
SECTION 2.03 - NOTICE AND SERVICE THEREOF ......................................................... 3
SECTION 2.04 - NOMENCLATURE ....................................................................................... 3
SECTION 2.05 - INVALID PROVISIONS ............................................................................. 3

**ARTICLE 3 -- INTERPRETATION OF CONTRACT DOCUMENTS** ..................................... 3

SECTION 3.01 - OWNER ......................................................................................................... 3
SECTION 3.02 - MEANING AND INTENT OF CONTRACT DOCUMENTS ..................... 3
SECTION 3.03 - ORDER OF PRECEDENCE ......................................................................... 4

**ARTICLE 4 -- MATERIALS AND LABOR** ................................................................................ 4

SECTION 4.01 - CONTRACTOR'S OBLIGATIONS ............................................................. 4
SECTION 4.02 - CONTRACTOR'S TITLE TO MATERIALS ............................................. 4
SECTION 4.03 - "OR EQUAL" CLAUSE ............................................................................... 5
SECTION 4.04 - QUALITY, QUANTITY AND LABELING ................................................. 5

**ARTICLE 5 -- CONTRACTOR** ...................................................................................................... 6

SECTION 5.01 - SUPERVISION BY CONTRACTOR .......................................................... 6
SECTION 5.02 - REPRESENTATIONS OF CONTRACTOR .............................................. 6
SECTION 5.03 - COPIES OF CONTRACT DOCUMENTS FOR CONTRACTORS ............ 7
SECTION 5.04 - MEETINGS .................................................................................................... 7
SECTION 5.05 - RELATED WORK ........................................................................................ 7
SECTION 5.06 - ERRORS OR DISCREPANCIES ................................................................. 8

**ARTICLE 6 -- SITE CONDITIONS** .............................................................................................. 8

SECTION 6.01 - SUBSURFACE OR SITE CONDITIONS FOUND DIFFERENT .............. 8
SECTION 6.02 - VERIFYING DIMENSIONS AND CONDITIONS ..................................... 8
SECTION 6.03 - SURVEYS ...................................................................................................... 8

**ARTICLE 7 -- INSPECTION AND ACCEPTANCE** ................................................................... 9

SECTION 7.01 - ACCESS TO THE WORK ............................................................................ 9
SECTION 7.02 - NOTICE FOR TESTING ............................................................................. 9
SECTION 7.03 - REEXAMINATION OF WORK ................................................................... 9
SECTION 7.04 - INSPECTION OF WORK ............................................................................ 9
SECTION 7.05 - DEFECTIVE OR DAMAGED WORK ...................................................... 10
SECTION 7.06 - TESTING ..................................................................................................... 10
SECTION 7.07 - ACCEPTANCE ........................................................................................... 10

**ARTICLE 8 -- CHANGES IN THE WORK** ................................................................................ 11

........................................................................................................................................... 11

i

SECTION 8.01 - CHANGES .................................................................................................................. 11
SECTION 8.02 - OVERHEAD AND PROFIT ALLOWANCE .......................................................................... 13
SECTION 8.03 - FORM OF CHANGE ORDERS ......................................................................................... 14

**ARTICLE 9 — TIME OF COMPLETION** .................................................................................... 15

SECTION 9.01 - TIME OF COMPLETION ................................................................................................. 15

**ARTICLE 10 — TERMINATION OR SUSPENSION** ................................................................ 16

SECTION 10.01 - TERMINATION FOR CAUSE ......................................................................................... 16
SECTION 10.02 - TERMINATION FOR CONVENIENCE OF OWNER ........................................................... 17
SECTION 10.03 - OWNER'S RIGHT TO DO WORK .................................................................................. 17
SECTION 10.04 - SUSPENSION OF WORK ............................................................................................. 17

**ARTICLE 11 — DISPUTES** ........................................................................................................ 18

SECTION 11.01 - CLAIMS FOR EXTRA WORK ........................................................................................ 18
SECTION 11.02 - CLAIMS FOR DELAY .................................................................................................. 19
SECTION 11.03 - FINALITY OF DECISIONS ............................................................................................ 19

**ARTICLE 12 — SUBCONTRACTS** ............................................................................................ 19

SECTION 12.01 - SUBCONTRACTING ................................................................................................... 19

**ARTICLE 13 — CONTRACT COORDINATION AND COOPERATION** ................................... 20

SECTION 13.01 - COOPERATION WITH OTHER CONTRACTORS .............................................................. 20
SECTION 13.02 - SEPARATE CONTRACTS ............................................................................................. 21
SECTION 13.03 - COORDINATED COMPOSITE DRAWINGS ...................................................................... 22

**ARTICLE 14 — PROTECTION OF RIGHTS, PERSONS AND PROPERTY** ........................... 22

SECTION 14.01 - ACCIDENT PREVENTION .......................................................................................... 22
SECTION 14.02 - SAFETY PROGRAMS ................................................................................................. 22
SECTION 14.03 - PROTECTION OF WORK AND PROPERTY ..................................................................... 23
SECTION 14.04 - ADJOINING PROPERTY ............................................................................................. 24
SECTION 14.05 - RISKS ASSUMED BY THE CONTRACTOR ...................................................................... 24

**ARTICLE 15 — INSURANCE AND CONTRACT SECURITY** ................................................... 27

SECTION 15.01 - INSURANCE PROVIDED BY CONTRACTOR .................................................................... 27
SECTION 15.02 - BUILDERS RISK ........................................................................................................ 31
SECTION 15.03 - GENERAL CONFORMANCE ......................................................................................... 31
SECTION 15.04 - CONTRACT SECURITY .............................................................................................. 31
SECTION 15.05 - ADDITIONAL OR SUBSTITUTE BOND .......................................................................... 32
SECTION 15.06 - FAILURE TO COMPLY WITH PROVISIONS OF ARTICLE 15 ............................................ 32

**ARTICLE 16 — USE OR OCCUPANCY PRIOR TO ACCEPTANCE BY OWNER** ................. 32

SECTION 16.01 - OCCUPANCY PRIOR TO ACCEPTANCE ........................................................................ 32

**ARTICLE 17 — PAYMENT** ........................................................................................................ 33

SECTION 17.01 - PROVISION FOR PAYMENT ........................................................................................ 33
SECTION 17.02 - ACCEPTANCE OF THE FIRST PAYMENT PURSUANT TO SECTION 17.01 D. OF THE CONTRACT CONSTITUTES RELEASE ..................................................................................................................... 35
SECTION 17.03 - RELEASE AND CONSENT OF SURETY ......................................................................... 35
SECTION 17.04 - LIENS ..................................................................................................................... 35
SECTION 17.05 - WITHHOLDING OF PAYMENTS .................................................................................. 35
SECTION 17.06 - OWNER'S RIGHT TO AUDIT AND INSPECTION OF RECORDS ....................................... 36
SECTION 17.07 - FALSE STATEMENTS/INFORMATION .......................................................................... 36

00106

SECTION 17.05 - LATE PAYMENT ..................................................................................................36

ARTICLE 18 -- TAX EXEMPTION ..................................................................................................37

    SECTION 18.01 - TAX EXEMPTION ..........................................................................................37

ARTICLE 19 – GUARANTEE ..........................................................................................................37

    SECTION 19.01 - GUARANTEE ..................................................................................................37

ARTICLE 20 – STANDARD PROVISIONS .....................................................................................37

    SECTION 20.01 - PROVISIONS REQUIRED BY LAW DEEMED INSERTED ............................37
    SECTION 20.02 - COMPLIANCE WITH LAWS, RULES AND REGULATIONS .........................37
    SECTION 20.03 - LAWS GOVERNING THE CONTRACT ..........................................................38
    SECTION 20.04 - ASSIGNMENTS .............................................................................................38
    SECTION 20.05 - NO THIRD PARTY RIGHTS ...........................................................................38
    SECTION 20.06 - CONTRACT DEEMED EXECUTORY ............................................................38
    SECTION 20.07 - ANTI-RIOT PROVISIONS ..............................................................................38
    SECTION 20.08 - FAIR TRADE EXEMPTION .............................................................................38
    SECTION 20.09 - DOMESTIC STEEL .........................................................................................39
    SECTION 20.10 - PROTECTION OF LIVES AND HEALTH ........................................................39
    SECTION 20.11 - PROHIBITED INTERESTS/ ETHICAL CONDUCT ..........................................39
    SECTION 20.12 – STATE AND FEDERAL LABOR LAW PROVISIONS ....................................41
    SECTION 20.13 - NONDISCRIMINATION ...................................................................................42
    SECTION 20.14 - LIMITATION ON ACTIONS ............................................................................45
    SECTION 20.15 - WAIVER OF REMEDIES ...............................................................................47
    SECTION 20.16 - WAIVER OF CERTAIN CAUSES OF ACTION ..............................................47
    SECTION 20.17 - CONTRACTOR RELATIONSHIP ...................................................................47
    SECTION 20.18 - FAILURE TO COMPLY WITH THIS ARTICLE ..............................................47
    SECTION 20.19 - THIRD PARTY BENEFICIARY RELATIONSHIP ...........................................47
    SECTION 20.20 - YEAR 2000 WARRANTY ...............................................................................48
    SECTION 20.21 - FALSE RECORDS/KICKBACKS ...................................................................48

ARTICLE 21 – AFFIRMATIVE ACTION ..........................................................................................49

    SECTION 21.01 - AFFIRMATIVE ACTION .................................................................................49

ARTICLE 22 - EXECUTIVE ORDER NO. 125 – N.Y.S. UNIFORM CONTRACTING QUESTIONNAIRE .....58

    SECTION 22.01 - DETERMINATION OF CONTRACTOR RESPONSIBILITY ...........................58
    SECTION 22.02 - UNIFORM CONTRACTING QUESTIONNAIRE .............................................58
    SECTION 22.03 - AFFIDAVIT OF NO CHANGE .......................................................................58

ARTICLE 23- INVESTIGATIONS ....................................................................................................58

iii

THIS SHEET INTENTIONALLY LEFT BLANK.

# ARTICLE 1 – DEFINITIONS

## Section 1.01

The following terms as used in the Contract Documents shall be defined as follows:

*Authority* - Dormitory Authority of the State of New York, a public benefit corporation with its principal office located at 515 Broadway, Albany, New York, 12207-2964.

*Beneficial Occupancy* - The use, occupancy or operation by the Owner of the Work or any part thereof as evidenced by a notification of Beneficial Occupancy executed by the Owner.

*Client* - The entity for whom the Dormitory Authority is performing services, including subsidiaries, agents, related corporations or fiduciaries.

*Construction Completion* - Acceptance by the Owner of the Work as evidenced by a Notification of Construction Completion executed by the Owner.

*Construction Manager* - A person, persons, firm, partnership or corporation, regularly engaged in the management of construction projects, and so designated by the Owner.

*Consultant* - A person, persons, firm, partnership or corporation providing Architectural, Engineering, or other professional services, and so designated by the Owner.

*Contract* - The agreement between the Owner and the Contractor consisting of the Contract Documents including all amendments and supplements thereto.

*Contract Documents* - The Contract, Notice to Bidders, Information for Bidders, Form of Bid, General Conditions, General Requirements, Bonds, Drawings, Specifications, Addenda, Change Orders, and any supplementary data together with all provisions of law deemed to be inserted in the Contract.

*Contractor* - A person, persons, firm, partnership or corporation with whom the Contract is entered into by the Owner to perform the Work.

*Extra Work* - Any work in addition to the Work initially required to be performed by the Contractor pursuant to the Contract.

*Furnish* – To deliver to the site ready for installation.

*Install* - To unload at the delivery point at the Site and perform every operation necessary to establish secure mounting and correct operation at the proper location.

*Notice to Proceed* - Written notice, signed by an authorized officer of the Dormitory Authority, or by an individual designated by an authorized officer in accordance with the Authority's By-Laws to sign contracts on behalf of the Dormitory Authority, that the Dormitory Authority accepts a Contractor's bid, that the Dormitory Authority intends to award a contract to the Contractor based on the bid, and that the Contractor is directed to start work.

*Owner* - Dormitory Authority

*Owner's Representative* - A person, persons, firm, partnership or corporation so designated by the Owner.

*Project* - Work at the site(s) carried out pursuant to one or more sets of Contract Documents.

*Provide* - To Furnish and Install complete in place and ready for operation and use.

*Shop Drawings* - Diagrams, fabrication drawings, illustration, schedules, test data, performance charts, cuts brochures and other data which are submitted by the Contractor and illustrate any portion of the Work.

*Site* - The area within the Contract limit, as indicated by the Contract.

*Subcontract* - An agreement between the Contractor and Subcontractor for work on the Site.

*Subcontractor* - A person, persons, firm, partnership or corporation under contract with the Contractor, or under contract with any Subcontractor, to provide labor and material at the Site.

*Substantial Completion* - Stage of construction at which the Owner determines there is a minimal amount of the Work to be completed, or Work to be corrected.

*Work* - The performance of all obligations imposed upon the Contractor by the Contract.

## ARTICLE 2 -- CONTRACT DOCUMENTS

## Section 2.01 - Captions

The table of contents, titles, captions, headings, running headlines, and marginal notes contained herein and in said documents are solely to facilitate reference to various provisions of the Contract Documents and in no way affect the interpretation of the provisions to which they refer.

00110

## Section 2.02 - Conflicting Conditions

Should any provision in any of the Contract Documents be in conflict or inconsistent with any of the General Conditions or Supplements thereto, the General Conditions or Supplements thereto shall govern.

## Section 2.03 - Notice and Service Thereof

Any notice to the Contractor from the Owner relative to any part of the Contract shall be in writing and service considered complete when said notice is mailed to the Contractor at the last address given by the Contractor, or when delivered in person to said Contractor or the Contractor's authorized representative.

## Section 2.04 - Nomenclature

Materials, equipment or other Work described in words which have a generally accepted technical or trade meaning shall be interpreted as having said meaning in connection with the Contract.

## Section 2.05 - Invalid Provisions

If any term or provision of the Contract Documents or the application thereof to any person, firm or corporation or circumstance shall, to any extent, be determined to be invalid or unenforceable, the remainder of the Contract Documents, or the application of such terms or provisions to persons, firms or corporations or circumstances other than those to which it is held invalid or unenforceable, shall not be affected thereby and each term or provision of the Contract Documents shall be valid and be enforced to the fullest extent permitted by law.

## ARTICLE 3 -- INTERPRETATION OF CONTRACT DOCUMENTS

## Section 3.01 - Owner

A.  The Owner shall give all orders and directions contemplated under the Contract relative to the execution of the Work. The Owner shall determine the amount, quality, acceptability of the Work and shall decide all questions which may arise in relation to said Work. The Owner's estimates and decisions shall be final except as otherwise expressly provided. In the event that any question arises between the Owner and Contractor concerning the Contract, the decision of the Owner shall be a condition precedent to the right of the Contractor to receive any money or payment under the Contract.

B. Any differences or conflicts concerning performance which may arise between the Contractor and other Contractors performing Work for the Owner shall be adjusted and determined by the Owner.

C. The Owner may act through a representative designated by the Owner.

## Section 3.02 - Meaning and Intent of Contract Documents

The meaning and intent of all Contract Documents shall be as interpreted by the Owner.

## Section 3.03 - Order of Precedence

A. Figured dimensions shall take precedence over scaled dimensions. Larger scale drawings shall take precedence over smaller scale drawings. Latest addenda shall take precedence over previous addenda and earlier dated drawings and specifications.

B. Should a conflict occur in or between or among any parts of the Contract Documents that are entitled to equal preference, the better quality or greater quantity of material shall govern, unless the Owner directs otherwise.

C. Drawings and specifications are complementary. Anything shown on the drawings and not mentioned in the specifications, or mentioned in the specifications and not shown on the drawings, shall have the same effect as if shown or mentioned in both.

## ARTICLE 4 – MATERIALS AND LABOR

## Section 4.01 - Contractor's Obligations

A. The Contractor shall, in a good workmanlike manner, perform all the Work required by the Contract within the time specified in the Contract.

B. The Contractor shall Furnish, erect, maintain, and remove such construction plant and such temporary Work as may be required for the performance of its Work. The Contractor shall be responsible for the safety, efficiency, and adequacy of the Contractor's plant, appliances and methods, and for damage which may result from failure or improper construction, maintenance, or operation of said plant, appliances and methods. The Contractor shall comply with all terms of the Contract, and shall do, carry on, and complete the entire Work to the satisfaction of the Owner.

C.  Any labor, materials or means whose employment, or utilization during the course of this Contract may tend to or in any way cause or result in strike, work stoppages, delays, suspension of Work or similar troubles by workmen employed by the Contractor, its subcontractors or material suppliers, or by any of the trades working in or about the buildings and premises where Work is being performed under this Contract, or by other Contractors, their subcontractors or material suppliers pursuant to other contracts shall not be allowed. Any violation by the Contractor of this requirement may in the sole judgment of the Owner be considered as proper and sufficient cause for declaring the Contractor to be in default, and for the Owner to take action against the Contractor as set forth in the General Conditions Article entitled "Termination" or such other action as the Owner may deem proper.

## Section 4.02 - Contractor's Title to Materials

A.  No materials or supplies for the Work shall be purchased by the Contractor or by any Subcontractor subject to any chattel mortgage or under a conditional sale or other agreement by which an interest is retained by any other party. The Contractor warrants that the Contractor has full, good and clear title to all materials and supplies used by the Contractor in the Work, or resold to the Owner pursuant to the Contract free from all liens, claims or encumbrances.

B.  All materials, equipment and articles which become the property of the Owner shall be new unless specifically stated otherwise.

## Section 4.03 - "Or Equal" Clause

A.  Whenever a material, article or piece of equipment is identified on the plans or in the specifications by reference to manufacturers' or vendors' names, trade names, catalogue number, or make, said identification is intended to establish a standard. Any material, article or equipment of other manufacturers and vendors which performs satisfactorily the duties imposed by the general design may be considered equally acceptable provided that, in the opinion of the Consultant, the material, article or equipment so proposed is of equal quality, substance and function and the Contractor shall not Provide, Furnish or Install any said proposed material, article or equipment without the prior written approval of the Consultant. The burden of proof and all costs related thereto concerning the "or equal" nature of the substitute item, whether approved or disapproved, shall be borne by the Contractor.

B.  Where the Consultant, pursuant to the provisions of this Section, approves a product proposed by the Contractor and said proposed product requires a revision of the Work covered by this Contract, or the Work covered by other contracts, all

Danny Standard

00113

changes to the Work of all contracts, revision or redesign, and all new drawings and details required therefor shall be provided by the Contractor at the cost of the Contractor and shall be subject to the approval of the Consultant.

C.     No substitution will be permitted which may result in a delay to the Project.

## Section 4.04 - Quality, Quantity and Labeling

A.     The Contractor shall Furnish materials and equipment of the quality and quantity specified in the Contract.

B.     When materials are specified to conform to any standard, the materials delivered to the Site shall bear manufacturer's labels stating that the materials meet said standards.

C.     The above requirements shall not restrict or affect the Owner's right to test materials as provided in the Contract.

D.     The Contractor shall develop and implement quality control plans to assure itself and the Owner that all Work performed by the Contractor and its Subcontractors complies fully with all contract requirements, and shall submit the plans to the Owner as required by the Contract.   See Submittals Section of the General Requirements. The Contractor's quality control plans shall be independent of any testing or inspection performed by or on behalf of the Owner.

## ARTICLE 5 -- CONTRACTOR

## Section 5.01 - Supervision by Contractor

A.     The Contractor shall provide full-time competent supervision for the duration of the Contract; during the course of on-site work the Contractor shall provide a full-time on-site superintendent who shall have full authority to act for the Contractor at all times.  The Superintendent must be able to read, write and speak English fluently, as well as communicate with the workers.

B.     If at any time the supervisory staff is not satisfactory to the Owner, the Contractor shall, if directed by the Owner, immediately replace such supervisory staff with other staff satisfactory to the Owner.

C.     The Contractor shall remove from the Work any employee of the Contractor or of any Subcontractor when so directed by the Owner.

00114

## Section 5.02 - Representations of Contractor

The Contractor represents and warrants:

A. That it is financially solvent and is experienced in and competent to perform the Work, and has the staff, manpower, equipment, subcontractors, and suppliers available to complete the Work within the time specified for the contract price.

B. That it is familiar with all Federal, State, Local, or other laws, ordinances, orders, rules and regulations, which may in any way affect the Work;

C. That any temporary and permanent Work required by the Contract can be satisfactorily constructed, and that said construction will not injure any person or damage any property; and

D. That it has carefully examined the Contract and the Site of the Work and that, from the Contractor's own investigations is satisfied as to the nature and materials likely to be encountered, the character of equipment and other facilities needed for the performance of the Work, the general and local conditions, and all other materials or items which may affect the Work.

E. That it is satisfied that the Work can be performed and completed as required in the Contract, and warrants that it has not been influenced by any oral statement or promise of the Owner or the Consultant.

F. That it will comply with all applicable local, state, and federal rules and regulations and all applicable construction standards of the Joint Commission on the Accreditation of Healthcare Organizations (JCAHO) and other accrediting agencies and organizations.

## Section 5.03 - Copies of Contract Documents for Contractors

A. The Owner shall furnish to the Contractor, without charge, up to ten (10) copies of Contract Documents.

B. Any sets in excess of the number mentioned above may be furnished to the Contractor at the cost of reproduction and mailing.

## Section 5.04 - Meetings

The Contractor shall attend all meetings as directed by the Owner or the Owner's Representative.

00115

## Section 5.05 - Related Work

To ascertain the relationship of its Work to all Work required by the Contract Documents, the Contractor shall examine the Contract Documents for Work of its Contract and any related work of other contracts.

## Section 5.06 - Errors or Discrepancies

The Contractor shall examine the Contract thoroughly before commencing the Work and report any errors or discrepancies to the Owner or the Owner's Representative, in writing, within five (5) days of discovery.

## ARTICLE 6 – SITE CONDITIONS

## Section 6.01 - Subsurface or Site Conditions Found Different

A.   The Contractor acknowledges that the Contract amount set forth in its bid includes such provisions which the Contractor deems proper for all subsurface or site conditions the Contractor could reasonably anticipate encountering as indicated in the Contract, or borings, reports, rock cores, foundation investigation reports, topographical maps or other information available to the Contractor or from the Contractor's inspection and examination of the Site prior to submission of bids.

B.   The Owner assumes no responsibility for the correctness of any boring or other subsurface information and makes no representation whatsoever regarding subsurface conditions and test borings, reports, rock cores, foundation investigation and topographical maps which may be made available to the Contractor.

C.   Should the Contractor encounter subsurface or site conditions at the Site materially differing from those shown on or described in or indicated in the Contract, the Contractor shall immediately give notice to the Owner and the Owner's Representative of such conditions and shall not disturb said conditions until authorized to do so by the Owner or the Owner's Representative.

## Section 6.02 - Verifying Dimensions and Conditions

A.   The Contractor shall take all measurements at the Site and shall verify all dimensions and conditions at the Site before proceeding with the Work. If said dimensions or conditions are found to be in conflict with the Contract, the

Disney Standard

00116

Contractor immediately shall refer said conflict to the Owner in writing. The Contractor shall comply with any revised Contract Documents.

B. During the progress of Work, the Contractor shall verify all field measurements prior to fabrication of building components or equipment, and proceed with the fabrication to meet field conditions.

C. The Contractor shall consult all Contract Documents to determine exact location of all Work and verify spatial relationships of all Work. Any question concerning said location or spatial relationships may be submitted in a manner approved by the Owner.

D. Special locations for equipment, pipelines, ductwork and other such items of Work, where not dimensioned on plans, shall be determined in consultation with other affected Contractors.

E. The Contractor shall be responsible for the proper fitting of the Work in place.

## Section 6.03 - Surveys

Unless otherwise expressly provided in the Contract, the Owner shall furnish the Contractor all surveys of the property necessary for the Work, but the Contractor shall lay out the Work.

## ARTICLE 7 -- INSPECTION AND ACCEPTANCE

## Section 7.01 - Access to the Work

The Owner or the Owner's Representative shall at all times have access to the Work and the Contractor shall provide proper facilities for said access.

## Section 7.02 - Notice for Testing

If the Contract Documents, the Owner's instructions, laws, rules, ordinances, or regulations, require that any Work be inspected or tested, the Contractor shall give the Owner a minimum of three (3) work days written notice of readiness of the Work for inspection or testing and the date fixed for said inspections or testing.

## Section 7.03 - Reexamination of Work

Reexamination of any part of the Work may be ordered by the Owner, and if so ordered the Work must be uncovered by the Contractor. If said Work is found to be in

accordance with the Contract, the Owner shall pay the cost of reexamination and if said Work is not found to be in accordance with the Contract, the Contractor shall pay the cost of reexamination and replacement.

## Section 7.04 - Inspection of Work

All Work, all materials whether or not incorporated in the Work, all processes of manufacture, and all methods of construction shall be, at all times and places, subject to the inspection of the Owner or the Owner's Representative, and the Owner shall be the final judge of the quality and suitability of the Work, materials, processes of manufacture, and methods of construction for the purposes for which said Work, materials, processes of manufacture, and methods of construction are used. Any Work not approved by the Owner shall be reconstructed, made good, replaced or corrected immediately by the Contractor including all Work of other Contractors destroyed or damaged by said removal or replacement. Rejected material shall be removed immediately from the Site. Acceptance of material and workmanship by the Owner shall not relieve the Contractor from the Contractor's obligation to replace all Work which is not in full compliance with the Contract.

## Section 7.05 - Defective or Damaged Work

If, in the opinion of the Owner, it is undesirable to replace any defective or damaged materials or to reconstruct or correct any portion of the Work damaged or not performed in accordance with the Contract, the compensation to be paid to the Contractor shall be reduced by an amount which, in the judgment of the Owner, shall be deemed to be equitable.

## Section 7.06 - Testing

All materials and equipment used in the Work shall be subject to inspection and testing in accordance with accepted standards to establish conformance with specifications and suitability for uses intended, unless otherwise specified in the Contract. If any Work shall be covered or concealed without the approval or consent of the Owner, said Work shall, if required by the Owner, be uncovered for examination. Any inspection by the Owner or by a testing laboratory on behalf of the Owner does not relieve the Contractor of the responsibility to maintain quality control of materials, equipment and installation to conform to the requirements of the Contract. If any test results are below specified minimums, the Owner may order additional testing. The cost of said additional testing, any additional professional services required, and any other expenses incurred by the Owner as a result of said additional testing shall be at the Contractor's expense. The Owner may deduct such costs from moneys due the Contractor.

## Section 7.07 - Acceptance

No previous inspection shall relieve the Contractor of the obligation to perform the Work in accordance with the Contract. No payment, either partial or full, by the Owner to the Contractor shall excuse any failure by the Contractor to comply fully with the Contract Documents. The Contractor shall remedy all defects and deficiencies, paying the cost of any damage to other Work resulting therefrom.

## ARTICLE 8 – CHANGES IN THE WORK

## Section 8.01 - Changes

A.  Without invalidating the Contract, the Owner may order Extra Work or make changes by altering, adding to, or deducting from the Work, the Contract consideration being adjusted accordingly. No claims for Extra Work shall be allowed unless such Extra Work is ordered in writing by the Owner. No changes in the Work shall be made unless such Work is ordered in writing by the Owner or Owners Representative. If the time for completion is affected by this change the revised time for completion shall be included in the change order. The Owner may order the Contractor to perform the Extra Work and proceed under the Dispute Article.

B.  The amount by which the Contract consideration is to be increased or decreased by any change order may be determined by the Owner by one (1) or more of the following methods:

1.  By applying the applicable unit price or prices contained in the Contract.

2.  By estimating the fair and reasonable cost of the extra work:

    a.  Labor, including all wages, required wage supplements and insurance required by law, paid to employees below the rank of superintendent directly employed at the Site. Wages are the prevailing rate of wages defined in the Contract Documents and supplemental updates.

    b.  Premiums or taxes paid by the Contractor for worker's compensation insurance, unemployment insurance, FICA tax and other payroll taxes as required by law, net of actual and anticipated refunds and rebates.

    c.  Materials

d.  Equipment, excluding hand tools, which in the judgment of the Owner, would have been or will be employed in the Work. The Owner may employ the use of rental rates it deems most appropriate from the "Green Book", the "Blue Book", or from the Associated General Contractors of America. In no case will the equipment rental cost exceed the purchase price of the equipment. Self-owned equipment is defined to include equipment rented from Contractor-controlled or loosely affiliated companies. It is the duty of the Contractor to utilize either rented or self-owned equipment that is of a nature and size appropriate for the Work to be performed. The Owner reserves the right to determine reasonable and appropriate equipment sizing, and at the Owner's discretion, it may adjust the costs allowed to reflect a smaller or less elaborate piece of equipment more suitable for performance of the extra Work.

3.  By determining the actual cost of the Extra Work in the same manner as in Article 8, Section 8.01, Subsection B. 2. except that the actual costs of the Contractor shall be used in lieu of estimated costs.

C.  The Owner shall have the option of determining by which method the Contractor shall proceed with said Extra Work. Wages are the prevailing rate of wages defined in the Contract Documents and supplemental updates. The Contractor will submit a signed and notarized Labor Rate Worksheet(s) to the Owner to be used to determine hourly rates for various classifications of workers. The Contractor agrees to provide documentation verifying costs and calculations at the Owner's request.

D.  Regardless of the method used by the Owner in determining the value of a change order, the Contractor shall, within the time-frame given by the Owner, submit to the Owner or Owner's Representative a detailed breakdown of the Contractor's estimate of the value of the omitted or Extra Work.

E.  Unless otherwise specifically provided for in a change order, the compensation specified therein for Extra Work includes full payment for the Extra Work covered thereby, and the Contractor waives all rights to any other compensation for said Extra Work, damage or expense.

F.  The Contractor shall furnish satisfactory bills, payrolls and vouchers covering all items of cost and when requested by the Owner shall give the Owner access to all accounts and records relating thereto, including records of subcontractors and material suppliers.

G.   At the completion of the Project Work, the Owner will address increased bonding costs, if any, which may have resulted from Owner-issued changes in the Work, upon submission of satisfactory proof of Contractor's increased costs. The Owner will not pay overhead and profit on any increased costs for bonding.

H.   At the completion of the Project Work, the Owner will address increased contractual liability insurance premium costs, if any, which may have resulted from changes in the Work upon submission of satisfactory proof of the Contractor's increased costs. The Owner will not pay overhead and profit on any increased costs for contractual liability insurance.

## Section 8.02 - Overhead and Profit Allowance

A.   For Extra Work performed directly by the Contractor, whether a base cost is arrived at by estimated cost or actual cost method (as outlined), add to said base cost a sum equal to twenty percent. See Exception - Paragraph "D". See Example A.

**Example A.**

| | |
|---|---|
| Contractor Base Cost | $1,000. |
| 20% OH & P Allowance | 200. |
| Total | $1,200. |

B.   For extra work performed by a subcontractor under contract with the Contractor, where estimated or actual cost is Ten Thousand Dollars ($10,000.00) or less, add to the base cost a sum equal to twenty percent of said cost, for the benefit of the subcontractor. For the benefit of the Contractor, add an additional sum equal to ten percent of the Subcontractor base cost. See Example B.

**Example B.**

| | |
|---|---|
| Subcontractor base cost | $1,000. |
| 20% Subcontractor OH & P Allowance | 200. |
| Subcontractor Total | $1,200. |
| 10% Contractor Allowance on Base Cost | 100. |
| Total | $1,300. |

C.   For extra work performed by a Subcontractor, under contract with the Contractor, which exceeds a base cost of Ten Thousand Dollars ($10,000) in estimated or actual costs (as outlined), add to the base cost a sum equal to twenty percent of said cost for the benefit of the subcontractor. For the benefit of the Contractor add an additional sum equal to ten percent of the first Ten Thousand Dollars ($10,000) of the subcontractor base cost, plus five percent of the next Ninety Thousand Dollars ($90,000) of the Subcontractor base cost, plus three percent of any sum in

00121

excess of One Hundred Thousand Dollars ($100,000) of the subcontractor base cost. See Example C.

Example C.

| | |
|---|---|
| Subcontractor Base Cost | $200,000. |
| 20% Subcontractor OH & P Allowance | 40,000. |
| Subcontractor Total | $240,000. |
| 10% Contractor Allowance on First $10,000 Base Cost | 1,000. |
| 5% on Next $90,000 Base Cost | 4,500. |
| 3% on Base Cost over $100,000 | 3,000. |
| Total | $248,500. |

D.   Markup Allowances On Major Equipment. (Examples; Switchgear, Transformers, Air Handling Units, Boilers, etc.)

For extra equipment purchases by Prime or Subcontractors which exceeds a base cost of Ten Thousand dollars ($10,000) in estimated or actual costs, add to the base cost for the benefit of the Contractor a sum equal to ten percent of the first Ten Thousand dollars ($10,000) of the vendor base costs plus five percent of the next Ninety Thousand dollars ($90,000) of the vendor base cost, plus three percent of any sum in excess of One Hundred Thousand dollars ($100,000) of the vendors base cost. See Example D.

Example D.

| | |
|---|---|
| Vendor Base Cost | $200,000. |
| 10% Prime or Subcontractor allowance on First $10,000 Base Cost | 1,000. |
| 5% on Next $90,000 Base Cost | 4,500. |
| 3% on Base Cost over $100,000 | 3,000. |
| Prime or Subcontractor Total | $208,500. |
| 10% Prime Contractor allowance on First $10,000 Base Cost when equipment is supplied by the Subcontractor. No other mark-up allowed. | 1,000. |
| Total | $209,500. |

E.   No allowance shall be made for extra work performed by a Subcontractor not under direct contract with the Contractor. No allowance shall be paid on the premium portion of overtime pay. Where the Extra Work involves both an increase and a reduction in similar or related Work, the overhead and profit allowance shall be applied only to the cost of the increase which exceeds the cost of the reduction.

## Section 8.03 - Form of Change Orders

All change orders shall be processed, executed and approved on the Owner's change order form, which is included herein and made part of the Contract Documents. No alteration to this form shall be acceptable to the Owner and no payment for Extra Work shall be due the Contractor unless it executes a change order on said form.

## ARTICLE 9 – TIME OF COMPLETION

### Section 9.01 - Time of Completion

A.  The Work shall be commenced at the time stated in the Owner's written notice to proceed, and shall be completed no later than the time of completion specified in the Contract. Notwithstanding anything to the contrary, a schedule submitted by the Contractor showing a time of completion earlier than that specified in the Contract shall not entitle the Contractor to any additional compensation in the event the earlier time of completion is not realized.

B.  It is hereby understood and mutually agreed, by and between the Contractor and the Owner, that the time for completion of the Work, as specified in the Contract, is an essential condition of the Contract.

C.  The Contractor agrees that the Work shall be prosecuted regularly, diligently, and uninterruptedly at such rate of progress as shall insure full completion thereof within the time specified. It is expressly understood and agreed, by and between the Contractor and the Owner, that the time for completion of the Work described herein is a reasonable time for completion of the same.

D.  If the Contractor shall neglect, fail or refuse to complete the Work within the time specified, or any proper extension thereof granted by the Owner, the Contractor agrees to pay to the Owner for loss of beneficial use of the structure an amount specified in the Contract, not as a penalty, but as liquidated damages, for each and every calendar day that the Contractor is in default. Default shall include abandonment of the Work by the Contractor.

E.  Said amount of liquidated damages is agreed upon by and between the Contractor and the Owner because of the impracticability and extreme difficulty of fixing and ascertaining the actual damages which the Owner would sustain for loss of beneficial use of the structure in the event of delay in completion, and said amount is agreed to be the amount of damages sustained by the Owner and said amount may be retained from time to time by the Owner.

F.  It is further agreed that time is of the essence for each and every portion of the Work. In any instance in which additional time is allowed for the completion of

00125

any Work, the new time of completion established by said extension shall be of the essence. The Contractor shall not be charged with liquidated damages or any excess cost if the Owner determines that the Contractor is without fault and that the delay in completion of the Work is due:

1.    to any preference, priority or allocation order duly issued by the Government of the United States or the State of New York;

2.    to an unforeseeable cause beyond the control and without the fault of, or negligence of the Contractor, and approved by the Owner, including, but not limited to, acts of God or of public enemy, acts of the Owner, fires, epidemics, quarantine, restrictions, strikes, freight embargoes and unusually severe weather; and

3.    to any delays of Subcontractors or suppliers occasioned by any of the causes specified in Subsections 1, and 2, of this paragraph

The Contractor shall, within ten (10) days from the beginning of any such delay, notify the Owner, in writing, of the causes of the delay.

G.    The time for completion can be extended only by change order approved by the Owner and may be extended for:

1.    all of the Work, or

2.    only that portion of the Work altered by the change order.

H.    The foregoing liquidated damages are intended to compensate the Owner only for the loss of beneficial use of the structure. In addition, the Contractor shall be liable to the Owner, to the fullest extent permitted by law, for whatever actual damages (other than actual loss of beneficial use) the Owner may incur as a result of any actions or inactions of the Contractor or its Subcontractors including, without limitation, interest expense and carrying costs, liabilities to other Contractors working on the project or other third parties, job extension costs, and other losses incurred by the Owner. The provisions of this paragraph are for the exclusive use of the Owner, and shall not accrue to other contractors or third parties.

## ARTICLE 10 – TERMINATION OR SUSPENSION

### Section 10.01 - Termination for Cause

In the event that any provision of the Contract is violated by the Contractor or by any Subcontractor, the Owner may serve written notice upon the Contractor and upon the Contractor's surety, if any, of the Owner's intention to terminate the Contract; such notice shall contain the reasons for the intention to terminate the Contract upon a date specified by the Owner. If the violation or delay shall not cease or arrangements satisfactory to the Owner shall not be made, the Contract shall terminate upon the date so specified by the Owner. In the event of any such termination, the Owner may take over the Work and prosecute same to completion by Contract or otherwise and at the expense of the Contractor, and the Contractor and Contractor's surety shall be liable to the Owner for all costs occasioned the Owner thereby. In the event of such termination the Owner may take possession of and may utilize such materials, appliances, and plant as may be on the Site and necessary or useful in completing the Work.

## Section 10.02 - Termination for Convenience of Owner

The Owner, at any time, may terminate the Contract in whole or in part. Any such termination shall be effected by delivering to the Contractor a notice of termination specifying the extent to which performance of Work under the Contract is terminated and the date upon which the termination becomes effective. Upon receipt of the notice of termination, the Contractor shall act promptly to minimize the expenses resulting from the termination. The Owner shall pay the Contractor for Project Work performed by the Contractor and accepted by the Owner for the period extending from the date of the last payment requisition up to the effective date of the termination, including Overhead and Profit Allowance as described in Section 8.02, but in no event shall the Contractor be entitled to compensation in excess of the total consideration of the Contract. In the event of such termination the Owner may take over the Work and prosecute same to completion by Contract or otherwise and may take possession of and may utilize such materials, appliances, and plant as may be on the Site and necessary or useful in completing the Work.

## Section 10.03 - Owner's Right to do Work

The Owner may, after notice to the Contractor, without terminating the Contract and without prejudice to any other right or remedy the Owner may have, perform or have performed by others all of the Work or any part thereof and may deduct the cost thereof from any moneys due or to become due the Contractor.

## Section 10.04 - Suspension of Work

A.     The Owner may order the Contractor in writing to suspend, delay or interrupt performance of all or any part of the Work for a reasonable period of time as the Owner may determine. The order shall contain the reason or reasons for issuance which may include but shall not be limited to the following:  latent field

00125

conditions, substantial program revisions, acquisition of rights of way or real property, financial crisis, labor disputes, civil unrest, acts of God.

B.   Upon receipt of a suspension order, the Contractor shall, as soon as practicable, cease performance of the Work as ordered and take immediate affirmative measures to protect such work from loss or damage.

C.   The Contractor specifically agrees that such suspension, interruption or delay of the performance of the Work pursuant to this Article shall not increase the cost of performance of the Work of this Contract.

D.   Time for completion of the Work may be extended to such time as the Owner determines shall compensate for the time lost by the suspension, interruption or delay, such determination to be set forth in writing.

## ARTICLE 11 -- DISPUTES

### Section 11.01 - Claims for Extra Work

A.   If the Contractor claims that any Work which the Contractor has been ordered to perform will be Extra Work, or that any action or omission of the Owner is contrary to the terms and provisions of the Contract and will require the Contractor to perform Extra Work, the Contractor shall:

  1.   Promptly comply with said order.

  2.   File with the Owner within fifteen (15) working days after being ordered to perform the Work claimed by the Contractor to be Extra Work or within fifteen (15) working days after commencing performance of the Work, whichever date shall be earlier, or within fifteen (15) working days after the said action or omission on the part of the Owner occurred, a written notice of the basis of the Contractor's claim, including estimated cost, and request for a determination thereof.

  3.   Proceed diligently, pending and subsequent to the determination of the Owner with respect to any said disputed matter, with the performance of the Work in accordance with all instructions of the Owner.

B.   No claim for Extra Work shall be allowed unless the same was done pursuant to a written order of the Owner. The Contractor's failure to comply with any or all parts of this Article shall be deemed to be:

00128

1.    a conclusive and binding determination on the part of the Contractor that said order, Work, action or omission does not involve Extra Work and is not contrary to the terms and provisions of the Contract,

2.    a waiver by the Contractor of all claims for additional compensation or damages as a result of said order, Work, action or omission.

C.    The value of claims for Extra Work, if allowed, shall be determined by the methods described in the Contract.

## Section 11.02 - Claims for Delay

No claims for increased costs, charges, expenses or damages of any kind shall be made by the Contractor against the Owner for any delays or hindrances from any cause whatsoever; provided that the Owner, in the Owner's discretion, may compensate the Contractor for any said delays by extending the time for completion of the Work as specified in the Contract.

## Section 11.03 - Finality of Decisions

A.    Any decision or determination of the Consultant, Owner or the Owner's Representative shall be final, binding and conclusive on the Contractor unless the Contractor shall, within ten (10) working days after said decision, make and deliver to the Owner a verified written statement of the Contractor's contention that said decision is contrary to a provision of the Contract. The Owner shall determine the validity of the Contractor's contention. Pending the decision of the Owner, the Contractor shall proceed in accordance with the original decision.

B.    Wherever it is required in the Contract that an application must be made to the Owner or a determination made by the Owner, the decision of the Owner on said application or the determination of the Owner under the Contract shall be final, conclusive and binding upon the Contractor unless the Contractor, within ten (10) working days after receiving notice of the Owner's decision or determination, files a written statement with the Owner that the Contractor reserves the Contractor's rights in connection with the matters covered by said decision or determination.

## ARTICLE 12 – SUBCONTRACTS

## Section 12.01 - Subcontracting

A.    The Contractor may utilize the services of Subcontractors.

The Contractor shall submit to the Owner, in writing, the name of each proposed Subcontractor as required by the Contract or earlier when requested. The Owner reserves the right to disapprove any proposed Subcontractor. Such disapproval shall not result in additional cost to the Owner.

C.      The Contractor shall be fully responsible for the Work, acts and omissions of Subcontractors, and of persons either directly or indirectly employed by Subcontractors. The Contractor shall be responsible for all guarantees and warranties provided by Subcontractors.

D.      The Contractor shall cause appropriate provisions to be inserted in all subcontracts relative to the Work to bind Subcontractors to the Contractor by the terms of the Contract insofar as applicable to the work of Subcontractors.

E.      The Contractor's use of Subcontractors shall not diminish the Contractor's obligation to complete the Work in accordance with the Contract. The Contractor shall control and coordinate the Work of Subcontractors.

F.      Nothing contained in the Contract or any subcontract shall create any contractual relationship between Subcontractors and the Owner.

G.      In selecting a Subcontractor, the Contractor shall consider whether the Subcontractor appears on any list of entities debarred or suspended from doing business with a government entity, including the List of Parties Excluded from Federal Procurement and Nonprocurement Programs published by the U.S. General Services Administration. The Contractor shall not Subcontract with any Subcontractor on the List of Employers Ineligible To Bid On Or Be Awarded Any Public Contract, published by the New York State Department of Labor Bureau of Public Work.

H.      Prior to or after award of the Contract, if requested by the Owner, the Contractor shall require a Subcontractor to submit a Uniform Contracting Questionnaire and a Dormitory Authority Contractor and Consultant questionnaire.

## ARTICLE 13 -- CONTRACT COORDINATION AND COOPERATION

## Section 13.01 - Cooperation with Other Contractors

A.      During the progress of the Work, other contractors may be engaged in performing work. The Contractor shall coordinate the Contractor's Work with the work of said other contractors in such a manner as the Owner may direct.

B.      If the Owner shall determine that the Contractor is failing to coordinate the Work with the work of other contractors as the Owner has directed:

0012■

1.    the Owner shall have the right to withhold any payments due un...
7.    Contract until the Owner's directions are complied with by the Contractor; and

2.    the Contractor shall assume the defense and pay on behalf of the Owner any and all claims or judgments or damages and from any costs or damages to which the Owner may be subjected or which the Owner may suffer or incur by reason of the Contractor's failure to promptly comply with the Owner's directions.

C.    If the Contractor notifies the Owner, in writing, that another contractor on the Site is failing to coordinate the work of said contractor with the Work, the Owner shall investigate the charge.  If the Owner finds it to be true, the Owner shall promptly issue such directions to the other contractor with respect thereto as the situation may require.  The Owner shall not be liable for any damages  suffered by the Contractor by reason of the other contractor's failure to promptly comply with the directions so issued by the Owner, or by reason of another contractor's default in performance.

D.    Should the Contractor sustain any damage through any act or omission of any other contractor having a contract with the Owner or through any act or omission of any Subcontractor of said other contractor, the Contractor shall have no claim against the Owner for said damage.

E.    Should any other contractor having or which shall have a contract with the Owner sustain damage through any act or omission of the Contractor or through any act or omission of a Subcontractor, the Contractor shall reimburse said other contractor for all said damages and shall indemnify and hold the Owner harmless from all said claims.

F.    The Owner cannot guarantee the responsibility, efficiency, unimpeded operations or performance of any Contractor.  The Contractor acknowledges these conditions and shall bear the risk of all delays including, but not limited to, delays caused by the presence or operations of other contractors and delays attendant upon any construction schedule approved by the Owner and the Owner shall not incur any liability by reason of any delay.

## Section 13.02 - Separate Contracts

A.    The Owner may award other contracts, work under which may proceed simultaneously with the execution of the Work.  The Contractor shall coordinate the Contractor's operations with those of other contractors as directed by the Owner.  Cooperation shall be required in the arrangements for access, the storage of material and in the detailed execution of the Work.

00122

B.   The Contractor shall keep informed of the progress and workmanship of other contractors and any Subcontractors and shall notify the Owner in writing immediately of lack of progress or defective workmanship on the part of other contractors or Subcontractors, where said delay or defective workmanship may interfere with the Contractor's operations.

C.   Failure of a Contractor to keep so informed and failure to give notice of lack of progress or defective workmanship by others shall be construed as acceptance by the Contractor of said progress and workmanship as being satisfactory for proper coordination with the Work.

D.   Where the Contractor shall perform Work in close proximity to work of other contractors or Subcontractors, or where there is evidence that Work of the Contractor may interfere with work of other contractors or Subcontractors, the Contractor shall assist in arranging space conditions to make satisfactory adjustment for the performance of said work and the Work. If the Contractor performs work in a manner which causes interference with the work of other contractors or Subcontractors, the Contractor shall make changes necessary to correct the condition.

## Section 13.03 - Coordinated Composite Drawings

The Contractor shall prepare coordinated composite scale reproducible drawings and sections, on mylar, clearly showing how the Work of the Contractor is to be performed in relation to work of other contractors or subcontractors.

## ARTICLE 14 -- PROTECTION OF RIGHTS, PERSONS AND PROPERTY

## Section 14.01 - Accident Prevention

The Contractor shall, at all times, take every precaution against injuries to persons or damage to property and for the safety of persons on or about the Site or engaged in the performance of the Work.

## Section 14.02 - Safety Programs

A.   The Contractor shall be responsible for the initiation, maintenance and supervision of safety precautions and programs in connection with the Work.

B.   The Owner, or the Project Construction Manager if any, shall provide the Contractor with copies of the Owner's safety orientation booklet. The Contractor shall provide

00130

copies of the booklet to each of its workers and to each worker of its Subcontractors prior to each worker starting Work. The Contractor shall maintain documentation that each worker received a copy of the Owner's safety orientation booklet prior to the worker starting Work.

C. The Owner, or the Project Construction Manager if any, shall provide the Contractor with a copy of the Owner's safety orientation video. The Contractor shall ensure that its workers and the workers of its Subcontractors view the Owner's safety orientation video prior to each worker starting Work.

## Section 14.03 - Protection of Work and Property

A. The Contractor shall, at all times, guard the Owner's property from injury or loss in connection with the Work. The Contractor shall, at all times, guard and protect the Contractor's Work, and adjacent property. The Contractor shall replace or make good any said loss or injury unless said loss or injury is caused directly by the Owner.

B. The Contractor shall have full responsibility to protect and maintain all materials and supplies on and off site in proper condition and forthwith repair, replace and make good any damage thereto until construction completion. The Contractor shall maintain an inventory of all materials and supplies for the Project that are delivered to the Site or approved for off-site storage facilities.

C. The Contractor shall report any loss, theft, burglary, vandalism or damage of materials or installed work to the Owner by phone and facsimile as soon as it is discovered. If vandalism, theft, or burglary is suspected as the cause of the loss, the Contractor shall notify site security personnel and the municipal police. The Contractor shall also protect the place of the loss until released from protection by the Owner or the Owner's Representative. The Contractor shall insure that no potential evidence relating to the loss is removed from the place of the loss.

D. Should the Contractor feel there is a claim for recovery under the Owner's builders risk insurance, a fully documented claim must be submitted to the Owner within thirty (30) days of discovery. The claim must at least include the following:

1. A copy of a police report (if applicable).

2. A complete inventory of damaged or lost items including:

   a. Description of each item.
   b. Purchase date and proof of delivery of each item.
   c. Supplier from whom purchased.

00131

d.     Serial number (if applicable).

e.     Price of each item.

f.      Total number of pieces and cost of all lost or damaged items.

3.     The name, address and telephone number of the person who controlled the lost or damaged items immediately before the loss or damage.

4.     The name, address and telephone number of the person who discovered the loss or damage.

5.     A written description of how the loss or damage occurred.

The Owner may refuse any claim from the Contractor for loss or damage unless all of the items required in this section are provided to the Owner, and are to the satisfaction of the Owner.

## Section 14.04 - Adjoining Property

The Contractor shall protect all adjoining property and shall repair or replace any said property damaged or destroyed during the progress of the Work.

## Section 14.05 - Risks Assumed by the Contractor

A.     The Contractor solely assumes the following distinct and several risks whether said risks arise from acts or omissions, whether supervisory or otherwise, of the Owner, of the Client, of any Subcontractor, of third persons or from any other cause, including unforeseen obstacles and difficulties which maybe encountered in the prosecution of the Work, whether said risks are within or beyond the control of the Contractor and whether said risks involve any legal duty, primary or otherwise, imposed upon the Owner, excepting only risks which arise from faulty designs as shown by the plans and specifications or from the negligence of the Owner or the Owner's members, officers, representatives or employees that caused the loss, damage or injuries hereinafter set forth:

1.     The risk of loss or damage, includes direct or indirect damage or loss, of whatever nature to the Work or to any plant, equipment, tools, materials or property furnished, used, installed or received by the Owner, the Construction Manager, the Contractor or any Subcontractor, materialmen or workmen performing services or furnishing materials for the Work. The Contractor shall bear said risk of loss or damage until construction completion or until completion or removal of said plant, equipment, tools, materials or property from the Site and the vicinity thereof, whichever

event occurs last. In the event of said loss or damage, the Contractor immediately shall repair, replace or make good any said loss or damage.

2.  The risk of claims, just or unjust, by third persons against the Contractor or the Owner, the Client, and the Construction Manager on account of wrongful death, bodily injuries and property damage, direct or consequential, loss or damage of any kind whatsoever arising or alleged to arise out of or as a result of or in connection with the performance by the Contractor of the Work, whether actually caused by or resulting from the performance of the Work, or out of or in connection with the Contractor's operations or presence at or in the vicinity of the Site. The Contractor shall bear the risk for all deaths, injuries, damages or losses sustained or alleged to have been sustained prior to the construction completion of the Work. The Contractor shall bear the risk for all deaths, injuries, damages or losses sustained or alleged to have been sustained resulting from the Contractor's negligence or alleged negligence which is discovered, appears, or is manifested after acceptance by the Owner.

3.  The Contractor assumes entire responsibility and liability for any and all damage or injury of any kind or nature whatsoever, including death resulting therefrom, to all persons, whether employees of the Contractor or otherwise, and to all property, caused by, resulting from, arising out of, or occurring in connection with the execution of the Work. If any person shall make said claim for any damage or injury, including death resulting therefrom, or any alleged breach of any statutory duty or obligation on the part of the Owner, the Client, the Owner's Representative, Construction Manager, servants and employees, the Contractor shall assume the defense and pay on behalf of the Owner, the Client, the Owner's Representative, the Construction Manager, servants and employees, any and all loss, expense, damage or injury that the Owner, the Client, the Owner's Representative, Construction Manager, servants and employees, may sustain as the result of any claim, provided however, the Contractor shall not be obligated to indemnify the Owner, the Client, the Owner's Representative, Construction Manager, servants and employees for their own negligence, if any. The Contractor agrees to assume, and pay on behalf of the Owner, the Client, and the Owner's Representative, Construction Manager, servants and employees, the defense of any action at law or equity which may be brought against the Owner, the Client and the Owner's Representative, Construction Manager, servants and employees. The assumption of defense and liability by the Contractor includes, but is not limited to the amount of any legal fees associated with defending, all costs of investigation, expert evaluation and any other costs including any judgment or interest or penalty that may be entered against

the Owner, the Client, and the Owner's Representative, Construction Manager, servants and employees, in any said action.

4.     The Contractor is advised that the work required under this contract may impose certain obligations and requirements mandated by the U.S. Department of Labor Occupational Safety and Health Administration regulations, Title 29 CFR Part 1926.62 Lead Exposure in Construction, relative to the potential exposure to lead by its employees. The Contractor assumes entire responsibility and liability for complying fully in all respects with these regulations.

B.     The Contractor's obligations under this Article shall not be deemed waived, limited or discharged by the enumeration or procurement of any insurance for liability for damages. The Contractor shall notify its insurance carrier within twenty four (24) hours after receiving a notice of loss or damage or claim from the Owner or Owner's Client. The Contractor shall make a claim on its insurer specifically under the provisions of the contractual liability coverages and any other coverages afforded the Owner or the Client including those of being an additional insured where applicable.

C.     Neither Final Acceptance of the Work nor making any payment shall release the Contractor from the Contractor's obligations under this Article. The enumeration elsewhere in the Contract of particular risks assumed by the Contractor or of particular claims for which the Contractor is responsible shall not be deemed to limit the effect of the provisions of this Article or to imply that the Contractor assumes or is responsible for only risks or claims of the type enumerated; and neither the enumeration in this Article nor the enumeration elsewhere in the Contract of particular risks assumed by the Contractor of particular claims for which the Contractor is responsible shall be deemed to limit the risks which the Contractor would assume or the claims for which the Contractor would be responsible in the absence of said enumerations.

Upon the conclusion of any action, proceeding or lawsuit, should a final binding determination of responsibility be made which allocates responsibility to the Owner, the Client, or the Owner's members, officers, employees, or representatives, the Owner agrees that the obligation to indemnify and hold harmless shall not be applicable to the portion of any uninsured money judgment for which the Owner is responsible, and the Owner agrees to pay the Contractor the percentage of uninsured defense costs which the Contractor incurred based upon an apportionment of the Owner's allocated responsibility.

The Contractor agrees that any claim or costs of the Owner and/or Client or Construction Manager arising from obligations in this Article and/or Article 15 shall be set off or deducted from payments due the Contractor.

# ARTICLE 15–INSURANCE AND CONTRACT SECURITY

## Section 15.01 - Insurance Provided by Contractor

A.    The Contractor shall procure and maintain all of the insurance required under this Article until all work, including punch list items, is complete.

The Contractor and each Subcontractor of every tier shall provide insurance as follows:

1.    Workers' Compensation and Employers Liability Insurance

   a.    Statutory Workers' Compensation (including occupational disease)

   b.    Employers Liability (with a minimum limit of $1,000,000) New York Statutory Endorsement

2.    Commercial General Liability (CGL) with a combined single limit for Bodily Injury, Personal Injury and Property Damage of at least $2,000,000 per occurrence & aggregate. The limit may be provided through a combination of primary and umbrella/excess liability policies.

Coverage shall provide and encompass at least the following:

   a.    Written on an occurrence form;

   b.    An endorsement naming the Dormitory Authority - State of New York, the Client, the Construction Manager (if applicable), and other entities as specified on the Dormitory Authority Sample Certificate of Insurance in the Supplement to Information for Bidders.

   c.    Policy or policies must be endorsed to be primary as respects the coverage afforded the Additional Insureds and such policy shall be primary to any other insurance maintained by the Owner. Any other insurance maintained by the Owner shall be excess of and shall not contribute with the Contractor's or Subcontractor's insurance, regardless of the "other insurance" clause contained in the Owner's own policy of insurance.

00135

3.  Commercial Automobile Liability and Property Damage Insurance covering all owned, leased, hired and non-owned vehicles used in connection with the Work with a combined single limit for Bodily Injury and Property Damage of at least $1,000,000 per occurrence. The limit may be provided through a combination of primary and umbrella/excess liability policies.

4.  Umbrella and/or Excess Liability policies used to follow the form of the CGL, Automobile Liability and Employers Liability limits shown above may be warranted to be in excess of limits provided by primary CGL, Automobile Liability and Employer's Liability, but not excess to other insurance maintained by the Owner.

5.  Asbestos Abatement Contractors and Subcontractors Only

    Asbestos Abatement Contractors Liability with a limit of $2,000,000 per occurrence & aggregate. Coverage shall provide and encompass at least the following:

    a.  An endorsement naming the Dormitory Authority - State of New York, the Client, the Construction Manager (if applicable), and other entities as specified on the Dormitory Authority Sample Certificate of Insurance in the Supplement to Information for

    b.  Coverage is on an "occurrence basis".

6.  Hazardous/Contaminated Materials Contractors and Subcontractors including Underground Petroleum Storage Tanks Contractors and Subcontractors Only

    Excavation including Removal, Repair, Installation, Testing and Petroleum Remediation Operations.

    Coverage shall provide and encompass at least the following:

    a.  Pollution Liability with a combined single limit of $2,000,000 per occurrence/$2,000,000 aggregate.

    b.  Endorsement naming the following as additional insured's: Dormitory Authority of the State of New York, The State of New York, the Construction Manager (if applicable) and other entities specified on the sample Certificate of Insurance provided by the Owner.

00136

c.    Extended reporting provision of up to 3 years after work is completed, or if coverage is canceled or not renewed, is required; and

d.    Maximum Self-Insured Retention of $50,000, or an amount approved by Owner.

7.    For Projects/Work in close proximity to railways that the Contractor determines will require entrance upon railway rights of way, the Contractor must provide Railroad Protective Liability coverage. Policy forms AASHO or ISO-RIMA will be required and must be submitted prior to award of Contract.

For information and use the Transit Authority provides the following information:

A Railroad Protective Liability policy covering Work to be performed at the job site and affording protection for damages arising out of bodily injuries or death, an injury to or destruction of property, will be required. The Protective Liability insurance policy (I.S.O. Form CG 00 35 11 85 or equivalent) must name the New York City Transit Authority (NYCTA), Manhattan and Bronx Surface Transit Operating Authority (MaBSTOA), Staten Island Rapid Transit Operating Authority (SIRTOA), Metropolitan Transportation Authority (MTA), its subsidiaries and affiliated companies, the City of New York and all other indemnified parties as Named Insureds with limits of liability of $2,000,000 each occurrence on a combined single limit basis (aggregate must be at least $4,000,000) for injuries (bodily injuries, including death and personal injuries) to persons and for damage to property and physical damage to all property owned by, leased by or in the care, custody and control of the Transit Authority.

B.    Prior to award of Contract, two Certificates of Insurance, indicating the Project, must be submitted and approved by the Owner prior to the commencement of Work. Certificates shall provide 30 days written notice prior to the cancellation, non-renewal, or material modification of any policy. Upon request, the Contractor shall furnish the Owner and the Construction Manager with certified copies of each policy. In addition, where applicable, the Contractor shall provide copies of Certificates of Insurance to the Construction Manager.

Certificates are to be forwarded to:

Risk Management Unit
Dormitory Authority--State of New York
515 Broadway

00137

Albany, New York  12207-2964

and

Contracts Unit
Dormitory Authority--State of New York
515 Broadway
Albany, New York  12207-2964

Sample forms of the Certificate(s) Insurance are attached.   Certificate(s) of
Insurance, when submitted to the Owner, constitute a warranty by the Contractor
that the insurance coverage described is in effect for the policy term shown.

Should the Contractor engage a Subcontractor, the same conditions as are
applicable to the Contractor under these insurance requirements shall apply to
each Subcontractor of every tier.  Proof thereof shall be supplied to the Dormitory
Authority's Risk Management Unit.

C.     All insurance required to be procured and maintained must be procured from
insurance companies licensed to do business in the State of New York and rated at
least B+ by A.M. Best and Company, or meet such other requirements as are
acceptable to the Owner.

D.     Should the Contractor fail to provide or maintain any insurance required by this
contract, the Owner may, after providing written notice to the Contractor,
purchase insurance complying with the requirements of this Article and charge
back such purchase to the Contractor.

E.     At any time that the coverage provisions and limits on the policies required herein
do not meet the provisions and limits set forth above, the Contractor shall
immediately cease Work on the Project.  The Contractor shall not resume Work
on the Project until authorized to do so by the Owner.  Any delay or time lost as a
result of the Contractor not having insurance required by this Article shall not
give rise to a delay claim or any other claim against the Owner or the Client.

F.     Notwithstanding any other provision in this Article, the Owner may require the
Contractor to provide, at the expense of the Owner, any other form or limit of
insurance necessary to secure the interests of the Owner.

G.     The Contractor shall secure, pay for, and maintain Property Insurance necessary
for protection against the loss of owned, borrowed or rented capital equipment
and tools, including any tools owned by employees, and any tools or equipment,
staging towers, and forms owned, borrowed or rented by the Contractor.   The
requirement to secure and maintain such insurance is solely for the benefit of the

00135

Contractor. Failure of the Contractor to secure such insurance or to maintain adequate levels of coverage shall not render the Additional Insureds or their agents and employees responsible for any losses; and the Additional Insureds, their agents and employees shall have no such Liability.

H.    Neither the procurement nor the maintenance of any type of insurance by the Owner, the Contractor or the Construction Manager shall in any way be construed or deemed to limit, discharge, waive or release the Contractor from any of the obligations or risks accepted by the Contractor or to be a limitation on the nature or extent of said obligations and risks.

## Section 15.02 - Builders Risk

A.    The Owner shall, except as otherwise specified, at all times during the period of construction and until physical completion and acceptance, procure and maintain, at the cost and expense of the Owner, "All Risk" Builder's Risk Insurance. The Contractors and Subcontractors will be covered for their Work. Losses up to and including $5,000 shall be borne by the Contractor. Reimbursement for loss, if any, is to be made payable to the Owner. The Owner shall, at the Owner's sole discretion, have power to adjust and to settle with the insurer any loss or claim under said insurance.

B.    Coverage shall include sublimits for property in transit and for property in storage on and off the job site. Specific higher limits for transit/storage are available as circumstances may require upon request by any Contractor or Subcontractor to the Owner's Risk Management Unit.

## Section 15.03 - General Conformance

The Contractor and Subcontractors shall not violate, or permit to be violated, any term or condition of their insurance policies, and shall at all times satisfy the safety requirements of the Owner and of the insurance companies issuing such policies.

## Section 15.04 - Contract Security

The Contractor shall furnish a surety bond in an amount at least equal to one hundred (100%) of the contract price as security for the faithful performance of the Contract and also labor and material bond in the form set forth in the Contract in an amount at least equal to one hundred (100%) of the contract price for the payment of all persons performing labor or providing materials in connection with the work. The surety on said bond shall be a surety company authorized to do business in the State of New York and shall be rated at least B+ by A.M. Best and Company, or meet such other requirements as are acceptable to the Owner.

00135

## Section 15.05 - Additional or Substitute Bond

If at any time the Owner shall become dissatisfied with any surety or sureties upon the performance bond, or the labor and material payment bond, or if for any other reason said bonds shall cease to be adequate security to the Owner, the Contractor shall, within five (5) days after notice from the Owner to do so, substitute an acceptable bond or bonds in such form and sum and signed by such other surety or sureties as may be satisfactory to the Owner. The premiums on said bond or bonds shall be paid by the Contractor. No further payments shall be deemed due nor shall be made until the new surety or sureties shall have furnished an acceptable bond or bonds to the Owner.

## Section 15.06 - Failure to Comply with Provisions of Article 15

The Contract may, at the sole option of the Owner, be declared void and of no effect if the Contractor fails to comply with the provisions of Article 15.

## ARTICLE 16 — USE OR OCCUPANCY PRIOR TO ACCEPTANCE BY OWNER

## Section 16.01 - Occupancy Prior to Acceptance

A.   If, before Construction Completion, the Owner desires Beneficial Occupancy of the Work, or any part thereof, which is completed or partly completed, or to place or install therein equipment and furnishings, the Owner shall have the right to do so, and the Contractor shall in no way interfere with or object to said Beneficial Occupancy by the Owner.

B.   Said Beneficial Occupancy (1) shall not constitue acceptance of space, systems, materials or elements of the Work, nor shall said Beneficial Occupancy affect the start of any guarantee period; and (2) shall not affect the obligations of the Contractor for Work which is not in accordance with the requirements of the Contract or other obligations of the Contractor under the Contract.

C.   Should the Contractor request Owner acceptance of any project system(s) related to the protection of life or property, prior to Beneficial Occupancy or Construction Completion, the Owner may accept such systems(s), however, the cost of maintaining such system(s) in operating condition, and labor costs to operate the system(s) including costs for remote public safety personnel, shall be borne by the Contractor. The guarantee period will begin from the date of Construction Completion.

D.  The Contractor shall continue the performance of the Work in a manner which shall not unreasonably interfere with said use, occupancy and operation by the Owner.

# ARTICLE 17 -- PAYMENT

## Section 17.01 - Provision for Payment

A.  The Owner may make a partial payment to the Contractor on the basis of an approved estimate of the Work performed during each preceding business month. The Owner shall retain five percent (5%) of the amount of each said estimate.

The Contractor shall submit a detailed contract payment breakdown prior to the Contractor's first application for payment. The model contract payment breakdown included in the Contract Documents shall establish the minimum level of detail required for the Contractor's payment breakdown. It is understood and the Contractor acknowledges that this model is included as an administrative tool for the purpose of illustrating a format and minimum level of detail required for the Contract Payment Breakdown and shall not be considered as delineating the Contractor's Scope of Work. The Owner may request further and more detailed Contract Payment Breakdown. Further, the Owner reserves the right to accept only those cost distributions which, in the Owner's opinion, are reasonable, equitably balanced and correspond to the estimated quantities in the Contract Documents.

No payment shall be made by the Owner until the Contract Payment Breakdown is approved by the Owner.

Each monthly partial payment requisition must include Affirmative Action Form AAP 7.0, Contractor's Compliance Report, properly executed, as a condition precedent to requisition payment by the Owner.

B.  In preparing estimates for partial payment, material delivered to the Site and properly stored and secured at the Site, and Material approved to be stored off-site under such conditions as the Owner shall prescribe may be taken into consideration. All costs related to the storage of materials are the sole responsibility of the Contractor.

The Owner will provide an Agreement for Materials Stored Off-Site and specific forms which the Contractor must complete and submit with any request for approval of partial payment for such material. Required information includes but is not limited to: a general description of the material; a detailed list of the materials; a pre-approved storage area; segregation and identification of the

material; insurance covering full value against all risks of loss or damage, with non-cancellation provision; immediate replacement agreement in event of loss or damage; agreement to pay the expense of all inspections of the material; ownership provisions; delivery guarantee; project completion statement; bill of sale, releases, and inventory.

C.   Any partial payment made shall not be construed as a waiver of the right of the Owner to require the fulfillment of all the terms of the Contract.

D.   After the Owner has determined Substantial Completion of the Work, the Contractor shall submit to the Owner, for the Owner's approval, a detailed estimate of the value of the known remaining items of Work as set forth by the Owner and a schedule of completion for said items of Work. The Owner shall review that estimate and make the final determination.

The Owner, when all the Work is substantially complete, shall pay to the Contractor the balance due the Contractor pursuant to the Contract, less:

1.   two (2) times the value of any remaining items of Work to be completed or corrected; and

2.   an amount necessary to satisfy any and all claims, liens or judgments against the Contractor.

As the remaining items of Work are completed and accepted by the Owner, the Owner shall pay the appropriate amount pursuant to the duly completed and submitted monthly requisitions.

The list of remaining Work items may be expanded to include additional items of corrective or completion Work until final acceptance as certified by the Owner's execution of "Notification of Construction Completion." Appropriate payments may be withheld to cover the value of these items pursuant to this Section.

E.   All Monthly Requisitions submitted by the Contractor shall be in the form and manner approved by the Owner. The Contractor shall furnish such affidavits, vouchers and receipts as to delivery and payment for materials as required by the Owner to substantiate each and every payment requested. The Contractor and its Subcontractors will submit with all applications for payment copies of the certified payrolls and certification of payment of wage supplements in a form satisfactory to the Owner. The submission of Contractor and Subcontractor certified payrolls is required at least monthly.

00142

F.    Timely payment by the Owner to the Contractor is governed by Section 2880 of the Public Authority Law.  Timely payment (15 days) by the Contractor to the Subcontractor is governed by Section 139-f of the State Finance Law.

## Section 17.02 - Acceptance of the First Payment Pursuant to Section 17.01 D. of the Contract Constitutes Release

The acceptance by the Contractor of the first payment pursuant to Section 17.01 D. shall be and shall operate as a release to the Owner of all claims by and all liability to the Contractor for all things in connection with the Work and for every act and neglect of the Owner and others relating to or arising out of the Work.  No payment, final or otherwise, shall operate to release the Contractor or the Contractor's sureties from any obligations under this Contract or the performance or labor and material payment bonds.

## Section 17.03 - Release and Consent of Surety

Notwithstanding any other provision of the Contract Documents to the contrary, the first payment pursuant to Section 17.01 D. shall not become due until the Contractor submits to the Owner a General Release and a Consent of Surety to said payment pursuant to Section 17.01 D., both in form and content acceptable to the Owner.

## Section 17.04 - Liens

Upon the Owner's receipt of a lien, a sum which shall be one and one-half (1 1/2) times the amount stated to be due in the notice of lien shall be deducted from the current payment due the Contractor. This sum shall be withheld until the lien is discharged.

## Section 17.05 - Withholding of Payments

A.    The Owner may withhold from the Contractor any part of any payment as may, in the judgment of the Owner, be necessary:

1.    to assure payment of just claims of any persons supplying labor or materials for the Work;

2.    to protect the Owner from loss due to defective Work not remedied; or

3.    to protect the Owner, Client, Construction Manager or Consultant from loss due to failure to defend, loss due to injury to persons or damage to the Work or property of other Contractors, Subcontractors or others caused by the act or neglect of the Contractor or Subcontractors.

00142

4. to assure payment of fines and penalties which may be imposed on the Contractor pursuant to the provisions of this contract.

5. to assure payment of fines and penalties which may be imposed on the Contractor pursuant to Article 21 - Affirmative Action, Section 21.01, paragraph D., subdivisions 6. g. and 6. h.  The estimated amount of said fines and penalties shall be the difference between the planned dollar amount of MBE/WBE sub-contract awards and the actual dollar amount of such awards.

D.   The Owner shall have the right to apply any such amounts so withheld, in such manner as the Owner may deem proper to satisfy said claims, fines and penalties, or to secure said protection.   Said application of the money shall be deemed payments for the account of the Contractor.

C.   The provisions of this Article 17 are solely for the benefit of the Owner, and any action or non-action hereunder by the Owner shall not give rise to any liability on the part of the Owner.

## Section 17.06 - Owner's Right to Audit and Inspection of Records

The Contractor shall maintain and keep, for a period of at least six (6) years after the date of final payment, all records and other data relating to the Work, including records of Subcontractors and material suppliers.  The Owner or the Owner's Representative shall have the right to inspect and audit all records and other data of the Contractor, Subcontractors and material suppliers relating to the Work.

## Section 17.07 - False Statements/Information

A.  False statements, information or data submitted on or with applications for payment may result in one or more of the following actions:

1. Termination of the Contract for cause;
2. Disapproval of future bids or contracts and sub-contracts;
3. Withholding of final payment on the Contract; and
4. Civil and/or criminal prosecution.

B.  These provisions are solely for the benefit of the Owner, and any action or non-action hereunder by the Owner shall not give rise to any liability on the part of the Owner.

## Section 17.08 - Late Payment

00144

Timeliness of payment and any interest to be paid to the Contractor for late payment shall be governed by Section 2880 of the Public Authorities Law, to the extent required by law.

## ARTICLE 18 -- TAX EXEMPTION

## Section 18.01 - Tax Exemption

A.  The Owner is exempt from payment of Federal, State, local taxes, and sales and compensating use taxes of the State of New York and of cities and counties on all materials and supplies incorporated into the completed Work. These taxes are not to be included in bids. This exception does not apply to tools, machinery, equipment or other property leased by or to the Contractor or a Subcontractor, or to supplies and materials which, even though they are consumed, are not incorporated into the completed Work, and the Contractor and Subcontractors shall be responsible for and pay any and all applicable taxes, including sales and compensating use taxes, on said leased tools, machinery, equipment or other property and upon all said unincorporated supplies and materials.

B.  The Contractor and Subcontractors shall obtain any and all necessary certificates or other documentation from the appropriate governmental agency or agencies, and use said certificates or other documentation as required by law, rule or regulation.

## ARTICLE 19 -- GUARANTEE

## Section 19.01 - Guarantee

The Contractor shall in all respects guarantee the Work to the Owner and be responsible for all material, equipment and workmanship of the Work. The Contractor shall forthwith repair, replace or remedy in a manner approved by the Owner, any said material, equipment, workmanship, or other part of the Work found by the Owner to be defective or otherwise faulty and not acceptable to the Owner, which defect or fault appears during the minimum period of one (1) year, or such longer period as may be prescribed by the Contract, from the date of Construction Completion or any part thereof, by the Owner. The Contractor shall also pay for any damage to the Work resulting from said defect or fault.

## ARTICLE 20 -- STANDARD PROVISIONS

## Section 20.01 - Provisions Required by Law Deemed Inserted

00145

Each and every provision of law and clause required by law to be inserted in the Contract shall be deemed to be inserted therein and the Contract shall read and shall be enforced as though so included therein.

## Section 20.02 - Compliance with Laws, Rules and Regulations

The Contractor shall comply fully with all applicable laws, rules and regulations.

## Section 20.03 - Laws Governing the Contract

The Contract shall be governed by the laws of the state of New York.

## Section 20.04 - Assignments

The Contractor shall not assign the Contract in whole or in part without prior written consent of the Owner. If the Contractor assigns all or part of any moneys due or to become due under the Contract, the instrument of assignment shall contain a clause substantially to the effect that the Contractor and assignee agree that the assignee's right in and to any moneys due or to become due to the Contractor shall be subject to all prior claims for services rendered or materials supplied in connection with the performance of the Work.

## Section 20.05 - No Third Party Rights

Nothing in the Contract shall create or shall give to third parties any claim or right of action against the Owner, the State of New York, the Client, and the Construction Manager, or any Institution at which the Work is being carried out beyond such as may legally exist irrespective of the Contract.

## Section 20.06 - Contract Deemed Executory

The Contractor agrees that the Contract shall be deemed executory to the extent of moneys available from either (i) the proceeds of bonds issued by the Authority for the Contract, or (ii) moneys made available by the Client for the Contract, or (iii) other non-Authority moneys made available from whatever source specifically for the Contract and no liability shall be incurred by the Owner beyond moneys available therefore.

## Section 20.07 - Anti-Riot Provisions

A.    The Contractor agrees that no part of the contract funds shall be used to make payments, give assistance, or supply services, in any form, to any individual convicted in any Federal, State, or local court of competent jurisdiction for

inciting, promoting, or carrying on a riot, or engaging in any group activity resulting in material damage to property or injury to persons found to be in violation of Federal, State or local laws designed to protect persons or property.

B.    The Contractor and each Subcontractor shall notify their employees of all rules and regulations adopted pursuant to Article 129-A of the Education Law of the State of New York. Notices containing the text of the aforementioned rules and regulations shall be posted by the Contractor at the Site.

## Section 20.08 - Fair Trade Exemption

Sales to the Owner are exempt from the terms of fair trade agreements.

## Section 20.09 - Domestic Steel

The Authority is required to comply with all provisions of Title 4 of Article 9 of the Public Authorities Law and in accordance therewith the Authority may require that structural steel, reinforcing steel or other major steel items to be incorporated into the work of Contracts in excess of $100,000 be produced or made in whole or substantial part in the United States, its territories or possessions.

## Section 20.10 - Protection of Lives and Health

A.    Each Contractor and Subcontractor shall comply fully with all applicable provisions of the laws of the State of New York, the United States of America and with all applicable rules and regulations adopted or promulgated by agencies or municipalities of the State of New York or the United States of America. The Contractor's and Subcontractor's attention is specifically called to the applicable rules and regulations, codes and bulletins of the New York State Department of Labor and to the standards imposed under the Federal Occupational Safety and Health Act of 1970, as amended. The Contractor shall report on compliance to the Owner or Owner's Representative at the weekly safety meetings.

B.    The Contractor shall maintain an accurate record of all cases of death, occupational disease, and injury requiring medical attention or causing loss of time from work, arising out of and in the course of employment of Work under the Contract, and shall immediately notify the Owner in writing of any injury which results in hospitalization or death. The Contractor shall provide to the Owner a copy of Form C-2, Employers Report of Injury/Illness within twenty-four (24) hours of any job related injury on the Owner's job site. Further, a copy of the OSHA Log of Injury and Illness shall also be provided to the Owner for any reporting period in which a job related injury or illness is recorded. The Contractor shall also provide a list of witnesses to the Owner. The list shall

00147

include at least the full name, home address, occupation and telephone number of each person who saw or has knowledge of the incident which caused the injury or illness.

C.  The Contractor alone shall be responsible for the safety, efficiency and adequacy of the Contractor's Work, plant, appliances and methods, and for any damage which may result from the failure or the improper construction, maintenance, or operation of such Work, plant, appliances and methods.

D.  If, in the performance of the Work, a harmful hazard is created for which appliances or methods of elimination have been approved by regulatory authorities, the Contractor shall install, maintain and operate said appliances or methods.

E.  The Owner may impose a payment penalty on the Contractor for any act of non-compliance with this section. The payment penalty shall not exceed one twentieth (1/20) of the contract price or a maximum of One Thousand Dollars ($1,000.00) for each time the Contractor fails to perform or to provide the information, reports, forms, etc. required in this section. This payment penalty is not exclusive, the Owner may avail itself of any other contractual remedy available.

F.  The Owner or Owner's Representatives may inspect the job-site at any time without notice to the Contractor. If the Owner finds that the Contractor is not complying with Section 20.10 A or any other provision of Section 20.10, the Owner may send written notice to the Contractor to correct any deficiency. Upon re-inspection, if the Owner finds the deficiencies have not been corrected, or in instances where a safety violation (s) must be corrected before work continues and the Contractor is given three (3) hours to make correction (s) and they are not made, the Owner may let a separate contract to correct any deficiencies and charge back the cost of the separate contract to the Contractor at a premium rate. The Contractor cannot pass these additional charges on to the Owner. No action taken under this section shall be deemed as a basis for any delay claim or any other claim against the Owner by the Contractor.

G.  The Contractor shall preserve and safeguard the scene of an accident involving a ladder, scaffold, mobile machinery, equipment, safety railing or uncovered floor opening or any other incident where the injured person required emergency medical treatment. The Contractor shall "tape off" the area, and not allow any material object or property to be altered, changed, moved or removed from the accident site. In addition to "taping off" the accident site, the Contractor shall telephone and "fax" Owner immediately, and post a person at the accident site to protect it. Safeguarding and protecting the accident site shall only be abandoned by the Contractor upon release by the Owner or the Owner's Representative. Failure of the Contractor to comply with the provisions of this paragraph shall be

00142

deemed a breach of this Contract. In addition to any other contractual remedies available, the Owner may satisfy the breach by imposing the penalties set out in paragraph 20.10 E or void the entire Contract and retain any or all amounts due the Contractor under this Contract.

## Section 20.11 - Prohibited Interests/ Ethical Conduct

A.    Officers and employees of the Owner are bound by Sections 73, 73-a and 74 of the *New York State Public Officers Law*. In addition, no officer, employee, architect, attorney, engineer, inspector or consultant of or for the Owner authorized on behalf of the Owner to exercise any legislative, executive, administrative, supervisory or other similar functions in connection with the Contract or the Work, shall become personally interested, directly or indirectly, in the Contract, material supply contract, subcontract, insurance contract, or any other contract pertaining to the Work.

B.    The Owner strongly discourages the Contractor from offering or giving anything of value to employees of the Owner under circumstances which may constitute, or even suggest, impropriety. Section 73(5) of the *Public Officers Law* expressly prohibits the Contractor, or its agents, from directly or indirectly offering or giving any gift having a value of $75 *or more* to an employee of the Owner under circumstances in which it could be reasonably inferred the gift was intended to influence the employee in the performance of their official duties, or was intended as a reward for the employee's official action.

Beyond individual gifts of $75 or more, neither the Contractor, nor its agents, may give multiple gifts to an employee of the Owner during any *twelve-month* period, where in the aggregate, the gifts are equal to or exceed a value of $75. Furthermore, neither the Contractor, nor its agents, may give cash, including gift certificates, in any amount, to an employee of the Owner. Also, under certain circumstances, the offering or giving of a gift of any value to an employee of the Owner may be considered inappropriate (i.e. gifts given during the contract procurement process). Employees of the Owner may not solicit any gift, gratuity, stipend or thing of value from the Contractor or its agents. Violations of these gift provisions may be grounds for immediate Contract termination and/or referral for civil action or criminal prosecution.

C.    To promote a working relationship with the Owner based on ethical business practices, the Contractor is expected to
- furnish all goods, materials and services to the Owner as contractually required and specified,
- submit complete and accurate reports to the Owner and its representatives as required,

- not seek, solicit, demand or accept any information, verbal or written, from the Owner or its representatives that provides an unfair advantage over a competitor,

- not engage in any activity or course of conduct that restricts open and fair competition on Owner-related projects and transactions,

- not engage in any course of conduct with Owner employees or its representatives that constitutes a conflict of interest, in fact or in appearance, and

- not offer or give any unlawful gifts or gratuities, or engage in bribery or other criminal activity.

D.   The Owner encourages the Contractor to advance and support ethical business conduct and practices among its directors, officers and employees, preferably through the adoption of corporate ethics awareness training programs and written codes of conduct.

E.   Although the Contractor may employ relatives of Owner employees, the Owner must be made aware of such circumstances as soon as possible, preferably in writing, to ensure a conflict of interest situation does not arise.  The Owner reserves the right to request that the Contractor modify the work assignment of a relative of an Owner employee where a conflict of interest, or the appearance thereof, is deemed to exist.

F.   The Contractor may hire former employees of the Owner.  However, as a general rule, former employees of the Owner may neither appear nor practice before the Owner, nor receive compensation for services rendered on a matter before the Owner, for a period of *two years* following their separation from service with the Owner.   In addition, former employees of the Owner are subject to a *"lifetime bar"* from appearing before the Owner or receiving compensation for services regarding any transaction in which they personally participated or which was under their active consideration during their tenure with the Owner.

G.   The Contractor agrees to notify the Owner's Office of Internal Affairs at 518-257-3193 of any activity by an employee of the Owner that is inconsistent with the contents of this Section.

H.   Any violation of these provisions shall justify termination of this Contract and may result in Owner's rejection of the Contractor's bids or proposals for future contracts.

## Section 20.12 – State and Federal  Labor Law Provisions

A.   It is hereby agreed that all applicable provisions of the Labor Law of the State of New York shall be carried out in the performance of the Work.

DO150

B.   The Contractor specifically agrees, as required by Labor Law, Sections 220 and 220-d as amended, that:

1.   no laborer, workman or mechanic, in the employ of the Contractor, Subcontractor or other person doing or contracting to do the whole or any part of the Work contemplated by the Contract shall be permitted or required to work more than eight (8) hours in any one (1) calendar day and more than five (5) days in any one week, except in the extraordinary emergencies set forth in the Labor Law;

2.   the wages paid for a legal day's work shall be not less than the prevailing rate of wages as defined by law;

3.   the minimum hourly rate of wage to be paid and supplement provided shall be not less than that stated in the Contract and as shall be designated by the Industrial Commissioner of the State of New York;

4.   the Contractor and every Subcontractor shall post in a prominent and accessible place on the Site, a legible statement of all minimum wage rates and supplements to be paid or provided for the various classes of laborers and mechanics to be engaged in the Work and all deductions, if any, required by law to be made from unpaid wages actually earned by the laborers and mechanics so engaged.

5.   the Contractor shall be responsible for obtaining prevailing wage rate updates directly from the New York State Department of Labor, either by accessing its website (www.labor.state.ny.us) or by faxing a written request to the Bureau of Public Work at (518) 485-1870.

C.   The minimum wage rates, if any, herein specified for apprentices shall apply only to persons working with the tools of the trade which such persons are learning under the direct supervision of journeyman mechanics.   Except as otherwise required by law, the number of apprentices in each trade or occupation employed by the Contractor or any Subcontractor shall not exceed the number permitted by the applicable standards of the New York State Department of Labor, or, in the absence of such standards, the number permitted under the usual practice prevailing between the unions and the employers' association of the respective trades or occupations.

D.   All employees of the Contractor and each Subcontractor shall be paid in accordance with the provisions of the Labor Law.   Certified payroll copies shall be provided to the Owner as specified in these General Conditions and otherwise upon request.

E.    The Contractor agrees that, in case of underpayment of wages to any worker engaged in the Work by the Contractor or any Subcontractor, the Owner shall withhold from the Contractor out of payments due an amount sufficient to pay such worker the difference between the wages required to be paid under the Contract and the wages actually paid such worker for the total number of hours worked, and that the Owner may disburse such amount so withheld by the Owner for and on account of the Contractor to the employee to whom such amount is due. The Contractor further agrees that the amount to be withheld pursuant to this paragraph may be in addition to the percentages to be retained by the Owner pursuant to other provisions of the Contract.

F.    Pursuant to subdivision 3 of section 220 and section 220-d of the Labor Law the Contract shall be forfeited and no sum paid for any Work done thereunder upon a Contractor's or Subcontractor's second conviction for willfully paying or providing less than:

1.    the stipulated wage scale or supplement as established by the fiscal officer, or

2.    the stipulated minimum hourly wage scale as designated by the Industrial Commissioner.

G.    Pursuant to Labor Law, Section 220-c, the Contractor specifically agrees:

1.    That in the hiring of employees for the performance of Work under the Contract or any subcontract hereunder, or for the manufacture, sale or distribution of materials, equipment or supplies hereunder, but limited to operation performed within the territorial limits of the State of New York, no Contractor, Subcontractor, nor any person acting on behalf of such Contractor or Subcontractor, shall by reason of race, creed, color, disability, sex or national origin discriminate against any citizen of the State of New York who is qualified and available to perform the Work to which the employment relates;

2.    That no Contractor, Subcontractor, nor any person on behalf of such Contractor or Subcontractor shall, in any manner, discriminate against or intimidate any employee hired for the performance of work under the Contract on account of race, creed, color, disability, sex or national origin;

3.    That there may be deducted from the amount payable to the Contractor, by the Owner under the Contract, a penalty of fifty dollars ($50.00) for each person for each calendar day during which such person was discriminated against or intimidated in violation of the terms of the Contract; and

4. That the Contract may be canceled or terminated by the Owner and all moneys due or to become due hereunder may be forfeited for a second or any subsequent violation of the terms or conditions of this section of the Contract, or when one final determination involves the falsification of payroll records or the kickback of wages and/or supplements.

H. The Contractor specifically agrees to certify its payrolls, to keep the certified records on site and available, and to provide copies to the Owner upon request.

I. If the project is Federally funded in part or whole and therefore subject to the requirements of the Davis Bacon Act, the U.S. Department of Labor's government-wide implementation of the Act, or to Federal program legislation, the Contractor must pay the higher of either New York State prevailing wage rates or wages established for the locality of the project by the Federal Department of Labor.

## Section 20.13 - Nondiscrimination

During the performance of the Work, the Contractor agrees as follows:

A. The Contractor will not discriminate against any employee or applicant for employment because of race, creed, color, sex, national origin, age, disability or marital status.

B. If directed to do so by the Commissioner of Human Rights, the Contractor will send to each labor union or representative of workers with which the Contractor has or is bound by a collective bargaining or other agreement or understanding, a notice, to be provided by the State Commissioner of Human Rights, advising such labor union or representative of the Contractor's agreement under clauses A through G (hereinafter called "non-discrimination clauses"). If the Contractor was directed to do so by the Owner as part of the bid or negotiation of this Contract, the Contractor shall request such labor union or representative to furnish a written statement that such labor union or representative will not discriminate because of race, creed, color, sex, national origin, age, disability or marital status, and that such labor union or representative will cooperate, within the limits of its legal and contractual authority, in the implementation of the policy and provisions of these nondiscrimination clauses and that it consents and agrees that recruitment, employment and the terms and conditions of employment under this Contract shall be in accordance with the purposes and provisions of these nondiscrimination clauses. If such labor union or representative fails or refuses to comply with such a request that it furnish such a statement, the Contractor shall

promptly notify the State Commissioner of Human Rights of such failure or refusal.

C.  If directed to do so by the Commissioner of Human Rights, the Contractor will post and keep posted in conspicuous places, available to employees and applicants for employment, notices to be provided by the State Commissioner of Human Rights setting forth the substance of the provisions of clauses A and B and such provisions of the State's laws against discrimination as the State Commissioner of Human Rights shall determine.

D.  The Contractor will state, in all solicitations or advertisement for employees placed by or on behalf of the Contractor, that all qualified applicants will be afforded equal employment opportunities without discrimination because of race, creed, color, sex, national origin, age, disability or marital status.

E.  The Contractor will comply with the provisions of Section 290-299 of the Executive Law and with the Civil Rights Law, will furnish all information and reports deemed necessary by the State Commissioner of Human Rights under these nondiscriminatory clauses and such sections of the Executive Law, and will permit access to the Contractor's books, records and accounts by the State Commissioner for the purposes of investigation to ascertain compliance with these nondiscrimination clauses and such sections of the Executive Law and Civil Rights Law.

F.  This Contract may be forthwith canceled, terminated or suspended, in whole or in part, by the Owner upon the basis of a finding made by the State Commissioner of Human Rights that the Contractor has not complied with these nondiscrimination clauses, and the Contractor may be declared ineligible for future contracts made by or on behalf of the State or a public authority or agency of the State, until the Contractor satisfies the State Commissioner of Human Rights that the Contractor has established and is carrying out a program in conformity with the provisions of these nondiscrimination clauses.  Such finding shall be made by the State Commissioner of Human Rights after conciliation  efforts by the Commissioner have failed to achieve compliance with these nondiscrimination clauses and after a verified complaint has been filed with the Commissioner, notice thereof has been given to the Contractor and an opportunity has been afforded the Contractor to be heard publicly in accordance with the Executive Law.  Such sanctions may be imposed and remedies invoked independently of or in addition to sanctions and remedies otherwise provided by law.

G.  The Contractor will include the provisions of clauses A through F above in every subcontractor purchase order in such a manner that such provisions will be binding upon each Subcontractor or vendor as to operation to be performed within the State of New York.  The Contractor will take such action in enforcing such

provisions of such Subcontract or purchase order as the State Commissioner of Human Rights or the Owner may direct, including sanctions or remedies for noncompliance. If the Contractor becomes involved in or is threatened with litigation with a Subcontractor or vendor as a result of such direction by the State Commissioner of Human Rights or the Owner, the Contractor shall promptly so notify the Attorney General, requesting the Attorney General to intervene and to protect the interests of the State of New York.

## Section 20.14 - Limitation on Actions

No action or proceeding shall lie in favor of or shall be maintained by the Contractor against the Owner unless such action shall be commenced within six (6) months after receipt by the Owner of the Contractor's final requisition or, if the Contract is terminated by the Owner, unless such action is commenced within six (6) months after the date of such termination.

## Section 20.15 - Waiver of Remedies

Inasmuch as the Contractor can be compensated adequately by money damages for any breach of the Contract which may be committed by the Owner, the Contractor agrees that no default, act or omission of the Owner shall constitute a material breach of Contract entitling the Contractor to cancel or rescind the same or to suspend or abandon performance thereof; and the Contractor hereby waives any and all rights and remedies to which the Contractor might otherwise be or become entitled to because of any wrongful act or omission of the Owner saving only the Contractor's right to money damages.

## Section 20.16 - Waiver of Certain Causes of Action

No action or proceeding shall lie or shall be maintained by the Contractor, nor anyone claiming under or through the Contractor, against the Owner upon any claim arising out of or based upon the Contract, relating to the giving of notices or information.

## Section 20.17 - Contractor Relationship

The relationship created by the Contract between the Owner and the Contractor is one of an independent contractor and it is no way to be construed as creating an agency relationship between the Owner and the Contractor nor is it to be construed as, in any way or under any circumstances, creating or appointing the Contractor as an agent of the Owner for any purpose whatsoever.

## Section 20.18 - Failure to Comply with this Article

The Contract shall be void and of no effect unless the Contractor complies with the provisions of this Article 20.

## Section 20.19 - Third Party Beneficiary Relationship

It is understood that the Client is an intended third party beneficiary of the Contract for the purposes of recovering any damages caused by the Contractor.

## Section 20.20 - Year 2000 Warranty

A.  Unless the Contractor has specifically stated in the Bid that the Work is not Year 2000-compliant, Contractor warrants that Work furnished pursuant to this Contract shall, when used in accordance with its documentation, be able to accurately process date/time data (including, but not limited to, calculating, comparing, and sequencing) from, into, and between the twentieth and twenty-first centuries, and the years 1999 and 2000, including leap year calculations. Where a contract requires that specific Work must perform as a package or system, this warranty shall apply to the Work as a system. The Contractor shall, on request, disclose to the Owner the date/time data definitions used by or in the Work.

B.  In the event of any breach of this warranty, Contractor shall restore the Work to the same level of performance as warranted herein, or repair or replace the Work with conforming product so as to minimize interruption to Client's ongoing business processes, time being of the essence, at Contractor's sole cost and expense. This warranty does not extend to correction of Client's errors in data entry or data conversion.

C.  This warranty shall survive beyond termination or expiration of the Contract.

D.  Nothing in this warranty shall be construed to limit any rights or remedies otherwise available under this Contract.

## Section 20.21 - False Records/Kickbacks

The Contractor agrees that this contract may be canceled or terminated for cause by the Owner and all moneys due or to become due hereunder may be forfeited upon the Owner's determination that the Contractor has submitted false records to the Owner and/or that the Contractor has participated in the kickback of wages. Said determination by the Owner must first allow the Contractor an opportunity to show why its contract should not be canceled or terminated for cause for said actions.

## ARTICLE 21 -- AFFIRMATIVE ACTION

### Section 21.01 - Affirmative Action

A.  The Contractor agrees, in addition to any other nondiscrimination provision of the Contract and at no additional cost to the Owner, to fully comply with and cooperate in the implementation of Affirmative Action Plans, including the Contractor's Workforce Utilization Plan designed to provide for equal employment opportunities for Minorities and Women, and a goal oriented Utilization Plan for Minority/Women Business Enterprise (M/WBE) participation in the performance of the Work, in such form and substance as herein stated. Failure to demonstrate good faith efforts to comply with its approved Utilization Plan for Minority/Women's Business Enterprise participation will be a primary consideration for future responsibility determinations. The Contractor further agrees to incorporate all Affirmative Action provisions of the Contract in all subcontracts, regardless of tier.

B.  The Contractor must submit to the Owner, and the prospective Subcontractors must submit to the Contractor, Affirmative Action Plans, including the Contractor's Workforce Utilization Plan which demonstrates its best efforts to provide for equal employment opportunities for Minorities and Women, and a goal oriented Utilization Plan for MBE/WBE participation in the performance of the Work, in such form and substance as may be required by the Owner. A meeting to review these submissions may be scheduled by the Owner.

C.  These Affirmative Action provisions shall be deemed supplementary to, and not in lieu of the nondiscrimination provisions required by N.Y.S. Labor Law or other applicable Federal, State or local laws.

D.  In Accordance with Article 15A of the Executive Law and in conformance with the Regulations promulgated by the Minority and Women's Business Development Division of the New York State Department of Economic Development, the Contractor agrees to be bound by the following clauses. In any circumstances of uncertainty or conflict, the Regulations of the Minority and Women's Business Development Division supersede this information.

1.  M/WBE Utilization Plan; Waivers.

    a.  The Contractor shall submit to the Owner a Utilization Plan on forms provided by the Owner within the time-frame stated in the Supplement To Information For Bidders. The Utilization Plan shall list all subcontractors and suppliers the Contractor intends to use on the Contract and indicate which ones are M/WBEs. The

Utilization Plan shall be prepared to achieve the participation goals indicated in the bid documents.

b.  The Owner will review the Utilization Plan and will issue to the Contractor a written notice of acceptance or deficiency within twenty (20) days of its receipt. A notice of deficiency shall include (i) the name of any M/WBE which is not acceptable for the purpose of complying with the M/WBE participation goals and the reasons why it is not acceptable; (ii) elements of the Contract scope of work which the Owner has determined can be reasonably structured by the Contractor to increase the likelihood of participation in the Contract by M/WBEs; and (iii) other information which the Owner determines to be relevant to the Utilization Plan.

c.  The Contractor shall respond to the notice of deficiency within seven (7) business days of receipt by submitting to the Owner a written remedy in response to the notice of deficiency. If the written remedy which is submitted is not timely or is found by the Owner to be inadequate, the Owner shall notify the Contractor and direct the Contractor to submit, within five (5) business days, a request for a partial or total waiver of M/WBE participation goals on forms provided by the Owner. Failure to file the waiver form in a timely manner may be grounds for disqualification of the bid.

d.  The Contractor who has made good faith efforts to obtain commitments from M/WBE subcontractors and suppliers prior to submitting its Utilization Plan may submit a request for waiver at the same time it submits its Utilization Plan. If a request for waiver is submitted with the Utilization Plan and is not accepted by the Owner at that time, the provisions of clauses (b) and (c), regarding the notice of deficiency and written remedy will apply. In this case, the Contractor may submit a second request for waiver as directed by the Owner.

e.  If the Contractor does not submit a Utilization Plan, remedy deficiencies in a Utilization Plan, submit a request for waiver, or if the Owner determines that the Utilization Plan does not indicate that the M/WBE participation goals will be met and/or that the Contractor has failed to document good faith efforts, the Owner may disqualify the Contractor as being not-responsible.

f. The Contractor shall attempt to utilize, in good faith, any MBE or WBE identified within its Utilization Plan, at least to the extent indicated in the Plan.

2. Administration Hearing on Disqualification

  a. If the Owner disqualifies a bid for any of the reasons set forth in (1) (e) above, the Contractor shall be entitled to an administrative hearing, on the record, before a hearing officer appointed by the Owner to review the determination of disqualification of the bid and determination of non-responsibility of the Contractor.

  b. The hearing officer's determination shall be the final determination of the Owner. Such final administrative determination shall be reviewable by a proceeding brought pursuant to Article 78 of the Civil Practice Law and Rules, provided such proceeding is commenced within thirty (30) days of notice given by certified mail, return receipt requested, rendering such final administrative determination in accordance with the provisions of Section 313 of the Executive Law.

3. Good Faith Efforts

  In order to show that it has made good faith efforts to comply with the M/WBE participation goals of this Contract, the Contractor shall submit such documentation as will enable the Owner to make a determination in accordance with the criteria set forth in Section 313 of the Executive Law and the Rules and Regulations promulgated thereunder.

4. Compliance Reports

  The Contractor shall submit, and shall require subcontractors to submit, compliance reports on forms and at intervals established by the Owner. Reports not submitted at such times as required by the Owner shall be cause for the Owner to delay implementing scheduled payments to the Contractor.

5. Contractor's Failure to Meet M/WBE Participation Goals

  a. If the Contractor, after making good faith efforts, is unable to comply with a Contract's M/WBE participation goals, the Contractor may submit a request for a partial or total waiver on forms provided by the Owner documenting good faith efforts by the Contractor to meet such goals. If the documentation required

with the request for waiver is complete, the Owner shall evaluate the request and issue a written notice of acceptance or denial within twenty (20) days of receipt.

b.   If the Owner, upon review of the Contractor's Utilization Plan and compliance reports, determines that the Contractor is failing or refusing to comply with the Contract's M/WBE participation goals, and no waiver has been issued in regards to such non-compliance, the Owner may issue a notice of deficiency to the Contractor. The Contractor must respond to the notice to deficiency within seven (7) days of receipt. Such response may include a request for partial or total waiver of M/WBE participation goals.

6.   Contractor and Owner Complaints; Arbitration

a.   Subsequent to the award of this Contract, if the Contractor submits a request for waiver of M/WBE participation goals and the Owner denies the request or fails to respond in any way within twenty (20) days of receiving it, or if the Contractor has received a written determination from the Owner that the Contractor is failing or refusing to comply with goals, the Contractor may file a complaint with the Director, Division of Minority and Women's Development in the Department of Economic Development ("Director"), according to the provisions of Section 316 of the Executive Law. The complaint must be filed within twenty (20) days of the Owner's receipt of the request for waiver, if the Owner has not responded in that time, or within twenty (20) days of a notification that the request has been denied by the Owner or within twenty (20) days of receipt of notification from the Owner that the Contractor is failing or refusing to comply with goals.

b.   If the Contractor fails or refuses to comply with goals for participation by M/WBEs as established by this Contract, the Owner may file a complaint with the Director pursuant to Section 316 of the Executive Law.

c.   A complaint shall set forth the facts and circumstances giving rise to the complaint together with a demand for relief.

d.   The party filing a complaint, whether the Contractor or the Owner, shall deliver a copy to the other party. Both the complaint and the copy shall be delivered by either personal service or by certified mail, return receipt requested.

DGX58

e.    Upon receipt of a complaint the Director shall provide the party against whom the complaint has been filed with an opportunity to respond to the complaint. If within thirty (30) days of receipt of the complaint the Director is unable to resolve the complaint to the satisfaction of the Owner and the Contractor, the complaint shall be referred to the American Arbitration Association for resolution pursuant to Section 316 of the Executive Law and the applicable requirements of Article 75 of the Civil Practice Law and Rules.

f.    Upon conclusion of the arbitration proceeding, the arbitrator will submit to the Director his or her award regarding the alleged violation of the Contract or refusal of the Owner to grant a waiver request by the Contractor. The award of the arbitrator with respect to the alleged violation of the Contract or the refusal of the Owner to grant a waiver shall be final and may be vacated or modified only as provided by Article 75 of the Civil Practice Law and Rules.

g.    Upon conclusion of the arbitration proceedings and the rendition of an award, the arbitrator will also recommend to the Director a remedy including, if appropriate, the imposition of sanctions, fines or penalties. The Director will either (i) adopt the recommendation of the arbitrator; (ii) determine that no sanctions, fines or penalties should be imposed; or (iii) modify the recommendation of the arbitrator, provided that such modification shall not expand upon any sanction recommended or impose any new sanction, or increase the amount of any recommended fine or penalty.

h.    The Director, within ten (10) days of receipt of the arbitrator's award and recommendations, will issue a determination of such matter and shall cause a copy of such determination to be served upon the respondent by personal service or by certified mail, return receipt requested. The determination of the Director as to the imposition of fines, sanctions, or penalties shall be reviewable pursuant to Article 78 of the Civil Practice Law and Rules.

i.    The determination of the Owner or the Contractor to proceed with a complaint shall not preclude the Owner, in its discretion, from pursuing any other remedies which it may have pursuant to law and Contract, including withholding from payments to the contractor the estimated amount of the fines and penalties which may be imposed pursuant to subdivisions 6g. and 6h. of this paragraph. Said amounts shall be the difference between the planned dollar amount of MBE/WBE sub-contract awards and the actual dollar amount of such awards.

7.    Subcontracts

The Contractor will include the provisions of paragraphs three (3.) and six (6.) above in every subcontract, in such manner that such provisions will be binding upon the subcontractor as to work in connection with this Contract.

E.    In Accordance with Article 15 A of the Executive Law and in conformance with the proposed Regulations promulgated by the Minority and Women's Business Development Division of the New York State Department of Economic Development, the Contractor agrees to be bound by the following clauses. In any circumstances of uncertainty or conflict, the proposed Regulations of the Minority and Women's Business Development Division supersede this information.

1.    Contractors and subcontractors shall undertake or continue existing programs of affirmative action to ensure that minority group members and women are afforded equal employment opportunities without discrimination because of race, creed, color, national origin, sex, age, disability or marital status. For these purposes, affirmative action shall apply in the areas of recruitment, employment, job assignment, promotion, upgradings, demotion, transfer, layoff, or termination and rates of pay or other forms of compensation.

2.    After bid opening, but prior to the award of the contract, the Contractor shall submit an Equal Employment Opportunity (EEO) Policy Statement to the Owner.

3.    The Contractor's EEO Policy Statement shall contain, but not necessarily be limited to, and the contractor, as a precondition to entering into a valid and binding Contract with the Owner, shall, during the performance of the contract, agree to the following:

a.    The Contractor will not discriminate against any employee or applicant for employment because of race, creed, color, national origin, sex, age, disability or marital status, will undertake or continue existing programs of affirmative action to ensure that minority group members and women are afforded equal employment opportunities without discrimination, and shall make and document its conscientious and active efforts to employ and utilize minority group members and women in its work force.

b.    The Contractor shall state in all solicitations or advertisements for employees that, in the performance of the contract, all qualified

applicants will be afforded equal employment opportunities without discrimination because of race, creed, color, national origin, sex, age, disability or marital status.

c. At the request of the Owner, the Contractor shall request each employment agency, labor union, or authorized representative of workers with which it has a collective bargaining or other agreement or understanding, to furnish a written statement that such employment agency, labor union, or representative will not discriminate on the basis of race, creed, color, national origin, sex age, disability or marital status and that such union or representative will affirmatively cooperate in the implementation of the Contractor's obligations herein.

4. The Contractor shall include the provisions of this subdivision E in every subcontract in such a manner that the requirements of the provisions will be binding upon each subcontractor as to work in connection with this contract, including the requirement that subcontractors shall undertake or continue existing programs of affirmative action to ensure that minority group members and women are afforded equal employment opportunities without discrimination, and, when requested, provide to the Contractor information on the ethnic background, gender, and Federal Occupational Categories of the employees to be utilized on the contract.

5. To ensure compliance with this section, the Contractor and subcontractor shall submit reports to the Owner on the distribution of the Contractor's permanent employees, the Contractor's Workforce Utilization Plan, EEO tabulation in person days, and a monthly Workforce Utilization Report, all on the forms provided by the Owner within the time frame stated in the Supplement to Information for Bidders.

a. The Owner may require the Contractor and any subcontractor to submit compliance reports relating to their operations and implementation of their affirmative action or equal employment opportunity program in effect as of the date this contract is executed.

b. If a Contractor or subcontractor does not have an existing affirmative action program, the Owner may provide to the Contractor or subcontractor a model plan of an affirmative action program.

c. Post-Award reports shall be submitted at intervals established by the Owner. Reports not submitted at such times as required by the

Owner shall be cause. for the Owner to delay implementing scheduled payments to the Contractor.

6.   If the Contractor does not submit an EEO Policy Statement, the Contractor's Distribution of Permanent Employees, and the Contractor's Workforce Utilization Plan, or if the Owner Determines that the information submitted does not meet the Contract requirements and/or that the Contractor has failed to document good faith efforts, the Owner may disqualify the Contractor as being not-responsible.

7.   In order to show that it has made good faith efforts to comply with the Minority Groups and Women Workforce requirements of this Contract, the Contractor shall submit and/or have available for inspection such documentation as will enable the Owner to make a determination in accordance with the criteria set forth in Section 313 of the Executive Law and the Rules and Regulations promulgated thereunder.

8.   If the Owner determines that the Contractor is not in compliance with the requirements of this subdivision E, and the Owner is unsuccessful in its efforts to resolve the matter and bring the Contractor into compliance with the requirements, the Owner may file a compliant with the Director, Division of Minority and Women's Development in the Department of Economic Development ("Director"), according to the provisions of Section 316 of the Executive Law.

   a.   The compliant shall set forth the facts and circumstances giving rise to the complaint.

   b.   A copy of the compliant shall be served upon the Contractor or subcontractor by personal service or by certified mail, return receipt requested.

   c.   If within thirty (30) days of receipt of compliant the Director is unable to resolve the complaint to satisfaction of the Owner and the Contractor, the complaint shall be referred to the American Arbitration Association for resolution pursuant to Section 316 of the Executive Law and the applicable requirements of Article 75 of the Civil Practice Law and Rules.

   d.   Upon conclusion of the arbitration proceeding, the arbitrator will submit to the Director his or her award regarding the alleged violation of the Contract. The award of the arbitrator with respect to the alleged violation of the Contract shall be final and may be

00164

vacated or modified only as provided by Article 75 of the Civil Practice Law and Rules.

c.  Upon conclusion of the arbitration proceedings and the rendition of an award, the arbitrator will also recommend to the Director a remedy including, if appropriate, the imposition of sanctions, fines or penalties. The Director will either (i) adopt the recommendation of the arbitrator; (ii) determine that no sanctions, fines or penalties should be imposed; or (iii) modify the recommendation of the arbitrator, provided that such modification shall not expand upon any sanction recommended or impose any new sanction, or increase the amount of any recommended fine or penalty.

f.  The Director, within ten (10) days of receipt of the arbitrator's award and recommendations, will issue a determination of such matter and shall cause a copy of such determination to be served upon the respondent by personal service or by certified mail, return receipt requested. The determination of the Director as to the imposition of fines, sanctions, or penalties shall be reviewable pursuant to Article 78 of the Civil Practice Law and Rules.

g.  The determination of the Owner to proceed with a complaint shall not preclude the Owner, in its discretion, from pursuing any other remedies which it may have pursuant to law and contract.

F.  The following forms are to be used in submitting Affirmative Action Plans and are hereby made a part of the Contract:

AAP 1.0     Contractor's Utilization Plan

AAP 2.0     Contractor's Utilization Plan, Bid-Contract Activity Summary With Minority and Women-Owned Business Enterprises

EEO 3.0     Not Used (Contractor's Permanent Employee Distribution Now included in AAP 1.0 Contractor's Utilization Plan)

EEO 4.0     Contractor's Utilization Plan, Six Month Utilization Workforce Projection Schedule By Person Days

EEO 5.0     "Weekly Workforce Report"

EEO 6.0     Monthly Work Force Utilization Report

AAP 7.0     Monthly Contractor's Compliance Report

6. Any violation of the provisions of this Article shall justify termination of this Contract and may result in the Owner's rejection of the Contractor's bids or proposals for future contracts.

## B. Disclosure of Criminal Investigations

1. The Contractor shall immediately notify the Owner's Office of Internal Affairs at (518) 257-3193 in the event that any owner, partner, director, officer or employee of the Contractor, or its affiliated companies as identified in the Uniform Contracting Questionnaire, are subpoenaed or questioned in connection with any business-related criminal investigation, whether or not the owner, partner, director, officer or employee is, or is believed to be, the subject or target of such investigation, or is notified or otherwise learns that any owner, partner, director, officer or employee of the Contractor or its affiliated companies is under investigation for an alleged business-related violation of criminal law, unless otherwise precluded by law enforcement authorities.

2. The Contractor shall immediately notify the Owner's Office of Internal Affairs at (518) 257-3193 in the event that any owner, partner, director, officer or employee of the Contractor or its affiliated companies as identified in the Uniform Contracting Questionnaire, the firm itself, or one of its affiliated companies is indicted or charged in an accusatory instrument for any business-related violation of local, state or federal criminal law, unless otherwise precluded by law enforcement authorities.

3. In the event that any owner, partner, director, officer or employee of the Contractor is indicted or charged in an accusatory instrument for any business-related violation of local, state or federal criminal law relating to this or any other Dormitory Authority Contract, the Owner may require the Contractor to remove said owner, partner, director, officer or employee from any direct involvement in the affairs of the Contractor as it relates to this Contract and all other Dormitory Authority Contracts until the criminal matter is resolved. In the event that any owner, partner, director, officer or employee of the Contractor is convicted of a business-related violation of local, state or federal criminal law, the Owner may require the Contractor to permanently remove said individual from any direct involvement in the affairs of this and all other Dormitory Authority Contracts.

4. In the event that the Contractor or any owner, partner, director, officer or employee of the Contractor is convicted of a business-related violation of local, state or federal criminal law, the Owner may schedule a hearing with the Contractor to determine the Contractor's responsibility to continue work under this Contract and other Dormitory Authority Contracts. Following this hearing, the Owner may, at its sole discretion, take one or more of the following actions:

a. Terminate the Contract;

b. Require the Contractor, at its own expense, to hire an independent private-sector inspector general (IPSIG) to monitor its activities, institute procedures and conduct internal inquiries, in a manner prescribed by DASNY;

c. Increase retainage in an amount not to exceed ten percent (10%); or,

d. Take any other remedial action deemed appropriate.

THIS SHEET INTENTIONALLY LEFT BLANK.