UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- x

WILLIAM A. GROSS CONSTRUCTION
ASSOCIATES, INC.,

                                        Plaintiff,


                -against-                                    **DECLARATION OF EDWIN
                                                            M. LEVY**
AMERICAN MANUFACTURERS MUTUAL
INSURANCE COMPANY,                                          07 CV 10639 (LAK) (AJP)

                                        Defendant.


------------------------------------------------------------------- x

AMERICAN MANUFACTURERS MUTUAL
INSURANCE COMPANY,

                        Third-Party Plaintiff,

                -against-

CAULDWELL-WINGATE COMPANY, LLC,

                        Third-Party Defendant.
------------------------------------------------------------------- x

CAULDWELL-WINGATE COMPANY, LLC,

                        Fourth-Party Plaintiff,

                -against-

DORMITORY AUTHORITY – STATE OF NEW
YORK,

                        Fourth-Party Defendant.

------------------------------------------------------------------- x


        EDWIN M. LEVY, an attorney admitted to practice before this Court, hereby

declares the following is true and correct under penalty of perjury, pursuant to 28 U.S.C. § 1746:

1.    I am an Assistant Corporation Counsel in the office of Michael A. Cardozo, Corporation Counsel of the City of New York, attorney for the fourth-party defendant Dormitory Authority of the State of New York ("DASNY"). I am familiar with the pleadings and proceedings in this matter. I make this declaration in support of DASNY's motion to dismiss the fourth-party complaint herein, or alternatively, to sever it from the main and third-party actions and for a stay.

2.    This diversity action was commenced on or about November 28, 2007 by William A. Gross Construction Associates, Inc. ("WAG"), a subcontractor domiciled in New York that performed site work during the construction of the Bronx County Hall of Justice ("BCHJ"), against American Manufacturers Mutual Insurance Company ("American Manufacturers"), an Illinois-based corporation which had issued a payment bond to Cauldwell Wingate Company, LLC ("Cauldwell Wingate"). Cauldwell Wingate was the contractor that engaged WAG to perform a small portion of the work under its general construction contract with DASNY on the BCHJ project. WAG filed an amended complaint on or about December 11, 2007.

3.    American Manufacturers filed an answer on or about December 17, 2007, and the following day it filed a third-party complaint against Cauldwell Wingate seeking indemnification. Cauldwell Wingate filed an answer to the third-party complaint on or about February 19, 2008, and, on or about March 14, 2008, filed its fourth-party complaint against DASNY.

4.    WAG's complaint, as amended, seeks additional compensation of $2,619,478.09 from the surety allegedly due under its $3,820,000 subcontract with Cauldwell Wingate (amended complaint ¶¶ 13, 18-20, 27).

5.      The fourth-party complaint involves the entire $52 million general construction contract between DASNY and Cauldwell Wingate to provide, among other things, masonry, metal and hardware work, drywall and ceilings, tile and marble, architectural metal and glasswork, painting, and sidewalk and landscaping ("general contract") (fourth-party complaint, ¶¶ 27-28.) Caldwell Wingate claims damages of $25.4 million, not only for WAG's work on the project, but also for its drywall and ceiling work subcontractor (fourth-party complaint, ¶¶ 71-74), its architectural metal and glass work subcontractor (fourth-party complaint, ¶¶ 75-89), its masonry subcontractor (fourth-party complaint, ¶¶ 102-03), its tile and marble subcontractor (fourth-party complaint, ¶¶ 104-05), its hollow metal and hardware work subcontractor (fourth-party complaint, ¶¶ 106-111), and its painting subcontractor (fourth-party complaint, ¶¶ 112-14) as well as its own damages (fourth-party complaint, ¶¶ 47-70).   A copy of the fourth-party complaint is annexed hereto as Exhibit A.   A copy of DASNY's answer to the fourth-party complaint and counterclaims is annexed hereto as Exhibit B.

6.      As both Cauldwell Wingate and DASNY have their principal offices in New York (fourth-party complaint ¶¶ 5-6), and no federal questions are raised, jurisdiction with respect to the fourth-party action is said to be premised on 28 U.S.C. § 1367(a).

7.      In contrast to the much more circumscribed scope of WAG's complaint, the fourth-party complaint asserts claims encompassing the entire breadth of Cauldwell Wingate's general contract with DASNY, including numerous subcontracts, none of which are related to plaintiff's claims. In all, Cauldwell Wingate seeks over $25 million in damages from DASNY based on alleged  breaches of contract for which DASNY or the consultants it engaged – Rafael Vinoly Architects, P.C., the project architect, and the two project construction managers, Bovis Lend Lease and Hill International, Inc. – are claimed to be responsible.

8.    Given the substantial predominance of the fourth-party claims over those set forth in WAG's complaint, for the reasons set forth in DASNY's accompanying memorandum of law, it is respectfully submitted that the Court should exercise its discretion to dismiss the fourth-party action.

9.    Pursuant to the Court's rules, copies of the Amended Complaint, the first-party answer, the third-party answer, the third-party complaint and the third-party answer are annexed hereto as Exhibits C, D, E and F, respectively.

**WHEREFORE**, it is respectfully requested that the fourth-party action be dismissed, or in the alternative, severed from the main and third-party complaints and stayed in the interests of justice, and that such other and further relief as the Court deems necessary and proper be granted.

Dated:  New York, New York
        June 13, 2008

EDWIN. M. LEVY (EL7792)

RECEIVED
MAR 1 4 2008
U.S.D.C. S.D. N.Y.
CASHIERS

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------x

WILLIAM A. GROSS CONSTRUCTION
ASSOCIATES, INC.,

                    Plaintiff,

        -against-

AMERICAN MANUFACTURERS MUTUAL
INSURANCE COMPANY,

                  Defendant.

--------------------------------------------------------------x

AMERICAN MANUFACTURERS MUTUAL
INSURANCE COMPANY,

            Third-Party Plaintiff,

        -against-

CAULDWELL-WINGATE COMPANY, LLC,

          Third-Party Defendant.

--------------------------------------------------------------x

CAULDWELL WINGATE COMPANY, LLC,

          Fourth-Party Plaintiff,

        -against-

DORMITORY AUTHORITY – STATE OF
NEW YORK,

          Fourth-Party Defendant.

--------------------------------------------------------------x

07-CV-10639-LAK

**FOURTH-PARTY COMPLAINT**

**JURY TRIAL REQUESTED**

       Third-Party Defendant/Fourth-Party Plaintiff Cauldwell Wingate Company, LLC

("Cauldwell Wingate"), by its attorneys, Ingram Yuzek Gainen Carroll & Bertolotti, LLP, for its

Fourth-Party Complaint against the Dormitory Authority – State of New York ("DASNY")

alleges as follows:

272570_1/00926-053

## JURISDICTION

1.     This Court has jurisdiction over this fourth-party action under 28 U.S.C. § 1367(a). The fourth-party claims are directly related to the claims in the main action and in the third-party action and therefore form part of the same case or controversy.

## THE PARTIES

2.     Cauldwell Wingate is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 380 Lexington Avenue, New York, New York. Cauldwell Wingate provides construction services, including strategic planning for construction, construction management, general construction and design build.

3.     Upon information and belief, DASNY is a public benefit corporation organized and existing under the Public Authorities Law of the State of New York, with its principal place of business located at 515 Broadway, Albany, New York.

## SUMMARY OF THE CASE

4.     This action arises from a $47 million construction contract that DASNY awarded to Cauldwell Wingate in December 2002 (the "CW Contract"), one of 17 individual prime contracts DASNY awarded for the construction of the new Bronx County Criminal Court Complex ("BCC").

5.     The BCC consists of a courthouse, known as the Bronx County Hall of Justice (the "Courthouse"), as well as a Jury Assembly Building and Garage/Plaza area.

6.     Upon information and belief, the total value of all of the contracts that DASNY awarded for this massive construction project (the "BCC Project") was $325 million. Also upon

information and belief, the BCC Project had cost overruns of almost $100 million, so that the total cost of the BCC was well over $425 million.

7.    The BCC Project was riddled with major problems from beginning to end. As a result, Cauldwell Wingate was severely handicapped in its efforts to execute the CW Contract successfully and within the original BCC Project schedule. Rather than acknowledge its own accountability for these problems, DASNY continually acted unreasonably with respect to Cauldwell Wingate, demanding, for example, that it adhere to deadlines that were patently unrealistic because of the delays and obstacles created by DASNY's agents and other contractors and that it assume the responsibility for and cost of repair work caused by those agents' errors.

8.    As a result of the problems created by DASNY and DASNY's insistence on maintaining artificial deadlines, Cauldwell Wingate was required to expend enormous additional sums of money. Cauldwell Wingate is entitled to be compensated for those expenditures, and is seeking that relief in this fourth-party action.

9.    Among some of the most significant roadblocks that Cauldwell Wingate encountered were: 1) unforeseen site conditions which not only significantly delayed the originally contemplated start time for the BCC Project but which led to ongoing problems, such as continuing water infiltration, after Cauldwell Wingate had embarked on its work; 2) concrete floor slabs encompassing hundreds of thousands of feet within the Courthouse, that had been so inadequately designed and poured that it affected and delayed virtually every aspect of Cauldwell Wingate's work; and 3) similar, massive, problems with the exterior site conditions, including surface conditions that were totally incompatible for the site and landscaping work for which Cauldwell Wingate had bid and contracted and which necessitated significant extra work that had not been scheduled or budgeted.

10.    These and the many other roadblocks which Cauldwell Wingate encountered are directly attributable both to DASNY's failure to ensure that the unique architectural design of its architect, Rafael Viñoly Architects, P.C. ("RVA"), was coordinated with the associated structural and mechanical, electrical, plumbing and sprinkler ("MEPS") designs and to the failure of DASNY and its agents to manage the work of its many prime contractors so that Cauldwell Wingate's tasks could proceed in a timely and unimpeded manner.  Throughout the lifetime of the BCC Project, DASNY not only failed to acknowledge its responsibility in this regard  -- in fact, continually ignoring Cauldwell's requests to address major problems -- but also failed to pay promptly for contracted work and for the significant extra work it ordered as its design plans continued to change, in clear breach of its contractual obligations, causing financial strain not only for Cauldwell Wingate but also for its subcontractors.

11.    The lack of adequate plans and supervision also resulted in literally thousands of written change orders and field work directives ("FWDs"), the latter being work orders that DASNY or its agents issued in the field and which Cauldwell Wingate documented on change orders after-the-fact.  DASNY failed to process and pay for a substantial number of the change orders in a timely manner, often refusing to pay at all for additional work it had ordered.

12.    Upon information and belief, as the BCC Project dragged on and cost overruns mounted, DASNY sought to recoup some of its losses by "back charging" Cauldwell Wingate for remedial and repair work necessitated by DASNY's own failures properly to plan for and implement this very complex project and by physical damage caused by other contractors, at times even manufacturing claims of defective and incomplete work out of whole cloth.

13.    Toward the end of the BCC Project, DASNY generated new "punch lists" with thousands of items that Cauldwell Wingate had supposedly not completed, when often Cauldwell

Wingate had, in fact, completed the work satisfactorily and it was subsequently damaged by others. DASNY also repeatedly demanded that Cauldwell Wingate complete punch list work for which it was not responsible under the CW Contract. After Cauldwell Wingate agreed to do that work as well, and DASNY agreed to pay for it, DASNY not only reneged on its agreement to pay for that non-Cauldwell Wingate punch list work but then hired others to do it and back charged Cauldwell Wingate for it.

14.    Upon information and belief, DASNY used the existence of these and other back charges, as well as punch list items, to attempt to justify its refusal to pay Cauldwell Wingate the remainder due on its contract and to release retainage, all in breach of the CW Contract.

15.    As explained herein, the actions and inactions of DASNY in this regard went far beyond the routine problems and delays that might be expected on a project of this magnitude, constituting unreasonable and grossly negligent behavior on the part of DASNY.

16.    These myriad problems were further exacerbated by DASNY's unfair and arbitrary treatment of Cauldwell Wingate and its subcontractors, including but not limited to DASNY's refusal to adjust deadlines after major unforeseen interruptions to Cauldwell Wingate's scheduled performance occasioned solely as a result of DASNY's own lack of planning and coordination.

17.    Upon information and belief, although most if not all of the other contractors on the BCC Project experienced similar problems, DASNY, acting in bad faith, at times singled out Cauldwell Wingate for particularly harsh and unreasonable treatment. Upon information and belief, particularly toward the end of the BCC Project, DASNY's bad faith actions toward Cauldwell were generated as a result of the pressures on DASNY to complete the BCC Project

and to compensate for the huge cost overruns, as well as to justify its failings and those of its agents.

18.    Among the unfair actions taken by DASNY aimed specifically at Cauldwell Wingate was its unexplained and unjustified insistence early in 2006 that Cauldwell Wingate remove from the project two of its most key personnel, Paul De Simone, the Project Manager, and Chris Hargrove, its Vice President of Operations and, in 2007, that Cauldwell Wingate remove its field supervisor from the site.

19.    Another example was DASNY's constant threat to assess liquidated damages against Cauldwell Wingate to induce it to perform work for which it was not responsible, and to meet a schedule that had become impossible to achieve because of problems caused by DASNY and it agents.

20.    Yet another example of DASNY's apparent particular animus toward Cauldwell Wingate was its steadfast refusal to approve and process a reduction in retainage when such a reduction was, in fact, granted to other prime contractors on the BCC Project and was called for under the CW Contract.

21.    DASNY further singled out Cauldwell Wingate, as detailed below, when it reduced its plans for bollards (safety barriers) and associated road work and sought to obtain a credit for reducing this item in Cauldwell Wingate's scope of work that was in excess of the amount DASNY had originally agreed to pay.

22.    Upon information and belief, DASNY's unreasonable and unfair actions toward Cauldwell Wingate escalated in 2007, after Cauldwell Wingate submitted a request for an adjustment to the CW Contract because of the significant losses it and its subcontractors had

incurred as a result of unanticipated factors attributable to DASNY's mismanagement and lack of planning.

23.     Among the damages suffered by Cauldwell Wingate as a result of DASNY's actions and inactions, also detailed herein, were: unanticipated increases in the amounts spent by, and thus due to, Cauldwell Wingate and its subcontractors, resulting from delays on the BCC Project caused by entities other than Cauldwell Wingate, including DASNY and its agents; amounts due for approved change orders which DASNY has refused to honor and for unapproved change orders and FWDs which DASNY should have approved but has not; contract balances owed to Cauldwell Wingate for the completion of its work, including retainage which DASNY has refused to release; and damages as a result of DASNY having forced Cauldwell Wingate to constructively accelerate its performance to meet a schedule that had become impossible to achieve through no fault of Cauldwell Wingate.  The damages sought here by Cauldwell Wingate total approximately $25.4 million.

24.     The main action, instituted by one of Cauldwell Wingate's subcontractors, William A. Gross Construction Associates, Inc. ("Gross"), against Cauldwell Wingate's surety, American Manufacturers Mutual Insurance Company ("American Manufacturers") arises as a direct result not of any actions by Cauldwell but from DASNY's actions complained of here. Gross's claim constitutes part of the damages sought by Cauldwell Wingate against DASNY.

25.     In addition to RVA, DASNY's principal agents for the BCC Project were Bovis Lend Lease ("Bovis"), the initial construction manager, and Hill International ("Hill"), which DASNY hired very late in the BCC Project to replace Bovis.  While the problems complained of here were often the direct result of actions and inactions by RVA, Bovis and Hill, they are attributed to DASNY, since its architect and construction managers are DASNY's agents.

## BACKGROUND

26.    Cauldwell Wingate and DASNY entered into the CW Contract on December 20,

2002.  A copy of the CW Contract is annexed hereto as Exhibit A.  A copy of the "General

Conditions," which comprises part of the CW Contract, is annexed hereto as Exhibit B.

27.    The work to be performed under the CW Contract was described as "General

Construction # 2 – Fitout Work."  (Ex. A at 1.)  The total sum of the CW Contract was

$46,995,000, and the scheduled completion date was July 31, 2005.  (Id.)  With undisputed

increases in the scope of work, the total of the CW Contract rose to approximately $52 million.

28.    The fitout work to be performed by CW included masonry work; hollow metal

and hardware work, including for detention facilities; drywall and ceiling work; architectural

metal and glass work; finish painting; tile and marble work; and sidewalk and landscaping work.

All of this work was to be carried out by subcontractors engaged by Cauldwell Wingate, with

DASNY's approval.

### The Delays Encountered by Cauldwell Wingate

29.    From the outset, Cauldwell Wingate was presented with major, unforeseen factors

which delayed both the commencement and the progress of the CW Contract work.

30.    For example, the discovery of unsuitable soil conditions under the Jury Assembly

Building resulted in an inability to begin work on the foundation of that building, with its

construction put on hold pending a redesign of part of the foundation system.

31.    There were also significant delays to the excavation/foundation work on the

Courthouse, resulting from such factors as latent conditions with regard to rock elevations and

groundwater levels, and a change in the design from pile foundations to spread footings.  The

delays in excavation/foundation work, in turn, led to delays in structural steel and shell construction. All of these delays adversely affected Cauldwell Wingate's ability to start work on the CW Contract.

32.    One of the most significant, unanticipated problems encountered by Cauldwell Wingate related to the concrete slabs, the proper installation of which was a threshold requirement for the various tasks and trades within Cauldwell Wingate's scope of work.

33.    The concrete slabs, as poured, did not provide a suitable substrate for the performance of the various floor finishes, such as marble and terrazzo, which were within Cauldwell Wingates's scope of work. Upon information and belief, some of the slab areas were poured higher than called for, in order to cover shear studs and other structural elements. Also, upon information and belief, DASNY's specifications for cast-in-place concrete were incorrect from the outset, because they were inconsistent with the tolerances for the various floor finishes.

34.    As a result, even before it commenced its interior work, Cauldwell Wingate was confronted with concrete slabs which had many areas of relative high and low points. The lack of a level slab affected scores of details of Cauldwell Wingate's work which required level floors, including the large glass wall assembly at the Courthouse's monumental stairway and numerous doors, as well as floor finishes, which in many cases were incompatible with the slab as poured. Cauldwell Wingate was unable not only to install various finish components, but also even to fabricate them until the details of the remediation work on the concrete slab were worked out, causing further delay. Cauldwell Wingate agreed to assist in that remediation work, even though it was not in its original scope of work.

35.    The problems with the concrete slabs caused massive delays; indeed, all of the slabs, including those for the Jury Assembly Building and the Garage/Plaza, were not completed

until October 4, 2005 -- 25 months later than scheduled, and more than two months after the
original scheduled completion date in the CW Contract.

36.     By letter dated May 7, 2004, Cauldwell Wingate formally notified DASNY of its
claim for delay in connection with the concrete slab condition.

37.     Another problem which plagued the entire BCC Project, and repeatedly frustrated
Cauldwell Wingate's efforts to proceed, was the failure by DASNY and its agents to coordinate
the MEPS drawings, either during the design phase or the design review phase.  The MEPS
coordination phase, which started early in 2002, was "substantially" completed almost two years
later than originally scheduled, yet even then the MEPS installations conflicted repeatedly with
the architectural and structural design of the Courthouse.

38.     As a result, for example, even after Cauldwell Wingate had installed ceilings
throughout the massive building complex, other prime contractors repeatedly had to go back into
the ceilings to change, complete or relocate their previous MEPS (wiring, lighting, piping,
sprinklers, etc.) work.  DASNY, in turn, then required Cauldwell Wingate to repair and replace
ceiling tiles, to such an extent that even the supply of surplus ceiling tile, which is referred to as
"attic stock" and which is required for such a large project, was exhausted, necessitating an
expenditure of approximately $50,000 just for additional ceiling tiles.

39.     The long delay in MEPS coordination and the frequent conflict of MEPS plans
with architectural elements caused other significant problems for Cauldwell Wingate and its
subcontractors.  Work was frequently put on hold to allow for redesign; the planned sequencing
of tasks and trades was severely adversely affected; and significant additional work not
contemplated in the original CW Contract was required.

40.    The problems that Caulwell Wingate encountered at the outset of its work with the concrete slab were repeated at the back end, with respect to the exterior of the BCC. Gross, the Plaintiff in the main action and Cauldwell Wingate's site work and landscaping subcontractor, encountered serious design deficiencies and ubiquitous uneven ground surfaces, requiring corrective work on the exterior landscape not unlike those required on the interior concrete slab.

41.    Another problem that affected virtually every aspect of Cauldwell Wingate's work, and which resulted from DASNY's failure to provide coordinated drawings, was the need for Cauldwell Wingate and its subcontractors repeatedly to generate Requests for Information ("RFIs") to RVA. Typically, Cauldwell Wingate's subcontractors would submit schedules to RVA for their respective work with a list of questions requiring clarification or confirmation. As often as not, RVA returned the schedules marked "approved," without having responded to any of the submitted questions. That, in turn, generated the need for the RFIs, many of which related to very basic questions which RVA simply had not addressed. Although it did not do so in a timely manner, RVA frequently responded to the RFIs by issuing Architect's Supplemental Instructions ("ASIs"). In many instances, after a particular problem had been resolved in this manner after months of delay, the "solution" proffered by RVA gave rise to yet other problems, resulting in additional cost and delays.

42.    Cauldwell Wingate and its subcontractors experienced other problems with the drawings generated by DASNY's agents. For example, repeated program changes caused not only delays but revisions to elements of Cauldwell Wingate's work that had already been fabricated.

43.    As yet another example, critical details were not always fully developed, and had to be refined during the shop drawing phase to an extent far greater than is typically expected or should have been expected. The contract documents sometimes called for work which would not have been code compliant and, with respect to fire ratings, work not called for that was required by code. Very late in the BCC Project, for example, in order to comply with code, DASNY demanded a rated enclosure between the exterior curtain wall and the monumental stairway which had not been contemplated in its original plans, at increased expense to Cauldwell Wingate.

44.    This problem with the fire rating exemplifies the bad faith evidenced by DASNY. Upon information and belief, because of these code-related issues, DASNY was well aware that it would not obtain its temporary certificate of occupancy by November, 2005, which was its revised deadline for completion. Yet it nevertheless insisted that Cauldwell Wingate adhere to that deadline, holding the specter of liquidated damages over Cauldwell Wingate to force it to endeavor to work within an obviously unrealistic schedule.

45.    The problems described here are only illustrative of the many problems that resulted in repeated, unforeseen delays for Cauldwell Wingate as well as additional, unanticipated costs. As delays mounted, and DASNY refused to pay the costs associated with these delays some of Cauldwell Wingate's subcontractors were particularly affected by the lack of additional capital required to complete their work.

46.    In bidding for the CW Contract, Cauldwell Wingate expected -- and had every right to expect -- a complete, coordinated and constructible set of contract documents so that the BCC Project could be built in the sequence planned and the time allotted. Instead, Cauldwell Wingate's planned work was thrown into virtual chaos, through no fault of its own.

### DASNY'S Refusal to Pay for Extra Work

47.     As indicated above, the numerous design problems and delays caused by DASNY and its agents resulted in the issuance of numerous change orders by Cauldwell Wingate, for work which DASNY approved and which Cauldwell Wingate's subcontractors performed in good faith. DASNY persistently failed to adhere to industry practice and the CW Contract with respect to honoring these change orders and acted in bad faith in responding to them.

48.     Among other things, DASNY rejected legitimate change orders, delayed the payment of those change orders it accepted by making repeated, unnecessary requests for supporting documentation previously given, and abused the process by taking positions at odds with the relevant facts including, but not limited to, making unsupportable back charge claims against Cauldwell Wingate with no notice, purportedly to justify its non-payment of this extra work. There currently are signed change orders for amounts that DASNY has arbitrarily, inexplicably and unjustly reduced by hundreds of thousands of dollars.

49.     At times, DASNY ignored Cauldwell Wingate's requests for payment of approved change orders for months on end. At other times, particularly when Cauldwell Wingate's subcontractors were unable to or refused to proceed without payment for the extra work, DASNY simply provided Cauldwell Wingate with additional funds unrelated to specific charge orders, admitting to Cauldwell Wingate that it was unable to keep track of its own books and records. It was not unusual for DASNY later to insist on credits for such payments, thus reneging on its obligation to pay for the extra work.

50.     DASNY's record keeping with respect to change orders was so haphazard that in the transition from Bovis to Hill, DASNY claimed to have lost track of approximately $1 million in change orders.

51.    DASNY currently owes $1.4 million in approved but unpaid change orders.

52.    Also as indicated, DASNY orally issued literally hundreds of FWDs to Cauldwell Wingate and its subcontractors. The extra work performed pursuant to these FWDs was outside the scope of the CW Contract, and often resulted from the poor design coordination as well as the need to patch and repair because of improper sequencing.

53.    As required under the CW Contract, Cauldwell Wingate timely issued written change orders for the work it performed pursuant to DASNY's FWDs.

54.    Cauldwell Wingate's subcontractors performed that extra work, after which DASNY often determined that no extra work had, in fact, been involved, and refused to sign change orders related to that work, with no fair basis for doing so.

55.    The total owed by DASNY on the change orders it has refused to approve is $5.4 million.

### DASNY's Refusal to Pay Retainage and The Contract Balance

56.    DASNY also has refused to pay amounts still due under the original CW Contract, comprised of both retainage and the unpaid contract balance.

57.    Under Article 17 of the CW Contract, DASNY was entitled to withhold 5% of the periodic requisitions as "retainage." Once Cauldwell Wingate had substantially completed its work, DASNY was required to reduce the retainage amount, less two times the value of the work remaining to be done.

58.    DASNY has improperly assessed Cauldwell Wingate for certain back charges in order to justify its refusal to pay Cauldwell Wingate the remaining contract balance. DASNY also has taken the position that it is not obligated to release retainage due because of alleged existing interior and exterior punch list items.

59.    On November 10, 2006, Cauldwell Wingate and Hill reached agreement on the scope of the remaining interior punch list work to be done. Cauldwell Wingate had argued, and DASNY had conceded, that much of the punch list work it was being asked to perform was the responsibility of other prime contractors, and thus was not Cauldwell Wingate's responsibility, and they reached an agreement that Cauldwell Wingate would be paid 46% of every dollar's worth of work it performed on that punch list.

60.    Notwithstanding that agreement, and subsequent completion by Cauldwell Wingate of much of that punch list work, DASNY refused to honor the agreement, by not paying for all of the work.

61.    DASNY also continued to add items to the punch list, creating a "moving target" of items way beyond what Cauldwell Wingate agreed to in November 2006. Many of these items have already been completed and had been accepted by DASNY's agents and many, again, were the responsibility of other contractors and not within Cauldwell Wingate's original scope of work.

62.    In addition, DASNY has levied a back charge against Cauldwell Wingate for the punch list work that it alleges Cauldwell Wingate should have performed, notwithstanding its earlier acknowledgement that the work was not originally Cauldwell Wingate's responsibility. The amount of that back charge is hundreds of thousands of dollars greater than the value of the punch list work the parties agreed to in November 2006, as a result of DASNY continuing to add items to the list and refusing to acknowledge those items already completed.

63.    DASNY thus not only has forced Cauldwell Wingate to do punch list work for which it was not even responsible, but has refused to pay for it *and* now seeks to hold back the amount that work was allegedly worth from the amount still owing under the CW Contract. In

so doing, DASNY has not only breached the CW Contract but has also manifested bad faith with respect to its obligations thereunder.

64.     Among the items clearly not within Cauldwell Wingate's scope of work were those relating to sprinklers, mechanical and electrical work.

65.     DASNY subsequently presented Cauldwell Wingate with a punch list for exterior work, including but not limited to pavement restoration work, but prevented Cauldwell Wingate from carrying out that work and back charged Cauldwell Wingate for the costs associated with the completion of that work by others.

66.     Cauldwell Wingate had attempted to complete the exterior punch list but was thwarted by the actions of DASNY and its agents, including having its subcontractors turned away when they showed up to do the work and having its field supervisor dismissed from the site.

67.     Upon information and belief, DASNY has manufactured outstanding punch list items in order to justify its improper refusal to pay Cauldwell Wingate the remainder due under the CW Contract, including retainage.

68.     Cauldwell Wingate has completed all of the punch list work for which it was responsible, except for the work it was prevented from doing as a result of DASNY's refusal to permit its workers access to the site.

69.     As a result of DASNY's refusal to pay the contract balance and for extra work, Cauldwell Wingate in turn has been unable to pay its subcontractors for all of the contract balances and extra work costs owed to them.

70.     Because Cauldwell Wingate performed all of the work it contracted to perform under the CW Contract, and was prevented by DASNY from finishing any remaining work on

the BCC Project, Cauldwell Wingate has effectively completed all of the work it was required to do under the CW Contract and is entitled to be paid for the contract balance, as well as for retainage.

**Some Specific Problems Encountered by Cauldwell Wingate's Subcontractors**

*Drywall and Ceiling Work*

71.     One of the most significant portions of Cauldwell Wingate's fitout work was drywall and ceiling work, accounting for approximately 30% of the CW Contract. Cauldwell Wingate subcontracted with Component Assembly Systems ("CAS"), one of the premier drywall/acoustic contractors in the New York metropolitan area, for this purpose.

72.     Although it could not start its work on time because of delays on other prime contracts, CAS took great efforts to begin its shop drawing and sample submission process early on, to avoid the coordination problems it had learned of from other contractors. This effort revealed serious conflicts on the contract drawings with regard to CAS's work, and caused CAS to begin its own process of RFI submissions in order to resolve these conflicts. Beginning in February 2003 and continuing through May 2006, Cauldwell Wingate generated more than 350 RFIs on CAS's behalf.

73.     CAS's work was perhaps most affected by the design and coordination problems that were endemic to the BCC Project. Among only some of the problems encountered by CAS were: critical dimensions typically missing on design drawings; at many locations, partitions (both rated and non-rated) fell partially off the concrete slab, based on the dimensions called for; fire ratings of gypsum wallboard ("GWB") compromised by reveals and a recessed terrazzo base; and plan dimensions and ceiling heights resulting in exposed structural steel at many locations throughout the job, forcing the ceiling heights to be lowered. Each time CAS

272570_1/00926-053                                      17

encountered one of these problems in the field it had to stop work, issue an RFI and wait for a response from RVA.

74.    Not only was CAS significantly delayed in the start of its GWB framing work and forced to perform this work in a fragmented manner, but it also experienced a pattern of damages to completed GWB walls by the MEPS prime contractors starting early in 2004 and continuing until the Courthouse was virtually completed.    This damage consisted of removal and replacement of GWB and outright punching of holes by the MEPS contractors in their efforts to relocate and/or install their equipment within partitions and ceilings, again because of the poor work coordination by DASNY and lack of interface between the MEPS drawings and other aspects of the design.  CAS's work also was affected by repeated flooding in various areas of the building from a variety of sources not caused by Cauldwell Wingate or its subcontractors. CAS's work also was plagued by damage to and the removal of the acoustical tiles it had begun to install, with the knowledge and approval of Bovis, on various floors, again caused by poor coordination and the need by other contractors to access ceiling areas.

*Architectural Metal and Glass Work*

75.    After the drywall and ceiling work, the next largest subcontracted portion of Cauldwell Wingate's fitout work was for architectural metal and glass ("AM&G").

76.    The subcontractor for the AM&G work was UAD Group ("UAD").  As a result of the endless problems that plagued UAD throughout the BCC Project, the costs to Cauldwell Wingate for AM&G work, original subcontracted for at $6.1 million, ballooned to over $10 million.

77.    The AM&G work was a particular challenge because of the highly sophisticated architectural design.  There were endless design modifications throughout the life of the BCC

Project. Indeed, as it modified or changed its design, RVA marked up UAD's shop drawings to such a degree that the contract documents on which Cauldwell Wingate and UAD had based their bids were considered to be merely conceptual in nature, with final design work taking place in the shop drawing phase.

78.     These design changes severely affected UAD's schedule and required numerous revisions to its work, including removal and re-fabrication of various elements within the AM&G scope of work. Cauldwell Wingate generated almost 200 RFIs on behalf of UAD.

79.     UAD, a minority subcontractor, suffered extreme financial hardships as a result of its work on the BCC Project. The length of its work on the BCC Project extended from the original 23 months projected to over 36 months, during which time prices for materials escalated, and DASNY and its agents consistently rejected change orders or failed to pay timely for them. These problems were a particular strain on UAD, because of its limited financial resources.

80.     As a result of these problems, all beyond UAD's and Cauldwell Wingate's control, Cauldwell Wingate petitioned DASNY, through Bovis, on numerous occasions to adjust the work schedule accordingly. Not only did DASNY fail to respond to Cauldwell Wingate's letters, but it directed that certain work be performed which actually delayed and disrupted UAD's field work even further. As just one example, DASNY insisted on the removal of the material hoist and closure of the curtain wall without affording UAD the proper time to deliver its oversized materials, the ordering and fabrication of which had been delayed by RVA re-designs. UAD was forced to deliver glass panels which measured 5' x 15' through a narrow and insufficient gap in the curtain wall and then re-rig these glass panels to the upper floors and, in some cases, walk the glass panels up flights of stairs.

81.     At some point, notwithstanding all of the disruptions and delays, DASNY unilaterally declared that the revised completion date for the project was November 30, 2005. As one of the last of the subcontractors in the sequence of work, and thus with much of its field work still undone, UAD was particularly negatively affected by this rush to finish.

82.     As a result, Cauldwell Wingate took the pro-active step of engaging two additional subcontractors to expedite the remaining AM&G work. It also provided direct financial assistance to UAD. Cauldwell Wingate has never been compensated for any of these additional expenditures. UAD's subcontract was more than $2 million over budget, and Cauldwell Wingate expended approximately $2 million more on AM&G work.

83.     DASNY's actions in accelerating the completion of the AM&G work were particularly unreasonable in light of the fact that DASNY has repeatedly had to extend the completion date, with the Courthouse not even opening until January of 2008.

84.     Upon information and belief, beset with its own delays and overruns, DASNY used UAD and Cauldwell Wingate as scapegoats for one of the BCC Project's major design failures. DASNY's actions in this regard constitute one of the most egregious examples of its demonstration of bad faith toward Cauldwell Wingate.

85.     In its scope of work, UAD was responsible for constructing the main entrance canopy (the "Canopy") to the Courthouse. With virtually no notice, in late March 2007, DASNY for the first time raised concerns that the five inch steel plate used to construct the primary connection assemblies was improperly certified and that the welds connecting the five inch plates were cracking and unacceptable. Less than two months later, DASNY decided to remove the Canopy, and to back charge Cauldwell Wingate approximately $450,000 for that work.

86.    DASNY's decision to remove the Canopy was undertaken in complete disregard of the facts and was at odds with accepted project management and construction practices.

87.    Prior to DASNY's removal of the Canopy, Cauldwell Wingate had provided it with two separate reports by nationally recognized experts concluding that there were no cracks in the Canopy welds. These reports concluded that, instead, the conditions observed by DASNY were the result of incomplete fusion, which occurred during the welding process, which process had been witnessed -- and apparently overlooked -- by DASNY's own materials tester.

88.    In addition, Cauldwell Wingate's expert issued an opinion that the welds used to attach the upper Canopy supports satisfied New York City Building Code and good engineering practices. While DASNY complained that these welds did not conform to the shop drawings, Cauldwell Wingate's expert explained that they were changed from the shop drawings because of a potential deficiency in those drawings associated with the impact of a profile change made by RVA and that, in any event, the welds, as redesigned, satisfied sound engineering practice.

89.    In mid-April 2007, after an inspection of the Canopy, DASNY and its own expert consultants concluded that the best way to confirm the acceptability of the Canopy weld connections would be through a controlled load test. In mid-May 2007 Cauldwell Wingate submitted a plan to DASNY for such testing, to be paid for by Cauldwell-Wingate. Cauldwell Wingage also forwarded to DASNY a remediation plan that would have required only two days of work by a single welder to correct the fusion problems. Inexplicably, DASNY rejected conducting the load test or any remediation, choosing instead to completely dismantle and remove the Canopy.

*Site Work/Landscaping*

90.     Gross, the plaintiff in the main action, was Cauldwell Wingate's subcontractor for the site work and landscaping work. This subcontract was Cauldwell Wingate's third largest, totaling $3,820,000.

91.     The original schedule called for Gross's work to be completed by June 30, 2005. Notwithstanding the many delays encountered by the BCC Project, DASNY refused to adjust that completion date beyond November 2005. While Gross was able to begin a small portion of its work in the Fall of 2004, no meaningful work could even begin until June of 2005.

92.     One of the principal problems affecting Gross's work was DASNY's failure to provide the Approved Builders Pavement Plan needed for Gross to secure required permits. While Cauldwell Wingate requested the Plan as early as May 2004, it still had not been provided by the November 2005 deadline.

93.     One of the issues affecting the issuance of the Approved Builders Pavement Plan had to do with major revisions related to the number of fixed and hydraulic bollards (safety barriers) to be installed around the BCC. The original plans, on which both Cauldwell Wingate and Gross bid, called for over 300 bollards. The City Planning Commission objected to that number, and until the issue was resolved DASNY could not obtain the Approved Builders Pavement Plan which, in turn, was one of the issues which held up the issuance of the temporary certificate of occupancy.

94.     Here again, although DASNY was well aware that it could not possibly complete the BCC Project even on its revised schedule, it continued to insist that Cauldwell Wingate adhere to that schedule and constantly threatened liquidated damages if it did not.

95.    Eventually, DASNY settled on approximately 30 bollards.  Its revised plans called for redesigned bollards and significantly less associated road work around the BCC than originally called for.

96.    While DASNY was entitled to a credit on the original work, it inexplicably insisted on a credit in the amount of $1.1 million, when it was clear from all of the related paper work that Cauldwell Wingate provided that a credit of only approximately $400,000 was in order.  While DASNY eventually reduced the claimed credit amount to about $800,000, that number is not supported by the voluminous documentation that Cauldwell Wingate and Gross have provided to DASNY on this issue.

97.    DASNY acted in bad faith and in a punitive manner in insisting on a larger credit than was warranted or documented.  Upon information and belief, DASNY singled Cauldwell Wingate out for such treatment in part at least to transfer the responsibility for its chronic delays, indecision and cost overruns to one of the few prime contractors that still remained at this point in time.

98.    In addition to being held up by the bollard issue, Gross also experienced the serious design deficiencies encountered by other contractors and subcontractors, requiring over 200 RFIs from late 2003 well into 2006.  One of the most significant problems encountered by Gross was the fact that, notwithstanding that the plans and specifications called for a 2" fill, the underlying surface for which DASNY (not Cauldwell Wingate or Gross) was responsible was not level and completely unsuited for the contracted landscaping work.

99.    Among the other problems encountered by Gross were: missing dimensions and elevations; conflicts between stated dimensions; missing details for critical elements of the work; and conflicts with the work of other prime contracts.

100.    In addition to these design issues, Gross experienced other significant problems and delays in the field, including but not limited to: waterproofing not completed and/or repaired; water ponding at low spots on the Plaza and problems with trench drains; interference from material and man lifts stored by the curtain wall contractor around the Plaza and sidewalks; open electrical issues, such as missing light poles or poles in the wrong location; and the necessity for relocating Bovis's trailers and walkways.

101.    As alleged in the Complaint in the main action, Gross is owed over $2.6 million on its subcontract, including 32 open change orders, pending change orders and extra work orders.

*Masonry Work*

102.    Cauldwell Wingate engaged Commodore Construction ("Commodore") to do the masonry work. While Commodore was able to begin some aspects of its work reasonably on schedule, it was delayed on other aspects as a result, *inter alia*, of the delay in the laying of the concrete floor slabs, which work had to be completed before Commodore could proceed.

103.    After commencing its work, Commodore then encountered numerous problems associated with the uneven floor slab, as well as same design and coordination deficiency problems that all other trades faced. As a result of the design deficiencies, there were more than 50 RFIs over the three-year period it took to do the masonry work.

Commodore encountered other conditions completely beyond its control which negatively affected its schedule including, but not limited to, the constant infiltration of water into the basement levels, caused by the incomplete curtain wall enclosure, and by the failure of DASNY to ensure the provision of temporary heat during the winter of 2003/04.

*Tile and Marble*

104.    Cauldwell Wingate subcontracted with Port Morris Tile & Marble Corp. ("Port Morris") to carry out the ceramic tile, terrazzo tile and stone work.  Here too there were sequencing issues, since Port Morris could not commence its work until completed partitions were in place and floor slabs were properly finished.  Port Morris encountered significant problems with the flatness and levelness of concrete floors, for which another prime contractor was responsible.  Surveys of these floors revealed significant deviations between existing conditions of flatness and levelness and the specified tolerance for much of the finish work to be performed by Port Morris.

105.    As a result, it was necessary to carry out remedial work before Port Morris could even begin.  Because of the remedial work required, Port Morris's work was delayed for up to a year.

Port Morris's work was also affected by the deficiencies and inconsistencies in the design documents, and its work alone generated 40 RFIs.

*Hollow Metal and Hardware Work*

106.    The subcontractor for the general hollow metal and hardware work was Long Island Fireproof Door ("LIFD").  The subcontract with LIFD was one of the earliest that Cauldwell Wingate entered into, because the furnishing of hollow metal frames is critical to drywall partition work, one of the largest elements of Cauldwell Wingate's fitout responsibilities.

107.    Although LIFD submitted schedules for approval by April 7, 2003, RVA did not fully sign off on them until May 30, 2003, still leaving many of LIFD's submitted questions unanswered.  Cauldwell Wingate was thus required to submit almost 60 RFIs on LIFD's behalf, in order to resolve open issues so that the door frames could be put into production.  The

questions included such basic items as missing partition types and thicknesses, clarification of transom panel requirements and fascia locations, and the coordination of hollow metal with the work of other contracts, such as the curtain wall/storefront contract and the electrical/low voltage systems contract.

108.    Problems persisted even after the door frames were ordered and delivered, often because the installed MEPS work prevented the installation of the door frames in their planned location.  The problems affected not only the door frames, but doors and hardware as well because of DASNY's failure to coordinate the schedule for their preparation with the schedule for the preparation of required electronic locks and security hardware.   These problems continued from the time of the first RFI, in July of 2003, to the last RFI, which was generated in June 2006.

109.    Cauldwell Wingate engaged a separate subcontractor, Maximum Security Products ("MSP") for the furnishing and installation of all of the material and equipment for the BCC's detention facilities, including hollow metal and hardware, which is generally more involved than conventional doors and frames.  The special requirements included specialized steel, solid reinforced masonry, sliding steel security doors and grillwork, solid steel ceilings, and the need to comply with security codes.

110.    Here too, although MSP's schedules were submitted for approval on March 12, 2003, they were not approved until May 15, 2003, and then with so many unanswered questions that Cauldwell Wingate had to generate over 70 RFIs on MSP's behalf.

111.    Even then, the design deficiencies of DASNY's detention work became painfully apparent. As just a few examples, in many instances the cell ceiling heights conflicted with the sliding door housings, requiring a reduction in door heights.  In a great many cases, the cell

masonry openings were too small to accommodate the cell door clear opening size and overall frame width for the slider. Because of these and other problems, none of which was caused by Cauldwell Wingate or its subcontractors, revisions to door sizes, masonry openings or configurations and frame openings -- or some combination of all three -- were required. These problems not only resulted in delays to the completion of the detention hollow metal and hardware work, but also to the start of the masonry work, which could not commence until these metal and hardware issues were resolved.

### Finish Painting

112.    Cauldwell Wingate subcontracted with L&L Painting Co. ("L&L") for the finish painting, which included taping, spackling and skimcoating as well as finish painting.

113.    By definition, the finish painting work could not be done until much of the other work had been completed. As a result, L&L's work was substantially delayed, particularly as a result of the delays to CAS for its GWB work.

114.    L&L's work was also plagued by many of the same problems that CAS experienced, such as the need for patching and repairing as a result of flooding, and significant damage to walls and ceilings caused by the MEPS trades. L&L performed this additional work, as directed, by DASNY. As a result, L&L's subcontract almost doubled in scope.

### Cauldwell Wingate's Claim for an Equitable Adjustment

115.    On February 13, 2007, pursuant to project protocol, Cauldwell Wingate submitted to DASNY a Claim for Equitable Adjustment (the "Adjustment Claim"). The Adjustment Claim outlined in both narrative and financial detail the extra costs incurred by Cauldwell Wingate and its subcontractors as a result of the events outlined herein. The claim was for approximately $23.5 million.

116.    DASNY refused to acknowledge any obligation to reimburse Cauldwell Wingate for any costs detailed in the Adjustment Claim.

117.    Approximately three-quarters of the $23.5 million outlined in the Adjustment Claim was the amount due to subcontractors as of the date submitted.

118.    One of the other items included in the Adjustment Claim, which also illustrates the animus and unfair behavior of DASNY toward Cauldwell Wingate, was a claim for almost $600,000 based on Cauldwell Wingate's replacement of precast concrete panels at the site planters, as DASNY's insistence.

119.    Cauldwell Wingate's subcontractor fabricated and installed these panels using a thickness approved by RVA and a concrete design mix used for building panels under another prime contract, and also approved by RVA.

120.    After some of the panels exhibited cracking and some chipping at the edges, both DASNY's and Cauldwell Wingate's experts undertook testing to determine whether these panels satisfied compressive strength requirements.  Notwithstanding results showing that the panels did, in fact, exceed such requirements, and Cauldwell Wingate's offer to replace 110 of the almost 900 panels and to patch chipping, DASNY insisted that *all* of the panels be removed and replaced.

121.    Cauldwell Wingate did so, at a cost of almost $600,000.  Cauldwell Wingate has submitted a proposed change order for this amount, which DASNY has refused to approve.

122.    Upon information and belief, DASNY's malicious conduct toward Cauldwell Wingate escalated as a result of Cauldwell Wingate's submission of the Adjustment Claim and DASNY's unwillingness to acknowledge any responsibility for the facts outlined therein and led to DASNY barring Cauldwell Wingate from the site in August, 2007

272570_1/00926-053                              28

## FIRST CLAIM
### (Breach of Contract – Unpaid Balance)

123.    Cauldwell Wingate repeats and realleges the allegations set forth in paragraphs 1 through 122 of this fourth-party complaint with the same force and effect as if set forth at length herein.

124.    The total amount that Cauldwell Wingate was entitled to be paid under the CW Contract, including change orders that DASNY approved, was approximately $52.3 million.

125.    Cauldwell Wingate has completed all of the work required under the CW Contract, except for the work which DASNY prevented it from performing. Cauldwell Wingate is thus not in breach of the CW Contract, and is entitled to be paid the contract balance as well as the retainage DASNY has withheld.

126.    DASNY has only paid Cauldwell Wingate approximately $48.6 million, and has refused to pay the additional $3.7 million due under the CW Contract, including retainage.

127.    By refusing to pay the contract balance, including retainage, DASNY has breached the CW Contract.

128.    Based on the foregoing, Cauldwell Wingate is entitled to a judgment against DASNY for the unpaid balance of the CW Contract, in the amount to be determined at trial, but no less than $3.7 million.

## SECOND CLAIM
### (Breach of Contract – Extra Work Performed)

129.    Cauldwell Wingate repeats and realleges the allegations set forth in paragraphs 1 through 128 of this fourth-party complaint with the same force and effect as if set forth at length herein.

130.    The CW Contract contemplated that, in addition to the work provided for therein, there would be additional work as well, documented and approved through change orders.

131.    Cauldwell Wingate complied with the requirements of the CW Contract in submitting all change orders to DASNY.

132.    Cauldwell Wingate and its subcontractors also performed work pursuant to written FWDs and other written design changes mandated by DASNY and its agents. Cauldwell Wingate has submitted written change orders for that work to DASNY, but DASNY has either refused to sign off on the change orders or has improperly rejected them. The total amount of unapproved change orders for work which Cauldwell Wingate and its subcontractors have performed is approximately $5.4 million.

133.    All of these outstanding change orders include allowances for overhead and profit, as provided in the CW Contract.

134.    By refusing to approve these change orders for work that Cauldwell Wingate performed at DASNY's direction, DASNY has breached the CW Contract.

135.    Based on the foregoing, Cauldwell Wingate is entitled to a judgment against DASNY for the total of all unapproved change orders, in an amount to be determined at trial, but not less than $5.4 million.

## THIRD CLAIM
### (Impact/Delay Claim)

136.    Cauldwell Wingate repeats and realleges the allegations set forth in paragraphs 1
through 135 of this fourth-party complaint with the same force and effect as if set forth at length
herein.

137.    Cauldwell Wingate experienced significant, unforeseen difficulties in completing
the CW Contract in a timely manner due to circumstances beyond the control of Cauldwell
Wingate or its subcontractors and ultimately attributable to DASNY's acts and omissions.

138.    Those acts and omissions included, but were not limited to, DASNY's failure to
ensure that the MEPS plans were properly coordinated with the other design plans, its failure
properly to sequence the work of its various prime contractors, and indeed its faulty, incomplete
and inaccurate contract documents which, as illustrated, ultimately served only as conceptual
guidelines. Cauldwell Wingate and its subcontractors were significantly delayed in the
completion of their work on the BCC Project, at significant cost.

139.    DASNY's actions in this regard were willful and malicious.

140.    Alternatively, these acts and omissions constituted grossly negligent conduct by
DASNY.

141.    These acts and omissions led to extremely unreasonable delays, which were
attributable to DASNY's breach of a fundamental contractual obligation.

142.    DASNY's acts and omissions, and the delays resulting therefrom, could not
reasonably have been contemplated by Cauldwell Wingate at the time of its bid on the BCC
Project.

143.    Based on the foregoing, Cauldwell Wingate is entitled to a judgment against DASNY for its delay claim in an amount to be determined at trial, but not less than $15.6 million.

### FOURTH CLAIM
#### (Constructive Acceleration)

144.    Cauldwell Wingate repeats and realleges the allegations set forth in paragraphs 1 through 143 of this fourth-party complaint with the same force and effect as if set forth at length herein.

145.    Cauldwell Wingate encountered significant, uncontemplated delays directly attributable to DASNY and its agents.

146.    As a result of those delays, Cauldwell Wingate made timely and sufficient requests for an extension of the CW Contract schedule.

147.    DASNY denied Cauldwell Wingate's request for an extension of the CW Contract schedule and, instead, insisted that CW complete its work within a period of time that failed to take into account the delays that had occurred though no fault of Cauldwell Wingate or its subcontractors.

148.    As a result of DASNY's constructive acceleration, Cauldwell Wingate was required to expend additional resources to compensate for the lost time and to remain on schedule including, but not limited to, costs for hiring additional workers, inordinate premium time costs, costs for subsidizing subcontractors who were experiencing extremely significant cash flow difficulties, and Cauldwell Wingate's own overhead and profits and other costs associated with loss of efficiency.

149.    Cauldwell Wingate notified DASNY that its demand to accelerate constituted a constructive change in the CW Contract.

150.    Based on the foregoing, Cauldwell Wingate is entitled to a judgment against DASNY as a result of DASNY's constructive acceleration in an amount to be determined at trial, but no less than $730,000.

## FIFTH CLAIM
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

151.    Cauldwell Wingate repeats and realleges the allegations set forth in paragraphs 1 through 150 of this fourth-party complaint with the same force and effect as if set forth at length herein.

152.    By virtue of its actions and inactions detailed herein, DASNY sought to deprive Cauldwell Wingate of the benefits of the CW Contract.

153.    Among the numerous actions taken by DASNY to deprive Cauldwell Wingate of the benefits of the CW Contract were: its persistent refusal to adjust the artificial deadlines imposed upon Cauldwell Wingate even after DASNY knew that the BCC Project could not possibly be completed within those deadlines; refusal to approve change orders for work which it had orally directed Cauldwell Wingate to perform; its insistence that Cauldwell Wingate perform punch list work on items that had never been Cauldwell Wingate's responsibility under the CW Contract and then, after Cauldwell Wingate had agreed to do that work for an agreed upon amount, refusing to pay for the work and back charging Cauldwell Wingate for that work done by others; its improper refusal to release retainage; its failure to pay Cauldwell Wingate for work properly performed, such as the Canopy, relying on fabricated claims of improper work, and then levying back charges against Cauldwell Wingate for the dismantling work done by others; and its unjustified removal of key Cauldwell Wingate personnel from the BCC Project site.

272570_1/00926-053

33

154.    As a result of these and other actions taken by DASNY, Cauldwell Wingate was deprived of the full benefits to which it was entitled under the CW Contract.

155.    Based on the foregoing, Cauldwell Wingate is entitled to a judgment against DASNY as a result of DASNY's breach of the implied covenant of good faith and fair dealing in an amount to be determined at trial, but no less than $25.4 million.

## DEMAND FOR A JURY TRIAL

Cauldwell Wingate demands trial by jury as to all issues in the above matter.

WHEREFORE, Third-Party Defendant/Fourth-Party Plaintiff, Cauldwell Wingate Company, LLC, demands judgment as follows:

A.    On its first claim, in an amount to be determined at trial but in no event less than the sum of $3.7 million;

B.    On its second claim, in an amount to be determined at trial but in no event less than the sum of $5.4 million;

C.    On its third claim, in an amount to be determined at trial but in no event less than the sum of $15.6 million;

D.    On its fourth claim, in an amount to be determined at trial but in no event less than the sum of $730,000;

E.    On its fifth claim, in an amount to be determined at trial but in no event less than the sum of $25.4 million;

F.    Applicable interest on all claims;

G.    The costs and disbursements of this action; and

H.    Such other and further relief as to the Court appears just and proper.

Dated:  New York, New York
        March 14, 2008

INGRAM YUZEK GAINEN CARROLL &
BERTOLOTTI, LLP

By: _____
        Larry F. Gainen (LG-9351)
        Patricia Hewitt (PH-7769)
Attorneys for Third-Party Defendant/Fourth-
        Party Plaintiff Cauldwell Wingate
        Company, LLC
250 Park Avenue
New York, New York 10177
(212) 907-9600

272570_1/00926-053

35

Case 1:07-cv-10639-LAK-AJP    Document 33    Filed 06/13/2008    Page 1 of 34

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------x

WILLIAM A. GROSS CONSTRUCTION
ASSOCIATES, INC.,                                                                 07-CV-10639 (LAK)(AJP)

                                        Plaintiff,

                                                                                **ANSWER TO FOURTH-
                                                                                PARTY COMPLAINT
                                                                                AND COUNTERCLAIMS**

                     - against -

AMERICAN MANUFACTURER'S MUTUAL
INSURANCE COMPANY,
                                        Defendant.

--------------------------------------------------------------x

AMERICAN MANUFACTURER'S MUTUAL
INSURANCE COMPANY,

                            Third-Party Plaintiff,

                – against –

CAULDWELL WINGATE COMPANY, LLC,

                            Third-Party Defendant.

--------------------------------------------------------------x

CAULDWELL WINGATE COMPANY, LLC,

                            Fourth-Party Plaintiff,

                – against –

DORMITORY AUTHORITY OF THE STATE OF
NEW YORK,

                            Fourth-Party Defendant.

--------------------------------------------------------------x

        Fourth-Party Defendant, the DORMITORY AUTHORITY OF THE STATE OF NEW

YORK (hereinafter "DASNY"), by its attorney, MICHAEL A. CARDOZO, Corporation

Counsel of the City of New York,  hereby Answers the Fourth-Party Complaint, as follows:

## AS AND FOR DASNY'S RESPONSE TO THE
## ALLEGATIONS CONCERNING JURISDICTION

1.      Denies the allegations set forth in paragraph "1" of the Fourth-Party

Complaint.

## AS AND FOR DASNY'S RESPONSE TO THE
## ALLEGATIONS CONCERNING THE PARTIES

2.      Denies knowledge or information sufficient to form a belief as to the truth

of the allegations set forth in paragraph "2" of the Fourth-Party Complaint.

3.      Denies the allegations set forth in paragraph "3" of the Fourth-Party

Complaint, except admits that DASNY is a public benefit corporation organized and existing

under the Public Authorities Law of the State of New York.

## AS AND FOR DASNY'S RESPONSE TO THE
## ALLEGATIONS SUMMARIZING THE CASE

4.      Denies knowledge or information sufficient to for a belief as to the truth of

the allegations set forth in paragraph "4" of the Fourth-Party Complaint, except admits that

DASNY awarded a contract to Cauldwell Wingate and that contract was one of seventeen

individual prime contracts awarded by DASNY for the construction of the new Bronx County

Criminal Court Complex.

5.      Denies knowledge or information sufficient to form a belief as to the truth

of the allegations set forth in paragraph "5" of the Fourth-Party Complaint.

6.      Denies knowledge or information sufficient to form a belief as to the truth

of the allegations set forth in paragraph "6" of the Fourth-Party Complaint.

7.      Denies the allegations set forth in paragraph "7" of the Fourth-Party

Complaint.

   8.  Denies the allegations set forth in paragraph "8" of the Fourth-Party Complaint.

   9.  Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "9" of the Fourth-Party Complaint.

   10.  Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "10" of the Fourth-Party Complaint.

   11.  Denies the allegations set forth in paragraph "11" of the Fourth-Party Complaint.

   12.  Denies the allegations set forth in paragraph "12" of the Fourth-Party Complaint.

   13.  Denies the allegations set forth in paragraph "13" of the Fourth-Party Complaint.

   14.  Denies the allegations set forth in paragraph "14" of the Fourth-Party Complaint.

   15.  Denies the allegations set forth in paragraph "15" of the Fourth-Party Complaint.

   16.  Denies the allegations set forth in paragraph "16" of the Fourth-Party Complaint.

   17.  Denies the allegations set forth in paragraph "17" of the Fourth-Party Complaint.

   18.  Denies the allegations set forth in paragraph "18" of the Fourth-Party Complaint.

Case 1:07-cv-10639-LAK-AJP    Document 33    Filed 06/13/2008    Page 4 of 34

19.    Denies the allegations set forth in paragraph "19" of the Fourth-Party Complaint.

20.    Denies the allegations set forth in paragraph "20" of the Fourth-Party Complaint.

21.    Denies the allegations set forth in paragraph "21" of the Fourth-Party Complaint.

22.    Denies the allegations set forth in paragraph "22" of the Fourth-Party Complaint.

23.    Denies the allegations set forth in paragraph "23" of the Fourth-Party Complaint.

24.    Denies the allegations set forth in paragraph "24" of the Fourth-Party Complaint, except denies knowledge or information sufficient to for a belief as to the allegation that Gross's claim constitutes part of the damages sought by Cauldwell Wingate against DASNY.

25.    Denies the allegations set forth in paragraph "25" of the Fourth-Party Complaint, except admits that Bovis Lend Lease was the initial construction manager and that Hill International was hired by DASNY to replace Bovis.

### AS AND FOR DASNY'S RESPONSE TO THE
### ALLEGATIONS CONCERNING THE BACKGROUND

26.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "26" of the Fourth-Party Complaint, except admits that Cauldwell Wingate and DASNY entered into a contract on December 20, 2002 and respectfully refers the Court to the documents annexed to the Fourth-Party Complaint as Exhibits A and B thereto for a full and complete statement of their contents.

27. Admits the allegations set forth in paragraph "27" of the Fourth-Party Complaint.

28. Admits the allegations contained in paragraph "28" of the Fourth-Party Complaint.

## AS AND FOR DASNY'S RESPONSE TO THE ALLEGATIONS CONCERNING DELAYS ENCOUNTERED BY CAULDWELL WINGATE

29. Denies knowledge or information sufficient to form a belief as to the allegations set forth in paragraph "29" of the Fourth-Party Complaint.

30. Denies the allegations set forth in paragraph "30" of the Fourth-Party Complaint.

31. Denies knowledge or information sufficient to form a belief as to the allegations set forth in paragraph "31" of the Fourth-Party Complaint.

32. Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "32" of the Fourth-Party Complaint.

33. Denies the allegations set forth in paragraph "33" of the Fourth-Party Complaint, except admits that the various floor finishes were within Cauldwell-Wingate's scope of work.

34. Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "34" of the Fourth-Party Complaint.

35. Denies the allegations set forth in paragraph "35" of the Fourth-Party Complaint, except admits that the work required under the contract between the parties was completed after the original scheduled completion date.

36. Denies knowledge or information sufficient to for a belief as to the truth of the allegations set forth in paragraph "36" of the Fourth-Party Complaint.

37.     Denies the allegations set forth in paragraph "37" of the Fourth-Party Complaint, except admits that the MEPS coordination phase started in 2002.

38.     Denies the allegations set forth in paragraph "38" of the Fourth-Party Complaint, except admits that DASNY required Cauldwell Wingate to repair and replace ceiling tiles.

39.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "39" of the Fourth-Party Complaint.

40.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "40" of the Fourth-Party Complaint.

41.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "41" of the Fourth-Party Complaint, except denies that DASNY failed to provide coordinated drawings.

42.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "42" of the Fourth-Party Complaint.

43.     Denies the allegations set forth in paragraph "43" of the Fourth-Party Complaint.

44.     Denies the allegations set forth in paragraph "44" of the Fourth-Party Complaint.

45.     Denies the allegations set forth in paragraph "45" of the Fourth-Party Complaint.

46.     Denies the allegations set forth in paragraph "46" of the Fourth-Party Complaint, except denies knowledge or information sufficient to form a belief as to the truth of

the allegation that Cauldwell Wingate expected a complete, coordinated and constructible set of contract documents.

### AS AND FOR DASNY'S RESPONSE TO THE
### ALLEGATIONS THAT DASNY REFUSED TO PAY FOR EXTRA WORK

47.    Denies the allegations set forth in paragraph "47" of the Fourth-Party Complaint.

48.    Denies the allegations set forth in paragraph "48" of the Fourth-Party Complaint.

49.    Denies the allegations set forth in paragraph "49" of the Fourth-Party Complaint.

50.    Denies the allegations set forth in paragraph "50" of the Fourth-Party Complaint.

51.    Denies the allegations set forth in paragraph "51" of the Fourth-Party Complaint.

52.    Denies the allegations set forth in paragraph "52" of the Fourth-Party Complaint

53.    Denies the allegations set forth in paragraph "53" of the Fourth-Party Complaint.

54.    Denies the allegations set forth in paragraph "54" of the Fourth-Party Complaint.

55.    Denies the allegations set forth in paragraph "55" of the Fourth-Party Complaint.

## AS AND FOR DASNY'S RESPONSE TO THE ALLEGATIONS
## THAT DASNY REFUSED TO PAY RETAINAGE AND THE CONTRACT BALANCE

56.     Denies the allegations set forth in paragraph "56" of the Fourth-Party Complaint.

57.     Admits the allegations set forth in paragraph "57" of the Fourth-Party Complaint, except denies that '[o]nce Cauldwell Wingate had substantially completed its work, DASNY was required to reduce the retainage amount, less two times the value of the work remaining to be done."

58.     Denies the allegations set forth in paragraph "58" of the Fourth-Party Complaint, except admits that DASNY assessed Cauldwell Wingate for backcharges.

59.     Denies the allegations set forth in paragraph "59" of the Fourth-Party Complaint.

60.     Denies the allegations set forth in paragraph "60" of the Fourth-Party Complaint.

61.     Denies the allegations set forth in paragraph "61" of the Fourth-Party Complaint.

62.     Denies the allegations set forth in paragraph "62" of the Fourth-Party Complaint, except admits that DASNY levied a back charge against Cauldwell Wingate.

63.     Denies the allegations set forth in paragraph "63" of the Fourth-Party Complaint.

64.     Denies the allegations set forth in paragraph "64" of the Fourth-Party Complaint.

65.     Denies the allegations set forth in paragraph "65" of the Fourth-Party Complaint, except admits that DASNY presented Cauldwell Wingate with a punch list.

66.    Denies the allegations set forth in paragraph "66" of the Fourth-Party Complaint.

67.    Denies the allegations set forth in paragraph "67" of the Fourth-Party Complaint.

68.    Denies the allegations set forth in paragraph "68" of the Fourth-Party Complaint.

69.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "69" of the Fourth-Party Complaint.

70.    Denies the allegations set forth in paragraph "70" of the Fourth-Party Complaint.

## AS AND FOR DASNY'S RESPONSE TO ALLEGATIONS CONCERNING ALLEGED PROBLEMS ENCOUNTERED BY CAULDWELL WINGATE'S SUBCONTRACTORS

### *Drywall And Ceiling Work*

71.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "71" of the Fourth-Party Complaint, except admits that Cauldwell Wingate subcontracted with Component Assembly Systems ("CAS").

72.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "72" of the Fourth-Party Complaint.

73.    Denies the allegations set forth in paragraph "73" of the Fourth-Party Complaint.

74.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "74" of the Fourth-Party Complaint, except denies that there was poor work coordination by DASNY.

### *Architectural Metal And Glass Work*

75.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "75" of the Fourth-Party Complaint.

76.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "76" of the Fourth-Party Complaint, except admits that Fourth-Party Plaintiff's subcontractor for the architectural metal and glass work was UAD Group ("UAD").

77.    Denies the allegations set forth in paragraph "77" of the Fourth-Party Complaint.

78.    Denies the allegations set forth in paragraph "78" of the Fourth-Party Complaint, except denies knowledge or information sufficient to form a belief as to the truth of the allegation that "Cauldwell Wingate generated almost 200 RFIs on behalf of UAD."

79.    Denies the allegations set forth in paragraph "79" of the Fourth-Party Complaint, except admits that work on the project extended to over 36 months.

80.    Denies the allegations set forth on paragraph "80" of the Fourth Party Complaint, except admits that UAD delivered glass panels to the work site.

81.    Denies the allegations set forth in paragraph "81" of the Fourth-Party Complaint, except admits that the completion date of the project was revised to November 30, 2005.

82.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "82" of the Fourth-Party Complaint.

83.    Denies the allegations set forth in paragraph "83" of the Fourth-Party Complaint.

84.    Denies the allegations set forth in paragraph "84" of the Fourth-Party Complaint.

85.    Denies the allegations set forth in paragraph "85" of the Fourth-Party Complaint, except admits that DASNY raised concerns that the five-inch steel plate used to construct the primary connection assemblies was improperly certified, that the weld connecting the five-inch plates was cracking and unacceptable and that DASNY decided to remove the canopy and to back charge Cauldwell Wingate for that work.

86.    Denies the allegations set forth in paragraph "86" of the Fourth-Party Complaint.

87.    Denies the allegations set forth in paragraph "87" of the Fourth-Party Complaint.

88.    Denies the allegations set forth in paragraph "88" of the Fourth-Party Complaint, except admits that DASNY complained that the welds used to attach the upper Canopy supports did not conform to shop drawings.

89.    Denies the allegations set forth in paragraph "89" of the Fourth-Party Complaint, except admits that DASNY inspected the Canopy in or about April 2007 and concluded that a controlled load test was required.

**_Site Work/Landscaping_**

90.    Admits the allegations set forth in paragraph "90" of the Fourth-Party Complaint.

91.    Denies the allegations set forth in paragraph "91" of the Fourth-Party Complaint, except admits that the original schedule called for Gross's work to be completed by June 30, 2005.

92.     Denies the allegations set forth in paragraph "92" of the Fourth-Party Complaint.

93.     Denies the allegations set forth in paragraph "93" of the Fourth-Party Complaint.

94.     Denies the allegations set forth in paragraph "94" of the Fourth-Party Complaint.

95.     Admits the allegations set forth in paragraph "95" of the Fourth-Party Complaint.

96.     Denies the allegations set forth in paragraph "96" of the Fourth-Party Complaint, except admits that DASNY was entitled to a credit.

97.     Denies the allegations set forth in paragraph "97" of the Fourth-Party Complaint.

98.     Denies the allegations set forth in paragraph "98" of the Fourth-Party Complaint.

99.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "99" of the Fourth-Party Complaint.

100.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "100" of the Fourth-Party Complaint.

101.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "101" of the Fourth-Party Complaint.

*Masonry Work*

102.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "102" of the Fourth-Party Complaint, except admits that Cauldwell Wingate engaged Commodore Construction for masonry work.

103.    Denies the allegations set forth in paragraph "103" of the Fourth-Party Complaint.

*Tile and Marble*

104.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "104" of the Fourth-Party Complaint, except admits that Cauldwell Wingate engaged Port Morris Tile & Marble Corp. for tile and stone work.

105.    Denies the allegations set forth in paragraph "105" of the Fourth-Party Complaint.

*Hollow Metal and Hardware Work*

106.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "106" of the Fourth-Party Complaint, except admits that Cauldwell Wingate subcontracted with Long Island Fire Proof Door for general hollow metal and hardware work.

107.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "107" of the Fourth-Party Complaint.

108.    Denies the allegations set forth in paragraph "108" of the Fourth-Party Complaint.

109.    Admits the allegations set forth in paragraph "109" of the Fourth-Party Complaint.

110.    Denies the allegations set forth in paragraph "110" of the Fourth-Party Complaint.

111.    Denies the allegations set forth in paragraph "111" of the Fourth-Party Complaint.

**_Finish Painting_**

112.    Admits the allegations set forth in paragraph "112" of the Fourth-Party Complaint.

113.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "113" of the Fourth-Party Complaint.

114.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "114" of the Fourth-Party Complaint.

## AS AND FOR DASNY'S RESPONSE TO CAULDWELL
## WINGATE'S CLAIM FOR AN EQUITABLE ADJUSTMENT

115.    Denies the allegations set forth in paragraph "115" of the Fourth-Party Complaint, except admits that Cauldwell Wingate submitted the Adjustment Claim to DASNY.

116.    Admits the allegations set forth in paragraph "116" of the Fourth-Party Complaint.

117.    Denies the allegations set forth in paragraph "117" of the Fourth-Party Complaint.

118.    Denies the allegations set forth in paragraph "118" of the Fourth-Party Complaint.

119.    Denies the allegations set forth in paragraph "119" of the Fourth-Party Complaint.

120.   Denies the allegations set forth in paragraph "120" of the Fourth-Party
Complaint, except admits that DASNY's experts tested the panels.

121.   Denies the allegations set forth in paragraph "121" of the Fourth-Party
Complaint.

122.   Denies the allegations set forth in paragraph "122" of the Fourth-Party
Complaint.

## AS AND FOR DASNY'S RESPONSE TO THE FIRST CLAIM
### (Breach Of Contract – Unpaid Balance)

123.   DASNY repeats and realleges the above responses the allegations set forth
in paragraphs "1" through "122" of the Fourth-Party Complaint with the same force and effect as
though fully set forth at length herein.

124.   Denies the allegations set forth in paragraph "124" of the Fourth-Party
Complaint.

125.   Denies the allegations set forth in paragraph "125" of the Fourth-Party
Complaint.

126.   Denies the allegations set forth in paragraph "126" of the Fourth-Party
Complaint, except admits that DASNY has paid Cauldwell Wingate approximately $48.6
million.

127.   Denies the allegations set forth in paragraph "127" of the Fourth-Party
Complaint.

128.   Denies the allegations set forth in paragraph "128" of the Fourth-Party
Complaint.

## AS AND FOR DASNY'S RESPONSE TO THE SECOND CLAIM
### (Breach Of Contract – Extra Work Performed)

129.    DASNY repeats and realleges the above responses the allegations set forth in paragraphs "1" through "128" of the Fourth-Party Complaint with the same force and effect as though fully set forth at length herein.

130.    The allegations set forth in paragraph "130" of the Fourth-Party Complaint constitute a legal conclusion and thus require no response.  However, to the extent that a response is deemed to be required, DASNY denies the allegations.

131.    Denies the allegations set forth in paragraph "131" of the Fourth-Party Complaint.

132.    Denies the allegations set forth in paragraph "132" of the Fourth-Party Complaint, except admits that Cauldwell Wingate submitted written change orders.

133.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "133" of the Fourth-Party Complaint.

134.    Denies the allegations set forth in paragraph "134" of the Fourth-Party Complaint.

135.    Denies the allegations set forth in paragraph "135" of the Fourth-Party Complaint.

## AS AND FOR DASNY'S RESPONSE TO THE THIRD CLAIM
### (Impact/Delay)

136.    DASNY repeats and realleges the above responses the allegations set forth in paragraphs "1" through "135" of the Fourth-Party Complaint with the same force and effect as though fully set forth at length herein.

137.    Denies the allegations set forth in paragraph "137" of the Fourth-Party Complaint.

138.    Denies the allegations set forth in paragraph "138" of the Fourth-Party Complaint.

139.    Denies the allegations set forth in paragraph "139" of the Fourth-Party Complaint.

140.    Denies the allegations set forth in paragraph "140" of the Fourth-Party Complaint.

141.    Denies the allegations set forth in paragraph "141" of the Fourth-Party Complaint.

142.    Denies the allegations set forth in paragraph "142" of the Fourth-Party Complaint.

143.    Denies the allegations set forth in paragraph "143" of the Fourth-Party Complaint.

### AS AND FOR DASNY'S RESPONSE TO THE FOURTH CLAIM
### (Constructive Acceleration)

144.    DASNY repeats and realleges the above responses the allegations set forth in paragraphs "1" through "143" of the Fourth-Party Complaint with the same force and effect as though fully set forth at length herein.

145.    Denies the allegations set forth in paragraph "145" of the Fourth-Party Complaint.

146.    Denies the allegations set forth in paragraph "146" of the Fourth-Party Complaint.

147.    Denies the allegations set forth in paragraph "147" of the Fourth-Party Complaint.

148.    Denies the allegations set forth in paragraph "148" of the Fourth-Party Complaint.

149.    Denies the allegations set forth in paragraph "149" of the Fourth-Party Complaint.

150.    Denies the allegations set forth in paragraph "150" of the Fourth-Party Complaint.

## AS AND FOR DASNY'S RESPONSE TO THE FIFTH CLAIM
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

151.    DASNY repeats and realleges the above responses the allegations set forth in paragraphs "1" through "150" of the Fourth-Party Complaint with the same force and effect as though fully set forth at length herein.

152.    Denies the allegations set forth in paragraph "152" of the Fourth-Party Complaint.

153.    Denies the allegations set forth in paragraph "153" of the Fourth-Party Complaint.

154.    Denies the allegations set forth in paragraph "154" of the Fourth-Party Complaint.

155.    Denies the allegations set forth in paragraph "155" of the Fourth-Party Complaint.

## AS AND FOR A FIRST DEFENSE

156.    The Fourth-Party Complaint fails to state a cause of action upon which relief can be granted.

## AS AND FOR A SECOND DEFENSE

157.    Pursuant to 28 U.S.C. § 1367, this Court lacks jurisdiction under over the claims asserted in the Fourth-Party Complaint.

## AS AND FOR A THIRD DEFENSE

158.    Cauldwell Wingate, for valuable consideration received and accepted, executed and delivered to DASNY a written release which released DASNY from any and all liability for the claims asserted in the Fourth-Party Complaint, except as to retainage.

159.    As a result, each of Cauldwell-Wingate's claims herein, except for retainage, is barred by release.

## AS AND FOR A FOURTH DEFENSE

160.    Cauldwell Wingate has been paid and has accepted all monies due and owing for the work it performed.

## AS AND FOR A FIFTH DEFENSE

161.    Cauldwell Wingate has waived some or all of its claims under the Cauldwell Wingate Contract.

## AS AND FOR A SIXTH DEFENSE

162.    Cauldwell Wingate has failed to mitigate any damages it may have suffered as a result of any of the actions it attributes to others as described in the Fourth-Party Complaint.

## AS AND FOR A SEVENTH DEFENSE

163.    Cauldwell Wingate has failed to duly perform and complete all the work in accordance with and as required under the Cauldwell Wingate Contract.

164. Cauldwell Wingate therefore has breached the Cauldwell Wingate Contract.

165. As a result, Cauldwell Wingate may not maintain the claims asserted in the Fourth-Party Complaint.

## AS AND FOR AN EIGHTH DEFENSE

166. The damages, if any, sustained by Cauldwell Wingate were the result of Cauldwell Wingate's own culpable conduct

167. As a result, Cauldwell Wingate may not maintain the claims asserted in the Fourth-Party Complaint.

## AS AND FOR A NINTH DEFENSE

168. Article 8, Section 8.01 of the General Conditions of the Cauldwell Wingate Contract ("Changes") provides as follows:

A. Without invalidating the Contract, the Owner may order Extra Work or make changes by altering, adding to, or deducting from the Work, the contract consideration being adjusted accordingly. No claims for Extra Work shall be allowed unless such Extra Work is ordered in writing by the Owner. No changes in the Work shall be made unless such Work is ordered in writing by the Owner or Owners Representative. If the time for completion is affected by this change the revised time for completion shall be included in the change order. The Owner may order the Contractor to perform the Extra Work and proceed under the Dispute Article.

\*     \*     \*

D. Regardless of the method used by the Owner in determining the value of a change order, the Contractor shall, within the time-frame given by the Owner, submit to the Owner or

Owner's Representative a detailed breakdown of the Contractor's estimate of the value of the omitted or Extra Work.

E.  Unless otherwise specifically provided for in a change order, the compensation specified therein for Extra Work includes full payment for the Extra Work covered thereby, and Contractor waives all rights to any other compensation for said Extra Work, damage or expense.

F.  The Contractor shall furnish satisfactory bills, payrolls and vouchers covering all items of cost and when requested by the Owner shall give the Owner access to all accounts and records relating thereto, including records of subcontractors and material suppliers.

169.    Section 8.01 is referred to and incorporated herein with the same force and effect as though fully set forth at length.

170.    Upon information and belief, Cauldwell Wingate has failed to comply with some or all of the requirements imposed under Section 8.01 of the General Conditions.

171.    Therefore, Cauldwell Wingate cannot maintain any claim based upon any allegation that there were changes to the work required under the Cauldwell Wingate Contract.

## AS AND FOR A TENTH DEFENSE

172.    Article 9, Section 9.01(F) of the General Conditions of the Cauldwell Wingate Contract ("Time of Completion") provides that, within ten (10) days "from the beginning" of any delay in the completion of the Contract, the contractor shall "notify the Owner, in writing, of the causes of the delay."

173.    Section 9.01(F) is referred to and incorporated herein with the same force and effect as though fully set forth at length.

174.    Upon information and belief, to the extent Cauldwell Wingate is asserting any claims for delay, it has waived some or all of its delay claims by failing to comply with the requirements of Section 9.01(F) of the General Conditions.

175.    Therefore, Cauldwell Wingate may not maintain any claim based upon any allegation that DASNY caused any delays to the work required under the Cauldwell Wingate Contract.

## AS AND FOR AN ELEVENTH DEFENSE

176.    Article 10, Section 10.03 of the General Conditions of the Cauldwell Wingate Contract ("Owner's Right to do Work") provides as follows:

> The Owner may, after notice to the Contractor, without terminating the Contract and without prejudice to any other right or remedy the Owner may have, perform or have performed by others all of the Work or any part thereof and may deduct the cost thereof from any moneys due or to become due the Contractor.

177.    At various times during the course of the Contract, DASNY notified Cauldwell Wingate of its concerns about Cauldwell Wingate's defective work and lack of progress on the project.

178.    DASNY further notified Cauldwell Wingate that it would invoke the Owner's Right to do Work unless such problems were remedied within the timeframes specified in the notices.

179.    Cauldwell Wingate was provided with ample opportunity to remedy the problems with the quality and progress of its work.

180.    Cauldwell Wingate failed to remedy the problems.

181.    Accordingly, DASNY acted within its rights under Article 10, Section

10.03 in hiring alternate contractors to complete and/or correct Cauldwell Wingate's work and

back charging Cauldwell Wingate.

182.    Therefore, Cauldwell Wingate may not maintain a cause of action for

breach of contract or impact/delay.

## AS AND FOR A TWELFTH DEFENSE

183.    Article 11, Section 11.01(A) of the General Conditions of the Cauldwell

Wingate Contract ("Claims for Extra Work") provides that:

    A.    If the contractor claims that any Work which
the Contractor has been ordered to perform
will be Extra Work, or that any action or
omission of the Owner is contrary to the
terms and provisions of the Contract and
will require the Contractor to perform Extra
Work the Contractor shall:

    1.    Promptly comply with said order.

    2.    File with the Owner within fifteen
(15) working days after being
ordered to perform the Work claimed
by the Contractor to be Extra Work
or within fifteen (15) working days
commencing performance of the
Work whichever date shall be
earlier; or within fifteen (15)
working days after the said action or
omission on the part of the Owner
occurred, a written notice of the
basis of the Contractor's claim,
including estimated cost, and request
for a determination thereof.

    3.    Proceed diligently, pending and
subsequent to the determination of
the Owner with respect to any said
disputed    matter,    with    the
performance    of    the    Work    in

accordance with all instruction of the
Owner.

184.    Section 11.01(A) is referred to and incorporated herein with the same

force and effect as though fully set forth at length.

185.    Upon information and belief, Cauldwell Wingate has failed to comply

with some or all of the requirements imposed under Section 11.01(A) of the General Conditions.

186.    Therefore, Cauldwell Wingate may not maintain any claim that it

performed extra work under the Cauldwell Wingate Contract.

### AS AND FOR A THIRTEENTH DEFENSE

187.    Article 11, Section 11.01(B) of the General Conditions of the Cauldwell

Wingate Contract ("Claims for Extra Work") provides that:

> B.    No claim for Extra Work shall be allowed
> unless the same was done pursuant to a
> written order of the Owner. The
> Contractor's failure to comply with any or
> all parts of this Article shall be deemed to
> be:
>
> 1.    a conclusive and binding
> determination on the part of the
> contractor that said order, Work,
> action or omission does not involve
> Extra Work and is not contrary to the
> terms and provisions of the Contract,
>
> 2.    a waiver by the Contractor of all
> claims for additional compensation
> or damages as a result of said order,
> Work, action or omission.

188.    Section 11.01(B) is referred to and incorporated herein with the same

force and effect as though fully set forth at length.

189.    Upon information and belief, Cauldwell Wingate has failed to comply

with some or all of the requirements imposed under Section 11.01(B) of the General Conditions.

24

190.    Therefore, Cauldwell Wingate may not maintain any claim for charges for extra work.

## AS AND FOR A FOURTEENTH DEFENSE

191.    Article 11, Section 11.02 of the General Conditions of the Cauldwell Wingate Contract ("Claims for Delay") provides that:

> No claims for increased costs, charges, expenses or damages of any kind shall be made by the Contractor against the Owner for any delays or hindrances from any cause whatsoever; provided that the Owner, in the Owner's discretion, may compensate the Contractor for any said delays by extending the time for completion of the Work as specified in the Contract.

192.    Section 11.02 is referred to and incorporated herein with the same force and effect as though fully set forth at length.

193.    Therefore, Cauldwell Wingate may not maintain any claims for delay damages.

## AS AND FOR A FIFTEENTH DEFENSE

194.    Article 11, Section 11.03 of the General Conditions of the Cauldwell Wingate Contract ("Finality of Decisions") provides:

> A.    Any decision or determination of the Consultant, Owner or the Owner's Representative shall be final, binding and conclusive on the Contractor unless the Contractor shall, within ten (10) working days after said decision, make and deliver to the Owner a verified written statement of the Contractor's contention that said decision is contrary to a provision of the Contract. The Owner shall determine the validity of the contractor's contention. Pending the decision of the Owner, the Contractor shall proceed in accordance with the original decision.

B.  Whenever it is required in the Contract that
an application must be made to the Owner or
a determination made by the Owner, the
decision of the Owner on said application or
the determination of the Owner under the
contract shall be final, conclusive and
binding upon the Contractor unless the
Contractor, within ten (10) working days
after receiving notice of the Owner's
decision or determination, files a written
statement with the Owner that the
Contractor reserves the Contractor's rights
in connection with the matters covered by
said decision or determination.

195.  Section 11.03 is referred to and incorporated herein with the same force
and effect as though fully set forth at length.

196.  Numerous decisions in this case were made by the Owner or its
Representative and, upon information and belief, Cauldwell Wingate has failed to comply with
the provisions of Section 11.03 of the General Conditions.

197.  Therefore, Cauldwell Wingate may not maintain any of its claims.

### AS AND FOR A SIXTEENTH DEFENSE

198.  Article 13, Section 13.01 of the General Conditions of the Cauldwell
Wingate ("Cooperation with Other Contractors") provides in relevant part that:

A.  During the progress of the Work, other
contractors may be engaged in performing
work. The Contractor shall coordinate the
Contractor's Work with the work of said
other contractors in such a manner as the
Owner may direct.

*       *       *

C.  If the Contractor notifies the Owner, in
writing, that another contractor on the Site is
failing to coordinate the work of said
contractor with the Work, the Owner shall
investigate the charge. If the Owner finds it
to be true, the Owner shall promptly issue

such directions to the other contractor with respect thereto as the situation may require. The Owner shall not be liable for any damages suffered by the Contractor by reason of the other contractor's failure to promptly comply with the directions so issued by the Owner, or by reason of another contractor's default in performance.

D.    Should the Contractor sustain any damage through any act or omission of any other contractor having a contract with the Owner or through any act or omission of any Subcontractor of said other contractor, the Contractor shall have no claim against the Owner for said damage.

\*       \*       \*

F.    The Owner cannot guarantee the responsibility, efficiency, unimpeded operations or performance of any Contractor. The Contractor acknowledges these conditions and shall bear the risk of all delays including, but not limited to, delays caused by the presence or operations of other contractors and delays attendant upon any construction schedule approved by the Owner and the Owner shall not incur any liability by reason of any delay.

199.    Section 13.01 is referred to and incorporated herein with the same force and effect as though fully set forth at length.

200.    Other contractors were involved in various stages of the project. Upon information and belief, some or all of these other contractors caused the damages of which Cauldwell Wingate complains.

201.    Section 13.01 of the General Conditions bars Cauldwell Wingate from recovering against DASNY for damages caused in whole or in part by other contractors.

202.    Therefore, Cauldwell Wingate may not maintain any of its claims.

## AS AND FOR A SEVENTEENTH DEFENSE

203.    Article 13, Section 13.02 of the General Conditions of the Cauldwell

Wingate Contract ("Separate Contracts") provides in relevant part:

> A.    The Owner may award other contracts, work
> under which may proceed simultaneously
> with the execution of the Work. The
> Contractor shall coordinate the Contractor's
> operations with those of other contractors as
> directed by the Owner. Cooperation shall be
> required in the arrangements for access, the
> storage of material and in the detailed
> execution of the Work

> B.    The Contractor shall keep informed of the
> progress and workmanship of other
> contractors and any Subcontractors and shall
> notify the Owner in writing immediately of
> lack of progress or defective workmanship
> on the part of other contractors or
> subcontractors, where said delay or
> defective workmanship may interfere with
> the Contractor's operations.

> C.    Failure of a Contractor to keep so informed
> and failure to give notice of lack of progress
> or defective workmanship by others shall be
> construed as acceptance by the Contractor of
> said progress and workmanship as being
> satisfactory for proper coordination with the
> Work.

204.    Section 13.02 is referred to and incorporated herein with the same force

and effect as though fully set forth at length.

205.    Upon information and belief, Cauldwell Wingate has waived its claims in

whole or in part by failing to comply with the requirements of Section 13.02 of the General

Conditions.

206.    Therefore, Cauldwell Wingate may not maintain any of its claims.

### AS AND FOR AN EIGHTEENTH DEFENSE

207.    Article 20, Section 20.16 of the General Conditions of the Cauldwell

Wingate Contract ("Waiver of Certain Causes of Action") provides as follows:

> No action or proceeding shall lie or shall be
> maintained by the Contractor, nor anyone claiming
> under or through the Contractor, against the Owner
> upon any claim arising out of or based upon the
> Contract, relating to the giving of notices or
> information.

208.    Upon information and belief, Cauldwell Wingate's claims in this action

relate, in whole or in part, to the giving of notices or information.

209.    Therefore, Cauldwell Wingate may not maintain any of its claims.

### AS AND FOR A NINETEENTH DEFENSE

210.    On or about December 27, 2002, the defendant in the main action,

American Manufacturers Mutual Insurance Company ("American"), as surety, issued Labor and

Material Payment Bond No. 3SEO30676 (the "Labor and Material Payment Bond") naming

Cauldwell Wingate as principal and DASNY as obligee.

211.    To the extent that, in the Fourth-Party Complaint, Cauldwell Wingate

seeks indemnification against claims asserted in the Amended Complaint of William A. Gross

Construction Associates, Inc. ("Gross"), the plaintiff in the main action, against the Labor and

Material Payment Bond issued by American as surety, the Fourth-Party Complaint is barred for

the reasons set forth in the affirmative defenses in American's Answer to the Amended

Complaint.

## AS AND FOR A FIRST COUNTERCLAIM

212.    DASNY is a public benefit corporation organized and existing under the Public Authorities Law of the State of New York, and maintains a place of business at 515 Broadway, Albany, New York.

213.    Upon information and belief, Cauldwell Wingate is a limited liability company organized under the laws of the State of Delaware, has its principal place of business at 380 Lexington Avenue, New York, New York, and provides general construction services.

214.    To the extent that it is deemed that this Court has jurisdiction over the claims asserted in the Fourth-Party Complaint, this Court has jurisdiction over DASNY's counterclaims in this fourth-party action pursuant to 28 U.S.C. § 1367, in that they are directly related to the claims in the main action and in the third-party action and therefore form part of the same case or controversy.

215.    On or about December 20, 2002, the parties entered into a written contract designated as "General Construction #2 – Fitout Work" (the "Cauldwell Wingate Contract") under which Cauldwell Wingate, as general contractor, would render services to DASNY in connection with the construction of the Bronx Criminal Court Complex in Bronx, New York.

216.    The Cauldwell Wingate Contract is referred to and incorporated herein with the same force and effect as though fully set forth at length herein.

217.    The Cauldwell Wingate Contract is legally binding upon both parties.

218.    The Cauldwell Wingate Contract required Cauldwell Wingate to "perform all Work of every kind or nature whatsoever required and all other things necessary to complete in a proper and workmanlike manner" the construction of the Bronx Criminal Court Complex in

strict accordance with the documents forming the Cauldwell Wingate Contract and with such changes ordered and approved by DASNY pursuant to the Cauldwell Wingate Contract.

219.   DASNY has complied with, and fully performed its obligations under, the Cauldwell Wingate Contract.

220.   Cauldwell Wingate failed to perform its obligations under, and thereby breached, the Cauldwell Wingate Contract by, *inter alia*, (i) failing to perform its work in accordance with the contract documents; (ii) performing defective work; (iii) failing to provide adequate manpower; (iv) failing to properly coordinate its work with the work of other contractors on the project; (v) delaying completion of its work and the work of other contractors on the project; and (vi) failing to comply with directives issued by the construction manager.

221.   As a result of Cauldwell Wingate's breach, DASNY has sustained damages in an amount to be determined at trial.

## AS AND FOR A SECOND COUNTERCLAIM

222.   DASNY repeats and realleges each and every allegation set forth in paragraphs "212" to "220" as if fully set forth at length herein.

223.   Article 9, Section 9.01 of the General Conditions of the Cauldwell Wingate Contract ("Time of Completion") states in relevant part as follows:

> D.   If the Contractor shall neglect, fail or refuse to complete the Work within the time specified, or any proper extension thereof granted by the Owner, the Contractor agrees to pay to the Owner for loss of beneficial use of the structure an amount specified in the Contract, not as a penalty, but as liquidated damages, for each and every calendar day that the Contractor is in default. Default shall include abandonment of the Work by the Contractor.

31

224.    As set forth in the Cauldwell Wingate Contract, Cauldwell Wingate is liable to DASNY for liquidated damages for each and every day that Cauldwell Wingate is in default after the date set forth therein for completion of the project.

225.    Cauldwell Wingate failed to complete its work by the completion date specified in the Cauldwell Wingate Contract.

226.    Accordingly, DASNY is entitled to recover from Cauldwell Wingate liquidated damages in an amount to be determined at trial.

### AS AND FOR A THIRD COUNTERCLAIM

227.    DASNY repeats and realleges each and every allegation set forth in paragraphs "212" to "220" as if fully set forth at length herein.

228.    Article 9, Section 9.01 of the General Conditions of the Cauldwell Wingate Contract ("Time of Completion") states, in relevant, part as follows:

> H.    The foregoing liquidated damages are intended to compensate the Owner only for the loss of beneficial use of the structure. In addition, the Contractor shall be liable to the Owner, to the fullest extent permitted by law, for whatever actual damages (other than actual loss of beneficial use) the Owner may incur as a result of any actions or inactions of the Contractor or its Subcontractors including, without limitation, interest expense and carrying costs, liabilities to other Contractors working on the project or other third parties, job extension costs, and other losses incurred by the Owner....

229.    As a consequence of Cauldwell Wingate's breaches of its obligations under the Cauldwell Wingate Contract, DASNY has incurred and/or will incur additional costs. These costs include, but are not limited to: (i) additional funds paid to other contractors as a result of delays caused by Cauldwell Wingate; (ii) additional funds paid to other contractors to

perform work that Cauldwell Wingate was required to perform but failed to perform pursuant to the Contract; (iii) additional construction management and general conditions fees paid to or owed to DASNY's construction manager; (iv) additional architectural and engineering fees paid to or owed to DASNY's architect/engineer; (iv) additional consultants' fees; (v) additional owner's fees; (vi) additional insurance fees; and (vi) other costs.

230.    Accordingly, DASNY is entitled to recover its actual damages from Cauldwell Wingate in an amount to be determined at trial.

## AS AND FOR A FOURTH COUNTERCLAIM

231.    DASNY repeats and realleges each and every allegation set forth in paragraphs "212" to "217" as if fully set forth at length herein.

232.    To the extent that DASNY is finally determined to be liable to any individual or entity for any act or omission of Cauldwell Wingate, DASNY shall be entitled to recover any such sum or sums from Cauldwell Wingate in amounts to be determined at trial.

## DEMAND FOR A JURY TRIAL

233.    DASNY demands a trial by jury as to all issues in the above matter.

## CONCLUSION

**WHEREFORE**, DASNY respectfully requests judgment in its favor:

(1)    dismissing the Fourth-Party Complaint, with prejudice, in its entirety;

(2)    awarding to DASNY all damages with respect to its counterclaims in amounts to be determined at trial;

(3)    awarding to DASNY its costs and disbursements; and

(4)    granting to DASNY such other and further relief as the Court may deem appropriate.

Dated:    New York, New York
          June 13, 2008

MICHAEL A. CARDOZO
Corporation Counsel of the
    City of New York
Attorney for the Dormitory Authority
    of the State of New York
100 Church Street, Room 3-241
New York, New York 10007
(212) 788-1185

By:

EDWIN M. LEVY (EL-7792)
Assistant Corporation Counsel

Carol A. Sigmond, Esq. CS 2735
Dunnington, Bartholow & Miller LLP
477 Madison Avenue – 12th Floor
New York, New York 10017
(212) 682-8811

UNITED STATES DISTRICT OF NEW YORK
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

WILLIAM A. GROSS CONSTRUCTION,                    CASE NO. 07CV10639
ASSOCIATES, INC.,

                              Plaintiff,

                                                  **Amended Complaint**

        -against-

AMERICAN MANUFACTURERS MUTUAL
INSURANCE COMPANY,

                              Defendant.

------------------------------------------------------------------

        Plaintiff William A. Gross Construction Associates, Inc., by its undersigned attorney,

complaining of the defendant, upon information and belief, alleges:

                                Jurisdiction

1.      Jurisdiction is pursuant to 28 U.S.C. section 1332 and is based upon diversity of the

        parties: Plaintiff is a corporation formed and existing under the laws of the State of New

        York, having its principal place of business in New York and Defendant is an insurance

        company formed and existing under the laws of the State of Illinois, having its principal

        place of business in Illinois (and in no other state) and there is more than $75,000 in

        issue.

                                  Venue

2.      Venue is pursuant to 28 U.S.C. section 1391 and is properly in this District by virtue of

                                     1

the claims in issue having arisen in the County of the Bronx, State of New York.

Parties

3.    William A. Gross Construction Associates, Inc. (hereinafter "WAGCA") is a corporation

organized and existing under the laws of the State of New York, being located at 117

South Fourth Street, New Hyde Park, NY 11040 and is engaged from time to time as a

site work contractor.

4.    Defendant American Manufacturers Mutual Insurance Company (hereinafter "American

Manufacturers") is a company formed and existing under the laws of the state of Illinois,

located at 1 Kemper Drive, Long Grove, Illinois and at all times relevant hereto was

authorized to operate as a surety in New York by the New York State Superintendent of

Insurance. Defendant American Manufacturers does not currently conduct any business

in New York and does not currently maintain an office for the issuance of insurance or

surety bonds in New York. Defendant American Manufacturers is currently in run off in

anticipation of a final shut down of its operations. See Exhibit B.

Other Entities

5.    Non party Cauldwell Wingate Company, LLC, (hereinafter "CWC") is a domestic limited

liability company having its principal place of business at 380 Lexington Avenue, New

York, NY.

6.    Non party New York State Dormitory Authority (hereinafter "DASNY") is a public

benefit corporation formed and existing under the laws of the State of New York.

Pursuant to a Memorandum of Understanding, DASNY acts as the developer of court

projects located in the City of New York for use by the Office of Court Administration as

2

courthouses.

## Background

7.    Upon information and belief, on or about December 20, 2002, CWC entered into a
contract with DASNY known as General Construction No.2 – Fitout Work at Bronx
Criminal Court Complex, DA NO. 92561, 138099999/CR58 in the approximate sum of
$46,995,000.00 (hereinafter "Prime Contract.")   Plaintiff begs leave to refer to the true
original Prime Contract for the precise terms thereof.

8.     Upon information and belief, under the Prime Contract, CWC agreed to furnish and
install all labor, material and equipment necessary to fit out the Bronx Criminal Court
Complex (hereinafter "Project.")

9.    On or about December 27, 2002, Defendant American Manufacturers issued a Labor and
Material Payment Bond No. 3SE030676 naming itself as Surety, DASNY as Owner and
CWC as Contractor for the benefit of any "claimant:" claimant being defined as one who
furnished labor, material or equipment for the Project as a subcontractor, sub-
subcontractor or supplier to CWC under Prime Contract.  A true and correct copy of said
bond is annexed hereto as Exhibit A and is incorporated hereat as if fully set forth.

10.    At all times relevant hereto, WAGCA is a "claimant" under said Labor and Material
Payment Bond.

11.    Less than one year has expired from the time that CWC stop work on the Project and the
commencement of this Action.

12.    On or about January 4, 2004, WAGCA entered into a subcontract with CWC for the site
work and landscaping for the Project under the Prime Contract.  Plaintiff respectfully

3

asks to refer to the true original for the exact terms and conditions, and incorporates said document here as if fully set forth.

13.   The January 4, 2004 contract provided that CWC would pay WAGCA the sum of $3,820,000 for the work, labor and material called for under the subcontract and said subcontract excluded material for 298 stainless steel bollards from WAGCA's obligations.

14.   Between January 4, 2004 and July 31, 2007, CWC ordered additional work and deleted work: with the net effect of the changes to the work being to increase the value of the contract between CWC and WAGCA to $6,704,037.44.

15.   Between approximately October 2005 and July 2007, WAGCA substantially performed its subcontract work, including substantially completing the punch list and change orders directed by CWC.

16.   Plaintiff WAGCA substantially performed its work notwithstanding: CWC ordering it to work out of sequence on waterproofing; CWC omitting to provide accurate and timely information respecting the actual elevations of the Project; CWC omitting to provide compete and accurate design information timely; CWC ordering changes to the work; CWC not providing access to the site timely; CWC not providing access to work areas timely or fully, among other obstructions, impediments and disruptions to the Project.

17.   Specifically, WAGCA substantially completed; a) $4,111,558 of base contract work, leaving $3442 not done by reason of the failure of CWC to provide a design for the work in issue; b) $974,521.44 in changed and additional work; and c) $1,644,958 in disputed work generally consisting of labor and material escalation, disrupted sequence of work,

4

and extended supervision and administrative costs.

18.   To date, CWC has paid WAGCA the sum of $4,084,559.35 against the sum due of

$6,704,037.44 leaving a balance due of $2,619,478.09.

19.   The sum due of $2,619,478.09 includes contract balance and $205,577.90 in retainage on

completed work.

20.   The sum due of $2,619,478.09 excludes the Change Orders (hereinafter "CO"), Pending

Change Orders (hereafter "PCO") Invoices, and Extra work orders processed and paid in

full by CWC prior to July 31, 2007, but includes the 32 open change orders, pending

change orders and extra work orders as set forth in paragraph 20 below.

21.   

| Co No. | Description | Amount |
|--------|-------------|--------|
| 3/PCO 349 | Drain Cover/Protection/Planter Drains | $  2,333.30 |
| 4/PCO 2428 | Plaza/Pavers/Light Weigh Fill | 196,544.29 |
| 10/PCO 431 | Increase for Non Slip Tread Nosing | 1,997.42 |
| 13 | Rigid Insulation/Stone Garden/JA Roof | 4,347.54 |
| 15/PCO 441 | Additional Work at Rock Garden | 17,026.28 |
| 20 | Supply/install ground cover at bike rack | 4,121.76 |
| 22 | Cutting Precast Pavers at electric lights | 16,034.05 |
| 23/PCO 355 & 240 | Changes to Stainless Steel Bollards | 204,556.45 |
| 24 | 4000 PSI concrete in lieu of 3200 PSI | 13,472.48 |
| 26 | Cast-in-Place add. Trench 12" wide | 32,257.00 |
| 27 | Add. wk per SK A 250 & 251 | 2,571.55 |
| 29 | Change Steel Face Curb/BPP | 5,537.80 |

5

| 31 | F&I Light Weight Fill at Breezeway | 17,855.00 |
| 32 | Open Trench Drain at Rain Pole | 2,094.00 |
| 36 | Remove & relocated Pre cast Panels per CWC | 906.11 |
| 37/PCO 1677 | Excavate Subgrade at sidewalk area | 77,485.39 |
| 38 | Early High Strength concrete | 496.00 |
| 40/Inv.108 | Add. labor for street restoration on E. 161/Morris | 2,425.58 |
| 41 | 2 Add. Lamp Foundations | 7,690.08 |
| 42 | Extra Wk TCO Walk through | 13,850.00 |
| 43 | Level & Shim Lift Slab | 19,866.31 |
| Inv. 104 | Asphalt on Sherman Ave. | 946.73 |
| Inv. 105 | Clean Up Driveway Area | 517.44 |
| Inv. 106 | Remove & replace broken stone @ bosque | 5,683.62 |
| Inv. 109 | Adjust Catch Basin & manholes @ various times | 1,855.58 |
| Inv. 110 | Obst. Temp. Fence on East 162/East 162 & Morris | 4,887.80 |
| Inv. 111 | Add. labor & equip. concrete rd. base on East 162 | 1,515.59 |
| Inv. 112 | Remove steps S. Side Bosque due to revised el'v. | 1,132.94 |
| CWC PCO 911R | Northside Redesign | 411,000.00 |
| CWC PCO 912 | Remove Contaminated Soil ($152,478.28) | 52,478.28 |
| CWC PCO 3296 | Trash Compactor Trenching | 6,513.96 |
| Flag Pole Credit | | (702.90) |

22.    The sum due of $2,619,478.09 includes $1,644,958 consisting of: escalated project

services -- $29,301; extended use of equipment -- $31,161; extended supervision --

6

$170,966; extended project administration -- $237,071; labor escalation -- $15,054; material escalation -- $179,301; additional work caused by waterproofing being installed by others out sequence -- $40,000; extended insurance -- $12,285; additional trucking -- $233,398; additional cost for top soil installation -- $59,555; and loss of productivity for concrete -- $362,706 all of which resulted from directives, instructions, actions and omissions to act on the part of CWC vis a vis Plaintiff WAGCA.

23.    In the documents provided by Plaintiff to Defendant American Manufacturers were copies of change orders, extra work tickets, directives and pending change orders signed by authorized representatives of CWC ordered Plaintiff to perform extra work or confirming that Plaintiff had performed extra work. Specifically, CWC issued allowance and written authorization for WAGCA CO 4 in the sum of $196,544.29; WAGCA CO 15 in the sum of $17,026.28; WAGCA CO 26 in the sum of $33,893.82; WAGCA CO 31 in the sum of $17,855.65; and WAGCA CO 37 in the sum of $77,485.39 for a total due of $342,805.43.

24.    Furthermore, CWC has signed Extra Work orders or other documents admitting liability for: WAGCA CO 22 in the sum of $16,034.05; WAGCA CO 24 in the sum of $13,472.48; WAGCA CO 29 in the sum of $5,537.80; WAGCA CO 32 in the sum of $2,093.55; WAGCA CO 36 in the sum of $906.11; WAGCA CO 41 in the sum of $7,690.08; WAGCA CO 42 in the sum of $13,954.98; WAGCA CO 43 in the sum of $19,866.31; WAGCA Invoice No. 109 in the sum of $1,855.58; WAGCA Invoice No. 111 in the sum of $1,515.59; and CWC No. 919 in the sum of $6,513.96 for a total of $89,440.49

7

25. Furthermore, CWC signed its "Subs Change Order 009" and "Subs Change Order 012" in favor of WAGCA in the sums of $132,479 and $20,000 respectively.

26. Furthermore, DASNY's representative Bovis Lend Lease signed directives for work also signed by CWC and transmitted to WAGCA by CWC for: WAGCA CO 34 in the sum of $1,130.42; WAGCA CO 38 in the sum of $433.13; WAGCA CO 41 in the sum of $7,690.08; WAGCA CO 42 in the sum of $13,954.98; and WAGCA CO 43 in the sum of $19,866.31.

27. To date and after demand, CWC has not paid any part of the $2,619,478.09 currently due and owing to Plaintiff WAGCA.

28. To date, there have been no complaints of material deficiency or defect in any of the work, labor or materials provided by Plaintiff.

29. At all times relevant hereto, Plaintiff has equitably credited CWC and therefore Defendant American Manufacturers with costs of deleted or incomplete work.

30. On or about August 6, 2007, that being less than 30 days after Plaintiff last performed work at the Project and more than 90 days had passed without payment in full to WAGCA by CWC, and while CWC was still performing work at the Project, Plaintiff provided timely notice of its claim under the Payment Bond and copies of its agreement with CWC and its last requisition numbered 26, to Defendant American Manufactures together with CWC and the Project's owner, DASNY.

31. On or about August 8, 2007 and September 12, 2007 respectively, Defendant American Manufactures and DASNY acknowledged notice of WAGCA claims under the Defendant's Payment Bond.

8

32.    By letters dated August 28 and September 5, 2007, Plaintiff provided Defendant
       American Manufacturers with the documents the latter requested respecting Plaintiff's
       claim for the purpose of allowing Defendant to conduct an investigation of Plaintiff's
       claim.

33.    To date, Defendant American Manufacturers has not responded to Plaintiff rejecting
       Plaintiff's claim or paid Plaintiff all or any part of the outstanding sum due under the
       Payment Bond of $2,619,478.09.

34.    To date, Defendant American Manufacturers has not provided any objection to the
       evidence of CWC direction for extra work provided by Plaintiff WAGCA.

### COUNT 1 PAYMENT BOND ACTION AGAINST DEFENDANT AMERICAN MANUFACTURERS

35.    In its Labor and Material Payment Bond bearing number 3SE030676, Defendant
       American Manufacturers agreed to pay suppliers and material men to the extent not paid
       by CWC, including, without limitation, Plaintiff WAGCA., who furnished labor and
       material to and where said labor material was incorporated into the Project if notice was
       given within 90 days of the supplying the last item of material to the site and 30 days had
       passed without payment being made by its principal.

36.    Plaintiff WAGCA has complied with all conditions precedent including, without
       limitation, notice and time requirements under the said Payment Bond.

37.    By reason of the foregoing, Defendant American Manufacturers is liable to Plaintiff
       WAGCA in the sum of together with attorney fees for this action as provided by the State
       Finance Law and interest at the legal rate dating from July 31, 2007.

9

Wherefore the premises considered, Plaintiff William A. Gross Construction Associates, Inc., demands judgment against Defendant American Manufacturers Mutual Insurance Company as follows:

a. As to Count 1, against Defendant damages for breach of the Payment Bond in the sum of $2,619,478.09 together with pre judgment interest dating from July 31, 2007, and attorney fees for this action.;

b. As to Count 1, against Defendant attorney fees pursuant to State Finance Law section 137; and

c. As to all Counts against Defendant, costs, disbursements and interest, together with such other, further or different relief as the Court may deem just.

Dated: New York, NY
      December 10, 2007

                                   _/s/ Carol A. Sigmond_____
                                   Carol A. Sigmond (CS 2735)
                                   Dunnington, Bartholow & Miller LLP
                                   Attorney for Plaintiff
                                   477 Madison Avenue Ɓ 12th Floor
                                   New York, NY  10022
                                   (212) 682-8811

10

# EXHIBIT A

# LABOR AND MATERIAL
## <u>PAYMENT BOND</u>



**DORMITORY AUTHORITY – STATE OF NEW YORK**

## LABOR AND MATERIAL PAYMENT BOND

Bond No. 3SE030676

KNOW ALL MEN BY THESE PRESENTS:

That    CAULDWELL WINGATE COMPANY, LLC

380 Lexington Avenue, 53rd Floor, New York, New York 10168

as Principal, hereinafter called CONTRACTOR, and

AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY

(Here insert the legal title of Surety)

Three Connell Drive, Berkeley Heights, New Jersey  07922-0608

(Address)

as Surety, hereinafter called Surety, are held and firmly bound unto the Dormitory Authority - State of New York, 515 Broadway, Albany, New York 12207, as Obligee, hereinafter called OWNER, in the amount of Forty-Six Million Nine Hundred Ninety-Five Thousand  and 00/100 Dollars ($46,995,000.00),

WHEREAS, CONTRACTOR has by written agreement dated December 20, 2002 entered into a Contract with OWNER for the General Construction #2 - Fitout Work at Bronx Criminal Court Complex, DA # 92561, 1380909999/CR58 in accordance with the Contract Documents and any changes thereto, which are made a part hereof, and are hereinafter referred to as the Contract.

NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION is such that if the CONTRACTOR shall promptly make payment to all claimants as hereinafter defined, for all labor and material used or reasonably required for use in the performance of the Contract, then this obligation shall be void; otherwise such obligation shall remain in full force and effect, subject, however, to the following conditions:

1.      A claimant is defined as one having a direct Contract with the CONTRACTOR or with a Subcontractor of the CONTRACTOR for labor, material, or both, used or reasonably required for use in the performance of the Contract, labor and material being construed to include that part of water, gas, power, light, heat, oil, gasoline, telephone service or rental of equipment directly applicable to the Contract.

2.      The above named CONTRACTOR and Surety hereby jointly and severally agree with the OWNER that every claimant as herein defined, who has not been paid in full before the expiration of a period of ninety (90) days after the date on which the last of such claimant's work or labor was done or performed, or materials were furnished by such claimant, may sue on this bond for the use of such claimant, prosecute the suit to final judgment for such sum or sums as may be justly due claimant, and have execution thereon.  The OWNER shall not be liable for the payment of any costs or expenses of any such suit.

1

3.     No suit or action shall be commenced hereunder by any claimant:

a.     Unless claimant, other than one having a direct contract with the CONTRACTOR, shall have given written notice to any two (2) of the following: 1) the CONTRACTOR, 2) the OWNER, or 3) the Surety above named, within ninety (90) days after such claimant did or performed the last of the work or labor, or furnished the last of the materials for which said claim is made, stating with substantial accuracy the amount claimed and the name of the party to whom the materials were furnished, or for whom the work or labor was done or performed. Such notice shall be served by mailing the same by registered mail or certified mail, postage prepaid, in an envelope addressed to the CONTRACTOR, OWNER, or Surety, at any place where an office is regularly maintained by said CONTRACTOR, OWNER, or Surety for the transaction of business, or served in any manner in which legal process may be served in the State in which the aforesaid project is located, save that such service need not be made by a public officer.

b.     After the expiration of one (1) year following the date on which CONTRACTOR ceased work of said Contract, however, if any limitation embodied in this bond is prohibited by any law controlling the construction hereof such limitation shall be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law.

c.     Other than in a State court of competent jurisdiction in and for the county or other political subdivision of the State in which the project, or any part thereof, is situated, or in the United States District Court for the district in which the project, or any part thereof, is situated, and not elsewhere.

4.     The penal sum of this Bond is in addition to any other Bond furnished by the CONTRACTOR and in no way shall be impaired or affected by any other Bond.

2

5.      The amount of this Bond shall be reduced by and to the extent of any payment or payments made in good faith hereunder, inclusive of the payment by Surety of Mechanics" Liens which may be filed of record against said improvement, whether or not claim for the amount of such lien be presented under and against this Bond.

Signed this _____27th_____ day of _____December_____ 2002.

IN THE PRESENCE OF:

CAULDWELL WINGATE COMPANY, LLC
(Contractor)

_____
(Signature)

Susan L. Hayes, President
(Title)

380 Lexington Avenue
(Address)

New York, New York  10168
(City, State, Zip)

(212) 983-7150
(Telephone Number)

(212) 983-7275
(Facsimile Number)

AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY
(Surety)

_____
(Signature)

THERESA J. FOLEY, ATTORNEY-IN-FACT
(Title)

Three Connell Drive
(Address)

Berkeley Heights, New Jersey  07922
(City, State, Zip)

(908) 286-5390
(Telephone Number)

(908) 286-5680
(Facsimile Number)

ACKNOWLEDGEMENT OF CONTRACTOR, IF A PARTNERSHIP, LIMITED LIABILITY
COMPANY OR INDIVIDUAL

STATE OF NEW YORK )
) ss:
COUNTY OF NY )

On the 30th day of December in the year 2002, before me, the undersigned, a Notary Public in and for said State, personally appeared Susan C. Hayes of CAULDWELL WINGATE COMPANY, LLC, personally known or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public

PATRICK J. HARDY
Notary Public, State of New York
No. 31-5052980
Qualified in New York County
Commission Expires Dec. 11, 2005

ACKNOWLEDGEMENT OF SURETY

STATE OF NEW YORK )
) ss:
COUNTY OF Nassau )

On the 27th day of December in the year 2002 before me personally came THERESA J. FOLEY to me known, who, being by me duly sworn, did depose and say that (s)he resides at Levittown, NY
_____, that (s)he is the Attorney-In-Fact of AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY, the corporation described in and which executed the above instrument; and that (s)he signed her/his name thereto by order of the Board of Directors of said corporation.

_____
Notary Public

GLORIA LOYD
Notary Public, State Of New York
No. 01LO6057748
Qualified in Queens County
Commission Expires April 23, 20 03

4

# POWER OF ATTORNEY

**Know All Men By These Presents:**

That the Lumbermens Mutual Casualty Company, the American Motorists Insurance Company, and the American Manufacturers Mutual Insurance Company, corporations organized and existing under the laws of the State of Illinois, having their principal office in Long Grove, Illinois (hereinafter collectively referred to as the "Company") do hereby appoint
Fred Nicholson , Theresa J. Foley , Fern Perry , George O. Brewster , Gloria Loyd and Nancy Schnee
of JERICHO , NY (EACH)

* * * * * * * * * * * *

their true and lawful agent(s) and Attorney(s)-in-Fact, to make, execute, seal, and deliver from the date of issuance of this power for and on its behalf as surety, and as their act and deed;

Any and all bonds and undertakings

EXCEPTION: NO AUTHORITY is granted to make, execute, seal and deliver any bond or undertaking which guarantees the payment or collection of any promissory note, check, draft or letter of credit.

This authority does not permit the same obligation to be split into two or more bonds in order to bring each such bond within the dollar limit of authority as set forth herein.

This appointment may be revoked at any time by the Company.

The execution of such bonds and undertakings in pursuance of these presents shall be as binding upon the said Company as fully and amply to all intents and purposes, as if the same had been duly executed and acknowledged by their regularly elected officers at their principal office in Long Grove, Illinois.

This Power of Attorney is executed by authority of resolutions adopted by the Executive Committees of the Boards of Directors of the Company on February 23, 1988 at Chicago, Illinois, true and accurate copies of which are hereinafter set forth and are hereby certified to by the undersigned Secretary as being in full force and effect:

"VOTED, That the Chairman of the Board, the President, or any Vice President, or their appointees designated in writing and filed with the Secretary, or the Secretary shall have the power and authority to appoint agents and attorneys-in-fact, and to authorize them to execute on behalf of the Company, and attach the seal of the Company thereto, bonds and undertakings, recognizances, contracts of indemnity and other writings, obligatory in the nature thereof, and any such officers of the Company may appoint agents for acceptance of process."

This Power of Attorney is signed, sealed and certified by facsimile under and by authority of the following resolution adopted by the Executive Committee of the Boards of Directors of the Company at a meeting duly called and held on the 23rd day of February, 1988:

"VOTED, That the signature of the Chairman of the Board, the President, any Vice President, or their appointees designated in writing and filed with the Secretary, and the signature of the Secretary, the seal of the Company, and certifications by the Secretary, may be affixed by facsimile on any power of attorney or bond executed pursuant to resolution adopted by the Executive Committee of the Board of Directors on February 23, 1988 and any such power so executed, sealed and certified with respect to any bond or undertaking to which it is attached, shall continue to be valid and binding upon the Company."

In Testimony Whereof, the Company has caused this instrument to be signed and their corporate seals to be affixed by their authorized officers, this November 22, 2002.

Attested and Certified:

Lumbermens Mutual Casualty Company
American Motorists Insurance Company
American Manufacturers Mutual Insurance Company



John K. Conway, Corporate Secretary

Gary J. Tully, Senior Vice President

STATE OF ILLINOIS    SS

COUNTY OF LAKE    SS

I, Maria I. Omori, a Notary Public, do hereby certify that Gary J. Tully and John K. Conway personally known to me to be the same persons whose names are respectively as Senior Vice President and Corporate Secretary of the Lumbermens Mutual Casualty Company, the American Motorists Insurance Company, and the American Manufacturers Mutual Insurance Company, Corporations organized and existing under the laws of the State of Illinois, subscribed to the foregoing instrument, appeared before me this day in person and severally acknowledged that they being thereunto duly authorized signed, sealed with the corporate seals and delivered the said instrument as the free and voluntary act of said corporations and as their own free and voluntary acts for the uses and purposes therein set forth.

"OFFICIAL SEAL"
MARIA I. OMORI
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 9/17/2003

Maria I. Omori, Notary Public
My commission expires 9-17-03

CERTIFICATION

I, J. K. Conway, Corporate Secretary of the Lumbermens Mutual Casualty Company, the American Motorists Insurance Company, and the American Manufacturers Mutual Insurance Company, do hereby certify that the attached Power of Attorney dated November 22, 2002 on behalf of the person(s) as listed above is a true and correct copy and that the same has been in full force and effect since the date thereof and is in full force and effect on the date of this certificate; and I do further certify that the said Gary J. Tully, who executed the Power of Attorney as Senior Vice President, was on the date of execution of the attached Power of Attorney the duly elected Senior Vice President of the Lumbermens Mutual Casualty Company, the American Motorists Insurance Company, and the American Manufacturers Mutual Insurance Company.

IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed the corporate seal of the Lumbermens Mutual Casualty Company, the American Motorists Insurance Company, and the American Manufacturers Mutual Insurance Company on this ___27th___ day of ___December___, 20 _02_



John K. Conway, Corporate Secretary

This Power of Attorney limits the acts of those named therein to the bonds and undertakings specifically named therein and they have no authority to bind the Company except in the manner and to the extent herein stated.

Home Office: Long Grove, IL 60049

FK 09 75 (Ed. 09 01)                    Page 2 of 2                    Printed in U.S.A.

AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY
FINANCIAL STATEMENT
DECEMBER 31, 2001

Assets

| | |
|---|---:|
| Cash in banks | $ 21,687,239 |
| Bonds owned | 496,844,017 |
| Stocks | 3,045,074 |
| Premiums in course of collection | 140,743,624 |
| Accrued interest and other assets | 74,951,749 |
| Total | $737,271,703 |

Liabilities

| | |
|---|---:|
| Reserve for losses and adjusting expenses | $329,394,911 |
| Reserve for unearned premiums | 100,522,301 |
| Reserve for taxes, expenses and other liabilities | 69,370,582 |
| Total | $499,287,794 |
| Surplus as regards policyholders | 237,983,909 |
| Total | $737,271,703 |

By _____     Attest _____
Vice President of Accounting Services                    Secretary

State of Illinois)
                 ) SS
County of Lake)


R. A. Daniel and J. K. Conway, being duly sworn, say that they are Vice President of Accounting Services and Secretary, respectively, of AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY, Illinois; that the foregoing is a true and correct statement of the financial condition of said company, as of December 31, 2001.

Subscribed and sworn to before me

On this 28th day of February, 2002


_____
Notary Public

"OFFICIAL SEAL"
ANGELA HANSEN
Notary Public, State of Illinois
My Commission Expires 2/18/04

# PERFORMANCE BOND



**DORMITORY AUTHORITY – STATE OF NEW YORK**

Bond No. 3SE030676

# PERFORMANCE BOND

KNOW ALL MEN BY THESE PRESENTS:

That    CAULDWELL WINGATE COMPANY, LLC

380 Lexington Avenue, 53rd Floor, New York, New York 10168

as Principal, hereinafter called CONTRACTOR, and

AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY

(Here insert the legal title of Surety)

Three Connell Drive, Berkeley Heights, New Jersey  07922

(Address)

as Surety, hereinafter called Surety, are held and firmly bound unto the Dormitory Authority - State of New York, 515 Broadway, Albany, New York 12207, as Obligee, hereinafter called OWNER, in the amount of Forty-Six Million Nine Hundred Ninety-Five Thousand    and 00/100 Dollars ($46,995,000.00) for the payment whereof CONTRACTOR and Surety bind themselves, their heirs, executors, administrators, successors and assigns, jointly and severally, firmly by these presents.

WHEREAS, CONTRACTOR has by written agreement dated December 20, 2002 entered into a Contract with OWNER for the General Construction #2 - Fitout Work at Bronx Criminal Court Complex, DA # 92561, 1380909999/CR58 in accordance with the Contract Documents and any changes thereto, which are made a part hereof, and are hereinafter referred to as the Contract.

1.    If the CONTRACTOR performs the Contract, the Surety and the CONTRACTOR shall have no obligation under this Bond, except to participate in conferences as provided in Subparagraph 2.1.

1

2.    If there is no OWNER default, the Surety's obligation under this Bond shall arise after:

    2.1    The OWNER has notified the CONTRACTOR, the Surety at its address described in Paragraph 8. below that the OWNER is considering declaring a CONTRACTOR in default.

    2.2    The OWNER has declared a CONTRACTOR in default and formally terminated the CONTRACTOR's right to complete the Contract.

    2.3    The OWNER has agreed to pay the Balance of the Contract Price to the Surety in accordance with the terms of the Contract or to a CONTRACTOR selected to perform the Contract in accordance with the terms of the Contract with the OWNER.

3.    When the OWNER has satisfied the conditions of Paragraph 2., the Surety shall, at the OWNER's option, promptly and at the Surety's expense take on the following actions:

    3.1    Arrange for the CONTRACTOR, with consent of the OWNER, to perform and complete the Contract; or

    3.2    Undertake to perform and complete the Contract itself, through its agents or through independent contractors; or

    3.3    Obtain bids or negotiated proposals from qualified contractors acceptable to the OWNER for a contract for performance and completion of the Contract, arrange for a contract to be prepared for execution by the OWNER and the CONTRACTOR selected with the OWNER's concurrence, to be secured with performance and payment bonds executed by a qualified Surety equivalent to the bonds issued on the Contract, and pay to the OWNER the amount of damages as described in Paragraph 5. in excess of the Balance of the Contract Price incurred by the OWNER resulting from the CONTRACTOR default.

4.    If the Surety does not proceed with reasonable promptness, the Surety shall be deemed to be in default on this Bond, and the OWNER shall be entitled to enforce any remedy available to the OWNER.

5.    After the OWNER has terminated the CONTRACTOR's right to complete the Contract, and if the Surety elects to act under Subparagraph 3.1, 3.2, or 3.3 above, then the responsibilities of the Surety to the OWNER shall not be greater than those of the CONTRACTOR under the Contract, and the responsibilities of the OWNER to the Surety shall not be greater than those of the OWNER under the Contract. To the limit of the amount of this Bond, but subject to commitment by the OWNER of the Balance of the Contract Price to mitigation of costs and damages on the Contract, the Surety is obligated without duplication for:

5.1 The responsibilities of the CONTRACTOR for correction of defective work and completion of the Contract;

5.2 Additional legal, design, professional, and delay costs resulting from the CONTRACTOR's Default, and resulting from the actions or failure to act of the Surety under Paragraph 3.; and

5.3 Liquidated Damages, or if no liquidated damages are specified in the Contract, actual damages caused by delayed performance or non-performance of the CONTRACTOR.

6. The Surety shall not be liable to the OWNER or others for obligations of the CONTRACTOR that are unrelated to the Contract, and the Balance of the Contract Price shall not be reduced or set off on account of any such unrelated obligations. No right of action shall accrue on this Bond to any person or entity other than the OWNER or its heirs, executors, administrators or successors.

7. The Surety hereby waives notice of any change, including changes of time, to the Contract or to related subcontracts, purchase orders, and other obligations.

8. Notice of the Surety and the CONTRACTOR shall be mailed or delivered to the address shown on the signature page. Notice to the OWNER shall be mailed or delivered to the address shown in the preamble.

9. Definitions:

9.1 Balance of the Contract Price: The total amount payable by the OWNER to the CONTRACTOR under the Contract after all proper adjustments have been made, including allowance to the CONTRACTOR of any amounts received or to be received by the OWNER in settlement of insurance or other claims for damages to which the CONTRACTOR is entitled, reduced by all valid and proper payments made to or on behalf of the CONTRACTOR under the Contract.

9.2 Contract: The agreement between the OWNER and the CONTRACTOR identified on the signature page, including all Contract Documents and changes thereto.

9.3 CONTRACTOR Default: Failure of the CONTRACTOR, which has neither been remedied nor waived, to perform or otherwise to comply with the terms of the Contract.

9.4 OWNER Default: Failure of the OWNER, which has neither been remedied nor waived, to pay the CONTRACTOR as required by the Contract or to perform and complete or comply with the other terms thereof.

3

The penal sum of this Bond is in addition to any other Bond furnished by the CONTRACTOR and in no way shall be impaired or affected by any other Bond.

Any suit under this Bond must be instituted before the expiration of two (2) years from the date on which Final Payment is made under this Contract.

Signed as of this _____27th_ day of _December_____ 2002.


IN THE PRESENCE OF:


CAULDWELL WINGATE
COMPANY, LLC
(Contractor)

_____
(Signature)

Susan L. Hayes, President
(Title)

380 Lexington Avenue
(Address)

New York, New York 10168
(City, State, Zip)

(212) 983-7150
(Telephone Number)

(212) 983-7275
(Facsimile Number)

AMERICAN MANUFACTURERS
MUTUAL INSURANCE COMPANY
(Surety)

_____
(Signature)

THERESA J. FOLEY, ATTORNEY-IN-FACT
(Title)

Three Connell Drive
(Address)

Berkeley Heights, New Jersey 07922
(City, State, Zip)

(908) 286-5390
(Telephone Number)

(908) 286-5680
(Facsimile Number)

4

ACKNOWLEDGEMENT OF CONTRACTOR, IF A PARTNERSHIP, LIMITED LIABILITY
COMPANY OR INDIVIDUAL

STATE OF NEW YORK )
                                        ) ss:
COUNTY OF __NY__ )

On the __30th__ day of __December__ in the year 2002, before me, the undersigned, a Notary
Public in and for said State, personally appeared __Susan L. Hayes__ of CAULDWELL WINGATE
COMPANY, LLC, personally known or proved to me on the basis of satisfactory evidence to be the individual(s)
whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the
same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the
person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public

PATRICK J. HARDY
Notary Public, State of New York
No. 31-5052980
Qualified in New York County
Commission Expires Dec. 11, 2005

ACKNOWLEDGEMENT OF SURETY

STATE OF NEW YORK )
                                        ) ss:
COUNTY OF ____Nassau____ )

On the __27th__ day of __December__ in the year 2002 before me personally came THERESA J. FOLEY
_____ to me known, who, being by me duly sworn, did depose and say that (s)he
resides at __Levittown, NY__
_____, that (s)he is the __Attorney-In-Fact__ of AMERICAN
MANUFACTURERS MUTUAL INSURANCE COMPANY, the corporation described in and which
executed the above instrument; and that (s)he signed her/his name thereto by order of the Board of
Directors of said corporation.

_____
Notary Public

GLORIA LOYD
Notary Public, State Of New York
No. 01LO6057748
Qualified in Queens County
Commission Expires April 23, 2003

5

# POWER OF ATTORNEY

Know All Men By These Presents:

That the Lumbermens Mutual Casualty Company, the American Motorists Insurance Company, and the American Manufacturers Mutual Insurance Company, corporations organized and existing under the laws of the State of Illinois, having their principal office in Long Grove, Illinois (hereinafter collectively referred to as the "Company") do hereby appoint
Fred Nicholson , Theresa J. Folley , Fern Perry , George O. Brewster , Gloria Loyd and Nancy Schnee of JERICHO , NY (EACH)

* * * * * * * * * * * * *

their true and lawful agent(s) and Attorney(s)-in-Fact, to make, execute, seal, and deliver from the date of issuance of this power for and on its behalf as surety, and as their act and deed:

Any and all bonds and undertakings

EXCEPTION: NO AUTHORITY is granted to make, execute, seal and deliver any bond or undertaking which guarantees the payment or collection of any promissory note, check, draft or letter of credit.

This authority does not permit the same obligation to be split into two or more bonds in order to bring each such bond within the dollar limit of authority as set forth herein.

This appointment may be revoked at any time by the Company.

The execution of such bonds and undertakings in pursuance of these presents shall be as binding upon the said Company as fully and amply to all intents and purposes, as if the same had been duly executed and acknowledged by their regularly elected officers at their principal office in Long Grove, Illinois.

This Power of Attorney is executed by authority of resolutions adopted by the Executive Committees of the Boards of Directors of the Company on February 23, 1988 at Chicago, Illinois, true and accurate copies of which are hereinafter set forth and are hereby certified to by the undersigned Secretary as being in full force and effect:

"VOTED, That the Chairman of the Board, the President, or any Vice President, or their appointees designated in writing and filed with the Secretary, or the Secretary shall have the power and authority to appoint agents and attorneys-in-fact, and to authorize them to execute on behalf of the Company, and attach the seal of the Company thereto, bonds and undertakings, recognizances, contracts of indemnity and other writings, obligatory in the nature thereof, and any such officers of the Company may appoint agents for acceptance of process."

This Power of Attorney is signed, sealed and certified by facsimile under and by authority of the following resolution adopted by the Executive Committee of the Boards of Directors of the Company at a meeting duly called and held on the 23rd day of February, 1988:

"VOTED, That the signature of the Chairman of the Board, the President, any Vice President, or their appointees designated in writing and filed with the Secretary, and the signature of the Secretary, the seal of the Company, and certifications by the Secretary, may be affixed by facsimile on any power of attorney or bond executed pursuant to resolution adopted by the Executive Committee of the Board of Directors on February 23, 1988 and any such power so executed, sealed and certified with respect to any bond or undertaking to which it is attached, shall continue to be valid and binding upon the Company."

FK 09 75 (Ed. 09 01)                          Page 1 of 2                          Printed in U.S.A.

In Testimony Whereof, the Company has caused this instrument to be signed and their corporate seals to be affixed by their authorized officers, this November 22, 2002.

Attested and Certified:

Lumbermens Mutual Casualty Company
American Motorists Insurance Company
American Manufacturers Mutual Insurance Company

  

John K. Conway, Corporate Secretary

Gary J. Tully, Senior Vice President

STATE OF ILLINOIS    SS

COUNTY OF LAKE    SS

I, Maria I. Omori, a Notary Public, do hereby certify that Gary J. Tully and John K. Conway personally known to me to be the same persons whose names are respectively as Senior Vice President and Corporate Secretary of the Lumbermens Mutual Casualty Company, the American Motorists Insurance Company, and the American Manufacturers Mutual Insurance Company, Corporations organized and existing under the laws of the State of Illinois, subscribed to the foregoing instrument, appeared before me this day in person and severally acknowledged that they being thereunto duly authorized signed, sealed with the corporate seals and delivered the said instrument as the free and voluntary act of said corporations and as their own free and voluntary acts for the uses and purposes therein set forth.

"OFFICIAL SEAL"
MARIA I. OMORI
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 9/17/2003

Maria I. Omori, Notary Public
My commission expires 9-17-03

CERTIFICATION

I, J. K. Conway, Corporate Secretary of the Lumbermens Mutual Casualty Company, the American Motorists Insurance Company, and the American Manufacturers Mutual Insurance Company, do hereby certify that the attached Power of Attorney dated November 22, 2002 on behalf of the person(s) as listed above is a true and correct copy and that the same has been in full force and effect since the date thereof and is in full force and effect on the date of this certificate and I do further certify that the said Gary J. Tully, who executed the Power of Attorney as Senior Vice President, was on the date of execution of the attached Power of Attorney the duly elected Senior Vice President of the Lumbermens Mutual Casualty Company, the American Motorists Insurance Company, and the American Manufacturers Mutual Insurance Company.

IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed the corporate seal of the Lumbermens Mutual Casualty Company, the American Motorists Insurance Company, and the American Manufacturers Mutual Insurance Company on this ___27th___ day of ___December___, 20 _02_

  

John K. Conway, Corporate Secretary

This Power of Attorney limits the acts of those named therein to the bonds and undertakings specifically named therein and they have no authority to bind the Company except in the manner and to the extent herein stated.

Home Office: Long Grove, IL 60049

AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY
FINANCIAL STATEMENT
DECEMBER 31, 2001

### Assets

| | |
|---|---|
| Cash in banks | $ 21,687,239 |
| Bonds owned | 496,844,017 |
| Stocks | 3,045,074 |
| Premiums in course of collection | 140,743,624 |
| Accrued interest and other assets | 74,951,749 |
| Total | $737,271,703 |

### Liabilities

| | |
|---|---|
| Reserve for losses and adjusting expenses | $329,394,911 |
| Reserve for unearned premiums | 100,522,301 |
| Reserve for taxes, expenses and other liabilities | 69,370,582 |
| Total | $499,287,794 |
| Surplus as regards policyholders | 237,983,909 |
| Total | $737,271,703 |

By _____       Attest _____
     Vice President of Accounting  Services                          Secretary

State of Illinois)
                 } SS
County of Lake)

R. A. Daniel and J. K. Conway, being duly sworn, say that they are Vice President of Accounting Services and Secretary, respectively, of AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY, Illinois; that the foregoing is a true and correct statement of the financial condition of said company, as of December 31, 2001.

Subscribed and sworn to before me

On this 28th day of February, 2002

_____
Notary Public

◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆
     "OFFICIAL SEAL"
   ANGELA HANSEN
Notary Public, State of Illinois
My Commission Expires 2/18/04
◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆

# EXHIBIT B

home | contact us | Job Opportunities | Eagle Insurance





| Run-Off Contact Information | List of Companies | Policy Cancellations | File A Claim |

**File A Claim**

**File A Claim**

As an organization in run off, the Kemper Insurance Companies substantially ceased issuing new policies in the spring of 2003. Policyholder claims are being handled under the terms of the existing policies. Most of Kemper's claim handling has been outsourced to unaffiliated third-party administrators.

**Claims on policies issued by Specialty National Insurance Company or Specialty Surplus Insurance Company**

Specialty National and Specialty Surplus were part of Kemper's "Kempes" unit formerly based in Scottsdale, Arizona. If you have a claim on any policies underwritten by Specialty National or Specialty Surplus, please contact Network Adjusters at 1-877-533-1211.

**Claims on policies issued by Eagle Pacific Insurance Company or Pacific Eagle Insurance Company**

If you have a claim on any policies originally underwritten by Eagle Pacific Insurance Company or Pacific Eagle Insurance Company, please contact SeaBright Insurance Company at 1-800-372-2255.

**Workers' compensation, commercial auto and premises and products liability claims**

Most workers' compensation, commercial auto and premises and products liability claims (standard forms) are being handled by Broadspire Services, Inc. Questions about medical bill review and medical case management should also be addressed to Broadspire. Broadspire's staff includes many of the same people who had been part of Kemper's former claims handling operation which was sold to Broadspire's parent, Platinum Equity, in July 2003. If you have a workers' compensation, commercial auto or premises and products liability claim (other than on policies issued by the Specialty or Eagle operations noted above), please contact Broadspire at:

Phone: 1-800-763-6737
Fax: 1-800-245-9927
Email: nol@choosebroadspire.com
Website: www.choosebroadspire.com

To expedite the process, please complete your claim form (link to WC and auto forms) and fax or email it to Broadspire.

**Commercial property and specialty liability claims**

Please contact Kemper's customer relations unit for commercial property claims on Kemper policies (other than those issued by the Specialty or Eagle operations noted above), as well as specialty liability claims, including:
- Environmental
- Directors and officers

File A Claim

- Professional liability
- Excess casualty
- Construction defect
- Malpractice
- Intellectual property
- Other non-standard liability

Phone: 1-847-320-3237 or 1-800-833-0355
Fax: 1-847-320-2228
Email: corprel@kemperinsurance.com
Website: www.kemperinsurance.com

### Personal lines claims

Kemper sold its personal lines business to Unitrin, Inc in 2002. Whether your Kemper Auto and Home policy was issued by a Kemper company or Unitrin, please contact Unitrin representatives at:

Phone: 1-888-252-2799
Website: www.kemperautoandhome.com

---

© 2007 - Lumbermens Mutual Casualty Co | Terms and Conditions of Use | Privacy Policy | Internet Privacy Policy
KemperInsurance.com is best viewed  using Internet Explorer version 5.0 or higher or Netscape version 6.0 or higher.





▶  Policy Cancellations

▶  File A Claim

▶  List of Companies

▶  Run-off Contacts

▶  Media Contacts

▶  Financial Information

▶  Job Opportunities

## List of Companies

As of January 1, 2007, Kemper Insurance Companies in the U.S. included Lumbermens Mutual Casualty Company and its affiliated property and casualty insurers:

- American Manufacturers Mutual Insurance Company
- American Motorists Insurance Company
- Kemper Casualty Insurance Company
- Kemper Lloyds Insurance Company
- Specialty Surplus Insurance Company

© 2007 - Lumbermens Mutual Casualty Co | Terms and Conditions of Use | Privacy Policy | Internet Privacy Policy
Kemperinsurance.com is best viewed  using Internet Explorer version 5.0 or higher or Netscape version 6.0 or higher.

Electronic Filing
ECF 1:07-cv-10639

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------X
WILLIAM A. GROSS CONSTRUCTION                    07-CV-10639-LAK
ASSOCIATES, INC.,

                                    Plaintiff,

                     - against -                          **Answer**

AMERICAN MANUFACTURERS MUTUAL
INSURANCE COMPANY,

                                    Defendant.
-----------------------------------------------------------------------X

Defendant, **American Manufacturers Mutual Insurance Company,** answers the amended

complaint in this action as set forth below.  The amended complaint will hereinafter be

referred to simply as the "complaint"; the parties referred to therein, as "Gross",

"American", "Cauldwell", and "DASNY".

### Denials/Admissions

      **First**   American denies it has knowledge or information sufficient to form

a belief as to any of the allegations made in the paragraphs of the complaint numbered 1,

2, 3, 5, or 6; except American admits it is incorporated and headquartered in Illinois, and

American believes DASNY is a New York public-benefit corporation.

      **Second**   American admits the allegations made in the paragraphs of the

complaint numbered 4 and 31.

      **Third**  American denies it has knowledge or information sufficient to form

a belief as to any of the allegations made in the paragraphs of the complaint numbered 7

or 8; except American believes Cauldwell entered into a contract with DASNY for certain

work at the new Bronx Criminal Court Complex, the full text of that contract being the best

evidence of its contents.

**Fourth**   American denies the allegations of paragraphs 9 and 35 of the

complaint; except American admits American was Cauldwell's surety on the labor-and-

material bond referred to, but refers to the full text of that bond for its actual terms and

conditions.

**Fifth**   American denies it has knowledge or information sufficient to form a

belief as to any of the allegations made in the paragraphs of the complaint numbered 10

through 22 or 24 through 27; except that Cauldwell (the principal obligor on the bond for

which American was surety) has denied those allegations, has denied due and complete

performance by Gross, has denied Gross is entitled to payment as claimed, and has

specifically denied that all conditions precedent for any further payment to Gross have

occurred, in that, among other things - -

- DASNY has not approved Gross's work as satisfactory and complete but has in fact found Gross's work to be defective and incomplete;

- DASNY has not agreed to pay for any of the change-orders or extra-work items claimed by Gross;

- DASNY has made price reductions, for items not furnished by Gross but deleted from work Gross was previously obligated to furnish;

- DASNY has allowed no additional compensation for the delays and disruptions claimed by Gross.

**Sixth**   American denies it has knowledge or information sufficient to form

a belief as to the allegations of paragraphs 23, 30, or 32, but denies receiving a sworn proof

of claim requested from Gross, and otherwise admits receiving written notice of Gross's claim and copies of various documents purporting to be for change-orders, etc.

**Seventh**  American denies each and every allegation made in the paragraphs of the complaint numbered 28, 29, and 37.

**Eighth**        American denies the allegations of paragraphs 33 and 34 of the complaint, except admits American has made no payment to Gross, Gross's claims having been rejected by the principal obligor on the bond, namely, Cauldwell, who communicated its objections to Gross.

**Ninth**  American denies it has knowledge or information sufficient to form a belief as to the allegations of paragraph 36 of the complaint, and respectfully requests that Gross be put to its proof as to due and timely compliance with all the terms and conditions of the labor-and-material payment bond, including with respect to the following:

- That, notwithstanding the objections stated by Cauldwell, and the lack of requisite DASNY approvals (referred to in paragraph "Fifth" above), Gross nevertheless became entitled to payment from Cauldwell as claimed;

- That Cauldwell failed promptly to pay Gross in full all that was actually due, owing, and payable;

- That suit was commenced against American within the time-limits for suit under the bond; and

- That Gross's claim against American is truly for labor or materials within the meaning of the labor-and-material payment bond.

3

## First Affirmative Defense

**Tenth** According to Cauldwell, Gross agreed not to claim any additional compensation or price increases, for delays or otherwise, except to the extent such additional compensation or price increases were recognized by and paid for by DASNY, and DASNY has not approved or paid for any of the additional compensation or price increases claimed by Gross in this action.

## Second Affirmative Defense

**Eleventh** American reserves the right to assert all other defenses, and all recoupments and set-offs, that may be available to Cauldwell, the principal obligor on the payment bond, for which American was merely the surety.

## Counterclaim

**Twelfth** American reserves the right to seek an award of counsel fees at the close of this case, under New York State Finance Law §137, or other provisions of law that may be applicable, in the event the claims made by plaintiff Gross prove to be without substantial basis in law or fact, whether as to entitlement, amount, or because premature.

4

## Request for Judgment

Wherefore, American respectfully requests judgment dismissing the claims against it in this action and awarding American costs, disbursements, and counsel fees.

Dated:  New York, NY
         December 17, 2007

ZICHELLO & McINTYRE, LLP
Attorneys for Defendant, American Manufacturers
 Mutual Insurance Company

By: /s/             Vincent J. Zichello
           Vincent J. Zichello (VZ-3487)
           Office & P.O. Address
           420 Lexington Avenue
           New York, NY 10170
           Tel. 212-972-5560
           E-mail  zimc@msn.com

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X

WILLIAM A. GROSS CONSTRUCTION                    07-CV-10639-LAK
ASSOCIATES, INC.,

                              Plaintiff,

                    - against -

AMERICAN MANUFACTURERS MUTUAL
INSURANCE COMPANY,                               **Third-Party Complaint**

                              Defendant.
-----------------------------------------------------------------------X
AMERICAN MANUFACTURERS MUTUAL
INSURANCE COMPANY,

                    Third-Party Plaintiff,

                    - against -

CAULDWELL-WINGATE COMPANY, LLC,

                    Third-Party Defendant.
-----------------------------------------------------------------------X

For its third-party complaint, against the above-named third-party defendant, **American**

**Manufacturers Mutual Insurance Company** alleges the following.


**Jurisdiction over Third-Party Action**

        1.      This court has supplemental jurisdiction over this third-party action,

under 28 USC 1367.  The third-party claims are so related to the claims in the main action

as to form part of the same case or controversy.

2.      This court also has diversity jurisdiction over this third-party action, under 28 USC 1332. The amount in controversy exceeds the jurisdictional threshold, and there is diversity of "citizenship" between third-party plaintiff (Illinois) and the third-party defendant (non-Illinois), as is more fully set forth below.

### Parties to Third-Party Action

3.      Third-party plaintiff, American Motorists Insurance Company (hereinafter "American") is a corporation. American is incorporated under the laws of the state of Illinois and maintains its principal place of business in Illinois.

4.      Third-Party defendant, Cauldwell-Wingate Company, LLC ("Cauldwell"), is believed to be a limited-liability company organized under the laws of Delaware, with its principal place of business in New York, and with none of its constituent members citizens of the same state as third-party plaintiff.

### American's First Claim against Cauldwell

5.      The plaintiff in this action, William A. Gross Construction Associates, Inc. ("Gross"), has asserted claims for more than $2.6 million against defendant, American.

6.      Plaintiff Gross's claims are set forth in its complaint, now an amended complaint, which is incorporated herein, purely for the purposes of this third-party action, without conceding the truth or validity of any of the plaintiff's allegations or claims. Gross's amended complaint will be referred to herein simply as the "complaint".

7.     As appears more fully in the complaint, plaintiff Gross's claims against American are based on the fact that American was the surety for the third-party defendant, Cauldwell.

8.     More particularly, American was Cauldwell's surety on a certain Labor-and-Material Payment Bond (no. 3SE030676) dated on or about December 27, 2002, and given in connection with a contract between Cauldwell and the Dormitory Authority of the State of New York ("DASNY") pertaining to the new Bronx Criminal Court Complex.

9.     Because American was merely the surety on that bond, and Cauldwell was the principal obligor, American will be entitled to judgment-over against Cauldwell in the event any liability is imposed on American by reason of plaintiff Gross's claims against American in this action.

**American's Second Claim against Cauldwell**

10.     As an inducement for American to act as Cauldwell's surety, Cauldwell expressly agreed to indemnify American for all sums paid or required to be paid by American as Cauldwell's surety, said agreement being contained in a written indemnity agreement dated on or about December 27, 2002.

11.     Pursuant to that indemnity agreement American will be entitled to judgment-over against Cauldwell in the event any liability is imposed on American in this

3

action, which is brought against American as Cauldwell's surety.

## Request for Judgment

Wherefore, third-party plaintiff, American Manufacturers Mutual Insurance Company, respectfully requests judgment-over against third-party defendant, Cauldwell-Wingate Company, LLC, for any liability imposed on American in this action, plus costs and disbursements, and interest as allowed by law.

Dated:  New York, NY
         December 17, 2007

                          ZICHELLO & McINTYRE, LLP
                          Attorneys for Defendant and Third-Party
                           Plaintiff American Manufacturers Mutual
                           Insurance Company


                 By: _____
                          Vincent J. Zichello (VZ-3487)
                          Office & P.O. Address
                          420 Lexington Avenue, Suite 2800
                          New York, NY 10170
                          Tel. 212-972-5560
                          E-mail  zimc@msn.com

4

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x

WILLIAM A. GROSS CONSTRUCTION          :
ASSOCIATES, INC.,                                       :        07-CV-10639-LAK
                                                                     :
                                    Plaintiff,              :
                                                                     :
            -against-                                      :
                                                                     :
AMERICAN MANUFACTURERS MUTUAL         :
INSURANCE COMPANY,                            :
                                                                     :
                                    Defendant.           :
------------------------------------------------------------x
AMERICAN MANUFACTURERS MUTUAL         :
INSURANCE COMPANY,                            :
                                                                     :
                        Third-Party Plaintiff,      :        **THIRD-PARTY ANSWER**
                                                                     :
            -against-                                      :
                                                                     :
CAULDWELL-WINGATE COMPANY, LLC,    :
                                                                     :
                        Third-Party Defendant.   :
                                                                     :
------------------------------------------------------------x

Third-Party Defendant Cauldwell Wingate Company, LLC, sued herein as

Cauldwell-Wingate Company, LLC ("Cauldwell Wingate"), by its attorneys Ingram Yuzek

Gainen Carroll & Bertolotti, LLP, as and for its answer (the "Answer") to the Third-Party

Complaint in this action (the "Third-Party Complaint"), alleges as follows:

        1.      As to the allegations of paragraph 1 of the Third-Party Complaint, admits

that the third-party claims are related to the claims in the main action and otherwise respectfully

refers the issues of law raised therein, including jurisdictional issues, to the Court.

        2.      As to the allegations of paragraph 2 of the Third-Party Complaint, admits

that Cauldwell Wingate is not a citizen of Illinois, denies knowledge or information sufficient to

form a belief as to the citizenship of Third-Party Plaintiff American Manufacturers Mutual

Insurance Company ("American Manufacturers") and otherwise respectfully refers the issues of law raised therein, including jurisdictional issues, to the Court.

3.    Denies knowledge or information sufficient to form a belief as to the allegations of paragraph 3 of the Third-Party Complaint.

4.    Admits the allegations of paragraph 4 of the Third-Party Complaint, except denies knowledge or information sufficient to form a belief as to the citizenship of American Manufacturers and clarifies that Cauldwell Wingate is organized by the name Cauldwell Wingate Company, LLC, not Cauldwell-Wingate Company LLC.

5.    As to the allegations of paragraph 5, 6 and 7 of the Third-Party Complaint, admits that William A. Gross Construction Assocs., Inc. ("Gross") is the Plaintiff in this action and respectfully refers the Court to the Amended Complaint, which was filed with the Court on or about December 11, 2007, and which speaks for itself.

6.    As to the allegations of paragraphs 8 and 9 of the Third-Party Complaint, admits that American Manufacturers was Cauldwell Wingate's surety on a Labor and Material Payment Bond dated on or about December 27, 2002, and otherwise respectfully refers the terms of that agreement, which raise issues of law, to the Court.

7.    As to the allegations of paragraphs 10 and 11 of the Third-Party Complaint, admits that Cauldwell Wingate signed a written indemnity agreement dated on or about December 27, 2002, and otherwise respectfully refers the terms of that agreement, which raise issues of law, to the Court.

## AS AND FOR A FIRST AFFIRMATIVE DEFENSE

8.    The Third-Party Complaint fails to state a claim against Cauldwell Wingate for which relief may be granted.

## AS AND FOR A SECOND AFFIRMATIVE DEFENSE

9.      If, in fact, Gross sustained any of the damages alleged in the Amended Complaint, those damages arise from the breach of contract and/or duty of non-parties to this action and, accordingly, Cauldwell Wingate is not liable for any indemnity payments.

**WHEREFORE,** Cauldwell Wingate demands judgment: (i) dismissing the Third-Party Complaint in its entirety; and (ii) for such other and further relief as the Court deems just and proper.

Dated:  New York, New York
         February 19, 2008

                              INGRAM YUZEK GAINEN
                              CARROLL & BERTOLOTTI, LLP

                              By: _____
                                  Larry F. Gainen (LG-9351)
                                  Patricia Hewitt (PH-7769)
                              250 Park Avenue
                              New York, New York 10177
                              (212) 907-9600
                              Attorneys for Third-Party Defendant, Cauldwell
                                  Wingate