<u>**ECF CASE**</u>

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

WILLIAM A. GROSS CONSTRUCTION     :
ASSOCIATES, INC.,                               :     07-CV-10639 (LAK)(AJP)

                                 :

                Plaintiff,       :

                                 :     <u>**AFFIDAVIT OF PATRICIA HEWITT**</u>

       -against-              :

                                 :

AMERICAN MANUFACTURERS MUTUAL   :
INSURANCE COMPANY,              :

                                 :

               Defendant.    :

------------------------------------------------------------x

    And successive impleader actions.   :

------------------------------------------------------------x

       **STATE OF NEW YORK**   )
                             ) ss.:
       **COUNTY OF NEW YORK**)

     **PATRICIA HEWITT**, being duly sworn, deposes and says:

     1.     I am a member of the firm Ingram Yuzek Gainen Carroll & Bertolotti, LLP, counsel to Third-Party Defendant/Fourth-Party Plaintiff Cauldwell Wingate Company, LLC ("Cauldwell Wingate"), and as such am fully familiar with the facts set forth herein. I submit this affidavit in opposition to Fourth-Party Defendant/Fifth-Party Plaintiff Dormitory Authority - State of New York ("DASNY")'s motion to dismiss the Fourth-Party Complaint or, alternatively, to sever it from the main and third-party actions and for a stay (the "Motion").

     2.     William A. Gross Construction Associates, Inc. ("Gross"), the Plaintiff in the main action, filed its original complaint in this action against American Manufacturers Mutual Insurance Company ("American Manufacturers") on or about November 20, 2007, and filed its Amended Complaint (the "Gross Complaint") on or about December 10, 2007. A copy of the

Gross Complaint is annexed as Exhibit C to the declaration of Edwin M. Levy (the "Levy Declaration") in support of the Motion.

3.    American Manufacturers filed its answer and its third-party complaint (the "American Manufacturers Complaint"), against Cauldwell Wingate, on or about December 17, 2007. These pleadings are annexed to the Levy Declaration as Exhibits D and E, respectively.

4.    Cauldwell Wingate filed its answer to the American Manufacturers Complaint on February 19, 2008. It is annexed to the Levy Declaration as Exhibit F.

5.    Cauldwell Wingate filed its Fourth-Party Complaint (the "Cauldwell Wingate Complaint") against DASNY on March 14, 2008. It is annexed to the Levy Declaration as Exhibit A.

6.    DASNY's answer to the Cauldwell Wingate Complaint is annexed to the Levy Declaration as Exhibit B.

7.    Counsel for Gross, American Manufacturers and Cauldwell Wingate appeared before Judge Kaplan for a preliminary conference on February 22, 2008. At that time, I informed the Court that Cauldwell Wingate would be serving its complaint against DASNY by March 14. Judge Kaplan adjourned the conference until April 4, 2008, and instructed me to inform DASNY that its counsel should appear at that time, which I did.

8.    All counsel, including Mr. Levy of the Corporation Counsel's office (on behalf of DASNY), appeared at the April 4, 2008 conference. Mr. Levy informed the Court that DASNY either was involved in or contemplated additional actions involving the same construction project that is at issue in the Gross and Cauldwell Wingate actions, namely, the Bronx Criminal Courthouse Complex (the "BCC"), and that DASNY was weighing its options as to when and where to bring any such actions. Mr. Levy requested, and the Court granted, a 45-day extension

beyond its original due date for DASNY to answer the Cauldwell Wingate Complaint (from April 3 to May 19). The Court also set a discovery schedule, and ordered that discovery proceed notwithstanding that DASNY had not yet filed its answer. The Scheduling Order (the "Scheduling Order") issued by the Court is annexed hereto as Exhibit A.

9.    Counsel for all parties also appeared before Magistrate Judge Peck on April 24, 2008. At that time, counsel for DASNY informed Judge Peck that DASNY had discovered a document in which Cauldwell Wingate had allegedly released its claims against DASNY, and that DASNY was going to move to dismiss on that basis. (See 4/24/08 Transcript, annexed hereto as Exhibit B, at 6:5-11.)

10.    Judge Peck suggested that, in light of that fact that discovery was otherwise proceeding, DASNY might make its motion even sooner than the May 19 date and seek a stay of discovery pending resolution of that motion. (Ex. B at 16:8-20.)

11.    Instead of making its motion to dismiss earlier, however, DASNY in fact sought additional time, first until June 6 and then until June 13, which requests were granted. Copies of correspondence to the Court to this effect are annexed hereto as Exhibits C and D.

12.    In each of the instances that DASNY sought additional time to make its motion, counsel had to adjust the briefing schedule we had agreed upon, adjusting both Cauldwell Wingate's time to answer and DASNY's time to reply. In one of the exchanges between Mr. Levy and me, where I had sent him a draft of a letter I planned to send to Judge Peck to explain the schedule adjustment, Mr. Levy objected to my proposed wording regarding the amount of time DASNY had had to make its motion. He suggested that since DASNY had "only discovered the release something like a couple of weeks before I made the application for an extension," DASNY really had not had the full 45 extra days to brief the release issue. I

accordingly did not include the language I had drafted pointing out to the Court the amount of time that DASNY had had to brief its motion.

13.     Counsel for the parties next appeared before Judge Peck on June 3, 2008. At that time, in light of DASNY's requests for additional time to make its motion, Judge Peck indicated that if it were up to him to decide that motion he would treat it as a motion for summary judgment, or deny it, since with the passage of time and the participation of all parties in discovery it was becoming increasingly inappropriate to make a motion to dismiss. (*See* 6/3/08 Transcript, annexed hereto as Exhibit E, at 10:2-13:6.)

14.     Judge Peck also ordered that, even if DASNY did proceed with its motion to dismiss, it should also serve an answer, so that the parties would be apprised of DASNY's affirmative defenses and could address them in discovery. (Ex. E at 13:7-10.)

15.     DASNY finally answered and moved to dismiss on June 13, 2008. DASNY did not seek a stay of discovery in conjunction with its motion.

16.     After the June 1 Scheduling Order deadline for adding new parties had passed, DASNY sought permission nevertheless to bring a fifth-party complaint. A copy of DASNY's letter to this effect is annexed hereto as Exhibit F.

17.     At the next conference before Judge Peck, on June 24, 2008, Judge Peck granted DASNY's application to add new parties, and ordered that it do so no later than July 9. (*See* 6/24/08 Transcript, annexed hereto as Exhibit G, at 27:15-19.)

18.     DASNY filed its Fifth-Party Complaint on July 9, 2008. A copy of that complaint is annexed hereto as Exhibit H.

19.     Throughout this time period, the parties have proceeded with discovery. They had their first Rule 26(f) meeting with all counsel present on May 14, 2008 and, at Judge Peck's

direction, (Ex. E at 4:20-7:17), had a second meeting, in order to include their technical staff and deal with issues relating to electronic discovery, on June 10, 2008. The parties also have participated in numerous conference calls, and have exchanged literally hundreds of e-mails on this subject.

20. The parties currently are proceeding on a schedule that provides for the production of documents between July 15 and July 30, 2008. No depositions have yet been scheduled.

21. In order to satisfy the current requirements for electronic production, Cauldwell Wingate has engaged the services of a proprietary document management

company.  It has had its entire Project file, consisting of close to 500,000 pages, scanned, and is in the process of readying all of the e-mails from the Project for production no later than July 30. Cauldwell Wingate already has incurred hundreds of thousands of dollars in connection with the process of preparing its documents and e-mails for production.

      22.    Annexed hereto as Exhibit I is a copy of the subcontract that was entered into between Gross and Cauldwell Wingate in connection with the BCC.

_____
**PATRICIA HEWITT**

Sworn to before me this
21 day of July, 2008.

_____
Notary Public

**ALEX KENDALL ROSS**
**Notary** Public, State of New **York**
No. 02RO6147769
**Qualified** in New York County
**Commission Expires June 19, 2010**

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
William A. Gross Construction Associates,

Inc.,

                    Plaintiff(s)

            V.                                              07-cv-10639 (LAK)

American Manufacturers Mutual

Insurance Company, et al.,
                    Defendant(s).
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

SDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4/8/08

### SCHEDULING ORDER

A pretrial conference having been held on April 4, 2008, it is hereby,

ORDERED that the following schedule of deadlines shall govern the further conduct of pretrial proceedings in this case:

(a)     Last date to join additional parties as of right or seek leave to do so - 6/1/08

(b)     Last date to amend pleadings as of right or seek leave to do so - 6/1/08

(c)     The parties shall make required Rule 26(a)(2) disclosures with respect to:

        (i)  expert witnesses on or before - 9/15/08

        (ii) rebuttal expert witnesses on or before - 10/8/08.

(d)     Completion of all discovery - 11/1/08

(e)     Service of summary judgment motions - 12/1/08

(f)     Filing of pretrial order, proposed jury instructions and requested voir dire questions -- case ready for trial
        - 12/1/08.

The following trial materials shall be filed at least ten days before trial:

(a)     Trial brief stating the legal and factual issues and authorities relied upon and discussing any anticipated
        substantive or procedural problems

(b)     Motions in limine to exclude evidence.

            Motions in limine shall be made returnable at the time and date fixed for trial unless made at or prior to the date
fixed for filing the pretrial order, in which case they shall be made without a return date and dealt with in accordance with the
Court's individual rules of procedure.  Papers in opposition to motions in limine made returnable on the trial date shall be filed at
least three days before trial.

Dated: April 7, 2008

                                                Lewis A. Kaplan
                                                United States District Court

# EXHIBIT B

840GGROC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   WILLIAM A. GROSS CONSTRUCTION
    ASSOCIATES, INC.,
4
                    Plaintiff,
5
              v.                              07 CV 10639 (LAK)(AJP)
6
    AMERICAN MANUFACTURERS MUTUAL
7   INSURANCE COMPANY, et al.,

8                   Defendants.

9   ------------------------------x
                                         New York, N.Y.
10                                       April 24, 2008
                                         10:10 a.m.
11
    Before:
12
                    HON. ANDREW J. PECK,
13
                                         Magistrate Judge
14
                          APPEARANCES
15
    DUNNINGTON, BARTHOLOW & MILLER LLP
16      Attorneys for Plaintiff Gross Construction
    BY:  CAROL A. SIGMOND
17
    NEW YORK CITY LAW DEPARTMENT
18  OFFICE OF THE CORPORATION COUNSEL
        Attorneys for Defendant Dormitory Authority,
19      State of New York
    BY:  EDWIN LEVY
20
    ZICHELLO & MCINTYRE, LLP
21      Attorneys for Defendant American Manufacturers
    BY:  VINCENT J. ZICHELLO
22
    INGRAM YUZEK GAINEN CARROLL & BERTOLOTTI, LLP
23      Attorneys for Defendant Cauldwell Wingate
    BY:  PATRICIA HEWITT
24

25

84OGGROC

1 (Case called)

2 THE COURT:  Okay.  How are we doing in discovery?

3 Judge Kaplan has given you what for him and is a fairly lengthy

4 discovery period, but let's make sure you don't let too much

5 time go by so that you get in a bind at the end of it.

6 Ms. Sigmond.

7 MS. SIGMOND:  Your Honor, I represent the plaintiff.

8 We served our document demands, including our demand for

9 production, to DASNY, a demand for the privilege to go through

10 the building.  I haven't decided with my client, besides

11 photographs, whether we want to take any surveys or anything

12 like that.  We obviously don't want to do anything destructive,

13 but we may want a survey.

14 THE COURT:  Is there any dispute on that?

15 MR. LEVY:  I represent DASNY, your Honor.  I have not

16 received those yet, and so --

17 THE COURT:  Okay.  Let's take care of whose mailman

18 ate the documents.

19 MR. LEVY:  I don't know when they were served.

20 MS. SIGMOND:  They were served Friday, and

21 Mr. Zichello has received his.  They were all mailed at the

22 same time.  He received his yesterday, so I'm assuming that

23 everybody will --

24 THE COURT:  Assuming that corp counsel's mailroom is

25 something like ours, the time from the mailroom to Mr. Levy's

84OGGROC

1    desk may explain that, but okay.  Assuming you get the

2    documents -- and what we're talking about is, at the moment,

3    just the inspection of the Bronx courthouse, which at least to

4    a certain extent is open to the public, although not with

5    cameras, perhaps, etc. -- is there going to be any dispute as

6    to that?

7              MR. ZICHELLO:  I don't believe so, your Honor.

8              THE COURT:  All right.  What else?

9              MS. SIGMOND:  I've also -- probably in this case I

10   have the smallest amount of documents, since I have the site or

11   contract to do the outside work at the end of the job.  My

12   client is gathering all of his e-mails, and we're just using a

13   simple Outlook search, because, essentially, we don't have that

14   many e-mails.  We're pulling everything that we have that

15   relates to the Bronx criminal court, and I'm going to try to

16   have that put on a disk.

17             We have served our Rule 26 discovery.  We served it

18   electronically.  We served it along with a disk, and we

19   included in that not only the material related to the change

20   orders, the contracts, you know, the immediate issues in the

21   case, we also included some of the documents that we received

22   from DASNY, including the freedom of information law request,

23   that we thought were pertinent.  DASNY gave me three times over

24   the billing time sheets, which I just didn't think were

25   relevant.  I have them.  People can look at them.  And I don't

84OGGROC

1    think anyone is going to be interested.

2         So we've served our witness list.  We've tried to make

3    it as comprehensive as possible.  We don't actually intend to

4    call everyone, but we did try to list everyone who had

5    knowledge.

6         THE COURT:  All right.  Well, one of the things that

7    that suggests is that, as you all go forward, you may, by

8    mutual agreement, decide, you know, to knock off certain people

9    from the list in return for the other parties not taking their

10   deposition.  Otherwise, they may want to take depositions not

11   because they think the person is of any particular relevance or

12   importance but that if they're on your trial witness list or

13   potential list, that they've got to protect themselves.  So

14   that's something you all should talk about to keep the costs

15   from exceeding what's reasonable under the circumstances.

16        All right.  Anything else from the plaintiff?

17        MS. SIGMOND:  No, your Honor.  Thank you.

18        THE COURT:  All right.  From the first defendant,

19   American Manufacturers?

20        MR. ZICHELLO:  I don't have anything to contribute at

21   this point.

22        THE COURT:  All right.  Have you done your 26(a)

23   mandatory disclosure?

24        MR. ZICHELLO:  Yes.

25        THE COURT:  And have you served document demands --

840GGROC

1          MR. ZICHELLO:  Not yet.

2          THE COURT:  -- on anybody else?

3          MR. ZICHELLO:  Not yet.

4          THE COURT:  Don't complain to me later that, you know,

5   you ran out of time.

6          Okay.  Mr. Levy, I'm not sure you're next in order.

7   You're probably last, but you had stood up already, so we'll

8   let you get your two cents in, and then I'll go back to

9   Ms. Hewitt.

10          MR. LEVY:  Your Honor, I'd like to make a couple of

11   observations.  Plaintiff claims the contract balance against

12   the payment bond surety, the payment bond surety third party

13   being the prime contractor on that claim, the prime contractor,

14   fourth party being DASNY on an unrelated claim.  It's under the

15   same contract, but it's not a claim for indemnification.  It's

16   a claim for delay, contract balance and extra work under the

17   contract with which the plaintiff is suing.

18          So far as I read the pleadings -- and that was done,

19   very essentially, because we're only just in the case, your

20   Honor, DASNY is.  There's no dispute that the prime contractor

21   owes the money to the plaintiff, and I would just like to point

22   out that in New York under New York law, the pay-when-paid

23   provisions of contracts are unenforceable.

24          THE COURT:  I'm sorry.  Say that again.

25          MR. LEVY:  Pay-when-paid provisions of contracts are

84OGGROC

1    unenforceable under New York law.  There is an independent

2    obligation that arises under those subcontracts to pay the

3    subcontract whether or not the owner has paid the prime

4    contract.

5        With respect to the claim that the prime contractor is

6    asserting against DASNY, it has just come to my attention that

7    we have in our possession a release from the prime contractor

8    to DASNY, which was executed with about substantial completion

9    in exchange for release of retainage, and this release does not

10   reserve any claim whatsoever.  So it is our intention, your

11   Honor, to make a motion based on that release.

12       THE COURT:  Do you have it with you?

13       MR. LEVY:  I printed it, and as I left the office, I

14   forgot to go to the printer to bring it.  And I apologize, your

15   Honor.

16       THE COURT:  All right.  Let me hear from Ms. Hewitt on

17   this issue in particular, and then we'll go from there, and

18   then anything else you have to say about the other parties that

19   are here.

20       MS. HEWITT:  Well, your Honor, with respect to the

21   first point that Mr. Levy made, which I think is not that

22   significant in light of his second point, but the point about

23   the pay when paid, I mean, that's obviously an issue between

24   Gross and Cauldwell Wingate which has not yet been addressed

25   between us.

84OGGROC

1            With respect to his second much more substantial

2     point, as far as I'm concerned, it's the first time hearing of

3     it, your Honor.  I don't know about a release.  I haven't seen

4     a release.  I don't know what the effect of the release is.  I

5     don't know what arguments we might have in response.  I

6     understand he plans to make a motion, and that's fine.  I don't

7     know if you noticed it or not, but DASNY has not even answered

8     yet.  Judge Kaplan made it clear, when we were before him a

9     couple of weeks ago, that they can have the extra time they

10    were seeking to answer or move but that he wanted us to go

11    forward.  He wanted us to appear before your Honor and to go

12    forward with the discovery.

13            So I think one question, your Honor, this morning will

14    be does discovery, in fact, go forward while this motion is

15    presumably being briefed back in --

16            THE COURT:  That I guess depends on -- let me be

17    clear.  How is your fourth-party complaint against DASNY

18    related to the other claims?

19            MS. HEWITT:  Well, it is related, your Honor, in that

20    it is the same project that is at issue.  My client, Cauldwell

21    Wingate, was the prime contractor.  They had any number of

22    subs.  One of the subs is suing the surety, who, in turn, is

23    suing us.  On the --

24            THE COURT:  But are your claims against DASNY related

25    to this sub, or are they related to other --

84OGGROC

1      MS. HEWITT:  Oh, yes, among others.  The sub is suing,

2    essentially, us, for a little over $2 million.  Our claims

3    total $25 million.  But Gross is -- I can't remember now --

4    maybe our third biggest claim within that $25 million.  So,

5    yes, they are related.

6      THE COURT:  All right.

7      MR. LEVY:  May I be heard, your Honor?

8      THE COURT:  Sure.

9      MR. LEVY:  Thank you.  As I pointed out earlier, the

10   plaintiff's claim against Cauldwell Wingate is a contract

11   balance claim.  And there is not a claim, so far as I can read

12   it, in Cauldwell Wingate's fourth-party complaint seeking

13   indemnification for this claim against DASNY.  The claims that

14   are being asserted against DASNY are for extra work, delay, and

15   contract balance.

16      Now, to the extent that Cauldwell Wingate is claiming

17   they can't pay plaintiff until DASNY pays them, that position

18   is untenable under New York law, at least in terms of

19   liability, perhaps not in terms of the practical paying the

20   dollars out of the bank.

21      The judge --

22      THE COURT:  Go ahead.

23      MR. LEVY:  The Court is exercising ancillary

24   jurisdiction over this claim against DASNY, but, in fact, this

25   claim is the 300-pound gorilla that's wagging the dog with

84OGGROC

1    respect to this $2 million claim for contract balance, which

2    essentially has nothing to do with the fourth-party complaint

3    against DASNY.

4            THE COURT:  Is there an independent basis for federal

5    jurisdiction on it?

6            MR. LEVY:  I don't believe so, your Honor.

7            THE COURT:  All right.  Ms. Hewitt, do you want to

8    respond to all of that or any of that?

9            MS. HEWITT:  Well, not necessarily, your Honor.  I

10   mean, I think what Mr. Levy is suggesting is something that

11   DASNY is going to put in a motion.  I mean, we're clearly not

12   going to decide all of this today.

13           THE COURT:  No.  But if I can avoid a motion either

14   because you all decide to dismiss the fourth-party complaint

15   without prejudice and go across the street and visit my friends

16   in the commercial division, but if 90 percent of the discovery

17   on the fourth-party claim would be totally unrelated to the

18   plaintiff's claim and the insurance company or bond company's

19   claim over against you -- you know, if you are convinced that

20   the release ends things as to everything or at least as to the

21   Gross portions so that there's not any relation, then, of

22   course, the case goes, but even assuming that there are good

23   arguments that the release isn't the full release or whatever,

24   it's a forgery, it's a this, it's a that, I mean, I think the

25   question is why should the tail wag the dog here?

84OGGROC

1          The other parties, as best I can see, have a bench

2     trial.  You have a jury trial request only for the fourth-party

3     claim.  If it takes infinitely more discovery on your claim

4     against DASNY that the other parties have no relation to and

5     don't care about, it suggests that the fourth-party complaint

6     should be dismissed or severed, at a minimum, particularly if

7     there is going to be a dispositive motion.  As fast as Judge

8     Kaplan and I are, if there is going to be a dispositive motion

9     because of the release and if much of the discovery or all of

10    the discovery between you and DASNY disappears if the release

11    claim is valid, I would be tempted, and possibly more than

12    tempted, inclined, to stay discovery, which would then put you

13    off track for the rest of the case anyway and, clearly, whether

14    the timetable in the rest of the case can be shortened if the

15    fourth-party complaint were to be on a different track or in a

16    different.  That's why I'm taking as much time as I am now to

17    deal with that issue.

18          Perhaps all I can do is leave it for Mr. Levy to send

19    you a copy that he forgot to bring, you know, fax it over to

20    you after the conference, and the two of you can talk.  And if

21    he then moves for a stay of discovery and he moves to dismiss,

22    you know, I'll treat that promptly, etc.  So we'll see where

23    that goes.

24          Ms. Sigmond is rising to --

25          MS. HEWITT:  Well, but if I may, your Honor, since you

84OGGROC

1    were addressing me.

2         THE COURT:  Uh-huh.

3         MS. HEWITT:  I think your Honor has raised a lot of

4    issues, and, again, I think some of them probably would abide

5    briefing.  But these case are related, and clearly, not all of

6    the discovery will be with respect to Gross' claim, but I think

7    a fairly significant part of it will.

8         As I understand your Honor, as long as there is a

9    basis for supplemental jurisdiction, which there is, then we

10   have the right to go forward in this court, even with

11   additional claims being brought in.

12        I might also add, your Honor, that let's assume that

13   the release --

14        THE COURT:  Question, because it's been a while.

15        MS. HEWITT:  It's 1367(c)(2), your Honor -- or it's

16   1367(c).

17        THE COURT:  All right.  I guess the question that I

18   was asking for, in addition to the statute, which is very

19   helpful, is whether, while you have the ability to bring it as

20   such, do I have and Judge Kaplan have the discretion to say we

21   think in the interest of justice -- yes.  Okay.  1367(c):  The

22   district court may decline to exercise supplemental

23   jurisdiction over a claim if, (2), the claim substantially

24   predominates over the claim or claims over which the district

25   court has original jurisdiction --

84OGGROC

1          MS. HEWITT:  And (c)(4) is also applicable, your

2     Honor.

3          THE COURT:   -- and in exceptional circumstances, there

4     are the compelling reasons to decline jurisdiction.  Okay.

5          MS. HEWITT:  But, your Honor, the law in the Second

6     Circuit, as I understand it, if you look at the beginning of

7     1367, which I don't have the statute in front of me, but before

8     you even get to (c), there's a sentence there that says, The

9     district court shall exercise.  And there is a split in the

10    circuits, but the way the Second Circuit has interpreted this

11    is that this means there is supplemental jurisdiction and that

12    those exceptions are extremely narrow.  So, you know, we will

13    brief that if we have to.

14          But the other point I wanted to make, your Honor, is

15    if -- again, putting the release aside, if this case were to be

16    dismissed, if your Honor or Judge Kaplan were to exercise

17    discretion, which I think would be extraordinary, Cauldwell

18    will find itself in both courts.  So I understand that DASNY

19    makes the argument that this is the tail wagging the dog; we

20    should be in state court, but we're here, your Honor, and I

21    haven't heard anything that gets us out of this court on the

22    claims against us by the surety.  So there is a prejudice on

23    our side as well.

24          THE COURT:  All right.  Ms. Sigmond.

25          MS. SIGMOND:  Your Honor, I just want to make a few

84OGGROC

```
 1    short points.  First of all, the William A. Gross complaint is
 2    for retainage, contract balances, certain unaddressed change
 3    orders and impacts from certain actions that were passed down
 4    to William A. Gross through Cauldwell from the owner.
 5         I will say that I have a lot of signatures from
 6    Cauldwell on a lot of these change orders.  So I think that's
 7    going to be a short bench trial on that part of it.
 8         Relative to this release, which none of us have ever
 9    seen, I will only say that for months Hill International on
10    behalf of DASNY has been running around doing change orders on
11    the Cauldwell project, and just yesterday we received notice
12    that they were taking another deduction on William A. Gross' --
13    you know, that they think is going to be passed through to
14    William A. Gross.  So I question, you know, not having seen the
15    release, exactly what this release says.
16         THE COURT:  All right.  Obviously, other than
17    Mr. Levy, we're all in the dark on that.
18         MS. SIGMOND:  And I want to make one final point,
19    Judge.  As the site or contractor outside, William A. Gross
20    suffered the consequences of a lot that happened in this job.
21    For example, when DASNY decided early in the job not to have
22    the original site work contractor -- that is, the foundation
23    contractor, A. Williams Trucking, they didn't have them remove
24    all of the contaminated soil.  They left it stacked up, told my
25    client it wasn't contaminated and directed my client to remove
```

84OGGROC

1    it.  My client, in accordance with City requirements, had

2    laboratory tests done on the soil, found it was contaminated,

3    and one of the disputes is whether he should be paid the price

4    for disposing of contaminated soil, since it's more expensive

5    to truck and dispose.

6         This is by way of saying there's another issue having

7    to do with the elevation of the building.  If you assume that

8    the front of the building where you enter at the street level

9    should be zero elevation, so that you walk straight from the

10   sidewalk into the building, this building varies and can be off

11   anywhere from an inch low to a half an inch high.  All of that

12   impacts my client.

13        Throughout the change order negotiation process,

14   essentially DASNY, even in response to my FOIA request, refused

15   to turn over any of the survey data or any of the other

16   information that pertained to these issues.  As a result,

17   Cauldwell is in a difficult position, and I say this as an

18   objective observer of that case, because there's a lot of

19   information that they need relevant to my case that may have

20   bearing on other change orders but bears on my change orders.

21        THE COURT:  All right.  I understand that, and I

22   understand that even if DASNY gets out of the case as a

23   fourth-party defendant, it's still going to be involved in

24   discovery, or even if the Cauldwell case against them gets

25   split in some way, you know, the Gross construction-related

84OGGROC

1   piece obviously will be discovered and perhaps litigated here.

2        But I take it what you're saying -- but maybe I

3   shouldn't put it as a leading question -- are you saying that

4   even to the extent that the DASNY/Cauldwell fight is bigger

5   than Gross and maybe dwarfs your case, you're content to have

6   it decided along here, because things, even from your point of

7   view, are sufficiently intertwined?

8        MS. SIGMOND:  From my point of view, your Honor, to be

9   perfectly frank with you, if DASNY is here and this court is a

10  party, the discovery will move.  If DASNY is allowed out, we

11  are all going to wallow, struggling with subpoenas to get DASNY

12  to produce documents.  And I can only say, Judge, I served --

13       THE COURT:  Probably not, because the subpoenas are

14  returnable to me.  So --

15       MS. SIGMOND:  I will only say, Judge, I served 25 FOIA

16  requests seeking specific documents concerning the William A.

17  Gross part of the contract.  I never once got the estimates or

18  backup documents for the alleged estimates that would be used

19  in the change orders.  All I kept getting were the same set of

20  worksheets for their time sheets.  So I can only say that what

21  makes me content is my desire to have a club over DASNY to get

22  the documents produced that I need to prove my case.

23       THE COURT:  Well, you've got the club in this court

24  regardless.

25       MS. SIGMOND:  Thank you.

84OGGROC

1    THE COURT:  All right.  Well, we will await your

2    sending the release to all other counsel, and if you want to

3    meet, Mr. Levy.  What date did Judge Kaplan give you for your

4    answer?

5    MR. LEVY:  May 19th, your Honor, 45 days from the 5th.

6    THE COURT:  All right.  Well, you have until May 19 to

7    do whatever you're going to do, but at the moment, discovery

8    continues as to everybody.  So if you're going to want to make

9    any sort of motion to stay discovery, that probably means that

10   you won't take until May 19th to make your motion, because I'm

11   not going to stay discovery unless I see the motion and see

12   that it has sufficient merit based on the release and/or

13   anything else that it's worth staying discovery, otherwise,

14   except for staying discovery as to anything beyond what's

15   necessary for the rest of the parties in the case as to the

16   Gross issue.  So it may not be worth it at all.  You may want

17   to move to dismiss but let discovery go.  I'll let you decide

18   what you want to do, and I'll decide thereafter, after hearing

19   from opposing counsel what I want to do or what Judge Kaplan

20   wants to do.

21   MR. LEVY:  One other point, your Honor, and this is

22   nothing that has yet happened, but your Honor should be aware

23   of it.  We're weighing where best to do this, whether in terms

24   of a fifth-party complaint here or across the street, as your

25   Honor pointed out, in front of the justices of the commercial

84OGGROC

1 division.  But besides Cauldwell's $25 million claim, there's

2 approximately another $50 million in claims by other prime

3 contractors on the job that we expect to be litigated, and

4 there will be a significant amount of affirmative litigation

5 brought by DASNY in connection with this.  And so if you add

6 all of that to the mix, we're talking about, I don't know, 100,

7 200 million dollars worth of claims, which --

8          THE COURT:  Pretty soon we'll get into real money.

9          MR. LEVY:  Right, which really does have the tail

10 wagging the dog for a $2 million claim.

11          THE COURT:  That may be, and it may be that, you know,

12 I exercise supplemental jurisdiction if Ms. Hewitt is right

13 that I have as much choice as the pure wording in the statute

14 may say, but it also may mean that if you don't do that until

15 May 19th --

16          MR. LEVY:  It would be immaterial, your Honor.  I

17 understand.

18          THE COURT:  Well, what I mean is it may be that, you

19 know, anything unrelated to Gross on fifth-party actions and

20 thereafter, you know, get put on a different timetable.  I'm

21 certainly not encouraging you to proceed here as opposed to the

22 commercial division.  They are very fine justices.  So you'll

23 do what you have to do, and I'll figure out what I have to do

24 accordingly.

25          Since there was some mention by Ms. Sigmond about key

840GGROC

1   discovery, e-mails, and the like, let me direct you all, if you

2   haven't already done it, to sit down with each other and talk

3   about what you need to do with respect to electronic discovery

4   in terms of form of production as required under Rule 34, in

5   terms of what you find to be accessible, inaccessible, you

6   know, what litigation holds have been put in place.  And if one

7   hasn't been put in place, you're already too late, but you'd

8   better put one in place sooner rather than later, etc.  There

9   is a good deal of literature on the subject.

10          I assume you are all familiar or will become familiar

11   with Judge Scheindlin's Zubulake decisions, the federal rule

12   amendments that are now a year and a quarter, a year and a half

13   old that dealt with ESI.  For better or worse for all of you,

14   I've become one of the talking heads that goes out and does

15   conferences on all of these.  So I'm relatively up to speed on

16   at least talking the talk.  And the sooner you get a handle on

17   all of this -- and, you know, what I always say on panels is

18   cooperation and transparency are the only way this can work.

19          So, you know, don't play hide the ball.  If you have

20   to have more in-house IT folks or outside consultants involved,

21   get them involved early.  Consider having, you know, all of

22   your IT folks in the same room, informally, off the record or

23   whatever you want to do, but they can probably cut through a

24   lot of the stuff that we as lawyers don't understand, or as I

25   sometimes put it, as once said about the Americans and Brits

840GGROC

1   being separated by a common language, I think the same can be

2   said about lawyers and IT professionals.

3        But I certainly want to avoid any spoliation sanction

4   applications down the road because you didn't deal with it up

5   front.  So you probably should have had your 26(f) conference

6   already at which all these issues are to be talked about, but

7   if you haven't or if you have talked about it yearly at the pro

8   forma generic level of saying, yeah, yeah, yeah, we'll deal

9   with it, start getting your hands dirty.

10       Ms. Sigmond.

11       MS. SIGMOND:  Your Honor, there was a 26(f) conference

12  that did not include DASNY, because they weren't a party.  I

13  think it's fair to say Mr. Zichello's client probably has very

14  little on the way of these documents.  As I say, my client is

15  not very sophisticated, so we're working on that.  I think

16  Ms. Hewitt's client has probably got a huge amount of material,

17  and I think they have already started working.  And we'll need

18  to meet with --

19       THE COURT:  I'm sure DASNY has even more, and I'm

20  somewhat familiar with DASNY's boxes of documents and

21  everything else from another case, not with Mr. Levy, but

22  another construction project that DASNY is -- I guess they're

23  the defendant on.  Frankly, before that case, I only thought

24  DASNY did dormitories, but you live and you learn.

25       So do what you need to do on that.  It is my practice

84OGGROC

```
 1    to regularly status cases to make sure that it gives you an

 2    incentive to resolve your disputes a day or two before the

 3    conference or at least get judicial resolution of them.  It

 4    sounds to me like we should be aiming for early June, and

 5    obviously, if you have read my rules -- and if you haven't, you

 6    should do so -- if there is a discovery or other problem prior

 7    to any scheduled conference, you should just get availabilities

 8    from the other counsel, and call my secretary and we'll get you

 9    in on an emergency basis.

10         And let me emphasize that conversely, if you get to

11    the point of 48 hours before the next scheduled conference and

12    discovery is going smoothly, there's no reason to talk about

13    it, there's no reason to talk about settlement, I don't need to

14    waste your client's money or my time or your time.  As long as

15    you all get together and somebody is able to say all four

16    parties agree that we don't need the conference and we can wait

17    to have it in X weeks, I don't need to drag you in, but I don't

18    want one party trying to pull that plug and then finding out

19    that that's because they're the bad guys and everybody else is

20    mad at them and etc.

21         So when do you want to come back?

22         MS. HEWITT:  Just not on a Friday, your Honor, only

23    because of the line downstairs, no other reason.

24         MR. LEVY:  Your Honor, I had to surrender my

25    Blackberry, so I will have to check.
```

84OGGROC

1      THE COURT:  You all should learn that despite

2  technological sophistication, you've got to print your calendar

3  out on paper when you come till the rules change.

4      MS. SIGMOND:  June 5, your Honor.

5      THE COURT:  June 5 doesn't work.  How about June 2 or

6  3, which would be the Monday or Tuesday of that week?

7      MS. HEWITT:  June 3, your Honor?

8      THE COURT:  Okay.  June 3 at 2:30, does that work for

9  everybody?

10     MS. SIGMOND:  Yes, your Honor.

11     THE COURT:  And for those who surrendered their

12  Blackberry, it works just because it will have to work and you

13  will cancel whatever else you have to cancel.

14      Settlement, let's not forget that subject.  Are you

15  talking at all?  There may be bigger fish to fry sitting at the

16  table on my right than there are on the table on the left, but

17  is there any way to resolve any or all of this case, or equally

18  importantly, other than keeping you all on track, is there

19  anything the Court should do to help you settle?  Anybody?

20  I'll start with the simple question:  Have you talked

21  settlement at all?

22     MS. SIGMOND:  I tried, your Honor.  I'm the plaintiff,

23  so naturally, I have tried.  My sense is that the surety

24  company, as surety companies always do, wants to give its

25  indemnor a chance to develop whatever defenses there are, since

840GGROC

1    the surety company is entitled to the defense of the indemnor.

2    And I certainly understand that, I respect it, and I appreciate

3    it.  On the other hand, I have a lot of signed tickets for a

4    lot of signed change orders, and, you know, I expect to be paid

5    on my signed tickets.

6        THE COURT:  All right.  Well, you and Ms. Hewitt and

7    Mr. Zichello should talk about that, and if one can knock out a

8    certain number of -- you know, certain dollar amount and agree

9    that that gets resolved and fight over the things where there

10   aren't signed documents or whatever it may be, but I invite you

11   all to talk.

12       MS. HEWITT:  Your Honor, Cauldwell Wingate would like

13   nothing more than to be able to settle their claims with DASNY,

14   but everything I have heard today -- and Mr. Levy just came

15   into the case a couple of weeks ago.  Everything that I have

16   heard today suggests that that is not going to happen, at least

17   until whatever motion we have is resolved.

18       THE COURT:  All right.  Nevertheless, it would seem to

19   me, for judicial efficiency and saving all of your legal fees,

20   even if you can't pay the amount to Ms. Sigmond's client

21   because you want a check from DASNY for that or other reasons

22   to help cover it, if you and the surety and Ms. Sigmond are

23   able to say this number of dollars from these change orders,

24   yes, we do owe it, we're not paying it yet, but at least it

25   avoids a partial summary judgment motion, etc., etc.  It saves

840GGROC

1    you at least some legal fees.  So talk is all I can tell you.

2        Finally, it is my practice at first conferences to

3    remind the parties that pursuant to 28 US Code, Section 636(c),

4    if all four of you or eight or ten, after what DASNY has said

5    it might do, consent -- and it does require unanimous consent

6    of all parties -- you have the option of having the case in

7    front of me for all purposes, including motions, trials, etc.

8        I should also note that you do have the option, if

9    you're not ready to cross that bridge, to have limited

10   consent -- it still requires all parties -- but consents on a

11   particular motion or whatever while reserving for summary

12   judgment motions or trial going back to Judge Kaplan.  Unless

13   anyone wants to jump up and shout out "yes" or "no" now, I'll

14   just leave it that the four of you should talk to your clients,

15   talk to each other.

16       And I guess, Ms. Sigmond, as the plaintiff, I'll let

17   you be the spokesperson, and just at the next conference either

18   hand up a signed form of some sort or say, you know, the

19   parties do not consent without saying, you know, who voted yes

20   and who voted no.  I don't really care if one of you were to

21   slip and say, well, I consented, he/she didn't.  My answer is I

22   don't care.  So what.  You're in front of Kaplan in that case

23   for a dispositive motion, unless he sends it to me for a

24   recommendation.  It is what it is.

25       Okay.  It is my practice to have the court reporter at

84OGGROC

1    these conferences take down discussion and any orders from the

2    bench, not that there were any today, but unless there is an

3    economic objection -- and hearing the dollar amounts from you,

4    I don't think there can be much in that way, but unless you

5    have any reason not to buy the transcript, I would require all

6    of you to buy it and figure out whether it's an even split or

7    how you want to do that.  Any problems with that?

8             MS. SIGMOND:  No, your Honor.

9             MS. HEWITT:  No, your Honor.

10            THE COURT:  We're adjourned.  Thank you.  And I need

11   the report.

12                              o0o

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT C

# FAX TRANSMITTAL SHEET



## ANDREW J. PECK
## UNITED STATES MAGISTRATE JUDGE
## UNITED STATES DISTRICT COURT
### Southern District of New York
**United States Courthouse**
**500 Pearl Street, Room 1370**
**New York, N.Y. 10007-1312**

**Fax No.:**        **(212) 805-7933**
**Telephone No.:**  **(212) 805-0036**

<u>Dated:</u>   <u>May 27, 2008</u>                    <u>Total Number of Pages:</u>   <u>3</u>

| TO | FAX NUMBER |
|---|---|
| Carol A. Sigmond, Esq. | 212-661-7769 |
| Patricia Hewitt, Esq. | 212-907-9681 |
| Vincent J. Zichello, Esq. | 212-972-5569 |
| Edwin Levy, Esq. | 212-788-8872 |

# TRANSCRIPTION:

**MEMO ENDORSED 5/27/08**

**The Court reluctantly approves the above briefing schedule.  The parties obviously understand that this means the motion is not likely to be decided before the Fall, and quite possibly not before the 11/1 discovery cutoff date.**

**Copy to:**    **Judge Lewis A. Kaplan**

# INGRAM YUZEK GAINEN CARROLL & BERTOLOTTI, LLP

250 PARK AVENUE

NEW YORK, NEW YORK 10177

Telephone (212) 907-9600

Facsimile (212) 907-9681



E-Mail: phewitt@ingramllp.com

May 21, 2008

(212) 907-9608

**VIA FACSIMILE**

Honorable Andrew J. Peck, U.S.M.J.
United States District Court for the
  Southern District of New York
500 Pearl Street
New York, NY 10007

MEMO ENDORSED

    Re:     **William A. Gross Construction Associates, Inc. v. American
Manufacturers Mutual Insurance Co. and other actions
07-CV-10639 (LAK) (AJP)**

Dear Judge Peck:

    Having spoken to Ms. Gould this morning, and on consent of all parties, I am writing to ask the Court to reconsider its modification of the proposed briefing schedule for Fourth Party Defendant ("DASNY")'s motion to dismiss, which schedule was set forth in the attached letters from counsel for DASNY, and to restore the original schedule submitted by counsel.

    Briefly, DASNY sought and received from Judge Kaplan an additional 45 days, to May 19, 2008, to respond to my client, Cauldwell Wingate's, fourth-party complaint. In granting this request, Judge Kaplan made it clear that discovery would nevertheless proceed.

    When DASNY sought yet additional time, to June 6, 2008, I did not object, since counsel were able to work out a mutually agreeable briefing schedule for DASNY's anticipated motion that also took into account my unusually heavy work schedule in late June. Had we not been able to do that, I might otherwise have objected to DASNY'S request. This motion is of great significance to Cauldwell Wingate, since DASNY will be seeking the dismissal of most if not all of its approximately $25 million claim, and the agreed-upon schedule allowed me to give our defense of that motion the full attention it warrants.

    All counsel are in agreement that this motion briefing schedule should in no way prejudice or interfere with discovery, as both the Court and Judge Kaplan have directed. We

5/21/08



May 21, 2008
Page 2

have conferred pursuant to Rule 26(f), and are moving forward with discovery according to the schedule ordered by Judge Kaplan.

Accordingly, we respectfully request that the Court approve the original schedule agreed upon by counsel which was:

(a)     DASNY's motion to be served by June 6th;

(b)     opposition papers to be served by July 14th; and

(c)     reply papers to be served by August 11th.

Respectfully,

Patricia Hewitt

Enclosures

cc: Edwin M. Levy, Esq.
    Carol A. Sigmond, Esq.
    Vincent J. Zichello, Esq.

**MEMO ENDORSED**

SO ORDERED:

Hon. Andrew Jay Peck
United States Magistrate Judge

**BY FAX**

281169_1/00926-0053



MICHAEL A. CARDOZO
*Corporation Counsel*

THE CITY OF NEW YORK
**LAW DEPARTMENT**
100 CHURCH STREET
NEW YORK, N.Y 10007-2601

**EDWIN M. LEVY**
*Senior Counsel, Commercial and*
*Real Estate Litigation Division*
Room 3-241
Phone: (212) 788-1185
Fax:    (212) 788-8872
elevy@law.nyc.gov

May 16, 2008

**BY HAND**

Honorable Lewis A. Kaplan
United States District Judge
United Sates District Court
500 Pearl Street
New York, NY 10007

Re:   *William A. Gross Construction Associates, Inc. v.*
*American Manufacturers Mutual Insurance*
*Company*, and other actions, 07-CV-10639
**(LAK)**

Dear Judge Kaplan:

    I represent Fourth-Party Defendant Dormitory Authority of the State of New York
("DASNY") in the above-referenced matter. Unfortunately, my letter of May 15, 2008 contained
an error in the briefing schedule submitted for you approval. The parties have agreed that papers
in opposition to DASNY's motion to dismiss are to be served by July 14th, not July 11th.

    I am sorry for any inconvenience or confusion this error may have caused.

Respectfully submitted,

Edwin M. Levy (EL7792)
Assistant Corporation Counsel

THE CITY OF NEW YORK LAW DEPARTMENT

Honorable Lewis A. Kaplan
May 16, 2008
Page 2

cc:   **(<u>Via First Class Mail</u>)**
      Dunnington, Bartholow & Miller, L.L.P
      477 Madison Avenue, 12th Floor
      New York, NY 10017

      Attn:  Carol A. Sigmond, Esq.

      Zichello & McIntyre, L.L.P.
      420 Lexington Avenue, Suite 2800
      New York, NY 10170

      Attn:  Vincent J. Zichello, Esq.

      Ingram, Yuzek, Gainen, Carroll & Bertolotti, L.L.P.
      250 Park Avenue
      New York, NY 10177

      Attn:  Patricia Hewitt, Esq.



**THE CITY OF NEW YORK**
## LAW DEPARTMENT
100 CHURCH STREET
NEW YORK, N.Y. 10007-2601

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#
DATE FILED: 3/19/08

MICHAEL A. CARDOZO
*Corporation Counsel*

EDWIN M. LEVY
*Senior Counsel, Commercial and
Real Estate Litigation Division*
Room J-241
Phone: (212) 788-1185
Fax:   (212) 788-8872
elevy@law.nyc.gov

May 15, 2008

**BY HAND**

# MEMO ENDORSED

Honorable Lewis A. Kaplan
United States District Judge
United Sates District Court
500 Pearl Street
New York, NY 10007

> Re:   *William A. Gross Construction Associates, Inc. v.*
> *American Manufacturers Mutual Insurance*
> *Company,* **and other actions, 07-CV-10639**
> **(LAK)**

Dear Judge Kaplan:

I represent Fourth-Party Defendant Dormitory Authority of the State of New York ("DASNY") in the above-referenced matter. I respectfully request that DASNY's time to respond to the Fourth-Party Complaint be extended from May 20, 2008 to June 6, 2008. This application is made on consent of the parties.

As Your Honor is aware, this action arises out of the construction of the Bronx County Hall of Justice Project ("BCHJ" or the "Project") which has engendered numerous, highly complex and large claims. As I explained during our last conference, this office represents DASNY in all matters arising out of the Project. We are presently working to address the claims and issues arising from them globally as well as litigating individual matters.

DASNY intends to move to dismiss, in lieu of answering, the Fourth-Party Complaint. We recently discovered a release executed by Fourth-Party Plaintiff Cauldwell-Wingate Company, L.L.C. ("CWC"), in favor of DASNY and our motion will be predicated on this release as well as jurisdictional grounds.[1] CWC's release purports to discharge all of its claims

---

[1] This release was previously circulated to the parties and Magistrate Judge Andrew J. Peck.

THE CITY OF NEW YORK LAW DEPARTMENT

Honorable Lewis A. Kaplan
May 15, 2008
Page 2

with the exception of retainage held by DASNY (just under $2 Million). Thus, if granted on this ground, plaintiff's claims herein would be reduced from approximately $25 Million to approximately $2 Million. Unfortunately, because of the press of other claims arising out of the Project a short additional period is necessary to draft the motion.

Additionally, we request this extension due to the death of the mother of a key member of our litigation team, my direct supervisor, who must be consulted and who must review the motion papers.

The short extension in our time to respond to the Fourth-Party Complaint will not delay proceedings herein. As directed, the parties will continue to conduct discovery during this period.

In addition to agreeing to extend DASNY's time to respond to the Fourth-Party Complaint, the parties have agreed to the following briefing schedule which we submit for your approval:

(a)     DASNY's motion to be served by June 6th,

(b)     opposition papers to be served by July 11th and 6/27

(c)     reply papers to be served by August 11th. 7/9

Respectfully submitted,

Edwin M. Levy (EL7792)
Assistant Corporation Counsel

MEMO ENDORSED 5/19/08

[handwritten endorsement]

SO ORDERED:

Hon. Andrew Jay Peck
United States Magistrate Judge

BY FAX

THE CITY OF NEW YORK LAW DEPARTMENT

Honorable Lewis A. Kaplan
May 15, 2008
Page 3

cc:     (Via First Class Mail)
        Dunnington, Bartholow & Miller, L.L.P
        477 Madison Avenue, 12th Floor
        New York, NY 10017

        Attn:  Carol A. Sigmond, Esq.

        Zichello & McIntyre, L.L.P.
        420 Lexington Avenue, Suite 2800
        New York, NY 10170

        Attn:  Vincent J. Zichello, Esq.

        Ingram, Yuzek, Gainen, Carroll & Bertolotti, L.L.P.
        250 Park Avenue
        New York, NY 10177

        Attn:  Patricia Hewitt, Esq.

# EXHIBIT D

# FAX TRANSMITTAL SHEET

6/2/08



## ANDREW J. PECK
## UNITED STATES MAGISTRATE JUDGE
## UNITED STATES DISTRICT COURT
### Southern District of New York
### United States Courthouse
### 500 Pearl Street, Room 1370
### New York, N.Y. 10007-1312

**Fax No.:**        (212) 805-7933
**Telephone No.:**  (212) 805-0036

<u>**Dated:**</u>   **June 2, 2008**                    <u>**Total Number of Pages:**</u>   **6**

| TO | FAX NUMBER |
|----|-----------|
| Carol A. Sigmond, Esq. | 212-661-7769 |
| Vincent J. Zichello, Esq. | 212-972-5569 |
| Patricia Hewitt, Esq. | 212-907-9681 |
| Edwin Levy, Esq. | 212-788-8872 |

# TRANSCRIPTION:

**MEMO ENDORSED 6/2/08**

**Schedule approved. Please not that the motion is returnable before Judge Kaplan (unless all parties agree to have me decide it pursuant to 28 U.S.C. § 636(c)).**

**Copy to:**   **Judge Lewis A. Kaplan**



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#
DATE FILED: 6/2/08



**MICHAEL A. CARDOZO**
*Corporation Counsel*

THE CITY OF NEW YORK
LAW DEPARTMENT
100 CHURCH STREET
NEW YORK, N.Y. 10007-2601

**EDWIN M. LEVY**
*Senior Counsel, Commercial and
Real Estate Litigation Division*
Room 3-241
Phone: (212) 788-1185
Fax:     (212) 788-8872
elevy@law.nyc.gov

June 2, 2008

**MEMO ENDORSED**

**BY FAX TO (212) 805-7933**

Honorable Andrew J. Peck
United States Magistrate Judge
United Sates District Court
500 Pearl Street
New York, NY 10007

> Re:  *William A. Gross Construction Associates, Inc. v.
> American Manufacturers Mutual Insurance
> Company*, and other actions, 07-CV-10639
> (LAK)

Dear Magistrate Judge Peck:

I represent Fourth-Party Defendant Dormitory Authority of the State of New York ("DASNY") in the above-referenced matter. I respectfully request that DASNY's time to move to dismiss the Fourth-Party Complaint be extended one (1) additional week. I am informed by Patricia Hewitt, Esq., counsel for Fourth-Party Plaintiff Cauldwell-Wingate Company ("Cauldwell-Wingate"), that her client takes no position with respect to the application for an extension of time with the proviso that its time to serve opposition papers not be shortened.

I make this application because I became ill only 3 days after the Court "So Ordered" the present briefing schedule and was able to return to work only today. Thus, I have missed over a week of work and need the additional week to prepare the motion.

In a Memo Endorsed Order, dated May 27, 2008, a copy of which is attached for the Court's reference, the Court ordered that DASNY's motion be served by June 6th, opposition papers to be served by July 14th and reply papers to be served by August 11th. Should the Court

THE CITY OF NEW YORK LAW DEPARTMENT

Honorable Andrew J. Peck
June 2, 2008
Page 2

grant this application, the briefing schedule dates would be modified to June 13th, July 21st and August 18th, respectively.     OK

It has already been directed that this motion and briefing schedule will not stay discovery herein. Accordingly, this short extension of time will not prejudice any party hereto.

Respectfully submitted,

Edwin M. Levy (EL7792)
Assistant Corporation Counsel

Enc.

cc:   **(Via Fax)**
      Dunnington, Bartholow & Miller, L.L.P
      Attorneys for Plaintiff William A. Gross
      Construction Associates, Inc.
      477 Madison Avenue, 12th Floor
      New York, NY 10017

      Attn:  Carol A. Sigmond, Esq.

      Zichello & McIntyre, L.L.P.
      Attorneys for Defendant and Third-Party
      Plaintiff American manufacturers Mutual
      Insurance Company
      420 Lexington Avenue, Suite 2800
      New York, NY 10170

      Attn:  Vincent J. Zichello, Esq.

      Ingram, Yuzek, Gainen, Carroll & Bertolotti, L.L.P.
      Attorneys for Third-Party Plaintiff and Fourth-Party
      Plaintiff Cauldwell-Wingate Company
      250 Park Avenue
      New York, NY 10177

      Attn:  Patricia Hewitt, Esq.

MEMO ENDORSED

*[handwritten endorsement, partially illegible]* ... to 28 U.S.C. §636(c).)

SO ORDERED:

Hon. Andrew Jay Peck
United States Magistrate Judge

BY FAX

# FAX TRANSMITTAL SHEET



## ANDREW J. PECK
## UNITED STATES MAGISTRATE JUDGE
## UNITED STATES DISTRICT COURT
### Southern District of New York
### United States Courthouse
### 500 Pearl Street, Room 1370
### New York, N.Y. 10007-1312

**Fax No.:** (212) 805-7933
**Telephone No.:** (212) 805-0036

**Dated:** May 27, 2008           **Total Number of Pages:** 3

| TO | FAX NUMBER |
|---|---|
| Carol A. Sigmond, Esq. | 212-661-7769 |
| Patricia Hewitt, Esq. | 212-907-9681 |
| Vincent J. Zichello, Esq. | 212-972-5569 |
| Edwin Levy, Esq. | 212-788-8872 |

# TRANSCRIPTION:

**MEMO ENDORSED 5/27/08**

The Court reluctantly approves the above briefing schedule. The parties obviously understand that this means the motion is not likely to be decided before the Fall, and quite possibly not before the 11/1 discovery cutoff date.

Copy to:    Judge Lewis A. Kaplan

# INGRAM YUZEK GAINEN CARROLL & BERTOLOTTI, LLP

250 PARK AVENUE
NEW YORK, NEW YORK 10177
Telephone (212) 907-9600
Facsimile (212) 907-9681

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#
DATE FILED: 5/27/08

E-Mail: phewitt@ingramllp.com

May 21, 2008

(212) 907-9608



**VIA FACSIMILE**

Honorable Andrew J. Peck, U.S.M.J.
United States District Court for the
 Southern District of New York
500 Pearl Street
New York, NY 10007

**MEMO ENDORSED**

Re:    **William A. Gross Construction Associates, Inc. v. American
         Manufacturers Mutual Insurance Co. and other actions
         07-CV-10639 (LAK) (AJP)**

Dear Judge Peck:

Having spoken to Ms. Gould this morning, and on consent of all parties, I am writing to ask the Court to reconsider its modification of the proposed briefing schedule for Fourth Party Defendant ("DASNY")'s motion to dismiss, which schedule was set forth in the attached letters from counsel for DASNY, and to restore the original schedule submitted by counsel.

Briefly, DASNY sought and received from Judge Kaplan an additional 45 days, to May 19, 2008, to respond to my client, Cauldwell Wingate's, fourth-party complaint. In granting this request, Judge Kaplan made it clear that discovery would nevertheless proceed.

When DASNY sought yet additional time, to June 6, 2008, I did not object, since counsel were able to work out a mutually agreeable briefing schedule for DASNY's anticipated motion that also took into account my unusually heavy work schedule in late June. Had we not been able to do that, I might otherwise have objected to DASNY'S request. This motion is of great significance to Cauldwell Wingate, since DASNY will be seeking the dismissal of most if not all of its approximately $25 million claim, and the agreed-upon schedule allowed me to give our defense of that motion the full attention it warrants.

All counsel are in agreement that this motion briefing schedule should in no way prejudice or interfere with discovery, as both the Court and Judge Kaplan have directed. We

May 21, 2008
Page 2

have conferred pursuant to Rule 26(f), and are moving forward with discovery according to the schedule ordered by Judge Kaplan.

Accordingly, we respectfully request that the Court approve the original schedule agreed upon by counsel which was:

(a)    DASNY's motion to be served by June 6th;

(b)    opposition papers to be served by July 14th; and

(c)    reply papers to be served by August 11th.

Respectfully,

Patricia Hewitt

Patricia Hewitt

Enclosures

cc: Edwin M. Levy, Esq.
    Carol A. Sigmond, Esq.
    Vincent J. Zichello, Esq.

**MEMO ENDORSED**

*[handwritten endorsement]*

SO ORDERED:

Hon. Andrew Jay Peck
United States Magistrate Judge

**BY FAX**

281269_1/00926-0053

# EXHIBIT E

863VGROC                    Conference

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    WILLIAM A. GROSS CONSTRUCTION
     ASSOCIATES, INC.,
4
5                    Plaintiff,

                v.                        07 CV 10639 (LAK)(AJP)
6
7    AMERICAN MANUFACTURERS MUTUAL
     INSURANCE COMPANY,
8
                    Defendant.
9
     ------------------------------x
                                          New York, N.Y.
10                                        June 3, 2008
                                          2:45 p.m.
11
     Before:
12
                        HON. ANDREW J. PECK,
13
                                          Magistrate Judge
14
                            APPEARANCES
15
     DUNNINGTON BARTHOLOW & MILLER
16         Attorneys for Plaintiff
     BY:   CAROL A. SIGMOND
17
     ZICHELLO & MCINTYRE
18         Attorneys for Defendant
              American Manufacturers Mutual Ins. Co.
19   BY:   VINCENT J. ZICHELLO

20   INGRAM YUZEK GAINEN CARROLL & BERTOLOTTI
           Attorneys for Defendant Cauldwell-Wingate Company, LLC
21   BY:   PATRICIA HEWITT

22   NEW YORK CITY LAW DEPARTMENT
     OFFICE OF CORPORATION COUNSEL
23         Attorneys for Defendant Dormitory Authority - State of NY
     BY:   EDWIN LEVY

24

25

863VGROC                         Conference

1          (In open court)

2          THE COURT:  Mr. Levy, you were late.

3          MR. LEVY:  I'm here, your Honor.

4          THE COURT:  Yes, I know you're here.  But you were

5    supposed to be here 15 minutes ago.

6          MR. LEVY:  Oh, I'm sorry.  I thought you were

7    commenting about something else, your Honor.  I apologize.

8    There was a holdup in security downstairs, and there was a long

9    line.

10          THE COURT:  What time did you get to security?

11          MR. LEVY:  A little bit before 2:30.

12          THE COURT:  Next time get here at 2 o'clock.

13          Is anyone asking for sanctions?

14          MS. SIGMOND:  No, your Honor.

15          MS. HEWITT:  No, your Honor.

16          THE COURT:  Okay.  Good.  All right.  So other than

17    the motion schedule that everybody seems to like to postpone

18    forever, where are we in discovery or anything else?  Start

19    with the plaintiff, Ms. Sigmond.

20          MS. SIGMOND:  Yes, your honor.  I just want to

21    confirm, did the motion finally get scheduled?  I've been

22    following it, but, I must say, sort of at a distance.

23          THE COURT:  Yes, June 13th for the motion, July 21 for

24    the op, and August 18th for the reply, which means, of course,

25    it will not get decided before the close of discovery.  So I

863VGROC                    Conference

1   don't know why it makes any sense to do that as opposed to a

2   summary judgment motion at the end, and maybe we'll talk about

3   that for a minute.  But putting that aside, where are we from

4   your point of view?

5          MS. SIGMOND:  We held the 26(f) conference, your

6   Honor.  And at least speaking for myself, I have all of my

7   emails assembled; I have a very small quantity of documents.

8          I think an issue has developed respecting the larger

9   productions that are going to be coming from Cauldwell Wingate

10  and the city.  And that is whether or not Cauldwell and the

11  city should possibly minimally code the documents and disclose

12  some kind of minimal coding, even if it's by date, just to make

13  it easier to plow through.  But it's really an issue for them

14  because they are making the productions.

15         THE COURT:  Okay.  Let's hear from Cauldwell and the

16  city on that issue.

17         MS. HEWITT:  Your Honor, I believe that Cauldwell

18  Wingate's discovery in this case is going to be voluminous.  If

19  ours is voluminous, I can only imagine what the Dormitory

20  Authority's is going to be like.  And my thought was that those

21  are things that Mr. Levy and I could work out, will work out.

22  We certainly conducted --

23         THE COURT:  I thought you all were supposed to have

24  worked that out before today.

25         MS. HEWITT:  Well, your Honor, we worked out the dates

863VGROC                    Conference

1    and we worked out some issues.  But in terms of the kind of

2    detail that Ms. Sigmond just raised, I didn't even know that

3    was an issue until I started talking to my tech people.  So as

4    these things develop, I would assume that I could work those

5    out with Mr. Levy.  I have no reason to believe I can't do

6    that, unless --

7         THE COURT:  I'm perfectly happy to leave -- you know,

8    to do one of two things:  I lecture on ediscovery to BNA and

9    POI and state bar, everything else.  I'm pretty up to speed on

10   it.  But I'm not here to micro-manage.  If you all want to do

11   it, however you all want to do it, so long as it complies with

12   the federal rules.  The longer you wait and don't fully

13   understand the tech issues and everything else, the more likely

14   it is that something is going to go wrong and that I'm not

15   going to be giving you any extensions or anything else.

16        So you all tell me if you want me to ask for a very

17   detailed electronic discovery report from all of you.  I know I

18   talked about it with you at the last conference and said make

19   sure you've all talked about it up to now.

20        Sounds like it might be advisable for all four parties

21   and their tech folks to get in a room, or forget the lawyers,

22   get, you know, each side's tech people in the room so that the

23   production is being done once with metadata, if that's what's

24   called for or partial metadata, in a way that is usable for

25   everybody so that you don't go spend a fortune, you know,

863VGROC                              Conference

1    reducing the emails to CD or DVDs for production and then get

2    told, Oh, I wish you did it a different way or the rules

3    require you to do it a different way.

4         So do you want me to leave you all to your own devices

5    and if you screw up, that's your problem or do you want --

6    what's your desire?

7         MS. HEWITT:  Well, speaking for Cauldwell, your Honor,

8    I believe that we could be left to our own devices, but I can

9    only speak for my client.

10        The type of case we have, as your Honor is well

11   familiar, since it's a construction case, I don't think

12   metadata are going to be the kind of problems we're going to

13   have.  It's volume.  And it's probably that 95 percent of what

14   at least we two parties will produce to each other, we may not

15   not even need, but we can't make that determination.

16        So the kind of things that Ms. Sigmond was referring

17   to are just ways in which we can cooperate and make each

18   other's lives a little easier.  I don't think they are

19   disputatious issues.

20        THE COURT:  All right.  Ms. Sigmond, is that

21   satisfactory or how do you want to proceed?

22        MS. SIGMOND:  I would be happier if I had some

23   milestones on the progress of the productions from Cauldwell

24   and the city.

25        THE COURT:  When were they due or when are they

6

863VGROC                        Conference

1   supposed to be in?

2           MS. SIGMOND:  They are supposed to be ready to run

3   searches on July 15th.

4           THE COURT:  It's an awful long way from now.

5           MS. SIGMOND:  And I want to be able to start

6   depositions like August 1.  So I want to be sure that on July

7   15 I'm going to get data in usable form.

8           THE COURT:  Sounds like you've got -- do you have a

9   tech person?

10          MS. SIGMOND:  I do.

11          THE COURT:  Good.  Why don't you and your tech person

12  sit down with them so that what you want in usable form is what

13  they're going to give you; or if they're not, you'll all reach

14  a compromise and you'll tell me why you should get it in the

15  way you want it, and they should tell me why they shouldn't do

16  it that way.

17          MS. SIGMOND:  Well, we're talking about working in

18  either Concordium or Summation, so I don't know that format is

19  much as an issue as much as, you know, are we actually going to

20  get delivery; is it going to be of the material that we've

21  asked for in our search terms.

22          THE COURT:  One of the things I know by being involved

23  in ediscovery panels is lawyers don't know what they're talking

24  about and judges probably less so.  So if you want it in

25  Concordance, they are not required to produce it that way under

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1      the rules.  If you're all able to cooperate and do that, that's

2      great.  So why don't you all have your -- that's what I thought

3      I directed you all to do last time.  And it sounds like, and I

4      don't have the 26(f) report from all of you, so if you had a

5      26(f) conference, ideally that's supposed to lead to a report

6      to the Court.

7              So how about we do this again, and we do it with the

8      tech people.  So I am ordering all of you to meet and confer in

9      person with your tech people; and that there will then be from

10     that an agreed-upon report to the Court as to what is being

11     done with BSI.  Format, etc.  And if July 15th is the deadline

12     for production, that should mean, since we're dealing -- to the

13     extent we're dealing with electronic information and not paper,

14     that you give them a disk or DVD or multiple disks and DVDs

15     with the information on July 15th, not that on July 15th you

16     say, Okay, we're now ready and now the equivalent of the Xerox

17     department will work on this for the next two weeks.

18             But just to reiterate, at the risk of being a broken

19     record, you know, discovery ends November 1.  There will be no

20     extension of that date.  The prior dates for expert reports and

21     all of that, I mean those could be extended, but nothing is

22     going to get you past November 1.  So make sure you really are

23     cooperating with each other and to the fullest.  I'm not saying

24     you're not currently, but it sounds like there hasn't been full

25     communication.

863VGROC                          Conference

1              So by our next conference or maybe beforehand, if you

2     want it, you're going to give me a full 26(f) report, including

3     all the ediscovery issues that 26(f) requires to be in the

4     report, and then some.  And if you don't do it now and somebody

5     screws up or somebody does, you know, it one way when the other

6     was expecting it to be another way, don't come running to me

7     for help.

8              All right.  Anything else from the plaintiff's side?

9              MS. SIGMOND:  No, your Honor.  Thank you.

10             THE COURT:  All right.  From, I guess, Mr. Zichello,

11    you're next.

12             MR. ZICHELLO:  No, I have nothing to add, your Honor.

13             THE COURT:  All right.  Ms. Hewitt?

14             MS. HEWITT:  Nothing else, your Honor.

15             THE COURT:  Mr. Levy?

16             MR. LEVY:  The only concern that I would raise at this

17    point, your Honor, is, again, we have a very small --

18    relatively small claim on the main action; and we have, on the

19    fourth-party action, a fairly large claim that's going to

20    involve a lot more discovery and a lot more expense.

21             THE COURT:  Look, I mean, Ms. Hewitt and her client

22    brought you in.  If the two of you can agree in some way to get

23    you out of the case or, you know, stay your action pending

24    result of the plaintiff's action or something else, that's

25    great.  Otherwise, I didn't ask for this to be in my court.

863VGROC                           Conference

1    You're here, and you may be the tail that's wagging the

2    plaintiff's dog, but deal with it.

3              MR. LEVY:  The other point that I would like to raise,

4    your Honor, is the determination hasn't been made yet, but

5    there may very well be a very large fifth-party complaint

6    coming down the road in this case, which would probably involve

7    all of the other contractors and the consultants on the job, as

8    well.

9              THE COURT:  Bring it on.

10             MR. LEVY:  I'm just letting the Court know.

11             THE COURT:  Well, let's set a deadline.  I can't

12   remember, does Judge Kaplan's April 8th order have a deadline

13   for this?  I can't imagine that we're almost 60 days beyond

14   that.

15             MS. SIGMOND:  It did, your Honor, and I believe it

16   passed.

17             MR. LEVY:  I'm sorry?

18             MS. SIGMOND:  There was an order, and I believe the

19   time has passed.

20             THE COURT:  If that's the answer, then that makes my

21   life easy.  I'm trying to find the actual order.  Here we go.

22   Last day to join additional parties as of right or seek leave

23   to do so, June 1.  So I think we are stuck with just the four

24   of you, unless we can now eliminate any of you one way or

25   another.  But we're not bringing anyone else in, absent some

10

863VGROC                    Conference

1    motion that is not on my desk that's untimely.

2         Frankly, you've got a supposed motion against

3    Ms. Hewitt that is beginning to make less and less sense as a

4    motion to dismiss. So maybe the answer is, having pushed off

5    the motion as far as you all have, that it should just be

6    reserved for a summary judgment motion.

7         And so I guess my question, particularly since you

8    would appear to be relying upon matters outside of the

9    pleadings, to wit, some release, why isn't it a summary

10   judgment motion? And since you don't want to bring it on

11   quickly, why shouldn't it be left for the summary judgment

12   motion stage that will be coming at the end of discovery?

13   Mr. Levy?

14        MR. LEVY:  Frankly, your Honor, that's beyond my

15   control.

16        THE COURT:  It's not beyond my control.

17        MR. LEVY:  I understand that, your Honor. But that's

18   a decision that will be made at a level above me. I can't bind

19   my office right now on that issue, and I apologize. I don't

20   have the authority to.

21        THE COURT:  Okay. Permission to make the motion to

22   dismiss is withdrawn. If you want to make it, you'll need

23   leave of the Court so the people above you can come in and

24   visit me; otherwise, it's a summary judgment motion and let's

25   get your answer in.

863VGROC                        Conference

1           MR. LEVY:  Your Honor, my time to answer at the very

2    least has been extended to 6/13.

3           THE COURT:  Right.

4           MR. LEVY:  The federal rules let me answer or move at

5    any time until I have to.

6           THE COURT:  That's all right, on June 14th I'll deny

7    the motion.

8           MR. LEVY:  If your Honor chooses to do that, your

9    Honor chooses to do that.  But I don't believe under federal

10   rules you have the authority to deny me the right to make the

11   motion.

12          THE COURT:  That's fine.

13          MR. LEVY:  Okay, your Honor.

14          THE COURT:  If you want to go down that route, that's

15   fine.  I suggest you talk to your office as to why it's a

16   motion to dismiss.  And that means if the motion to dismiss

17   cites to anything outside of the pleadings, I certainly have

18   the right to deny it.  If you wanted to make an early summary

19   judgment motion, which is what this effectively looks like it's

20   going to be, first of all, under the briefing schedule you've

21   established it won't be decided till after discovery; but,

22   secondly, my rule is a party gets one summary judgment motion.

23          So if you file this motion, and I don't just deny it

24   out of hand, and if I decide it's a summary judgment motion,

25   then there will be no later summary judgment motion.  Is that

863VGROC                          Conference

1    clear?

2              MR. LEVY:  It is, your Honor.

3              THE COURT:  And if you need to bring people at a level

4    above you to these conferences, I know you may have thought

5    that the motion was already a fait accompli and this may be

6    catching you by surprise, but generally, other than settlement,

7    which is a client prerogative, the lawyers who appear in front

8    of me, whether it's a junior associate at a law firm or an

9    assistant chief from corp. counsel, binds their office.

10             MR. LEVY:  Just to clarify, your Honor, your Honor's

11   most recent order directs that the motion be made returnable

12   before Judge Kaplan rather than yourself.

13             THE COURT:  That's true.  And if I deny it, you

14   obviously then have the right to take it to Judge Kaplan, who

15   I'm sure will be delighted to find out how you're going to be

16   using his time.

17             MR. LEVY:  I'm really not trying to annoy you, your

18   Honor, I'm just trying to understand what the procedure is

19   going to be.  Is your Honor intending to report and recommend

20   on the motion if the motion is made to Judge Kaplan or --

21             THE COURT:  If I decide to go that route, yes.

22             MR. LEVY:  Okay, your Honor.

23             THE COURT:  Which is within my authority.  And also --

24   we'll leave it at that.  I just don't want anybody to be

25   wasting the Court's time.  And the more I think about the

863VGROC                    Conference

1   motion and the more it keeps getting extended, it's clear to me

2   it's a summary judgment motion, and that it's not going to get

3   decided under the two-month briefing schedule you all agreed

4   upon and reluctantly got me to approve. It's not going to be

5   decided before the discovery is virtually complete or indeed

6   complete. So it just doesn't make sense to me.

7        In any event, I am also going to require you to answer

8   on June 13th, regardless of any motion, so that everybody will

9   know what affirmative defenses and everything else there may be

10  so that discovery can be complete with respect to that.

11       Any other issues from anybody other than dates for our

12  next conference? Hearing nothing, when do you want to come

13  back?

14       MS. SIGMOND: May I propose June 24, your Honor?

15       THE COURT: Generally, my conferences run on a

16  four-to-six-week schedule. What's the magic of June 24?

17       MS. SIGMOND: I want to make sure that the 26(f)

18  conference takes place and we've resolved all of these issues,

19  because I really do want to start depositions August 1. Maybe

20  I'm being overly --

21       THE COURT: Let's do it this way: Your 26(f) report

22  is due to the Court on Monday, June 23. And knowing that that

23  will hopefully be an agreed-upon report, and knowing, if you've

24  read my rules, that if you need an emergency conference,

25  so-called emergency, just write and we'll get you in. And

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

863VGROC                        Conference

1    otherwise and conversely, if you're 48 hours or more before a

2    conference date and all four parties agree it's not necessary,

3    we can adjourn conferences.

4           Are we looking for early July, mid July, July right

5    after the July 15th production?  What's your pleasure?

6    Anybody?

7           MS. SIGMOND:  July 21, Judge?

8           THE COURT:  All right.  Hearing nothing from anyone

9    else, July 21, 10 a.m.  And I'll ask the two other questions,

10   although I suspect the answer is there's been no progress.

11   Anything going on on settlement or anything I should be doing

12   to help in that regard?

13          MS. SIGMOND:  There is a meeting scheduled, your

14   Honor, between Cauldwell Wingate and -- the principals of

15   Cauldwell Wingate and the principal of William A. Gross.

16          THE COURT:  Okay.  Good.  Keep talking settlement at

17   all levels.

18          I raised with all of you at the April 24th conference

19   the issue of whether all four parties were interested in having

20   the case in front of me for all purposes pursuant to 28 U.S.

21   Code, Section 636(c).  Did you all meet and talk about that?

22          MS. SIGMOND:  There was a discussion, your Honor.

23   There was no resolution of the issue.

24          THE COURT:  All right.  Let me know when there is a

25   resolution and otherwise -- well, when you say no resolution,

863VGROC                        Conference

1   does that mean there was at least one no vote or that everybody

2   is still thinking?

3           MS. SIGMOND:  Everybody is still thinking, Judge.

4   There were no votes one way or the other.

5           THE COURT:  All right.  Then we'll defer it to the

6   July 21 conference.

7           Okay.  Usual drill:  I'll require all of the parties

8   to purchase the transcript and split it however you have been

9   splitting it.  And with that, we are adjourned.

10          MS. SIGMOND:  Thank you, your Honor.

11          MS. HEWITT:  Thank you, your Honor.

12                          *      *      *

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT F



THE CITY OF NEW YORK
**LAW DEPARTMENT**
100 CHURCH STREET
NEW YORK, N.Y. 10007-2601

MICHAEL A. CARDOZO
*Corporation Counsel*

EDWIN M. LEVY
*Senior Counsel, Commercial and
Real Estate Litigation Division*
Room 3-241
Phone: (212) 788-1185
Fax:   (212) 788-8872
elevy@law.nyc.gov

June 9, 2008

**BY HAND**
Honorable Lewis A. Kaplan
United States District Judge
United Sates District Court
500 Pearl Street
New York, NY 10007

Re:    *William A. Gross Construction Associates, Inc. v.
American   Manufacturers   Mutual   Insurance
Company,*   and   other   actions,   07-CV-10639
**(LAK)**

Dear Judge Kaplan:

       This office represents Fourth-Party Defendant Dormitory Authority of the State of New
York ("DASNY") in the above-referenced matter.   We respectfully request a conference to
discuss an application by DASNY to extend its time to add new parties from June 1, 2008 to at
least June 24, 2008.

       At the conference held on April 3, 2008, Your Honor directed that DASNY's response to
the Fourth-party Complaint was due on May 20, 2008 and that any additional parties be added by
June 1, 2008 (11 days later).   In the time since, DASNY's time to respond to the Fourth-Party
Complaint has been extended to June 13, 2008.   Unfortunately, while I did request and receive
extensions of time to respond, due to inadvertence on my part and a period of illness in the
interim, I did not request a similar extension of DASNY's time to add new parties.   As a result,
DASNY is in the unusual situation of not yet having to respond to the Fourth-Party Complaint
but not being able to add necessary and proper parties to the litigation.   Accordingly, we
respectfully request a conference to make an application to extend DASNY's time to add new
parties, at the earliest, to June 24th (11 days after the response to the Fourth Party Complaint is
due) and to discuss issues which may arise from this extension.

       The reason we are seeking a conference, rather than simply making a request by this
letter, is due to the unusual relationship of this litigation to the on-going work at the subject

THE CITY OF NEW YORK LAW DEPARTMENT

Honorable Lewis A. Kaplan
June 9, 2008
Page 2

project. As Your Honor may recall, this action arises out of the construction of the Bronx County Hall of Justice ("BCHJ" or the "Project"). The BCHJ is an occupied and operating New York courthouse housing approximately 50 courtrooms in which criminal cases, both felonies and misdemeanors, are adjudicated. The Project has engendered approximately $72 Million in highly complex claims by various prime contractors.[1]  In addition, there is unfinished and remedial work that is either ongoing or being planned. In some instances, contractors with claims against DASNY, and/or contractors against whom DASNY may have claims, are participating in this work. We therefore most respectfully request the opportunity to confer with the Court briefly to discuss our request for an extension of time to add additional parties.

Respectfully submitted,

Edwin M. Levy (EL7792)
Assistant Corporation Counsel

Cc:     **(By Hand)**
        Honorable Andrew J. Peck
        United States Magistrate Judge
        United Sates District Court
        500 Pearl Street
        New York, NY 10007

        Dunnington, Bartholow & Miller, L.L.P
        477 Madison Avenue, 12th Floor
        New York, NY 10017
        Attn:   Carol A. Sigmond, Esq.

        Zichello & McIntyre, L.L.P.
        420 Lexington Avenue, Suite 2800
        New York, NY 10170
        Attn:   Vincent J. Zichello, Esq.

        Ingram, Yuzek, Gainen, Carroll & Bertolotti, L.L.P.
        250 Park Avenue
        New York, NY 10177
        Attn:   Patricia Hewitt, Esq.

---

[1]  To date, only one prime contractor other than Cauldwell Wingate has commenced an action against DASNY. That action is pending in New York State Supreme Court. Many of the other claimants are in negotiations with DASNY.

# EXHIBIT G

86OUGROC.txt

1

86OUGROC
1   UNITED STATES DISTRICT COURT
1   SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
2   WILLIAM A. GROSS CONSTRUCTION
3   ASSOCIATES, INC.,
3
4           Plaintiff,
4
5           v.                          07 CV 10639(LAK)(AJP)
5
6   AMERICAN MANUFACTURERS MUTUAL
6   INSURANCE COMPANY,
7
7           Defendant.
8   ------------------------------x
8
9                                   New York, N.Y.
9                                   June 24, 2008
10                                  3:00 p.m.
11
12  Before:
12
13                    HON. ANDREW J. PECK
13
14                                  Magistrate Judge
14
15                       APPEARANCES
15
16  DUNNINGTON, BARTHOLOW & MILLER, LLP
16       Attorneys for Plaintiff
17  BY:  CAROL A. SIGMOND
17
18  ZICHELLO & MCINTYRE, LLP
18       Attorneys for Defendant American Manufacturers
19  BY:  ANN TERESA MCINTYRE
19
20  INGRAM YUZEK GAINEN CARROLL & BERTOLOTTI, LLP
20       Attorneys for Defendant Cauldwell-Wingate Company
21  BY:  PATRICIA HEWITT
21
22  NEW YORK CITY LAW DEPARTMENT
22  OFFICE OF THE CORPORATION COUNSEL
23       Attorneys for Dormitory Authority
23  BY:  EDWIN LEVY
24       Assistant Corporation Counsel
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2

86OUGROC
1           (Case called)
2           THE COURT:  One of you -- Ms. Sigmond, since you are
3   standing up -- said that you needed this emergency conference
4   or pseudo-emergency conference because there were discovery
5   problems.
6           MS. SIGMOND:  Thank you.
7           We met on June 10 for the 27(f) discussion.
8           THE COURT:  26(f), but who is counting?
9           MS. SIGMOND:  Technical people were there, and I think
10  that we resolved most of the technical issues.
                        Page 1

86OUGROC.txt
```
11          The issue that prompted me to seek this conference --
12   and I speak for myself now -- is that the fourth party
13   defendant has attempted to make very targeted document request.
14          We have not asked for everything.  Our demands are
15   basically focused on change orders, and the class being sought,
16   for a construction case, it is the documents.
17          I served my demands over a month ago.  Yesterday, I
18   served my first round of search terms on the City and they had
19   asked them for by that day, so I provided them with search
20   terms.  But DASNY is saying that they will not be able to begin
21   to run searches or review for privilege or determine whether
22   the search is even feasible until July 15.  They are not even
23   saying they will make the July 15th date.
24          Cauldwell has committed to that date.
25          William A. Gross has produced a fairly substantial
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                              3

86OUGROC
```
1    26(f) production.
2           No one has served anything else at this point, but we
3    have our e-mails.  We have very little relative to the other
4    parties except for American Manufacturers.
5           I want to take 30(b)(6) depositions.  It would be
6    helpful to have documents from the City before these
7    depositions take place, particularly e-mails.  I would like to
8    schedule those for the first part of August, and I'm concerned
9    about doing that if I don't have some firm commitment that I am
10   going to have a substantial production from DASNY, particularly
11   as it relates to my client's change orders.
12          THE COURT:  Mr. Levy.
13          MR. LEVY:  Good afternoon, your Honor.
14          There are several interconnected issues here.  First,
15   let me address the discovery issue since that is what is up on
16   deck.
17          We have a universe of about 3 million papers that we
18   are estimating -- paper.  We have, based on time records, 120
19   custodians for e-mails.  And possibly the documents that we are
20   trying to get ahold of, we figure 1.5 gigabytes for Sigmond, so
21   we are talking about 300 million gigs of e-mail plus
22   E-documents, plus 3 million pages of hard copy.
23          We have a number of consultants.  I have
24   representatives here and some of my litigation team because I
25   want the Court to be aware that we are making every effort and
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                              4

86OUGROC
```
1    spending huge amounts of money and resources on trying to
2    comply, but the dispute that came up, the reason why we have
3    this conference is because counsel believed that I had
4    committed to producing documents by July 15.  We don't need to
5    get into he-said-she-said, but my position is that what we
6    committed to do was our very, very, very best to try to have
7    our database in shape to do word searches by July 1st.  It is a
8    huge, huge undertaking.  It is not as if this is a case with 30
9    boxes.  We have 52 filing cabinets.
10          THE COURT:  Let's put the paper aside for a moment
11   because paper is paper.
12          MR. LEVY:  In this case, paper is the vast majority of
13   what the project file is going to be.
14          THE COURT:  Then I am not sure that you two have
15   talked enough.  If the change orders, as I understand them, at
```
                                Page 2

86OUGROC.txt
```
16    least as to William Gross -- they are at least as Ms. Sigmond
17    described it, and I have not seen the document request -- if
18    they are mostly interested in change orders, and assuming those
19    are paper documents, I can't imagine, and you will have to
20    educate me why at least that can't be quickly found in the
21    paper records.
22         MR. LEVY:  We will do our very best to do that, your
23    Honor.
24         THE COURT:  You've got to do better than that.  You
25    have to tell me how your construction material is organized.
```
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              5

86OUGROC
```
 1    That's what happens when you don't educate the Court.  I cannot
 2    imagine that something as important as change orders, assuming
 3    it is a formal change order -- as opposed to an e-mail that
 4    says, please re-grade the street, OK, I will do it if you pay
 5    me, or whatever -- but if it is a formal change order, I find
 6    it hard to believe that it is not something that is kept in a
 7    set of binders, that it is not in some way findable without
 8    having to randomly search 3 million pages.
 9         MR. LEVY:  It is findable, your Honor.  The problem
10    that we have is that the document collection is not organized
11    as well as it might be.
12         THE COURT:  Whose fault is that?
13         MR. LEVY:  Unfortunately, your Honor, I can really not
14    lay blame for that.  It is a somewhat chaotic situation.
15         What adds to the problem is that we have our
16    document-imaging vendor going in and grabbing many, many boxes
17    of documents at a time, taking them, imaging them, keeping them
18    as long as it takes and then shipping them back to be put back
19    where they came from.  It makes it difficult for me to go into
20    the room where all of the documents are kept at any given time
21    and say, I know everything is in this cabinet because I don't
22    know that everything is in this cabinet.  There may be 20
23    cabinets' worth of stuff that is over at the document-imaging
24    company at any given time.  So I can go and see what is
25    there --
```
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                              6

86OUGROC
```
 1         THE COURT:  What is the purpose of imaging?
 2         MR. LEVY:  Cauldwell wants an entire collection in
 3    images.  We will need to have the entire collection imaged for
 4    our purposes in the litigation as well.
 5         THE COURT:  Stop for one minute because this may well
 6    tie into your motion to bifurcate the Cauldwell action against
 7    you.  But since I am dealing with Ms. Sigmond's request, what
 8    would happen if you put your document-imaging service on hold
 9    for a week or two weeks or whatever it takes, and you send in
10    an Army of paralegals, contract attorneys, etc., to take care
11    of the paper documents, at least the change orders that
12    Ms. Sigmond wants?
13         MR. LEVY:  Aside from the gap, it would substantially
14    slow down the process again and it would require ramping up.
15    And on top of that, we have informed our consultants that we
16    have stepped up -- we have a number of people who have put a
17    lot of people on this.
18         THE COURT:  Then what you are telling me is not that
19    you will do your best efforts to get this in a searchable
20    format by July 15, but that unless your vendors don't meet
```
                            Page 3

86OUGROC.txt
```
21   their contractual deadline, you will be done with the imaging
22   and whatever else you have to do to be able to then run
23   searches on July 16?
24              MR. LEVY:  July 15.
25              THE COURT:  Fine.  In that case, why can't you produce
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

7

86OUGROC
```
 1   everything within a week or so after that?
 2              MR. LEVY:  There are a number of problems with that.
 3   And this is bound up in what your Honor said might be ancillary
 4   issues.  There has to be privilege review.  This is a huge
 5   collection.
 6              THE COURT:  All of that has to be done.  Unless I am
 7   missing something -- and maybe I am -- if they have already a
 8   certain percentage of the stuff online, and it may not be the
 9   most efficient, but you have to do your privilege review and
10   your production and everything else sequentially and not just
11   say, OK, I am not doing anything production or review wise
12   until July 15 when everything is imaged.
13              There is no reason that you can't say, they will put
14   in a field of date entered on the computer.  There are ways the
15   vendors can deal with it and say, every Friday you are going to
16   search the database for new entries through that Friday and you
17   will pull out what you need to pull out for Ms. Sigmond, and
18   from that you will do a privilege review and you will do the
19   same for any other requests from the other parties.
20              MR. LEVY:  Your Honor, what we had hoped to do,
21   instead of looking at it page by page, which is enormously
22   time-consuming -- construction contract files, even if they are
23   somewhat disorganized, you can look at a folder and see, for
24   instance, that it is a partial payment request and you know
25   that there are not going to be any privileged documents in that
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

8

86OUGROC
```
 1   folder and you put it aside.  That may be 35,000 pages.  I
 2   don't have to look at that page by page, which is what I would
 3   have to do if I am looking electronically.
 4              THE COURT:  I'm sorry.  You are putting everything in
 5   the computer --
 6              MR. LEVY:  For the privilege review, it will be faster
 7   to look at the paper.
 8              THE COURT:  Again, what you need to do is get some
 9   organizational system with your vendor so that they identify
10   what paper documents they are done with, and you do your
11   privilege review, if that is the way you want to do it, which I
12   think is the old-fashioned way but it is yours to do as you
13   wish.  Start doing it.
14              MR. LEVY:  With the method that you are proposing, it
15   assumes that there is a system and an organization to --
16              THE COURT:  It now assumes that from today forward
17   there will be one.  I don't care how they do it.  Buy some new
18   file cabinets.  I really don't care.  You've got to do it.
19              MR. LEVY:  Respectfully, it will stop the collection.
20   It will stop the imaging.
21              THE COURT:  Counsel, with all due respect, unless the
22   imaging company has been imaging multiple times and they don't
23   know where they are getting it from -- they must know what
24   files they have finished with.  They must --
25              MR. LEVY:  They know the filing cabinet.  The know the
```
                              Page 4

86OUGROC.txt
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9

86OUGROC
1   drawer. The know the left side of the drawer. They know the
2   right side of the drawer. They will tell you that. That is
3   absolutely right.
4           Sorry to interrupt, but there is no section for change
5   orders.
6           THE COURT: You are missing my point. You are telling
7   me that you need a lot of time to do a privilege review and
8   that you want to do it manually.
9           MR. LEVY: I did not say that I needed a lot of time.
10  I just said I needed time to do a review.
11          THE COURT: Democracy is going to end in a few moments
12  because you are not helping me and I am probably not helping
13  you.
14          All documents responsive to the outstanding requests
15  are to be produced by July 30. That gives you two weeks from
16  the vendor's completion to get it done. Staff up accordingly.
17          MS. SIGMOND: May I address the other motions --
18          MS. HEWITT: May I just clarify, since now we are
19  going into a motion?
20          THE COURT: Yes.
21          MS. HEWITT: When you say July 30, do you mean with
22  respect to all parties?
23          THE COURT: Assuming your requests are outstanding
24  sufficiently long that I am not shortening any time, July 30.
25  So if you haven't served your requests yet, no, you can't get
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

10

86OUGROC
1   more time. But if you served your requests roughly at the same
2   time as the plaintiff did, then it all gets done by July 30,
3   subject to anyone saying, I don't need it that fast, I will cut
4   you a break, you owe me one, you can push it back. If it is
5   all electronic and every party is entitled to what every other
6   party has asked for and is getting, it should not be a major
7   issue.
8           But certainly as to the plaintiff, and you all tell
9   me, if you wish, when you made your document requests, but
10  assuming it is already 30 days old or very close to it then,
11  yes, July 30.
12          MR. LEVY: Your Honor, we just answered and we have
13  not yet served our discovery demand. Hopefully, we don't need
14  any discovery.
15          THE COURT: I am only asking as to discovery against
16  you since you seem to be the person with the issue. If you
17  serve your discovery on any of the other folks, they will
18  either respond within the 30 days, cut a deal with you if they
19  need more time, maybe quid quo pro, maybe not. And if there
20  are fights about that, you know where to find me.
21          MS. HEWITT: Your Honor, obviously I don't want to
22  interrupt Mr. Levy, but with respect to the mechanics of
23  document production and that process, Cauldwell-Wingate has
24  different issues than Gross has. I am happy to wait until he
25  finishes, but if we are getting on to a different point, I
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

11

86OUGROC
1   would just as soon deal with the logistics. It was Ms. Sigmond
Page 5

860UGROC.txt
```
2   and I who called the Court yesterday.
3           THE COURT: Let's hear it.  Go ahead.
4           MS. HEWITT: First of all, Cauldwell has not served
5   its document production request.  The draft is on my desk.  I
6   will get that in another day.  That may change the dates.
7           One of the reasons I was not rushing to do that is
8   because one of the things we talked about at the Rule 26(f) was
9   Cauldwell getting the entire project file.  They are getting
10  our entire project file.  We believe, notwithstanding the
11  volume, that it makes more sense for us.  If we give them
12  search terms, for example --
13          THE COURT: As long as you and Mr. Levy are in
14  agreement that that's the way you want to do it and you have
15  figured that the costs basically wash or that somebody is
16  paying some amount of costs, if that's an agreement, that is
17  fine with me.
18          MS. HEWITT: There are a couple of issues.  One is
19  that -- granting there was a misunderstanding, and as Mr. Levy
20  said, we don't have to get into it -- under the belief that we
21  were going to get actual documents by July 15, we were prepared
22  to enter into the 26(f).  Then it turned out there was a
23  misunderstanding about that, which is why we are here.
24          My concern is -- and maybe I need to make certain too,
25  but I haven't served my document request -- an end date.  What
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    12

860UGROC
```
1   I hear is why we can't get certain things.  I am open to being
2   flexible on dates.
3           THE COURT: It sounds like, one, I'm not sure why you
4   are serving a document request if you and Mr. Levy have, by
5   agreement, agreed to exchange full files.
6           MS. HEWITT: But that's the point, your Honor.  If
7   that's the agreement, then when will I get the full file?
8           THE COURT: That is something you need to talk about.
9   It is hard for me to say that, as to you, as opposed to Ms.
10  Sigmond's client, he has been dilatory or needs to put on 25
11  extra people if you have not served a document demand yet.  And
12  since the meet-and-confer under 26(f) was only a week or two
13  ago, however long it took to find out that there was a
14  misunderstanding, he is not in default, so to speak -- not that
15  he is in default as to Ms. Sigmond, but he is not behind the
16  8-ball as to you, so why don't the two of you work it out.
17          MS. HEWITT: This is something that we may work out
18  but we may have to come back on.  Because of formatting
19  requests, there may be an issue as to who bears the cost and if
20  that becomes an issue, we would like to come back.
21          THE COURT: You are always free to come back, but if
22  there are cost issues, they probably should be worked out
23  before the costs are incurred because if it costs an extra
24  million dollars -- just picking a number out of thin air -- and
25  you are each going to be saying he, she should pay it, when you
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    13

860UGROC
```
1   come before me and you get the wrong answer, you may well have
2   said, I could have lived without it if I knew I had to pay for
3   it and knew it cost that much.
4           Work it out, and if you have gotten to the point where
5   you have done whatever you can and you still have a
6   disagreement, present it to me.  Probably on that, I would need
```
                              Page 6

86OUGROC.txt
```
 7   affidavits.  If there is a dispute as to what it should cost,
 8   then I need vendor affidavits or the like to give me real
 9   numbers and not made up numbers.  But if there is agreement
10   that it is going to cost about 100,000 but he thinks you should
11   pay it and you think he should pay it, then you will make your
12   arguments and then it will be whatever I assume is equitable
13   and we will go from there.
14             MS. HEWITT:  We have made clear that we are not going
15   to incur the costs until we have an agreement or an
16   understanding as to who will bear the costs.
17             THE COURT:  All the more reason why you need to get
18   your agreements in place, preferably in writing ASAP so that
19   you have no misunderstanding and, if you do, I have something
20   to look at and say, this is what is on the piece of paper with
21   two signatures.  I am going to construe that and enforce it.
22             The other thing, of course, is to the extent that you
23   may be the dog wagging her tail or whatever  -- the example I
24   am using here -- you still have the option of negotiating out
25   Mr. Levy's motion that your case is too big and shouldn't be
```
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                                14

86OUGROC
```
 1   involved with all of this so that only what limited piece you
 2   need to deal with, the Gross Construction piece should be here
 3   and the rest should be held in abeyance and perhaps sent back
 4   to my friends across the street in state court.
 5             At the moment, as I said previously, absent agreement
 6   or a ruling on the motion, there appears to be sufficiently
 7   enough, both substantive and discretionary, that it will
 8   probably be with Judge Kaplan, although I have not had a chance
 9   to talk to him about, Heaven forbid, whether it is going to
10   land on my desk.
11             We have said previously full discovery goes forward
12   unless and until the motion is decided in a way that changes
13   that.  So it may well be that it is actually in your client's
14   interest to work something out with Mr. Levy, not on
15   mirror-imaging everything in each other's files, and figure out
16   who is going to pay for it, but reducing this case to what is
17   necessary for Gross and putting everything else on hold or in
18   or whatever.
19             To the extent that a so-ordered stipulation is
20   necessary so that it is not considered claim splitting or
21   something that will haunt either of your client's down the
22   road, work out what you would like and present it to me or
23   Judge Kaplan for signature.  If you don't, then we wait until
24   the motion is decided, which at this point the motion has not
25   even been responded to so, obviously, it can't be decided.
```
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                                15

86OUGROC
```
 1             Anything else?
 2             MR. LEVY:  Yes.
 3             THE COURT:  Mr. Levy, back to you.
 4             MR. LEVY:  Before we go back to other matters, I
 5   wanted to clarify that your Honor's order is that all documents
 6   that have been previously requested be produced by July 31?
 7             THE COURT:  Subject to whatever you would hold
 8   legitimately on privilege grounds, I am not overruling any
 9   objections that you have to her requests, but if you do have
10   any such objections and you have not already filed the formal
11   response that would include those objections, I am going to
```
                            Page 7

86OUGROC.txt
12    direct you to do so by June 30 so that you and Ms. Sigmond can
13    negotiate those out, so that will not be anything that slows
14    down the production once you start producing. And, similarly,
15    to the extent you can, now that you have the July 30 date which
16    will more or less let Ms. Sigmond have August depositions, not
17    early August but mid August -- I don't care if you do it on a
18    rolling basis or not -- but if you can feasibly do it without
19    slowing the whole process down, that makes the most sense.
20              MR. LEVY:  Thank you, your Honor.
21              THE COURT:  Next.
22              MR. LEVY:  Now on to the motion and the application
23    that we made which was referred by Judge Kaplan to your Honor,
24    which we carbon copied --
25              THE COURT:  What motion?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                16
86OUGROC
1               MR. LEVY:  The motion to dismiss which your Honor has
2     mentioned.
3               THE COURT:  You just said that Judge Kaplan has sent
4     to me --
5               MR. LEVY:  No, not a motion.  We had made an
6     application to Judge Kaplan.  We carbon copied you.  Judge
7     Kaplan's courtroom deputy informed us that the matter was
8     properly before your Honor.
9               THE COURT:  This is the addition of new parties?
10              MR. LEVY:  Yes, your Honor.  And that bears on the
11    motion as well.  The application --
12              THE COURT:  With all due respect to Judge Kaplan's
13    chambers -- and I do know that he is on vacation or at least he
14    was last week and I think that he may still be this week --
15    while technically it is in front of me, you are asking me to
16    override a deadline that he set which, even though Judge Kaplan
17    and I were in private practice together and are as close as can
18    be, it is always a dicey issue.  Particularly, where what you
19    are basically going to do is turn the case into Vietnam.
20              So I guess my question is this, and I am not sure I am
21    going to rule on that now.  If you were to add a gazillion new
22    parties, and I suppose I should let you tell me what number
23    really goes in there -- I said a gazillion -- how many new
24    parties are there and is there any substantive as opposed to
25    procedural harm to DASNY if I say, sorry, you missed the first
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                17
86OUGROC
1     deadline, I am not extending the new one, go sue them in State
2     Supreme?
3               MR. LEVY:  First, let me say, your Honor, that we
4     addressed the application to Judge Kaplan specifically for the
5     reason that your Honor stated, and we were very surprised at
6     that time it was referred to your Honor.
7               THE COURT:  I think, by the way, I am more surprised
8     in the sense that I have heard nothing from Judge Kaplan's
9     chambers until you said that.
10              MR. LEVY:  They told us that they had specifically
11    referred it to your chambers, your Honor.
12              THE COURT:  News to me.
13              MR. LEVY:  There is a very real possibility of harm if
14    we are not permitted to add additional parties.  We are
15    litigating issues of delay and who caused delay and which
16    parties may have caused delay and contributed to delay with
                              Page 8

86OUGROC.txt

```
17   Cauldwell in this case.
18            It is our position that a number of contractors caused
19   a number of delays that affected Cauldwell.  They are not in
20   this action.  And we may end up with a collateral estoppel
21   issue where, if we are not permitted to add the parties here,
22   we have no choice but to litigate in State Supreme, and we may
23   end up with an inconsistent outcome or collateral estoppel
24   issue arising out of this case.  It is a very unfair situation
25   to be in, your Honor.
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

18

86OUGROC
```
1             THE COURT:  Let me hear from the other counsel,
2    starting, I guess, with Ms. Hewitt.
3             MS. HEWITT:  Your Honor, we have not objected or taken
4    a position on the application.
5             THE COURT:  Let me make your life harder then.
6             I suspect that if new parties are brought in that what
7    I am likely to do, in fairness to Ms. Sigmond's client, is
8    bifurcate and say, your fourth party claim against DASNY and
9    DASNY's fifth party claim against all of these new folks will
10   be on a different track than the simpler -- not simple but
11   simpler -- case of whether William Gross is entitled to the
12   money it is claiming it is entitled to in the main complaint.
13            MS. HEWITT:  Your Honor, it is a --
14            THE COURT:  Something that may happen anyway, by the
15   way, but go ahead.
16            MS. HEWITT:  It is a difficult issue for the following
17   reason.
18            Gross's complaint is not only about change orders,
19   your Honor.  That is apparently the concern that Ms. Sigmond
20   has vis-a-vis Mr. Levy in terms of getting documents.  But the
21   complaint which is against the surety, and the surety has a
22   third party against us, is for $2.6 million and much of which
23   relates to delay, back charges, extra work -- the exact same
24   kind of claim that we have in this case.
25            So while it sounds like Gross's issues are discrete,
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

19

86OUGROC
```
1    as pleaded in our complaint, your Honor, there were a series of
2    delays, Gross being one the last subcontractors because they
3    did the outside work -- all of which led to what they are now
4    suing us for.
5             Your Honor, if we think about defending depositions or
6    looking at documents, the earlier developments, if you will,
7    will be implicated.  So I am not saying that they have to go to
8    state court for a fifth party action, because we all run the
9    risk of inconsistent judgments, but I believe -- and this is
10   the position that we will take in the motion -- that these
11   issues are related and belong in one court and this is the
12   court they are in.
13            THE COURT:  All right.  I might as well keep going
14   right to left.
15            Ms. McIntyre.
16            MS. McINTYRE:  I basically agree with the position
17   taken by Ms. Hewitt.  We have not taken a formal position yet
18   on it, but we agree with her statement that the issues are
19   related.
20            THE COURT:  Ms. Sigmond.
21            MS. SIGMOND:  Your Honor, my complaint seeks two and a
```
Page 9

86OUGROC.txt
```
22   half million dollars, about a million 7 is in change orders,
23   deals with credits, change orders and other items that are
24   fairly discrete to Gross.  There is a small piece having to do
25   with the out-of-sequence waterproofing that may relate to
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    20

86OUGROC
```
 1   Cauldwell in a broader sense, but may have no relationship to
 2   DASNY.
 3            There is a lack of storage on the site issue which is
 4   like another issue off to the side that may have implications
 5   for DASNY.  We don't really know.  It is a Cauldwell issue that
 6   Cauldwell promised us site storage, but didn't give us a place
 7   to put the dirt, the rock, the sand that we needed at the end
 8   of the job.
 9            THE COURT:  Are you able to drop your delay claims
10   since that is what seems --
11            MS. SIGMOND:  I would have to talk to my client about
12   that, but I might be inclined to do that to get it severed.  I
13   might be inclined to look at the so-called delay part of it,
14   but not the extra work directed at Cauldwell having to do with
15   the lack of site storage and that sort of thing but so-called
16   pure delay claims.  My client might be willing to allow me to
17   drop those.
18            I really see us as, on the one side, part of the
19   bigger, but we are the outside contractor, Judge.  We did most
20   of our work outside the building.  I am fairly confident that
21   there are enormous claims inside the building.  And one way to
22   break this up -- there are two ways to break this up, but one
23   way is to break it up, take the inside of the building and do
24   it somewhere else.
25            THE COURT:  If there are delay damage claims, that
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                    21

86OUGROC
```
 1   really doesn't work because what I assume everyone is saying,
 2   they couldn't do some of the outside work until they finished
 3   tramping around inside.
 4            MS. SIGMOND:  That is not what our delay claims are.
 5   Our delay claims have to do with us sitting around and waiting
 6   all day to decide whether or not or how to take out
 7   contaminated soil.  Our delay claims really are not in any way
 8   linked to the inside of the building --
 9            THE COURT:  It may be that after you think about it
10   and talk to your client and talk to Ms. Hewitt and Mr. Levy,
11   there may be ways to drop parts of your claim that are not
12   worth much money and that would save you --
13            MS. SIGMOND:  I agree.  I am willing to engage with my
14   client in that process.
15            MS. HEWITT:  I would have to engage with my client
16   also because, as I say now, I am looking at Gross's amended
17   complaint and it says, of the 2.6 that it is seeking against
18   American Manufacturers, it includes 1.6 which is escalated
19   project services, extended use of equipment, extended
20   supervision, extended project administration, labor escalation,
21   material escalation, additional work caused by waterproofing --
22            THE COURT:  There is no point arguing what their claim
23   is.  The question is, if they are willing to file a second
24   amended complaint, and doing it in consultation with the rest
25   of you, that drops anything that implicates all of these other
```
                    SOUTHERN DISTRICT REPORTERS, P.C.

86OUGROC.txt
(212) 805-0300

22

86OUGROC
1  claims and these new parties, it may be that you do not need
2  them in this action or that, in any event, even if they are
3  entitled to be in the case and DASNY is entitled to bring them
4  in, that we can bifurcate all of that and have the easier, mere
5  Sigmond claim dealt with on the schedule that we currently have
6  and everything else that should be in state court, but is at
7  least partly here, resolved subsequently here or, if smarter
8  heads prevail, in state court where they actually understand
9  these construction cases and have more of them.
10         I suppose that one could also ask Ms. Sigmond whether
11 you would be prepared to go to the commercial division with
12 this case and let my friends there sort all of this out, but be
13 that as it may.
14         MS. HEWITT:  Your Honor, if I may, I gather that your
15 Honor is familiar with the motion that has been made.
16         THE COURT:  Yes.
17         MS. HEWITT:  The motion no longer has anything to do
18 with the release.
19         THE COURT:  I always like to think that lawyers
20 occasionally listen to me, and I told Mr. Levy that that sounds
21 like a summary judgment motion to me which was premature.  Now,
22 obviously if he shows you the release documents and convinces
23 you that he doesn't need to bring in fifth parties, etc., etc.,
24 but I am not that big of an optimist.
25         MS. HEWITT:  Your Honor, if the basis of the motion
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

23

86OUGROC
1  now is 1367(C)(2), that there is no relationship to the Gross
2  claim and that this Court has no jurisdiction or should not
3  exercise its jurisdiction, obviously the case law -- I
4  shouldn't say "obviously" -- but we do believe that the case
5  law in this circuit particularly doesn't support that argument.
6  I question if the City is on the one hand agreeing or asking
7  for a bifurcation, are they also acknowledging that this Court
8  would then have jurisdiction?
9          These are issues that I have to discuss with my client
10 before I know what my client's position would be on the very
11 serious issues that we are now discussing.
12         THE COURT:  Sounds like you all need to consult with
13 your clients with respect to the motion, that is, the formal
14 motion that is pending.
15         With respect to the letter application, my
16 inclination, even though I feel like I am going to shoot myself
17 down the road, is not to prejudice DASNY because counsel was
18 sticking to a deadline which, if he had not blown by a few days
19 or if you all had consented to his rolling the deadline a month
20 ago, my inclination, subject to further discussion from all of
21 you, is to allow him in a very short period of time to bring
22 the fifth party complaint and then whether the fourth party and
23 fifth party complaints get bifurcated or trifurcated or
24 anything else, or whether once he brings it, Judge Kaplan deals
25 with his motion and says, you were right, Mr. Levy, the first
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

24

86OUGROC
1  time, the court shouldn't exercise jurisdiction over any of
2  this stuff and then dumps it all in state court.  But I am not
                         Page 11

86OUGROC.txt
3    inclined, although, it does mean that the schedule will get
4    screwed up, to prevent DASNY from bringing a fifth party
5    complaint.
6             So does anyone have anything further to say on that?
7             MS. SIGMOND:  Two things, Judge.
8             The original schedule agreed before the City was
9    involved was a little longer than the present schedule.
10            THE COURT:  But if you bring in new parties --
11            MS. SIGMOND:  It may be --
12            THE COURT:  You are lucky that if they are served by
13   July 4 and then they have 30 days to a year, and then they are
14   going to ask for an extension because they have to catch up to
15   all of you -- it is going to hurt the schedule.  How much it
16   will hurt will depend on how fast the other parties are able to
17   move.
18            MS. SIGMOND:  Your Honor, it would be helpful for me,
19   in talking about the delay claims, to actually see the fourth
20   party defendants, fifth parties and to see that complaint --
21            THE COURT:  You are going to see that quickly because,
22   if I allow the extension, I am going to give Mr. Levy until the
23   end of the month and not much longer.
24            MR. LEVY:  May I be heard, your Honor?
25            THE COURT:  Let me see if anyone is objecting to me
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                                    25
     86OUGROC
1    giving you this time and then, at the risk of me changing my
2    leanings, you tell me that you need six months to draft this
3    then, whatever.
4             MR. LEVY:  As a preliminary matter, your Honor, I
5    would like to ask the Court for a direction that today's
6    conference be kept confidential by counsel, for the reason I
7    will explain and not to speak --
8             THE COURT:  As you are starting to say that, there are
9    the five people in the back of the room aligned with one or
10   more of you?
11            MR. LEVY:  They are all corporation counsel and will
12   be bound by whatever I say.
13            THE COURT:  Fine.
14            MR. LEVY:  We have a number of contractors on-site who
15   are doing work presently.  We have consultants who are doing
16   work presently.  This comes up because of Ms. Sigmond's
17   request.  If I start bandying about who we are going to sue and
18   what our claims are going to be, it is quite possible that
19   these people will walk off the job.
20            THE COURT:  Life is short.  With all due respect, the
21   deadline was June 1st.  You wrote Judge Kaplan on the 9th
22   saying, can you have until June 24.
23            I didn't know -- I still don't know for sure this is
24   referred to me, but you say it is and I am willing to give you
25   a week or so, but are you telling me that these folks are going
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                                    26
     86OUGROC
1    to finish their work?
2             MR. LEVY:  No, your Honor.  I just want an admonition
3    from the Court so that, in the meantime, things don't fall
4    apart.
5             THE COURT:  In the week or the six days before you
6    have to actually sue these people?
7             MR. LEVY:  Yes, your Honor.
                         Page 12

860UGROC.txt

8      With respect to the time, your Honor, we are thinking
9  about 13 or 14 new parties.
10      THE COURT:  I can't wait.
11      MR. LEVY:  It is an awful lot to do in a week.  Just
12  as we put in the application, just ask for the original length
13  of time -- we made the application, saying that we would like a
14  conference, and I forgot if it was two weeks -- from the time
15  of the conference to be able to add them.
16      THE COURT:  With all due respect, you wrote on June 9
17  saying the deadline was June 1, can we have a conference, and
18  at that conference, give me until June 24.  So that is, I guess
19  15 days, and you really need to ruin the day before your July
20  4th holiday or the day after, but I don't know that it is going
21  to make any difference to anything.
22      MR. LEVY:  Your Honor, I do believe that these 15 days
23  are necessary and that it is pretty impossible to do what your
24  Honor is expecting in a week.
25      THE COURT:  With all due respect, it might have
             SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

                                                            27

860UGROC
1  behooved you, while this letter was sitting around, to have
2  actually drafted it so that if Judge Kaplan had called you in
3  for a conference, you could actually, as is often done when
4  leave to amend is being sought, say, here it is, I am ready to
5  go now.
6      MR. LEVY:  Yes, your Honor.
7      If I may, we have been running around literally -- I
8  am working nights and weekends to try to get up to where we are
9  supposed to be in this case.  We are running late.  We have the
10  biggest burden.  I have been killing myself.  I'm trying to get
11  the discovery ready.  There has not been time to do that and
12  also start drafting fifth party complaints, your Honor.
13      THE COURT:  Then you shouldn't ask for permission to
14  file it.
15      I will give you the 15 days, which means July 9.  I
16  expect service to be accomplished super expeditiously meaning,
17  I assume that all of these are New York companies and all it
18  takes is a process server to knock on the door, etc.  I will
19  give you until July 18th to complete service.
20      Obviously, if you run into a problem that is not a
21  service manpower problem, but is somebody ducking service or
22  somebody that is not a New York corporation or something out of
23  the ordinary, you can come back and ask for specific leave.
24  But I don't want to give you the full 120 days that you have
25  under the Federal Rules or the new parties will be in after the
             SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

                                                            28

860UGROC
1  case is over.
2      MS. HEWITT:  Your Honor, may I?
3      It is like the domino theory, one thing leads to
4  another.
5      Your Honor, it strikes me that if Corporation Counsel
6  or DASNY is going to serve that fifth party complaint, if it
7  doesn't moot their motion, it certainly makes no sense for me
8  to be answering a few weeks later, if the parties --
9      THE COURT:  Answering what?
10      MS. HEWITT:  There are at least two issues addressed
11  in the motion.  One is that the Court shouldn't exercise
12  jurisdiction at all.  If they are going to serve a fifth party
                    Page 13

860UGROC.txt
13  complaint, I would argue, your Honor, that moots that request
14  that they have made.
15          THE COURT:  It may well.  And that is a risk that they
16  are going to have to take, Mr. Levy and his client.
17          On the one hand, it may ruin one of your arguments
18  while giving you a much better argument that this case is huge
19  and is not so related to William Gross that you shouldn't
20  bifurcate or send to the state court or both.  It is what it
21  is.
22          And, frankly, I think I received this on June 16 which
23  means, assuming that was the day that it was filed, that you
24  have until June 30.
25          MS. HEWITT:  Your Honor, there was a motion schedule
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                            29
860UGROC
1   worked out because of longstanding vacation plans.  It was done
2   consensually.  We have until July 21 --
3           THE COURT:  Then you will know --
4           MS. HEWITT:  If I may, your Honor?
5           THE COURT:  Yes.
6           MS. HEWITT:  And maybe I could work this out with
7   Mr. Levy, but if I don't know until July 9 whether he is even
8   serving a fifth party complaint.
9           THE COURT:  Let me stop you right here.
10          If I give you this permission, Mr. Levy, so that you
11  don't get everybody running around crazy, are you going to
12  exercise it or is it something that DASNY is still only
13  thinking about?
14          MR. LEVY:  This provision?
15          THE COURT:  Permission to file the fifth party
16  complaint.
17          MR. LEVY:  We will certainly file the fifth party
18  complaint.
19          THE COURT:  That answers --
20          MS. HEWITT:  Am I briefing severance or, your Honor,
21  can we put off the date of answering because of all of these
22  issues that we have addressed, except for discovery, this
23  afternoon?  We are now going to talk to our client and find out
24  whether they are willing --
25          THE COURT:  Answering what?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                            30
860UGROC
1           MS. HEWITT:  To answer the motion, your Honor.  It is
2   due July 21.  I have people briefing it as we speak.  It is a
3   waste.  I am not sure what they are briefing.
4           THE COURT:  Frankly, you are all, because of your
5   schedules, creating a motion that may be a waste of time when
6   the fifth parties come in screaming and yelling about the
7   discovery schedule.  I warned you all about this previously.
8   You have taken two months to fully brief the motion under the
9   current schedule in a way that the reply comes in on August 18,
10  very close to both the turnover of law clerks at the end of
11  August, beginning of September and, frankly, the traditional
12  late August vacation.  So you are not going to have a
13  resolution of the motion until discovery, including experts, is
14  largely done, other than whatever happens because the fifth
15  parties ask for more time.
16          So if you all want to extend it further, the grand
17  impact of all of that is, I probably should just deny the
                            Page 14

86OUGROC.txt
18  motion on the ground that all the excess discovery that you are
19  all worried about will have occurred by the time that the
20  motion is ready for decision.
21          So if you all really want to work out extending this
22  even further -- I really don't see why, you don't have to know
23  who all of the people are that he is bringing in.  He is
24  bringing in other people on the project on a fifth party claim.
25          And, frankly, you and Mr. Levy can talk and maybe he
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                    31

86OUGROC
1   will tell you more or you can say that the fact that he brings
2   in all of these folks means he loses point 1 of his argument
3   but he has a better argument on point 2.
4          Whatever it is, I am not inclined voluntarily to give
5   you more time on something that is only further going to moot
6   it.
7          MS. HEWITT:  Your Honor, if I may -- and I don't
8   believe that things that go on between counsel or things -- we
9   have not requested a single delay on this motion.  They all
10  came from the corp counsel's office and you granted every
11  single one of them.  It is not our fault that they are now in a
12  position -- it is fine with me that he is filing the fifth
13  party complaint, and I don't care who the parties are really,
14  but on July 9 is the first I am going to see that and by July
15  21, I am supposed to take principled, legal positions which I
16  have associates researching and briefing as we speak, and now I
17  don't even know what the issues are.
18          It seems to me that, in light of that, that to give
19  Cauldwell another couple of weeks to answer that motion --
20  maybe we should only focus on bifurcation at that point; maybe
21  we would have agreed on Gross with bifurcation and that would
22  be mooted.
23          THE COURT:  Frankly, any agreements with Gross, I
24  would think, are going to come very soon and by July 9, if not
25  long before then, you are all going to know whether Gross has
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                    32

86OUGROC
1   agreed to drop the delay claims which makes it easy, and in
2   which case you and DASNY may stipulate lots of things.  If you
3   are telling me that you desperately need more time, frankly, I
4   don't buy it.
5          MS. HEWITT:  I don't desperately need more time.
6   Maybe the thing to do is to ask leave of the Court, if we see
7   the papers on July 9 and that raises issues that we have not
8   anticipated, then we would come back.
9          What I don't like doing, your Honor, is wasting my
10  client's time and money.  And I have people researching issues
11  that may be mooted by virtue of the fact --
12          THE COURT:  You know that now, is all that I am
13  saying.  I think what you just said makes sense.  On July 9 or
14  sooner, when he gives you either a draft or the final of the
15  fifth amended complaint, if that so suddenly changes the
16  universe, you will work it out with all of the other lawyers
17  and hope that when you approach me that I will grant you more
18  time.
19          I am just telling you all that, as a practical matter,
20  you are going to be going through, absent the agreement and
21  reconsideration as between your client, Ms. Hewitt, and DASNY
22  and whatever Gross wants to agree to to keep their case moving
                            Page 15

860UGROC.txt
23    which now is moving at the snail's pace as opposed to the
24    double snail's pace it will be in July when the new parties
25    come in kicking and screaming -- you all work it out, but the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

                                                                    33
860UGROC
 1    motion is going to largely be mooted.
 2             If we do all of the discovery here because you need
 3    more time and he needs more time and she needs more time and
 4    you get the motion to Judge Kaplan and then he has to deal with
 5    it, if discovery is over, and to the extent that this is an
 6    issue of judicial discretion, not complete lack of
 7    jurisdiction -- and it does seem to be a judicial discretion
 8    issue -- if we have taken the time to do all of the discovery
 9    here, I am not altogether certain, to put it mildly, that we
10    will then say, OK, the case is now trial ready, but we will let
11    the trial go over to our friends at 100 Centre Street or 60
12    Centre Street, wherever they are.
13             So the more time you all take on this, if this had
14    been a more normal briefing schedule, the motion would be fully
15    teed up in the next week or two and might well have been
16    decided before the new people appeared, but that's not the way
17    it is now.
18             Ms. Sigmond, you are standing, so I will give you the
19    floor.
20             MS. SIGMOND:  Two points.
21             We currently have a conference scheduled for Monday,
22    July 21.  Would it be a good idea if the fifth party complaints
23    were served concerning a notice of conference?
24             THE COURT:  Obviously they may or may not show up
25    until they have hired lawyers and etc., etc., but, yes.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

                                                                    34
860UGROC
 1             MS. SIGMOND:  And we should hold that date?  It seems
 2    to me that would be logical.
 3             THE COURT:  And even before then, the four of you,
 4    before we have twelve other lawyers joining you here, really
 5    need to think about the best way to handle all of this.
 6             And I think that the burden, Ms. Sigmond, is largely
 7    on you to talk to your clients and see what you can drop
 8    without severe economic harm, or even if not dropping it
 9    completely, bifurcating it and saying, if anyone brings a delay
10    claim against DASNY, Cauldwell or whoever, that you then might
11    be able to join in but, otherwise, dropping it.
12             And once you talk to your client, talk to all of the
13    other lawyers, see if that allows them to bifurcate in federal
14    court or, even better, dismiss without prejudice other than for
15    discovery purposes that they may need to be in, in some way,
16    but bring in all of the bigger claims with everybody else on
17    the construction project over to State Supreme.
18             What else, if anything, do we need to do today?
19             MR. LEVY:  The only point left is whether or not your
20    Honor is going to direct that the issue as to adding parties
21    not be discussed beyond clients and people in the offices?
22             THE COURT:  Is everybody willing to do that on a
23    voluntary basis?
24             MS. HEWITT:  Yes, your Honor.
25             MS. MCINTYRE:  Yes, your Honor.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300
                              Page 16

86OUGROC.txt

35

86OUGROC
1          MS. SIGMOND:  Yes, your Honor.
2          THE COURT:  Good.  Then there is no need for me to
3   order it since you have convinced the other people to do it
4   voluntarily.
5          Usual drill.  I will require you all to purchase the
6   transcript however you have been splitting it.  Use whatever
7   method makes sense.
8          I will see you in July, hopefully not sooner, unless
9   it is for good news.
10
11                         o    0   o
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# EXHIBIT H

◇AO 440  (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

_____ Southern _____   District of   _____ New York _____

William A. Gross Construction Associates, Inc.,
Plaintiff,

V.

American Manufacturers Mutual Insurance
Company, Defendant.

**SUMMONS IN A CIVIL ACTION**

CASE NUMBER:   07-CV-10639 (LAK) (AJP)

*Please Note: This is a fifth-Party action. Please see the attached Fifth-party Complaint for the full caption*

TO: (Name and address of Defendant)

See attached service list.

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

MICHAEL A. CARDOZO
Corporation Counsel of the City of New York
Attorney for Fourth-Party Defendant and Fifth-Party Plaintiff
    Dormitory Authority of the State of New York
100 Church Street
New York, N.Y. 10007
(212) 788-1185

By:   Edwin M. Levy
         Assistant Corporation Counsel

an answer to the complaint which is served on you with this summons, within _____ 20 _____ days after service of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this Court within a reasonable period of time after service.

J. MICHAEL McMAHON

CLERK

(By) DEPUTY CLERK

DATE   7/9/2008

AO 440 (Rev. 8/01) Summons in a Civil Action

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and complaint was made by me[1] | |
| NAME OF SERVER (PRINT) | TITLE |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant. Place where served:

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

Name of person with whom the summons and complaint were left:

☐ Returned unexecuted:

☐ Other (specify):

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL $0.00 |
|---|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____        _____
                    Date                              Signature of Server

                                          _____
                                          Address of Server

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure

# FIFTH-PARTY COMPLAINT SERVICE LIST

A. WILLIAMS TRUCKING & BACKHOE TRENCHING, INC.
c/o Department of State of the State of New York
One Commerce Plaza
99 Washington Avenue
Albany, NY 12231

AMERICAN CASUALTY COMPANY OF READING, PA
c/o CNA Surety Corporation
CNA Plaza
333South Wabash
13-South
Chicago, IL 60685-1303
Attn: Raymond M. Lemming, P.E.

ASPRO MECHANICAL CONTRACTING, INC.
c/o Department of State of the State of New York
One Commerce Plaza
99 Washington Avenue
Albany, NY 12231

BEAUBOIS CANADA, INC.
c/o Department of State of the State of New York
One Commerce Plaza
99 Washington Avenue
Albany, NY 12231

BOVIS LEND LEASE LMB, INC.
c/o Department of State of the State of New York
One Commerce Plaza
99 Washington Avenue
Albany, NY 12231

DIERKS HEATING COMPANY, INC.
c/o Department of State of the State of New York
One Commerce Plaza
99 Washington Avenue
Albany, NY 12231

ENCLOS CORPORATION
c/o Department of State of the State of New York
One Commerce Plaza
99 Washington Avenue
Albany, NY 12231

FIVE STAR ELECTRIC CORPORATION
c/o Department of State of the State of New York
One Commerce Plaza
99 Washington Avenue
Albany, NY 12231


FUTURE TECH CONSULTANTS OF NEW YORK, INC.
c/o Department of State of the State of New York
One Commerce Plaza
99 Washington Avenue
Albany, NY 12231

HERITAGE AIR SYSTEMS, INC.
c/o Department of State of the State of New York
One Commerce Plaza
99 Washington Avenue
Albany, NY 12231

HUGH O'KANE ELECTRIC CO., L.L.C.
c/o Department of State of the State of New York
One Commerce Plaza
99 Washington Avenue
Albany, NY 12231

MATERIALS TESTING LAB, INC.
c/o Department of State of the State of New York
One Commerce Plaza
99 Washington Avenue
Albany, NY 12231

PYRAMID FIRE PROTECTION, INC.
c/o Department of State of the State of New York
One Commerce Plaza
99 Washington Avenue
Albany, NY 12231

RAFAEL VINOLY ARCHITECTS, P.C.
c/o Department of State of the State of New York
One Commerce Plaza
99 Washington Avenue
Albany, NY 12231

SMI-OWEN STEEL COMPANY, INC.
c/o Department of State of the State of New York
One Commerce Plaza
99 Washington Avenue
Albany, NY 12231

STONEWALL CONTRACTING CORPORATION
c/o Department of State of the State of New York
One Commerce Plaza
99 Washington Avenue
Albany, NY 12231

TRACTEL, INC.
c/o Department of State of the State of New York
One Commerce Plaza
99 Washington Avenue
Albany, NY 12231

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- x
WILLIAM A. GROSS CONSTRUCTION ASSOCIATES,
INC.,

                             Plaintiff,

-against-

AMERICAN MANUFACTURERS MUTUAL
INSURANCE COMPANY,

                             Defendant.
-------------------------------------------------------------------- x
AMERICAN MANUFACTURERS MUTUAL
INSURANCE COMPANY,

                          Third-Party Plaintiff,

-against-

CAULDWELL WINGATE COMPANY, LLC,

                          Third-Party Defendant.
-------------------------------------------------------------------- x
CAULDWELL WINGATE COMPANY, LLC,

                          Fourth-Party Plaintiff,

-against-

DORMITORY AUTHORITY OF THE STATE OF NEW
YORK,

                          Fourth-Party Defendant.
-------------------------------------------------------------------- x

07-CV-10639 (LAK)(AJP)

**FIFTH-PARTY COMPLAINT**

Caption continued on the next page

---------------------------------------------------------------------- x

DORMITORY AUTHORITY OF THE STATE OF NEW
YORK,

                                    Fifth-Party Plaintiff,

               -against-

A. WILLIAMS TRUCKING & BACKHOE
TRENCHING, INC., ASPRO MECHANICAL
CONTRACTORS, INC., BEAUBOIS CANADA, INC.,
BOVIS LEND LEASE LMB, INC. CNA SURETY
CORPORATION D/B/A AMERICAN CASUALTY
COMPANY OF READING, PA, DIERKS HEATING
COMPANY, INC., ENCLOS CORPORATION, FIVE
STAR ELECTRIC CORPORATION, FUTURE TECH
CONSULTANTS OF NEW YORK, INC., HERITAGE
AIR SYSTEMS, INC., HUGH O'KANE ELECTRIC CO.,
LLC, MATERIALS TESTING LAB, INC., PYRAMID
FIRE PROTECTION, INC., RAFAEL VINOLY
ARCHITECTS P.C., SMI-OWEN STEEL COMPANY,
INC., STONEWALL CONTRACTING CORPORATION,
TRACTEL LTD. SWINGSTAGE DIVISION,

                                    Fifth-Party Defendants.
---------------------------------------------------------------------- x

               Fourth-Party Defendant and Fifth-Party Plaintiff DORMITORY AUTHORITY

OF THE STATE OF NEW YORK ("DASNY"), by its counsel MICHAEL A. CARDOZO,

Corporation Counsel of the City of New York, respectfully alleges as follows:

## NATURE OF THE ACTION

               1.      This action arises from the failure of the Fifth-Party Defendants to

perform pursuant to numerous contracts relating to the construction of a new criminal court

complex, the Bronx County Hall of Justice (the "Complex" or the "Project") located in Bronx

County, New York. The Project was financed and managed by the DASNY, pursuant to a

contract with the City of New York (the "City").

.2

2.     Fifth-Party Defendants are contractors and consultants who were engaged by DASNY to perform construction work and provide construction-related services in connection with the Project. Fifth-Party Defendants' repeated failures to perform in accordance with their contractual obligations, and in accordance with generally accepted professional standards, have substantially delayed the completion of the construction, which resulted in DASNY incurring increased construction costs, and delayed the opening of the Complex – initially scheduled for December 31, 2005 – until February 2008, and have required, and will continue to require, the performance of corrective work necessary to correct defective and/or incomplete work .

## JURISDICTION AND VENUE

3.     This Court has supplemental jurisdiction over this Fifth-Party Action under 28 U.S.C. § 1367(a), to the extent that the Court has supplemental jurisdiction over the claims asserted in the Fourth-Party Action.[1]

4.     Venue is proper under 28 U.S.C. § 1391(b).

## PARTIES

5.     DASNY is public benefit corporation organized and existing under the Public Authorities Law of the State of New York, and maintains a place of business at 515 Broadway, Albany, New York 12207.

6.     Upon information and belief, A. Williams Trucking & Backhoe Trenching, Inc. ("Williams") is, and was at all relevant times, a domestic business corporation

---

[1] As of the date of the filing of this Fifth-Party Complaint, DASNY's motion, filed on June 13, 2008, to dismiss the Fourth-Party Action for lack of supplemental jurisdiction, has not been fully briefed, and therefore remains pending. In serving and filing the instant Fifth-Party Action, DASNY preserves, and in no way intends to waive, any of its jurisdictional objections or other defenses and/or counterclaims asserted in the Fourth-Party Action.

duly organized and existing under the laws of the State of New York. Williams' principal place of business is located at 225 Third Avenue, Brooklyn, New York 11217.

7.    Upon information and belief, Aspro Mechanical Contractors, Inc. ("Aspro") is, and was at all relevant times, a domestic business corporation duly organized and existing under the laws of the State of New York. Aspro's principal place of business is 127-08 Merrick Boulevard, Springfield Gardens, New York 11434.

8.    Upon information and belief, Beaubois Canada, Inc. ("Beaubois") is, and was at all relevant times, a foreign business corporation duly organized and existing under the laws of the Canada and authorized to conduct business in the State of New York. Beaubois' principal place of business is located at 521 6th Avenue, St. Georges, Quebec, Canada G5YB-7.

9.    Upon information and belief, Bovis Lend Lease LMB, Inc. ("Bovis") is, and was at all relevant times, a domestic business corporation duly organized and existing under the laws of the State of New York. Bovis' principal place of business is located at 200 Park Avenue, 9th Floor, New York, New York 10166.

10.    Upon information and belief, Dierks Heating Company, Inc. ("Dierks") is, and was at all relevant times, a domestic business corporation duly organized and existing under the laws of the State of New York. Dierks' principal place of business is located at 43-32 33rd Street, Long Island City, New York 11101.

11.    Upon information and belief, Enclos Corporation ("Enclos") is, and was at all relevant times, a corporation organized and existing under the laws of the State of Minnesota and authorized to conduct business in the State of New York. Enclos' principal place of business is located at 2770 Blue Water Road, Eagan, Minnesota 55121.

4

12.     Upon information and belief, Five Star Electric Corporation ("Five Star") is, and was at all relevant times, a domestic business corporation duly organized and existing under the laws of the State of New York.  Five Star's principal place of business is located at 101-32 101st Street, Ozone Park, New York 11416.

13.     Upon information and belief, Future Tech Consultants of New York, Inc. ("Future Tech") is, and was at all relevant times, a domestic business corporation duly organized and existing under the laws of the State of New York.  Future Tech's principal place of business is located at 52 East 2nd Street, Mineola, New York 11501.

14.     Upon information and belief, Heritage Air Systems, Inc., also known as Heritage Mechanical Services, Inc. ("Heritage"), is, and was at all relevant times, a domestic business corporation duly organized and existing under the laws of the State of New York.  Heritage's principal place of business is located at 305 Suburban Avenue, Deer Park, New York 11729.

15.     Upon information and belief, Hugh O'Kane Electric Co., LLC ("O'Kane") is, and was at all relevant times, a foreign limited liability company duly organized and existing under the laws of the State of Delaware, and authorized to conduct business in the State of New York.  O'Kane's principal place of business is located at 90 White Street, New York, New York 10013.

16.     Upon information and belief, Materials Testing Lab, Inc. ("MTL") is, and was at all relevant times, a domestic business corporation duly organized and existing under the laws of the State of New York.  MTL's principal place of business is located at 145 Sherwood Avenue, Farmingdale, New York 11735.

17.     Upon information and belief, Pyramid Fire Protection, Inc. ("Pyramid") is, and was at all relevant times, a domestic business corporation duly organized and existing under the laws of the State of New York.  Pyramid's principal place of business is located at 2138 Williamsbridge Road, Bronx, New York 10461.

18.     Upon information and belief, Rafael Vinoly, Architects P.C. ("RVA") is, and was at all relevant times, a professional corporation duly organized and existing under the laws of the State of New York.  RVA's principal place of business is located at 50 Vandam Street, New York, New York 10013.

19.     Upon information and belief, SMI-Owen Steel Company, Inc. ("SMI-Owen") is, and was at all relevant times, a corporation duly organized and existing under the laws of the State of South Carolina and authorized to conduct business in the State of New York.  SMI-Owen's principal place of business is located at 113 East Warehouse Court, Taylors, South Carolina 29687.

20.     Upon information and belief, CNA Surety Corporation d/b/a American Casualty Company of Reading, PA ("CNA") is, and was at all relevant times, was a foreign corporation authorized to do business in the State of New York.  Upon information and belief, CNA maintains a principal place of business at CNA Plaza, 333 South Wabash, 13-South, Chicago, Illinois 60685.

21.     Upon information and belief, Stonewall Contracting Corporation ("Stonewall") is, and was at all relevant times, a domestic business corporation duly organized and existing under the laws of the State of New York.  Stonewall's principal place of business is located at 14-09 110th Street, College Point, New York 11356.

6

22.    Upon information and belief, Tractel Inc., d/b/a Tractel Ltd. Swingstage Division ("Tractel") is, and was at all relevant times, a corporation duly organized and existing under the laws of the State of Massachusetts and authorized to conduct business in the State of New York.  Tractel's principal place of business is located at 110 Shawmut Road, Canton, Massachusetts 02021.

## FACTUAL ALLEGATIONS

**The Genesis of the Project**

23.    The City, in conjunction with the New York State Office of Court Administration, having determined that additional courtroom space was needed in The Bronx, decided to construct the Complex.

24.    The Complex was to include a Courthouse, a Jury Assembly Building, and an underground parking garage.

25.    The site selected for the Project covers two and one-half square city blocks, just east of the existing Bronx County Criminal Court and Family Court building, between East 161st Street on the south, East 163rd Street to the north, Sherman Avenue on the west, and Morris Avenue on the east (the "Site").

26.    In order to commence the Project, the City acquired title to several properties at the Site.

27.    The City, through the New York City Department of Design and Construction ("DDC"), commissioned RVA to devise architectural plans for the Complex (the "RVA Contract").  The architectural plans envisioned the construction of 774,000 square foot, nine-story building with forty-seven (47) courtrooms, seven (7) grand jury rooms, and office

7

space, a two-level underground parking garage, and a large, open plaza. The Complex would be one of the largest courthouses in the country.

28.    DASNY took over the planning and construction of the Project, pursuant to the Project Management Agreement between DASNY and the City, dated October 16, 1992, and in accordance with the provisions of the Dormitory Authority Act, as amended, Public Authorities Law §§ 1675, *et seq.* A budget of $325 million was established. Under the construction schedule established, work on the Project would begin in August 2001, and end in December 2005.

**The Project Contracts and Problems Encountered During the Project**

29.    Under the Project Management Agreement, DASNY was authorized to enter into contracts with consultants, construction contractors and a construction manager. With respect to the Project, DASNY entered into numerous contracts with not less than nineteen different prime contractors and several engineering and other consulting firms.

**The Project Design**

30.    In or about June 2001, RVA entered into Contract No. DA 72278/1380909999 (the "RVA Contract") with DASNY, under which RVA agreed to provide DASNY with certain architectural services in connection with the construction of the Project. The original amount of the RVA Contract was $6,664,170.00, although this amount was adjusted upward during the performance of the work through approved change orders.

31.    RVA failed to provide the services required under the RVA Contract.

32.    RVA failed to coordinate various design documents and failed to include essential design elements for construction, such as returns in several areas for the air heating and cooling systems.

8

33.     RVA failed to ensure that its designs and the construction materials it designated complied with applicable provisions in the New York City Building Code.

34.     RVA failed to timely respond to contractor inquiries and requests for information, which resulted in significant delays on the Project.

35.     RVA failed to properly review and approve proposed design changes to the Complex submitted by various contractors during construction, which resulted in significant structural failures.

**Construction Management**

36.     In or about August and September 2000, DASNY and Bovis entered into three separate written contracts – Contract No. DA 72369/1380909999, Contract No. DA 72345/1380909999, and Contract No. DA 72384/1380909999 (collectively the "Bovis Contracts") – under which Bovis agreed to perform certain services to DASNY in connection with the design of the Project, and with construction management and coordination services in connection with its construction.

37.     However, Bovis failed to provide the services required under the Bovis Contracts.

38.     Bovis failed to properly coordinate the work of the contractors hired for the Project.

39.     Bovis failed to develop a proper schedule for the Project.

40.     Bovis failed to properly supervise the work of the contractors hired for the Project.

41.     Bovis failed to properly provide adequate management of the Project, such as by sending unqualified personnel to oversee the work.

9

**Excavation and Foundation Work**

42.     In or about January 2002, Williams entered into a written contract identified as Contract No. DA 83083/1380909999 (the "Williams Contract") with DASNY, under which Williams agreed to perform certain excavation and foundation work in connection with the Project. The original amount of the Williams Contract was $18,479,000.00, although this amount was adjusted upward during the performance of the work through approved change orders.

43.     Williams failed to complete its work in a timely manner, despite time extensions agreed to by DASNY.

44.     Upon information and belief, the completion of Williams' work was delayed because it failed to adequately coordinate with other contractors.

45.     In addition, Williams failed to perform in a workmanlike manner, by, *inter alia,* over-excavating the Site, which required excavated earth to be replaced; and by rupturing public water mains on at least two separate occasions.

46.     Upon information and belief, Williams failed to adequately supervise the workers it hired to perform the services required under the Williams Contract.

**Structural Steel Work**

47.     In or about March 2001, SMI-Owen entered into Contract No. DA 78798/1380909999 (the "SMI-Owen Contract") with DASNY, under which DASNY agreed to perform certain structural steel work in connection with the Project. The original amount of the SMI-Owen Contract was $27,850,000.00, although this amount was adjusted upward during the performance of the work through approved change orders.

48.     SMI-Owens failed to complete its work in a timely manner, despite time extensions agreed to by DASNY.

49.     Upon information and belief, SMI-Owens' work was delayed because it failed to adequately coordinate with other contractors.

50.     SMI-Owens failed to provide sufficient manpower to erect the steel skeleton of the buildings, which delayed completion of that phase of the Project, and commencement of subsequent phases.

51.     In addition, SMI-Owens failed to perform in a workmanlike manner, as evidenced, *inter alia*, by its deficient job in welding the monumental staircase installed in the Courthouse.

52.     Upon information and belief, on March 25, 2002, CNA executed performance bond no. 929216831 in the penal sum of $27,850,000.00, in connection with the SMI-Owen Contract, naming SMI-Owen as the principal and DASNY as the obligee.

53.     Upon information and belief, by letter dated December 10, 2003, SMI-Owen declared itself in voluntary default of the SMI-Owen Contract, and DASNY accepted SMI-Owen's voluntary default and made a demand upon CNA to perform under the performance bond.

54.     Upon information and belief, by letter dated January 9, 2004, CNA confirmed SMI-Owen's voluntary default.

55.     Upon information and belief, in an agreement dated January 29, 2004, entered into between DASNY and CNA, CNA agreed to arrange for the completion of the SMI-Owen Contract in accordance with the terms and conditions of the SMI-Owen Contract (the "Takeover Agreement").

11

56.    Article I of the Takeover Agreement provides in relevant part:

Surety is the completing surety and agrees to cause the completion of all of the work under the Contract through its contractor, A.J. McNulty & Company, Inc. (the "Completion Contractor") and accepts responsibility for the performance of the work remaining to be completed under the Contract. The terms and conditions of the Bonds and the Contract as of the date of this Agreement shall govern the rights and liabilities of the parties except as set forth hereinafter.

Surety agrees to comply with all terms and provisions of the Contract including furnishing all insurance policies that the contract requires the Contractor to furnish said insurance policies naming DASNY and, where required, others as an additional insured and Surety shall furnish DASNY with evidence thereof. The Surety shall cause the Completion Contractor to furnish all necessary insurance with respect to the Contract. DASNY reserves the right to disapprove any proposed Completion Contractor.

57.    Upon information and belief, CNA entered into a contract with A.J. McNulty & Company, Inc. ("McNulty") to complete all remaining work on the SMI-Owen Contract.

58.    CNA, acting through McNulty and others, failed to complete the work remaining under the SMI-Owen Contract in a timely manner, despite time extensions agreed to by DASNY.

59.    Upon information and belief, McNulty's work was delayed because it failed to adequately coordinate with other contractors.

60.    In addition, McNulty failed to perform in a workmanlike manner, as evidenced, *inter alia*, by its deficient job in welding the monumental staircase installed in the Courthouse.

12

**Exterior Work**

61.    In or about September 2001, Enclos entered into a written contract identified as Contract No. DA 78639/1380909999 (the "Enclos Contract") with DASNY under which Enclos agreed to perform certain curtain wall work and other exterior work at the Complex.  The original amount of the Enclos Contract was $35,366,541.00, although this amount was adjusted upward during the performance of the work through approved change orders.

62.    Upon information and belief, work on the Project was delayed because Enclos failed to adequately coordinate its work with other contractors.

**General Contract Work**

63.    In or about December 2001, Stonewall entered into Contract No. DA 84873/1380909999 (the "Stonewall Contract") with DASNY, under which Stonewall agreed to perform certain core and shell work in connection with the Project.  The original amount of the Stonewall Contract was $29,927,792.00, although this amount was adjusted upward during the performance of the work through approved change orders.

64.    Stonewall failed to complete its work in a timely manner, despite time extensions agreed to by DASNY.

65.    In addition, Stonewall failed to perform in a workmanlike manner, as evidenced, *inter alia*, by its failure to properly apply adequate laminate to the floors, and the failure of the topping slabs to bond to the underlying structural slabs.

66.    Stonewall also installed inadequate steel reinforcements in the walls of elevator shafts in at least twenty-three (23) different locations at the Site, the amelioration of which delayed completion of that phase of the Project and commencement of subsequent phases.

13

### Heating, Ventilation and Air Conditioning ("HVAC")

67.    In or about November 2001, Dierks entered into a written contract identified as Contract No. DA 84162/1380909999 (the "Dierks Contract") with DASNY, under which Dierks agreed to perform certain HVAC-related work to DASNY in connection with the Project. The original amount of the Dierks Contract was $12,614,000.00, although this amount was adjusted upward during the performance of the work through approved change orders.

68.    Dierks failed to complete its work in a timely manner, despite time extensions agreed to by DASNY.

69.    Upon information and belief, Dierks' work was delayed because it failed to adequately coordinate with other contractors.

70.    In addition, Dierks failed to perform in a workmanlike manner, as evidenced by its failure to adequately maintain temporary boilers and chillers before the permanent HVAC system was installed.

### Sheet Metal Work

71.    In or about November 2001, Heritage entered into a written contract identified as Contract No. DA 84112/1380909999 (the "Heritage Contract") with DASNY, under which Heritage agreed to perform certain sheetmetal work in connection with the Project. The original amount of the Heritage Contract was $11,413,000.00, although this amount was adjusted upward during the performance of the work through approved change orders.

72.    Heritage failed to complete its work in a timely manner, despite time extensions agreed to by DASNY.

14

73.    In addition, Heritage failed to perform in a workmanlike manner, as evidenced by its inadequate installation of variable air volume ("VAV") boxes necessary for adequate room cooling.

74.    Heritage also failed to diligently maintain and protect its work as required under the Heritage Contract, as evidenced by its failure to seal the sheet metal used in its installations.

**Plumbing**

75.    In or about October 2001, Aspro entered into a written contract identified as Contract No. DA 84008/1380909999 (the "Aspro Contract") with DASNY, under with Aspro agreed to perform certain plumbing services in connection with the Project. The original amount of the Aspro Contract was $6,263,500.00, although this amount was adjusted upward during the performance of the work through approved change orders.

76.    Aspro failed to complete its work in a timely manner, despite an extension agreed to by DASNY.

77.    Aspro failed to install plumbing fixtures in the manner required by the New York City Building Code by, among other things, causing plumbing lines to be pitched in the wrong direction, and utilizing vents of insufficient size.

**Fire Protection**

78.    In or about October 2001, Pyramid entered into Contract No. DA 84011/1380909999 (the "Pyramid Contract") with DASNY, under which Pyramid agreed to perform certain fire protection work in connection with the Project. The original amount of the Pyramid Contract was $3,687,000.00, although this amount was adjusted upward during the performance of the work through approved change orders.

15

79.     Upon information and belief, Pyramid failed to complete the Pyramid Contract and abandoned the Project.

**Building Power and Fire Alarm Systems**

80.     In or about November 2001, O'Kane entered into a written contract identified as Contract No. DA 84220/1380909999 (the "O'Kane Contract") with DASNY, under which O'Kane agreed to perform certain electrical work in connection with the Project. The original amount of the O'Kane Contract was $37,900,000.00, although this amount was adjusted upward during the performance of the work through approved change orders.

81.     O'Kane's work failed to meet specifications under the O'Kane Contract.

82.     O'Kane failed to provide "as built" drawings to DASNY as required under the O'Kane Contract.

**Low Voltage Electrical Work**

83.     In or about March 2003, Five Star entered into a written contract identified as Contract No. DA 94397/1380909999 (the "Five Star Contract") with DASNY, under which Five Star agreed to perform certain low voltage electrical work in connection with the Project. The original amount of the Five Star Contract was $9,270,000.00, although this amount was adjusted upward during the performance of the work through approved change orders.

84.     Five Star's work failed to meet specifications under the Five Star Contract.

**Millwork**

85.     In or about February 2003, Beaubois entered into two separate written contracts – Contract No. DA 93680/1380909999 and Contract No. DA 93863/1380909999 (collectively the "Beaubois Contracts") – with DASNY, under which Beaubois agreed to

16

perform certain architectural woodwork and finishing work in connection with the construction of the Complex. The original amount of Contract No. DA 93680 was $1,916.000.00 and the original amount of Contract No. DA 93663 was $4,047,950.00, although these amounts were adjusted upward during the performance of the work through approved change orders.

86.     Beaubois' work and materials failed to meet specifications under the Beaubois Contracts.

87.     Beaubois also failed to perform in a workmanlike manner, which caused the hardware to break or become detached from the doors, and the wood veneer to delaminate.

**Façade Maintenance**

88.     In or about February 2004, Tractel entered into Contract No. DA 102566/ 1380909999 (the "Tractel Contract") with DASNY, under which Tractel agreed to perform certain façade maintenance in connection the construction of the Complex. The original amount of the Tractel Contract was $1,500,000.00, although this amount was adjusted upward during the performance of the work through approved change orders.

89.     To the extent that Tractel failed to meet its obligations under the Tractel Contract, it is liable to DASNY for any claims asserted against DASNY stemming from such failures.

**Testing**

90.     In or about January 2003, MTL entered into a written contract identified as Contract No. DA 92729/1380909999 (the "MTL Contract") with DASNY, under which MTL would provide certain engineering consulting services to DASNY in connection with the Project, including the performance of concrete testing services.

17

91.    In performing services under the MTL Contract, MTL provided to DASNY false and/or incorrect information upon which DASNY relied.

92.    MTL failed to meet its obligations under the MTL Contract by, *inter alia*, failing to note or advise DASNY of defective welds with respect to the canopy located at the Courthouse.

93.    In or about January 2003, Future Tech entered into a written contract identified as Contract No. DA 92704/1380909999 (the "Future Tech Contract") with DASNY, under which Future Tech would provide certain engineering consulting services and concrete inspection services in connection with the Project.

94.    Future Tech failed to meet its obligations under the Future Tech Contract by, *inter alia*, failing to note or advise DASNY of defective work in the parking garage that it was charged with inspecting and of the elevated concrete slabs located within the Courthouse.

### AS AND FOR A FIRST CLAIM FOR RELIEF:
### DEFENDANT WILLIAMS

95.    DASNY repeats and realleges the allegations contained in Paragraphs 1 through 94 above, with the same force and effect as though fully set forth at length herein.

96.    Pursuant to the Williams Contract, Williams agreed to complete, in a good, workmanlike manner, all work required by the Williams Contract.

97.    Williams failed to progress the work in a timely manner and failed to perform in a good, workmanlike manner as required by the Williams Contract.

98.    Williams breached the Williams Contract by failing to complete the work it was required to perform under the contract in a timely manner and in accordance with the terms of the contract, by, *inter alia*, (i) failing to perform its work in accordance with the contract documents; (ii) performing defective work; (iii) failing to properly coordinate its work with the

work of other contractors on the Project; (iv) failing to adequately supervise its work; (v) failing

to retain adequate and competent staff; (vi) delaying completion of its work and the work of

other contractors on the Project; and (vii) failing to comply with directives issued by the

construction manager.

99.    As a result of Williams' material breaches of the Williams Contract,

DASNY incurred significant additional expenses in connection with the completion of the

Project.

100.    Accordingly, DASNY is entitled to recover from Williams all additional

costs in an amount to be determined at trial arising from Williams' breach of contract.

## AS AND FOR A SECOND CLAIM FOR RELIEF: DEFENDANT WILLIAMS

101.    DASNY repeats and realleges the allegations set forth in Paragraphs 1

through 100 above, with the same force and effect as though fully set forth at length herein.

102.    Article 9, Section 9.01 of the General Conditions of the Williams'

Contract ("Time of Completion") states, in relevant part, as follows:

> D.    If the Contractor shall neglect, fail or refuse
> to complete the Work within the time specified, or
> any proper extension thereof granted by the Owner,
> the Contractor agrees to pay the Owner for loss of
> beneficial use of the structure an amount specified
> in the Contract, not as a penalty, but as liquidated
> damages, for each and every calendar day that the
> Contractor is in default.    Default shall include
> abandonment of the Work by the Contractor.

103.    Williams did not complete its work in the time required by the Williams

Contract.

104.    As a result of Williams' delay, other contractors on the Project incurred

delays.

19

105.    As a result of Williams' material breaches of its obligations under the Williams Contract, DASNY is entitled to recover from Williams liquidated damages in an amount to be determined at trial.

### AS AND FOR A THIRD CLAIM FOR RELIEF: DEFENDANT WILLIAMS

106.    DASNY repeats and realleges the allegations contained in Paragraphs 1 through 105 above, with the same force and effect as though fully set forth at length herein.

107.    In the event that DASNY is found liable for any damages to any party, DASNY demands judgment in the same amount against Williams, together with the costs and disbursements of this action, to the extent such damages were caused by Williams' acts and omissions.

### AS AND FOR A FOURTH CLAIM FOR RELIEF: DEFENDANT ASPRO

108.    DASNY repeats and realleges the allegations contained in Paragraphs 1 through 107 above, with the same force and effect as though fully set forth at length herein.

109.    Pursuant to the Aspro Contract, Aspro agreed to complete, in a good, workmanlike manner, all work required by the Aspro Contract.

110.    Aspro failed to progress the work in a timely manner and failed to perform in a good, workmanlike manner as required by the Aspro Contract.

111.    Aspro failed to complete work that was in compliance with the New York City Building Code.

112.    Aspro breached the Aspro Contract by failing to complete the work it was required to perform under the contract in a timely manner and in accordance with the terms of the contract, by, *inter alia*, (i) failing to perform its work in accordance with the contract documents; (ii) performing defective work; (iii) failing to properly coordinate its work with the

20

work of other contractors on the Project; (iv) delaying completion of its work and the work of other contractors on the Project; and (v) failing to comply with directives issued by the construction manager.

113.    As a result of Aspro's material breaches of the Aspro Contract, DASNY incurred significant additional expenses in connection with the completion of the Project.

114.    Accordingly, DASNY is entitled to recover from Aspro all additional costs in an amount to be determined at trial arising from Aspro's breach of contract.

## AS AND FOR A FIFTH CLAIM FOR RELIEF: DEFENDANT ASPRO

115.    DASNY repeats and realleges the allegations contained in Paragraphs 1 through 114 above, with the same force and effect as though fully set forth at length herein.

116.    Article 9, Section 9.01 of the General Conditions of the Aspro Contract ("Time of Completion") states, in relevant part, as follows:

> D.    If the Contractor shall neglect, fail or refuse to complete the Work within the time specified, or any proper extension thereof granted by the Owner, the Contractor agrees to pay the Owner for loss of beneficial use of the structure an amount specified in the Contract, not as a penalty, but as liquidated damages, for each and every calendar day that the Contractor is in default.    Default shall include abandonment of the Work by the Contractor.

117.    Aspro failed to complete its work in the time required in the Aspro Contract.

118.    As a result of Aspro's delay, other contractors on the Project incurred delays.

21

119.    As a result of Aspro's material breaches of its obligations under the Aspro Contract, DASNY is entitled to recover from Aspro liquidated damages in an amount to be determined at trial.

## AS AND FOR A SIXTH CLAIM FOR RELIEF:
## DEFENDANT ASPRO

120.    DASNY repeats and realleges the allegations contained in Paragraphs 1 through 119 above, with the same force and effect as though fully set forth at length herein.

121.    In the event that DASNY is found liable for any damages to any party, DASNY demands judgment in the same amount against Aspro, together with the costs and disbursements of this action, to the extent such damages were caused by Aspro's acts and omissions.

## AS AND FOR A SEVENTH CLAIM FOR
## RELIEF: DEFENDANT BEAUBOIS

122.    DASNY repeats and realleges the allegations contained in Paragraphs 1 through 121 above, with the same force and effect as though fully set forth at length herein.

123.    Pursuant to the Beaubois Contracts, Beaubois agreed to complete, in a good, workmanlike manner, all work required by the Beaubois Contracts.

124.    Beaubois failed to progress the work in a timely manner and failed to perform in a good, workmanlike manner as required by the Beaubois Contracts.

125.    Beaubois failed to properly order and install materials that meet that specifications in the Beaubois Contracts.

126.    Beaubois breached the Beaubois Contracts by failing to complete the work it was required to perform under the contract in a timely manner and in accordance with the terms of the contract, by, *inter alia*, (i) failing to perform its work in accordance with the contract documents; (ii) performing defective work; (iii) failing to properly coordinate its work with the

22

work of other contractors on the Project; (iv) delaying completion of its work and the work of other contractors on the Project; (v) failing to properly order and install materials that meet that contracts' specifications; and (vi) failing to comply with directives issued by the construction manager.

127.    As a result of Beaubois' material breaches of the Beaubois Contracts, DASNY incurred significant additional expenses in connection with the completion of the Project.

128.    Accordingly, DASNY is entitled to recover from Beaubois all additional costs in an amount to be determined at trial arising from Beaubois' breach of contract.

## AS AND FOR A EIGHTH CLAIM FOR RELIEF: DEFENDANT BEAUBOIS

129.    DASNY repeats and realleges the allegations contained in Paragraphs 1 through 128 above, with the same force and effect as though fully set forth at length herein.

130.    Article 9, Section 9.01 of the General Conditions of the Beaubois Contracts ("Time of Completion") states, in relevant part, as follows:

> D.    If the Contractor shall neglect, fail or refuse to complete the Work within the time specified, or any proper extension thereof granted by the Owner, the Contractor agrees to pay the Owner for loss of beneficial use of the structure an amount specified in the Contract, not as a penalty, but as liquidated damages, for each and every calendar day that the Contractor is in default.   Default shall include abandonment of the Work by the Contractor.

131.    Beaubois failed to complete its work in the time required by the Beaubois Contracts.

132.    As a result of Beaubois' delay, other contractors on the Project incurred delays.

23

133.    As a result of Beaubois' material breaches of its obligations under the Beaubois Contracts, DASNY is entitled to recover from Beaubois liquidated damages in an amount to be determined at trial.

### AS AND FOR A NINTH CLAIM FOR RELIEF: DEFENDANT BEAUBOIS

134.    DASNY repeats and realleges the allegations contained in Paragraphs 1 through 133 above, with the same force and effect as though fully set forth at length herein.

135.    In the event that DASNY is found liable for any damages to any party, DASNY demands judgment in the same amount against Beaubois, together with the costs and disbursements of this action, to the extent such damages were caused by Beaubois' acts and omissions.

### AS AND FOR A TENTH CLAIM FOR RELIEF: DEFENDANT DIERKS

136.    DASNY repeats and realleges the allegations contained in Paragraphs 1 through 135 above, with the same force and effect as though fully set forth at length herein.

137.    Pursuant to the Dierks Contract, Dierks agreed to complete, in a good, workmanlike manner, all work required by the Dierks Contract.

138.    Dierks failed to progress the work in a timely manner and failed to perform in a good, workmanlike manner as required by the Dierks Contract.

139.    Dierks breached the Dierks Contract by failing to complete the work it was required to perform under the contract in a timely manner and in accordance with the terms of the contract, by, *inter alia*, (i) failing to perform its work in accordance with the contract documents; (ii) performing defective work; (iii) failing to properly coordinate its work with the work of other contractors on the Project; (iv) delaying completion of its work and the work of

24

other contractors on the Project; (v) failing to diligently maintain and protect its work as required

by the contract; and (vi) failing to comply with directives issued by the construction manager.

   140. As a result of Dierks' material breaches of the Dierks Contract, DASNY

incurred significant additional expenses in connection with the completion of the Project.

   141. Accordingly, DASNY is entitled to recover from Dierks all additional

costs in an amount to be determined at trial arising from Dierks' breach of contract.

**AS AND FOR A ELEVENTH CLAIM FOR
RELIEF: DEFENDANT DIERKS**

   142. DASNY repeats and realleges the allegations contained in Paragraphs 1

through 141 above, with the same force and effect as though fully set forth at length herein.

   143. Article 9, Section 9.01 of the General Conditions of the Dierks Contract

("Time of Completion") states, in relevant part, as follows:

> D. If the Contractor shall neglect, fail or refuse
> to complete the Work within the time specified, or
> any proper extension thereof granted by the Owner,
> the Contractor agrees to pay the Owner for loss of
> beneficial use of the structure an amount specified
> in the Contract, not as a penalty, but as liquidated
> damages, for each and every calendar day that the
> Contractor is in default. Default shall include
> abandonment of the Work by the Contractor.

   144. Dierks failed to complete its work in the time required by the Dierks

Contract.

   145. As a result of Dierks' delay, other contractors on the Project incurred

delays.

   146. As a result of Dierks' material breaches of its obligations under the Dierks

Contract, DASNY is entitled to recover from Dierks liquidated damages in an amount to be

determined at trial.

25

## AS AND FOR A TWELFTH CLAIM FOR
## RELIEF: DEFENDANT DIERKS

147.    DASNY repeats and realleges the allegations contained in Paragraphs 1 through 146 above, with the same force and effect as though fully set forth at length herein.

148.    In the event that DASNY is found liable for any damages to any party, DASNY demands judgment in the same amount against Dierks, together with the costs and disbursements of this action, to the extent such damages were caused by Dierks' acts and omissions.

## AS AND FOR A THIRTEENTH CLAIM FOR
## RELIEF: DEFENDANT ENCLOS

149.    DASNY repeats and realleges the allegations contained in Paragraphs 1 through 148 above, with the same force and effect as though fully set forth at length herein.

150.    Pursuant to the Enclos Contract, Enclos agreed to complete, in a good, workmanlike manner, all work required by the Enclos Contract.

151.    Enclos failed to progress the work in a timely manner and failed to perform in a good, workmanlike manner as required by the Enclos Contract.

152.    Enclos breached the Enclos Contract by failing to complete the work it was required to perform under the contract in a timely manner and in accordance with the terms of the contract, by, *inter alia*, (i) failing to perform its work in accordance with the contract documents; (ii) performing defective work; (iii) failing to properly coordinate its work with the work of other contractors on the Project; (iv) delaying completion of the work of other contractors on the Project; and (v) failing to comply with directives issued by the construction manager.

153.    As a result of Enclos' material breaches of the Enclos Contract, DASNY incurred significant additional expenses in connection with the completion of the Project.

154.    Accordingly, DASNY is entitled to recover from Enclos all additional

costs in an amount to be determined at trial arising from Enclos' breach of contract.

## AS AND FOR A FOURTEENTH CLAIM FOR
## RELIEF: DEFENDANT ENCLOS

155.    DASNY repeats and realleges the allegations contained in Paragraphs 1

through 154 above, with the same force and effect as though fully set forth at length herein.

156.    In the event that DASNY is found liable for any damages to any party,

DASNY demands judgment in the same amount against Enclos, together with the costs and

disbursements of this action, to the extent such damages were caused by Enclos' acts and

omissions.

## AS AND FOR A FIFTEENTH CLAIM FOR
## RELIEF: DEFENDANT FIVE STAR

157.    DASNY repeats and realleges the allegations contained in Paragraphs 1

through 156 above, with the same force and effect as though fully set forth at length herein.

158.    Pursuant to the Five Star Contract, Five Star agreed to complete, in a

good, workmanlike manner, all work required by the Five Star Contract.

159.    Five Star failed to progress the work in a timely manner and failed to

perform in a good, workmanlike manner as required by the Five Star Contract.

160.    Five Star breached the Five Star Contract by failing to complete the work

it was required to perform under the contract in a timely manner and in accordance with the

terms of the contract, by, *inter alia*, (i) failing to perform its work in accordance with the contract

documents; (ii) performing defective work; (iii) failing to properly coordinate its work with the

work of other contractors on the Project; (iv) delaying completion of its work and the work of

other contractors on the Project; (v) failing to properly integrate low voltage technical systems as

27

required under the terms of the contract; and (vi) failing to comply with directives issued by the construction manager.

161.    As a result of Five Star's material breaches of the Five Star Contract, DASNY incurred significant additional expenses in connection with the completion of the Project.

162.    Accordingly, DASNY is entitled to recover from Five Star all additional costs in an amount to be determined at trial arising from Five Star's breach of contract.

## AS AND FOR A SIXTEENTH CLAIM FOR RELIEF: DEFENDANT FIVE STAR

163.    DASNY repeats and realleges the allegations contained in Paragraphs 1 through 162 above, with the same force and effect as though fully set forth at length herein.

164.    Article 9, Section 9.01 of the General Conditions of the Five Star Contract ("Time of Completion") states, in relevant part, as follows:

> D.    If the Contractor shall neglect, fail or refuse to complete the Work within the time specified, or any proper extension thereof granted by the Owner, the Contractor agrees to pay the Owner for loss of beneficial use of the structure an amount specified in the Contract, not as a penalty, but as liquidated damages, for each and every calendar day that the Contractor is in default.    Default shall include abandonment of the Work by the Contractor.

165.    Five Star failed to complete its work in the time required by the Five Star Contract.

166.    As a result of Five Star's delay, other contractors on the Project incurred delays.

167.    As a result of Five Star's material breaches of its obligations under the Five Star Contract, DASNY is entitled to recover from Five Star liquidated damages in an amount to be determined at trial.

## AS AND FOR A SEVENTEENTH CLAIM FOR
## RELIEF: DEFENDANT FIVE STAR

168.    DASNY repeats and realleges the allegations contained in Paragraphs 1 through 167 above, with the same force and effect as though fully set forth at length herein.

169.    In the event that DASNY is found liable for any damages to any party, DASNY demands judgment in the same amount against Five Star, together with the costs and disbursements of this action, to the extent such damages were caused by Five Star's acts and omissions.

## AS AND FOR A EIGHTEENTH CLAIM FOR
## RELIEF: DEFENDANT HERITAGE

170.    DASNY repeats and realleges the allegations contained in Paragraphs 1 through 169 above, with the same force and effect as though fully set forth at length herein.

171.    Pursuant to the Heritage Contract, Heritage agreed to complete, in a good, workmanlike manner, all work required by the Heritage Contract.

172.    Heritage failed to progress the work in a timely manner and failed to perform in a good, workmanlike manner as required by the Heritage Contract.

173.    Heritage breached the Heritage Contract by failing to complete the work it was required to perform under the contract in a timely manner and in accordance with the terms of the contract, by, *inter alia*, (i) failing to perform its work in accordance with the contract documents; (ii) performing defective work; (iii) failing to properly coordinate its work with the work of other contractors on the Project; (iv) delaying completion of its work and the work of

29

other contractors on the Project; (v) failing to diligently maintain and protect its work as required

by the contract; and (vi) failing to comply with directives issued by the construction manager.

174.    As a result of Heritage's material breaches of the Heritage Contract,

DASNY incurred significant additional expenses in connection with the completion of the

Project.

175.    Accordingly, DASNY is entitled to recover from Heritage all additional

costs in an amount to be determined at trial arising from Heritage's breach of contract.

## AS AND FOR A NINETEENTH CLAIM FOR RELIEF: DEFENDANT HERITAGE

176.    DASNY repeats and realleges the allegations contained in Paragraphs 1

through 175 above, with the same force and effect as though fully set forth at length herein.

177.    Article 9, Section 9.01 of the General Conditions of the Heritage Contract

("Time of Completion") states, in relevant part, as follows:

> D.    If the Contractor shall neglect, fail or refuse
> to complete the Work within the time specified, or
> any proper extension thereof granted by the Owner,
> the Contractor agrees to pay the Owner for loss of
> beneficial use of the structure an amount specified
> in the Contract, not as a penalty, but as liquidated
> damages, for each and every calendar day that the
> Contractor is in default.    Default shall include
> abandonment of the Work by the Contractor.

178.    Heritage failed to complete its work in the time required by the Heritage

Contract.

179.    As a result of Heritage's delay, other contractors on the Project incurred

delays.

30

180.    As a result of Heritage's material breaches of its obligations under the Heritage Contract, DASNY is entitled to recover from Heritage liquidated damages in an amount to be determined at trial.

## AS AND FOR A TWENTIETH CLAIM FOR RELIEF: DEFENDANT HERITAGE

181.    DASNY repeats and realleges the allegations contained in Paragraphs 1 through 180 above, with the same force and effect as though fully set forth at length herein.

182.    In the event that DASNY is found liable for any damages to any party, DASNY demands judgment in the same amount against Heritage, together with the costs and disbursements of this action, to the extent such damages were caused by Heritage's acts and omissions.

## AS AND FOR A TWENTY-FIRST CLAIM FOR RELIEF: DEFENDANT O'KANE

183.    DASNY repeats and realleges the allegations contained in Paragraphs 1 through 182 above, with the same force and effect as though fully set forth at length herein.

184.    Pursuant to the O'Kane Contract, O'Kane agreed to complete, in a good, workmanlike manner, all work required by the O'Kane Contract.

185.    O'Kane failed to progress the work in a timely manner and failed to perform in a good, workmanlike manner as required by the O'Kane Contract.

186.    O'Kane breached the O'Kane Contract by failing to complete the work it was required to perform under the contract in a timely manner and in accordance with the terms of the contract, by, *inter alia*, (i) failing to perform its work in accordance with the contract documents; (ii) performing defective work; (iii) failing to properly coordinate its work with the work of other contractors on the Project; (iv) delaying completion of its work and the work of

31

other contractors on the Project; and (v) failing to comply with directives issued by the construction manager.

187.    As a result of O'Kane's material breaches of the O'Kane Contract, DASNY incurred significant additional expenses in connection with the completion of the Project.

188.    Accordingly, DASNY is entitled to recover from O'Kane all additional costs in an amount to be determined at trial arising from O'Kane's breach of contract.

## AS AND FOR A TWENTY-SECOND CLAIM
## FOR RELIEF: DEFENDANT O'KANE

189.    DASNY repeats and realleges the allegations contained in Paragraphs 1 through 188 above, with the same force and effect as though fully set forth at length herein.

190.    Article 9, Section 9.01 of the General Conditions of the O'Kane Contract ("Time of Completion") states, in relevant part, as follows:

> D.    If the Contractor shall neglect, fail or refuse to complete the Work within the time specified, or any proper extension thereof granted by the Owner, the Contractor agrees to pay the Owner for loss of beneficial use of the structure an amount specified in the Contract, not as a penalty, but as liquidated damages, for each and every calendar day that the Contractor is in default.    Default shall include abandonment of the Work by the Contractor.

191.    O'Kane failed to complete its work in the time required by the O'Kane Contract.

192.    As a result of O'Kane's delay, other contractors on the Project incurred delays.

193.    As a result of O'Kane's material breaches of its obligations under the Heritage Contract, DASNY is entitled to recover from O'Kane liquidated damages in an amount to be determined at trial.

### AS AND FOR A TWENTY-THIRD CLAIM FOR RELIEF: DEFENDANT O'KANE

194.    DASNY repeats and realleges the allegations contained in Paragraphs 1 through 193 above, with the same force and effect as though fully set forth at length herein.

195.    In the event that DASNY is found liable for any damages to any party, DASNY demands judgment in the same amount against O'Kane, together with the costs and disbursements of this action, to the extent such damages were caused by O'Kane's acts and omissions.

### AS AND FOR A TWENTY-FOURTH CLAIM FOR RELIEF: DEFENDANT PYRAMID

196.    DASNY repeats and realleges the allegations contained in Paragraphs 1 through 195 above, with the same force and effect as though fully set forth at length herein.

197.    Pursuant to the Pyramid Contract, Pyramid agreed to complete, in a good, workmanlike manner, all work required by the Pyramid Contract.

198.    Pyramid failed to progress the work in a timely manner and failed to perform in a good, workmanlike manner as required by the Pyramid Contract.

199.    Pyramid breached the Pyramid Contract by failing to complete the work it was required to perform under the contract in a timely manner and in accordance with the terms of the contract, by, *inter alia,* (i) failing to perform its work in accordance with the contract documents; (ii) performing defective work; (iii) failing to properly coordinate its work with the work of other contractors on the Project; (iv) delaying completion of its work and the work of

33

other contractors on the Project; (v) abandoning work on the Project; (and (vi) failing to comply with directives issued by the construction manager.

200.    As a result of Pyramid's material breaches of the Pyramid Contract, DASNY incurred significant additional expenses in connection with the completion of the Project.

201.    Accordingly, DASNY is entitled to recover from Pyramid all additional costs in an amount to be determined at trial arising from Pyramid's breach of contract.

### AS AND FOR A TWENTY-FIFTH CLAIM
### FOR RELIEF: DEFENDANT PYRAMID

202.    DASNY repeats and realleges the allegations contained in Paragraphs 1 through 201 above, with the same force and effect as though fully set forth at length herein.

203.    Article 9, Section 9.01 of the General Conditions of the Pyramid Contract ("Time of Completion") states, in relevant part, as follows:

> D.    If the Contractor shall neglect, fail or refuse to complete the Work within the time specified, or any proper extension thereof granted by the Owner, the Contractor agrees to pay the Owner for loss of beneficial use of the structure an amount specified in the Contract, not as a penalty, but as liquidated damages, for each and every calendar day that the Contractor is in default.    Default shall include abandonment of the Work by the Contractor.

204.    Pyramid failed to complete its work in the time required by the Pyramid Contract.

205.    As a result of Pyramid's delay, other contractors on the Project incurred delays.

34

206. As a result of Pyramid's material breaches of its obligations under the Heritage Contract, DASNY is entitled to recover from Pyramid liquidated damages in an amount to be determined at trial.

## AS AND FOR A TWENTY-SIXTH CLAIM
## FOR RELIEF: DEFENDANT PYRAMID

207. DASNY repeats and realleges the allegations contained in Paragraphs 1 through 206 above, with the same force and effect as though fully set forth at length herein.

208. In the event that DASNY is found liable for any damages to any party, DASNY demands judgment in the same amount against Pyramid, together with the costs and disbursements of this action, to the extent such damages were caused by Pyramid's acts and omissions.

## AS AND FOR A TWENTY-SEVENTH CLAIM
## FOR RELIEF: DEFENDANT SMI-OWEN

209. DASNY repeats and realleges the allegations contained in Paragraphs 1 through 208 above, with the same force and effect as though fully set forth at length herein.

210. Pursuant to the SMI-Owen Contract, SMI-Owen agreed to complete, in a good, workmanlike manner, all work required by the SMI-Owen Contract.

211. SMI-Owen failed to progress the work in a timely manner and failed to perform in a good, workmanlike manner as required by the SMI-Owen Contract.

212. SMI-Owen failed to provide sufficient number of qualified labor on the Project.

213. SMI-Owen breached the SMI-Owen Contract by failing to complete the work it was required to perform under the contract in a timely manner and in accordance with the terms of the contract, by, *inter alia*, (i) failing to perform its work in accordance with the contract documents; (ii) performing defective work; (iii) failing to properly coordinate its work with the

work of other contractors on the Project; (iv) delaying completion of its work and the work of other contractors on the Project; and (v) failing to comply with directives issued by the construction manager.

214.    As a result of SMI-Owen's material breaches of the SMI-Owen Contract, DASNY incurred significant additional expenses in connection with the completion of the Project.

215.    Accordingly, DASNY is entitled to recover from SMI-Owen all additional costs in an amount to be determined at trial arising from SMI-Owen's breach of contract.

## AS AND FOR A TWENTY-EIGHTH CLAIM
## FOR RELIEF: DEFENDANT SMI-OWEN

216.    DASNY repeats and realleges the allegations contained in Paragraphs 1 through 215 above, with the same force and effect as though fully set forth at length herein.

217.    Article 9, Section 9.01 of the General Conditions of the SMI-Owen Contract ("Time of Completion") states, in relevant part, as follows:

> D.    If the Contractor shall neglect, fail or refuse to complete the Work within the time specified, or any proper extension thereof granted by the Owner, the Contractor agrees to pay the Owner for loss of beneficial use of the structure an amount specified in the Contract, not as a penalty, but as liquidated damages, for each and every calendar day that the Contractor is in default.    Default shall include abandonment of the Work by the Contractor.

218.    SMI-Owen failed to complete its work in the time required by the SMI-Owen Contract.

219.    As a result of SMI-Owen's delay, other contractors on the Project incurred delays.

36

220.    As a result of SMI-Owen's material breaches of its obligations under the SMI-Owen Contract, DASNY is entitled to recover from SMI-Owen liquidated damages in an amount to be determined at trial.

## AS AND FOR A TWENTY-NINTH CLAIM
## FOR RELIEF: DEFENDANT SMI-OWEN

221.    DASNY repeats and realleges the allegations contained in Paragraphs 1 through 220 above, with the same force and effect as though fully set forth at length herein.

222.    In the event that DASNY is found liable for any damages to any party, DASNY demands judgment in the same amount against SMI-Owen, together with the costs and disbursements of this action, to the extent such damages were caused by SMI-Owen's acts and omissions.

## AS AND FOR A THIRTIETH CLAIM FOR
## RELIEF: DEFENDANT CNA

223.    DASNY repeats and realleges the allegations contained in Paragraphs 1 through 222 above, with the same force and effect as though fully set forth at length herein.

224.    Pursuant to the Takeover Agreement, CNA agreed to complete, in a good, workmanlike manner, all work required by the SMI-Owen Contract.

225.    CNA failed to progress the work in a timely manner and failed to perform in a good, workmanlike manner as required by the SMI-Owen Contract.

226.    CNA failed to provide sufficient number of qualified labor on the Project.

227.    CNA breached the Takeover Agreement SMI-Owen Contract by failing to complete the work it was required to perform under the contract in a timely manner and in accordance with the terms of the contract, by, *inter alia*, (i) failing to perform its work in accordance with the contract documents; (ii) performing defective work; (iii) failing to properly coordinate its work with the work of other contractors on the Project; (iv) delaying completion of

37

its work and the work of other contractors on the Project; and (v) failing to comply with directives issued by the construction manager.

228.    As a result of CNA's material breaches of the Takeover Agreement SMI-Owen Contract, DASNY incurred significant additional expenses in connection with the completion of the Project.

229.    Accordingly, DASNY is entitled to recover from CNA all additional costs in an amount to be determined at trial arising from CNA's breach of contract.

### AS AND FOR A THIRTY-FIRST CLAIM FOR RELIEF: DEFENDANT CNA

230.    DASNY repeats and realleges the allegations contained in Paragraphs 1 through 229 above, with the same force and effect as though fully set forth at length herein.

231.    Article 9, Section 9.01 of the General Conditions of the SMI-Owen Contract ("Time of Completion") states, in relevant part, as follows:

> D.    If the Contractor shall neglect, fail or refuse to complete the Work within the time specified, or any proper extension thereof granted by the Owner, the Contractor agrees to pay the Owner for loss of beneficial use of the structure an amount specified in the Contract, not as a penalty, but as liquidated damages, for each and every calendar day that the Contractor is in default.    Default shall include abandonment of the Work by the Contractor.

232.    CNA failed to complete its work in the time required by the SMI-Owen Contract.

233.    As a result of CNA'S delay, other contractors on the Project incurred delays.

38

234.    As a result of CNA'S material breaches of its obligations under the SMI-Owen Contract, DASNY is entitled to recover from CNA liquidated damages in an amount to be determined at trial.

### AS AND FOR A THIRTY-SECOND CLAIM
### FOR RELIEF: DEFENDANT CNA

235.    DASNY repeats and realleges the allegations contained in Paragraphs 1 through 234 above, with the same force and effect as though fully set forth at length herein.

236.    In the event that DASNY is found liable for any damages to any party, DASNY demands judgment in the same amount against CNA, together with the costs and disbursements of this action, to the extent such damages were caused by CNA'S acts and omissions.

### AS AND FOR A THIRTY-THIRD CLAIM FOR
### RELIEF: DEFENDANT STONEWALL

237.    DASNY repeats and realleges the allegations contained in Paragraphs 1 through 236 above, with the same force and effect as though fully set forth at length herein.

238.    Pursuant to the Stonewall Contract, Stonewall agreed to complete, in a good, workmanlike manner, all work required by the Stonewall Contract.

239.    Stonewall failed to progress the work in a timely manner and failed to perform in a good, workmanlike manner as required by the Stonewall Contract.

240.    Stonewall breached the Stonewall Contract by failing to complete the work it was required to perform under the contract in a timely manner and in accordance with the terms of the contract, by, *inter alia*, (i) failing to perform its work in accordance with the contract documents; (ii) performing defective work; (iii) failing to properly coordinate its work with the work of other contractors on the Project; (iv) delaying completion of its work and the work of

other contractors on the Project; and (v) failing to comply with directives issued by the construction manager.

241. As a result of Stonewall's material breaches of the Stonewall Contract, DASNY incurred significant additional expenses in connection with the completion of the Project.

242. Accordingly, DASNY is entitled to recover from Stonewall all additional costs in an amount to be determined at trial arising from Stonewall's breach of contract.

## AS AND FOR A THIRTY-FOURTH CLAIM
## FOR RELIEF: DEFENDANT STONEWALL

243. DASNY repeats and realleges the allegations contained in Paragraphs 1 through 242 above, with the same force and effect as though fully set forth at length herein.

244. Article 9, Section 9.01 of the General Conditions of the Stonewall Contract ("Time of Completion") states, in relevant part, as follows:

> D. If the Contractor shall neglect, fail or refuse to complete the Work within the time specified, or any proper extension thereof granted by the Owner, the Contractor agrees to pay the Owner for loss of beneficial use of the structure an amount specified in the Contract, not as a penalty, but as liquidated damages, for each and every calendar day that the Contractor is in default. Default shall include abandonment of the Work by the Contractor.

245. Stonewall failed to complete its work in the time required by the Stonewall Contract.

246. As a result of Stonewall's delay, other contractors on the Project incurred delays.

247.    As a result of Stonewall's material breaches of its obligations under the Stonewall Contract, DASNY is entitled to recover from Stonewall liquidated damages in an amount to be determined at trial.

## AS AND FOR A THIRTY-FIFTH CLAIM FOR
## RELIEF: DEFENDANT STONEWALL

248.    DASNY repeats and realleges the allegations contained in Paragraphs 1 through 247 above, with the same force and effect as though fully set forth at length herein.

249.    In the event that DASNY is found liable for any damages to any party, DASNY demands judgment in the same amount against Stonewall, together with the costs and disbursements of this action, to the extent such damages were caused by Stonewall's acts and omissions.

## AS AND FOR A THIRTY-SIXTH CLAIM FOR
## RELIEF: DEFENDANT TRACTEL

250.    DASNY repeats and realleges the allegations contained in Paragraphs 1 through 249 above, with the same force and effect as though fully set forth at length herein.

251.    Pursuant to the Tractel Contract, Tractel agreed to complete, in a good, workmanlike manner, all work required by the Tractel Contract.

252.    Tractel failed to progress the work in a timely manner and failed to perform in a good, workmanlike manner as required by the Tractel Contract.

253.    Tractel breached the Tractel Contract by failing to complete the work it was required to perform under the contract in a timely manner and in accordance with the terms of the contract, by, *inter alia*, (i) delaying completion of the work of other contractors on the Project; and (ii) failing to comply with directives issued by the construction manager.

254.    As a result of Tractel's material breaches of the Tractel Contract, DASNY incurred significant additional expenses in connection with the completion of the Project.

41

255.    Accordingly, DASNY is entitled to recover from Tractel all additional costs in an amount to be determined at trial arising from Tractel's breach of contract.

## AS AND FOR A THIRTY-SEVENTH CLAIM
## FOR RELIEF: DEFENDANT TRACTEL

256.    DASNY repeats and realleges the allegations contained in Paragraphs 1 through 255 above, with the same force and effect as though fully set forth at length herein.

257.    In the event that DASNY is found liable for any damages to any party, DASNY demands judgment in the same amount against Tractel, together with the costs and disbursements of this action, to the extent such damages were caused by Tractel's acts and omissions.

## AS AND FOR A THIRTY-EIGHTH CLAIM
## FOR RELIEF: DEFENDANT RVA

258.    DASNY repeats and realleges each and every allegation contained in Paragraphs 1 through 257 above, with the same force and effect as though fully set forth at length herein.

259.    Upon information and belief, RVA engaged subcontractors and subconsultants to carry out certain work related to RVA's duties under the RVA Contract.

260.    RVA was fully responsible for the work of its subcontractors and subconsultants and was obligated to ensure that all work performed by its subcontractors and subconsultants was in compliance with the RVA Contract.

261.    RVA breached the RVA Contract by failing to complete and properly perform the work required under the contract by, *inter alia*, (i) failing to perform its work in accordance with the contract documents, (ii) failing to provide adequate designs for the Project; (iii) failing to properly supervise the subcontractors and subconsultants it retained with regard to the Project, (iv) failing to monitor the overall progress on the Project to ensure that work was

42

being completed properly and in substantial compliance with the design recommendations, specifications and their intent; (v) failing to timely and adequately respond to requests for information; .and (vi) failing to ascertain that certain design changes proposed by other contractors were inadequate.

262.    As a result of RVA's material breaches of the RVA Contract, DASNY has incurred and will continue to incur significant additional expenses in connection with the completion of the Project.

263.    Accordingly, DASNY is entitled to recover from RVA all additional costs in an amount to be determined at trial arising from RVA's breach of contract.

### AS AND FOR A THIRTY-NINTH CLAIM FOR RELIEF: DEFENDANT RVA

264.    DASNY repeats and realleges each and every allegation contained in Paragraphs 1 through 263 above, with the same force and effect as though fully set forth at length herein.

265.    RVA failed to comply with professional standards of care in that RVA, by, *inter alia*, (i) failing to perform its work in accordance with the contract documents, (ii) failing to provide adequate designs for the Project; (iii) failing to properly supervise the subcontractors and subconsultants it retained with regard to the Project, (iv) failing to monitor the overall progress on the Project to ensure that work was being completed properly and in substantial compliance with the design recommendations, specifications and their intent; (v) failing to ascertain that certain design changes proposed by other contractors were inadequate; (vi) failing to timely and adequately respond to requests for information; and (vii) failing to use due and reasonable care in a manner consistent with applicable professional standards, customs and practices.

43

266.    As a result of RVA's failure to perform in accordance with widely-accepted standards and practices in its profession, DASNY has incurred and will continue to incur significant additional expenses to complete the Project that DASNY would not have incurred absent such negligence.

267.    Accordingly, DASNY is entitled to recover additional costs in an amount to be determined at trial based on RVA's acts and omissions.

## AS AND FOR A FORTIETH CLAIM FOR RELIEF: DEFENDANT RVA

268.    DASNY repeats and realleges each and every allegation contained in Paragraphs 1 through 267 above, with the same force and effect as though fully set forth at length herein.

269.    In the event that DASNY is found liable for any damages to any party, DASNY demands judgment in the same amount against RVA under the principles of implied and/or common law indemnification and contribution, together with the costs and disbursements of this action, as such damages were caused by RVA's acts and omissions.

## AS AND FOR A FORTY-FIRST CLAIM FOR RELIEF: DEFENDANT BOVIS

270.    DASNY repeats and realleges each and every allegation contained in Paragraphs 1 through 269 above, with the same force and effect as though fully set forth at length herein.

271.    Pursuant to the Bovis Contracts, Bovis agreed to complete, in a good, workmanlike manner, all work required by the Bovis Contracts.

272.    Bovis failed to timely progress the Project, and to coordinate

273.    Bovis failed to properly staff the Project with competent and adequately-trained personnel.

44

274.    Bovis breached the Bovis Contracts by failing to complete the work it was required to perform under the contract in a timely manner and in accordance with the terms of its contracts, by, *inter alia*, (i) failing to properly coordinate the work of contractors and subcontractors on the Project; (ii) failing to properly coordinate its work with the work of other contractors on the Project; (iii) failing to detect defective work; (iv) delaying completion of the Project by drafting unreasonable and incomprehensible construction schedules; (v) failing to timely review and appropriately approve certain payment requests; (vi) failing to retain qualified personnel; and (vii) failing to create an overall construction plan that would ensure timely completion of the Project.

275.    As a result of Bovis' material breaches of the Bovis Contracts, DASNY has incurred and will continue to incur significant additional expenses in connection with the completion of the Project.

276.    Accordingly, DASNY is entitled to recover from Bovis additional costs in an amount to be determined at trial arising from Bovis' breach of contract.

### AS AND FOR A FORTY-SECOND CLAIM
### FOR RELIEF: DEFENDANT BOVIS

277.    DASNY repeats and realleges each and every allegation contained in Paragraphs 1 through 276 above, with the same force and effect as though fully set forth at length herein.

278.    In the event that DASNY is found liable for any damages to any party, DASNY demands judgment in the same amount against Bovis, together with the costs and disbursements of this action, to the extent such damages were caused by Bovis' acts and omissions.

45

## AS AND FOR A FORTY-THIRD CLAIM FOR
## RELIEF:  DEFENDANT FUTURE TECH

279.    DASNY repeats and realleges each and every allegation contained in Paragraphs 1 through 278 above, with the same force and effect as though fully set forth at length herein.

280.    Pursuant to the Future Tech Contract, Future Tech agreed to complete, in a good, workmanlike manner, all work required by the Future Tech Contract.

281.    Future Tech breached the Future Tech Contract by failing to perform its work in accordance with the Future Tech Contract by, *inter alia*, (i) failing to monitor and inspect concrete pours in the underground parking garage and (ii) failing to monitor and inspect rebar installation in the underground parking garage.

282.    As a result of Future Tech's material breaches of the Future Tech Contract, DASNY has incurred and will continue to incur significant additional expenses in connection with the completion of the Project.

283.    Accordingly, DASNY is entitled to recover from Future Tech additional costs in an amount to be determined at trial arising from Future Tech's breach of contract.

## AS AND FOR A FORTY-FOURTH CLAIM
## FOR RELIEF:  DEFENDANT FUTURE TECH

284.    DASNY repeats and realleges each and every allegation contained in Paragraphs 1 through 283 above, with the same force and effect as though fully set forth at length herein.

285.    In the event that DASNY is found liable for any damages to any party, DASNY demands judgment in the same amount against Future Tech under the principles of implied or common law indemnification, together with the costs and disbursements of this action, as such damages were directly caused by Future Tech's acts and omissions.

46

## AS AND FOR A FORTY-FIFTH CLAIM FOR
## RELIEF: DEFENDANT MTL

286.    DASNY repeats and realleges each and every allegation contained in Paragraphs 1 through 285 above, with the same force and effect as though fully set forth at length herein.

287.    MTL breached the MTL contract by, *inter alia*, (i) failing to advise DASNY of certain welding defects in relation to the canopy.

288.    As a result of MTL's material breaches of the MTL Contract, DASNY has incurred and will continue to incur significant additional expenses in connection with the completion of the Project.

289.    Accordingly, DASNY is entitled to recover from MTL additional costs in an amount to be determined at trial arising from MTL's breach of contract.

## AS AND FOR A FORTY-SIXTH CLAIM FOR
## RELIEF: DEFENDANT MTL

290.    DASNY repeats and realleges each and every allegation contained in Paragraphs 1 through 289 above, with the same force and effect as though fully set forth at length herein.

291.    In the event that DASNY is found liable for any damages to any party, DASNY demands judgment in the same amount against MTL under the principles of implied or common law indemnification and/or contribution, together with the costs and disbursements of this action, as such damages were directly caused by MTL's acts and omissions.

### JURY DEMAND

292.    DASNY hereby demands a jury trial as to all issues of this suit.

47

## CONCLUSION

**WHEREFORE,** Fourth-Party Defendant and Fifth-Party Plaintiff Dormitory Authority of the State of New York respectfully prays that the Court grant judgment against Fifth-Party Defendants as prayed for above, together with interest thereon, plus the costs and disbursements of this action, and such other and further relief as the Court may deem appropriate.

Dated:        New York, New York
              July 9, 2008

                         MICHAEL A. CARDOZO
                         Corporation Counsel of the
                            City of New York
                         Attorney for the Dormitory Authority
                            of the State of New York
                         100 Church Street, Room 3-241
                         New York, New York 10007
                         (212) 788-1185

                         By: _____
                              EDWIN M. LEVY (EL-7792)
                              Assistant Corporation Counsel

48

07-CV-10639 (LAK) (AJP)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WILLIAM A. GROSS CONSTRUCTION
ASSOCIATES, INC.,

Plaintiff,

- against -

AMERICAN MANUFACTURER'S MUTUAL
INSURANCE COMPANY,

Defendant.

And Other Actions.

### FIFTH-PARTY COMPLAINT

*MICHAEL A. CARDOZO*
*Corporation Counsel of the City of New York*
*Attorney for Fourth-Party Defendant DASNY*
*100 Church Street, Room 3-122*
*New York, N.Y. 10007*

*Of Counsel: Edwin M. Levy*
*Tel: (212)788-1185*

*LM No. 2007-038373*

*Due and timely service is hereby admitted.*

*New York, N.Y. .........................................................., 200......*

*......................................................................................... Esq.*

*Attorney for.........................................................................*

# PURCHASE ORDER



380 Lexington Avenue, New York, N.Y. 10168  (212) 983-7150  Fax 212-983-7275

Subcontract No.   2200097 - 0035

TO:
Vendor No.   144803
Wm A Gross Const Assoc
116 South Second Street

New Hyde Park NY 11040

JOB NAME:

New Bronx Criminal Court Comp.
161st Street
Bronx, NY

Date:   08/11/03          Project Manager:   Kathy Grubb

YOU ARE HEREBY AUTHORIZED TO PERFORM ALL SITEWORK AS PER
ATTACHED COPIES OF THE DOCUMENT LIST (31 PAGES), RIDER "A"
SIGNED ON 7/22/03 & RIDER "B" SIGNED ON 5/13/03.

Total Base Contract $   3,820,000.00

RECEIVED
DEC 31 2003
CAULDWELL WINGATE

Issued by:

Cauldwell Wingate Company, LLC

Accepted by:

for Subcontractor

**\*CONTRACT TERMS AND CONDITIONS AS PER ATTACHED SUBCONTRACT AGREEMENT\***

**TERMS AND CONDITIONS AS PER REVERSE**

WAG  1002

# SUBCONTRACT

This Agreement, made as of the 11 day of **August, 2003**, by and between Cauldwell Wingate Company LLC, (a Delaware Corporation) with offices located at 380 Lexington Avenue, NY, NY 10168 (the" Contractor") and **William A Gross Construction Associates** (a ＮＹ corporation) with its principal office at **117 South 4ᵗʰ Street, New Hyde Park, NY 11040** (the "Subcontractor"),

## WITNESSETH:

For the consideration hereinafter named, the Contractor and the Subcontractor, intending to be legally bound, do hereby mutually covenant and agree as follows:

ARTICLE I
DESCRIPTION OF WORK

1.1 The Subcontractor will furnish all labor, surveying, layout, materials, appliances, tools, plant, appurtenances, equipment, scaffolding, permits, methods, transportation, power, fuel, water, supplies, hoisting, rigging and services of every kind necessary for the complete and entire performance of the work under this Subcontract; and in a good, substantial, thorough and workmanlike manner, and in strict accordance with all plans and specifications and any and all addenda, memoranda, bulletins and modifications thereto, subject to the final completion, approval and acceptance of the Contractor, the Architect and the Owner, and perform in every respect complete and operable when applicable, (hereinafter the "Work") for and at:

The new Bronx Criminal Court Complex (hereinafter the "Project"); located on premises bounded by: 161ˢᵗ Street, 162ⁿᵈ Street, Morris Ave, and Sherman Ave, Bronx NY (hereinafter the "Premises"), as shown and described, and in strict accordance with the plans, specifications, addenda and bulletins thereto, as per Document List dated 8/19/02 general conditions and special conditions, as more particularly defined in the annexed Exhibit I, Attachments and the terms and provisions of the general contract between the Contractor and Dormitory Authority State of New York (hereinafter the "Owner") dated 12/20/02 (hereinafter the "Contract").

The Work of this Subcontract includes all work to **Sitework.**

ARTICLE II
CONTRACT DOCUMENTS

2.1 The plans, specifications, general conditions, special conditions, addenda and bulletins, and the Contract, are included as a part of this Agreement insofar as applicable to the Work. Each document is available for examination by the Subcontractor at all reasonable times at the office of the Contractor. All of the aforesaid documents, including this Agreement, are sometimes referred to hereafter as the Contract Documents. The Subcontractor represents and agrees that it has carefully examined and understands this Agreement and the other Contract Documents, has investigated the nature, locality and site of the Work and the conditions and difficulties under which it is to be performed, and that it enters



1

MSDOCS/Projects/2200097/ Subagreements/ New Sub.doc

WAG 1003

into this Agreement on the basis of its own examination, investigation and evaluation of all such matters and not in reliance upon any opinions or representations of the Contractor, or the Owner, or of any of their respective officers, agents, servants, or employees.

Subcontractor shall be bound by all the terms of the Contract and assume (i) all the obligations of Contractor as stated therein which are applicable to the Work covered by this Subcontract and (ii) the general obligations as between Contractor and Owner, which shall also apply as between Contractor and Subcontractor, including any provisions of the Contract required to be inserted or incorporated into this and other subcontracts, as fully as though copied herein.

2.2  The plans, drawings, details and specifications are intended to supplement one another and any work or materials shown, mentioned or reasonably implied in one and not in the others are to be furnished by the Subcontractor without extra charge.  The enumeration of particular items in this Subcontract or in the specifications shall not be construed to exclude other items.  The intention of the Contract Documents is to include everything, whether specified herein or not, necessary for the proper execution and completion of the Work.

ARTICLE III
COMMENCEMENT AND COMPLETION OF WORK

3.1  The Subcontractor shall commence and complete the Work at the times hereinafter mentioned or as required by the Contractor to ensure Contractor's compliance with the time requirements of the Contract.  Where the dates for the commencement or completion of work or the making of deliveries are not specified or if said dates are specified but the Contractor shall require such commencement or deliveries prior to or after the time fixed for such commencement, such work or deliveries or the part of the same concerning which no dates are given, shall be commenced on three (3) days notice from the Contractor and shall be prosecuted and completed with all possible diligence and speed or as otherwise directed by the Contractor.  The time stated in this Agreement for the commencement, prosecution and completion of the Work and the deliveries and installation of material shall be deemed of the essence of this Agreement.

3.2  The Subcontractor agrees that in the performance of the Work, it will cooperate with other contractors and subcontractors at the Project and not interfere with, or impede the work of the Contractor, or any other subcontractor or contractor at the Project and must afford all other contractors and subcontractors reasonable opportunity for the introduction and storage of their materials and the execution of their work.

The Subcontractor shall proceed with the Work in a prompt and diligent manner, without delay, and shall perform the Work so as not to delay the other trades and to insure completion of the Work in accordance with the requirements of the Contract, and as may be modified during the construction of the Project, at the sole discretion of the Contractor.

3.3  The scheduling of all construction operations at the Project shall be at the option of the Contractor and the Subcontractor shall, if requested, furnish all scheduling information in such form and detail as requested by the Contractor, to the satisfaction of the Contractor.  The Subcontractor shall



2

WAG 1004

furnish such information within seven (7) days of request, and the Subcontractor shall update and/or revise such information, as requested by the Contractor, at any time, either prior to or during the performance of the Work.

Information submitted by the Subcontractor or others, acceptance or approval by the Contractor and the scheduling that may be developed and implemented by the Contractor shall not constitute the basis of any claim by the Subcontractor or its subcontractors or materialmen for damage or delay, or excuse the Subcontractor's performance as required herein.

3.4  In the event the Subcontractor fails to commence the Work after being notified to do so, or should the Contractor judge that the Subcontractor is delaying the progress of the Work or not complying with the progress schedule, if any, or not pursuing the Work in the manner set forth by the plans, specifications and this Agreement, the Contractor shall notify the Subcontractor, who shall, within two (2) calendar days thereafter, furnish whatever materials are required by the Contractor, and employ additional workmen, equipment and supplies as required so as to bring the Work into conformity with the job progress as required by the Contractor or be found in default of this Agreement, at the option of the Contractor.

The Subcontractor shall, at its sole expense, work overtime, including Saturdays and Sundays at the direction of the Contractor, if in the judgment of the Contractor such overtime and Saturday/Sunday work is necessary to meet progress requirements due to any delays caused by the Subcontractor or the failure by the Subcontractor to commence its work timely or the failure by the Subcontractor to be in conformity with the job progress. The failure of the Subcontractor to comply with said demand shall constitute a material breach and a default of this Agreement, at the option of the Contractor.

The Subcontractor shall be obligated to pay the Contractor for supervision and any labor and/or expenses related to facilities required during overtime to perform work including but not limited to temporary facilities, safety, security etc.

3.5  If the progress of the Work or of the Project is delayed not because of any fault or neglect or act or failure to act on the part of the Subcontractor or any of its officers, agents, servants or employees, then the Contractor, if it deems necessary, may direct the Subcontractor to work overtime, and if so directed, the Subcontractor shall work said overtime and the Contractor will pay the Subcontractor for such overtime in an amount equal to the actual additional wages paid, if any, at rates which have been approved in writing by the Contractor, plus taxes and other charges imposed by law on such additional wages required to be paid by the Subcontractor.

3.6  Whenever a Subcontractor requires overtime, whether behind schedule or not, it must be with the approval of the Contractor. The Subcontractor requiring the overtime must pay all cost including but not limited to electricians for temporary power and light, hoist/elevators operators, plumber, teamster, master mechanic maintenance engineer, etc. These costs will be deducted from the contract amount by the Contractor in a change order and from progress payments to the Subcontractor.

3.7  Work set forth in the Contract Documents for the Contract shall be commenced as stated in written Letter of Intent and shall be completed no later than the dates indicated in the Completion



3

Schedule. Liquidated Damages may be assessed for each and every calendar day that the work is not complete.

ARTICLE IV
PRICE AND PAYMENTS

4.1   Subject to the terms herein stated, the amount to be paid by the Contractor to the Subcontractor for the satisfactory performance and completion of the Work and of all of the duties, obligations and responsibilities of the Subcontractor under this Agreement and the other Contract Documents shall be ------**Three million eight hundred twenty thousand ($3,820,000)** Dollars (hereinafter the "Price") subject to additions and deductions as herein provided.

The Price includes all Federal, State, County, Municipal and other taxes imposed by law and based upon labor, services, materials, equipment or other items acquired, performed, furnished or used by or levied or assessed with respect to the Work, including by not limited to sales, use and personal property taxes payable by or levied or assessed against the Owner, the Contractor or the Subcontractor. Where the law requires any such taxes to be stated and charged separately, the total price of all items included in the Work plus the amount of such taxes shall not exceed the Price.

4.2   Prior to commencement of Work the Subcontractor shall review and accept the pre-determined Trade Payment Breakdown items for their work. This contract payment breakdown included in the Contract Documents establishes the minimum level of detail required for the Subcontractor's invoices. It is understood and the Subcontractor acknowledges that this is an administrative tool for the purpose of illustrating a format and minimum level of detail required and shall not be considered as delineating the Subcontractor's Scope of Work. Further, the Subcontractor acknowledges that these cost distributions have been prepared using industry standard valuations, which, in the Contractors opinion, are reasonable, equitably balanced and correspond to the estimated quantities in the Contract Documents. The final acceptance of the Trade Payment Breakdown is at the sole discretion of the Owner.

No invoicing will be submitted by the Subcontractor which does not comply with the Trade Payment Breakdown. No payment shall be made by the Contractor to the Subcontractor until the entire Contract Payment Breakdown is approved by the Owner.

4.3 Subcontractor shall submit a monthly "draft" Trade Payment Breakdown by the 22nd of each month to Contractor which reflects the projected work in place on contract through 30th of the same month. Subcontractor shall be notified by Contractor of the acceptance/revision to values for submittal of final invoices by 1st of the following month.

*Within seven (7) days receipt of payment from Owner,* the Contractor shall make partial payment to the Subcontractor on the basis of the approved invoice, except that the Owner shall retain five percent (5%) of the amount of each said item.

Each monthly payment requisition must include Affirmative Action Form AAP 7.0, Contractor's Compliance Report, properly executed, as a condition precedent to requisition payment by the Contractor. Certified Payroll reports for the previous payment made must be submitted to the Contractor



4

WAG 1006

with each invoice. Failure to provide proper documentation will cause subcontractor invoices to be rejected.

In preparing invoices for partial payment, material delivered to the Site and Material stored off-site will not be taken into consideration. All costs related to the storage of materials are the sole responsibility of the Subcontractor. Payment will be made only upon installation of each item.

The Subcontractor agrees that if and when requested to do so by the Contractor, it shall furnish copies of any and all purchase orders to vendors, for material and equipment to be installed as part of the Work.

The Subcontractor agrees that if and when requested to do so by the Contractor, it shall furnish such additional information, evidence and substantiation as the Contractor may require with respect to the nature and extent of all obligations incurred by the Subcontractor for or in connection with the Work, all payments made by the Subcontractor thereon, and the amounts remaining unpaid, to whom and the reasons therefore.

The Subcontractor further agrees that it shall, as a condition precedent to entitlement to any payment, furnish to the Contractor waivers of lien, releases or any other documentation required by the Contractor, executed by all suppliers, materialmen, laborers or sub-subcontractors or anyone furnishing labor or materials for the work under this Subcontract.

4.4   After the Contractor has determined Substantial Completion of the Work, the Subcontractor shall submit for approval, a detailed estimate of the value of the known remaining items of Work as set forth by the Contractor and a schedule of completion for said items of Work. The Contractor shall review that estimate and make the final determination.

The Contractor when all the Work is substantially complete, shall pay to the Subcontractor the balance due the Contractor pursuant to the Contract, less:

  a.  two (2) times the value of any remaining items of Work to be completed or corrected; and

  b.  an amount necessary to satisfy any and all claims, liens or judgments against the Subcontractor.

As the remaining Work items are completed and accepted by the Owner, the Contractor shall pay the Subcontractor the appropriate amount pursuant to the duly completed and submitted monthly requisitions.

The list of remaining Work items may be expanded to include additional items of corrective or completion Work until final acceptance as certified by the Contractors execution of "Notification of Construction Completion." Appropriate payments may be withheld to cover the value of these items pursuant to this Section.

4.5 If any claim or lien is made or filed with or against the Contractor, the Owner, the Project or the Premises by any person claiming that the Subcontractor or any subcontractor or other person under it has failed to make payment for any labor, services, materials, equipment, taxes or other items or obligations furnished or incurred for or in connection with the Work, or if at any time there shall be



5

WAG 1007

evidence of such nonpayment or of any claim or lien for which, if established, the Contractor or the Owner might become liable and which is chargeable to the Subcontractor, or if the Subcontractor or any subcontractor or other person under it causes damage to the Work or to any other work on the Project, or if the Subcontractor fails to perform or is otherwise in default under any of the terms or provisions of this Agreement or the other Contract Documents, the Contractor shall have the right to retain from any payment then due or thereafter to become due the Subcontractor an amount which it deems sufficient to (1) satisfy, discharge and/or defend against any such claim or lien or any action which may be brought or judgment which may be recovered thereon, (2) make good any such nonpayment, damage, failure or default, and (3) compensate the Contractor and the Owner for any and all losses, liability, damages, costs and expenses, including legal fees and disbursements, which may be sustained or incurred by either or both of them in connection therewith, and the Subcontractor shall indemnify and hold harmless the Contractor against the same. The Contractor shall have the right to apply and charge against the Subcontractor so much of the amount retained as may be required for the foregoing purposes. If the amount retained is insufficient therefore, the Subcontractor shall be liable for the difference and immediately upon notice pay the same to the Contractor

4.6    No payment (final or otherwise) made under or in connection with this Agreement shall be conclusive evidence of the performance of the Work or of this Agreement, in whole or in part, and no such payment shall be construed to be an acceptance of defective, faulty or improper work or materials, or shall it release the Subcontractor from any of its obligations under this Agreement; nor shall entrance and/or use by the Owner constitute acceptance of the Work or any part thereof.

4.7    The Subcontractor agrees that the Contractor shall be under no obligation to pay the Subcontractor for any work done on this Project, until and unless the Contractor has been paid therefore by the Owner, and the provisions hereof, stating the time of progress and final payments and the amount thereof are expressly contingent upon and made subject to the condition that the Contractor shall receive from the Owner progress or final payments of the amounts being claimed by the Subcontractor on account of work done by the Subcontractor on this Project. The time when such payments shall be due the Subcontractor shall be postponed until the Contractor has received same from the Owner. The Subcontractor further agrees and acknowledges that he relies primarily for payment for work performed on the credit and ability to pay of the Owner, and not on that of the Contractor and that the payment by the Owner to the Contractor for work performed by the Subcontractor shall be a condition precedent to any payment obligation of the Contractor to the Subcontractor. The Subcontractor further agrees that the liability of the surety on the Contractor bond, if any, for payment to the Subcontract, is subject to the same conditions precedent as are applicable to the Contractor's liability for payment to the Subcontractor. It is the intention of Contractor and Subcontractor that each shall bear the risk as to payments due them for their work, labor or services, that the Owner may unreasonably withhold payment and/or may be unable to make payment as a result of insolvency or otherwise. This clause only controls the right of Subcontractor to receive payment from Contractor and Contractor's Surety (if any) but shall not impair any right of Subcontractor to enforce and foreclose upon any lien upon the Owner's property and/or upon any funds due from Owner to Contractor granted under any lien statute. In accordance with New York Lien Law, Section 34, by agreeing to the terms of this clause Subcontractor is not waiving any rights to which it is entitled under the Lien Law. To the extent that this clause could operate to limit or restrict the full extent of Subcontractor's lien rights, this clause is waived in that context only. However, for all other purposes, this clause shall remain in full force and effect.



6

4.8  Without diminishing the provisions of laws, any and all funds payable to the Subcontractor hereunder are declared to constitute trust funds to be applied first by the Subcontractor to the payment of claims of subcontractors, architects, engineers, surveyors, laborers and materialmen arising out of the Work, to claims for utilities furnished and taxes imposed, and to the payment of premiums on surety bonds and other bonds filed and premiums on insurance accruing during the construction of the Work, before application to any other purpose.

ARTICLE V
DELAYS, EXTENSIONS OF TIME ETC;

5.1  The Subcontractor agrees that if it shall delay the progress of the Work so as to cause damage, of whatsoever kind or nature for which the Contractor shall suffer or become liable, the Subcontractor shall make good to the Contractor any such damages or costs (including legal fees) and indemnify and save the Contractor harmless from the same. Any assent or permission of the Contractor to the delayed finishing of the Work shall not be construed as a waiver of this Agreement to make good any damage caused by such delay or default, nor shall it be a forfeiture of such damages.

5.2  In the event the Work of the Subcontractor is damaged, or should the Work of the Subcontractor be delayed or interfered with by any other subcontractor or other contractor on the Project, the Subcontractor and each such subcontractor or other contractor shall be directly responsible to the other, each shall look solely to the other for compensation, and the Subcontractor will not seek compensation or damages from the Contractor, by reason thereof. Contractor agrees to insert this clause in all subcontract agreements issued under this Contract.

5.3  Should the Subcontractor be obstructed or delayed in the commencement, prosecution or completion of the Work because of conditions not attributable to the Subcontractor and which by the terms of the Contract may be grounds for an extension of time, it shall, in full and complete compensation for said delay within twenty-four (24) hours thereafter, make claim to the Contractor in writing, for an extension of time, and the Contractor may award and certify the amount of additional time to be allowed, if any. Said extension of time shall be the same as shall be allowed by the Owner to the Contractor under the Contract for said delay. If the Subcontractor fails to furnish to the Contractor written notice in accordance with this paragraph, the Subcontractor agrees that it has waived any right to any such extension of time. Where such delays are caused by the Owner, except to the extent any costs or claim for such delays are recognized and paid by the Owner under the Contract, the extension of time granted shall be Subcontractor's sole remedy.

5.4  The Subcontractor acknowledges that the Price is based on the fact that the Contractor is not liable for any damages or costs due to delays, accelerations, impact, non-performance, interferences with performance, suspension or changes in the performance or sequence of the Subcontractor's Work, even if the Contractor wrongfully denies an extension of time to the Subcontractor. Thus, in no event shall the Contractor be liable to the Subcontractor for any damages caused by delay, acceleration, interferences, suspension, non-performance, or changes in the sequence of performance or impact upon, or with, the Work of the Subcontractor. The Contractor shall have the right, at any time, to delay, accelerate or suspend the commencement or execution of the whole or any part of the Work herein contracted to be



7          MSDOCS/Projects/22000097/ Subagreements/ New Sub.doc

WAG 1009

done, or vary the sequence or performance thereof, without compensation to the Subcontractor other than extending the time for completing the Subcontractor's Work for a period equal to such delay or suspension. Progress schedules may from time to time be modified to conform to acceleration, delays, suspensions or variances and the Subcontractor shall conform its progress thereto. No allowance for time will be made to the Subcontractor for delay in preparing its submittals or in securing approval of the Architect when such submittals are not properly prepared for approval of the Architect.

5.5   In addition to the foregoing provisions of this Article, and not in limitation thereof, it is understood that, at the time of the execution of this Subcontract, the parties hereto are aware of the possibility of increases in the prices of labor or materials necessary to perform this Subcontract and/or the difficulty in obtaining same.   It is accordingly understood that no claim shall be made by the Subcontractor for any increase in the Price herein even though it may be necessary to obtain materials from local warehouse stocks or otherwise in order to perform within the time required by the Contractor. The Subcontractor shall at no time claim that the Price was predicated on obtaining materials from any particular source of supply. If it be thereafter claimed that the Subcontractor finds that the price of labor and materials herein provided for has increased to any extent, for any reason whatsoever, including (but without limiting the generality of the source or causes of such possible increases) strikes, forced or voluntary agreements between employer and employee, present or future Federal, State, County or Municipal regulations, enactments, statutes, decrees, present or future codes, trade association agreements; whether the same be brought by statute, agreement or otherwise, freight rates, or any change of economic conditions whatsoever, it is understood that any and all risks of increase in the price of labor and materials have been contemplated by the Subcontractor and have been taken into full consideration in arriving at the Price. The Subcontractor shall at no time claim such increase even though the Subcontractor has been brought into a period of increased labor and material cost by reason of delays of the Contractor, any of its other subcontractors, the Owner or its representatives, or other independent contractors employed by the Owner, or for any cause whatsoever.

5.6   Should concealed conditions be encountered in the performance of the Work below the surface of the ground, or should concealed or unknown conditions be at variance with the conditions indicated or depicted by the Contract Documents, or should unknown physical conditions exist below the surface of the ground or should concealed or unknown conditions exist in an existing structure of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inherent in the work of the character provided for in this Agreement, be encountered, the Subcontractor shall remain obligated to continue to perform the Work in accordance with the terms of this Agreement, and except to the extent such claim is recognized by Owner under the Contract, Subcontractor shall not be entitled to an extension of contract time or payment of any additional amounts to perform the Work, notwithstanding the existence of such conditions, as the Subcontractor specifically assumes the risk of encountering any and all such concealed conditions.

5.7   Should the Subcontractor be delayed by general strikes or lockouts throughout the trade, then the time for the completion of the Work shall be extended for a period equivalent to the time lost, or the Contractor shall, at its option, have the right to terminate this Agreement and to employ other contractors to finish the Work and provide the materials therefore, and to pay the Subcontractor pro rata for materials and work already supplied, or the Price, reduced by previous payments made and the cost to the Contractor of completing the Work for which provision is made herein, whichever is less.



8

WAG 1010

5.8  If the Subcontractor notifies the Contractor, in writing, that another Subcontractor on the Site is failing to coordinate the work of said Contractor with the Work; the Contractor shall investigate the charge.  If the Contractor finds it to be true, the Contractor shall promptly issue such directions to the other Subcontractor.

## ARTICLE VI
## FREIGHT CHARGES AND SHIPMENT

6.1  The Subcontractor in making or ordering shipments shall not consign or have consigned materials, equipment or any other items in the name of the Contractor.  The Contractor is under no obligation to make payment for charges on shipments made by or to the Subcontractor but may, at its option, pay such charges, in which case the Subcontractor shall immediately upon presentation for payment reimburse the Contractor for the amount of such payment ~~plus a service charge of twenty-five (25) percent of the amount paid~~.

## ARTICLE VII
## DIMENSIONS AND CONTINGUOUS WORK

7.1  Notwithstanding the dimensions given on the plans, specifications and other Contract Documents it shall be the obligation and responsibility of the Subcontractor to take such measurements as will insure the proper matching and fitting of the Work covered by this Agreement with contiguous work.

7.2  The Subcontractor shall prepare and immediately upon receipt of an executed copy of this Agreement submit to the Contractor such shop drawings as may be necessary to describe completely the details and construction of the Work.  Approval of such shop drawings by the Contractor and/or the Architect shall not relieve the Subcontractor of its obligation to perform the Work in strict accordance with the Contract Documents, or of its responsibility for the proper matching and fitting of the Work with contiguous work.  If any shop drawing shows variation from the requirements of the Contract Documents because of standard shop practice or any other reason, Subcontractor shall make specific mention of such variation in his letter of transmittal to Contractor; otherwise Subcontractor will not be relieved of the responsibility for executing the work in accordance with the Contract Documents, even though such shop drawings have been reviewed or approved.  The review and/or approval of samples, shop drawings and details will be general and will not relieve Subcontractor from the responsibility for adherence to this Subcontract nor shall it relieve Subcontractor from the responsibility for any errors which may exist.

7.3  Should the proper and accurate performance of the Work hereunder depend upon the proper and accurate performance of other work not covered by this Agreement, the Subcontractor shall carefully examine such other work, determine whether it is in fit, ready and suitable condition for the proper and accurate performance of the Work hereunder, use all means necessary to discover any defects in such other work, and before proceeding with the Work hereunder, report promptly any improper conditions and defects to the Contractor in writing and allow the Contractor a reasonable time to have such improper conditions and defects remedied.



9

WAG 1011

*Schedule will then be modified to allow adequate duration for subcontractor to complete the work.*

Upon the commencement of such work by the Subcontractor, the Subcontractor shall have conclusively accepted such contiguous work as fit, ready and in a condition suitable and, sufficient for the proper and accurate performance of the Work hereunder.

7.4  The Subcontractor will provide all Layout and Engineering work required for the Work beyond two (2) axis lines and one (1) bench mark provided by the Contractor on grade.

### ARTICLE VIII
### INTERPRETATION OF PLANS AND SPECIFICATIONS

8.1  The Work hereunder is to be performed and furnished under the direction and to the satisfaction of both the Architect and the Contractor.  The decision of the Architect as to the true construction, meaning and intent of the plans and specifications shall be final and binding upon the parties hereto.  The Contractor will furnish to the Subcontractor such additional information and plans as may be prepared by the Architect to further describe the Work to be performed and furnished by the Subcontractor and the Subcontractor shall conform to and abide by the same.

The Subcontractor shall not make any changes, additions and/or omissions in the Work except upon written order of the Contractor as provided in Article IX hereof.

### ARTICLE IX
### CHANGES IN THE WORK

9.1  The Contractor reserves the right, from time to time, whether the Work or any part thereof shall or shall not have been completed, to make changes, additions and/or omissions in the Work as it may deem necessary upon written order to the Subcontractor.  The Subcontractor acknowledges and agrees that it shall make no claim for extra or additional compensation on account of any such work, unless same shall have been done pursuant to a written order, signed by the representative designated by the Contractor as having the authority to order such extra work.

9.2  For Change Order preparation, the following cost scenarios will be accepted:

A.    For Extra Work performed by the Subcontractor, whether a base cost is arrived at by estimated cost or actual cost method (as outlined), add to said base cost a sum equal to twenty percent.  See Exception- Paragraph "B".  See Example A.

Example A.
| | |
|---|---|
| Base Cost | $1,000 |
| 20% OH & P Allowance | 200. |
| Total | $1,200. |



WAG 1012

B.    Markup Allowances on Major Equipment. (Examples; Switchgear, Transformers, Air Handling Units, Boilers, etc.)

For extra equipment purchases by Subcontractors which exceeds a base cost of Ten Thousand dollars ($10,000) in estimated or actual costs, add to the base cost for the benefit of the subcontractor a sum equal to ten percent of the first Ten Thousand dollars ($10,000) of the vendor base cost plus five percent of the next Ninety Thousand dollars ($90,000) of the vendor base cost, plus three percent of any sum in excess of One Hundred Thousand dollars ($100,000) of the vendors base cost. See Example B.

| Example B | |
| --- | --- |
| Vendor Base Cost | $200,000. |
| 10% | |
| on First $10,000 Base Cost | 1,000. |
| 5% on Next $90,000 Base Cost | 4,500. |
| 3% on Base Cost over $100,000 | 3,000. |
| Total | $208,500. |

No allowance shall be made for extra work performed by a Subcontractor not under direct contract with the Contractor. No allowance shall be paid on the premium portion of overtime pay. Where the Extra Work involves both an increase and a reduction in similar or related Work, the overhead and profit allowance shall be applied only to the cost of the increase, which exceeds the cost of the reduction.

9.3  In the event that the Contractor directs the Subcontractor to perform any item of work, which the Subcontractor claims involves extra or additional work, it shall, within *seven (7) days* after receipt of such direction, and before proceeding therewith, make written claim to the Contractor, giving in detail the basis of its contention that the work is extra or additional, together with a detailed breakdown showing separately the additional cost of each item of labor and material. The Subcontractor shall then proceed with this work.

A failure to make written notice of claim within the time specified, and in the manner as herein provided, shall constitute a waiver of such claim and no recovery may be had by the Subcontractor, on account of the performance of such work.

The failure of the Subcontractor to perform this work, immediately after giving written notice of its claim, or on the *eighth (8ᵗʰ) day* subsequent to being directed to perform this work, whichever is less, shall constitute a material breach of this Agreement, regardless of the legitimacy of the Subcontractor's contentions, as it is specifically understood and agreed that the progress of the Work may not be delayed by reason of any controversy between the parties.

9.4  With respect to any item of work referred to in paragraph 9.3, upon the receipt of the Subcontractor's written notice of its claim, the Contractor may submit same to the Architect for his determination. The Subcontractor agrees to be bound by the determination of the Architect and will accept such payment, if any, as specified by the Architect, as full and final payment for all claims



11

submitted. Should the Architect determine that the work is not an extra, and awards no payment for such, or awards a partial payment for said claim, the Subcontractor agrees to accept said determination and payment as payment in full.

The Contractor, however, at its sole discretion, may appeal from any ruling or may institute suit for damages for extra work or contest any deduction or refusal to pay by the Owner for any reason which involves the Work of the Subcontractor. In that event, the Subcontractor shall pay the cost of appeal or suit, and shall render every assistance, without cost to the Contractor, in the prosecution of said appeal or suit. The Subcontractor shall otherwise be bound by the determination of the Owner; and/or its Architect; or in the event of an appeal or suit, by determination in said appeal or suit or by any settlement made by the Contractor, in good faith, at any time during the pendency of said appeal or suit. In the case of any recovery, the Subcontractor shall be entitled to those amounts allocated to its work, less overhead and profit to the Contractor and all expenses and attorneys fees incurred by the Contractor in prosecuting such appeal or suit.

The Subcontractor agrees that no claim, invoice or application for payment shall include any modifications to the Price, without an executed change order, pursuant to which such work is eligible for payment.

9.5  Where any additional work is ordered, the Subcontractor shall for such purposes, permit the Contractor to audit its books. The Subcontractor shall produce any and all data which the Contractor may request for the purpose of determining the correctness of the charges. The Subcontractor shall keep such full and detailed accounts as may be necessary to reflect its operations with respect to such changes and extras, and the system adopted shall be such as is satisfactory to the Contractor, the Contractor, their agents and employees, shall be afforded access at all reasonable time to the Subcontractor's and vendor's books, correspondence, instructions, receipts, vouchers, memoranda and records of all kinds, relating to all work under this Subcontract as well as to such changes and extras, and the Subcontractor shall preserve the same for a period of one year after final payment hereunder. In regard to the foregoing and generally, the Subcontractor hereby authorizes the Contractor to check directly with its suppliers of labor and materials the charges for such labor, materials and other items appearing in the Subcontractor's bills rendered to the Contractor, to confirm balances due and obtain sworn statements and waivers of lien.

9.6  Should the Subcontractor receive a bulletin, or pricing request, which it contends will involve additional work, if it is to perform the work identified in any of the foregoing documents, it shall submit its proposal to the Contractor within 7 days of receipt. It is agreed that if the Subcontractor does not submit such proposal within seven (7) days, then the Contractor may estimate the value of work to be performed by the Subcontractor and the Subcontractor will execute a subcontract change order for the Contractor's estimated value of work, if so directed by the Contractor.

9.7  In no event shall the terms of this Article impair or modify in any manner, or extend the liability of the Contractor to the Subcontractor, as set forth in Article V of this Agreement.

ARTICLE X
INSPECTION AND DEFECTIVE WORK



12

WAG 1014

10.1  The Subcontractor shall at all times provide sufficient, safe and proper facilities for the inspection of the Work by the Contractor, the Architect and their authorized representatives in the field, at shops, or any other place where materials or equipment for the Work are in the course of preparation, manufacture, treatment or storage.  The Subcontractor shall, within twenty-four (24) hours after receiving written notice from the Contractor of any defective work, proceed to take down all portions of the Work and remove from the premises all materials whether worked or unworked, which the Architect or the Contractor shall condemn as unsound, defective or improper or as in any way failing to conform to this Agreement or the plans, specifications or other Contract Documents, and the Subcontractor, at its own cost and expense shall replace the same with proper and satisfactory work and materials and make good all work damaged or destroyed by or as a result of such unsound, defective, improper or nonconforming work or materials or by the taking down, removal or replacement thereof.  Removal and replacement by the Subcontractor as aforementioned shall constitute the Subcontractor's acknowledgment that the portion of the work removed was unsound, defective or improper or otherwise failed to conform to the Contract Documents.

ARTICLE XI
DEFAULT

11.1  Should the Subcontractor at any time refuse or neglect to supply sufficient skilled workmen or materials of the proper quality and quantity, or fail in any respect to prosecute the Work with promptness and diligence, or cause by any act or omission the stoppage or delay of or interference with or damage to the work of the Contractor or of any other contractors or subcontractors on the Project, or fail in the performance of any of the terms and provisions of this Agreement or of the other Contract Documents, or should the Architect determine that the Work or any portion thereof is not being performed in accordance with the Contract Documents, then in any of such events, each of which shall constitute a default hereunder on the Subcontractor's part, the Contractor shall have the right, in addition to any other rights and remedies otherwise provided by this Agreement and the other Contract Documents, or by law, after three (3) days written notice to the Subcontractor mailed or delivered to the last known address of the Subcontractor, (a) to perform and furnish through itself or through others any such labor or materials for the Work and to deduct the cost thereof from any monies due or to become due to the Subcontractor under this Agreement, and/or (b) to terminate the employment of the Subcontractor for all or any portion of the Work, enter upon the premises and take possession for the purpose of completing the Work, of all materials, equipment, scaffolds, tools, appliances and other items thereon, all of which the Subcontractor hereby transfers, assigns and sets over to the Contractor for and until the completion of such work, and to employ any person or persons to complete the Work and provide all the labor, services, materials, equipment and other items required therefore.  In case of such termination of the employment of Subcontractor, the Subcontractor shall not be entitled to receive any further payment under this Agreement until the Work shall be wholly completed to the satisfaction of the Contractor and the Architect and shall have been accepted by them, at which time, if the unpaid balance of the amount to be paid under this Agreement shall exceed the cost and expense incurred by the Contractor in completing the Work, such excess shall be paid by the Contractor to the Subcontractor; but if such cost and expense shall exceed such unpaid balance, then Subcontractor shall immediately upon receipt of notice of the amount thereof pay the difference to the Contractor.  Such cost and expense shall include, the cost of completing the Work to the satisfaction of the Contractor, the Owner and the Architect, and of performing and furnishing all labor, services, materials, equipment, and other items



13

WAG 1015

required therefor; a reasonable charge for the Contractor's overhead; and all losses, damages, costs and expenses, including legal fees and disbursements sustained, incurred or suffered by reason of or resulting from the Subcontractor's default.

11.2  The Subcontractor agrees that, if it delays the progress of work or breaches its guarantees of the Work so as to cause any damages (including direct, indirect, incidental, special and/or consequential) for which the Contractor shall suffer or become liable, it shall make good to and/or indemnify the Contractor against all such damages, including, but not limited to, paying the Contractor for the Subcontractor's share of any liquidated damages assessed against the Contractor under the terms of the General Contract to the extent caused or contributed to by the acts and omissions of the Subcontractor.

11.3  Should one or more other subcontracts, now or hereafter, exist between the Subcontractor and the Contractor, concerning this or any other construction project, then a breach by the Subcontractor of any subcontract may, at the option of the Contractor, be considered a breach of all subcontracts; and in that event, the Contractor may terminate any and all of the subcontracts so breached or may withhold monies due or to become due on any subcontracts and apply the same toward payment of any damage suffered on that or any other such subcontracts.

ARTICLE XII
LOSS OR DAMAGE TO WORK

12.1    Neither the Owner nor the Contractor shall be responsible for any loss or damage to the Work to be performed and furnished under this Agreement, however caused, until after final acceptance thereof by the Contractor and the Owner, nor shall the Contractor or the Owner be responsible for loss of or damages to materials, tools, equipment, appliances or other personal property owned, rented or used by the Subcontractor or anyone employed by it in the performance of the Work, however caused and all such risk of loss shall remain with Subcontractor.

Regardless of the provisions of the Contract or specifications, the Contractor will not be required to provide any watchman service or other security for the protection of the Subcontractor and will not, in any manner, be answerable or accountable for any loss or damage, including theft, that shall or may happen to the Work, or any part or parts thereof, or any of the materials or other things used or employed in finishing or completing the Work.

12.2    Subcontractor shall be responsible for cleaning and protection of the work in accordance with the Contract Documents.    This includes maintaining conditions, applying protective cover/wrappings, limiting construction traffic, repairing damaged finish, replacing any items subject to breakage, chipping, cracks, or damage in other ways due to construction activities of other contractors, natural causes, accidents, or acts of vandalism.   All work shall be protected and maintained throughout the project schedule for final inspections to establish date of Substantial Completion in each area of the project.

12.3    The Contractor or the Owner, if provided in the Contract Documents, shall effect and maintain fire insurance (with extended coverage, if specified or otherwise required) upon all work, materials and equipment incorporated in the Project and all materials and equipment on or about the



14

WAG  1016

Premises intended for permanent use or incorporation in the Project or incident to the construction thereof, the capital value of which includes the cost of the Work, but not including any machinery, tools, equipment, appliances or other property owned, rented or used by the Subcontractor or anyone employed by it in the performance of the Work.

The total value of the property insurable under this paragraph, as shown on the approved monthly requisition provided for in Article IV, plus the total value of similar property incorporated in the Project or delivered on the Premises by or on behalf of the Subcontractor during the month but not included in said requisition, as reported by the Subcontractor to the Contractor for insurance purposes only, shall determine the total value of the Subcontractor's work, materials and equipment to be insured under this paragraph.

The maximum liability to the Subcontractor under such insurance shall be for no more than that proportion of any loss which the last reported value of the Subcontractor's insured property bore to the actual value of said property at the time of such last report, and in no event for more than the actual loss.

In the event of a loss under this paragraph, the Subcontractor shall be bound by any adjustment which shall be made between Contractor or the Owner and the insurance company or companies. Loss, if any, shall be payable to the Contractor and/or the Owner, as their interests may appear, for the account of whom it may concern.

12.3 The Subcontractor shall also fully and adequately protect all adjoining private and public property and all existing work on the Project site insofar as the work referred to in this Subcontract is concerned.

ARTICLE XIII
CLEANING UP

13.1 The Subcontractor shall on a daily basis, in the sole discretion of the Contractor, and at the Subcontractor's own cost and expense, (1) keep the area of the premises in which the Work is being performed free at all times from all waste materials, packaging materials and other rubbish accumulated in connection with the execution of the Work by collecting and depositing daily said material and rubbish in locations as designated by the *Owner* from which it shall be removed by the *Construction Manager* from the Premises without charge, (2) clean and remove from its own work and from all contiguous work of others any soiling, staining, mortar, plaster, concrete or dirt caused by the execution of the Work and make good all defects resulting therefrom, (3) at the completion of its work in each area, perform such cleaning as may be required to leave the area "broom clean" and (4) upon the completion of the Work, remove all of its tools, equipment, scaffolds, shanties, trailers and surplus materials. Should the Subcontractor fail to perform any of the foregoing to the Contractor's satisfaction, the Contractor shall have the right after notice (written or oral) to perform and complete such work itself or through others and deduct the cost thereof from the final payment due the Subcontractor.

ARTICLE XIV
COMPLIANCE WITH LAW AND PERMITS

14.1 The Subcontractor shall obtain and pay for necessary permits and licenses pertaining to the Work and shall comply with all Federal, State, County and Municipal laws, ordinances, rules,



15    MSDOCS/Projects/2200097/ Subagreements/ New Sub.doc

regulations, orders, notices and requirements, including, among others, those relating to safety, discrimination in employment, fair employment practices or equal employment opportunity, and with the requirements of the American Insurance Association, whether or not provided for by the plans, specifications, general conditions or other Contract Documents, without additional charge or expense to the Contractor, and shall also be responsible to correct, at its own cost and expense, any violations thereof resulting from or in connection with the performance of the Work. The Subcontractor shall at any time upon demand furnish such proof as the Contractor may require showing such compliance and the correction of such violations. The Subcontractor agrees to save harmless and indemnify the Contractor from and against any and all loss, injury, claims, actions, proceedings, liability, damages, fines, penalties, costs and expenses, including legal fees and disbursements, caused or occasioned directly or indirectly by the Subcontractor's failure to comply with any of said laws, ordinances, rules, regulations, standards, orders, notices or requirements or to correct such violations, including but not limited to OSHA and municipal regulations.

Where the Contract Documents or any part thereof, conflict with law, codes, ordinances, rules, regulations, order, notices or requirements (collectively "Laws"), it is intended that Laws be followed. The Subcontractor shall at once report to the Contractor any inconsistency with any Laws prior to proceeding. The Subcontractor shall promptly notify the Contractor and any respective departments, or official bodies, when its work is ready for inspection and shall, at once, do all work required to remove any violations or to comply with such inspections, without additional charge to the Contractor. The Subcontractor shall perform all work necessary to obtain approval from all authorities and agencies without additional cost to the Contractor or the Owner.

14.2 Subcontractor will notify the Contractor of any and all hazardous material (as defined by OSHA or any State or local law, code or regulation) being brought to or stored at the Project five (5) days before same arrives at the job site and the length of time the material will remain at the Project and the manner in which it will be used and applied; so that all personnel on the site can be notified.

ARTICLE XV
LABOR, MATERIALS AND EQUIPMENT

15.1    The Subcontractor shall not employ persons, means, materials or equipment which or whose presence or performance on or at the Premises are likely to cause strikes, work stoppages or any disturbances by workmen employed by the Subcontractor, the Contractor or other contractors or subcontractors, on or in connection with any work on the Project. The Subcontractor agrees that all disputes as to jurisdiction of trades shall be adjusted in accordance with any plan for the settlement of jurisdictional disputes which may be in effect in the locality in which the Work is being done and that it shall be bound and abide by all such adjustments and settlements of jurisdictional disputes, provided that the provisions of this Article shall not be in violation of or in conflict with any provisions of law applicable to the settlement of such disputes. Should the Subcontractor fail to carry out or comply with any of the foregoing provisions, the Contractor shall have the right, in addition to any other rights and remedies provided by this Agreement or the other Contract Documents or by law, after three (3) days written notice mailed or delivered to the last known address of the Subcontractor, to terminate this Agreement or any part thereof or the employment of the Subcontractor for all or any portion of the Work, and, for the purpose of completing the Work, to enter upon the Premises and take possession, in



MSDOCS/Projects/2200097/ Subagreements/ New Sub.doc

WAG 1018

the same manner, to the same extent and upon the same terms and conditions as set forth in Article XI of this Agreement.

All Municipal, County, State and Federal anti-discrimination and right-to-work laws will be observed by the Subcontractor in the employment of all personnel at the Project.

15.2    The Work is to be done in the best manner and by persons skilled in the type of work to be performed. The Subcontractor shall give the Work constant attention and supervision through a responsible representative or superintendent, and any necessary assistants. Such representative shall be authorized to act for the Subcontractor in all matters relating to the Work, and all directions given him shall be as binding as if given to the Subcontractor. The Subcontractor shall also keep a competent foreman at the Project while work is in progress, and enforce strict discipline among its employees, including the Contractor's regulations with regard to fires, smoking and other hazards. The Contractor is given the right to require the Subcontractor to remove immediately any employee or agent of the Subcontractor employed at the Project whom the Contractor deems incompetent or a hindrance to the proper progress of the Work, and such person shall not again be employed in the Work without the prior written consent of the Contractor.

15.3    All materials and equipment are to be new and of the best quality of the kind specified, and the Subcontractor shall furnish satisfactory evidence of the kind and quality of materials and equipment. The Subcontractor shall obtain the manufacturer's written recommendation that the material and equipment is designed and appropriate for the use intended and shall furnish guarantees where such can be obtained. Such materials and equipment shall not be subject to any conditional bill of sale, security agreement, financing statement, chattel mortgage, or any other claim, lien or encumbrance. The Subcontractor shall, if required by the Contractor, cause the materials (1) to be manufactured in advance, (2) to be warehoused either at the factory or elsewhere, as directed by the Contractor, (3) to be delivered to the Project promptly when so instructed by the Contractor and (4) to be relocated or removed from the Project at the cost of the Subcontractor. Care must be exercised by the Subcontractor against overloading any parts of floors, roofs, scaffolding and other installations. All materials delivered to the Project which are to form a part of the Work herein specified shall not be removed without the consent of the Contractor, but the Subcontractor will have the right to and shall remove all its surplus materials after completion of the Work provided such material was not originally provided by the Contractor for the Subcontractor's safekeeping and installation.

15.4    Subcontractor acknowledges that this project is being performed under a Project Labor Agreement (PLA) and commits to being a signatory of said agreement. All on-site labor shall be paid in accordance with the current Prevailing Wage as included in the project documents.

15.5    The project Subcontractor may select any competent Sub-subcontractors to perform work on the Project, whether or not they have executed agreements with any Local Unions. The Project Subcontractor however shall ensure that all Sub-subcontractors working at the project either sign this Agreement or agree in writing to observe its terms. In addition, each selected Sub-subcontractor which is not already a signator ("non-signator Sub-subcontractors") shall sign appropriate Local Union Agreement(s) covering the craftpersons its employs on the project; the local Union Agreement, however,



WAG 1019

shall bind non-signator Sub-subcontractors only with respect to work they perform on the Project and shall not cover other work they perform in the Local Union's jurisdiction.

15.6    Shift work may be scheduled at the option of each Contractor, but must continue for at least five consecutive working days. A shift premium shall be paid for any hours worked on a shift beginning after 3:00 p.m. at the premium amount specified in each Local Union Agreement that provides for shift work; or in the absence of a reference to shift work; at the premium rate of 14%

## ARTICLE XVI
## TAXES AND CONTRIBUTIONS

16.1    The Subcontractor for the Price herein provided for, hereby accepts and assumes exclusive liability for and shall indemnify, protect and save harmless the Contractor and the Owner from and against the payment of:

A.    all contributions, taxes, or premiums (including interest and penalties thereon) which may be payable under the Unemployment Insurance Law of any State, the Federal Social Security Act, Federal, State, County and/or Municipal Tax withholding laws, or any other laws, measured upon the payroll of or required to be withheld from employees, by whomsoever employed, engaged in the Work to be performed and furnished under this Agreement; and

B.    all sales, use, personal property and other taxes (including interest and penalties thereon) required by any Federal, State, County and Municipal law to be paid or collected by the Subcontractor or any of its subcontractors or vendors or any other person or persons acting for, through or under it or any of them, by reason of the performance of the Work or the acquisition, ownership, furnishing or use of any materials, equipment, supplies, labor, services or other items for or in connection with the Work; and

C.    all pension, welfare, vacation, annuity and other union benefit contributions payable under or in connection with labor agreements with respect to all persons, by whomsoever employed, engaged in the Work to be performed and furnished under this Agreement; and

D.    The Subcontractor's proportionate share of any and all other taxes imposed by any governmental body as a consequence of the Contractor's performance of the Contract other than Federal, State County and Municipal Income Taxes.

## ARTICLE XVII
## PATENTS

17.1    The Subcontractor hereby agrees to indemnify, protect and save harmless the Contractor and the Owner from and against any and all liability, loss or damage and to reimburse the Contractor and the Owner for any expenses, including legal fees and disbursements, to which the Contractor and the Owner may be put because of claims or litigation on account of infringement or alleged infringement of any letters patent or patent rights by reason of the Work or materials, equipment or other items used by the Subcontractor in its performance.



18

WAG 1020

## ARTICLE XVIII
## MECHANIC'S LIENS

18.1 In the event that Subcontractor's subcontractors, material suppliers, and or employees or any party with whom it has entered into a relationship, files a mechanic's lien arising out of or in connection with the Work, labor or material which is included in this Agreement, the Subcontractor shall within two days after notice from the Contractor institute proceedings to cause same to be discharged, satisfied or bonded, and in default thereof, the Contractor shall have the right to bond said claim or otherwise discharge same and to retain, out of any payment then due, or thereafter to become due, an amount sufficient to completely indemnify itself and the Owner against such lien or other claim, with interest, together with the expense incident to discharging such lien, or claim, and the defense of any such suit to enforce such lien or other claim, including any premiums charged for any bond and all attorneys fees and disbursements incurred, all of which the Subcontractor agrees to pay to the Contractor. Should there prove to be any claim by a subcontractor or supplier of the Subcontractor after all payments have been made under this Agreement, the Subcontractor shall refund to the Contractor all monies that the later may be compelled to pay in discharge and/or defense of the claim. Any lien or other claim, until satisfied or withdrawn shall preclude any and all claim or demand for any payment whatsoever by the Subcontractor. The Subcontractor agrees to indemnify, protect and save harmless the Contractor and the Owner from and against any and all claims, actions, fines and penalties brought or imposed or judgments rendered thereon, or any loss, damages, liability, cost and expenses including legal fees and disbursements which the Contractor and/or the Owner may sustain or incur as a consequence of the Subcontractor's failure to comply with the terms of this Article.

18.2 The Subcontractor agrees to save harmless the Contractor from any and all claims arising out of its failure to comply with any provisions of this Agreement, and should any claims be presented to the Contractor by any suppliers, materialmen, subcontractors or provider of any goods and services, the Subcontractor shall, within ten (10) days after notification that said claim has been made, dispose of said claim to the final satisfaction of the Contractor. If after the said ten (10) day period, the Subcontractor has failed to dispose of said claim or claims, the Contractor shall have the right to dispose of said claims in any manner it sees fit. Should the resolution of such claim be contingent upon disbursement of funds to a claimant, the Contractor has the right to make disbursements to the claimant directly, or by a joint check payable to the Subcontractor and the claimant and deduct said payments from the monies due or to become due to the Subcontractor.

## ARTICLE XIX
## ASSIGNMENT AND SUBCONTRACTING

19.1 Neither this Agreement nor any monies due or to become due hereunder shall be assignable without prior written consent of the Contractor nor shall the whole or any part of the Work be subcontracted without like prior written consent. Any such assignment or subcontracting without such prior written consent shall be void and of no effect and shall vest no right or right of action in the assignee or subcontractor against the Contractor. The Contractor's consent to any assignment or subcontracting shall not relieve the Subcontractor of any of its agreements, duties, responsibilities or obligations under this Agreement and the other Contract Documents, and the Subcontractor shall be and



WAG 1021

remain as fully responsible and liable for the defaults, neglects, acts and omissions of its assignees and subcontractors and all persons directly or indirectly employed by them as it is for its own defaults, neglects, acts and omissions and those of its own officers, servants and employees. .The Subcontractor shall bind each of its permitted sub-subcontractors to all of the terms, provisions and covenants of this Agreement and the other Contract Documents. The Contractor's consent to any subcontracting shall not be deemed to create any contractual or third party beneficiary relationship between the Contractor and any sub-subcontractor to whom the work or any portion thereof is subcontracted, and shall not vest any right of action in such sub-subcontractor against the Contractor or the Owner.

19.2  In selecting a Sub-Subcontractor or Supplier, the Subcontractor shall consider whether the firm appears on any list of entities debarred or suspended from doing business with a government entity, including the List of Parties Excluded from Federal Procurement and Nonprocurement Programs published by the U.S. General Services Administration.  The Subcontractor shall not retain any Sub-Subcontractor or Supplier on the List of Employers Ineligible To Bid On Or Be Awarded Any Public Contract, published by the New York State Department of Labor Bureau of Public Work.

19.3  Subcontractor agrees to enforce all the same contractual obligations and reporting requirements contained herein with any sub-subcontractor, supplier, or vendor who performs work on behalf of Subcontractor under this agreement.

## ARTICLE XX
## TERMINATION OF AGREEMENT

20.1  The Contractor shall have the right at any time upon three (3) day written notice to the Subcontractor, to terminate this Agreement and require the Subcontractor to cease work hereunder, in which case, provided the Subcontractor is not then in default, the Contractor shall indemnify the Subcontractor against costs directly resulting from such termination, except that the Subcontractor shall not be entitled to anticipated profits or overhead on work unperformed or on materials or equipment unfurnished, subject however to the limitations of paragraph 20.2.

20.2  The Contractor shall have the right, in the event of a termination of the Contract for any cause, at any time, to cancel this Agreement and require the Subcontractor to cease work thereon. In that event, the Contractor shall be liable only for the amount actually received by it for the work performed by the Subcontractor less the Contractor's appropriate share of said sums; and in no event shall the amount received by the Subcontractor be a greater sum than that which the Contractor obtains from the Owner whether such sum is received by reason of additions, omission or termination; and deducted therefrom shall be the Subcontractor's proportionate share of all expenses incurred by the Contractor (including litigation costs and attorneys fees, if any) and reasonable overhead and profit to the Contractor. The recovery, if any, by the Subcontractor shall be entirely conditioned upon the receipt of payment by the Contractor from the Owner. In the event of a deduction, the amount of the deduction taken by the Owner shall be binding upon the Subcontractor.

## ARTICLE XXI
## GUARANTEES



20

21.1  The Subcontractor hereby guarantees the Work to the full extent provided in the plans, specifications, general conditions, special conditions, and other Contract Documents.

The Subcontractor shall remove, replace and/or repair at its own expense and at the convenience of the Owner any faulty, defective or improper work, materials or equipment discovered within one (1) year from the date of the final acceptance of the Project as a whole by the Architect and the Owner or for such longer period as may be provided in the plans, specifications, general conditions, special conditions or other Contract Documents.  The Subcontractor shall commence such work within twenty-four (24) hours notice from the Contractor and in default thereof, the Contractor may proceed to perform such work at the expense of the Subcontractor.

Without limitation by the foregoing, the Subcontractor shall pay in addition for all damages to the Project resulting from defects in the Work and all costs and expenses necessary to correct, remove, replace and/or repair the Work and any other work or property which may be damaged in correcting, removing, replacing or repairing the Work.  This guarantee shall in no way limit the Subcontractor's liability for defective work, and Subcontractor and its bonding company shall indemnify and hold harmless the Contractor for all loss, liability, costs and damages attributable to any such defective work or error of performance by the Subcontractor.

ARTICLE XXII
ACCIDENT PREVENTION

22.1  The Subcontractor agrees that the prevention of accidents to workmen engaged upon or in the vicinity of the Work is its responsibility.  The Subcontractor agrees to comply with all Federal, State, County and Municipal laws, ordinances, rules, regulations, codes, standards, orders, notices and requirements concerning safety as shall be applicable to the work, including, among others, the Federal Occupational Safety and Health Act of 1970, as amended, and all standards, rules, regulations and orders which have been or shall be adopted or issued thereunder, and with the safety standards established by the Contractor, during the progress of the Work.  When so ordered, the Subcontractor shall stop any part of the Work which the Contractor deems unsafe until corrective measures satisfactory to the Contractor have been taken, and the Subcontractor agrees that it shall not have or make any claim for damages growing out of such stoppages.  Should the Subcontractor neglect to take such corrective measures, the Contractor may do so at the cost and expense of the Subcontractor and may deduct the cost thereof from any payments due or to become due to the Subcontractor.  Failure on the part of the Contractor to stop unsafe practices shall in no way relieve the Subcontractor of its responsibility therefor.    The Subcontractor agrees to indemnify, protect, and save harmless the Contractor from any and all claims, actions, fines and penalties brought or imposed or judgments rendered thereon, and from and against any and all loss, damages, liability, costs and expenses, including legal fees and disbursements, which the Contractor and/or the Owner may sustain or incur in connection therewith.

22.2  The Subcontractor shall notify the Contractor of any injury to any one of its employees or any employee of one of its subcontractors on the day of the injury and provide a written description of the injury within three (3) days of the date of such injury.

22.3  Notwithstanding any other provision of this Subcontract, the Subcontractor acknowledges that it is ultimately responsible for all construction safety procedures and precautions under Federal,



State, County and Municipal law, and the Subcontractor shall hold, indemnify and save the Owner and the Contractor harmless from and against any and all claims or expenses resulting from any act taken by any employee of the Subcontractor, a sub-subcontractor, or any injury or damage caused by any unsafe or negligent act or occurrence resulting from the Work.

### ARTICLE XXIII
### INDEMNITY AND INSURANCE

23.1    To the fullest extent permitted by law, the Subcontractor hereby assumes entire responsibility and liability for any and all damage or injury of any kind or nature whatever (including death resulting therefrom) to all persons, whether employees of the Subcontractor or otherwise, and to all property, caused by, resulting from, arising out of or occurring in connection with the execution of the Work; and if any claims for such damage or injury (including death resulting therefrom) be made or asserted, whether or not such claims are based upon the Contractor's or the Owner's alleged active or passive negligence or participation in the wrong or upon any alleged breach of any statutory duty or obligation on the part of the Contractor or the Owner, the Subcontractor agrees to indemnify and save harmless the Contractor and the Owner, their officers, agents, servants and employees from and against any and all claims of any party, and further from and against any and all loss, cost, expense, liability, damage or injury, including legal fees and disbursements, that the Contractor or the Owner, their officers, agents, servants or employees may directly or indirectly sustain, suffer or incur as a result thereof or as the result, in whole or part, of Subcontractor's breach of contract, and the Subcontractor agrees to and does hereby assume, on behalf of the Contractor and the Owner, their officers, agents, servants and employees, the defense of any action at law or in equity which may be brought against the Contractor or the Owner, their officers, agents, servants or employees upon or by reason of such claims and to pay on behalf of the Contractor and the Owner, their officers, agents, servants and employees, upon demand, the amount of any judgment that my be entered against the Contractor and the Owner, their officers, agents, servants or employees in any such action. In the event that any such claims, loss, cost, expense, liability, damage or injury arise, or are made, asserted or threatened against the Contractor or the Owner, their officers, agents, servants or employees, the Contractor shall have the right to withhold from any payments due or to become due to the Subcontractor an amount sufficient in the Contractor's judgment to protect and indemnify it and the Owner and their officers, agents, servants and employees from and against any and all such claims, loss, cost, expense, liability, damage, or injury, including legal fees and disbursements, or the Contractor, in its discretion, may require the Subcontractor to furnish a surety bond satisfactory to the Contractor guaranteeing such protection, which bond shall be furnished by the Subcontractor within five (5) days after written demand has been made therefor.

23.2    Certificates of Insurance must be issued by all Subcontractor's and approved by the Contractor prior to the start of any work on site. Two (2) separate certificates must be issued; (1) Cauldwell Wingate Company, LLC., 380 Lexington Avenue, NY, NY 10168 as the certificate holder, and; (2) Dormitory Authority State of New York, 515 Broadway, Albany, NY 12207-2964 Attn: Risk Management unit, as the certificate holder. The description of operations block must include: DASNY Contract No. 1380909999, New Court Facilities, Bronx Criminal Court, and contain the following additional insureds:



22    MSDOCS/Projects/2200097/ Subagreements/ New Sub.doc

1. Cauldwell Wingate Company, LLC
2. Dormitory Authority State of New York
3. City of New York
4. Bovis Lend Lease

The minimum insurance limits acceptable are:

Worker's Compensation/Employers Liability - in accordance with laws of the State of New York (certificate must be obtained from the Comp. Carrier). Any businesses located outside of New York State must include on the certificate in the description box:
"Coverage is extended to include all New York State employees in accordance with the New York State workers compensation law"
- Include all states endorsement, where applicable.
- All insurers shall agree to waive the right of subrogation against Owner and Contractor.

Commercial Liability and/or Contractors Liability - $2,000,000.00 per occurrence and $2,000,000.00 aggregate. With an Excess or Umbrella additional of not less than $3,000,000.00.
- Premises/Operations – must cover all work to be performed by Subcontractor and their Sub-subcontractors.
- Contractual Liability written specifically for this contract.
- Products/Completed Operations must include a two year extension beyond acceptance date.
- Broad Form Property Damage including completed operations.
- Independent Contractors.
- Blanket Explosion, Collapse & Underground Property Damage Liability.
- Employees as additional insureds.
- Supplemental payments in addition to limit of liability.
- Contractual exclusion pertaining to operations performed within 50' of railroad must be eliminated.
- Additional Insureds to be included on a primary basis.
- Any deductible clauses, exclusions or special endorsements must be approved by contractor prior to inclusion.
- Insuring agreement to read "to pay on behalf of".
- Waiver of subrogation for Owner, Contractor, its director, officers, employees, subsidiaries and affiliates
- Severability of interests (cross liability)
- Coverage shall not include any exclusions unacceptable to the Contractor and Owner.

Comprehensive Automobile Liability - Covering all owned, non-owned and hired vehicles including:
- LIMIT: $1,000,000 any one loss for Bodily Injury (including death) & Property Damage combined.
- Contractual Liability.
- All insurers agree to waive their rights of subrogation against Owner and Contractor, its directors, officers, employees, subsidiaries and affiliates.

When applicable, Subcontractor shall furnish evidence that is has provided Pollution Liability Insurance covering all lead and pollution operations with limits not less than $2,000,000 each occurrence



23                MSDOCS/Projects/2200097/ Subagreements/ New Sub.doc

combined single limit for bodily injury, property damage and clean up-costs including completed operations (3 year continuation beyond acceptance), broad form contractual (including coverage for third party over claims), and independent contractors coverage. If policy contains a general aggregate, this aggregate must apply on a per project basis, all of which must be evidenced on certificate. Insurers agree to waive the rights of subrogation against additional insureds and the Contractor and its directors, officers, employees, subsidiaries, and affiliates.

- Defense costs must be payable in addition to limit of liability.
- Any deductibles, clauses, exclusions or special endorsements must be approved by Contractor prior to inclusion.
- Coverage must include on-site, off-site and in-transit exposures.
- Policy to read "to pay on behalf of" (in lieu of indemnify).
- Must include loading and unloading coverages.
- Must be written on occurrence form.
- Policy to be submitted to the Contractor for review and approval.

Insurance policies specified above shall be endorsed to name Owner and Contractor, its directors, officers, employees, subsidiaries and affiliates, as additional insureds, and shall stipulate that this insurance is primary, that any other insurance or self-insurance maintained by Owner and Contractor shall be excess only and shall not be called upon to contribute with this insurance.

The original certificates for both the liability and worker's compensation must be received at Contractors office prior to the scheduled start of work being performed, and be in affect for thirty (30) days after completion.

23.3    The Subcontractor covenants and agrees that it shall not sublet any part of the work hereunder without requiring its subcontractors to purchase and maintain insurance policies and coverage required by the terms and conditions of paragraph 23.2. The Subcontractor shall furnish satisfactory evidence that its subcontractors have purchased said insurance by causing a certificate of insurance to be furnished to the Contractor

23.4    Compliance by the Subcontractor with the foregoing requirements as to the carrying of insurance and furnishing of certificates of insurance, shall not in any way relieve the Subcontractor from any liability or diminish its obligations under this Article or any other provision of this Agreement.

23.5    Within twenty-four (24) hours of all accidents or occurrences resulting in injury to the Subcontractor's employees, or third parties or damage to property of another, the Subcontractor shall submit a written report, in a form acceptable to the Contractor. When requested by the Contractor, the Subcontractor shall furnish the Contractor with a copy of any reports prepared for submission to the Subcontractor's insurance company.

23.6    The Contractor, Subcontractor and their insurers do hereby waive any and all rights of subrogation against the Owner and each other to the extent of the insurance coverages provided hereunder.

ARTICLE XXIV
DISPUTE RESOLUTION



24                MSDOCS/Projects/2200097/ Subagreements/ New Sub.doc

WAG 1026

24.1  Except as provided in paragraph 24.2 below, any and all disputes arising out of and/or related to this Agreement and the performance of the Work at the Project, shall be decided solely in the state courts of the State of New York and venue in any such action must be placed in the County of New York.

24.2  In the event that a dispute exists between the Subcontractor and the Contractor arising out of and/or related to a modification of the Contract or any action by the Owner and/or the Architect and in the event that the Contractor actually commences an action or proceeding against the Owner, at any time whatsoever, then the dispute between the Contractor and the Subcontractor shall be decided in the same manner, location and forum as provided for in the Contract.  In the event that an action has been previously commenced by the Subcontractor against the Contractor, the Subcontractor agrees to withdraw such action, and participate in the action or proceeding then commenced by the Contractor against the Owner and/or Architect.  The Subcontractor agrees to participate in such action or proceeding and to present its own claim therein, through an attorney chosen by the Contractor, at the Subcontractor's own expense and to be bound by the decision rendered thereon.  The joinder of additional parties by the Contractor or the Owner, or the consolidation of such proceeding with another proceeding, shall in no manner invalidate or limit the provisions of this Article.  It is expressly understood that the purpose of this paragraph is to insure consistency in the resolution of disputes arising out of all work at the Project, in the event that the Contractor, *with mutual consent of Subcontractor and without wrongful denial of the subcontractor for their portion of the work*, commences an action against the Owner.  In no event shall the Contractor be liable to the Subcontractor for work performed or for any other cause whatsoever except to the extent that the Contractor may recover therefore, from the Owner.  In the event of such a recovery, the amount awarded to the Contractor on account of the Subcontractor's claim shall be paid to the Subcontractor less the Subcontractor's proportionate share of the expenses, costs and attorneys fees incurred by the Contractor in prosecuting the claim.  In addition thereto the Subcontractor's recovery shall be diminished by reasonable overhead and profit markup to the Contractor.

24.3  When this Agreement is signed by the Contractor, it is deemed executed and delivered in the State of New York and shall be construed in accordance with the Laws of the State of New York without any consideration being given to any principles of choice or conflict of laws.

ARTICLE XXV
INCONSISTENT TERMS

25.1  In the event there is any inconsistency between the specific terms of this Agreement and the terms of the Contract, general conditions or supplementary conditions, or any other Contract Document, or in the event that any right or obligation is modified or limited or altered by the terms of any other Contract Document, then the terms of this Agreement shall have precedence and govern unless, the Subcontractor shall have advised the Contractor, upon the execution of the Subcontract of such conflict or inconsistency in which event, the Contractor shall have the sole discretion to render an interpretation of and decision as to which Contract Document has precedence or, the Contractor may refer the matter to the Architect for an interpretation and decision.  In either event the decision of the Contractor or the Architect, shall be final, conclusive and binding upon the Subcontractor.



WAG 1027

**ARTICLE XXVI**
**BONDS**

26.1 If requested by the Contractor, at any time, either at the commencement of performance or at any time during performance of the Work, the Subcontractor shall furnish to the Contractor a performance bond in the amount of one hundred (100) percent of the Price and a separate payment bond in the amount of one hundred (100) percent of the Price, the form and contents of such bonds and the Surety or Sureties thereon to be satisfactory to the Contractor.

**ARTICLE XXVII**
**CLAIMS BY THE SUBCONTRACTOR**

27.1 Notwithstanding the fact that a dispute, controversy or question shall have arisen in the interpretation of any provision of this Agreement regarding the performance of any work, the delivery of any material, the payment of any monies to Subcontractor, or otherwise, the Subcontractor agrees that it will not directly or indirectly stop or delay any work or part of work required to be performed, or stop or delay the delivery of any materials required to be furnished hereunder, pending the determination of such dispute or controversy.

27.2 If Subcontractor is damaged by the act of the Owner, for which act the Contract affords benefits and remedies solely to Contractor, then Subcontractor shall be derivatively entitled to the benefits to be achieved by the pursuit of such remedies, as Subcontractor's interest may appear. Contractor shall not be required on behalf of Subcontractor to file any claim or take any action against any person other than Owner; nor to make any claim or take any action against any party whatsoever (including the Owner) that is not asserted in good faith. It is agreed that the claim of Subcontractor against Contractor for the acts of the Owner is limited to the rights of Contractor against Owner and when such rights have been exhausted (subject to the provisions of this Subcontract), Subcontractor's claim automatically shall be deemed settled whether or not any recovery thereon shall be obtained.

27.3 No claims for increased costs, charges, expenses or damages of any kind shall be made by the Subcontractor against the Owner for any delays or hindrances from any cause whatsoever; provided that the Contractor, in the Owner's discretion, may compensate the Subcontractor for any said delays by extending the time for completion of the Work as specified in the Contract.

27.4 If the Subcontractor claims that any Work which the Subcontractor has been ordered to perform will be Extra Work, or that any action or omission of the Contractor is contrary to the terms and provisions of the Contract and will require the Subcontractor to perform Extra Work, the Subcontractor shall: File with the Contractor within fifteen (15) working days after being ordered to perform the Work claimed by the Subcontractor to be Extra Work or within fifteen (15) working days after commencing performance of the Work, whichever date shall be earlier, or within fifteen (15) working days after the said action or omission on the part of the Contractor occurred, a written notice of the basis of the Subcontractor's claim, including estimated cost, and request for a determination thereof.

**ARTICLE XXVIII**



26                     MSDOCS/Projects/22000097/ Subagreements/ New Sub.doc

WAG 1028

## ENTIRE AGREEMENT

28.1  No oral representations or other agreements or understandings have been made by the Contractor except as stated in this Agreement.  This Agreement may not be changed in any way except as herein provided, and no term or provision hereof may be waived by the Contractor except in writing signed by its duly authorized officer.  This agreement constitutes the entire negotiated Agreement between the parties hereto, the terms of which shall  not be construed against the Contractor as the drafter of this document.

28.2  The failure of the Contractor to insist in any one or more instances upon a strict compliance with any provision of this Agreement, or to exercise any option herein conferred, shall not be construed as a waiver or relinquishment of the right of the Contractor thereafter to require compliance with such provision or a waiver of the right of the Contractor thereafter to exercise such option, but such provision or option will remain in full force and effect.

28.3  In the event that any article, paragraph, term or condition of this Agreement is deemed to be invalid pursuant to any rule, regulation, law, ordinance, code, decision of any court having jurisdiction over the parties or for any reason whatsoever, previously or hereinafter enacted, all other articles, paragraphs, terms or conditions shall be unaffected thereby and remain in full force and effect.

28.4  The title of each Article is for convenience only. No such title shall diminish, affect or alter any term or condition of this Agreement.

## ARTICLE XXIX
## PROGRESS REPORTS TESTING AND INSPECTIONS

29.1  The Subcontractor shall furnish daily progress reports of the Work, including status of materials or equipment, that may be in the course of preparation or manufacture.

29.2  In addition to the rights granted the Contractor by other provisions of this Subcontract, the Contractor shall have the right to inspect the progress of the work required to be performed in the Subcontractor's shop or places other than the site of the work.  To accomplish this, the Subcontractor shall, upon demand, furnish the Contractor with a list of all the Subcontractor's vendors.  If the Subcontractor's Work has not sufficiently progressed in the shop or elsewhere, either by reason of the failure on the part of the Subcontractor to (a) prepare and promptly progress the shop drawings and samples, if any, that are required hereunder; (b) expedite the approval of the shop drawings and samples, if any, in the office of the Owner's authorized representatives; (c) order raw or processed materials required for delivery either to the Subcontractor's shop for fabrication or to the site, as required, sufficiently in advance so as to avoid any possible delays in the performance of the Work; (d) properly process the fabrication in the Subcontractor's shop; (e) or otherwise; as a result of which the work in the field is likely to be delayed, the Contractor shall have all the rights set forth in Paragraph 11 hereof, irrespective of the condition of the work at the site of the construction, and irrespective of whether the Subcontractor may be of the opinion that the work in the field is not sufficiently advance to warrant the progress away from the site, of the construction or fabrication required by the Contractor.



27

WAG 1029

29.3 All materials and equipment used in the Work shall be subject to inspection and testing in accordance with accepted standards to establish conformance with specifications and suitability for uses intended unless otherwise specified in the Contract. If any Work shall be covered or concealed without the approval or consent of the Contractor or Owner, said Work shall, if required by the Subcontractor, be uncovered for examination. Any inspection by the Contractor or the Owner or by a testing laboratory on behalf of the Owner does not relieve the Subcontractor of the responsibility to maintain quality control of materials, equipment and installation to conform to the requirements of the Contract. If any test results are below specified minimums, the Owner may order additional testing. The cost of said additional testing, any additional professional services required, and any other expenses incurred as a result of said additional testing shall be at the Subcontractor's expense. The Contractor may deduct such costs from moneys due the Subcontractor.

## ARTICLE XXX
## MISCELLANEOUS

30.1 The Subcontractor shall place and relocate his shanty when and where directed by the Contractor. The Subcontractor is responsible for the acquisition, maintenance and removal of all utilities and telephone services required for their shanty. All energy charges will be paid by the Subcontractor directly to the Electrical Subcontractor.

30.2 The Subcontractor shall comply with the Contractor's quality control plan and safety plan and shall at its own expense provide all temporary safety protection required at site and furnish his labor with all necessary safety equipment.

30.3 In the event that Contractor shall, during the course of the project, issue to Subcontractor any backcharge for work done or materials provided for the Subcontractor's account, or for any other reason whatsoever, and in the further event that the Subcontractor shall reject such backcharge in whole or in part, then the Subcontractor must notify Contractor in writing and within five (5) days of receipt thereof, setting forth in detail the grounds upon which the Subcontractor rejects the backcharge in whole or in part. In the event the Subcontractor fails to so notify Contractor, then Subcontractor waives any right to contest said backcharge at any time in the future and that said backcharge shall be final and conclusive both as to liability and amount.

30.4 If, before Construction Completion, the Owner desires Beneficial Occupancy of the Work or any part thereof, which is completed or partly completed, or to place or install therein equipment and furnishings, the Owner shall have the right to do so, and the Subcontractor shall in no way interfere with or object to said Beneficial Occupancy by the Contractor.

Said Beneficial Occupancy (1) shall not constitute acceptance of space, systems, materials or elements of the Work, nor shall said Beneficial Occupancy affect the start of any guarantee period, and (2) shall not affect the obligations of the Subcontractor for Work which is not in accordance with the requirements of the Subcontract or other obligations of the Subcontractor under the Contract.

Should the Subcontractor request Contractor acceptance of any project system(s) related to the protection of life or property prior to Beneficial Occupancy or Construction Completion, the Contractor may accept such systems(s), however, the cost of maintaining such system(s) in operating condition, and labor costs



28                MSDOCS/Projects/2200097/ Subagreements/ New Sub.doc

to operate the system(s) including costs for remote public safety personnel, shall be borne by the Subcontractor. The guarantee period will begin from the date of the Construction Completion.

The Subcontractor shall continue the performance of the Work in a manner which shall not unreasonably interfere with said use, occupancy and operation by the Contractor.

30.5  Subcontractor agrees to accept and execute the terms of performance under Owner policy of Certification of Non-Segregated Facilities, Non-discrimination in Employment in Northern Ireland, Compliance with the Federal Equal Employment Opportunity Act, and Commitment to Affirmative Action; And Acknowledgement of Notice Regarding Transfer of Offset Credits.

30.6  Affirmative action requirements – by incorporation of Project Documents, subcontractor agrees to conform with all requirements regarding participation goals and reporting of Minority/Women Owned Business Enterprises, Minority & Women Workforce Utilization, and local resident inclusion on this contract.   Be advised of the following:

| Percent of Total | Contract |
|---|---|
| Minority Business Enterprise Goal | 15% |
| Women's Business Enterprise Goal | 9% |

The goals stated above, for each contract, do not apply to bids of less than $100,000.

Percent of Total Work Force

| Minority & Women Work force Goal (for all Trades) | 35% |
|---|---|

30.7  The said parties, for themselves, their heirs, executors, administrators, successors and assigns, do hereby agree to the full performance of all of the terms and provisions herein contained.

IN WITNESS THEREOF, the parties have hereunto set their hands or caused this Agreement to be executed by their duly authorized officers as of the day and year first above written. This Agreement must be signed and returned to the Contractor at his address above no later than **December 31, 2003, 2003, 5PM** or otherwise may be rejected by the Contractor.



MSDOCS/Projects/22000097/ Subagreements/ New Sub.doc

WAG 1031

Cauldwell Wingate Company LLC, Contractor

By:    Susan L. Hayes
       President

Date: _____

       Vice President
       1/14/04

William A. Gross Const. Assoc. Inc. , Subcontractor

By: _____  Mark Gross

       Title: V. President

Dated:  12/30/03

ATTESTED TO FOR SUBCONTRACTOR:

By _____

       Title: Secretary



30          MSDOCS/Projects/2200097/ Subagreements/ New Sub.doc

WAG 1032

Exhibit I (Attachments)

| | |
|---|---|
| (X) | Rider A, as executed by Subcontractor signed 7/22/03 |
| (X) | Rider B, as executed by Subcontractor signed 5/13/03 |
| (X) | Attachment C, Detailed Work description as per Purchase Order # **2200097-0035.** |
| (X) | Attachment D, CWC Project Safety Manual Dated January 15, 2003 |
| (X) | Attachment E, Master Document List dated 8/19/02, 31 pages |
| (X) | Attachment F, Project Labor Agreement (PLA) |
| (X) | Attachment G, DASNY Sales Tax Exemption Clarification |
| (X) | Attachment H, Dormitory Authority Code Of Business Ethics Handbook |

Other forms required for this project:

- Bronx Security ID Application Form
- Certification of Non-Segregated Facilities
- Contractors Monthly Compliance Report (M/WBE)
- EEO Tabulation Report
- MBE-WBE Utilization Summary
- Monthly Work Force Utilization Report
- NYS Business Enterprise Letter (Sample)
- Payroll Certification
- Six Month Workforce Utilization
- EEO Policy Statement
- Labor Rate Worksheets
- Signed Acknowledgement, CWC Safety Manual



MSDOCS/Projects/2200097/ Subagreements/ New Sub.doc

WAG 1033

## RIDER "A"
### ADMINISTRATIVE PROJECT ISSUES
**Bronx Criminal Courthouse, 161ˢᵗ Street, Bronx, NY**
**Contract #9 – GC Fitout #2**

A)   *We have reviewed the entire Document List dated August 19, 2002, 31 pages (attached) including addendums #1 thru #4 and understand our contract is based on any / all related work contained within these documents.*

B)   *We have reviewed and understand our contract will include the following administrative and standard on-site issues that we are responsible for over the entire project duration:*

1.   EEO Policy and affirmative Action Policy Statements.
2.   Pre-approval by DASNY Office of Opportunities and registered with the NYS DBS.
3.   Subcontractor responsible for locking and security of all equipment and materials on site.
4.   Subcontractor responsible to construct/power/sprinkler/remove their own Shanty if required and be relocated as directed by CWC.
5.   Compliance with all Insurance Requirements.
6.   Subcontractor to provide their own Site Safety Program and participate in the Safety and Security Procedures on site.
7.   Warranty clause of 1 year or as specified, and all applicable manuals and guarantees.
8.   Testing, Controlled Inspections, Reports, P.E. sign-offs, etc., for your work.
9.   Verification/Shop Drawings/Surveying/Layout as required for your work.
10.  Review & acceptance of Project Manual Specification Section #01010 – Summary of the Work. In this section, each subcontract shall include all related items under the designation entitled "Contract 9".
11.  Provide all samples, submittals, mock-ups, testing, etc., as designated.
12.  In work scope where electrical equipment/devices are being provided by subcontracts in "Contract 9", such items will be installed with wiring brought above the ceiling (or as designated) to a nearby junction box.
13.  Each subcontractor will protect their own work.
14.  Each subcontractor will place their debris in centralized container locations throughout each floor.
15.  All work is to be furnished and installed in accordance with all drawings, details and specifications. Include for all worst-case scenario's and conflicts between architectural versus engineering drawings and/or specifications.
16.  This Sub-Contractor is responsible for all items of work, which fall under the jurisdiction of their union(s) and trade(s).
17.  All items not listed as "work not included" in Rider "B" shall be deemed part of your trade work and subcontract.
18.  All scaffolding, planking and working platforms required for this Sub-Contractor's work shall be the responsibility of this Sub-Contractor. All scaffold and planking must comply with OSHA standards.
19.  This Sub-Contractor shall be responsible for furnishing, delivering, receiving, handling, rigging, installing, protecting and storing of all materials defined by the drawings, specs, this Rider and governed by his/her trade jurisdiction so that disputes are avoided. This includes pre-purchased equipment assigned to you, for which the subcontractor shall handle in such a manner as if they had purchased it themselves, including any necessary coordination including any misc. parts necessary to provide a complete and fully functional system.

Msdocs/projects/2200097/riders/Rider A

Page 1 of 2

WAG  1034

## RIDER "A"
### ADMINISTRATIVE PROJECT ISSUES
**Bronx Criminal Courthouse, 161st Street, Bronx, NY**
**Contract #9 – GC Fitout #2**

20. Work includes sealing of all penetrations in an approved, fire-rated manner.
21. Includes all work per attached Rider "B".
22. All changes in scope must be approved in writing prior to start of work.
23. Subcontractor to provide sufficient on site field supervision and project management. This subcontractor to attend all meetings as required.
24. All subcontractors to submit daily reports.
25. All subcontractors shanties will be sub-metered for power consumption. Subcontractor to pay for usage.
26. 24 hour notice must be given for all deliveries.
27. All subcontractor are responsible for flagmen as required for their trucking and deliveries.
28. All deliveries are with Teamster drivers.
29. Saturday work requires DOB Work Permits obtained by each subcontractor.
30. Job site operates from 7:00 a.m. to 3:30 p.m. while teamsters operate from 8:00 a.m. to 4:30 p.m. *Contractors will be responsible for deliveries on overtime before 7:00 a.m. and after 4:30 p.m.*

**C)** *We have reviewed and understand our contract will include the following financial requirements that we are responsible for over the entire project duration:*

1. Bonding of Subcontractors (if required by CWC)
2. Waivers from all your subs/vendors after each payment – before next payment.
3. Subcontractor is responsible to purchase a master set of sepias and specification books for their own use.
4. Provide Certified Payroll reports for the prior month with each new Requisition.
5. The project is Tax Exempt, for both sales/use tax and capital improvement.
6. Change Order mark-ups for all subcontractors will not exceed 20%. This percentage is configured by any combination of overhead, insurance, profit, etc. Change Order mark-ups for all major equipment purchases is 10% of the first $10,000 value only.
7. All Change Orders will be submitted with highly detailed scope and complete financial breakdown information (labor hours, specific materials, mark-ups, etc.). No "lump sum" proposals will be accepted. All submissions to be broken down by floor as well. No Exceptions.
8. Minority Business Enterprise Goals, 15% to subcontractors.
9. Women Business Enterprise Goals, 9% to subcontractors.
10. Disadvantage Workforce Utilization Goals (on-site personnel) 35% of total.
11. Signator and compliance with the Project Labor Agreement (PLA).

_____                              _7/22/03_
Reviewed & Accepted - Signed                              Date

_William A. Gross_                                       _Pres. I w/_
Name (print)                                             Title

WAG 1035

May 13 03 02:25p                                                            P.4

# Bronx Courthouse
161st Street
Bronx, NY

Issued 4/25/03

RIDER B

Trade: SITEWORK

| Scope Description | Subcontractor |
|---|---|
| The Scope of Work as outlined below is for informational purposes only. It does not exactly define ALL work that occurs in your trade contract. Where one detail is specifically outlined, it is to be carried as a "Typical" detail for all related or similar situations throughout. A full review of All Drawings, Specifications, The Project Manual, Rider A, etc. is in conjunction with this informational Scope Rider. | |
| | |
| *Trade Specific Scope Items:* | |
| Removals, carting, tree removal, etc. for your work | |
| Trenching, compaction, backfill for other trades as specified | |
| Receive and Install Bollards throughout site | |
| Receive and Install Hydraulic Bollards ( This includes using "Certified" installers ) | |
| Excavation / compaction / backfill & concrete bases for Flag Poles, Hydrants, Light Poles, Hydraulic Bollards, Traffic Gates, Parking Booth, Etc. | - |
| Receive, Install Booth, Lift Gates, Tilt-up Gates & Card Readers | |
| F/I All Concrete Work as specified including Pigmented | |
| F/I All Caulking, Sealants, Expansion Materila, etc. | |
| F/I Boulders in Plaza and Jury Roof ( This includes all Crane Permits, Fees, Flagmen, Etc. ) | |
| Surveying for your work | |
| Testing / Inspections for your work | |
| F/I All Paver Work | |
| Trenching / Proper Elevations of Soil for All Plaza & Landscaping work | |
| F/I Perimeter Fence, including finish Painting | |
| Maintain / Relocate Existing "Construction Fence" as required During your work. *There is no specific guideline as to what will happen to the existing fence & barricades on site. Removal & disposal of said fencing shall be included in this work scope but may be credited later. Any temporary protection, fences, gates, etc required during your work is to be included so that the "site" is protected at all times.   **List exact $ carried for this item in the box to the right :* | - · · · |
| F/I All Perimeter curbing & sidewalk work | |
| F/I All Gravel | |
| F/I Bike Racks | |
| F/I Trench Drains as specified. This includes the Body and Cover but no plumbing. ( There are approx. 7 locations of this:   1 @ Parking Ramp and 6 inside the basement of building ) | - |
| F/I Stone Dust | |
| All Road Repaving work as specified   ( This includes all necessary Permits & Fees ) | |
| High Density Styrofoam Fill | |
| All Sawcutting, expansion joint, control joint work as specified | |
| Removable Slabs at Areaway ( Steel Frames with Eyebolts & Concrete, Etc. ) On A-242 | |
| F/I Light Pole Bolts, Nuts, Plates, Etc. ( F/I Poles themselves are by Others ) | |
| I/O ( 5 ) vehicle safety detector loops | |
| F/I PVC Piping for Hydraulic Bollards | |
| Conduit & wire connections for All items installed by this contractor | |

WAG  1036

May 13 03 02:26p                                                                    p.5

| | | |
|---|---|---|
| Concrete "Benches" to be clad with Granite | | |
| F/I Granite Bench Cladding | | |
| F/I all Sleeves as required for any / all work you are enclosing, pouring around, etc. | | |
| Design, Engineer & Pour 3' long, 1 foot high opening in Sallyport Slab left open by base building contractor to allow for Hydraulic Bollard Piping Sleeves. This includes ALL reinforcing work | - | |
| Provide an Allowance of $30,000 for Misc. on site Electrical wiring, conduits, connections, etc. | $ | 30,000 |
| | | |
| **Landscaping:** | - | |
| F/I All new plantings as specified | | |
| High Density Insulation Fill | | |
| Root Barrier sheet | | |
| Light Weight Soil | | |
| Geocomposite | | |
| F/I All Gravel | | |
| F/I All Top Soil, Mulch, Stone Dust, Broken Stone, etc. | | |
| F/I Rock Garden & Gravel on top of Jury Assembly Roof | | |
| 24 Month Maintenance after Substantial Completion | | |
| Allowance of $5,000 for Phliostachys Nigra | $ | 5,000 |
| | - | |
| Payment & Performance Bond for All Sitework & Landscaping | | |
| Provide all Permits, Applications, Fees, etc. | | |
| Provide all Labor of Proper Union Jurisdiction & Affiliation for all work | | |
| *General Note:* Cauldwell has included 4 days of on-site consultation from the vendor supplying | - | |
| the Hydraulic Bollards, Wedge Barriers, Booth, Lift Gates, Etc. They will be on site for 2 days | - | |
| during the "rough-in" period and 2 days for final operation start-up & testing. You will have | - | |
| them to assist you at your direction. | - | |
| | | |
| ***Work Not Included:*** | | |
| Roof Pavers | | |
| Furnishing of individual Steel Bollards throughout site ( Bollards only - any rebar, plates, concrete, etc. required for installation is part of installers work scope ) | - | *Furnish Complete -* |
| Furnishing of Hydraulic Bollard System | | |
| Waterproofing Systems for the Plaza Decks | | |
| Plaza "Sculptures" | | |
| Funishing of Security Booth, Lift Gates, Till-up Gates & Card Readers | | |
| F/I Flagpoles, Hydrants, Light Poles | | |
| Lighweight, sloped Concrete that pitches to drains ( under waterproofing ) | | |
| Light Fixtures in Stairs ( Coordinate only ) | | |
| Architectural Pre-Cast panels, base, capping, etc. | | |
| Stainless Steel Plaza Railings | | |
| *Master Mechanic, Teamster Foreman or Labor Shop Steward.* | | |
| *Removal or Disposal of Contaminated Soil* | | |
| *Removal, Relocation, Support or Installation of any Utilities.* | | |

**Total Price $ *3,880,000* °°**

*William A. Gross Const. Assoc, Inc.*
_____
                COMPANY
        *William A. Gross*          *[signature]*        *5-13-03*
           NAME (PRINTED)   SIGNATURE                     DATE

✓ *Work Not Included (Cont)*
*Removal or Disposal of Rock, Vaults, Meter Pits (etc)*
*Building Demolition, Site Clearing or Asbestos Abatement.*
*Metal Decking or Weep Tubes*
*Structural Concrete Slabs, Mud Slab or Lightweight Fill.*
*Foundation Excavation or Concrete*
*Railings, Granite Cladding, Flagpoles or Pre-Cast Panels.*

WAG 1037