UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
WILLIAM A. GROSS CONSTRUCTION
ASSOCIATES, INC.,

                Plaintiff,

      -against-

AMERICAN MANUFACTURERS MUTUAL
INSURANCE COMPANY,

                Defendant.
-----------------------------------------------------------x
AMERICAN MANUFACTURERS MUTUAL
INSURANCE COMPANY,

Third-Party Plaintiff,

      -against-

CAULDWELL-WINGATE COMPANY, LLC,

          Third-Party Defendant.
-----------------------------------------------------------x
CAULDWELL WINGATE COMPANY, LLC,

Fourth-Party Plaintiff,

      -against-

DORMITORY AUTHORITY – STATE OF
NEW YORK,

         Fourth-Party Defendant.
-----------------------------------------------------------x

**ECF CASE**

07-CV-10639(LAK)(AJP)

**AFFIDAVIT OF SUSAN L. HAYES**

**STATE OF NEW YORK** )
                    ) ss.:
**COUNTY OF NEW YORK** )

SUSAN L. HAYES, being duly sworn, deposes and says:

287125_1/00926-0053

1.      I am the President and Chief Executive Officer of Third-Party Defendant/Fourth-Party Plaintiff Cauldwell Wingate Company, LLC ("Cauldwell Wingate"). I submit this affidavit in opposition to Fourth-Party Defendant/Fifth-Party Plaintiff Dormitory Authority - State of New York ("DASNY")'s motion to dismiss the Cauldwell Wingate Complaint or, alternatively, to sever it from the main and third-party actions and for a stay (the "Motion").

2.      I was the President and CEO of Cauldwell Wingate during the entire period that Cauldwell Wingate carried out its contract to perform the "Fitout Work" in connection with the construction of the Bronx Criminal Courthouse Complex ("BCC"). I executed that contract on Cauldwell Wingate's behalf, and the Cauldwell Wingate personnel who worked on the BCC project ultimately reported to me. I visited the BCC site innumerable times during the period of Cauldwell Wingate's involvement, and interfaced regularly, on virtually a daily basis, not only with Cauldwell Wingate's various subcontractors but also with representatives of DASNY and its various agents, including its architect and its construction managers. As a result, I am fully familiar with the facts set forth herein.

3.      It is my understanding that DASNY claims that Cauldwell Wingate has conceded that it owes the amounts sought by one of Cauldwell Wingate's subcontractors, William A. Gross Construction Associates, Inc. ("Gross"), in the Gross Complaint. That is decidedly not the case.

4.      Since it was brought into this case on a Third-Party claim by the surety, American Manufacturers Mutual Insurance Company, Cauldwell Wingate has not yet directly answered Gross's various allegations. But Cauldwell Wingate has defenses to them, which it will of course assert in defending against the third-party action.

5. For example, over $1.1 million of Gross's approximately $2.6 million claim is for "32 open change orders, pending change orders and extra work orders" that Gross alleges Cauldwell Wingate has not paid. (Gross Complaint, ¶ 21.) Yet it is Cauldwell Wingate's position that Gross has actually been overpaid, and that it is not due anything for outstanding change orders or extra work orders.

6. For example, as described in the Cauldwell Wingate Complaint, DASNY's plans for the BCC originally called for the installation of approximately 300 fixed and hydraulic bollards (safety barriers). That is the number on which both Cauldwell Wingate and Gross based their bids. After the City Planning Commission objected to that number, DASNY ultimately settled on approximately 30 bollards, with significantly less associated road work around the BCC than originally called for. Those changes affected the amount of work Gross ultimately was required to do in connection with bollards.

7. As also described in the Cauldwell Wingate Complaint, DASNY's own agents admitted to Cauldwell Wingate that they were not always able to keep track of payments made to their various contractors on the BCC Project. Thus, for example, DASNY paid Cauldwell Wingate approximately $400,000 for the bollards, which is the amount that it would have owed if the original plan for 300 bollards had been carried out. Cauldwell Wingate, in turn, mistakenly overpaid Gross for bollard work it did not do.

8. While DASNY is entitled to a credit for this overpayment, it claims that the credit amount should be $800,000, while the documentation provided by both Cauldwell Wingate and Gross clearly shows that that number should be closer to $400,000.

9. And, in any event, Cauldwell Wingate does not owe Gross over $200,000 for changes to stainless steel bollards, as Gross alleges in the Gross Complaint. Instead, Gross owes Cauldwell Wingate approximately $344,000 that it was overpaid in connection with the bollards.

10. Gross also alleges that it is owed $411,000 for "Northside Redesign." (Gross Complaint, ¶ 21.) This item pertains to extra work done at an area referred to as the North Site. While there was a proposed change order for the amount sought by Gross, that amount was never approved by DASNY. In fact, DASNY assessed approximately $96,500 in back charges for the North Site, because it maintained that Cauldwell Wingate and Gross not only did not do extra work but in fact had to do less work than originally contemplated. In any event, while Cauldwell Wingate is seeking payment for this extra work from DASNY, it never issued a purchase order to Gross for the $411,000, because DASNY never approved payment for this extra work. At best, then, there is a dispute between Gross and Cauldwell Wingate as to whether Gross is entitled to the $411,000 it is seeking for this item. And, indeed, Cauldwell Wingate maintains that it is entitled to pass on the approximately $96,500 back charge assessed by DASNY in connection with this work.

11. In total, instead of being owed approximately $1.1 million by Cauldwell Wingate on open and pending change orders, as well as extra work orders, as it alleges, Gross actually owes Cauldwell Wingate approximately $200,000, which is the difference between what Gross should have been paid for its work after back charges and other adjustments, and the amount it has actually been paid.

12. These are the issues that I expect will be litigated as Gross pursues its First-Party action and Cauldwell Wingate defends the Third-Party action. Cauldwell Wingate is of course prepared to defend against these and other disputed change orders at trial.

13. As I am informed Gross's own counsel has admitted, both Gross and Cauldwell Wingate will need access to DASNY's documents and e-mails with respect to the specific tasks and line items in dispute.

14. I understand that Gross also alleges that it is owed approximately $1.6 million for such items as "escalated project services," "extended supervision" and "extended project administration." (Gross Complaint, ¶ 22.) These are precisely the type of delay claims that Cauldwell Wingate is seeking in its action against DASNY.

15. As alleged in the Cauldwell Wingate Complaint, the BCC Project was delayed from the outset, because of unexpected soil conditions, rock elevations and groundwater levels. Thereafter, Cauldwell Wingate was constantly frustrated in its ability to carry out the project on DASNY's timetables, both because of the extremely poor interface, for example, between architectural and mechanical drawings, and because of the grossly inadequate supervision of DASNY's construction managers.

16. Rather than adjust the construction schedule realistically as a result of all of these delays, which delays I understand DASNY has now even admitted in its Firth-Party Complaint, DASNY instead required Cauldwell Wingate to accelerate its own work.

17. Because it performed site and landscaping work, Gross's work was sequenced toward the end of the BCC Project. It was thus particularly affected by the accumulated delays.

18. As a result, its allegations regarding delay mirror Cauldwell Wingate's. It is apparent to me that both Gross and Cauldwell Wingate will rely on the same information,

5

including documents, e-mails and the many photographs that were taken, to prove their respective claims regarding delay.

_____
SUSAN L. HAYES

Sworn to before me this
18th day of July, 2008.

_____
Notary Public

JOSEPHINE CABAN-ODIOT
Notary Public, State of New York
No. 01CA4705166
Qualified in Westchester County
Commission Expires Dec. 31, 2009