UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- x

WILLIAM A. GROSS CONSTRUCTION ASSOCIATES, INC.,

07-CV-10639 (LAK)(AJP)

Plaintiff,

-against-

AMERICAN MANUFACTURERS MUTUAL
INSURANCE COMPANY,

Defendant.

**REPLY DECLARATION OF
EDWIN M. LEVY  IN
SUPPORT MOTION TO
DISMISS FOURTH-PARTY
COMPLAINT**

-------------------------------------------------------------------- x

AMERICAN MANUFACTURERS MUTUAL
INSURANCE COMPANY,

Third-Party Plaintiff,

-against-

CAULDWELL WINGATE COMPANY, LLC,

Third-Party Defendant.

-------------------------------------------------------------------- x

CAULDWELL WINGATE COMPANY, LLC,

Fourth-Party Plaintiff,

-against-

DORMITORY AUTHORITY OF THE STATE OF NEW
YORK,

Fourth-Party Defendant.

-------------------------------------------------------------------- x

Caption continued on the next page

```
------------------------------------------------------------------------ x
```
DORMITORY AUTHORITY OF THE STATE OF NEW
YORK,

                              Fifth-Party Plaintiff,

              -against-

A. WILLIAMS TRUCKING & BACKHOE
TRENCHING, INC., ASPRO MECHANICAL
CONTRACTORS, INC., BEAUBOIS CANADA, INC.,
BOVIS LEND LEASE LMB, INC., CNA SURETY
CORPORATION D/B/A AMERICAN CASUALTY
COMPANY OF READING, PA, DIERKS HEATING
COMPANY, INC., ENCLOS CORPORATION, FIVE
STAR ELECTRIC CORPORATION, FUTURE TECH
CONSULTANTS OF NEW YORK, INC., HERITAGE
AIR SYSTEMS, INC., HUGH O'KANE ELECTRIC CO.,
LLC, MATERIALS TESTING LAB, INC., PYRAMID
FIRE PROTECTION, INC., RAFAEL VINOLY
ARCHITECTS P.C., SMI-OWEN STEEL COMPANY,
INC., STONEWALL CONTRACTING CORPORATION,
TRACTEL LTD. SWINGSTAGE DIVISION,

                              Fifth-Party Defendants.
```
------------------------------------------------------------------------ x
```

**EDWIN M. LEVY,** an attorney duly admitted to practice law before the United

States District Court for the Southern District of New York, declares, pursuant to 28 U.S.C. §

1746, under penalties of perjury, that the following is true and correct:

      1. I am a Senior Counsel in the office of MICHAEL A. CARDOZO,

Corporation Counsel of the City of New York, attorney for fourth-party defendant and fifth-

party plaintiff Dormitory of the State of New York's ("DASNY"). Annexed hereto to be read

in support of DASNY's motion to dismiss the fourth-party complaint are true copies of the

following documents discussed in DASNY's Reply Memorandum of Law:

- the Cauldwell Wingate Company, LLC Request for Equitable Contract Adjustment is annexed as <u>Exhibit A;</u>

- the William A. Gross Construction Associates, Inc. Request for Equitable Contract Adjustment is annexed as <u>Exhibit B</u>; and

- the William A. Gross Construction Associates, Inc. Application to Extend Lien, filed July 25, 2008 is annexed as <u>Exhibit C</u>.

Dated: New York, NY
      August 4, 2008

EDWIN M. LEVY (EL7792)

Exhibit A

Cauldwell Wingate Company, LLC
Bronx Criminal Court Complex

Request for Equitable
Contract Adjustment

# **Table of Contents**

Tab 1            Narrative

Tab 2            Document Database, Including Database Codes

Tab 3            Damages

Tab 4            Planned vs. Actual Cash Flow Chart

Tab 5            Field Work Directive Log

Tab 6            Cauldwell Wingate RFI Log

Tab 7            Long Island Fireproof Door RFI Log

Tab 8            Maximum Security Products RFI Log

Tab 9            Commodore Construction RFI Log

Tab 10           Port Morris Tile & Marble Corp. RFI Log

Tab 11           As-Planned vs. As-Built Schedule (Major Subcontractors)

Tab 12           ASI Log

Cauldwell Wingate Company, LLC
Bronx Criminal Court Complex

Request for Equitable
Contract Adjustment

# <u>Narrative</u>

Cauldwell Wingate Company, LLC ("Cauldwell Wingate") entered into a contract with DASNY[1], dated December 20, 2002, for the work identified as Prime Contract #9 – General Construction #2 – Fitout Work at the New Bronx Criminal Court Complex.   This contract was in the amount of $46,995,000 and had a completion date of July 31, 2005.  It was one of seventeen (17) individual contracts issued on the project by DASNY, thirteen (13)[II] of which directly concerned construction of the Courthouse Building complex, from excavation/foundation work to architectural woodwork.

Cauldwell Wingate and its major subcontractors are companies which have extensive experience in their fields, and are among the most experienced and sophisticated contractors in the New York City area.  Some of these companies have been successfully in business for more than fifty years.  Yet virtually all of these companies suffered significant financial losses on this particular project.   In discussions with the principals of at least six (6) of the other prime contractors on the project, again firms with considerable Public Works experience, Cauldwell Wingate was advised that these firms suffered similar losses. This can only be attributed to the quality and completeness of the contract documents, or lack thereof, program changes, design revisions, and other items of this nature, and the administration of the contract by DASNY and its consultants and representatives.

Based on the caliber and experience of all of these contractors and subcontractors, under no circumstances can DASNY sustain even the possibility of "bidding error" as an affirmative defense on this project.  In fact, responsibility in this matter has been acknowledged by DASNY's willingness to settle one (1) early claim, to approve and pay certain material escalation claims during the course of the project, and to negotiate, and attempt to settle, one (1) other known total claim by a Prime Contractor prior to project completion.

---

For I and II see last page of Narrative.

Cauldwell Wingate Company, LLC
Bronx Criminal Court Complex

Then what really happened on this project to cause such significant losses for all concerned? The following is an outline of the major impacts to the project, almost from its inception.

The delays to the project began as early as the excavation/foundation work, which was being performed under Contract #5 by another contractor. While excavating for the new concrete foundations at the Jury Assembly Building, unsuitable soil conditions were encountered, which resulted in a redesign to part of the foundation system in this area. In an effort to minimize delays to the overall project, it was decided by DASNY and Bovis Lend Lease ("Bovis") to put the Jury Assembly Building on hold, pending the redesign, and to shift all efforts to the Courthouse Building foundation work. The Jury Assembly Building would be returned to at a later date.

However, this proved to be only the first of a number of impacts and delays to the excavation/foundation work. As a result of other impacts, such as latent conditions with regard to rock elevations, groundwater levels and conversion from pile foundations to spread footings, as well as an inordinate number of Requests for Information (RFI's) and design changes, the work of Contract #5 was delayed to the point that it severely impacted the work of Contract #6 – Structural Steel and ultimately the start of Contract #7 – Shell Construction.

The scope of Contract #7 – Shell Construction consisted generally of the following work:

A.  All superstructure concrete including slabs on metal deck, formed slabs, certain slabs on grade and the Garage structure.
B.  Roofing and waterproofing.
C.  Spray-on fireproofing.
D.  Shaftwalls at elevator shafts.
E.  All elevators, escalators and wheelchair lifts.

While all of these elements were important for the performance of Cauldwell Wingate's work under Contract #9 – General Construction #2 – Fitout Work, the completion of the concrete slabs was critical, since no work could begin in the field without these slabs in place, at the very least.

According to Stonewall's "Bid Schedule," Data Date June 4, 2001, the first area of concrete slab work was to begin at the Jury Assembly Building on, or about, December 18, 2001 and continue until completion of this building on February 25, 2002. As mentioned previously, unsuitable soil material and a foundation redesign in this area put this building on hold and efforts were redirected to the Courthouse building. Concrete slabs on metal deck in this building were originally scheduled to begin on July 4, 2002 and were to be completed eight (8) months later on February 28, 2003. As a result of foundation delays and impacts to the structural steel work, performed under Contract #6, which followed the foundations, the first area of metal deck was not turned over for Mechanical, Electrical and Plumbing/Sprinkler ("MEP") roughing and rebar until February, 2003. This area consisted of only the small portion of the B-1 level slab between column lines 1/12 and A/D, and this area was not poured until February 12, 2003, almost fourteen (14) months after the first concrete slab was to be poured under Contract #7.

These late releases of small portions of the Courthouse decks continued and, when combined with other impacts such as MEP coordination issues and pending RFI responses, significantly delayed completion of the Courthouse concrete slabs. In fact, the West Courthouse slabs were not completed until July 31, 2003, almost ten (10) months later than originally scheduled, and the East Courthouse slabs were not completed until January 14, 2004, again approximately ten (10) months later than scheduled. When factoring in the late release of the Jury Assembly Building in the Fall of 2003 and the Garage/Plaza area in the Summer of 2004, the concrete contract work was not completed until October 4, 2005, twenty-five (25) months later than scheduled.

Although Cauldwell Wingate's contract, for the work they were to perform under Contract #9, is dated December 20, 2002, there was virtually no field work it could perform without the concrete slabs in place. It was not until June/July of 2003 that layout work and framing for drywall work could begin, in a very limited manner. It was not until September 23, 2003, fully nine (9) months into a thirty (30) month job, that the first meeting was held to coordinate the MEP work with the drywall/framing work so that framing of a mock-up court room could begin. Court Room #301 was chosen as the mock-up area with framing to begin on September 29, 2003. At this point in time the MEP coordination process had been ongoing for more than a year, but continued to experience serious conflicts and was considered barely fifty percent (50%) completed. While this issue is dealt with, specifically, elsewhere

Cauldwell Wingate Company, LLC
Bronx Criminal Court Complex

Request for Equitable
Contract Adjustment

in this narrative, its impact on drywall framing and masonry partition work is obvious
and it was hoped that the court room mock-up would identify any remaining
conflicts at these critical spaces so that all such conflicts could finally be resolved.
While framing and partition work did move forward, the MEP conflicts remained far
from resolved, and interferences continued to be discovered as the finish work
progressed. These interferences generated hundreds of additional RFI's which led to
design modifications and, in many cases, cutting, patching and repairing of already
completed work. The resulting added work, comeback work and loss of efficiency in
an operation such as this is obvious, yet the significant additional costs suffered by the
prime contractors and many of their subcontractors remain substantially unpaid to
date.

<u>Delays to the Completion of the MEP Coordination Drawings</u>

The MEP coordination drawing process started very early in 2002 but it
immediately became apparent that the MEP design drawings were not suitable for
construction. These drawings were not properly coordinated in the design phase
among the MEP disciplines, nor were they fully coordinated with the structural and
architectural details. Piping runs, which were shown straight on the design drawings,
often conflicted with structural building elements and had to be offset and re-routed.
In addition, the MEP design drawings did not identify the fire/smoke dampers. This
was done at a much later date and, as a result, the duct background drawings were
delayed, which, in turn, delayed the coordination process. In February, 2002 Rafael
Vinoly Architects, P.C. ("RVA") advised that the boilers would have to be relocated
due to space limitations and this area, at which coordination was already underway,
was put on hold. The redesign of this area was not issued until Mid-March, 2002, at
which time the coordination of this area had to start all over again.

Over the next several months significant design changes were made by RVA
with the result that all MEP coordination at the B-2 Level, Mezzanine and 7th Floor
Mechanical Equipment Room was put on hold. At the point in time when the "as
planned" status of the MEP coordination process should have been seventy-five
percent (75%) completed, the progress, in actuality, was approximately five percent
(5%) done. The project underwent constant design relocations of equipment by RVA
and the other consultants. This resulted in continuous re-engineering and re-work of
the coordination process with many coordination drawings having to be placed on
lengthy hold. The prime contractor for Contract #10 – Heating & Cooling, Dierks

Heating Co., Inc. ("Dierks") wrote Bovis on a number of occasions to report the slow and costly status of this MEP coordination. On November 22, 2002 Dierks noted that the scheduled time for coordination was already depleted, yet the actual progress stood at just eleven percent (11%) completion. Dierks wrote again on June 12, 2003 stating that the MEP coordination was barely fifty percent (50%) completed at that time, and again on August 13, 2003 noting that the allotted spaces on the architectural drawings were hardly adequate for the mechanical installations and this was a major impediment to the coordination process.

This situation continued to drag on and the MEP coordination process was only deemed to be "substantially" completed in Mid 2004, approximately two (2) years later than originally planned. Of course, this constant design relocation of equipment, and its associated piping, not only caused delay to the project but also proved to be very costly. Dierks estimated that sixty percent (60%) more offsets, vents, drains and fittings were installed than originally anticipated, and this work was generally done around previously installed ductwork and piping. But the worst was yet to come for Cauldwell Wingate and its subcontractors. Just as the contract drawings were deemed "complete" and suitable for bidding, despite their deficiencies, so, too, the MEP coordination drawings needed to be released or the project would never be built. The problem for Cauldwell Wingate and its subcontractors was that the MEP work, while finally, reasonably coordinated among these disciplines, did not fit within the architectural and structural parameters of the building itself. This resulted in constant "hits" and interferences for many of Cauldwell Wingate's subcontractors, particularly Component Assembly Systems ("CAS"), the impacts of which are dealt with later in this narrative.

By this time the enormity of the effort required to achieve full coordination of the contract documents and the work of all trades by DASNY/Bovis, so that Cauldwell Wingate could complete its own contract work, became evident. This was not the situation Cauldwell Wingate expected at the time it prepared its estimate and submitted its bid. Cauldwell Wingate expected, and had every right to expect, a clear, concise and fully coordinated set of contract documents so that this project could be built in the sequence planned and the time allotted. This was, however, not the case for a number of reasons, none of which were the fault of Cauldwell Wingate. These reasons will be further detailed later on in this narrative.

Cauldwell Wingate Company, LLC
Bronx Criminal Court Complex

Request for Equitable
Contract Adjustment

Any analysis of this sort must start with the clarity and completeness of the contract documents. In this case, the level of coordination of not only the MEP work, but the architectural and structural details as well, was critically lacking, particularly for a project of such a unique design. Many critical items of contract work were not fully coordinated between the various plans and specifications within the Contract #9 scope of work, and also with those of the many other prime contracts on the project.

### Delays to Hollow Metal and Hardware work due to design issues.

As the general contractor for the fit-out work on this project, by far the largest subcontracted portion of Cauldwell Wingate's contract was for the drywall and ceiling work. These trades represented approximately thirty percent (30%) of Cauldwell Wingate's work, with the drywall portion accounting for more than half of this percentage. The start of drywall partition work is the most critical element of the fit-out work, and the furnishing of hollow metal frames is similarly critical to this partition work. With this in mind, Cauldwell Wingate entered into a contract with Long Island Fireproof Door ("LIFD") to furnish all hollow metal doors and frames, as well as hardware, on February 28, 2003, shortly after receiving its own contract from DASNY. LIFD began work immediately on the preparation of door and hardware schedules for the project, which were submitted on April 7, 2003. These schedules were held an inordinately long time by the architect and were finally returned on May 27, 2003 for the door schedule and May 30, 2003 for the hardware schedule. Both schedules were stamped approved as noted, but this approval turned out to be very misleading.

These schedules, when submitted, included lists of questions which required clarification and confirmation. However, the vast majority of cases the returned schedules did not include responses to these questions. As a result, it was necessary for Cauldwell Wingate to generate close to sixty (60) RFI's, on behalf of LIFD (See LIFD RFI Log – Tab 7), in order to resolve all open issues so that these frames could be put into production. These RFI's concerned such basic questions as missing partition types and thicknesses, added and/or revised hollow metal and hardware items, clarification of transom panel requirements and fascia locations, and coordination of hollow metal with the work of other contracts, such as Contract #8 – Curtain Wall/Storefront and Contract #15 – Electrical – Low Voltage Systems. These RFI's were ultimately responded to, in some cases by the issuance of Architect's

Cauldwell Wingate Company, LLC
Bronx Criminal Court Complex

Request for Equitable
Contract Adjustment

Supplemental Instructions ("ASI's"), such as #104, 1213, 129R, 153, 166 and 168, and the frames were finally put into production.

This, however, did not solve all the hollow metal problems, but rather generated additional ones. When frames arrived at the site and partition work could begin, this partition work was all too often interrupted by conflicts with the frames as approved and manufactured. These conflicts took several forms, but in each case the partition work in the areas affected was forced to stop until these conflicts were resolved. To begin with, there were dozens of instances where the dimensions of the building structure itself prevented the installation of the frames. These included many cases where frames would not fit under existing beams, frames which would not fit under stair landings such as at Stairs #5 and #6, and frames which were interfered with by various other portions of the structure.

There were many instances where the installed MEP work interfered with and prevented the installation of frames in their planned location, with the result that frames had to be relocated, modified or both, with a corresponding delay or disruption to the partition work as well. There were also many instances where soffits, chases or lowered ceilings, which were the result of the MEP coordination process, now interfered with the installation of frames or with door swings, and once again the partition work was disrupted. It should be noted that these "hits" and interferences were now surfacing in all areas despite the protracted MEP coordination process, which took almost two (2) years longer than originally scheduled, as outlined in a separate portion of this narrative. All of these issues with regard to the hollow metal frames severely impacted the progress of the drywall partition work, which, again, was the most critical element to the progress of Cauldwell Wingate's contract work.

The issues, and resulting delays, with regard to the hollow metal work did not end with the frames. There were also many coordination issues and revisions which affected the doors and hardware as well, including doors which required modification and certain custom hardware required at the entrances to all typical courtrooms. The problems did not end there. There were also serious conflicts between the contract door schedule, the approved hardware schedule and the approved security shop drawings, prepared under separate Contract #15, with regard to the required electronic locks and security hardware, which also impacted the shop preparation of the hollow metal frames and doors. The problems with regard to this critical work

Cauldwell Wingate Company, LLC
Bronx Criminal Court Complex

Request for Equitable
Contract Adjustment

continued throughout the course of Cauldwell Wingate's work, from the first RFI generated July 3, 2003 to the last RFI which was generated June 21, 2006. Cauldwell Wingate and its subcontractors had every right to rely on a much more complete and coordinated set of contract documents with which to perform their work. The failure of DASNY to ensure the provision of such documents caused Cauldwell Wingate and its subcontractors to suffer considerable additional costs, for which they expect to be compensated.

Delays to Detention Hollow Metal and Hardware work, and Detention Equipment work, due to design issues

While the start of drywall partition work is the most critical element of Cauldwell Wingate's Contract #9 fit-out work, the next important element is the start of masonry partitions. In this case the furnishing of detention hollow metal frames is similarly critical to this partition work. Since the coordination of detention hollow metal and hardware work is generally more involved than conventional doors and frames, Cauldwell Wingate, once again, entered into a contract with the provider of this material, Maximum Security Products ("MSP"), on February 28, 2003, shortly after receiving its own contract from DASNY. MSP's contract included the furnishing and installation of all detention material and equipment as well as the detention hollow metal and hardware work. MSP also began work immediately on the preparation of its door and hardware schedules for the project, which were submitted for approval on March 12, 2003 for the hardware schedule and March 18, 2003 for the door schedule. As was the case with the conventional hollow metal submissions, these schedules were held an inordinately long time by the architect and were finally returned, on May 15, 2003, stamped approved as noted. Once again this "approval" turned out to be very misleading.

These schedules when submitted included numerous questions which required clarifications and confirmations, but again, in the majority of cases, the returned schedules did not adequately respond to these questions. It was again necessary for Cauldwell Wingate to generate more than seventy (70) RFI's on behalf of MSP (See MSP RFI Log – Tab 8) so that this detention material could be put into fabrication, but in this case the coordination, space limitations and access requirements posed even more problems than the conventional hollow metal and hardware did. To begin

with, all steel material for the cell walls and ceilings, as well as the metal frames, was heavy gauge steel which was very difficult to modify in the field after fabrication. In addition, the detention work consisted mainly of very small temporary holding cells for prisoners in connection with their court appearances. These cells were constructed of solid, reinforced masonry walls on three (3) sides, and generally with sliding steel security doors and grillwork across the cell fronts. The cell ceilings were also of solid steel construction, with framed openings for light fixtures.

The cell dimensions had to comply with security codes as well as certain handicap requirements. All cells required the typical MEP services and access to these services, as well as to all concealed door hardware, was governed by strict security requirements. Given these size and security parameters, and the relative inflexibility of all the materials of cell construction, the design deficiencies of this detention work soon became painfully apparent. To begin with, in a great many cases, the cell ceiling heights conflicted with the sliding door housings and as a result door heights were reduced, sometimes from 7'– 0" to 6'-8". Also in a great many cases, the cell masonry openings were too small to accommodate the cell door clear opening size and overall frame width for the slider. In other cases, the plan masonry opening was too small for the sliding door mechanism required by the clear door opening specified. There were instances where the required size of the release column and receiving channel for the lock mechanism to function, caused the overall frame width to increase, and even an instance where the clear opening and sliding device specified exceeded the industry maximum by 2'-0". In all such instances, either door sizes had to change, masonry openings or configurations changed, frame openings were revised, and at times, a combination of such revisions was necessary. This greatly impacted the start of masonry work in all areas and, once started, caused this work to be performed in a discontinuous and inefficient manner.

In coordination with the timing of the detention hollow metal frame shop drawing phase of the work, and in preparation for the start of masonry partitions, Cauldwell Wingate entered into a contract with Commodore Construction ("Commodore") on February 28, 2003 to perform this masonry work. Commodore made every effort to start its work as closely as possible to the original schedule date but was prevented from doing so in most areas by a number of factors beyond its control. To begin with, the concrete floor slabs, being provided under Contract #7, were significantly delayed. In addition, the MEP coordination work, which began early in 2002, was severely behind schedule as a result of design and coordination

Cauldwell Wingate Company, LLC
Bronx Criminal Court Complex

Request for Equitable
Contract Adjustment

deficiencies in the Contract Documents, and was barely fifty percent (50%) completed in June, 2003. And finally, the fabrication and delivery of the hollow metal and detention hollow metal frames was delayed due to these same design deficiency issues, as evidenced by the more than one hundred and thirty (130) RFI's which were generated between these two (2) items of work.

While Commodore was able to start its Network Protector Room work reasonably on schedule, the above impacts prevented any meaningful start to the balance of the project. When Commodore did start the balance of its work, albeit in a limited manner, it encountered the same design and coordination deficiency problems as all other trades were facing. Thus began a series of RFI's generated by Cauldwell Wingate on behalf of Commodore, which started in June, 2003 and continued for the next three (3) years. More than fifty (50) RFI's were generated for this trade alone (See Commodore RFI LOG – Tab 9), and the problems were typical of those being experienced by the other trades. There were missing dimensions and inadequate details on the contract drawings to begin with. There were also dozens of instances where Concrete Masonry Unit ("CMU") partitions could not be installed as shown due to interferences with steel wind bracing or other structural elements, as well as previously installed piping and ductwork. There were conflicts with CMU partitions at plumbing chases in the cells, at door swings with benches in the holding cells, and with the installation of lateral support braces by Commodore. On the B-1 Level there were numerous instances where CMU partitions were chased, by others, to install electrical conduit, which was missed in the original installation, and this CMU now had to be patched. Even such straight forward work as the masonry at planter walls on the Plaza, required clarification of the contract drawings as to dowels and waterproofing details.

All of these issues severely impacted Commodore's work causing significant delays and loss of efficiency in the work performed. These delays and losses of efficiency were further compounded by the constant infiltration of water into the Basement levels, caused by incomplete curtain wall enclosure, and by the failure of DASNY/Bovis to ensure provision of temporary heat during the winter of 2003/2004.

Aside from all of the problems which plagued the hollow metal frames and hardware for the cells, there were many other issues resulting from interferences in the field, which delayed job progress. Again, despite the protracted MEP coordination process, which took almost two (2) years longer than originally

Cauldwell Wingate Company, LLC
Bronx Criminal Court Complex

Request for Equitable
Contract Adjustment

scheduled, the MEP installations in the cell areas created many conflicts with the detention work installations. The MEP installations, as coordinated, projected below the plan detention ceiling heights, causing these heights to be lowered or soffits and fascias to be created over portions of the rooms. In some cases the soffits created to conceal MEP work caused coordination problems at the intersection with the hollow metal frames. The MEP installations also prevented the installation of the required seismic anchor bracing, as detailed, in a great many areas. There were such instances as a door frame which interfered with a floor drain and a door frame head which was cut, by others in the field, in order to install a pipe which was installed below the ceiling.

In many of the holding cells on Floors 3 to 6 there was structural steel bracing which interfered with the ceiling panel installations, and the swing doors in many of these holding cells were hitting the concrete benches. There were coordination issues between the security ceilings and the Type L-11 light fixture in these spaces which caused additional labor for all. The MEP coordination drawings indicated access doors for MEP work in the security ceilings, but these were not part of the Contract #9 work. There were also twenty-seven (27) locations on the B-1 and Ground Floor levels where low voltage power was required to the detention hardware, but no conduit was shown on the drawings or installed in the masonry walls.

As previously mentioned, there were more than seventy (70) RFI's generated in connection with the detention hollow metal and equipment work, starting with the first RFI on March 13, 2003 and continuing through to May 9, 2006. While all RFI's were ultimately responded to, including by issuance of ASI's such as #104, 118, 120, 122, 153 and 165, it was apparent, once again, that the contract documents provided by DASNY were not complete, concise and well coordinated so that Cauldwell Wingate and its subcontractors could perform their work in an efficient and uninterrupted manner.

Component Assembly Systems Issues

As mentioned previously, by far the largest subcontracted portion of Cauldwell Wingate's contract was for the drywall and ceiling work, which represented approximately thirty percent (30%) of Cauldwell Wingate's work. With

this in mind, Cauldwell Wingate selected Component Assembly Systems ("CAS") as its subcontractor for this work and entered into a contract with CAS on May 1, 2003. CAS is one of the premier drywall/acoustic contractors in the New York metropolitan area, with more than forty (40) years experience in this work. CAS also maintains offices in New Jersey, Boston, Washington, D.C., and Las Vegas and has successfully completed contracts totaling nearly two billion dollars ($2,000,000,000).

While CAS could not start any work in the field due to delays in the pouring of concrete slabs under Contract #7, it did begin its shop drawing and sample submission process almost immediately, and also began a careful review of the contract drawings, as well as all available shop drawings which were critical to its work. Through discussions among all prime contractors at the weekly job meetings, CAS became aware of the problems being experienced by the MEP contractors in their efforts to prepare the coordination drawings for their work. At that time the coordination process had been ongoing for more than a year, but continued to experience serious conflicts and was considered less than fifty percent (50%) completed. CAS also became aware of the conflicts which were encountered in the preparation of the shop drawings for the hollow metal, hardware, detention hollow metal, detention hardware and security work, as well as the mounting list of RFI's which had already been generated, by others, and which exceeded one thousand (1,000) in number.

Based on the situation at hand, CAS re-doubled its own coordination effort and plan review in order to flush out any conflicts it could detect which might delay or disrupt its own field work. This effort revealed serious conflicts on the contract drawings with regard to CAS' work and caused CAS to begin its own process of RFI submissions in order to resolve these conflicts. These RFI's by CAS began in February, 2003 and continued, virtually every step of the way, throughout the course of its work, totaling more than three hundred and fifty (350) RFI's by May, 2006 (See CAS RFI Log – Tab 7, CAS Claim Book). CAS was finally able to begin its layout and framing for drywall work, in a very limited manner, in June/July of 2003, and began to fully appreciate the chaos to be expected as a result of deficiencies in the contract drawings. The following is a sampling of some of the problems typically encountered by CAS while trying to perform its work in the field.

1.    Dimensions were missing fairly typically, many of which were critical.

2.  Many partitions were either not identified by type or were incorrectly labeled.

3.  Instances of stud sizes and gauges, which were structurally inadequate for their required height, were fairly typical.

4.  Partition and ceiling construction types shown would not provide the required fire rating indicated.

5.  At many locations, partitions, both rated and non-rated, fell partially off the concrete slab based on given dimensions.

6.  Time and again throughout its work, CAS encountered MEP installations which were too low to permit installation of the ceilings at their plan height.

7.  Partitions and rated duct enclosures interfered with sloped clerestory with no contract details for the intersections.

8.  There were conflicts between the floor plans and elevations of the same area.

9.  Fire ratings of Gypsum Wallboard ("GWB") partitions were compromised by reveals and recessed terrazzo base.

10. Instances where ducts penetrate the floor slab and continue up but the duct enclosure is shown as a non-rated partition.

11. Rated plenum enclosure of horizontal ductwork shown on architectural drawings does not agree with approved MEP shop drawings as to size and limits.

12. Plan dimensions and ceiling heights still resulted in exposed structural steel at many locations throughout the job, forcing the ceiling heights to be lowered.

13. Structural bracing interfered with door openings.

14. Door swings had to be changed due to interferences with stair landings and stringers, equipment curbs and bases.

15. Plumbing pipes and electrical conduit stub-ups interfered with door locations.

16. Confusion as to which doors receive transoms results in ceiling conflicts.

17. Crossing of pipes under ducts causes ceiling heights to drop throughout the project.

18. Conflicts between light fixtures and the approved ceiling grid.

19. Light fixture layouts are not fully dimensioned.

Cauldwell Wingate Company, LLC
Bronx Criminal Court Complex

Request for Equitable<br>Contract Adjustment

20.   GWB enclosures are required at certain light fixtures but the contract drawings are not clear as to any fire rating requirements, or clearance requirements for ventilation, etc.

21.   Interferences in Boiler Room B232 between partitions, boiler control panel, dampers, MEP supports and door swing.

22.   The gap between the curtain wall and the slab edge results in partition landing off slab edge and closure plates being required at certain locations.

23.   Insufficient dimensions given for front wall layout at various elevators.

24.   There are no details of headers required to carry ceiling joists and concern about this framing being able to support the weight of the GW-1 frame and glass.

Bearing in mind that every one of these issues caused an RFI to be generated and the RFI's for CAS alone exceeded three hundred and fifty (350) by count, one can truly appreciate the scope of the problem and the staggering loss of productivity to CAS. Each time one of these problems was encountered, CAS was forced to stop work at that location and await an RFI response from RVA. In many cases photographs of the problem were forwarded to RVA to assist in their response, but in other cases a field visit by RVA was required in order to answer, and CAS could not continue in the area. It should also be noted that these were not isolated issues, but were encountered by CAS virtually every step of the way, on all floors and at all areas. Every area had to be approached by CAS on a "touch and feel" basis to flush out the problems, which were almost guaranteed. There was virtually no portion of CAS' work which its men could just pick-up and run with in an extended and uninterrupted manner, without demobilizing and then remobilizing once the problems were solved.

In essence, we have a set of contract drawings for a very unique building, which is, at best, poorly coordinated between the architectural, structural and MEP work. This coordination is apparently taken just so far and then the job is put out for bidding. After bidding and award, the MEP coordination process runs far longer than anticipated and is also, apparently, taken just so far and then released for fabrication and field installation. At this point in time the problem falls to Cauldwell Wingate/CAS, whose partition and ceiling work is the basis for virtually all finish work in the building which follows, to make sense of this mess and to, somehow, complete the building as planned. No contractor would work this way, especially on

a fixed price contract basis, and neither Cauldwell Wingate nor CAS anticipated this situation when preparing and submitting their bids.

This extreme set of circumstances resulted in significant additional costs to CAS, and ultimately to Cauldwell Wingate as well. For CAS in particular, there were the added costs of remaining on the job for a greatly extended period of time, material and labor escalation costs, and loss of productivity costs to name just the major items.

Not only was CAS significantly impacted, disrupted and delayed in the start of its GWB framing work and then forced to perform this work in a fragmented manner, but as the GWB and taping work began to progress, another serious problem developed. A pattern of damage to completed GWB walls by the MEP primes soon developed, in early 2004, and continued, on a regular basis, until the building was virtually completed. This damage consisted of removal and replacement of GWB and outright punching of holes by the MEP's in their efforts to relocate and/or install their roughing within partitions and ceilings, based on coordination errors and poorly timed work, and also to comply with the latest design revisions. Bovis issued more than four hundred fifty (450) Field Work Directives ("FWD's") during the course of the project (See FWD Log – TAB 5), dozens of which directed CAS and L&L Painting ("L&L") to perform tens of thousands of dollars in repairs, which they promptly did, but the impact to job progress and efficiency was never recovered. Cauldwell Wingate and its subcontractors were further penalized by the failure of DASNY/Bovis to process and pay the change orders for this repair work in a timely manner, and also by their pattern of wrongfully reducing the amount billed by arbitrary and unfounded claims of damage by Cauldwell Wingate's subcontractors.

The project was also plagued by repeated flooding in the building through several sources. As early as July, 2004 there was water infiltration through Heating, Ventilating and Air Conditioning ("HVAC") rooftop goosenecks which damaged finished GWB on the 8th Floor. In January, 2005 there was serious damage to finished work on the 7th, 8th and 9th Floors as a result of roof leaks at the juncture with the curtain wall, at which time taping operations in these areas were suspended. From October, 2005 until as late as July, 2006, CAS and L&L performed repair work on finished GWB walls resulting from continual water infiltration, particularly on the B-1 and B-2 Levels and up through the 2nd Floor. These repair costs were in excess of $38,000, which amount again does not include the loss of efficiency from working in

these flooded areas, nor does it account for the resulting impact, delay and disruption to Cauldwell Wingate and its subcontractors.

CAS also suffered damage to its finished Acoustic Tile ("ACT") ceiling work throughout the building, especially on the 3rd, 4th, 5th and 6th Floors. By its letter of October 25, 2005 and Cauldwell Wingate's letter of November 8, 2005, they confirmed to Bovis that CAS had proceeded to install its final ACT on these floors, with the exception of four (4) small spaces, which were delayed awaiting completion of MEP work. This was done in accordance with Bovis FWD's #582 and #607, yet CAS was already witnessing widespread removal of this tile on all floors. This pattern continued throughout the duration of the job and wound up being a significant item on both the RVA/Bovis punch list and that of Hill International ("Hill"). Naturally, neither Cauldwell Wingate nor CAS could be held responsible for the repair/replacement of this ACT whether the work was to be performed by CAS or by others.

As if these problems and resulting costs weren't enough, the impact to both CAS and Cauldwell Wingate was compounded by the actions, or inaction of DASNY and Bovis. These took the form of imposed unrealistic completion dates, failure to process and pay change orders in a timely manner, wrongful backcharges with no prior notification, being assessed partial backcharges of its own cost to repair damages caused by others, and DASNY's refusal to process a reduction in retainage payment.

CAS and Cauldwell Wingate were further damaged by the issuance of multiple punch lists, some of which were prepared after DASNY permitted furniture and equipment to be moved into most areas of the building, and, this, after CAS and Cauldwell Wingate had satisfactorily completed the punch list prepared by RVA per the Contract. On behalf of CAS and itself, Cauldwell Wingate reiterates its claim to recover all damages suffered as a result of these impacts, as fully detailed later in this presentation.

Architectural Metal and Glass Work

After the drywall and ceiling work, the next largest subcontracted portion of Cauldwell Wingate's fit-out work on this project was for the Architectural Metal and Glass ("AM&G") work. In view of the highly unique design of this complex, in general, and the AM&G elements in particular, Cauldwell Wingate took immediate

Cauldwell Wingate Company, LLC
Bronx Criminal Court Complex

Request for Equitable
Contract Adjustment

steps to negotiate and award a subcontract for this work as quickly as possible.
Competitive bids had been received from a Cauldwell Wingate preferred bidders list
as well as other vendors in this field, including UAD Group ("UAD"), with all bids
falling generally within a ten percent (10%) range in price. All bids were compared
as to price and scope of work and references were checked. In view of the fact that
UAD's price was competitive and its scope was complete, and in further view of the
contract requirement that fifteen percent (15%) of its contract be awarded to
Minority Business Enterprise ("MBE") firms, Cauldwell Wingate awarded the AM&G
portion of its Contract #9 work to UAD. A formal contract in the amount of
$6,100,000.00 was entered into on February 28, 2003, which was subject to the
approval of the subcontractor by DASNY. UAD was submitted for approval and was,
in fact, approved by both Bovis ("BLL") and DASNY.

While the architect and its structural and mechanical consultants are
responsible to produce a complete and coordinated set of contract documents for the
project, they are not just working in a vacuum. This process is also supposed to be
monitored along the way by DASNY and its Construction Manager to ensure that the
schedule for producing these documents is being maintained, that the projected
construction cost remains within budget and to generally review the documents at
various stages of completion to ensure that they are complete and suitable for bidding
and construction. This is particularly important on a project of this nature which was
unique, firstly by its highly sophisticated architectural design. It was additionally
important since the work was subdivided among thirteen (13) major, separate and
distinct prime contracts. Every bidder on each of these separate prime contracts had
every right to rely on the thoroughness and completeness of this process by all parties
involved so that the documents put out for bid were ready for construction.
Unfortunately, this turned out not to be the case.

As a result of the unique design of the AM&G portions of the project, UAD's
subcontract work proved to be one of the more severely impacted elements due to
reasons which were entirely beyond its control. These reasons included, but were not
limited to, the following:

A.    Failure of DASNY to provide complete, accurate and fully coordinated
      contract documents with which to perform the work.
B.    Failure of DASNY to provide competent administration of the
      Cauldwell Wingate contract.

Cauldwell Wingate Company, LLC
Bronx Criminal Court Complex

Request for Equitable
Contract Adjustment

C.  Failure of DASNY to provide competent coordination and administration of all prime contracts on the project.

D.  Failure of DASNY to ensure timely, accurate and complete responses to RFI's and submissions.

E.  Failure of DASNY to provide a workable schedule with a realistic completion date based on proper timing and sequencing of the work of all prime contracts.

F.  Failure of DASNY to provide a watertight and climate controlled building for Cauldwell Wingate to perform its Contract #9 fit-out work.

While the above reasons, as well as others mentioned elsewhere in this narrative, impacted Cauldwell Wingate and all of its subcontractors, they were particularly devastating to UAD, to the extent that its time duration increased from approximately twenty-three (23) months to in excess of thirty-six (36) months and the cost to perform this work to both UAD and Cauldwell Wingate exceeded $10,000,000. The impacts to the AM&G work in particular became apparent very early in the shop drawing phase of the project, but the extent of the damage to this subcontractor would not be realized until much later on.

UAD began preliminary work immediately with submissions, during the months of March, April and May, 2003, of samples and product data for most of the glass materials, as well as shop drawings and engineering calculations for Glass Walls GW-2, GW-3, GW-4, GR-1, and Metal Cladding AM-2, the light monitor grille and other miscellaneous work. Concurrent with the preparation of these shop drawings UAD came to realize the amount of missing design information and detail on the contract drawings and the process of RFI submissions began simultaneously. Cauldwell Wingate generated the first RFI in connection with UAD's work on February 12, 2003 and by the time the AM&G work was substantially done, almost two hundred (200) RFI's were necessary to complete the work of just this one subcontractor (RFI Log – Tab 5). In addition, these RFI's were not just limited to the shop drawing phase of this work, but continued on through May 22, 2006 in order to resolve conflicts encountered in the field while installing this work. Once again, while all RFI's were ultimately responded to, including by issuance of ASI's such as # 116, 129, 129R-1, 146, 151, 166, 168, 197, 199 and 213, the responses and the ASI's very often required further clarification and elicited additional RFI's. As an example,

Cauldwell Wingate Company, LLC
Bronx Criminal Court Complex

Request for Equitable
Contract Adjustment

the issuance of ASI #213, in itself, generated twelve (12) new RFI's on February 9, 2006 seeking further clarification.

While this process was going on, a serious pattern had developed with regard to the status of the submissions which were being returned to UAD by the architect ("RVA"). In far too many cases UAD's shop drawings were being marked-up to indicate design modifications now desired by RVA, or necessary in order to make these systems work as planned. This happened often enough and with regard to many very critical portions of the AM&G work, that the contract documents on which UAD and Cauldwell Wingate had based their bids were considered to be merely conceptual in nature, with final design work taking place through the shop drawing process. Critical systems which were caught up in this process included GW-3 (at the monumental stairs, the escalator, general areas and hardware issues), GW-2 glass redesign and re-engineering, AM-5 at OCA, HRL-1G, RL-1 at the escalator, RL-3, and on, and on.

As a result of these ongoing design modifications, the shop drawing process was extended significantly for UAD, with a number of systems being resubmitted as many as five, six and seven times for drawing revisions and re-engineering. This arduous, and totally unanticipated, shop drawing process severely impacted UAD in a number of ways. To begin with it caused serious financial hardship to the company in that the cost of the shop drawing and engineering phase of its contract far exceeded the amount anticipated in the bid. Secondly, the significant delays to this first phase prevented UAD from ordering materials and starting fabrication, this during a period of significant price escalation of materials, particularly for metals. This initial impact and delay similarly forced the field installation work to be performed in a later pay period and at increased wage rates. All of this also caused UAD to be working on this project for more than one (1) year longer than originally scheduled by DASNY, and to bear all general conditions and overhead costs for this project during this extended period. Finally, UAD suffered financially by having to bear all of the change order costs, which resulted from work added by RVA and DASNY during the shop drawing phase, due to the failure of DASNY and Bovis to process and pay these change orders in a timely manner, if at all. This situation was compounded by DASNY and Bovis unilaterally, and wrongfully, rejecting submitted change orders for legitimate extra work performed by UAD, some of which was performed pursuant to Field Work Directives issued by DASNY and Bovis themselves.

The extended delays to the early phases of its work also left UAD with a much shorter period of time to perform its field installation work, based on the original contract completion date. While UAD took all reasonable steps to perform its work based on this compressed schedule, through, and with, Cauldwell Wingate it petitioned DASNY/Bovis, on numerous occasions, to appropriately adjust the current work schedule so that it would reflect the proper sequence and flow of work for all contractors, based on the impacts and delays which occurred on the project to that date. Not only did Bovis fail to respond to these numerous letters by Cauldwell Wingate, but through their continued failure to properly manage and administer this very complicated project, they directed that certain work be performed which actually impacted, delayed and disrupted UAD's field work even further. One prime example of this mismanagement was Bovis' insistence on the removal of the material hoist and closure of the curtain wall without affording UAD the proper time to deliver its oversized materials, the ordering and fabrication of which had been impacted and delayed by RVA redesigns. As one result, UAD was forced to deliver glass panels which measured 5' x 15' x ½" thickness through a 6" gap in the curtain wall, and then re-rig these glass panels to the upper floors, and in some cases, walk the panels up flights of stairs. Not only did this further impact UAD's work and cause it considerable additional expense, but it further compressed the time left to complete its field work. Another example is DASNY/Bovis permitting the installation of intumescent fireproofing on structural members prior to the installation of UAD's attachments to these members. UAD had to remove the fireproofing to make its attachments and these areas then had to be patched. Still other examples of impact, delay and added expense to UAD as a result of DASNY/Bovis' actions are the remedial work at the slab edge of the GW-3 Stair system, and the remediation of concrete slabs in connection with terrazzo work, which was permitted on several floors at the same time. All of these items further impacted UAD's work, compressed its remaining time and caused it additional expense.

At this point in time it becomes obvious, that as a result of all of the impacts, delays and disruptions the project has suffered due to latent conditions, significant design revisions, ineffective management and administration of all prime contracts, failure to process and pay change orders in a timely manner, etc., there is no way that the original contract completion date can be met. But instead of meeting with all prime contractors to establish a realistic revised completion date, on May 25, 2005, DASNY/Bovis unilaterally proclaim that November 30, 2005 would be the new completion date for the substantial portion of the project. While none of the prime

Cauldwell Wingate Company, LLC
Bronx Criminal Court Complex

Request for Equitable
Contract Adjustment

contractors truly accepts this as a realistic date, they all take steps, as directed by DASNY/Bovis, to increase manpower and/or establish overtime programs to meet this date. These actions were taken despite the significant losses already suffered by virtually all of the contractors on the project. Unfortunately, UAD was the contractor with the most sophisticated portion of the work yet to be completed at that time. However, due to the impacts, delays and added costs UAD had already suffered on the project, which were compounded by DASNY's failure to pay its change orders, UAD was in no position financially to implement these steps without the financial assistance of Cauldwell Wingate.

In an effort to meet this "mandated" date, Cauldwell Wingate took the pro-active step of bringing on two (2) additional contractors, highly qualified in AM&G work, in order to expedite remaining AM&G work by adding manufacturing capability and additional experienced installation personnel. Due to the limited number of known, qualified, union contractors for this work, and given the very tight time constraints imposed by DASNY/Bovis, the work given to these other contractors was done so without true competitive bidding, and, to date, Cauldwell Wingate has borne all of these costs. Cauldwell Wingate also advanced significant sums of money to, and on behalf of, UAD to partially compensate them for the added costs they were suffering as a result of all of the impacts and delays to their work. It is now more than one (1) year after that mythical November 30, 2005 completion date and yet there is not one (1) permanent occupant in the building, program changes are just now being finalized and Cauldwell Wingate is now stopped from completing its remaining site work, valued at approximately a half-million dollars, pending a site redesign by DASNY. In effect, all of the additional money spent by Cauldwell Wingate and its subcontractors in the acceleration effort to meet this November 30, 2005 date only served to compound the losses suffered by all; particularly the losses of over $4,000,000 suffered in the performance of the AM&G portion of the work.

The Bovis management style on this project was apparently to "throw men, material and money at the job" in an attempt to recover time lost due to issues not of the contractors' making. The tragedy with this style is that Bovis is the only entity on the project that is not "at risk." A worse tragedy is that DASNY made no apparent attempt to remedy this situation until the job was virtually completed, at which time a new management team was brought in, and Bovis was marginalized.

Cauldwell Wingate Company, LLC
Bronx Criminal Court Complex

Request for Equitable
Contract Adjustment

L & L Painting Co., Inc.

As mentioned earlier in this narrative, the GWB partition and ceiling work, which was installed by CAS, was the basis for virtually all finish work in the building which was to follow. The first, and most significant, item of such finish work, was the taping, spackling and skimcoating of all GWB walls and ceilings, which was followed, of course, by the finish painting work. The performance of this work was subcontracted, by Cauldwell Wingate, to L&L Painting Co., Inc. ("L&L") for the sum of $1,995,000, which again represented a very significant portion of Cauldwell Wingate's contract work. But L&L could not tape, spackle or paint GWB work which was not completed and in place, and was, therefore, directly affected by the impacts and delays being endured by CAS. As mentioned above, these impacts and delays, were a direct result of deficiencies in the design documents. They also resulted from the inability of the MEP contractors to achieve a truly coordinated set of drawings for their work, which fit within the architectural and structural parameters of the buildings, as a result of these design deficiencies. L&L was forced to work in the same fragmented and unproductive manner as the work of the trades which preceded it. This also applied to the painting of the masonry partitions being installed by Commodore, which work was similarly impacted.

L&L was impacted by DASNY initiated program changes, just as the prior trades were, and, in the case of painting work, the paint colors for the entire complex were not even available until RVA issued the PT Series drawings on July 26, 2004, and then "For Information Only." There were design changes, such as fire rating the underside of stair landings at the B-2 Level, and the resultant change to GWB ceilings due to headroom issues, which resulted in additional work for L&L. There was also the need for L&L to re-tape and re-spackle the GWB ceiling at the Third Floor Monumental Stair, which was removed and reinstalled during the work performed as part of ASI #199. There were many such instances of additional work for L&L, not the least of which was the constant patch and repair work they were directed by DASNY/Bovis to perform. This repair work was required as a result of damage to completed installations through several causes. One such cause was the ever-present infiltration of water into many areas of the building, which damaged completed GWB work as well as previously painted masonry walls. There was also the significant amount of damage to walls and ceilings caused by the MEP trades in the untimely coordination or installation of their work at completed areas. All of these issues, as well as DASNY's failure to make the building available for Cauldwell Wingate and its

Cauldwell Wingate Company, LLC
Bronx Criminal Court Complex

Request for Equitable
Contract Adjustment

subcontractors to start their work as scheduled, caused L&L to suffer impacts, delays and losses of efficiency in the performance of its work. This resulted in a sizeable financial loss to L&L, which is itemized elsewhere in this presentation.

<u>Port Morris Tile & Marble Corp</u>

Another subcontractor of Cauldwell Wingate, whose work was totally dependent on the completion of the GWB work by CAS, was Port Morris Tile & Marble Corp. ("PMTM"). Cauldwell Wingate entered into a contract with PMTM on February 28, 2003 for the ceramic tile, terrazzo tile and stone work at the project. Just as in the case of all other finish work contractors, PMTM required completed partitions in place and the floor slabs properly finished in order for it to begin its installation. While the impacts and inefficiencies suffered by CAS in the installation of its GBW partition work are detailed in another portion of this narrative, the impact to the start of PMTM's work is obvious. In the case of PMTM, however, the problems encountered with the Flatness/Levelness of the concrete floor slabs, which were installed under a separate prime contract, further compounded the problems for this particular subcontractor. Surveys of these floors revealed significant deviations between existing conditions of Flatness/Levelness and the specified tolerances for certain finish work, including the ceramic tile and terrazzo tile work to be performed by PMTM. Further review revealed inconsistencies in the specifications themselves with regard to concrete floor slabs as opposed to other finishes to be applied to, and adjacent to, these slabs. This situation was further complicated by the fact that the slabs, in many instances, were poured high to cover shear studs or other structural elements.

As a result, it was necessary to establish new datum elevations for each floor area, and to then perform the required remedial work, before PMTM could work in these areas. The remedial program established consisted of a combination of floor chopping, then applying a hand troweled smooth finish at high areas, and infilling of low areas. This impacted and delayed the start of PMTM's work by approximately seven (7) months with regard to ceramic tile and more than one (1) year with regard to terrazzo base and wall tile. In addition to the late start of its work, due to the building not being available to receive same, PMTM's work was also impacted by the same problem of deficiencies and inconsistencies in the design documents that affected all of Cauldwell Wingate's other subcontractors. This resulted in Cauldwell Wingate generating more than forty (40) RFI's on behalf of PMTM (see PMTM RFI Log – Tab 10), running from March 10, 2003 to July 31, 2006, for what should have

been a fairly straight forward item of contract work. This combination of a late start to the work, when compounded by the fragmented and inefficient manner in which PMTM was forced to work, resulted in considerable additional costs to PMTM, as outlined elsewhere in this presentation, for which it expects to be compensated.

In previous portions of this narrative, the impacts and delays to the two (2) largest subcontracted portions of Cauldwell Wingate's fit-out work were described in detail. These portions concerned the drywall and ceiling work for one, followed by the architectural metal and glass work. The third largest subcontracted item was the Sitework and Landscaping work, for which Cauldwell Wingate entered into a contract with William A. Gross Construction Assoc. ("WAG"), in the amount of $3,820,000, on August 11, 2003. Based on the original schedule included with the bid documents this work was to be performed between July 1, 2004 and June 30, 2005. In the full schedule update, dated June 1, 2003, which was established as the Master Schedule Update for the project, the duration for Sitework and Landscaping continued to be shown as running from July 1, 2004 to June 30, 2005. In actuality, this proposed schedule bore no resemblance to the impacted, delayed and fragmented manner in which this work became available for WAG to perform its contract.

To begin with, as outlined earlier, the concrete work at the Garage/Plaza area, which was being performed under Prime Contract #7, was not released to that contractor until the Summer of 2004. This was due to design issues and latent conditions encountered during the excavation/foundation phase of the work, and all concrete work at this area was not completed until October, 2005. While WAG was able to begin a small portion of its work on such items as tree removal and bollards in the Fall of 2004, no meaningful work by WAG would follow until the Summer of 2005, after its originally scheduled completion date. Aside from experiencing this significant impact to the start of its contract work, WAG also became aware of the serious design deficiencies which were impacting the work of all other trades on the project, and would now impact its own work.

Once again a series of RFI submissions was begun by Cauldwell Wingate on behalf of WAG in order to resolve these design issues, as well as coordination and site logistics issues which WAG was encountering. This almost continuous stream of RFI's began late in 2003 and continued into the Summer of 2006. At last count more than two hundred (200) RFI's were generated for this subcontractor alone (See WAG RFI Log – See Tab 14, WAG Claim Book). These concerned such issues as missing

dimensions and elevations, dimensional conflicts, missing details for critical elements of the work and conflicts with the work of other prime contracts, particularly the electrical work, a portion of which was being redesigned. This pattern continued through the Summer of 2005, by which time more than one hundred (100) RFI's had been generated but very little additional work was available to WAG. By this time Cauldwell Wingate's concerns regarding the impacts, disruptions and delays to this sitework became even more critical with winter weather fast approaching.

One major area of concern was the lack of progress on the Plaza waterproofing work which was being performed by Contract #7. Despite many appeals by Cauldwell Wingate to Bovis during the Summer and into the early Fall of 2005, there still remained contract waterproofing work to be completed as well as repair work at certain areas that had suffered damage, yet DASNY/Bovis was unable to have this work completed. It was not until October 31, 2005 that DASNY/Bovis confirmed by E-Mail that the waterproofing work had resumed on that date. While some sitework was able to resume on the East side of the Plaza, there were still many other issues which were impacting WAG's work at that time.

The primary issue was DASNY/Bovis' failure to provide the required Approved Builders Pavement Plan which was needed in order for WAG to secure its permits for the work. This information was formally requested by Cauldwell Wingate through its RFI #0296, dated May 18, 2004, yet almost eighteen (18) months later it still had not been provided. As far back as August, 2004 both DASNY/Bovis and RVA acknowledged that there might be problems in securing this approval, but apparently this issue was not on anyone's high priority list. As late as November 22, 2005 this was still an open item.

Among the other impacts to Cauldwell Wingate/WAG's work at the Plaza were the following:

1. Waterproofing was not completed and/or repaired at many areas.
2. Water was ponding at low spots on the Plaza and not draining.
3. The curtain wall contractor had material and man lifts stored around the Plaza and sidewalks.
4. There were open electrical issues, such as light poles that were missing or in the wrong location, light pole roughing not in the correct

Cauldwell Wingate Company, LLC
Bronx Criminal Court Complex

Request for Equitable
Contract Adjustment

    location, and installed conduits which would not allow adequate
concrete coverage.

5.    Work of other contractors was not installed at the correct elevation or
location in many cases, such as utility manholes, valve boxes, fire
hydrants, Con Edison electric vaults, and even certain foundation walls
at the Southwest corner of the building.

6.    There were problems with trench drain and drain assembly details and
conflicts.

7.    Bovis' trailers and walkways, the easterly fence and gate, and
protection around the site and sidewalk had to be relocated for WAG's
work to continue.

    As late as November 22, 2005, and in accordance with FWD #572, Cauldwell
Wingate had only been released to perform work at approximately fifty percent
(50%) of the Plaza/Sidewalk area. It should be noted that this was just one (1) week
prior to the November 30, 2005 completion date previously mandated by
DASNY/Bovis. As a matter of fact, as late as December, 2006, more than one (1) year
later, a significant portion of the Plaza work has been on hold, pending a
DASNY/RVA redesign, and Cauldwell Wingate is still unable to complete its work.
Finally, on December 14, 2005, Cauldwell Wingate advised DASNY/Bovis, that due to
inclement weather conditions at that time of the year, Cauldwell Wingate was unable
to continue with even that portion of the Plaza and Sidewalk work which was made
available to it, and requested that they revise the Master and Milestone schedules
accordingly.

    When work was finally able to resume in the Spring, 2006, many of the same
issues remained unresolved and, finally, in July, 2006, WAG was again forced to de-
mobilize. However, at this time there was a far more serious problem facing
Cauldwell Wingate/WAG and that concerned unpaid change orders. As with
virtually all of Cauldwell Wingate's other subcontractors, the good faith effort to
complete this most difficult project resulted in change order work for Cauldwell
Wingate and these contractors which totaled in the millions of dollars. Due to
DASNY/Bovis' failure to process and pay change orders in a timely manner, both
Cauldwell Wingate and its subcontractors were forced to endure a serious financial
burden, which only served to exacerbate the losses all were suffering. In the case of

WAG, the amount of unpaid change orders at that time was well in excess of $400,000, and it could no longer continue to finance this project.

Many of the critical details were not fully developed and needed to be refined during the shop drawing process. But due to the unique design and complex nature of the details, this became a protracted and time consuming process, particularly with the work of such trades as UAD Group's Aluminum and Glass work.

There were instances where the documents rigidly reflect the product of one particular manufacturer, even though more than one manufacturer's product is specified. The documents were then strictly interpreted so that other manufacturers' products were deemed not to comply, thus creating a virtual proprietary item, in contradiction of DASNY policy. Such was the case with the impacts and added costs Cauldwell Wingate suffered in connection with the sound control doors.

There were instances in which the contract documents called for work which proved to be not code compliant and, in the case of fire rating at the monumental stair, work was lacking which was required by code. In the case of this monumental stair, the timing of the discovery of the problems seriously compounded the issue. Cauldwell Wingate had originally raised questions with regard to code issues concerning this stair sometime in 2003, but it was not until October 2005 that Cauldwell Wingate was issued ASI #199. This ASI revised the fire rating of the underside of the stair between the building and the curtain wall. However, even at that, this ASI required further clarification through RFI's generated by Cauldwell Wingate. In fact, as of its letter of November 7, 2005, Cauldwell Wingate was still not in a position to price the additional work involved or to determine its impact to the schedule. There were also other unresolved design issues in connection with this stair, including gaps and open areas between tube steel and the exterior curtain wall, as well as where the exterior and interior curtain wall systems met. All these open issues existed, despite the fact that the unrealistic completion date of November 30, 2005, which was unilaterally mandated by Bovis, was less than a month away. Needless to say, this date was completely out of the question.

This, however, proved to be the lesser of the problems with regard to this monumental stair. Cauldwell Wingate was then issued ASI #213 as prepared by RVA, dated December 22, 2005, which contained details of aluminum and glass work required to create a rated enclosure between the exterior curtain wall and this stair.

This significant amount of highly detailed work now being added at the tail end of the project created yet another emergency situation for all, particularly DASNY/Bovis. The metal and glass industry was at its busiest in years, and UAD's capacity was strained as a result of all the design revisions they were already dealing with, as outlined in another section of this narrative. While no other contractor was willing to price this added work, Cauldwell Wingate was able to prevail upon A-Val, who was already working on the project, to price the work. Apparently not satisfied with A-Val's price, and unable to secure a contractor of their own to price the work, DASNY/Bovis reacted, typically we might add, by threatening Cauldwell Wingate with liquidated damages. The fact that a main architectural feature of the building was not code compliant and neither RVA, Bovis or DASNY recognized this fact until well after Cauldwell Wingate's original contract completion date had passed, is indicative of the design/construction management problems which Cauldwell Wingate was forced to endure throughout the course of the project.

There were also instances where large areas, such as the B-2 Level and the Probation Areas on the East Side of Floors 3 and 4, were placed on hold pending redesigns as a result of DASNY program changes. Impacts and delays resulting from DASNY's program changes at the B-2 Level were detailed in ASI #166, which was not issued until August 23, 2004. Similar impacts and delays resulting from DASNY's program changes at the Probation Areas on the East Side of Floors 3 and 4 were detailed in ASI #168, which was not finalized until September 30, 2005. Both of these ASI's resulted in re-coordination of the areas involved and, in some cases, required revisions to ductwork which had already been fabricated.

Items such as noted above resulted in literally thousands of RFI's being generated by the various prime contractors, as well as Bovis, in order to build this complex. Items such as noted above also caused the architect to issue hundreds of ASI's in order to resolve these issues.

In most instances the process of responding to RFI's, issuing required ASI's, issuing change orders as required and fully resolving all issues so that work could proceed, took months and, in a number of cases, more than a year. There were several cases where the resolution of a problem, after many months of delay, gave rise to a subsequent problem, as a result, and the process began anew with regard to this subsequent problem.

Cauldwell Wingate Company, LLC
Bronx Criminal Court Complex

Request for Equitable
Contract Adjustment

As a result of the excessive amount of time taken by DASNY/Bovis and the consultants to resolve so many of these issues, the time available to perform the work often became critical. In order to have the work started as quickly as possible, DASNY/Bovis issued Field Work Directives (FWD's) to the prime contractors, in most cases before a formal change order was issued or Cauldwell Wingate had the opportunity to submit its proposal for additional work involved. In far too many cases, once the work was done, Bovis unilaterally determined that there was no extra work involved and no change order would be issued.

A.    There were many examples of FWD's where payment was denied after the work was done, with no fair basis for doing so.

B.    There were many cases where Cauldwell Wingate was backcharged for a portion of the repair work it performed under FWD's, with no prior notification from DASNY or Bovis.

Also, as a result of excessive time taken to resolve such issues, by the time the various Primes and their subcontractors were able to proceed with their work, many areas had already been closed up with GWB or masonry and these areas had to be opened up again. There were also instances where problem resolutions were not fully coordinated, by the consultants, with later following work and as a result there were subsequent interferences which required opening up completed work. FWD's were issued to Cauldwell Wingate to patch and repair such areas, but, again, there were too many instances where DASNY/Bovis refused to honor the extra work done. The very large volume of FWD's issued to Cauldwell Wingate was an indication of the chaos created by the combination of poorly coordinated design drawings and unrealistic completion dates imposed on all Prime Contractors by DASNY/Bovis.

It became apparent that Cauldwell Wingate was not operating on a level playing field. In addition to all of the job problems and impacts which DASNY/Bovis failed to deal with in a timely and knowledgeable manner, as would be expected of the project's Construction Manager, there were actions taken by DASNY/Bovis which were directed specifically at Cauldwell Wingate, that were not similarly directed at any of the other prime contractors. One such action was the unexplained insistence that Cauldwell Wingate remove, from the project, two of its most key personnel, Mr. Paul De Simone, its Project Manager, and Mr. Chris Hargrove, its Vice President of Operations. This occurred early in 2006 when continuity was particularly critical to

any completion effort. Another example was Bovis' constant threat to assess liquidated damages against Cauldwell Wingate as a method to have Cauldwell Wingate perform certain work. The only work Cauldwell Wingate ever refused to perform was work which was either not part of its contract, or additional change order work at a time when the value of unprocessed and unpaid change orders was severely impacting the cash flow of its subcontractors. Still a third example of DASNY/Bovis' actions specifically directed against Cauldwell Wingate was its steadfast refusal to approve and process a reduction in retainage for Cauldwell Wingate when such a reduction was, in fact, granted for other prime contractors on the project.

Precast Concrete Panel Replacement

Perhaps the most glaring example of Bovis' actions which were specifically directed against Cauldwell Wingate was its seemingly punitive insistence on the wholesale removal and replacement of the precast concrete panels at the site planters. In view of the problems these panels presented for Cauldwell Wingate from the very beginning, and the supporting evidence of testing results and expert professional opinions, as well as the remedial measures proposed by Cauldwell Wingate, this decision by DASNY/Bovis was excessive at best.

To begin with, and recap the sequence of events in this matter, the contract drawings indicated these panels to be 2" thick. Through RFI #1649 dated December 31, 2003, Cauldwell Wingate advised that the panel manufacturers stated that this thickness should be 2½", at the very least, to avoid cracking. By its response to this RFI on January 5, 2004, RVA determined that a 2½" thickness was acceptable and this response was confirmed by DASNY/Bovis. The ultimate panel manufacturer, Durastone, by its letters of August 27, 2004 and September 1, 2004, advised that the PCI Handbook recommended 4" as the minimum thickness for such panels and also requested a disclaimer should the thickness remain 2½". RVA, however, did not increase the panel thickness and it remained 2½".

Cauldwell Wingate then proceeded based on this 2½" thickness, but reduced the panel lengths from approximately 10' to 5'. Cauldwell Wingate then received, from DASNY/Bovis, the concrete design mix used by Global, the precaster for the building panels provided under Contract #7, and submitted samples accordingly. RVA approved these samples as matching the aesthetics of the building panels. Upon

Cauldwell Wingate Company, LLC
Bronx Criminal Court Complex

Request for Equitable
Contract Adjustment

later review, however, there was some question as to whether Global's design mix was truly a 5000 psi mix or similar to a 3500 psi standard mix.

After fabrication and installation, some panels exhibited some cracking, as well as, chipping at the edges, which probably occurred during shipping and installing. RVA then prepared a punch list of remedial work required in September, 2005. Based on this list, Cauldwell Wingate proposed to replace approximately one hundred and ten (110) panels, with a new manufacturer since Durastone was then out of business, and to also patch miscellaneous chipping in accordance with industry standards. By this time, however, Bovis had retained Future Tech Consultants ("FTC"), a testing laboratory, to take cores at certain white panels. These cores were taken at the panel edges to avoid reinforcing steel but this resulted in cracking of the cores, before testing, due to vibration, and, when tested, the results generally ranged between 2800 psi and 3200 psi. Cores were then taken from the center of the panel, which tested higher, but still less than 5000 psi. Cores taken at several gray panels tested from 4660 psi to 5300 psi and were acceptable.

The Engineer of Record for Durastone, Richard Hughes, P.E., then arranged for Swiss Hammer testing of certain white panels, due to the variations from recommended procedures observed during the core testing by FTC, especially the width to depth ratio of 1:1 as opposed to the 1:2 ratio recommended. This Swiss Hammer testing, which was also a non-destructive test, yielded results in the 2800 psi to 4800 psi range. Mr. Hughes also stated, in his letter dated September 13, 2005, that a range of 3000 psi to 3500 psi was "probably sufficient" for this particular panel application and location.

At this point in time, Cauldwell Wingate hired Delta Testing to perform Windsor Probe tests, also a non-destructive test, and considered by many to be the most reliable test method in this situation. A total of forty-four (44) tests were taken, representing ten percent (10%) of the white panels, with results ranging from 3000 psi to 6000 psi, and an average of 5027 psi. The Windsor Probe method was then used by FTC. A total of forty-two (42) tests were taken with results ranging from 3000 psi to 6000 psi, for an average of greater than 5000 psi.

In addition, DASNY did its own Quality Control review, claiming to have reviewed thirty-three (33) tests but with no correlation with the results of either of the other two (2) laboratories. DASNY's letter of January 30, 2006 quotes an average

Cauldwell Wingate Company, LLC
Bronx Criminal Court Complex

Request for Equitable
Contract Adjustment

compressive strength of less than 4000 psi, but the test data they used would indicate an average of 4647 psi, and these results were issued five (5) months after the other testing was done.

In addition to the conclusions presented by Mr. Hughes, the Engineer of Record, Cauldwell Wingate also retained the services of two (2) prominent consulting firms with expertise in these matters. A summary of the findings and analyses with regard to compressive strength indicates the following:

    A.    The characteristics of the general Windsor Probe Strength (75 data points) is described as follows:

        1.  Range:            3000 – 6200 psi
        2.  Average:         5020 psi
        3.  Median:          5200 psi
        4.  Standard Deviation:  720 psi

    B.    General characteristics of the Core Strength (68 data points) is described as follows:

        1.  Range:            2470 – 6750 psi
        2.  Average:         4540 psi
        3.  Median:          4670 psi
        4.  Standard Deviation:  1070 psi

Petrographic testing was also performed by FTC and Universal Construction Testing, Ltd. with all results conforming to the specified ranges and tolerances. The petrographic report indicates the concrete to be of "good" quality.

Based on the opinions of these experts and their analyses of the test results, it appears that while some of the compressive strength results may not have achieved the spec requirements with regard to 5000 psi, the averages and medians of the different test methods are well in excess of the 3000 psi to 3500 psi that Mr. Hughes deemed to be sufficient for this particular panel application and location. In addition, the panel concrete was deemed to be of "good" quality in accordance with petrographic test results.

Cauldwell Wingate Company, LLC
Bronx Criminal Court Complex

Request for Equitable
Contract Adjustment

Based on all of this information, it is Cauldwell Wingate's position that the rejection of the precast panels, and the directive to remove and replace same, ignores the data as presented above and summarily dismisses any reasonable engineering approach to resolving this issue. Cauldwell Wingate was ready and willing to replace certain rejected panels and to patch certain chipping in accordance with RVA's punch list. Having been wrongfully denied this opportunity, Cauldwell Wingate had no choice but to proceed as directed, and is now in the process of removing and replacing the material in question. Cauldwell Wingate hereby reiterates its claim for all costs it may incur in so doing. These costs are indicated as Proposed Change Order #854, including the appropriate back-up information, as a separate item under Schedule 8 of this presentation.

In addition to all of the problems resulting from the issues enumerated above, Cauldwell Wingate was further impacted by the fact that the project was divided among thirteen (13) major separate Prime Contracts. This in itself resulted in gaps in contractual responsibility among the many Prime Contractors and created further coordination problems in the performance of the work. This was another example of the problems created by poorly coordinated design drawings, with responsibility split among thirteen (13) major Prime Contractors and then having an unrealistic Completion Date established by DASNY/Bovis.

Given these circumstances, the need for clear and strong coordination and direction by DASNY's Representative, Bovis, as Construction Manager, was paramount in order to pull all these diverse elements together, but unfortunately this did not take place. Instead of direction, Bovis played the "Blame Game." Instead of fully acknowledging the enormity of this job's problems and issues, Bovis' approach was to issue unrealistic completion schedules in order to recover time already lost due to circumstances beyond the control of the Prime Contractors on the project. The coordination effort and leadership required to pull together all the problems and loose ends on the project never did happen and the result was ill timed work based on pressure to finish, then Primes blaming each other for the costs of corrective work.

It took literally thousands of RFI's in order for these contract documents to be rendered workable and the building to be constructed. These RFI's were generated by the various prime contractors and their subcontractors, and not by DASNY, Bovis or Hill. Most of this coordination of the contract documents could have, and should have, been done by RVA during the design phase and by DASNY/Bovis during the

design review phase, but certainly prior to bidding. Unfortunately, virtually nothing was done.

In reaction to the unrealistic completion dates imposed by DASNY/Bovis, Cauldwell Wingate began issuing bi-weekly and, at times, weekly lists of "Items Impacting Contract 9 Work" by floor and area, including any outstanding items by other primes or the consultants which were preventing Cauldwell Wingate from completing its work. These lists were issued continuously for more than sixteen (16) months, are still being issued as of this date, and should have been acted upon and responded to by DASNY/Bovis. Again, unfortunately, there was no meaningful response and nothing was done by DASNY/Bovis.

There is still a portion of the sitework which Cauldwell Wingate cannot complete since the area is on "HOLD" by DASNY pending a redesign. Cauldwell Wingate has repeatedly asked when this area would be released. Again, unfortunately, there has been no response from DASNY, Bovis or Hill.

At the appropriate time, RVA issued punch lists to Cauldwell Wingate for each area and floor of the Buildings, as per the contract, and Cauldwell Wingate and its subcontractors satisfactorily completed all punch list work so issued. Apparently ignoring these earlier punch lists, Hill International ("Hill") subsequently issued its own punch list containing more than one thousand (1,000) items per floor for most floors. Cauldwell Wingate reviewed every one of these thousands of items and responded, by floor, listing categories of items for which Cauldwell Wingate assumed responsibility and items for which it was not responsible. In each letter Cauldwell Wingate requested a response and confirmation from DASNY/Hill that these latest lists represented the final punch list for each floor and that there was agreement with Cauldwell Wingate's breakdown of responsibility. In the meantime Cauldwell Wingate began to complete the portions of these punch lists which it considered to be its legitimate work as noted to DASNY/Hill. Once again, unfortunately, there was no meaningful response from DASNY/Hill.

And what was the payback for these extraordinary efforts by Cauldwell Wingate and its subcontractors? DASNY/Hill then threatened to take over all of the work on these latest punch lists on Cauldwell Wingate's behalf and to backcharge Cauldwell Wingate on an open ended basis.

Cauldwell Wingate Company, LLC
Bronx Criminal Court Complex

Request for Equitable
Contract Adjustment

In addition to all of the other unanticipated problems on this project which Cauldwell Wingate and its subcontractors were forced to endure, the failure of DASNY/Bovis to process and pay change orders in a timely manner started to become critical at least two (2) years ago. By January, 2006 the total value of the changes yet to be reviewed by Bovis plus the change orders forwarded to DASNY by Bovis, which still awaited authorization to bill, exceeded $1,000,000. This situation continued to steadily worsen and by June, 2006 this total exceeded $2,500,000. By this time, Cauldwell Wingate's major subcontractors were refusing to perform any further change order work on the project due to the severe financial burden this was placing on their companies. In many cases this impacted the completion of base contract work which could not move forward until extra work was completed. Interestingly enough, what Bovis did find time to do was issue unjustified back charge credit change orders to Cauldwell Wingate, which were issued without prior written notification. Not only were these back charges without merit, but the entire process was clearly in violation of the terms of the Contract.

While Cauldwell Wingate and its subcontractors were not responsible for any of the design problems which plagued this project from the onset, and while Cauldwell Wingate cooperated fully at all times to achieve, what it believed were, unrealistic milestone dates established by DASNY/Bovis, the combination of these two (2) circumstances led to a barrage of FWD's and change orders in order to achieve this goal. As a result of the failure of both DASNY/Bovis to process and pay these change orders in a timely manner, Cauldwell Wingate and its subcontractors suddenly found themselves "at risk" for the change order work performed, and this was in addition to all of the other damages they had already suffered on this project.

Cauldwell Wingate was at a significant disadvantage from the very first day it was able to start work on this project. To begin with, the structural steel, metal deck and concrete work, which were performed by others and had to be completed in order for Cauldwell Wingate to start work, were actually completed many months late.

This impact and delay to Cauldwell Wingate's ability to even start its work was further compounded by DASNY/Bovis' decision to shorten the time allowed to complete the work.

Cauldwell Wingate Company, LLC
Bronx Criminal Court Complex

Request for Equitable
Contract Adjustment

While the effects of other impacts, delays, disruptions and interferences to Cauldwell Wingate's ability to perform its work are dealt with in other sections of this narrative, for the moment we will deal just with the impact of this time compression on Cauldwell Wingate's cost to perform its contract work. Once areas of work became available so that Cauldwell Wingate could start, albeit significantly later than originally scheduled, it began its framing work immediately.

Putting aside for now all of the other impacts, delays, disruptions and interferences which occurred, Cauldwell Wingate was dependent upon completion of the following work, by others, before it could apply sheetrock to enclose wall, ceiling, soffit or fascia framing, and then begin taping, spackling and finish work:

A.   Completion, testing and sign-off of all concealed plumbing, HVAC, sprinkler and electrical (MEP) work.

B.   Completion of concealed roughing and control work for all low voltage electrical work.

C.   Completion of all redesigns to the concealed MEP work which were necessary.

While Cauldwell Wingate is forced to start its work later than scheduled due to impacts and delays by others, and is forced to complete its work earlier than scheduled due to DASNY/Bovis' unilateral decisions, it has no way to enforce a corresponding shortening of durations for all of the above-referenced concealed work by others. As a result, the acceleration costs to accomplish this time compression for its work are absorbed solely by Cauldwell Wingate, without reimbursement. These acceleration costs include, but are not limited to, loss of efficiency, inordinate premium time costs, cluster craziness of too many men and too much equipment in tight spaces at the same time and ultimately just throwing enough bodies at the work in an attempt to maintain the schedule with no time to be concerned about the exorbitant cost of doing so.

Based upon all of the above impacts and issues, the Cauldwell Wingate work will not be completed until all currently held areas are released. Our best estimate at this time, is completion by June 30, 2007 which is reflected in the damage portion of this presentation. As a result, Cauldwell Wingate and its subcontractors each suffered significant additional costs, which included labor and material escalation, loss of productivity on labor, extended cost of supervisory and administrative personnel,

Cauldwell Wingate Company, LLC
Bronx Criminal Court Complex

Request for Equitable
Contract Adjustment

extended site overhead, extended cost of tools and equipment, extended general and administrative expenses, and additional interest expense on delayed reductions in retainage, as well as lack of payment of unresolved change orders and protest work. To this total one must also add the appropriate percentages for overhead, profit and increase in bond premium.

   In summary, there is no question that throughout the course of this project Cauldwell Wingate and its subcontractors did everything within their power to expedite the work and to meet all milestones, despite the difficulties they were forced to overcome. This, however, was done at a staggering cost to their companies. It is expected that this Request for Equitable Contract Adjustment will be resolved in the same spirit of fairness and cooperation previously exhibited by DASNY.

---

[1] DASNY – Dormitory Authority
State of New York
Bovis – Bovis Lend Lease – Construction Manager
Hill – Hill International – Replacement Construction Manager
RVA – Rafael Vinoly Architects, P.C.
HOK – Hugh O'Kane Electric Co., Inc. – Contract No. 14
Dierks – Dierks Heating Co., Inc. – Contract No. 10
CAS – Component Assembly Systems
LIFD – Long Island Fireproof Door
MSP – Maximum Security Products
Commodore – Commodore Construction
L&L – L&L Painting Co., Inc.
PMTM – Port Morris Tile & Marble Corp.
UAD – UAD Group
WAG – William A. Gross Construction Associates, Inc.
GWB – Gypsum Wallboard
MEP – Mechanical, Electrical and Plumbing (Sprinkler)
RFI – Request for Information
ASI – Architect's Supplemental Instructions
FWD – Field Work Directive
CMU – Concrete Masonry Unit
HVAC – Heating, Ventilating & Air Conditioning
ACT – Acoustic Tile
AM&G – Architectural Metal & Glass
MBE – Minority Business Enterprise

Cauldwell Wingate Company, LLC
Bronx Criminal Court Complex

II Contract 5 - Excavation/Foundation
Contract 6 – Structural Steel
Contract 7 – Shell Construction
Contract 8 – Curtain Wall, Storefront
Contract 9 – Interior Construction
Contract 10 – Heating & Cooling
Contract 11 – Sheetmetal & Air System
Contract 12 – Plumbing
Contract 13 – Fire Protection
Contract 14 – Electrical – Power, Lighting, Fire alarm
Contract 15 – Electrical – Low Voltage Systems
Contract 16 – Architectural Woodwork #1     Contract 17 – Architectural Woodwork #2

Exhibit B

Wililam A. Gross Construction Associates, Inc.
New Bronx Criminal Court Complex

Request for Equitable
Contract Adjustment

# **Table of Contents**

Section 1          Damages

Section 2          Charts & Exhibits

William A. Gross Construction Associates, Inc.
New Bronx Criminal Court Complex

## **Summary of Damages**

| | | | | |
|---|---|---|---|---|
| Schedule 1-GM | Extended Supervision | $ 170,966 | | |
| Schedule 2-GM | Extended Project Administration | 237,071 | | |
| Schedule 3-GM | Labor Escalation | 15,054 | | |
| Schedule 4-GM | Material Escalation | 179,301 | | |
| Schedule 5-GM | Escalated Project Services | 29,301 | | |
| Schedule 6-GM | Unanticipated Waterproof Protection | 40,000 | | |
| Schedule 7-GM | Extended Use of Equipment | 31,161 | | |
| Schedule 8-GM | Additional Project Insurance | 12,285 | | |
| Schedule 9-GM | Additional Trucking Costs | 233,398 | | |
| Schedule 10-GM | Additional Topsoil Installation Costs | 59,555 | | |
| Schedule 11-GM | Loss of Productivity on Concrete Operation | 362,706 | | |
| | Subtotal | | $ 1,370,798 | |
| | OH&P @ 20% | | 274,160 | |
| | Total Claim | | | $ 1,644,958 |

Note: This claim excludes William A. Gross' unpaid extra work, in the amount of $13,800 (as of 12/26/06).

William A. Gross Construction Associates, Inc.
New Bronx Criminal Court Complex

## Extended Supervision

Project Superintendent Costs[1]

|  |  |  |  |
|---|---|---|---|
| - Terry Ramnath | $ 162,565 | | |
| - Steve Rizzo | 132,019 | | |

Total Expenditure          $ 294,584

Months of Supervision[2]
   (7/1/04 - 10/31/06)         28

Monthly Superintendent Cost
   ($294,584 ÷ 28 mos.)       $ 10,521.00

Months of Project Delay[3]        16.25

Total Extended Supervision       $ 170,966

---

[1] From William A. Gross' Accounting Department.

[2] Note: Although minimal construction took place between 7/1/04 and 7/1/05, supervision existed on a part-time
basis which included attendance of meetings, discussions of problems, project setup etc.

[3] Reference "As-Planned vs. As-Built Schedule," Tab 1.

William A. Gross Construction Associates, Inc.
New Bronx Criminal Court Complex

Request for Equitable
Contract Adjustment
SCHEDULE 2-GM

## Extended Project Administration

Project Administration Costs[4]

| | | |
|---|---|---|
| - Theresa Carbone (Clerical) | $ | 41,951 |
| - Donna Destefano (Engineer) | | 34,706 |
| - Tony Luna (Project Manager) | | 175,261 |
| - Brian Heneghan (Project Manager) | | 57,760 |
| - Larry Waingarten (Project Manager) | | 98,810 |

Total Expenditure                                          $ 408,488

Months of Project Administration[5]
   (7/1/04 - 10/31/06)                                        28

Monthly Administration Cost
   ($408,488 ÷ 28 mos.)                                $ 14,589.00

Months of Project Delay[5]                                      16.25


Total Extended Project Administration                      $   237,071

---

[4] From William A. Gross' Accounting Department
[5] Reference "As-Planned vs As-Built Schedule," Tab I

William A. Gross Construction Associates, Inc.
New Bronx Criminal Court Complex

Request for Equitable
Contract Adjustment
SCHEDULE 3-GM

## Labor Escalation

| Wage Periods | Composite Wage Rates [6] | Anticipated Contract Completion (%) [7] | Hours [8] | $ Cost | | Actual Contract Completion (%) [9] | Actual Hours | $ Cost |
|---|---|---|---|---|---|---|---|---|
| 7/1/03 - 6/30/04 | $ 66.82 | | | | | 0.15 | 7 | $ 468 |
| 7/1/04 - 6/30/05 | $ 70.02 | 100 | 4,785 | $ 335,046 | | 1.99 | 95 | $ 6,652 |
| 7/1/05 - 6/30/06 | $ 72.89 | | | | | 88.21 | 4,221 | $ 307,669 |
| 7/1/06 - 6/30/07 | $ 76.43 | | | | | 9.65 | 462 | $ 35,311 |
| TOTALS | | 100 | 4,785 | $ 335,046 | | 100 | 4,785 | $ 350,100 |

Actual Cost of Non-Claimed Escalated Labor      $      350,100

Less: Anticipated Cost of Non-Claimed Escalated Labor      (335,046)

Total Labor Escalation      $      15,054

---

[6] Reference "Summary of Wage Rates," Tab 6.

[7] Reference "As-Planned vs As-Built Schedule," Tab 1

[8] Actual contract hours subject to escalation* at anticipated rate of progress.

| * Total Payroll Hours | 13,705.0 |
|---|---|
| Less: Extra Work Hours | (3,142.0) |
| Less: Claimed Hours @ Escalated Rate | |
| - Additional Topsoil Installation | (596.5) |
| - LOP @ Concrete Installation | (5,182.0) |
| Total Hours Subject to Escalation | 4784.5 |

[9] Reference "Full Requisition Analysis," Tab 1

William A. Gross Construction Associates, Inc.
New Bronx Criminal Court Complex

Request for Equitable
Contract Adjustment
SCHEDULE 4-GM

# Material Escalation [10]

| Item | 2003/2004 Cost | 2004/2005 Cost | Escalation |
|---|---|---|---|
| Steel Curbing | $   11,714 | $   15,961 | $   4,247 |
| Safety Tread Nosing | 9,025 | 9,994 | 969 |
| Concrete | 136,315 | 216,583 | 80,268 |
| Topsoil/Soil | 34,878 | 40,542 | 5,664 |
| Light Weight Aggregate | 26,100 | 26,942 | 842 |
| Recycle Stone | 6,838 | 7,627 | 789 |
| Color Admixture | 75,900 | 84,180 | 8,280 |
| Miscellaneous Materials<br>  - Color Wax<br>  - Filter Fabric<br>  - Miradrain | 5,378<br>2,030<br>6,545 | 5,625<br>2,490<br>6,930 | 247<br>460<br>385 |
| Expansion Joint & Cap | 2,200 | 2,680 | 480 |
| Rigid Insulation | 14,147 | 16,128 | 1,981 |
| Reinforcing Steel | 23,627 | 35,516 | 11,889 |
| Steel Fence | 92,000 | 138,240 | 46,240 |
| Granite | 66,240 | 82,800 | 16,560 |
| TOTALS | $   512,937 | $   692,238 | $   179,301 |

Total Material Escalation    $   179,301

---

[10] Reference "Escalation of Materials and Services," Tab 8.

William A. Gross Construction Associates, Inc.
New Bronx Criminal Court Complex

Request for Equitable
Contract Adjustment
SCHEDULE 5-GM

# Escalated Project Services [11]

| Item | 2003/2004 Cost | 2004/2005 Cost | Escalation |
|------|---------------:|---------------:|-----------:|
| Saw Cutting | $ 26,529 | $ 50,190 | $ 23,661 |
| Material Testing | 29,350 | 34,990 | 5,640 |
| TOTALS | $ 55,879 | $ 85,180 | $ 29,301 |

Total Escalated Project Services                    $    29,301

---

[11] Reference "Escalation of Materials and Services," Tab 8.

William A. Gross Construction Associates, Inc.
New Bronx Criminal Court Complex

Request for Equitable
Contract Adjustment
SCHEDULE 6-GM

# **Unanticipated Waterproofing Protection**

In order to proceed with its boulder placement operation, William A. Gross had to provide plywood protection over the prematurely installed plaza deck waterproofing material. Installed out-of-sequence by others, the deck waterproofing was located in such a manner it had to be traversed in order to get access to the areas of rock placement. Therefore, this additional effort was required, since setting these extremely heavy boulders could not be done by hand; thus requiring heavy equipment to travel over the easily breached waterproofing. Even with all the extra care and expense, some damage, which required repair, could not be avoided (plywood shifting and waterproofing material tearing when track equipment made a change in direction). However, in the end, this extra work was absolutely key to advancing the boulder placement.

Total Unanticipated Waterproof Protection[12]          $ 40,000

---

[12] Estimated by William A. Gross' project personnel.

William A. Gross Construction Associates, Inc.                    Request for Equitable
New Bronx Criminal Court Complex                                  Contract Adjustment
                                                                 SCHEDULE  7-GM

# Extended Use of Equipment

| | | | | | | |
|---|---|---|---|---|---|---|
| Concrete Pump | $ 28,468 | 6 | $ 4,745 | 0.375 | 1.6 | $ 7,592 |
| Forms | $ 2,644 | 6 | $ 441 | 0.375 | 1.6 | $ 706 |
| Forklift | $ 6,279 | 3 | $ 2,093 | 0.188 | 0.8 | $ 1,674 |
| Power Buggy | $ 7,156 | 7 | $ 1,022 | 0.438 | 1.9 | $ 1,942 |
| Roller | $ 2,918 | 5 | $ 584 | 0.313 | 1.3 | $ 759 |
| Excavating Equipment | $ 66,983 | 13 | $ 5,153 | 0.813 | 3.5 | $ 18,036 |
| Office Trailer | $ 1,721 | 8 | $ 215 | 0.500 | 2.1 | $ 452 |
| TOTAL | | | | | | $ 31,161 |

Total Extended Use of Equipment                    $   31,161

---

[13] Reference "Equipment Rental Information," Tab 10

[14] With the exception of the on-hold sitework, substantial construction took place within a 16 month period (7/1/04 - 10/31/06)

[15]  $\frac{\text{Mos. Of Use}}{\text{Mos. of Construction}}$  x Extended Project Construction Period*

*16.25 Mos. Project Delay - 12 Mos. Late Start = 4.25 Mos (Reference: "As-Planned vs. As-Built Schedule," Tab 1)

William A. Gross Construction Associates, Inc.
New Bronx Criminal Courthouse Complex

# Additional Project Insurance[16]

| | |
|---|---|
| Total Company 2006 Umbrella Insurance Premium | $ 65,000.00 |
| Courthouse 2006 Sales vs. Company 2006 Sales | 14% |
| Courthouse Share of 2006 Umbrella Premium | $  9,100.00 |
| Years of Extended Project Duration (16.25 Mos. ÷ 12 Mos.) | 1.35 |
| Total Additional Project Insurance | $ 12,285 |

---

[16] From William A. Gross' accounting department.

William A. Gross Construction Associates, Inc.
New Bronx Criminal Courthouse Complex

Request for Equitable
Contract Adjustment
SCHEDULE 9-GM

# **Additional Trucking Costs**

As a result of an extremely congested site, in which the few available storage areas were occupied by other trades, William A. Gross had nowhere to stockpile its material. Accordingly, all material had to be held until installation was eminent; then and only then could a delivery be made to the job site. In lieu of a limited number of large shipments, William A. Gross had no choice but to make many small deliveries, driving the costs of trucking (equipment and labor) way beyond the original budget.

In addition, the sitework concrete operation was performed in a stop/start, out-of-sequence manner, due to the many encumbrances placed upon this work (late builders pavement plan, out-of-sequence waterproofing, incorrect subgrade and deck elevations at the plaza, late electrical work, perimeter fence interferences, etc.). Therefore, following this erratic pattern of construction advancement, the supporting equipment was constantly mobilized on and off the site; which also required a level of trucking never intended. On the following page is a calculation of the additional trucking costs.

William A. Gross Construction Associates, Inc.
New Bronx Criminal Courthouse Complex

# **Additional Trucking Costs**
### **(continued)**

Additional Truck Rental Costs:[17]

| | |
|---|---:|
| - Ancar Trucking | $ 2,714 |
| - F & I Trucking | 908 |
| - Jon-Mar Trucking | 793 |
| - Redwood Construction | 1,728 |
| - TR Contracting | 7,008 |
| - United Rentals | 1,143 |
| - Zano Industries | 2,215 |
| - Super Justice | 13,437 |

Total Additional Truck Rentals                    $  29,946

William A. Gross Truck & Operator Costs:[17]

| | |
|---|---:|
| For 2005 | $ 162,580 |
| For 2006 | 40,872 |

Total William A. Gross Truck Costs                    203,452

Total Additional Trucking                    $  233,398

---

[17] Reference: "Additional Trucking Costs," Tab 11.

William A. Gross Construction Associates, Inc.
New Bronx Criminal Court Complex

Request for Equitable
Contract Adjustment
SCHEDULE 10-GM

# Additional Topsoil Installation Costs[18]

      As a result of out-of sequence waterproofing by others, William A. Gross was unable to perform its topsoil installation as intended. Precluded from traversing the prematurely waterproofed plaza/garage deck with heavy equipment*, William A. Gross was forced into placing the topsoil, at its specified planter locations, by the use of a conveyor system. This approach not only required unanticipated equipment, but also a large additional labor expenditure to support this operation.

| | | |
|---|---|---|
| Additional Labor Hours | 596.50 | |
| Average Wage Rate | $ 81.67 | |
| Total Additional Labor | | $ 48,718 |
| | | |
| Equipment Hours | 168.00 | |
| Average Rate | $ 64.51 | |
| Total Additional Equipment | | 10,837 |
| | | |
| Total Additional Topsoil Installation | | $ 59,555 |

Note: The plywood protection for boulder placement (Schedule 6-GM) covered a relatively small section of deck, while the topsoil operation encompassed the entire area. Protection and subsequent repair work, for the full deck, would have been cost prohibitive.

---

[18] Reference: "Additional Topsoil Installation Costs," Tab 9.

William A. Gross Construction Associates, Inc.
New Bronx Criminal Court Complex

Request for Equitable<br>Contract Adjustment<br>SCHEDULE 11-GM

# <u>Loss of Productivity on Concrete Operation</u>

Throughout the sidewalk, curbing and deck concrete work on this project, William A. Gross sustained significant losses of productivity due to the following issues:

♦ Having to work the sidewalk and curbing in a severely restricted (between building and obstruction) and unintended (off the existing paved streets) area, due to the presence of an unanticipated security fence.

♦ Performing its sidewalk and curbing activity in a modified fashion (hand work vs. planned equipment performance, plus concrete pumping vs. planned direct truck dumping); due to the existence of the security fence.

♦ Performing its deckwork in a hopscotch and piecemeal fashion, as a result of grading inaccuracies and late electrical lighting work.

♦ Interferences by other contractors along with debris on site, preventing area availability and a steady flow of work.

On the following page is a summary of the labor inefficiencies associated with the subject concrete work.

Page 1 of 2

William A. Gross Construction Associates, Inc.
New Bronx Criminal Court Complex

Request for Equitable
Contract Adjustment
SCHEDULE 11-GM

# Loss of Productivity on Concrete Operation
### (continued)

| | | |
|---|---:|---:|
| Actual Concrete Labor Production Costs[19] | | |
| - Deck | $253,692 | |
| - Sidewalk | 136,149 | |
| - Curbing | 130,910 | |
| Total Actual Concrete Labor Production | | $520,751 |
| | | |
| Less: | | |
| Anticipated Concrete Labor Production Costs[20] | | |
| - Deck | $ 83,518 | |
| - Sidewalk | 37,717 | |
| - Curbing | 36,810 | |
| Total Anticipated Concrete Labor Production | | (158,045) |
| | | |
| Total Loss of Productivity on Concrete Operation | | $ 362,706 |

[19] Reference "Concrete Labor Summary," Tab 12  Provided by William A  Gross' accounting department

[20] Based upon William A  Gross' historical production rates.

Page 2 of 2

Exhibit C

Supplier# 132175
JDE # 9256105

# ORIGINAL

43440

ok to docket
as f 7.25.08
SV 7.25.08

**DORMITORY AUTHORITY**
**STATE OF NEW YORK**
In the matter of the Application of Lienor
For the Extension of Public Improvement Lien
Claimed by and on behalf of

**WILLIAM A. GROSS CONSTRUCTION ASSOCIATES, INC.**

           Lienor,

                         **CONTRACT#: 1380909999**

      -Against-

**CAULDWELL WINGATE COMPANY, LLC (GC)**
State of New York
County of Nassau

Mark Nash, being duly sworn, deposes and says:

    1. I am the Agent for **WILLIAM A. GROSS CONSTRUCTION ASSOCIATES, INC**. a domestic corporation and hereinabove and hereinafter referred to as the Lienor, which has its principal office and place of business at **117 SOUTH 4TH STREET NEW YORK NY 11040** make this application for the EXTENSION for one year of the Public Improvement Lien dated **AUGUST 6, 2007.**

    2. The Notice of Public Improvement Lien now sought to be continued was dated, **AUGUST 6, 2007** and was filed on **AUGUST 7, 2007.**

    3. The lien arises from a contract for the **material and labor** provided and entered into claiming the sum of **$2,935,110.10** as a lien against the interest of **CAULDWELL WINGATE COMPANY, LLC (GC);** the owner of said contract is the Dormitory Authority State of New York, herein and hereafter described.

    4. The contract against which the lien aforesaid is claimed is as follows:

           Contract #:    **1380909999**
           Address:      **BRONX CRIMINAL COURTHOUSE**
                      **265 East 161st STREET**
                      **BRONX, NEW YORK**

    5. No payment has been made, the amount now due and owing thereon the sum of **$2,935,110.10** with interest from **AUGUST 7, 2007.**

                                          Counsel Received

                                          **JUL 25 2008**

                                        Dormitory Authority

ORIGINAL

6. Your affiant has diligently sought payment for the **material and labor** provided to **CAULDWELL WINGARE COMPANY, LLC (GC)**, and will be initiating a lawsuit against said parties to recover monies owed pursuant to a contract.

7. The lien will expire pursuant to a statute on **AUGUST 7, 2008**, after which the said lien will be ineffective and unenforceable unless further continued.

8. No previous application has been made to this agency for the relief sought.

**JULY 10, 2008**

_____
Mark Nash
Agent

Sworn to before me on this **10th day of JULY, 2008**

_____
Notary Public

MARIE RUIZ
Notary Public, State of New York
NO. 01RU6164740
Qualified in Nassau County
Commission Expires April 30, 2011

ORIGINAL

State of New York, County of Nassau

Mark Nash, being duly sworn, deposes and says that the deponent is the Agent for **WILLIAM A. GROSS CONSTRUCTION ASSOCIATES, INC.** herein, and that deponent has read the foregoing Affidavit for the Extension of Public Improvement Lien and knows the contents thereof and that the same is true to deponent's own knowledge, except as to the matters therein stated to be alleged upon information and belief, and that as to those matters deponent believes to be true. The reason why this verification is made by the deponent, to wit, the Agent for **WILLIAM A. GROSS CONSTRUCTION ASSOCIATES, INC.** which is a domestic corporation and deponent, is familiar with the facts and circumstances herein.

The sources of deponent's information and the grounds of deponent's belief as to all matters therein stated upon deponent's knowledge are as follows:

Books and records of said corporation.

Mark Nash
Agent

Sworn to before me this
**10TH day of JULY, 2008**

Notary Public

MARIE RUIZ
Notary Public, State of New York
NO. 01RU6164740
Qualified in Nassau County
Commission Expires April 30, 2011