Carol A. Sigmond, Esq. (CS 2735)
Dunnington, Bartholow & Miller LLP
1359 Broadway, Suite 600
New York, New York 10018
(212) 682-8811

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------

WILLIAM A. GROSS CONSTRUCTION
ASSOCIATES, INC.,

                                  Plaintiff,

    -against-

AMERICAN MANUFACTURERS MUTUAL
INSURANCE COMPANY,

                              Defendant.

------------------------------------------------------------------

          And other actions

------------------------------------------------------------------

C.A. No. 07-CV-10639-LAK

Plaintiff's
Declaration In Sur Reply
of DASNY's Motion to
Dismiss Fourth-Party Complaint

      Carol A. Sigmond, an attorney admitted to practice before the courts of the state of New York, under penalty of perjury, states as follows:

    1.      I am a member of Dunnington, Bartholow & Miller LLP and we represent Plaintiff William A. Gross Construction Associates, Inc. ("Plaintiff" or "WAGCA") in the within captioned action.

    2.      The purpose of this Declaration is to present a sur reply to Fourth-Party Defendant DASNY's "Reply Memorandum of Law in Support of DASNY's Motion to Dismiss the Fourth Party Complaint" ("DASNY Reply"). DASNY maintains that Rule 19 and 28 U.S. 1359 wherein DASNY states:

> These glaring omissions suggest that Gross, perhaps acting with American and/or Cauldwell Wingate, is attempting to manufacture diversity jurisdiction by omitting Cauldwell Wingate and DASNY from the main action, even though DASNY is an indispensable, though non-diverse, party with respect to Gross' delay and Northside Redesign claims.

DASNY Reply at 10.

3.      I deny the foregoing allegation.   I should take offense at both Dormitory Authority of the State of New York ("DASNY") failure to comply with the Rule 12 in seeking dismissal of Plaintiff's Complaint without formal notice to the undersigned as counsel for Plaintiff and the scurrilous charge quoted above, but DASNY demonstrates such a misunderstanding of the law of suretyship and contracts I need not say more.

4.      Plaintiff is not party to a direct contract with DASNY, hence Plaintiff is not in privity of contract with DASNY.  Cauldwell is a party to a General Contract No. 2 for the Fit-out Work at Bronx Criminal Court Complex ("Project") with DASNY dated on or about December 20, 2002.[1]

5.      At all times relevant hereto, Plaintiff, an experienced site work contractor, is party to a subcontract with Third Party Defendant Cauldwell Wingate, LLC ("Cauldwell"), for  finish site work, dated January 4, 2004, copy annexed as Exhibit A ("Subcontract").  The subcontract is self liquidating as to claims that Plaintiff may wish to bring against DASNY, paragraph 9.4.

6.      Plaintiff commenced this action by the filing and service of a Summons and Complaint, copy annexed as Exhibit B.  Annexed to the Complaint as Exhibit A is a copy of the Payment Bond ("Payment Bond") issued by Defendant American

---

[1] See *infra* paragraph 6, and Exhibit A (the Payment Bond) to Exhibit B (the Complaint).

Manufacturers Mutual Insurance Company ("American").  Jurisdiction in this Court is based on diversity.  Plaintiff is a New York corporation and is resident and doing business in New York.  American is an insurance company formed and existing under the laws of the State of Illinois and is in run off, so it is only resident in Illinois.

7.      Plaintiff had no role in selecting American as the Surety for Cauldwell.  As to American's citizenship for diversity purposes for this action, Plaintiff merely accepted conditions created by others.

8.      Properly and as the master of its own action, Plaintiff did make an election of remedies by commencing this action against American.  Plaintiff had three options in structuring this action to obtain full relief: a) sue American under the Payment Bond as an intended third party beneficiary and seek attorney fees under State Finance Law section 137(c); b) sue Cauldwell for breach of the Subcontract and have no prospect of attorney fees; or c) sue American and Cauldwell, the former for breach of the Payment Bond and the latter for breach of the Subcontract.  Plaintiff selected the first option for three reasons:  a) American's ability to pay a judgment is more certain that Cauldwell's because the regulatory schemes for insurance companies, even in run-off preserve assets to protect the interests of claimants, while a private entity such as Cauldwell has the ability to make itself judgment proof and attorney fees and costs are not available in a breach of contract action; b) American's apparent failure to make a full investigation of the facts of this matter in the four month interval between Plaintiff's giving notice of the Payment Bond claim makes it vulnerable to post-

trial proceedings for attorney fees under State Finance Law section 137 (c);[2] and

c) suing American and Cauldwell jointly might have allowed American to tender

the defense to Cauldwell, a result that would be counter-productive to Plaintiff's

goal of obtaining an award of attorney fees against American under State Finance

Law section 137 (c) less viable.

9.     Among other things, the Complaint seeks damages for additional costs incurred

by Plaintiff.  Contrary to the assertions of both DASNY and Plaintiff maintains

that its costs were increased by Cauldwell and its failure to coordinate the Project,

in at least two respects.  Specifically and by way of example, in paragraph 22 of

the Amended Complaint, Plaintiff seeks damages for additional work caused by

waterproofing being installed out of sequence, additional trucking, additional cost

for top soil installation and loss of productivity for concrete.  Cauldwell, without

regard to DASNY caused at least two material changes to Plaintiff's work that

increased Plaintiff's costs.  First, Cauldwell did not complete the installation of

the pre-cast panels timely, meaning that Plaintiff's concrete that tied into the

panels was disrupted and Plaintiff had to work inefficiently.  Cauldwell further

increased Plaintiff's costs when it developed that Cauldwell's pre-cast panels were

defective and had to be removed.  Second, Cauldwell sequenced work on the

plaza inefficiently.  Plaintiff was not able to perform plaza concrete work from the

center of the area to the edge, it had to hop-scotch and cross over completed work.

---

[2] American's failure to investigate extends beyond the two matters discussed in paragraph 8, and includes at least two other issues.  During the course of the Project, Cauldwell repeatedly altered the schedule of values it used to compute payments to Plaintiff.  As shown on Exhibit C, each change was calculated to deprive Plaintiff of fair compensation.  As a result, Cauldwell has been paid for work by DASNY performed by Plaintiff for which Cauldwell has not paid Plaintiff.  Plaintiff calculates that it has been under-paid approximately $600,000 for base contract and owner approved change orders.  Exhibit C shows how Cauldwell improperly its own mark-up on the bollard items so as to extort an excess credit from Plaintiff.  By this subterfuge, Cauldwell is attempting to charge Plaintiff an approximately $800,000 credit for work that is only worth approximately $227,365.

Moreover, Cauldwell allowed waterproofing of the plaza so that Plaintiff could not operate any equipment on the plaza for installing topsoil among other things. The soil was placed by means of a conveyor belt system.

10.     The Complaint also seeks payment for Plaintiff's extra work due to the redesign of the North Side based on, among other things, Cauldwell's approval of the Plaintiff's claim for $411,000.  A copy of the proposed change approved by the initialing thereof by Alan Haines, Cauldwell's Chief Information Officer, is annexed as Exhibit D.

11.     American answered the Complaint asserting various defenses to the allegations, copy annexed as Exhibit E.  Significantly, American's defenses are substantive, not procedural.

12.     There came a time that DASNY asserted a Counterclaim against Cauldwell, copy annexed as Exhibit E.  In the Counterclaim, among other things, DASNY asserts that Cauldwell breached its contract with DASNY by "failing to properly coordinate its work with the work of other contractors on the site" and "delaying completion of its work."  Exhibit F, paragraph 220.

13.     DASNY's allegations against Cauldwell are consistent with Plaintiff's claims that Cauldwell damaged Plaintiff as described *supra* in paragraph 7.

14.     As discussed in the accompanying memorandum of law, there is no basis in law or fact for DASNY to move to dismiss the Complaint under Rule 19.  DASNY's off-handed remark set forth *supra* paragraph 2 *in haec verba* notwithstanding, DASNY is not a necessary party in Plaintiff's action against American.  In fact, Plaintiff may not sue DASNY in this matter at all, as there is no privity of

contract between Plaintiff and DASNY. Moreover, since Plaintiff may obtain complete relief in its action against American, and Cauldwell is not a required party in an action on the payment bond, Cauldwell is not a necessary party in Plaintiff's action against American.

15.    As discussed in the accompanying memorandum of law, there is no basis for DASNY to move to dismiss the Complaint based on collusion respecting federal jurisdiction. American has been a citizen of Illinois for diversity purposes since on or before December 27, 2002. American was selected as surety for Cauldwell by Cauldwell on or before December 27, 2002. DASNY accepted American as surety for Cauldwell on or about December 27, 2002. Therefore, Plaintiff has not colluded with anyone to 'manufacture' diversity, American, Cauldwell and DASNY managed the process that created diversity nearly 5 years before this litigation commenced. Exhibit A to Exhibit B.

16.    At page 10 of the DASNY Reply, DASNY may be voicing its suspicion that Plaintiff thought about more than simply how it would obtain full and fair compensation for work performed on the Project in making the strategic decision to file the within captioned action in federal court. True, Plaintiff did consider the complications associated with commencing litigation about the Bronx Criminal Courthouse with venue in the Supreme Court for the County of The Bronx before a New York State Supreme Court Judge sitting in The Bronx who would be answerable to officials at the New York State Office of Court Administration, including The Honorable Ann Pfau who is a potential witnesses in this matter. In that scenario, the potential for inadvertent *ex parte* communications would be

significant.

17.     Accordingly, Plaintiff respectfully asks that this Honorable Court deny DASNY's application to dismiss the Complaint.     DASNY has not demonstrated the application of either Rule 19 or 28 U.S.C. section 1359 ousts this Court of diversity jurisdiction over the Complaint.


Dated:     New York, NY
           August 15, 2008



                              _____/s/   Carol A. Sigmond_____
                              Carol A. Sigmond (CS 2735)
                              Dunnington, Bartholow & Miller LLP
                              Attorneys for Plaintiff
                              1359 Broadway – Suite 600
                              New York, NY 10018
                              212-682-8811

# EXHIBIT A

## SUBCONTRACT

This Agreement, made as of the **11** day of **August, 2003**, by and between **Cauldwell Wingate Company LLC, (a Delaware Corporation)** with offices located at 380 Lexington Avenue, NY, NY 10168 (the" Contractor") and **William A Gross Construction Associates** (a N.Y. corporation) with its principal office at **117 South 4th Street, New Hyde Park, NY 11040** (the "Subcontractor"),

### WITNESSETH:

For the consideration hereinafter named, the Contractor and the Subcontractor, intending to be legally bound, do hereby mutually covenant and agree as follows:

### ARTICLE I
### DESCRIPTION OF WORK

1.1  The Subcontractor will furnish all labor, surveying, layout, materials, appliances, tools, plant, appurtenances, equipment, scaffolding, permits, methods, transportation, power, fuel, water, supplies, hoisting, rigging and services of every kind necessary for the complete and entire performance of the work under this Subcontract; and in a good, substantial, thorough and workmanlike manner, and in strict accordance with all plans and specifications and any and all addenda, memoranda, bulletins and modifications thereto, subject to the final completion, approval and acceptance of the Contractor, the Architect and the Owner, and perform in every respect complete and operable when applicable, (hereinafter the "Work") for and at:

The new Bronx Criminal Court Complex (hereinafter the "Project"); located on premises bounded by: 161st Street, 162nd Street, Morris Ave, and Sherman Ave, Bronx NY (hereinafter the "Premises"), as shown and described, and in strict accordance with the plans, specifications, addenda and bulletins thereto, as per Document List dated 8/19/02 general conditions and special conditions, as more particularly defined in the annexed Exhibit I, Attachments and the terms and provisions of the general contract between the Contractor and Dormitory Authority State of New York (hereinafter the "Owner") dated 12/20/02 (hereinafter the "Contract").

The Work of this Subcontract includes all work to **Sitework**.

### ARTICLE II
### CONTRACT DOCUMENTS

2.1  The plans, specifications, general conditions, special conditions, addenda and bulletins, and the Contract, are included as a part of this Agreement insofar as applicable to the Work. Each document is available for examination by the Subcontractor at all reasonable times at the office of the Contractor. All of the aforesaid documents, including this Agreement, are sometimes referred to hereafter as the Contract Documents.  The Subcontractor represents and agrees that it has carefully examined and understands this Agreement and the other Contract Documents, has investigated the nature, locality and site of the Work and the conditions and difficulties under which it is to be performed, and that it enters



1

WAG 1

into this Agreement on the basis of its own examination, investigation and evaluation of all such matters and not in reliance upon any opinions or representations of the Contractor, or the Owner, or of any of their respective officers, agents, servants, or employees.

Subcontractor shall be bound by all the terms of the Contract and assume (i) all the obligations of Contractor as stated therein which are applicable to the Work covered by this Subcontract and (ii) the general obligations as between Contractor and Owner, which shall also apply as between Contractor and Subcontractor, including any provisions of the Contract required to be inserted or incorporated into this and other subcontracts, as fully as though copied herein.

2.2  The plans, drawings, details and specifications are intended to supplement one another and any work or materials shown, mentioned or reasonably implied in one and not in the others are to be furnished by the Subcontractor without extra charge.  The enumeration of particular items in this Subcontract or in the specifications shall not be construed to exclude other items.  The intention of the Contract Documents is to include everything, whether specified herein or not, necessary for the proper execution and completion of the Work.

ARTICLE III
COMMENCEMENT AND COMPLETION OF WORK

3.1  The Subcontractor shall commence and complete the Work at the times hereinafter mentioned or as required by the Contractor to ensure Contractor's compliance with the time requirements of the Contract.  Where the dates for the commencement or completion of work or the making of deliveries are not specified or if said dates are specified but the Contractor shall require such commencement or deliveries prior to or after the time fixed for such commencement, such work or deliveries or the part of the same concerning which no dates are given, shall be commenced on three (3) days notice from the Contractor and shall be prosecuted and completed with all possible diligence and speed or as otherwise directed by the Contractor.   The time stated in this Agreement for the commencement, prosecution and completion of the Work and the deliveries and installation of material shall be deemed of the essence of this Agreement.

3.2  The Subcontractor agrees that in the performance of the Work, it will cooperate with other contractors and subcontractors at the Project and not interfere with, or impede the work of the Contractor, or any other subcontractor or contractor at the Project and must afford all other contractors and subcontractors reasonable opportunity for the introduction and storage of their materials and the execution of their work.

The Subcontractor shall proceed with the Work in a prompt and diligent manner, without delay, and shall perform the Work so as not to delay the other trades and to insure completion of the Work in accordance with the requirements of the Contract, and as may be modified during the construction of the Project, at the sole discretion of the Contractor.

3.3  The scheduling of all construction operations at the Project shall be at the option of the Contractor and the Subcontractor shall, if requested, furnish all scheduling information in such form and detail as requested by the Contractor, to the satisfaction of the Contractor.  The Subcontractor shall



2

WAG 1

furnish such information within seven (7) days of request, and the Subcontractor shall update and/or revise such information, as requested by the Contractor, at any time, either prior to or during the performance of the Work.

Information submitted by the Subcontractor or others, acceptance or approval by the Contractor and the scheduling that may be developed and implemented by the Contractor shall not constitute the basis of any claim by the Subcontractor or its subcontractors or materialmen for damage or delay, or excuse the Subcontractor's performance as required herein.

3.4 In the event the Subcontractor fails to commence the Work after being notified to do so, or should the Contractor judge that the Subcontractor is delaying the progress of the Work or not complying with the progress schedule, if any, or not pursuing the Work in the manner set forth by the plans, specifications and this Agreement, the Contractor shall notify the Subcontractor, who shall, within two (2) calendar days thereafter, furnish whatever materials are required by the Contractor, and employ additional workmen, equipment and supplies as required so as to bring the Work into conformity with the job progress as required by the Contractor or be found in default of this Agreement, at the option of the Contractor.

The Subcontractor shall, at its sole expense, work overtime, including Saturdays and Sundays at the direction of the Contractor, if in the judgment of the Contractor such overtime and Saturday/Sunday work is necessary to meet progress requirements due to any delays caused by the Subcontractor or the failure by the Subcontractor to commence its work timely or the failure by the Subcontractor to be in conformity with the job progress. The failure of the Subcontractor to comply with said demand shall constitute a material breach and a default of this Agreement, at the option of the Contractor.

The Subcontractor shall be obligated to pay the Contractor for supervision and any labor and/or expenses related to facilities required during overtime to perform work including but not limited to temporary facilities, safety, security etc.

3.5 If the progress of the Work or of the Project is delayed not because of any fault or neglect or act or failure to act on the part of the Subcontractor or any of its officers, agents, servants or employees, then the Contractor, if it deems necessary, may direct the Subcontractor to work overtime, and if so directed, the Subcontractor shall work said overtime and the Contractor will pay the Subcontractor for such overtime in an amount equal to the actual additional wages paid, if any, at rates which have been approved in writing by the Contractor, plus taxes and other charges imposed by law on such additional wages required to be paid by the Subcontractor.

3.6 Whenever a Subcontractor requires overtime, whether behind schedule or not, it must be with the approval of the Contractor. The Subcontractor requiring the overtime must pay all cost including but not limited to electricians for temporary power and light, hoist/elevators operators, plumber, teamster, master mechanic maintenance engineer, etc. These costs will be deducted from the contract amount by the Contractor in a change order and from progress payments to the Subcontractor.

3.7 Work set forth in the Contract Documents for the Contract shall be commenced as stated in written Letter of Intent and shall be completed no later than the dates indicated in the Completion



3

MSDOCS/Projects/2200097/ Subagreements/ New Sub.doc

Schedule. Liquidated Damages may be assessed for each and every calendar day that the work is not complete.

## ARTICLE IV
## PRICE AND PAYMENTS

4.1    Subject to the terms herein stated, the amount to be paid by the Contractor to the Subcontractor for the satisfactory performance and completion of the Work and of all of the duties, obligations and responsibilities of the Subcontractor under this Agreement and the other Contract Documents shall be -------**Three million eight hundred twenty thousand ($3,820,000)** Dollars (hereinafter the "Price") subject to additions and deductions as herein provided.

The Price includes all Federal, State, County, Municipal and other taxes imposed by law and based upon labor, services, materials, equipment or other items acquired, performed, furnished or used by or levied or assessed with respect to the Work, including by not limited to sales, use and personal property taxes payable by or levied or assessed against the Owner, the Contractor or the Subcontractor. Where the law requires any such taxes to be stated and charged separately, the total price of all items included in the Work plus the amount of such taxes shall not exceed the Price.

4.2    Prior to commencement of Work the Subcontractor shall review and accept the pre-determined Trade Payment Breakdown items for their work. This contract payment breakdown included in the Contract Documents establishes the minimum level of detail required for the Subcontractor's invoices. It is understood and the Subcontractor acknowledges that this is an administrative tool for the purpose of illustrating a format and minimum level of detail required and shall not be considered as delineating the Subcontractor's Scope of Work. Further, the Subcontractor acknowledges that these cost distributions have been prepared using industry standard valuations, which, in the Contractors opinion, are reasonable, equitably balanced and correspond to the estimated quantities in the Contract Documents. The final acceptance of the Trade Payment Breakdown is at the sole discretion of the Owner.

No invoicing will be submitted by the Subcontractor which does not comply with the Trade Payment Breakdown. No payment shall be made by the Contractor to the Subcontractor until the entire Contract Payment Breakdown is approved by the Owner.

4.3  Subcontractor shall submit a monthly "draft" Trade Payment Breakdown by the 22nd of each month to Contractor which reflects the projected work in place on contract through 30th of the same month. Subcontractor shall be notified by Contractor of the acceptance/revision to values for submittal of final invoices by 1st of the following month.

***Within seven (7) days receipt of payment from Owner***, the Contractor shall make partial payment to the Subcontractor on the basis of the approved invoice, except that the Owner shall retain five percent (5%) of the amount of each said item.

Each monthly payment requisition must include Affirmative Action Form AAP 7.0, Contractor's Compliance Report, properly executed, as a condition precedent to requisition payment by the Contractor. Certified Payroll reports for the previous payment made must be submitted to the Contractor



MSDOCS/Projects/2200097/ Subagreements/ New Sub.doc

with each invoice. Failure to provide proper documentation will cause subcontractor invoices to be rejected.

In preparing invoices for partial payment, material delivered to the Site and Material stored off-site will not be taken into consideration. All costs related to the storage of materials are the sole responsibility of the Subcontractor. Payment will be made only upon installation of each item.

The Subcontractor agrees that if and when requested to do so by the Contractor, it shall furnish copies of any and all purchase orders to vendors, for material and equipment to be installed as part of the Work.

The Subcontractor agrees that if and when requested to do so by the Contractor, it shall furnish such additional information, evidence and substantiation as the Contractor may require with respect to the nature and extent of all obligations incurred by the Subcontractor for or in connection with the Work, all payments made by the Subcontractor thereon, and the amounts remaining unpaid, to whom and the reasons therefore.

The Subcontractor further agrees that it shall, as a condition precedent to entitlement to any payment, furnish to the Contractor waivers of lien, releases or any other documentation required by the Contractor, executed by all suppliers, materialmen, laborers or sub-subcontractors or anyone furnishing labor or materials for the work under this Subcontract.

4.4    After the Contractor has determined Substantial Completion of the Work, the Subcontractor shall submit for approval, a detailed estimate of the value of the known remaining items of Work as set forth by the Contractor and a schedule of completion for said items of Work. The Contractor shall review that estimate and make the final determination.

The Contractor when all the Work is substantially complete, shall pay to the Subcontractor the balance due the Contractor pursuant to the Contract, less:

    a. two (2) times the value of any remaining items of Work to be completed or corrected; and

    b. an amount necessary to satisfy any and all claims, liens or judgments against the Subcontractor.

As the remaining Work items are completed and accepted by the Owner, the Contractor shall pay the Subcontractor the appropriate amount pursuant to the duly completed and submitted monthly requisitions.

The list of remaining Work items may be expanded to include additional items of corrective or completion Work until final acceptance as certified by the Contractors execution of "Notification of Construction Completion." Appropriate payments may be withheld to cover the value of these items pursuant to this Section.

4.5 If any claim or lien is made or filed with or against the Contractor, the Owner, the Project or the Premises by any person claiming that the Subcontractor or any subcontractor or other person under it has failed to make payment for any labor, services, materials, equipment, taxes or other items or obligations furnished or incurred for or in connection with the Work, or if at any time there shall be



5

WAG 10

evidence of such nonpayment or of any claim or lien for which, if established, the Contractor or the Owner might become liable and which is chargeable to the Subcontractor, or if the Subcontractor or any subcontractor or other person under it causes damage to the Work or to any other work on the Project, or if the Subcontractor fails to perform or is otherwise in default under any of the terms or provisions of this Agreement or the other Contract Documents, the Contractor shall have the right to retain from any payment then due or thereafter to become due the Subcontractor an amount which it deems sufficient to (1) satisfy, discharge and/or defend against any such claim or lien or any action which may be brought or judgment which may be recovered thereon, (2) make good any such nonpayment, damage, failure or default, and (3) compensate the Contractor and the Owner for any and all losses, liability, damages, costs and expenses, including legal fees and disbursements, which may be sustained or incurred by either or both of them in connection therewith, and the Subcontractor shall indemnify and hold harmless the Contractor against the same.  The Contractor shall have the right to apply and charge against the Subcontractor so much of the amount retained as may be required for the foregoing purposes.  If the amount retained is insufficient therefore, the Subcontractor shall be liable for the difference and immediately upon notice pay the same to the Contractor

4.6  No payment (final or otherwise) made under or in connection with this Agreement shall be conclusive evidence of the performance of the Work or of this Agreement, in whole or in part, and no such payment shall be construed to be an acceptance of defective, faulty or improper work or materials, or shall it release the Subcontractor from any of its obligations under this Agreement; nor shall entrance and/or use by the Owner constitute acceptance of the Work or any part thereof.

4.7  The Subcontractor agrees that the Contractor shall be under no obligation to pay the Subcontractor for any work done on this Project, until and unless the Contractor has been paid therefore by the Owner, and the provisions hereof, stating the time of progress and final payments and the amount thereof are expressly contingent upon and made subject to the condition that the Contractor shall receive from the Owner progress or final payments of the amounts being claimed by the Subcontractor on account of work done by the Subcontractor on this Project.  The time when such payments shall be due the Subcontractor shall be postponed until the Contractor has received same from the Owner.  The Subcontractor further agrees and acknowledges that he relies primarily for payment for work performed on the credit and ability to pay of the Owner, and not on that of the Contractor and that the payment by the Owner to the Contractor for work performed by the Subcontractor shall be a condition precedent to any payment obligation of the Contractor to the Subcontractor.  The Subcontractor further agrees that the liability of the surety on the Contractor bond, if any, for payment to the Subcontract, is subject to the same conditions precedent as are applicable to the Contractor's liability for payment to the Subcontractor.  It is the intention of Contractor and Subcontractor that each shall bear the risk as to payments due them for their work, labor or services, that the Owner may unreasonably withhold payment and/or may be unable to make payment as a result of insolvency or otherwise.  This clause only controls the right of Subcontractor to receive payment from Contractor and Contractor's Surety (if any) but shall not impair any right of Subcontractor to enforce and foreclose upon any lien upon the Owner's property and/or upon any funds due from Owner to Contractor granted under any lien statute.  In accordance with New York Lien Law, Section 34, by agreeing to the terms of this clause Subcontractor is not waiving any rights to which it is entitled under the Lien Law.  To the extent that this clause could operate to limit or restrict the full extent of Subcontractor's lien rights, this clause is waived in that context only.  However, for all other purposes, this clause shall remain in full force and effect.



6

WAG 10

4.8  Without diminishing the provisions of laws, any and all funds payable to the Subcontractor hereunder are declared to constitute trust funds to be applied first by the Subcontractor to the payment of claims of subcontractors, architects, engineers, surveyors, laborers and materialmen arising out of the Work, to claims for utilities furnished and taxes imposed, and to the payment of premiums on surety bonds and other bonds filed and premiums on insurance accruing during the construction of the Work, before application to any other purpose.

ARTICLE V
DELAYS, EXTENSIONS OF TIME ETC;

5.1  The Subcontractor agrees that if it shall delay the progress of the Work so as to cause damage, of whatsoever kind or nature for which the Contractor shall suffer or become liable, the Subcontractor shall make good to the Contractor any such damages or costs (including legal fees) and indemnify and save the Contractor harmless from the same.  Any assent or permission of the Contractor to the delayed finishing of the Work shall not be construed as a waiver of this Agreement to make good any damage caused by such delay or default, nor shall it be a forfeiture of such damages.

5.2  In the event the Work of the Subcontractor is damaged, or should the Work of the Subcontractor be delayed or interfered with by any other subcontractor or other contractor on the Project, the Subcontractor and each such subcontractor or other contractor shall be directly responsible to the other, each shall look solely to the other for compensation, and the Subcontractor will not seek compensation or damages from the Contractor, by reason thereof. Contractor agrees to insert this clause in all subcontract agreements issued under this Contract.

5.3  Should the Subcontractor be obstructed or delayed in the commencement, prosecution or completion of the Work because of conditions not attributable to the Subcontractor and which by the terms of the Contract may be grounds for an extension of time, it shall, in full and complete compensation for said delay within twenty-four (24) hours thereafter, make claim to the Contractor in writing, for an extension of time, and the Contractor may award and certify the amount of additional time to be allowed, if any.  Said extension of time shall be the same as shall be allowed by the Owner to the Contractor under the Contract for said delay.  If the Subcontractor fails to furnish to the Contractor written notice in accordance with this paragraph, the Subcontractor agrees that it has waived any right to any such extension of time.  Where such delays are caused by the Owner, except to the extent any costs or claim for such delays are recognized and paid by the Owner under the Contract, the extension of time granted shall be Subcontractor's sole remedy.

5.4  The Subcontractor acknowledges that the Price is based on the fact that the Contractor is not liable for any damages or costs due to delays, accelerations, impact, non-performance, interferences with performance, suspension or changes in the performance or sequence of the Subcontractor's Work, even if the Contractor wrongfully denies an extension of time to the Subcontractor.  Thus, in no event shall the Contractor be liable to the Subcontractor for any damages caused by delay, acceleration, interferences, suspension, non-performance, or changes in the sequence of performance or impact upon, or with, the Work of the Subcontractor.  The Contractor shall have the right, at any time, to delay, accelerate or suspend the commencement or execution of the whole or any part of the Work herein contracted to be



7

done, or vary the sequence or performance thereof, without compensation to the Subcontractor other than extending the time for completing the Subcontractor's Work for a period equal to such delay or suspension. Progress schedules may from time to time be modified to conform to acceleration, delays, suspensions or variances and the Subcontractor shall conform its progress thereto. No allowance for time will be made to the Subcontractor for delay in preparing its submittals or in securing approval of the Architect when such submittals are not properly prepared for approval of the Architect.

5.5 In addition to the foregoing provisions of this Article, and not in limitation thereof, it is understood that, at the time of the execution of this Subcontract, the parties hereto are aware of the possibility of increases in the prices of labor or materials necessary to perform this Subcontract and/or the difficulty in obtaining same. It is accordingly understood that no claim shall be made by the Subcontractor for any increase in the Price herein even though it may be necessary to obtain materials from local warehouse stocks or otherwise in order to perform within the time required by the Contractor. The Subcontractor shall at no time claim that the Price was predicated on obtaining materials from any particular source of supply. If it be thereafter claimed that the Subcontractor finds that the price of labor and materials herein provided for has increased to any extent, for any reason whatsoever, including (but without limiting the generality of the source or causes of such possible increases) strikes, forced or voluntary agreements between employer and employee, present or future Federal, State, County or Municipal regulations, enactments, statutes, decrees, present or future codes, trade association agreements; whether the same be brought by statute, agreement or otherwise, freight rates, or any change of economic conditions whatsoever, it is understood that any and all risks of increase in the price of labor and materials have been contemplated by the Subcontractor and have been taken into full consideration in arriving at the Price. The Subcontractor shall at no time claim such increase even though the Subcontractor has been brought into a period of increased labor and material cost by reason of delays of the Contractor, any of its other subcontractors, the Owner or its representatives, or other independent contractors employed by the Owner, or for any cause whatsoever.

5.6 Should concealed conditions be encountered in the performance of the Work below the surface of the ground, or should concealed or unknown conditions be at variance with the conditions indicated or depicted by the Contract Documents, or should unknown physical conditions exist below the surface of the ground or should concealed or unknown conditions exist in an existing structure of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inherent in the work of the character provided for in this Agreement, be encountered, the Subcontractor shall remain obligated to continue to perform the Work in accordance with the terms of this Agreement, and except to the extent such claim is recognized by Owner under the Contract, Subcontractor shall not be entitled to an extension of contract time or payment of any additional amounts to perform the Work, notwithstanding the existence of such conditions, as the Subcontractor specifically assumes the risk of encountering any and all such concealed conditions.

5.7 Should the Subcontractor be delayed by general strikes or lockouts throughout the trade, then the time for the completion of the Work shall be extended for a period equivalent to the time lost, or the Contractor shall, at its option, have the right to terminate this Agreement and to employ other contractors to finish the Work and provide the materials therefore, and to pay the Subcontractor pro rata for materials and work already supplied, or the Price, reduced by previous payments made and the cost to the Contractor of completing the Work for which provision is made herein, whichever is less.



MSDOCS/Projects/2200097/ Subagreements/ New Sub.doc

WAG 10

5.8  If the Subcontractor notifies the Contractor, in writing, that another Subcontractor on the Site is failing to coordinate the work of said Contractor with the Work; the Contractor shall investigate the charge.  If the Contractor finds it to be true, the Contractor shall promptly issue such directions to the other Subcontractor.

ARTICLE VI
FREIGHT CHARGES AND SHIPMENT

6.1  The Subcontractor in making or ordering shipments shall not consign or have consigned materials, equipment or any other items in the name of the Contractor.  The Contractor is under no obligation to make payment for charges on shipments made by or to the Subcontractor but may, at its option, pay such charges, in which case the Subcontractor shall immediately upon presentation for payment reimburse the Contractor for the amount of such payment ~~plus a service charge of twenty-five (25) percent of the amount paid~~.

ARTICLE VII
DIMENSIONS AND CONTINGUOUS WORK

7.1  Notwithstanding the dimensions given on the plans, specifications and other Contract Documents it shall be the obligation and responsibility of the Subcontractor to take such measurements as will insure the proper matching and fitting of the Work covered by this Agreement with contiguous work.

7.2  The Subcontractor shall prepare and immediately upon receipt of an executed copy of this Agreement submit to the Contractor such shop drawings as may be necessary to describe completely the details and construction of the Work.  Approval of such shop drawings by the Contractor and/or the Architect shall not relieve the Subcontractor of its obligation to perform the Work in strict accordance with the Contract Documents, or of its responsibility for the proper matching and fitting of the Work with contiguous work.  If any shop drawing shows variation from the requirements of the Contract Documents because of standard shop practice or any other reason, Subcontractor shall make specific mention of such variation in his letter of transmittal to Contractor; otherwise Subcontractor will not be relieved of the responsibility for executing the work in accordance with the Contract Documents, even though such shop drawings have been reviewed or approved.  The review and/or approval of samples, shop drawings and details will be general and will not relieve Subcontractor from the responsibility for adherence to this Subcontract nor shall it relieve Subcontractor from the responsibility for any errors which may exist.

7.3  Should the proper and accurate performance of the Work hereunder depend upon the proper and accurate performance of other work not covered by this Agreement, the Subcontractor shall carefully examine such other work, determine whether it is in fit, ready and suitable condition for the proper and accurate performance of the Work hereunder, use all means necessary to discover any defects in such other work, and before proceeding with the Work hereunder, report promptly any improper conditions and defects to the Contractor in writing and allow the Contractor a reasonable time to have such improper conditions and defects remedied.



MSDOCS/Projects/2200097/ Subagreements/ New Sub.doc

WAG 101

*Schedule will then be modified to allow adequate duration for subcontractor to complete the work.*

Upon the commencement of such work by the Subcontractor, the Subcontractor shall have conclusively accepted such contiguous work as fit, ready and in a condition suitable and, sufficient for the proper and accurate performance of the Work hereunder.

7.4   The Subcontractor will provide all Layout and Engineering work required for the Work beyond two (2) axis lines and one (1) bench mark provided by the Contractor on grade.

ARTICLE VIII
INTERPRETATION OF PLANS AND SPECIFICATIONS

8.1   The Work hereunder is to be performed and furnished under the direction and to the satisfaction of both the Architect and the Contractor.   The decision of the Architect as to the true construction, meaning and intent of the plans and specifications shall be final and binding upon the parties hereto.   The Contractor will furnish to the Subcontractor such additional information and plans as may be prepared by the Architect to further describe the Work to be performed and furnished by the Subcontractor and the Subcontractor shall conform to and abide by the same.

The Subcontractor shall not make any changes, additions and/or omissions in the Work except upon written order of the Contractor as provided in Article IX hereof.

ARTICLE IX
CHANGES IN THE WORK

9.1   The Contractor reserves the right, from time to time, whether the Work or any part thereof shall or shall not have been completed, to make changes, additions and/or omissions in the Work as it may deem necessary upon written order to the Subcontractor.   The Subcontractor acknowledges and agrees that it shall make no claim for extra or additional compensation on account of any such work, unless same shall have been done pursuant to a written order, signed by the representative designated by the Contractor as having the authority to order such extra work.

9.2   For Change Order preparation, the following cost scenarios will be accepted:

A.      For Extra Work performed by the Subcontractor, whether a base cost is arrived at by estimated cost or actual cost method (as outlined), add to said base cost a sum equal to twenty percent.   See Exception- Paragraph "B".   See Example A.

Example A.
Base Cost                          $1,000
20% OH & P Allowance                  200.
Total                              $1,200.



WAG 10

B.   Markup Allowances on Major Equipment. (Examples; Switchgear, Transformers, Air Handling Units, Boilers, etc.)

For extra equipment purchases by Subcontractors which exceeds a base cost of Ten Thousand dollars ($10,000) in estimated or actual costs, add to the base cost for the benefit of the subcontractor a sum equal to ten percent of the first Ten Thousand dollars ($10,000) of the vendor base cost plus five percent of the next Ninety Thousand dollars ($90,000) of the vendor base cost, plus three percent of any sum in excess of One Hundred Thousand dollars ($100,000) of the vendors base cost. See Example B.

Example B
| | |
|---|---|
| Vendor Base Cost | $200,000. |
| 10% | |
| on First $10,000 Base Cost | 1,000. |
| 5% on Next $90,000 Base Cost | 4,500. |
| 3% on Base Cost over $100,000 | 3,000. |
| Total | $208,500. |

No allowance shall be made for extra work performed by a Subcontractor not under direct contract with the Contractor. No allowance shall be paid on the premium portion of overtime pay. Where the Extra Work involves both an increase and a reduction in similar or related Work, the overhead and profit allowance shall be applied only to the cost of the increase, which exceeds the cost of the reduction.

9.3  In the event that the Contractor directs the Subcontractor to perform any item of work, which the Subcontractor claims involves extra or additional work, it shall, within *seven (7) days* after receipt of such direction, and before proceeding therewith, make written claim to the Contractor, giving in detail the basis of its contention that the work is extra or additional, together with a detailed breakdown showing separately the additional cost of each item of labor and material. The Subcontractor shall then proceed with this work.

A failure to make written notice of claim within the time specified, and in the manner as herein provided, shall constitute a waiver of such claim and no recovery may be had by the Subcontractor, on account of the performance of such work.

The failure of the Subcontractor to perform this work, immediately after giving written notice of its claim, or on the *eighth (8th) day* subsequent to being directed to perform this work, whichever is less, shall constitute a material breach of this Agreement, regardless of the legitimacy of the Subcontractor's contentions, as it is specifically understood and agreed that the progress of the Work may not be delayed by reason of any controversy between the parties.

9.4  With respect to any item of work referred to in paragraph 9.3, upon the receipt of the Subcontractor's written notice of its claim, the Contractor may submit same to the Architect for his determination. The Subcontractor agrees to be bound by the determination of the Architect and will accept such payment, if any, as specified by the Architect, as full and final payment for all claims



WAG 10

submitted. Should the Architect determine that the work is not an extra, and awards no payment for such, or awards a partial payment for said claim, the Subcontractor agrees to accept said determination and payment as payment in full.

The Contractor, however, at its sole discretion, may appeal from any ruling or may institute suit for damages for extra work or contest any deduction or refusal to pay by the Owner for any reason which involves the Work of the Subcontractor. In that event, the Subcontractor shall pay the cost of appeal or suit, and shall render every assistance, without cost to the Contractor, in the prosecution of said appeal or suit. The Subcontractor shall otherwise be bound by the determination of the Owner; and/or its Architect; or in the event of an appeal or suit, by determination in said appeal or suit or by any settlement made by the Contractor, in good faith, at any time during the pendency of said appeal or suit. In the case of any recovery, the Subcontractor shall be entitled to those amounts allocated to its work, less overhead and profit to the Contractor and all expenses and attorneys fees incurred by the Contractor in prosecuting such appeal or suit.

The Subcontractor agrees that no claim, invoice or application for payment shall include any modifications to the Price, without an executed change order, pursuant to which such work is eligible for payment.

9.5  Where any additional work is ordered, the Subcontractor shall for such purposes, permit the Contractor to audit its books. The Subcontractor shall produce any and all data which the Contractor may request for the purpose of determining the correctness of the charges. The Subcontractor shall keep such full and detailed accounts as may be necessary to reflect its operations with respect to such changes and extras, and the system adopted shall be such as is satisfactory to the Contractor, the Contractor, their agents and employees, shall be afforded access at all reasonable time to the Subcontractor's and vendor's books, correspondence, instructions, receipts, vouchers, memoranda and records of all kinds, relating to all work under this Subcontract as well as to such changes and extras, and the Subcontractor shall preserve the same for a period of one year after final payment hereunder. In regard to the foregoing and generally, the Subcontractor hereby authorizes the Contractor to check directly with its suppliers of labor and materials the charges for such labor, materials and other items appearing in the Subcontractor's bills rendered to the Contractor, to confirm balances due and obtain sworn statements and waivers of lien.

9.6  Should the Subcontractor receive a bulletin, or pricing request, which it contends will involve additional work, if it is to perform the work identified in any of the foregoing documents, it shall submit its proposal to the Contractor within 7 days of receipt. It is agreed that if the Subcontractor does not submit such proposal within seven (7) days, then the Contractor may estimate the value of work to be performed by the Subcontractor and the Subcontractor will execute a subcontract change order for the Contractor's estimated value of work, if so directed by the Contractor.

9.7  In no event shall the terms of this Article impair or modify in any manner, or extend the liability of the Contractor to the Subcontractor, as set forth in Article V of this Agreement.

ARTICLE X
INSPECTION AND DEFECTIVE WORK



12

10.1  The Subcontractor shall at all times provide sufficient, safe and proper facilities for the inspection of the Work by the Contractor, the Architect and their authorized representatives in the field, at shops, or any other place where materials or equipment for the Work are in the course of preparation, manufacture, treatment or storage.   The Subcontractor shall, within twenty-four (24) hours after receiving written notice from the Contractor of any defective work, proceed to take down all portions of the Work and remove from the premises all materials whether worked or unworked, which the Architect or the Contractor shall condemn as unsound, defective or improper or as in any way failing to conform to this Agreement or the plans, specifications or other Contract Documents, and the Subcontractor, at its own cost and expense shall replace the same with proper and satisfactory work and materials and make good all work damaged or destroyed by or as a result of such unsound, defective, improper or nonconforming work or materials or by the taking down, removal or replacement thereof.  Removal and replacement by the Subcontractor as aforementioned shall constitute the Subcontractor's acknowledgment that the portion of the work removed was unsound, defective or improper or otherwise failed to conform to the Contract Documents.

ARTICLE XI
DEFAULT

11.1  Should the Subcontractor at any time refuse or neglect to supply sufficient skilled workmen or materials of the proper quality and quantity, or fail in any respect to prosecute the Work with promptness and diligence, or cause by any act or omission the stoppage or delay of or interference with or damage to the work of the Contractor or of any other contractors or subcontractors on the Project, or fail in the performance of any of the terms and provisions of this Agreement or of the other Contract Documents, or should the Architect determine that the Work or any portion thereof is not being performed in accordance with the Contract Documents, then in any of such events, each of which shall constitute a default hereunder on the Subcontractor's part, the Contractor shall have the right, in addition to any other rights and remedies otherwise provided by this Agreement and the other Contract Documents, or by law, after three (3) days written notice to the Subcontractor mailed or delivered to the last known address of the Subcontractor, (a) to perform and furnish through itself or through others any such labor or materials for the Work and to deduct the cost thereof from any monies due or to become due to the Subcontractor under this Agreement, and/or (b) to terminate the employment of the Subcontractor for all or any portion of the Work, enter upon the premises and take possession for the purpose of completing the Work, of all materials, equipment, scaffolds, tools, appliances and other items thereon, all of which the Subcontractor hereby transfers, assigns and sets over to the Contractor for and until the completion of such work, and to employ any person or persons to complete the Work and provide all the labor, services, materials, equipment and other items required therefore.  In case of such termination of the employment of Subcontractor, the Subcontractor shall not be entitled to receive any further payment under this Agreement until the Work shall be wholly completed to the satisfaction of the Contractor and the Architect and shall have been accepted by them, at which time, if the unpaid balance of the amount to be paid under this Agreement shall exceed the cost and expense incurred by the Contractor in completing the Work, such excess shall be paid by the Contractor to the Subcontractor; but if such cost and expense shall exceed such unpaid balance, then Subcontractor shall immediately upon receipt of notice of the amount thereof pay the difference to the Contractor.  Such cost and expense shall include, the cost of completing the Work to the satisfaction of the Contractor, the Owner and the Architect, and of performing and furnishing all labor, services, materials, equipment, and other items



13                MSDOCS/Projects/2200097/ Subagreements/ New Sub.doc

required therefor; a reasonable charge for the Contractor's overhead; and all losses, damages, costs and expenses, including legal fees and disbursements sustained, incurred or suffered by reason of or resulting from the Subcontractor's default.

11.2 The Subcontractor agrees that, if it delays the progress of work or breaches its guarantees of the Work so as to cause any damages (including direct, indirect, incidental, special and/or consequential) for which the Contractor shall suffer or become liable, it shall make good to and/or indemnify the Contractor against all such damages, including, but not limited to, paying the Contractor for the Subcontractor's share of any liquidated damages assessed against the Contractor under the terms of the General Contract to the extent caused or contributed to by the acts and omissions of the Subcontractor.

11.3 Should one or more other subcontracts, now or hereafter, exist between the Subcontractor and the Contractor, concerning this or any other construction project, then a breach by the Subcontractor of any subcontract may, at the option of the Contractor, be considered a breach of all subcontracts; and in that event, the Contractor may terminate any and all of the subcontracts so breached or may withhold monies due or to become due on any subcontracts and apply the same toward payment of any damage suffered on that or any other such subcontracts.

ARTICLE XII
LOSS OR DAMAGE TO WORK

12.1    Neither the Owner nor the Contractor shall be responsible for any loss or damage to the Work to be performed and furnished under this Agreement, however caused, until after final acceptance thereof by the Contractor and the Owner, nor shall the Contractor or the Owner be responsible for loss of or damages to materials, tools, equipment, appliances or other personal property owned, rented or used by the Subcontractor or anyone employed by it in the performance of the Work, however caused and all such risk of loss shall remain with Subcontractor.

Regardless of the provisions of the Contract or specifications, the Contractor will not be required to provide any watchman service or other security for the protection of the Subcontractor and will not, in any manner, be answerable or accountable for any loss or damage, including theft, that shall or may happen to the Work, or any part or parts thereof, or any of the materials or other things used or employed in finishing or completing the Work.

12.2    Subcontractor shall be responsible for cleaning and protection of the work in accordance with the Contract Documents.   This includes maintaining conditions, applying protective cover/wrappings, limiting construction traffic, repairing damaged finish, replacing any items subject to breakage, chipping, cracks, or damage in other ways due to construction activities of other contractors, natural causes, accidents, or acts of vandalism.  All work shall be protected and maintained throughout the project schedule for final inspections to establish date of Substantial Completion in each area of the project.

12.3  The Contractor or the Owner, if provided in the Contract Documents, shall effect and maintain fire insurance (with extended coverage, if specified or otherwise required) upon all work, materials and equipment incorporated in the Project and all materials and equipment on or about the



WAG 101

Premises intended for permanent use or incorporation in the Project or incident to the construction thereof, the capital value of which includes the cost of the Work, but not including any machinery, tools, equipment, appliances or other property owned, rented or used by the Subcontractor or anyone employed by it in the performance of the Work.

The total value of the property insurable under this paragraph, as shown on the approved monthly requisition provided for in Article IV, plus the total value of similar property incorporated in the Project or delivered on the Premises by or on behalf of the Subcontractor during the month but not included in said requisition, as reported by the Subcontractor to the Contractor for insurance purposes only, shall determine the total value of the Subcontractor's work, materials and equipment to be insured under this paragraph.

The maximum liability to the Subcontractor under such insurance shall be for no more than that proportion of any loss which the last reported value of the Subcontractor's insured property bore to the actual value of said property at the time of such last report, and in no event for more than the actual loss.

In the event of a loss under this paragraph, the Subcontractor shall be bound by any adjustment which shall be made between Contractor or the Owner and the insurance company or companies. Loss, if any, shall be made payable to the Contractor and/or the Owner, as their interests may appear, for the account of whom it may concern.

12.3 The Subcontractor shall also fully and adequately protect all adjoining private and public property and all existing work on the Project site insofar as the work referred to in this Subcontract is concerned.

ARTICLE XIII
CLEANING UP

13.1 The Subcontractor shall on a daily basis, in the sole discretion of the Contractor; and at the Subcontractor's own cost and expense, (1) keep the area of the premises in which the Work is being performed free at all times from all waste materials, packaging materials and other rubbish accumulated in connection with the execution of the Work by collecting and depositing daily said material and rubbish in locations as designated by the *Owner* from which it shall be removed by the *Construction Manager* from the Premises without charge, (2) clean and remove from its own work and from all contiguous work of others any soiling, staining, mortar, plaster, concrete or dirt caused by the execution of the Work and make good all defects resulting therefrom, (3) at the completion of its work in each area, perform such cleaning as may be required to leave the area "broom clean" and (4) upon the completion of the Work, remove all of its tools, equipment, scaffolds, shanties, trailers and surplus materials. Should the Subcontractor fail to perform any of the foregoing to the Contractor's satisfaction, the Contractor shall have the right after notice (written or oral) to perform and complete such work itself or through others and deduct the cost thereof from the final payment due the Subcontractor.

ARTICLE XIV
COMPLIANCE WITH LAW AND PERMITS

14.1 The Subcontractor shall obtain and pay for necessary permits and licenses pertaining to the Work and shall comply with all Federal, State, County and Municipal laws, ordinances, rules,



15    MSDOCS/Projects/2200097/ Subagreements/ New Sub.doc

WAG 101

regulations, orders, notices and requirements, including, among others, those relating to safety, discrimination in employment, fair employment practices or equal employment opportunity, and with the requirements of the American Insurance Association, whether or not provided for by the plans, specifications, general conditions or other Contract Documents, without additional charge or expense to the Contractor, and shall also be responsible to correct, at its own cost and expense, any violations thereof resulting from or in connection with the performance of the Work. The Subcontractor shall at any time upon demand furnish such proof as the Contractor may require showing such compliance and the correction of such violations. The Subcontractor agrees to save harmless and indemnify the Contractor from and against any and all loss, injury, claims, actions, proceedings, liability, damages, fines, penalties, costs and expenses, including legal fees and disbursements, caused or occasioned directly or indirectly by the Subcontractor's failure to comply with any of said laws, ordinances, rules, regulations, standards, orders, notices or requirements or to correct such violations, including but not limited to OSHA and municipal regulations.

Where the Contract Documents or any part thereof, conflict with law, codes, ordinances, rules, regulations, order, notices or requirements (collectively "Laws"), it is intended that Laws be followed. The Subcontractor shall at once report to the Contractor any inconsistency with any Laws prior to proceeding. The Subcontractor shall promptly notify the Contractor and any respective departments, or official bodies, when its work is ready for inspection and shall, at once, do all work required to remove any violations or to comply with such inspections, without additional charge to the Contractor. The Subcontractor shall perform all work necessary to obtain approval from all authorities and agencies without additional cost to the Contractor or the Owner.

14.2 Subcontractor will notify the Contractor of any and all hazardous material (as defined by OSHA or any State or local law, code or regulation) being brought to or stored at the Project five (5) days before same arrives at the job site and the length of time the material will remain at the Project and the manner in which it will be used and applied; so that all personnel on the site can be notified.

ARTICLE XV
LABOR, MATERIALS AND EQUIPMENT

15.1 The Subcontractor shall not employ persons, means, materials or equipment which or whose presence or performance on or at the Premises are likely to cause strikes, work stoppages or any disturbances by workmen employed by the Subcontractor, the Contractor or other contractors or subcontractors, on or in connection with any work on the Project. The Subcontractor agrees that all disputes as to jurisdiction of trades shall be adjusted in accordance with any plan for the settlement of jurisdictional disputes which may be in effect in the locality in which the Work is being done and that it shall be bound and abide by all such adjustments and settlements of jurisdictional disputes, provided that the provisions of this Article shall not be in violation of or in conflict with any provisions of law applicable to the settlement of such disputes. Should the Subcontractor fail to carry out or comply with any of the foregoing provisions, the Contractor shall have the right, in addition to any other rights and remedies provided by this Agreement or the other Contract Documents or by law, after three (3) days written notice mailed or delivered to the last known address of the Subcontractor, to terminate this Agreement or any part thereof or the employment of the Subcontractor for all or any portion of the Work, and, for the purpose of completing the Work, to enter upon the Premises and take possession, in



16

the same manner, to the same extent and upon the same terms and conditions as set forth in Article XI of this Agreement.

All Municipal, County, State and Federal anti-discrimination and right-to-work laws will be observed by the Subcontractor in the employment of all personnel at the Project.

15.2    The Work is to be done in the best manner and by persons skilled in the type of work to be performed. The Subcontractor shall give the Work constant attention and supervision through a responsible representative or superintendent, and any necessary assistants. Such representative shall be authorized to act for the Subcontractor in all matters relating to the Work, and all directions given him shall be as binding as if given to the Subcontractor. The Subcontractor shall also keep a competent foreman at the Project while work is in progress, and enforce strict discipline among its employees, including the Contractor's regulations with regard to fires, smoking and other hazards. The Contractor is given the right to require the Subcontractor to remove immediately any employee or agent of the Subcontractor employed at the Project whom the Contractor deems incompetent or a hindrance to the proper progress of the Work, and such person shall not again be employed in the Work without the prior written consent of the Contractor.

15.3    All materials and equipment are to be new and of the best quality of the kind specified, and the Subcontractor shall furnish satisfactory evidence of the kind and quality of materials and equipment. The Subcontractor shall obtain the manufacturer's written recommendation that the material and equipment is designed and appropriate for the use intended and shall furnish guarantees where such can be obtained. Such materials and equipment shall not be subject to any conditional bill of sale, security agreement, financing statement, chattel mortgage, or any other claim, lien or encumbrance. The Subcontractor shall, if required by the Contractor, cause the materials (l) to be manufactured in advance, (2) to be warehoused either at the factory or elsewhere, as directed by the Contractor, (3) to be delivered to the Project promptly when so instructed by the Contractor and (4) to be relocated or removed from the Project at the cost of the Subcontractor. Care must be exercised by the Subcontractor against overloading any parts of floors, roofs, scaffolding and other installations. All materials delivered to the Project which are to form a part of the Work herein specified shall not be removed without the consent of the Contractor, but the Subcontractor will have the right to and shall remove all its surplus materials after completion of the Work provided such material was not originally provided by the Contractor for the Subcontractor's safekeeping and installation.

15.4    Subcontractor acknowledges that this project is being performed under a Project Labor Agreement (PLA) and commits to being a signatory of said agreement. All on-site labor shall be paid in accordance with the current Prevailing Wage as included in the project documents.

15.5    The project Subcontractor may select any competent Sub-subcontractors to perform work on the Project, whether or not they have executed agreements with any Local Unions. The Project Subcontractor however shall ensure that all Sub-subcontractors working at the project either sign this Agreement or agree in writing to observe its terms. In addition, each selected Sub-subcontractor which is not already a signator ("non-signator Sub-subcontractors") shall sign appropriate Local Union Agreement(s) covering the craftpersons its employs on the project; the local Union Agreement, however,



17                MSDOCS/Projects/2200097/ Subagreements/ New Sub.doc

WAG 10

shall bind non-signator Sub-subcontractors only with respect to work they perform on the Project and shall not cover other work they perform in the Local Union's jurisdiction.

15.6    Shift work may be scheduled at the option of each Contractor, but must continue for at least five consecutive working days.  A shift premium shall be paid for any hours worked on a shift beginning after 3:00 p.m. at the premium amount specified in each Local Union Agreement that provides for shift work; or in the absence of a reference to shift work; at the premium rate of 14%

## ARTICLE XVI
## TAXES AND CONTRIBUTIONS

16.1    The Subcontractor for the Price herein provided for, hereby accepts and assumes exclusive liability for and shall indemnify, protect and save harmless the Contractor and the Owner from and against the payment of:

A.  all contributions, taxes, or premiums (including interest and penalties thereon) which may be payable under the Unemployment Insurance Law of any State, the Federal Social Security Act, Federal, State, County and/or Municipal Tax withholding laws, or any other laws, measured upon the payroll of or required to be withheld from employees, by whomsoever employed, engaged in the Work to be performed and furnished under this Agreement; and

B.  all sales, use, personal property and other taxes (including interest and penalties thereon) required by any Federal, State, County and Municipal law to be paid or collected by the Subcontractor or any of its subcontractors or vendors or any other person or persons acting for, through or under it or any of them, by reason of the performance of the Work or the acquisition, ownership, furnishing or use of any materials, equipment, supplies, labor, services or other items for or in connection with the Work; and

C.  all pension, welfare, vacation, annuity and other union benefit contributions payable under or in connection with labor agreements with respect to all persons, by whomsoever employed, engaged in the Work to be performed and furnished under this Agreement; and

D.  The Subcontractor's proportionate share of any and all other taxes imposed by any governmental body as a consequence of the Contractor's performance of the Contract other than Federal, State County and Municipal Income Taxes.

## ARTICLE XVII
## PATENTS

17.1    The Subcontractor hereby agrees to indemnify, protect and save harmless the Contractor and the Owner from and against any and all liability, loss or damage and to reimburse the Contractor and the Owner for any expenses, including legal fees and disbursements, to which the Contractor and the Owner may be put because of claims or litigation on account of infringement or alleged infringement of any letters patent or patent rights by reason of the Work or materials, equipment or other items used by the Subcontractor in its performance.



18

WAG 10

ARTICLE XVIII
MECHANIC'S LIENS

18.1 In the event that Subcontractor's subcontractors, material suppliers, and or employees or any party with whom it has entered into a relationship, files a mechanic's lien arising out of or in connection with the Work, labor or material which is included in this Agreement, the Subcontractor shall within two days after notice from the Contractor institute proceedings to cause same to be discharged, satisfied or bonded, and in default thereof, the Contractor shall have the right to bond said claim or otherwise discharge same and to retain, out of any payment then due, or thereafter to become due, an amount sufficient to completely indemnify itself and the Owner against such lien or other claim, with interest, together with the expense incident to discharging such lien, or claim, and the defense of any such suit to enforce such lien or other claim, including any premiums charged for any bond and all attorneys fees and disbursements incurred, all of which the Subcontractor agrees to pay to the Contractor. Should there prove to be any claim by a subcontractor or supplier of the Subcontractor after all payments have been made under this Agreement, the Subcontractor shall refund to the Contractor all monies that the later may be compelled to pay in discharge and/or defense of the claim. Any lien or other claim, until satisfied or withdrawn shall preclude any and all claim or demand for any payment whatsoever by the Subcontractor. The Subcontractor agrees to indemnify, protect and save harmless the Contractor and the Owner from and against any and all claims, actions, fines and penalties brought or imposed or judgments rendered thereon, or any loss, damages, liability, cost and expenses including legal fees and disbursements which the Contractor and/or the Owner may sustain or incur as a consequence of the Subcontractor's failure to comply with the terms of this Article.

18.2 The Subcontractor agrees to save harmless the Contractor from any and all claims arising out of its failure to comply with any provisions of this Agreement, and should any claims be presented to the Contractor by any suppliers, materialmen, subcontractors or provider of any goods and services, the Subcontractor shall, within ten (10) days after notification that said claim has been made, dispose of said claim to the final satisfaction of the Contractor. If after the said ten (10) day period, the Subcontractor has failed to dispose of said claim or claims, the Contractor shall have the right to dispose of said claims in any manner it sees fit. Should the resolution of such claim be contingent upon disbursement of funds to a claimant, the Contractor has the right to make disbursements to the claimant directly, or by a joint check payable to the Subcontractor and the claimant and deduct said payments from the monies due or to become due to the Subcontractor.

ARTICLE XIX
ASSIGNMENT AND SUBCONTRACTING

19.1 Neither this Agreement nor any monies due or to become due hereunder shall be assignable without prior written consent of the Contractor nor shall the whole or any part of the Work be subcontracted without like prior written consent. Any such assignment or subcontracting without such prior written consent shall be void and of no effect and shall vest no right or right of action in the assignee or subcontractor against the Contractor. The Contractor's consent to any assignment or subcontracting shall not relieve the Subcontractor of any of its agreements, duties, responsibilities or obligations under this Agreement and the other Contract Documents, and the Subcontractor shall be and



MSDOCS/Projects/2200097/ Subagreements/ New Sub.doc

WAG 102

remain as fully responsible and liable for the defaults, neglects, acts and omissions of its assignees and subcontractors and all persons directly or indirectly employed by them as it is for its own defaults, neglects, acts and omissions and those of its own officers, servants and employees. The Subcontractor shall bind each of its permitted sub-subcontractors to all of the terms, provisions and covenants of this Agreement and the other Contract Documents. The Contractor's consent to any subcontracting shall not be deemed to create any contractual or third party beneficiary relationship between the Contractor and any sub-subcontractor to whom the work or any portion thereof is subcontracted, and shall not vest any right of action in such sub-subcontractor against the Contractor or the Owner.

19.2  In selecting a Sub-Subcontractor or Supplier, the Subcontractor shall consider whether the firm appears on any list of entities debarred or suspended from doing business with a government entity, including the List of Parties Excluded from Federal Procurement and Nonprocurement Programs published by the U.S. General Services Administration.  The Subcontractor shall not retain any Sub-Subcontractor or Supplier on the List of Employers Ineligible To Bid On Or Be Awarded Any Public Contract, published by the New York State Department of Labor Bureau of Public Work.

19.3  Subcontractor agrees to enforce all the same contractual obligations and reporting requirements contained herein with any sub-subcontractor, supplier, or vendor who performs work on behalf of Subcontractor under this agreement.

## ARTICLE XX
## TERMINATION OF AGREEMENT

20.1  The Contractor shall have the right at any time upon three (3) day written notice to the Subcontractor, to terminate this Agreement and require the Subcontractor to cease work hereunder, in which case, provided the Subcontractor is not then in default, the Contractor shall indemnify the Subcontractor against costs directly resulting from such termination, except that the Subcontractor shall not be entitled to anticipated profits or overhead on work unperformed or on materials or equipment unfurnished, subject however to the limitations of paragraph 20.2.

20.2  The Contractor shall have the right, in the event of a termination of the Contract for any cause, at any time, to cancel this Agreement and require the Subcontractor to cease work thereon. In that event, the Contractor shall be liable only for the amount actually received by it for the work performed by the Subcontractor less the Contractor's appropriate share of said sums; and in no event shall the amount received by the Subcontractor be a greater sum than that which the Contractor obtains from the Owner whether such sum is received by reason of additions, omission or termination; and deducted therefrom shall be the Subcontractor's proportionate share of all expenses incurred by the Contractor (including litigation costs and attorneys fees, if any) and reasonable overhead and profit to the Contractor. The recovery, if any, by the Subcontractor shall be entirely conditioned upon the receipt of payment by the Contractor from the Owner. In the event of a deduction, the amount of the deduction taken by the Owner shall be binding upon the Subcontractor.

## ARTICLE XXI
## GUARANTEES



WAG 10

21.1   The Subcontractor hereby guarantees the Work to the full extent provided in the plans, specifications, general conditions, special conditions, and other Contract Documents.

The Subcontractor shall remove, replace and/or repair at its own expense and at the convenience of the Owner any faulty, defective or improper work, materials or equipment discovered within one (1) year from the date of the final acceptance of the Project as a whole by the Architect and the Owner or for such longer period as may be provided in the plans, specifications, general conditions, special conditions or other Contract Documents.  The Subcontractor shall commence such work within twenty-four (24) hours notice from the Contractor and in default thereof, the Contractor may proceed to perform such work at the expense of the Subcontractor.

Without limitation by the foregoing, the Subcontractor shall pay in addition for all damages to the Project resulting from defects in the Work and all costs and expenses necessary to correct, remove, replace and/or repair the Work and any other work or property which may be damaged in correcting, removing, replacing or repairing the Work.  This guarantee shall in no way limit the Subcontractor's liability for defective work, and Subcontractor and its bonding company shall indemnify and hold harmless the Contractor for all loss, liability, costs and damages attributable to any such defective work or error of performance by the Subcontractor.

ARTICLE XXII
ACCIDENT PREVENTION

22.1   The Subcontractor agrees that the prevention of accidents to workmen engaged upon or in the vicinity of the Work is its responsibility. The Subcontractor agrees to comply with all Federal, State, County and Municipal laws, ordinances, rules, regulations, codes, standards, orders, notices and requirements concerning safety as shall be applicable to the work, including, among others, the Federal Occupational Safety and Health Act of 1970, as amended, and all standards, rules, regulations and orders which have been or shall be adopted or issued thereunder, and with the safety standards established by the Contractor, during the progress of the Work.  When so ordered, the Subcontractor shall stop any part of the Work which the Contractor deems unsafe until corrective measures satisfactory to the Contractor have been taken, and the Subcontractor agrees that it shall not have or make any claim for damages growing out of such stoppages.  Should the Subcontractor neglect to take such corrective measures, the Contractor may do so at the cost and expense of the Subcontractor and may deduct the cost thereof from any payments due or to become due to the Subcontractor.  Failure on the part of the Contractor to stop unsafe practices shall in no way relieve the Subcontractor of its responsibility therefor.   The Subcontractor agrees to indemnify, protect, and save harmless the Contractor from any and all claims, actions, fines and penalties brought or imposed or judgments rendered thereon, and from and against any and all loss, damages, liability, costs and expenses, including legal fees and disbursements, which the Contractor and/or the Owner may sustain or incur in connection therewith.

22.2   The Subcontractor shall notify the Contractor of any injury to any one of its employees or any employee of one of its subcontractors on the day of the injury and provide a written description of the injury within three (3) days of the date of such injury.

22.3   Notwithstanding any other provision of this Subcontract, the Subcontractor acknowledges that it is ultimately responsible for all construction safety procedures and precautions under Federal,

WAG 102

State, County and Municipal law, and the Subcontractor shall hold, indemnify and save the Owner and the Contractor harmless from and against any and all claims or expenses resulting from any act taken by any employee of the Subcontractor, a sub-subcontractor, or any injury or damage caused by any unsafe or negligent act or occurrence resulting from the Work.

ARTICLE XXIII
INDEMNITY AND INSURANCE

23.1    To the fullest extent permitted by law, the Subcontractor hereby assumes entire responsibility and liability for any and all damage or injury of any kind or nature whatever (including death resulting therefrom) to all persons, whether employees of the Subcontractor or otherwise, and to all property, caused by, resulting from, arising out of or occurring in connection with the execution of the Work; and if any claims for such damage or injury (including death resulting therefrom) be made or asserted, whether or not such claims are based upon the Contractor's or the Owner's alleged active or passive negligence or participation in the wrong or upon any alleged breach of any statutory duty or obligation on the part of the Contractor or the Owner, the Subcontractor agrees to indemnify and save harmless the Contractor and the Owner, their officers, agents, servants and employees from and against any and all claims of any party, and further from and against any and all loss, cost, expense, liability, damage or injury, including legal fees and disbursements, that the Contractor or the Owner, their officers, agents, servants or employees may directly or indirectly sustain, suffer or incur as a result thereof or as the result, in whole or part, of Subcontractor's breach of contract, and the Subcontractor agrees to and does hereby assume, on behalf of the Contractor and the Owner, their officers, agents, servants and employees, the defense of any action at law or in equity which may be brought against the Contractor or the Owner, their officers, agents, servants or employees upon or by reason of such claims and to pay on behalf of the Contractor and the Owner, their officers, agents, servants and employees, upon demand, the amount of any judgment that my be entered against the Contractor and the Owner, their officers, agents, servants or employees in any such action. In the event that any such claims, loss, cost, expense, liability, damage or injury arise, or are made, asserted or threatened against the Contractor or the Owner, their officers, agents, servants or employees, the Contractor shall have the right to withhold from any payments due or to become due to the Subcontractor an amount sufficient in the Contractor's judgment to protect and indemnify it and the Owner and their officers, agents, servants and employees from and against any and all such claims, loss, cost, expense, liability, damage, or injury, including legal fees and disbursements, or the Contractor, in its discretion, may require the Subcontractor to furnish a surety bond satisfactory to the Contractor guaranteeing such protection, which bond shall be furnished by the Subcontractor within five (5) days after written demand has been made therefor.

23.2    Certificates of Insurance must be issued by all Subcontractor's and approved by the Contractor prior to the start of any work on site. Two (2) separate certificates must be issued; (1) Cauldwell Wingate Company, LLC., 380 Lexington Avenue, NY, NY 10168 as the certificate holder, and; (2) Dormitory Authority State of New York, 515 Broadway, Albany, NY 12207-2964 Attn: Risk Management unit, as the certificate holder. The description of operations block must include: DASNY Contract No. 1380909999, New Court Facilities, Bronx Criminal Court, and contain the following additional insureds:



22                    MSDOCS/Projects/2200097/ Subagreements/ New Sub.doc

WAG 102

1. Cauldwell Wingate Company, LLC
2. Dormitory Authority State of New York
3. City of New York
4. Bovis Lend Lease

The minimum insurance limits acceptable are:

Worker's Compensation/Employers Liability - in accordance with laws of the State of New York (certificate must be obtained from the Comp. Carrier). Any businesses located outside of New York State must include on the certificate in the description box:
"Coverage is extended to include all New York State employees in accordance with the
 New York State workers compensation law"
- Include all states endorsement, where applicable.
- All insurers shall agree to waive the right of subrogation against Owner and Contractor.

Commercial Liability and/or Contractors Liability - $2,000,000.00 per occurrence and $2,000,000.00 aggregate. With an Excess or Umbrella additional of not less than $3,000,000.00.
- Premises/Operations – must cover all work to be performed by Subcontractor and their Sub-subcontractors.
- Contractual Liability written specifically for this contract.
- Products/Completed Operations must include a two year extension beyond acceptance date.
- Broad Form Property Damage including completed operations.
- Independent Contractors.
- Blanket Explosion, Collapse & Underground Property Damage Liability.
- Employees as additional insureds.
- Supplemental payments in addition to limit of liability.
- Contractual exclusion pertaining to operations performed within 50' of railroad must be eliminated.
- Additional Insureds to be included on a primary basis.
- Any deductible clauses, exclusions or special endorsements must be approved by contractor prior to inclusion.
- Insuring agreement to read "to pay on behalf of".
- Waiver of subrogation for Owner, Contractor, its director, officers, employees, subsidiaries and affiliates
- Severability of interests (cross liability)
- Coverage shall not include any exclusions unacceptable to the Contractor and Owner.

Comprehensive Automobile Liability - Covering all owned, non-owned and hired vehicles including:
- LIMIT: $1,000,000 any one loss for Bodily Injury (including death) & Property Damage combined.
- Contractual Liability.
- All insurers agree to waive their rights of subrogation against Owner and Contractor, its directors, officers, employees, subsidiaries and affiliates.

When applicable, Subcontractor shall furnish evidence that is has provided Pollution Liability Insurance covering all lead and pollution operations with limits not less than $2,000,000 each occurrence



23

combined single limit for bodily injury, property damage and clean up-costs including completed operations (3 year continuation beyond acceptance), broad form contractual (including coverage for third party over claims), and independent contractors coverage. If policy contains a general aggregate, this aggregate must apply on a per project basis, all of which must be evidenced on certificate. Insurers agree to waive the rights of subrogation against additional insureds and the Contractor and its directors, officers, employees, subsidiaries, and affiliates.

- Defense costs must be payable in addition to limit of liability.
- Any deductibles, clauses, exclusions or special endorsements must be approved by Contractor prior to inclusion.
- Coverage must include on-site, off-site and in-transit exposures.
- Policy to read "to pay on behalf of" (in lieu of indemnify).
- Must include loading and unloading coverages.
- Must be written on occurrence form.
- Policy to be submitted to the Contractor for review and approval.

Insurance policies specified above shall be endorsed to name Owner and Contractor, its directors, officers, employees, subsidiaries and affiliates, as additional insureds, and shall stipulate that this insurance is primary , that any other insurance or self-insurance maintained by Owner and Contractor shall be excess only and shall not be called upon to contribute with this insurance.

The original certificates for both the liability and worker's compensation must be received at Contractors office prior to the scheduled start of work being performed, and be in affect for thirty (30) days after completion.

     23.3   The Subcontractor covenants and agrees that it shall not sublet any part of the work hereunder without requiring its subcontractors to purchase and maintain insurance policies and coverage required by the terms and conditions of paragraph 23.2.  The Subcontractor shall furnish satisfactory evidence that its subcontractors have purchased said insurance by causing a certificate of insurance to be furnished to the Contractor

     23.4   Compliance by the Subcontractor with the foregoing requirements as to the carrying of insurance and furnishing of certificates of insurance, shall not in any way relieve the Subcontractor from any liability or diminish its obligations under this Article or any other provision of this Agreement.

     23.5   Within twenty-four (24) hours of all accidents or occurrences resulting in injury to the Subcontractor's employees, or third parties or damage to property of another, the Subcontractor shall submit a written report, in a form acceptable to the Contractor.  When requested by the Contractor, the Subcontractor shall furnish the Contractor with a copy of any reports prepared for submission to the Subcontractor's insurance company.

     23.6   The Contractor, Subcontractor and their insurers do hereby waive any and all rights of subrogation against the Owner and each other to the extent of the insurance coverages provided hereunder.

ARTICLE XXIV
DISPUTE RESOLUTION



WAG 10

24.1  Except as provided in paragraph 24.2 below, any and all disputes arising out of and/or related to this Agreement and the performance of the Work at the Project, shall be decided solely in the state courts of the State of New York and venue in any such action must be placed in the County of New York.

24.2  In the event that a dispute exists between the Subcontractor and the Contractor arising out of and/or related to a modification of the Contract or any action by the Owner and/or the Architect and in the event that the Contractor actually commences an action or proceeding against the Owner, at any time whatsoever, then the dispute between the Contractor and the Subcontractor shall be decided in the same manner, location and forum as provided for in the Contract.  In the event that an action has been previously commenced by the Subcontractor against the Contractor, the Subcontractor agrees to withdraw such action, and participate in the action or proceeding then commenced by the Contractor against the Owner and/or Architect.  The Subcontractor agrees to participate in such action or proceeding and to present its own claim therein, through an attorney chosen by the Contractor, at the Subcontractor's own expense and to be bound by the decision rendered thereon.  The joinder of additional parties by the Contractor or the Owner, or the consolidation of such proceeding with another proceeding, shall in no manner invalidate or limit the provisions of this Article.  It is expressly understood that the purpose of this paragraph is to insure consistency in the resolution of disputes arising out of all work at the Project, in the event that the Contractor, *with mutual consent of Subcontractor and without wrongful denial of the subcontractor for their portion of the work,* commences an action against the Owner.  In no event shall the Contractor be liable to the Subcontractor for work performed or for any other cause whatsoever except to the extent that the Contractor may recover therefore, from the Owner.  In the event of such a recovery, the amount awarded to the Contractor on account of the Subcontractor's claim shall be paid to the Subcontractor less the Subcontractor's proportionate share of the expenses, costs and attorneys fees incurred by the Contractor in prosecuting the claim.  In addition thereto the Subcontractor's recovery shall be diminished by reasonable overhead and profit markup to the Contractor.

24.3  When this Agreement is signed by the Contractor, it is deemed executed and delivered in the State of New York and shall be construed in accordance with the Laws of the State of New York without any consideration being given to any principles of choice or conflict of laws.

ARTICLE XXV
INCONSISTENT TERMS

25.1  In the event there is any inconsistency between the specific terms of this Agreement and the terms of the Contract, general conditions or supplementary conditions, or any other Contract Document, or in the event that any right or obligation is modified or limited or altered by the terms of any other Contract Document, then the terms of this Agreement shall have precedence and govern unless, the Subcontractor shall have advised the Contractor, upon the execution of the Subcontract of such conflict or inconsistency in which event, the Contractor shall have the sole discretion to render an interpretation of and decision as to which Contract Document has precedence or, the Contractor may refer the matter to the Architect for an interpretation and decision.  In either event the decision of the Contractor or the Architect, shall be final, conclusive and binding upon the Subcontractor.



MSDOCS/Projects/2200097/ Subagreements/ New Sub.doc

ARTICLE XXVI
BONDS

26.1  If requested by the Contractor, at any time, either at the commencement of performance or at any time during performance of the Work, the Subcontractor shall furnish to the Contractor a performance bond in the amount of one hundred (100) percent of the Price and a separate payment bond in the amount of one hundred (100) percent of the Price, the form and contents of such bonds and the Surety or Sureties thereon to be satisfactory to the Contractor.

ARTICLE XXVII
CLAIMS BY THE SUBCONTRACTOR

27.1  Notwithstanding the fact that a dispute, controversy or question shall have arisen in the interpretation of any provision of this Agreement regarding the performance of any work, the delivery of any material, the payment of any monies to Subcontractor, or otherwise, the Subcontractor agrees that it will not directly or indirectly stop or delay any work or part of work required to be performed, or stop or delay the delivery of any materials required to be furnished hereunder, pending the determination of such dispute or controversy.

27.2  If Subcontractor is damaged by the act of the Owner, for which act the Contract affords benefits and remedies solely to Contractor, then Subcontractor shall be derivatively entitled to the benefits to be achieved by the pursuit of such remedies, as Subcontractor's interest may appear. Contractor shall not be required on behalf of Subcontractor to file any claim or take any action against any person other than Owner; nor to make any claim or take any action against any party whatsoever (including the Owner) that is not asserted in good faith.  It is agreed that the claim of Subcontractor against Contractor for the acts of the Owner is limited to the rights of Contractor against Owner and when such rights have been exhausted (subject to the provisions of this Subcontract), Subcontractor's claim automatically shall be deemed settled whether or not any recovery thereon shall be obtained.

27.3  No claims for increased costs, charges, expenses or damages of any kind shall be made by the Subcontractor against the Owner for any delays or hindrances from any cause whatsoever; provided that the Contractor, in the Owner's discretion, may compensate the Subcontractor for any said delays by extending the time for completion of the Work as specified in the Contract.

27.4  If the Subcontractor claims that any Work which the Subcontractor has been ordered to perform will be Extra Work, or that any action or omission of the Contractor is contrary to the terms and provisions of the Contract and will require the Subcontractor to perform Extra Work, the Subcontractor shall: File with the Contractor within fifteen (15) working days after being ordered to perform the Work claimed by the Subcontractor to be Extra Work or within fifteen (15) working days after commencing performance of the Work, whichever date shall be earlier, or within fifteen (15) working days after the said action or omission on the part of the Contractor occurred, a written notice of the basis of the Subcontractor's claim, including estimated cost, and request for a determination thereof.

ARTICLE XXVIII



WAG 10

**ENTIRE AGREEMENT**

28.1  No oral representations or other agreements or understandings have been made by the Contractor except as stated in this Agreement.  This Agreement may not be changed in any way except as herein provided, and no term or provision hereof may be waived by the Contractor except in writing signed by its duly authorized officer.  This agreement constitutes the entire negotiated Agreement between the parties hereto, the terms of which shall  not be construed against the Contractor as the drafter of this document.

28.2  The failure of the Contractor to insist in any one or more instances upon a strict compliance with any provision of this Agreement, or to exercise any option herein conferred, shall not be construed as a waiver or relinquishment of the right of the Contractor thereafter to require compliance with such provision or a waiver of the right of the Contractor thereafter to exercise such option, but such provision or option will remain in full force and effect.

28.3  In the event that any article, paragraph, term or condition of this Agreement is deemed to be invalid pursuant to any rule, regulation, law, ordinance, code, decision of any court having jurisdiction over the parties or for any reason whatsoever, previously or hereinafter enacted, all other articles, paragraphs, terms or conditions shall be unaffected thereby and remain in full force and effect.

28.4  The title of each Article is for convenience only.  No such title shall diminish, affect or alter any term or condition of this Agreement.

**ARTICLE XXIX**
**PROGRESS REPORTS TESTING AND INSPECTIONS**

29.1  The Subcontractor shall furnish daily progress reports of the Work, including status of materials or equipment, that may be in the course of preparation or manufacture.

29.2  In addition to the rights granted the Contractor by other provisions of this Subcontract, the Contractor shall have the right to inspect the progress of the work required to be performed in the Subcontractor's shop or places other than the site of the work.  To accomplish this, the Subcontractor shall, upon demand, furnish the Contractor with a list of all the Subcontractor's vendors.  If the Subcontractor's Work has not sufficiently progressed in the shop or elsewhere, either by reason of the failure on the part of the Subcontractor to (a) prepare and promptly progress the shop drawings and samples, if any, that are required hereunder; (b) expedite the approval of the shop drawings and samples, if any, in the office of the Owner's authorized representatives; (c) order raw or processed materials required for delivery either to the Subcontractor's shop for fabrication or to the site, as required, sufficiently in advance so as to avoid any possible delays in the performance of the Work; (d) properly process the fabrication in the Subcontractor's shop; (e) or otherwise; as a result of which the work in the field is likely to be delayed, the Contractor shall have all the rights set forth in Paragraph 11 hereof, irrespective of the condition of the work at the site of the construction, and irrespective of whether the Subcontractor may be of the opinion that the work in the field is not sufficiently advance to warrant the progress away from the site, of the construction or fabrication required by the Contractor.



MSDOCS/Projects/2200097/ Subagreements/ New Sub.doc

WAG 102

29.3  All materials and equipment used in the Work shall be subject to inspection and testing in accordance with accepted standards to establish conformance with specifications and suitability for uses intended unless otherwise specified in the Contract.  If any Work shall be covered or concealed without the approval or consent of the Contractor or Owner, said Work shall, if required by the Subcontractor, be uncovered for examination.  Any inspection by the Contractor or the Owner or by a testing laboratory on behalf of the Owner does not relieve the Subcontractor of the responsibility to maintain quality control of materials, equipment and installation to conform to the requirements of the Contract.  If any test results are below specified minimums, the Owner may order additional testing.  The cost of said additional testing, any additional professional services required, and any other expenses incurred as a result of said additional testing shall be at the Subcontractor's expense.  The Contractor may deduct such costs from moneys due the Subcontractor.

ARTICLE XXX
MISCELLANEOUS

30.1  The Subcontractor shall place and relocate his shanty when and where directed by the Contractor.  The Subcontractor is responsible for the acquisition, maintenance and removal of all utilities and telephone services required for their shanty.  All energy charges will be paid by the Subcontractor directly to the Electrical Subcontractor.

30.2  The Subcontractor shall comply with the Contractor's quality control plan and safety plan and shall at its own expense provide all temporary safety protection required at site and furnish his labor with all necessary safety equipment.

30.3  In the event that Contractor shall, during the course of the project, issue to Subcontractor any backcharge for work done or materials provided for the Subcontractor's account, or for any other reason whatsoever, and in the further event that the Subcontractor shall reject such backcharge in whole or in part, then the Subcontractor must notify Contractor in writing and within five (5) days of receipt thereof, setting forth in detail the grounds upon which the Subcontractor rejects the backcharge in whole or in part.  In the event the Subcontractor fails to so notify Contractor, then Subcontractor waives any right to contest said backcharge at any time in the future and that said backcharge shall be final and conclusive both as to liability and amount.

30.4  If, before Construction Completion, the Owner desires Beneficial Occupancy of the Work or any part thereof, which is completed or partly completed, or to place or install therein equipment and furnishings, the Owner shall have the right to do so, and the Subcontractor shall in no way interfere with or object to said Beneficial Occupancy by the Contractor.

Said Beneficial Occupancy (1) shall not constitute acceptance of space, systems, materials or elements of the Work, nor shall said Beneficial Occupancy affect the start of any guarantee period, and (2) shall not affect the obligations of the Subcontractor for Work which is not in accordance with the requirements of the Subcontract or other obligations of the Subcontractor under the Contract.

Should the Subcontractor request Contractor acceptance of any project system(s) related to the protection of life or property prior to Beneficial Occupancy or Construction Completion, the Contractor may accept such systems(s), however, the cost of maintaining such system(s) in operating condition, and labor costs



to operate the system(s) including costs for remote public safety personnel, shall be borne by the Subcontractor. The guarantee period will begin from the date of the Construction Completion.

The Subcontractor shall continue the performance of the Work in a manner which shall not unreasonably interfere with said use, occupancy and operation by the Contractor.

30.5  Subcontractor agrees to accept and execute the terms of performance under Owner policy of Certification of Non-Segregated Facilities, Non-discrimination in Employment in Northern Ireland, Compliance with the Federal Equal Employment Opportunity Act, and Commitment to Affirmative Action; And Acknowledgement of Notice Regarding Transfer of Offset Credits.

30.6  Affirmative action requirements – by incorporation of Project Documents, subcontractor agrees to conform with all requirements regarding participation goals and reporting of Minority/Women Owned Business Enterprises, Minority & Women Workforce Utilization, and local resident inclusion on this contract.   Be advised of the following:

| Percent of Total | Contract |
|---|---|
| Minority Business Enterprise Goal | 15% |
| Women's Business Enterprise Goal | 9% |

The goals stated above, for each contract, do not apply to bids of less than $100,000.

Percent of Total Work Force

| Minority & Women Work force Goal | |
|---|---|
| (for all Trades) | 35% |

30.7  The said parties, for themselves, their heirs, executors, administrators, successors and assigns, do hereby agree to the full performance of all of the terms and provisions herein contained.


IN WITNESS THEREOF, the parties have hereunto set their hands or caused this Agreement to be executed by their duly authorized officers as of the day and year first above written. This Agreement must be signed and returned to the Contractor at his address above no later than **December 31, 2003, 2003, 5PM** or otherwise may be rejected by the Contractor.



WAG 10

Cauldwell Wingate Company LLC, Contractor

By:    Susan L. Hayes
       President
Date: _____ *Vice President*
                            1/19/04

W.lliam A. Gross Consl. Assoc. Inc. , Subcontractor

By: _____ Mark Gross
     Title: _Vice president_

Dated: 12/30/03 _____

ATTESTED TO FOR SUBCONTRACTOR:

By: _____
    Title: _Secretary_

WAG  10

Exhibit I (Attachments)

(X)     Rider A, as executed by Subcontractor signed 7/22/03
(X)     Rider B, as executed by Subcontractor signed 5/13/03
(X)     Attachment C, Detailed Work description as per Purchase Order # **2200097-0035**.
(X)     Attachment D, CWC Project Safety Manual Dated January 15, 2003
(X)     Attachment E, Master Document List dated 8/19/02, 31 pages
(X)     Attachment F, Project Labor Agreement (PLA)
(X)     Attachment G, DASNY Sales Tax Exemption Clarification
(X)     Attachment H, Dormitory Authority Code Of Business Ethics Handbook

Other forms required for this project:

- Bronx Security ID Application Form
- Certification of Non-Segregated Facilities
- Contractors Monthly Compliance Report (M/WBE)
- EEO Tabulation Report
- MBE-WBE Utilization Summary
- Monthly Work Force Utilization Report
- NYS Business Enterprise Letter (Sample)
- Payroll Certification
- Six Month Workforce Utilization
- EEO Policy Statement
- Labor Rate Worksheets
- Signed Acknowledgement, CWC Safety Manual



WAG 10

# RIDER "A"
## ADMINISTRATIVE PROJECT ISSUES
### Bronx Criminal Courthouse, 161st Street, Bronx, NY
### Contract #9 – GC Fitout #2

**A)**    *We have reviewed the entire Document List dated August 19, 2002, 31 pages (attached) including addendums #1 thru #4 and understand our contract is based on any / all related work contained within these documents.*

**B)**    *We have reviewed and understand our contract will include the following administrative and standard on-site issues that we are responsible for over the entire project duration:*

1.    EEO Policy and affirmative Action Policy Statements.
2.    Pre-approval by DASNY Office of Opportunities and registered with the NYS DBS.
3.    Subcontractor responsible for locking and security of all equipment and materials on site.
4.    Subcontractor responsible to construct/power/sprinkler/remove their own Shanty if required and be relocated as directed by CWC.
5.    Compliance with all Insurance Requirements.
6.    Subcontractor to provide their own Site Safety Program and participate in the Safety and Security Procedures on site.
7.    Warranty clause of 1 year or as specified, and all applicable manuals and guarantees.
8.    Testing, Controlled Inspections, Reports, P.E. sign-offs, etc., for your work.
9.    Verification/Shop Drawings/Surveying/Layout as required for your work.
10.    Review & acceptance of Project Manual Specification Section #01010 – Summary of the Work. In this section, each subcontract shall include all related items under the designation entitled "Contract 9".
11.    Provide all samples, submittals, mock-ups, testing, etc., as designated.
12.    In work scope where electrical equipment/devices are being provided by subcontracts in "Contract 9", such items will be installed with wiring brought above the ceiling (or as designated) to a nearby junction box.
13.    Each subcontractor will protect their own work.
14.    Each subcontractor will place their debris in centralized container locations throughout each floor.
15.    All work is to be furnished and installed in accordance with all drawings, details and specifications. Include for all worst-case scenario's and conflicts between architectural versus engineering drawings and/or specifications.
16.    This Sub-Contractor is responsible for all items of work, which fall under the jurisdiction of their union(s) and trade(s).
17.    All items not listed as "work not included" in Rider "B" shall be deemed part of your trade work and subcontract.
18.    All scaffolding, planking and working platforms required for this Sub-Contractor's work shall be the responsibility of this Sub-Contractor. All scaffold and planking must comply with OSHA standards.
19.    This Sub-Contractor shall be responsible for furnishing, delivering, receiving, handling, rigging, installing, protecting and storing of all materials defined by the drawings, specs, this Rider and governed by his/her trade jurisdiction so that disputes are avoided. This includes pre-purchased equipment assigned to you, for which the subcontractor shall handle in such a manner as if they had purchased it themselves, including any necessary coordination including any misc. parts necessary to provide a complete and fully functional system.

M:\docs\projects\2200097\riders\Rider A

Page 1 of 2

# RIDER "A"
## ADMINISTRATIVE PROJECT ISSUES
### Bronx Criminal Courthouse, 161ˢᵗ Street, Bronx, NY
### Contract #9 – GC Fitout #2

20.  Work includes sealing of all penetrations in an approved, fire-rated manner.
21.  Includes all work per attached Rider "B".
22.  All changes in scope must be approved in writing prior to start of work.
23.  Subcontractor to provide sufficient on site field supervision and project management. This subcontractor to attend all meetings as required.
24.  All subcontractors to submit daily reports.
25.  All subcontractors shanties will be sub-metered for power consumption. Subcontractor to pay for usage.
26.  24 hour notice must be given for all deliveries.
27.  All subcontractor are responsible for flagmen as required for their trucking and deliveries.
28.  All deliveries are with Teamster drivers.
29.  Saturday work requires DOB Work Permits obtained by each subcontractor.
30.  Job site operates from 7:00 a.m. to 3:30 p.m. while teamsters operate from 8:00 a.m. to 4:30 p.m. *Contractors will be responsible for deliveries on overtime before 7:00 a.m. and after 4:30 p.m.*

C)  *We have reviewed and understand our contract will include the following financial requirements that we are responsible for over the entire project duration:*

1.   Bonding of Subcontractors (if required by CWC)
2.   Waivers from all your subs/vendors after each payment – before next payment.
3.   Subcontractor is responsible to purchase a master set of sepias and specification books for their own use.
4.   Provide Certified Payroll reports for the prior month with each new Requisition.
5.   The project is Tax Exempt, for both sales/use tax and capital improvement.
6.   Change Order mark-ups for all subcontractors will not exceed 20%. This percentage is configured by any combination of overhead, insurance, profit, etc. Change Order mark-ups for all major equipment purchases is 10% of the first $10,000 value only.
7.   All Change Orders will be submitted with highly detailed scope and complete financial breakdown information (labor hours, specific materials, mark-ups, etc.). No "lump sum" proposals will be accepted. All submissions to be broken down by floor as well. No Exceptions.
8.   Minority Business Enterprise Goals, 15% to subcontractors.
9.   Women Business Enterprise Goals, 9% to subcontractors.
10.  Disadvantage Workforce Utilization Goals (on-site personnel) 35% of total.
11.  Signator and compliance with the Project Labor Agreement (PLA).

_____          _____
Reviewed & Accepted – Signed                  Date
                                              7/22/03

_____          _____
Name (print)                                  Title
William A. Gross                              Pres/ml

# EXHIBIT B

Carol A. Sigmond, Esq. CS 2735
Dunnington, Bartholow & Miller LLP
477 Madison Avenue – 12th Floor
New York, New York 10017
(212) 682-8811

UNITED STATES DISTRICT OF NEW YORK
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

WILLIAM A. GROSS CONSTRUCTION,                     CASE NO. 07CV10639
ASSOCIATES, INC.,

                  Plaintiff,

                                    **Amended Complaint**

   -against-

AMERICAN MANUFACTURERS MUTUAL
INSURANCE COMPANY,

                 Defendant.

-------------------------------------------------------------------

     Plaintiff William A. Gross Construction Associates, Inc., by its undersigned attorney,

complaining of the defendant, upon information and belief, alleges:

Jurisdiction

1.    Jurisdiction is pursuant to 28 U.S.C. section 1332 and is based upon diversity of the

     parties: Plaintiff is a corporation formed and existing under the laws of the State of New

     York, having its principal place of business in New York and Defendant is an insurance

     company formed and existing under the laws of the State of Illinois, having its principal

     place of business in Illinois (and in no other state) and there is more than $75,000 in

     issue.

Venue

2.    Venue is pursuant to 28 U.S.C. section 1391 and is properly in this District by virtue of

1

the claims in issue having arisen in the County of the Bronx, State of New York.

Parties

3.     William A. Gross Construction Associates, Inc. (hereinafter "WAGCA") is a corporation

organized and existing under the laws of the State of New York, being located at 117

South Fourth Street, New Hyde Park, NY 11040 and is engaged from time to time as a

site work contractor.

4.     Defendant American Manufacturers Mutual Insurance Company (hereinafter "American

Manufacturers") is a company formed and existing under the laws of the state of Illinois,

located at 1 Kemper Drive, Long Grove, Illinois and at all times relevant hereto was

authorized to operate as a surety in New York by the New York State Superintendent of

Insurance.  Defendant American Manufacturers does not currently conduct any business

in New York and does not currently maintain an office for the issuance of insurance or

surety bonds in New York.  Defendant American Manufacturers is currently in run off in

anticipation of a final shut down of its operations.  See Exhibit B.

Other Entities

5.     Non party Cauldwell Wingate Company, LLC, (hereinafter "CWC") is a domestic limited

liability company having its principal place of business at 380 Lexington Avenue, New

York, NY.

6.     Non party New York State Dormitory Authority (hereinafter "DASNY") is a public

benefit corporation formed and existing under the laws of the State of New York.

Pursuant to a Memorandum of Understanding, DASNY acts as the developer of court

projects located in the City of New York for use by the Office of Court Administration as

2

courthouses.

Background

7.     Upon information and belief, on or about December 20, 2002, CWC entered into a

contract with DASNY known as General Construction No.2 – Fitout Work at Bronx

Criminal Court Complex, DA NO. 92561, 138099999/CR58 in the approximate sum of

$46,995,000.00 (hereinafter "Prime Contract.")   Plaintiff begs leave to refer to the true

original Prime Contract for the precise terms thereof.

8.      Upon information and belief, under the Prime Contract, CWC agreed to furnish and

install all labor, material and equipment necessary to fit out the Bronx Criminal Court

Complex (hereinafter "Project.")

9.     On or about December 27, 2002, Defendant American Manufacturers issued a Labor and

Material Payment Bond No. 3SE030676 naming itself as Surety, DASNY as Owner and

CWC as Contractor for the benefit of any "claimant:" claimant being defined as one who

furnished labor, material or equipment for the Project as a subcontractor, sub-

subcontractor or supplier to CWC under Prime Contract.  A true and correct copy of said

bond is annexed hereto as Exhibit A and is incorporated hereat as if fully set forth.

10.    At all times relevant hereto, WAGCA is a "claimant" under said Labor and Material

Payment Bond.

11.    Less than one year has expired from the time that CWC stop work on the Project and the

commencement of this Action.

12.    On or about January 4, 2004, WAGCA entered into a subcontract with CWC for the site

work and landscaping for the Project under the Prime Contract.  Plaintiff respectfully

3

asks to refer to the true original for the exact terms and conditions, and incorporates said document here as if fully set forth.

13.    The January 4, 2004 contract provided that CWC would pay WAGCA the sum of $3,820,000 for the work, labor and material called for under the subcontract and said subcontract excluded material for 298 stainless steel bollards from WAGCA's obligations.

14.    Between January 4, 2004 and July 31, 2007, CWC ordered additional work and deleted work: with the net effect of the changes to the work being to increase the value of the contract between CWC and WAGCA to $6,704,037.44.

15.    Between approximately October 2005 and July 2007, WAGCA substantially performed its subcontract work, including substantially completing the punch list and change orders directed by CWC.

16.    Plaintiff WAGCA substantially performed its work notwithstanding: CWC ordering it to work out of sequence on waterproofing; CWC omitting to provide accurate and timely information respecting the actual elevations of the Project; CWC omitting to provide compete and accurate design information timely; CWC ordering changes to the work; CWC not providing access to the site timely; CWC not providing access to work areas timely or fully, among other obstructions, impediments and disruptions to the Project.

17.    Specifically, WAGCA substantially completed; a) $4,111,558 of base contract work, leaving $3442 not done by reason of the failure of CWC to provide a design for the work in issue; b) $974,521.44 in changed and additional work; and c) $1,644,958 in disputed work generally consisting of labor and material escalation, disrupted sequence of work,

4

and extended supervision and administrative costs.

18.    To date, CWC has paid WAGCA the sum of $4,084,559.35 against the sum due of $6,704,037.44 leaving a balance due of $2,619,478.09.

19.    The sum due of $2,619,478.09 includes contract balance and $205,577.90 in retainage on completed work.

20.    The sum due of $2,619,478.09 excludes the Change Orders (hereinafter "CO"), Pending Change Orders (hereafter "PCO") Invoices, and Extra work orders processed and paid in full by CWC prior to July 31, 2007, but includes the 32 open change orders, pending change orders and extra work orders as set forth in paragraph 20 below.

21.

| Co No. | Description | Amount |
|---|---|---|
| 3/PCO 349 | Drain Cover/Protection/Planter Drains | $ 2,333.30 |
| 4/PCO 2428 | Plaza/Pavers/Light Weigh Fill | 196,544.29 |
| 10/PCO 431 | Increase for Non Slip Tread Nosing | 1,997.42 |
| 13 | Rigid Insulation/Stone Garden/JA Roof | 4,347.54 |
| 15/PCO 441 | Additional Work at Rock Garden | 17,026.28 |
| 20 | Supply/install ground cover at bike rack | 4,121.76 |
| 22 | Cutting Precast Pavers at electric lights | 16,034.05 |
| 23/PCO 355 & 240 | Changes to Stainless Steel Bollards | 204,556.45 |
| 24 | 4000 PSI concrete in lieu of 3200 PSI | 13,472.48 |
| 26 | Cast-in-Place add. Trench 12" wide | 32,257.00 |
| 27 | Add. wk per SK A 250 & 251 | 2,571.55 |
| 29 | Change Steel Face Curb/BPP | 5,537.80 |

5

| 31 | F&I Light Weight Fill at Breezeway | 17,855.00 |
|---|---|---|
| 32 | Open Trench Drain at Rain Pole | 2,094.00 |
| 36 | Remove & relocated Pre cast Panels per CWC | 906.11 |
| 37/PCO 1677 | Excavate Subgrade at sidewalk area | 77,485.39 |
| 38 | Early High Strength concrete | 496.00 |
| 40/Inv.108 | Add. labor for street restoration on E. 161/Morris | 2,425.58 |
| 41 | 2 Add. Lamp Foundations | 7,690.08 |
| 42 | Extra Wk TCO Walk through | 13,850.00 |
| 43 | Level & Shim Lift Slab | 19,866.31 |
| Inv. 104 | Asphalt on Sherman Ave. | 946.73 |
| Inv. 105 | Clean Up Driveway Area | 517.44 |
| Inv. 106 | Remove & replace broken stone @ bosque | 5,683.62 |
| Inv. 109 | Adjust Catch Basin & manholes @ various times | 1,855.58 |
| Inv. 110 | Obst. Temp. Fence on East 162/East 162 & Morris | 4,887.80 |
| Inv. 111 | Add. labor & equip. concrete rd. base on East 162 | 1,515.59 |
| Inv. 112 | Remove steps S. Side Bosque due to revised el'v. | 1,132.94 |
| CWC PCO 911R | Northside Redesign | 411,000.00 |
| CWC PCO 912 | Remove Contaminated Soil ($152,478.28) | 52,478.28 |
| CWC PCO 3296 | Trash Compactor Trenching | 6,513.96 |
| Flag Pole Credit | | (702.90) |

22.    The sum due of $2,619,478.09 includes $1,644,958 consisting of: escalated project

services -- $29,301; extended use of equipment -- $31,161; extended supervision --

6

$170,966; extended project administration -- $237,071; labor escalation -- $15,054; material escalation -- $179,301; additional work caused by waterproofing being installed by others out sequence -- $40,000; extended insurance -- $12,285; additional trucking -- $233,398; additional cost for top soil installation -- $59,555; and loss of productivity for concrete -- $362,706 all of which resulted from directives, instructions, actions and omissions to act on the part of CWC vis a vis Plaintiff WAGCA.

23.    In the documents provided by Plaintiff to Defendant American Manufacturers were copies of change orders, extra work tickets, directives and pending change orders signed by authorized representatives of CWC ordered Plaintiff to perform extra work or confirming that Plaintiff had performed extra work.  Specifically, CWC issued allowance and written authorization for WAGCA CO 4 in the sum of $196,544.29; WAGCA CO 15 in the sum of $17,026.28; WAGCA CO 26 in the sum of $33,893.82; WAGCA CO 31 in the sum of $17,855.65; and WAGCA CO 37 in the sum of $77,485.39 for a total due of $342,805.43.

24.    Furthermore, CWC has signed Extra Work orders or other documents admitting liability for: WAGCA CO 22 in the sum of $16,034.05; WAGCA CO 24 in the sum of $13,472.48; WAGCA CO 29 in the sum of $5,537.80; WAGCA CO 32 in the sum of $2,093.55; WAGCA CO 36 in the sum of $906.11; WAGCA CO 41 in the sum of $7,690.08; WAGCA CO 42 in the sum of $13,954.98; WAGCA CO 43 in the sum of $19,866.31; WAGCA Invoice No. 109 in the sum of $1,855.58; WAGCA Invoice No. 111 in the sum of $1,515.59; and CWC No. 919 in the sum of $6,513.96 for a total of $89,440.49

7

25. Furthermore, CWC signed its "Subs Change Order 009" and "Subs Change Order 012" in favor of WAGCA in the sums of $132,479 and $20,000 respectively.

26. Furthermore, DASNY's representative Bovis Lend Lease signed directives for work also signed by CWC and transmitted to WAGCA by CWC for: WAGCA CO 34 in the sum of $1,130.42; WAGCA CO 38 in the sum of $433.13; WAGCA CO 41 in the sum of $7,690.08; WAGCA CO 42 in the sum of $13,954.98; and WAGCA CO 43 in the sum of $19,866.31.

27. To date and after demand, CWC has not paid any part of the $2,619,478.09 currently due and owing to Plaintiff WAGCA.

28. To date, there have been no complaints of material deficiency or defect in any of the work, labor or materials provided by Plaintiff.

29. At all times relevant hereto, Plaintiff has equitably credited CWC and therefore Defendant American Manufacturers with costs of deleted or incomplete work.

30. On or about August 6, 2007, that being less than 30 days after Plaintiff last performed work at the Project and more than 90 days had passed without payment in full to WAGCA by CWC, and while CWC was still performing work at the Project, Plaintiff provided timely notice of its claim under the Payment Bond and copies of its agreement with CWC and its last requisition numbered 26, to Defendant American Manufactures together with CWC and the Project's owner, DASNY.

31. On or about August 8, 2007 and September 12, 2007 respectively, Defendant American Manufactures and DASNY acknowledged notice of WAGCA claims under the Defendant's Payment Bond.

8

32.  By letters dated August 28 and September 5, 2007, Plaintiff provided Defendant American Manufacturers with the documents the latter requested respecting Plaintiff's claim for the purpose of allowing Defendant to conduct an investigation of Plaintiff's claim.

33.  To date, Defendant American Manufacturers has not responded to Plaintiff rejecting Plaintiff's claim or paid Plaintiff all or any part of the outstanding sum due under the Payment Bond of $2,619,478.09.

34.  To date, Defendant American Manufacturers has not provided any objection to the evidence of CWC direction for extra work provided by Plaintiff WAGCA.

## COUNT 1 PAYMENT BOND ACTION AGAINST DEFENDANT AMERICAN MANUFACTURERS

35.  In its Labor and Material Payment Bond bearing number 3SE030676, Defendant American Manufacturers agreed to pay suppliers and material men to the extent not paid by CWC, including, without limitation, Plaintiff WAGCA., who furnished labor and material to and where said labor material was incorporated into the Project if notice was given within 90 days of the supplying the last item of material to the site and 30 days had passed without payment being made by its principal.

36.  Plaintiff WAGCA has complied with all conditions precedent including, without limitation, notice and time requirements under the said Payment Bond.

37.  By reason of the foregoing, Defendant American Manufacturers is liable to Plaintiff WAGCA in the sum of together with attorney fees for this action as provided by the State Finance Law and interest at the legal rate dating from July 31, 2007.

9

Wherefore the premises considered, Plaintiff William A. Gross Construction Associates, Inc., demands judgment against Defendant American Manufacturers Mutual Insurance Company as follows:

a. As to Count 1, against Defendant damages for breach of the Payment Bond in the sum of $2,619,478.09 together with pre judgment interest dating from July 31, 2007, and attorney fees for this action.;

b. As to Count 1, against Defendant attorney fees pursuant to State Finance Law section 137; and

c. As to all Counts against Defendant, costs, disbursements and interest, together with such other, further or different relief as the Court may deem just.

Dated: New York, NY
        December 10, 2007

        /s/ Carol A. Sigmond
        Carol A. Sigmond (CS 2735)
        Dunnington, Bartholow & Miller LLP
        Attorney for Plaintiff
        477 Madison Avenue B 12th Floor
        New York, NY  10022
        (212) 682-8811

# EXHIBIT A

# LABOR AND MATERIAL
# PAYMENT BOND



**DORMITORY AUTHORITY – STATE OF NEW YORK**

## LABOR AND MATERIAL PAYMENT BOND

Bond No. 3SE030676

KNOW ALL MEN BY THESE PRESENTS:

That    CAULDWELL WINGATE COMPANY, LLC

380 Lexington Avenue, 53rd Floor, New York, New York 10168

as Principal, hereinafter called CONTRACTOR, and

AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY

(Here insert the legal title of Surety)

Three Connell Drive, Berkeley Heights, New Jersey  07922-0608

(Address)

as Surety, hereinafter called Surety, are held and firmly bound unto the Dormitory Authority - State of New York, 515 Broadway, Albany, New York 12207, as Obligee, hereinafter called OWNER, in the amount of Forty-Six Million Nine Hundred Ninety-Five Thousand  and 00/100 Dollars ($46,995,000.00),

WHEREAS, CONTRACTOR has by written agreement dated December 20, 2002 entered into a Contract with OWNER for the General Construction #2 - Fitout Work at Bronx Criminal Court Complex, DA # 92561, 1380909999/CR58 in accordance with the Contract Documents and any changes thereto, which are made a part hereof, and are hereinafter referred to as the Contract.

NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION is such that if the CONTRACTOR shall promptly make payment to all claimants as hereinafter defined, for all labor and material used or reasonably required for use in the performance of the Contract, then this obligation shall be void; otherwise such obligation shall remain in full force and effect, subject, however, to the following conditions:

1.    A claimant is defined as one having a direct Contract with the CONTRACTOR or with a Subcontractor of the CONTRACTOR for labor, material, or both, used or reasonably required for use in the performance of the Contract, labor and material being construed to include that part of water, gas, power, light, heat, oil, gasoline, telephone service or rental of equipment directly applicable to the Contract.

2.    The above named CONTRACTOR and Surety hereby jointly and severally agree with the OWNER that every claimant as herein defined, who has not been paid in full before the expiration of a period of ninety (90) days after the date on which the last of such claimant's work or labor was done or performed, or materials were furnished by such claimant, may sue on this bond for the use of such claimant, prosecute the suit to final judgment for such sum or sums as may be justly due claimant, and have execution thereon.  The OWNER shall not be liable for the payment of any costs or expenses of any such suit.

1

3.    No suit or action shall be commenced hereunder by any claimant:

  a.    Unless claimant, other than one having a direct contract with the CONTRACTOR, shall have given written notice to any two (2) of the following: 1) the CONTRACTOR, 2) the OWNER, or 3) the Surety above named, within ninety (90) days after such claimant did or performed the last of the work or labor, or furnished the last of the materials for which said claim is made, stating with substantial accuracy the amount claimed and the name of the party to whom the materials were furnished, or for whom the work or labor was done or performed. Such notice shall be served by mailing the same by registered mail or certified mail, postage prepaid, in an envelope addressed to the CONTRACTOR, OWNER, or Surety, at any place where an office is regularly maintained by said CONTRACTOR, OWNER, or Surety for the transaction of business, or served in any manner in which legal process may be served in the State in which the aforesaid project is located, save that such service need not be made by a public officer.

  b.    After the expiration of one (1) year following the date on which CONTRACTOR ceased work of said Contract, however, if any limitation embodied in this bond is prohibited by any law controlling the construction hereof such limitation shall be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law.

  c.    Other than in a State court of competent jurisdiction in and for the county or other political subdivision of the State in which the project, or any part thereof, is situated, or in the United States District Court for the district in which the project, or any part thereof, is situated, and not elsewhere.

4.    The penal sum of this Bond is in addition to any other Bond furnished by the CONTRACTOR and in no way shall be impaired or affected by any other Bond.

5.    The amount of this Bond shall be reduced by and to the extent of any payment or payments made in good faith hereunder, inclusive of the payment by Surety of Mechanics' Liens which may be filed of record against said improvement, whether or not claim for the amount of such lien be presented under and against this Bond.

Signed this _____27th_____ day of _____December_____ 2002.

IN THE PRESENCE OF:

| CAULDWELL WINGATE COMPANY, LLC | AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY |
|---|---|
| (Contractor) | (Surety) |
| _____ | _____ |
| (Signature) | (Signature) |
| Susan L. Hayes, President | THERESA J. FOLEY, ATTORNEY-IN-FACT |
| (Title) | (Title) |
| 380 Lexington Avenue | Three Connell Drive |
| (Address) | (Address) |
| New York, New York 10168 | Berkeley Heights, New Jersey 07922 |
| (City, State, Zip) | (City, State, Zip) |
| (212) 983-7150 | (908) 286-5390 |
| (Telephone Number) | (Telephone Number) |
| (212) 983-7275 | (908) 286-5680 |
| (Facsimile Number) | (Facsimile Number) |

3

ACKNOWLEDGEMENT OF CONTRACTOR, IF A PARTNERSHIP, LIMITED LIABILITY
COMPANY OR INDIVIDUAL

STATE OF NEW YORK               )
                                ) ss:
COUNTY OF __NY__                )

On the __30th__ day of __December__ in the year __2002__, before me, the undersigned, a Notary Public in and for said State, personally appeared __Susan C. Hayes__ of **CAULDWELL WINGATE COMPANY, LLC,** personally known or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____                     PATRICK J. HARDY
Notary Public                            Notary Public, State of New York
                                               No. 31-5052980
                                          Qualified in New York County
                                       Commission Expires Dec. 11, 2005

ACKNOWLEDGEMENT OF SURETY

STATE OF NEW YORK               )
                                ) ss:
COUNTY OF __Nassau__            )

On the __27th__ day of __December__ in the year 2002 before me personally came _____ __THERESA J. FOLEY__ to me known, who, being by me duly sworn, did depose and say that (s)he resides at _____ __Levittown, NY__ _____, that (s)he is the __Attorney-In-Fact__ _____ of __AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY__, the corporation described in and which executed the above instrument; and that (s)he signed her/his name thereto by order of the Board of Directors of said corporation.

_____
Notary Public

                                               GLORIA LOYD
                                        Notary Public, State Of New York
                                               No. 01LO6057748
                                          Qualified in Queens County
                                       Commission Expires April 23, 20 03

4

# POWER OF ATTORNEY

Know All Men By These Presents:

That the Lumbermens Mutual Casualty Company, the American Motorists Insurance Company, and the American Manufacturers Mutual Insurance Company, corporations organized and existing under the laws of the State of Illinois, having their principal office in Long Grove, Illinois (hereinafter collectively referred to as the "Company") do hereby appoint
Fred Nicholson , Theresa J. Foley , Fern Perry , George O. Brewster , Gloria Loyd and Nancy Schnee
of JERICHO , NY (EACH)

* * * * * * * * * * * *

their true and lawful agent(s) and Attorney(s)-in-Fact, to make, execute, seal, and deliver from the date of issuance of this power for and on its behalf as surety, and as their act and deed:

Any and all bonds and undertakings

EXCEPTION:  NO AUTHORITY is granted to make, execute, seal and deliver any bond or undertaking which guarantees the payment or collection of any promissory note, check, draft or letter of credit.

This authority does not permit the same obligation to be split into two or more bonds in order to bring each such bond within the dollar limit of authority as set forth herein.

This appointment may be revoked at any time by the Company.

The execution of such bonds and undertakings in pursuance of these presents shall be as binding upon the said Company as fully and amply to all intents and purposes, as if the same had been duly executed and acknowledged by their regularly elected officers at their principal office in Long Grove, Illinois.

This Power of Attorney is executed by authority of resolutions adopted by the Executive Committees of the Boards of Directors of the Company on February 23, 1988 at Chicago, Illinois, true and accurate copies of which are hereinafter set forth and are hereby certified to by the undersigned Secretary as being in full force and effect:

"VOTED, That the Chairman of the Board, the President, or any Vice President, or their appointees designated in writing and filed with the Secretary, or the Secretary shall have the power and authority to appoint agents and attorneys-in-fact, and to authorize them to execute on behalf of the Company, and attach the seal of the Company thereto, bonds and undertakings, recognizances, contracts of indemnity and other writings, obligatory in the nature thereof, and any such officers of the Company may appoint agents for acceptance of process."

This Power of Attorney is signed, sealed and certified by facsimile under and by authority of the following resolution adopted by the Executive Committee of the Boards of Directors of the Company at a meeting duly called and held on the 23rd day of February, 1988:

"VOTED, That the signature of the Chairman of the Board, the President, any Vice President, or their appointees designated in writing and filed with the Secretary, and the signature of the Secretary, the seal of the Company, and certifications by the Secretary, may be affixed by facsimile on any power of attorney or bond executed pursuant to resolution adopted by the Executive Committee of the Board of Directors on February 23, 1988 and any such power so executed, sealed and certified with respect to any bond or undertaking to which it is attached, shall continue to be valid and binding upon the Company."

FK 09 75 (Ed. 09 01)              Page 1 of 2              Printed in U.S.A.

In Testimony Whereof, the Company has caused this instrument to be signed and their corporate seals to be affixed by their authorized officers, this November 22, 2002.

Attested and Certified:

Lumbermens Mutual Casualty Company
American Motorists Insurance Company
American Manufacturers Mutual Insurance Company

 

_John K. Conway_

John K. Conway, Corporate Secretary

_Gary J. Tully_

Gary J. Tully, Senior Vice President

STATE OF ILLINOIS      SS

COUNTY OF LAKE      SS

I, Maria I. Omori, a Notary Public, do hereby certify that Gary J. Tully and John K. Conway personally known to me to be the same persons whose names are respectively as Senior Vice President and Corporate Secretary of the Lumbermens Mutual Casualty Company, the American Motorists Insurance Company, and the American Manufacturers Mutual Insurance Company, Corporations organized and existing under the laws of the State of Illinois, subscribed to the foregoing instrument, appeared before me this day in person and severally acknowledged that they being thereunto duly authorized signed, sealed with the corporate seals and delivered the said instrument as the free and voluntary act of said corporations and as their own free and voluntary acts for the uses and purposes therein set forth.

```
"OFFICIAL SEAL"
MARIA I. OMORI
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 9/17/2003
```

_Maria I. Omori_

Maria I. Omori, Notary Public
My commission expires 9-17-03

CERTIFICATION

I, J. K. Conway, Corporate Secretary of the Lumbermens Mutual Casualty Company, the American Motorists Insurance Company, and the American Manufacturers Mutual Insurance Company, do hereby certify that the attached Power of Attorney dated November 22, 2002 on behalf of the person(s) as listed above is a true and correct copy and that the same has been in full force and effect since the date thereof and is in full force and effect on the date of this certificate; and I do further certify that the said Gary J. Tully, who executed the Power of Attorney as Senior Vice President, was on the date of execution of the attached Power of Attorney the duly elected Senior Vice President of the Lumbermens Mutual Casualty Company, the American Motorists Insurance Company, and the American Manufacturers Mutual Insurance Company.

IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed the corporate seal of the Lumbermens Mutual Casualty Company, the American Motorists Insurance Company, and the American Manufacturers Mutual Insurance Company on this ___27th___ day of ___December___, 20__02__.

  

_John K. Conway_

John K. Conway, Corporate Secretary

This Power of Attorney limits the acts of those named therein to the bonds and undertakings specifically named therein and they have no authority to bind the Company except in the manner and to the extent herein stated.

Home Office: Long Grove, IL 60049

FK 09 75 (Ed. 09 01)          Page 2 of 2          Printed in U.S.A.

AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY
FINANCIAL STATEMENT
DECEMBER 31, 2001

Assets

| | |
|---|---|
| Cash in banks | $ 21,687,239 |
| Bonds owned | 496,844,017 |
| Stocks | 3,045,074 |
| Premiums in course of collection | 140,743,624 |
| Accrued interest and other assets | 74,951,749 |
| Total | $737,271,703 |

Liabilities

| | |
|---|---|
| Reserve for losses and adjusting expenses | $329,394,911 |
| Reserve for unearned premiums | 100,522,301 |
| Reserve for taxes, expenses and other liabilities | 69,370,582 |
| Total | $499,287,794 |
| Surplus as regards policyholders | 237,983,909 |
| Total | $737,271,703 |

By _____      Attest _____
    Vice President of Accounting Services          Secretary

State of Illinois)
                 ) SS
County of Lake)


R. A. Daniel and J. K. Conway, being duly sworn, say that they are Vice President of Accounting Services and Secretary, respectively, of AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY, Illinois; that the foregoing is a true and correct statement of the financial condition of said company, as of December 31, 2001.


Subscribed and sworn to before me


On this 28th day of February, 2002


_____
Notary Public

"OFFICIAL SEAL"
ANGELA HANSEN
Notary Public, State of Illinois
My Commission Expires 2/18/04

# PERFORMANCE BOND



**DORMITORY AUTHORITY – STATE OF NEW YORK**

Bond No. 3SE030676

# PERFORMANCE BOND

KNOW ALL MEN BY THESE PRESENTS:

That    CAULDWELL WINGATE COMPANY, LLC

380 Lexington Avenue, 53rd Floor, New York, New York 10168

as Principal, hereinafter called CONTRACTOR, and

AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY

(Here insert the legal title of Surety)

Three Connell Drive, Berkeley Heights, New Jersey  07922

(Address)

as Surety, hereinafter called Surety, are held and firmly bound unto the Dormitory Authority - State of New York, 515 Broadway, Albany, New York 12207, as Obligee, hereinafter called OWNER, in the amount of Forty-Six Million Nine Hundred Ninety-Five Thousand    and 00/100 Dollars ($46,995,000.00) for the payment whereof CONTRACTOR and Surety bind themselves, their heirs, executors, administrators, successors and assigns, jointly and severally, firmly by these presents.

WHEREAS, CONTRACTOR has by written agreement dated December 20, 2002 entered into a Contract with OWNER for the General Construction #2 - Fitout Work at Bronx Criminal Court Complex, DA # 92561, 1380909999/CR58 in accordance with the Contract Documents and any changes thereto, which are made a part hereof, and are hereinafter referred to as the Contract.

1.    If the CONTRACTOR performs the Contract, the Surety and the CONTRACTOR shall have no obligation under this Bond, except to participate in conferences as provided in Subparagraph 2.1.

1

2.    If there is no OWNER default, the Surety's obligation under this Bond shall arise after:

    2.1    The OWNER has notified the CONTRACTOR, the Surety at its address described in Paragraph 8. below that the OWNER is considering declaring a CONTRACTOR in default.

    2.2    The OWNER has declared a CONTRACTOR in default and formally terminated the CONTRACTOR's right to complete the Contract.

    2.3    The OWNER has agreed to pay the Balance of the Contract Price to the Surety in accordance with the terms of the Contract or to a CONTRACTOR selected to perform the Contract in accordance with the terms of the Contract with the OWNER.

3.    When the OWNER has satisfied the conditions of Paragraph 2., the Surety shall, at the OWNER's option, promptly and at the Surety's expense take on the following actions:

    3.1    Arrange for the CONTRACTOR, with consent of the OWNER, to perform and complete the Contract; or

    3.2    Undertake to perform and complete the Contract itself, through its agents or through independent contractors; or

    3.3    Obtain bids or negotiated proposals from qualified contractors acceptable to the OWNER for a contract for performance and completion of the Contract, arrange for a contract to be prepared for execution by the OWNER and the CONTRACTOR selected with the OWNER's concurrence, to be secured with performance and payment bonds executed by a qualified Surety equivalent to the bonds issued on the Contract, and pay to the OWNER the amount of damages as described in Paragraph 5. in excess of the Balance of the Contract Price incurred by the OWNER resulting from the CONTRACTOR default.

4.    If the Surety does not proceed with reasonable promptness, the Surety shall be deemed to be in default on this Bond, and the OWNER shall be entitled to enforce any remedy available to the OWNER.

5.    After the OWNER has terminated the CONTRACTOR's right to complete the Contract, and if the Surety elects to act under Subparagraph 3.1, 3.2, or 3.3 above, then the responsibilities of the Surety to the OWNER shall not be greater than those of the CONTRACTOR under the Contract, and the responsibilities of the OWNER to the Surety shall not be greater than those of the OWNER under the Contract. To the limit of the amount of this Bond, but subject to commitment by the OWNER of the Balance of the Contract Price to mitigation of costs and damages on the Contract, the Surety is obligated without duplication for:

5.1     The responsibilities of the CONTRACTOR for correction of defective work and completion of the Contract;

5.2     Additional legal, design, professional, and delay costs resulting from the CONTRACTOR's Default, and resulting from the actions or failure to act of the Surety under Paragraph 3.; and

5.3     Liquidated Damages, or if no liquidated damages are specified in the Contract, actual damages caused by delayed performance or non-performance of the CONTRACTOR.

6.     The Surety shall not be liable to the OWNER or others for obligations of the CONTRACTOR that are unrelated to the Contract, and the Balance of the Contract Price shall not be reduced or set off on account of any such unrelated obligations. No right of action shall accrue on this Bond to any person or entity other than the OWNER or its heirs, executors, administrators or successors.

7.     The Surety hereby waives notice of any change, including changes of time, to the Contract or to related subcontracts, purchase orders, and other obligations.

8.     Notice of the Surety and the CONTRACTOR shall be mailed or delivered to the address shown on the signature page. Notice to the OWNER shall be mailed or delivered to the address shown in the preamble.

9.     Definitions:

9.1     Balance of the Contract Price: The total amount payable by the OWNER to the CONTRACTOR under the Contract after all proper adjustments have been made, including allowance to the CONTRACTOR of any amounts received or to be received by the OWNER in settlement of insurance or other claims for damages to which the CONTRACTOR is entitled, reduced by all valid and proper payments made to or on behalf of the CONTRACTOR under the Contract.

9.2     Contract: The agreement between the OWNER and the CONTRACTOR identified on the signature page, including all Contract Documents and changes thereto.

9.3     CONTRACTOR Default: Failure of the CONTRACTOR, which has neither been remedied nor waived, to perform or otherwise to comply with the terms of the Contract.

9.4     OWNER Default: Failure of the OWNER, which has neither been remedied nor waived, to pay the CONTRACTOR as required by the Contract or to perform and complete or comply with the other terms thereof.

The penal sum of this Bond is in addition to any other Bond furnished by the CONTRACTOR and in no way shall be impaired or affected by any other Bond.

Any suit under this Bond must be instituted before the expiration of two (2) years from the date on which Final Payment is made under this Contract.

Signed as of this _____ 27th _____ day of _____ December _____ 2002.


IN THE PRESENCE OF:


| | |
|---|---|
| CAULDWELL WINGATE COMPANY, LLC | AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY |
| (Contractor) | (Surety) |
| _____ | _____ |
| (Signature) | (Signature) |
| Susan L. Hayes, President | THERESA J. FOLEY, ATTORNEY-IN-FACT |
| (Title) | (Title) |
| 380 Lexington Avenue | Three Connell Drive |
| (Address) | (Address) |
| New York, New York  10168 | Berkeley Heights, New Jersey  07922 |
| (City, State, Zip) | (City, State, Zip) |
| (212) 983-7150 | (908) 286-5390 |
| (Telephone Number) | (Telephone Number) |
| (212) 983-7275 | (908) 286-5680 |
| (Facsimile Number) | (Facsimile Number) |

4

ACKNOWLEDGEMENT OF CONTRACTOR, IF A PARTNERSHIP, LIMITED LIABILITY
COMPANY OR INDIVIDUAL

STATE OF NEW YORK          )
                          ) ss:
COUNTY OF _____           )

On the _____ day of _____ in the year 2002, before me, the undersigned, a Notary Public in and for said State, personally appeared _Susan L. Hayes_ of **CAULDWELL WINGATE COMPANY, LLC**, personally known or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public

PATRICK J. HARDY
Notary Public, State of New York
No. 31-5052980
Qualified in New York County
Commission Expires Dec. 11, 2005

ACKNOWLEDGEMENT OF SURETY

STATE OF NEW YORK          )
                          ) ss:
COUNTY OF _____ Nassau    )

On the _27th_ day of _December_ in the year 2002 before me personally came THERESA J. FOLEY _____ to me known, who, being by me duly sworn, did depose and say that (s)he resides at _Levittown, NY_ _____, that (s)he is the _Attorney-In-Fact_ of AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY, the corporation described in and which executed the above instrument; and that (s)he signed her/his name thereto by order of the Board of Directors of said corporation.

_____
Notary Public

GLORIA LOYD
Notary Public, State Of New York
No. 01LO6057748
Qualified In Queens County
Commission Expires April 23, 20 03

5

# POWER OF ATTORNEY

Know All Men By These Presents:

That the Lumbermens Mutual Casualty Company, the American Motorists Insurance Company, and the American Manufacturers Mutual Insurance Company, corporations organized and existing under the laws of the State of Illinois, having their principal office in Long Grove, Illinois (hereinafter collectively referred to as the "Company") do hereby appoint
Fred Nicholson , Theresa J. Folley , Fern Perry , George O. Brewster , Gloria Loyd and Nancy Schnee
of JERICHO , NY (EACH)


* * * * * * * * * * * *

their true and lawful agent(s) and Attorney(s)-in-Fact, to make, execute, seal, and deliver from the date of issuance of this power for and on its behalf as surety, and as their act and deed:

Any and all bonds and undertakings

EXCEPTION:   NO AUTHORITY is granted to make, execute, seal and deliver any bond or undertaking which guarantees the payment or collection of any promissory note, check, draft or letter of credit.

This authority does not permit the same obligation to be split into two or more bonds in order to bring each such bond within the dollar limit of authority as set forth herein.

This appointment may be revoked at any time by the Company.

The execution of such bonds and undertakings in pursuance of these presents shall be as binding upon the said Company as fully and amply to all intents and purposes, as if the same had been duly executed and acknowledged by their regularly elected officers at their principal office in Long Grove, Illinois.

This Power of Attorney is executed by authority of resolutions adopted by the Executive Committees of the Boards of Directors of the Company  on February 23, 1988 at Chicago, Illinois, true and accurate copies of which are hereinafter set forth and are hereby certified to by the undersigned Secretary as being in full force and effect:

"VOTED, That the Chairman of the Board, the President, or any Vice President, or their appointees designated in writing and filed with the Secretary, or the Secretary shall have the power and authority to appoint agents and attorneys-in-fact, and to authorize them to execute on behalf of the Company, and attach the seal of the Company thereto, bonds and undertakings, recognizances, contracts of indemnity and other writings, obligatory in the nature thereof, and any such officers of the Company may appoint agents for acceptance of process."

This Power of Attorney is signed, sealed and certified by facsimile under and by authority of the following resolution adopted by the Executive Committee of the Boards of Directors of the Company at a meeting duly called and held on the 23rd day of February, 1988:

"VOTED, That the signature of the Chairman of the Board, the President, any Vice President, or their appointees designated in writing and filed with the Secretary, and the signature of the Secretary, the seal of the Company, and certifications by the Secretary, may be affixed by facsimile on any power of attorney or bond executed pursuant to resolution adopted by the Executive Committee of the Board of Directors on February 23, 1988 and any such power so executed, sealed and certified with respect to any bond or undertaking to which it is attached, shall continue to be valid and binding upon the Company."

In Testimony Whereof, the Company has caused this instrument to be signed and their corporate seals to be affixed by their authorized officers, this November 22, 2002.

Attested and Certified:

Lumbermens Mutual Casualty Company
American Motorists Insurance Company
American Manufacturers Mutual Insurance Company

_John K. Conway_

John K. Conway, Corporate Secretary

_Gary J. Tully_

Gary J. Tully, Senior Vice President

STATE OF ILLINOIS      SS

COUNTY OF LAKE      SS

I, Maria I. Omori, a Notary Public, do hereby certify that Gary J. Tully and John K. Conway personally known to me to be the same persons whose names are respectively as Senior Vice President and Corporate Secretary of the Lumbermens Mutual Casualty Company, the American Motorists Insurance Company, and the American Manufacturers Mutual Insurance Company, Corporations organized and existing under the laws of the State of Illinois, subscribed to the foregoing instrument, appeared before me this day in person and severally acknowledged that they being thereunto duly authorized signed, sealed with the corporate seals and delivered the said instrument as the free and voluntary act of said corporations and as their own free and voluntary acts for the uses and purposes therein set forth.

"OFFICIAL SEAL"
MARIA I. OMORI
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 9/17/2003

_Maria I. Omori_

Maria I. Omori, Notary Public
My commission expires 9-17-03

CERTIFICATION

I, J. K. Conway, Corporate Secretary of the Lumbermens Mutual Casualty Company, the American Motorists Insurance Company, and the American Manufacturers Mutual Insurance Company, do hereby certify that the attached Power of Attorney dated November 22, 2002 on behalf of the person(s) as listed above is a true and correct copy and that the same has been in full force and effect since the date thereof and is in full force and effect on the date of this certificate; and I do further certify that the said Gary J. Tully, who executed the Power of Attorney as Senior Vice President, was on the date of execution of the attached Power of Attorney the duly elected Senior Vice President of the Lumbermens Mutual Casualty Company, the American Motorists Insurance Company, and the American Manufacturers Mutual Insurance Company.

IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed the corporate seal of the Lumbermens Mutual Casualty Company, the American Motorists Insurance Company, and the American Manufacturers Mutual Insurance Company on this ___27th___ day of ___December___, 20__02_

  

_John K. Conway_

John K. Conway, Corporate Secretary

This Power of Attorney limits the acts of those named therein to the bonds and undertakings specifically named therein and they have no authority to bind the Company except in the manner and to the extent herein stated.

Home Office: Long Grove, IL 60049

FK 09 75 (Ed. 09 01)                Page 2 of 2                Printed in U.S.A.

## AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY
## FINANCIAL STATEMENT
### DECEMBER 31, 2001

**Assets**

| | |
|---|---:|
| Cash in banks | $ 21,687,239 |
| Bonds owned | 496,844,017 |
| Stocks | 3,045,074 |
| Premiums in course of collection | 140,743,624 |
| Accrued interest and other assets | 74,951,749 |
| | |
| Total | $737,271,703 |

**Liabilities**

| | |
|---|---:|
| Reserve for losses and adjusting expenses | $329,394,911 |
| Reserve for unearned premiums | 100,522,301 |
| Reserve for taxes, expenses and other liabilities | 69,370,582 |
| | |
| Total | $499,287,794 |
| | |
| Surplus as regards policyholders | 237,983,909 |
| | |
| Total | $737,271,703 |

By _____    Attest _____
Vice President of Accounting Services             Secretary

State of Illinois)
        ) SS
County of Lake)

R. A. Daniel and J. K. Conway, being duly sworn, say that they are Vice President of Accounting Services and Secretary, respectively, of AMERICAN MANUFACTURERS MUTUAL INSURANCE COMPANY, Illinois; that the foregoing is a true and correct statement of the financial condition of said company, as of December 31, 2001.

Subscribed and sworn to before me

On this 28th day of February, 2002

_____
Notary Public

"OFFICIAL SEAL"
ANGELA HANSEN
Notary Public, State of Illinois
My Commission Expires 2/18/04

# EXHIBIT B





► Policy Cancellations

► File A Claim

► List of Companies

► Run-off Contacts

► Media Contacts

► Financial Information

► Job Opportunities

**List of Companies**

As of January 1, 2007, Kemper Insurance Companies in the U.S. included Lumbermens Mutual Casualty Company and its affiliated property and casualty insurers:

- American Manufacturers Mutual Insurance Company
- American Motorists Insurance Company
- Kemper Casualty Insurance Company
- Kemper Lloyds Insurance Company
- Specialty Surplus Insurance Company

---

© 2007 - Lumbermens Mutual Casualty Co | Terms and Conditions of Use | Privacy Policy | Internet Privacy Policy
Kemperinsurance.com is best viewed  using Internet Explorer version 5.0 or higher or Netscape version 6.0 or higher.





| | | | |
|---|---|---|---|
| **Run-Off Contact Information** | **List of Companies** | **Policy Cancellations** | **File A Claim** |

**File A Claim**

**File A Claim**

As an organization in run off, the Kemper Insurance Companies substantially ceased issuing new policies in the spring of 2003. Policyholder claims are being handled under the terms of the existing policies. Most of Kemper's claim handling has been outsourced to unaffiliated third-party administrators.

**Claims on policies issued by Specialty National Insurance Company or Specialty Surplus Insurance Company**

Specialty National and Specialty Surplus were part of Kemper's "Kempes" unit formerly based in Scottsdale, Arizona. If you have a claim on any policies underwritten by Specialty National or Specialty Surplus, please contact Network Adjusters at 1-877-533-1211.

**Claims on policies issued by Eagle Pacific Insurance Company or Pacific Eagle Insurance Company**

If you have a claim on any policies originally underwritten by Eagle Pacific Insurance Company or Pacific Eagle Insurance Company, please contact SeaBright Insurance Company at 1-800-372-2255.

**Workers' compensation, commercial auto and premises and products liability claims**

Most workers' compensation, commercial auto and premises and products liability claims (standard forms) are being handled by Broadspire Services, Inc. Questions about medical bill review and medical case management should also be addressed to Broadspire. Broadspire's staff includes many of the same people who had been part of Kemper's former claims handling operation which was sold to Broadspire's parent, Platinum Equity, in July 2003. If you have a workers' compensation, commercial auto or premises and products liability claim (other than on policies issued by the Specialty or Eagle operations noted above), please contact Broadspire at:

Phone: 1-800-753-6737
Fax: 1-800-245-9927
Email: nol@choosebroadspire.com
Website: www.choosebroadspire.com

To expedite the process, please complete your claim form (link to WC and auto forms) and fax or email it to Broadspire.

**Commercial property and specialty liability claims**

Please contact Kemper's customer relations unit for commercial property claims on Kemper policies (other than those issued by the Specialty or Eagle operations noted above), as well as specialty liability claims, including:
- Environmental
- Directors and officers

- Professional liability
- Excess casualty
- Construction defect
- Malpractice
- Intellectual property
- Other non-standard liability

Phone: 1-847-320-3237 or 1-800-833-0355
Fax: 1-847-320-2228
Email: corprel@kemperinsurance.com
Website: www.kemperinsurance.com

**Personal lines claims**

Kemper sold its personal lines business to Unitrin, Inc in 2002. Whether your Kemper Auto and Home policy was issued by a Kemper company or Unitrin, please contact Unitrin representatives at:

Phone: 1-888-252-2799
Website: www.kemperautoandhome.com

© 2007 - Lumbermens Mutual Casualty Co | Terms and Conditions of Use | Privacy Policy | Internet Privacy Policy
Kemperinsurance.com is best viewed  using Internet Explorer version 5.0 or higher or Netscape version 6.0 or higher.

**EXHIBIT C**

| | BREAKDOWN'S CWC GAVE TO WAGCA WITH AMOUNTS & PERCENT | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | QTY CWC | CWC BREAKDOWN TO DASNY | % CHANGE | $ CHANGE | CWC ORIGINAL WITH OUT | % CHANGE | $ CHANGE | CWC WITH LANDSCAPE | $ CHANGE | CWC WITH $295,000.00 08/04 | $ CHANGE | CWC 12/31/2005 | $ CHANGE | CWC 01/31/2006 |
| 2438 | Concrete Footing for Fixed Bollard including excavation & backfill | LABOR | 307 EA | $120,000.00 | 27.1% | $44,518.00 | $164,518.00 | -22.4% | ($9,871.00) | 154,647.00 | $12,705.00 | 167,352.00 | ($60,148.00) | $107,204.00 | $0.00 | $107,204.00 |
| 2439 | Concrete Footing for Fixed Bollard including excavation & backfill | MATERIAL | 307 EA | $29,660.00 | -13.9% | ($3,611.00) | $26,049.00 | -21.1% | ($1,563.00) | 24,486.00 | $2,011.00 | 26,497.00 | $0.00 | $26,497.00 | $0.00 | $26,497.00 |
| 2440 | Concrete Footing for Flagpole including excavation & hardware | LABOR | 2 EA | $4,287.00 | -13.9% | ($594.00) | $4,287.00 | -21.1% | ($258.00) | 4,029.00 | $332.00 | 4,361.00 | $0.00 | $4,361.00 | $0.00 | $4,361.00 |
| 2441 | Concrete Footing for Flagpole including excavation & hardware | MATERIAL | 2 EA | $1,220.00 | -13.9% | ($149.00) | $1,071.00 | -21.2% | ($64.00) | 1,007.00 | $83.00 | 1,090.00 | $0.00 | $1,090.00 | $0.00 | $1,090.00 |
| 2442 | Concrete Footing for Hydraulic Bollard including excavation & backfill | LABOR | 16 EA | $8,916.00 | -46.8% | ($2,843.00) | $6,073.00 | -56.2% | ($364.00) | 5,709.00 | $469.00 | 6,178.00 | $0.00 | $6,178.00 | $0.00 | $6,178.00 |
| 2443 | Concrete Footing for Hydraulic Bollard including excavation & backfill | MATERIAL | 16 EA | $1,220.00 | -13.9% | ($149.00) | $1,071.00 | -21.2% | ($64.00) | 1,007.00 | $83.00 | 1,090.00 | $0.00 | $1,090.00 | $0.00 | $1,090.00 |
| 2444 | Concrete Footing for Site Lights including excavation & backfill | LABOR | 62 EA | $12,611.00 | -13.9% | ($1,535.00) | $11,076.00 | -21.1% | ($665.00) | 10,411.00 | $655.00 | 11,266.00 | $0.00 | $11,266.00 | $0.00 | $11,266.00 |
| 2445 | Concrete Footing for Site Lights including excavation & backfill | MATERIAL | 62 EA | $8,305.00 | -50.0% | ($2,768.00) | $5,537.00 | -59.6% | ($332.00) | 5,205.00 | $428.00 | 5,633.00 | $0.00 | $5,633.00 | $0.00 | $5,633.00 |
| 2446 | Concrete Light Pole Bases, including install anchor bolts, excavation, footings & backfill | LABOR | 11 EA | $6,712.00 | -13.9% | ($817.00) | $5,895.00 | -21.1% | ($354.00) | 5,541.00 | $456.00 | 5,996.00 | $0.00 | $5,996.00 | $0.00 | $5,996.00 |
| 2447 | Concrete Light Pole Bases, including install anchor bolts, excavation, footings & backfill | MATERIAL | 11 EA | $1,678.00 | -13.8% | ($204.00) | $1,474.00 | -21.2% | ($89.00) | 1,385.00 | $114.00 | 1,499.00 | $0.00 | $1,499.00 | $0.00 | $1,499.00 |
| 2448 | Expansion Joint Filler Board at Unit Pavers | LABOR | 300 LF | $1,098.00 | -2.5% | ($27.00) | $1,071.00 | -9.0% | ($64.00) | 1,007.00 | $83.00 | 1,090.00 | $0.00 | $1,090.00 | $0.00 | $1,090.00 |
| 2449 | Expansion Joint Filler Board at Unit Pavers | MATERIAL | 300 LF | $610.00 | -13.8% | ($74.00) | $536.00 | -21.0% | ($32.00) | 504.00 | $41.00 | 545.00 | $0.00 | $545.00 | $0.00 | $545.00 |
| 2450 | Fixed Bollards installed only | LABOR | 307 EA | $237,696.00 | -38.1% | ($146,160.00) | $383,876.00 | -34.1% | ($23,032.00) | 360,844.00 | $183,051.00 | 543,895.00 | ($332,081.00) | $211,814.00 | $0.00 | $211,814.00 |
| 2451 | Fixed Bollards installed only | MATERIAL | 307 EA | $131,116.00 | 13.1% | $19,692.00 | $150,808.00 | 7.5% | ($9,048.00) | 141,760.00 | ($141,760.00) | 5,443.00 | $8.00 | $5,451.00 | $0.00 | $5,451.00 |
| 2452 | Hydraulic Bollard Installation | LABOR | 1 LS | $6,091.00 | -13.8% | ($740.00) | $5,351.00 | -21.1% | ($321.00) | 5,030.00 | $413.00 | 5,443.00 | | | | |
| 2453 | Hydraulic Piping & Control Wiring to Bollards incl PVC Sleeve in allowance | LABOR | 1 LS | $3,559.00 | -13.9% | ($433.00) | $3,126.00 | -21.1% | ($188.00) | 2,938.00 | $242.00 | 3,180.00 | $0.00 | $3,180.00 | $0.00 | $3,180.00 |
| 2454 | Hydraulic Power Unit for Bollards in allowance | LABOR | 1 EA | $1,220.00 | -13.9% | ($149.00) | $1,071.00 | -21.2% | ($64.00) | 1,007.00 | $83.00 | 1,090.00 | $0.00 | $1,090.00 | $0.00 | $1,090.00 |

# EXHIBIT D



February 23, 2007

Proposed Change Order # 911R

Hill International, Inc.
Mr. Hosney Abdelgelil
One Penn Plaza, Suite 3415
New York, NY 10119

RE: **New Bronx Criminal Court Complex**
CWC#: **2200097**
CLIENT #: **92561**
BLL PCO#: **3211**
CONTRACT #: **No.9-GC #2 Fitout**

Dear Mr. Abdelgelil,

We are pleased to submit our Change Order Proposal #     911R , for the following scope
of work described below.

**For the Sum of**    $466,691
(Four Hundred Sixty Six Thousand Six Hundred Ninety One Dollars)

**SCOPE OF WORK**

This change order represents the additional sitework costs associated with RFI response # 3346 rev 4
and existing site conditions, includes credit for base contract and escalation. This change order also
represents all negotiations to date with Hill International. The excavation, trucking and disposal of
the contaminated will be handled under a separate allowance PCO # 3239.

**BREAKDOWN OF COST**

| | | |
|---|---|---:|
| Sitework | $ | 372,530 |
| **SUBTOTAL:** | $ | 372,530 |
| Subcontractor Mark-Up 20% | $ | 74,506 |
| Premium Time | $ | 5,979 |
| **SUBTOTAL:** | $ | 453,015 |
| CWC Mark-up 10% 0-$10,000 | $ | 1,000 |
| CWC Mark-up 5% $10,001-$100,000 | $ | 4,500 |
| CWC Mark-up 3% $100,001 & Over | $ | 8,176 |
| **TOTAL:** | $ | 466,691 |

*Handwritten annotations:*
base: 337,518
PT: 5,979
20%: 67,503
411,000
1,000
4,500
411,000
1000
4500
7,126
9423.6
HILL INTERNATIONAL, INC.
FEB 23 2007
RECEIVED
ALAN HH 6/15

23

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| COST IN BOLLARD CHANGE ORDER | | | in bollard charge | | | | | |
| INSTALL STAINLESS STEEL OUTER TUPE | 2 | | | | | | | |
| AND FILL PIPE WITH CONCRETE | | | | | | | | |
| labor | | | | 1.00 | 0.00 | $69.60 | $0.00 | |
| iron worker | | | | 1.00 | 0.00 | $80.94 | $0.00 | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | ========= | ========= |
| TOTAL COST TO CONSTRUCT NORTH SIDE AS PER REVISIONS | | | | | | | $349,329.96 | $16,726. |
| | | | | | | CREDIT | | |
| | | | | | | | | |
| | | | | | | OVERHEAD AND PROFIT | | 20 |
| | | | | | | TOTAL ADDITIONAL COST | | |
| | | | | | | SUB TOTAL  CHANGE ORDER | | |
| | | | | | | | PREMIUM TIME | |
| | | | | | | | | |
| | | | | | | TOTAL CHANGE ORDER | | |
| | | | | | | NOT INCLUDING CONTAMINATED MATERIAL REMOV | | |
| | | | | | | AND EXCAVATION | | |

*Also Per Meetings-*
*6/15/07*

*Total*
*Prec*

Mr. Hosney Abdelgelil
Proposed Change Order #        911R
Page # 2

## NOTES & QUALIFICATIONS

1. Future environmental conditions due to this work are not the responsibility of Cauldwell Wingate or our Subcontractors performing work. All materials and products installed are with the approval of the Owner/Architect of Record on the project.
2. All hoisting/lifting of personnel and materials necessary to perform this work is to be provided by BLL. Costs of Teamsters, Elevator Operators, etc. are excluded from our price.
3. Rates are based on CWC hourly wages approved by DASNY. If this work extends beyond current union rate period, an additional charge will apply at time of billing.
4. Approval of this change order and performance of the work described will impact the schedule of this project. CWC will submit a request for a time extension after we evaluate the impact and delays associated with this work in accordance with master schedule.
5. Scheduled ASAP for fabrication and release, and we require 15 working days approval prior to commencing this work.
6. In accordance with Contract, all additional costs of bonding shall be compensated at contract completion.
7. No additional work will be performed without prior written approval/acceptance below.

We thank you for the opportunity to submit this Proposal. Should you have any questions or require further clarification, please do not hesitate to contact me at the office or via e-mail, at cshaw@cwingate.com.

Sincerely,

CAULDWELL WINGATE COMPANY, LLC

Christopher Shaw
Project Manager


_____          _____
Reviewed for Scope - Architect                          Date


_____          _____
Reviewed for Scope - Engineer                           Date


_____          _____
Recommended - Owners' Representative                    Date


_____          _____
Approved - Project Manager - Owner                      Date


_____          _____
Approved - Accounting                                   Date



| | REVISED COST   06/14/07 | | | | UNIT | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | COST TO COMPLETE NORTH SIDE OF PROJECT INCLUDING REVISIONS | | | | | | | | | |
| | CHANGES NORTH SIDE | | | | | | | | | |
| | RFI 3346 rev. 5 | | | | | | | | | |
| | | | | | UNIT | | | | | |
| | CONCRETE RETAINING WALL | ( 4/SK-4) | | | | | | | | |
| | | 21 | LF | | | | | | | |
| | | | | | | | | | | |
| 21 | CONCRETE FOOTING | 1.04 | CY | 1.50 | | | | | | |
| AVG H | (6.35+4.1)/2 | 5.33 | LF | | | | | | | |
| | CONCRETE WALL | 4.15 | CY | 4.50 | | | | | | |
| | TOTAL CONCRETE | 5.19 | CY | 6.00 | $119.00 | | | | | |
| | SHORT LOAD CHARGE | 2.00 | | 2.00 | $100.00 | | | | | |
| | COLOR PIGMENTED CONCRETE | 5.19 | BAGS | 6.00 | $92.00 | | | | | |
| | FORMS | | | | | | | | | |
| | FOOTING | 28.14 | SF | 30.00 | $1.00 | | | | | |
| | WALL RADIUS | 223.86 | SF | 225.00 | $10.00 | | | | | |
| | DELIVERY OF FORMS | 1.00 | LS | 1.00 | $250.00 | | | | | |
| | STONE | 1.17 | CY | 1.50 | $25.50 | | | | | |
| | STONE POCKET | 0.22 | CY | 0.33 | $25.50 | | | | | |
| | PICK UP OF STONE | 1.83 | | 1.00 | $100.00 | | | | | |
| | WEEP HOLES 2" DIA PVC | 6.00 | LF | 6.00 | $10.00 | | | | | |
| | COPPER MESH SCREENING | 1.50 | SF | 2.00 | $50.00 | | | | | |
| | GEOCOMPOSITE SHEET | 3.38 | SF | 1.00 | $395.00 | | | | | |
| | | | | ROLL | | | | | | |
| | REINF STEEL | 896.00 | LF | | | | | | | |
| | | 412.15 | LB. | 494.58 | $0.42 | | | | | |
| | CHAMFER STRIP | 42 | LF | 42.00 | $0.38 | | | | | |
| | EXPANSION JOINT | 7.33 | SF | 20.00 | $0.72 | | | | | |
| | SEAL JOINTS | 11.66 | LF | 11.66 | $9.25 | | | | | |
| | PICK UP & DELIVER MISC. ITEMS | 1 | | 1.00 | $200.00 | | | | | |
| | WAG had to bring materials from job site to our yard for storage | | | | | | | | | |
| | and then this material had to be returned to the site | | | | | | | | | |
| | WAG also had to pick up material from different suppliers and deliver it to the site | | | | | | | | | |
| | because the size of orders the suppliers would not deliver | | | | | | | | | |
| 150 | BLANKETS TO COVER CURB | 1.00 | EA. | 1.00 | $32.00 | | | | | |
| | EXCAVATION TO BE STOCK PILED AND REMOVED AS CONTAMINATED MATERIAL | | | | | | | | | |
| | IMPORTED FILL  TAG M  FOR BACK FILL | | CY | | | | | | | |
| | | 9.33 | CY | 11.67 | $24.00 | | | | | |
| 7 | REMOVE EXCESS TRUCK | 10.00 | | | | | | | | |

2

| | | | | | HILL | days | hours | Rate | LABOR | |
|---|---|---|---|---|---|---|---|---|---|---|
| | CONCRETE CURB | ( 3 / SK-4) | | | | | | | | |
| | | 67.5 | LF | | | | | | | |
| | CONCRETE CURB | 5.00 | CY | 5 | $119.00 | | | | | |
| | SHORT LOAD CHARGE | 1.00 | | 1 | $100.00 | | | | | |
| | COLOR PIGMENTED CONCRETE | 5.00 | BAGS | 5 | $92.00 | | | | | |
| | FORMS | 270.00 | SF | 270 | $1.00 | | | | | |
| | STONE | 2.50 | CY | 3.38 | $25.50 | | | | | |
| | PICK UP OF STONE | 3.38 | | 1.00 | $100.00 | | | | | |
| | REINF STEEL | 896.00 | LF | | | | | | | |
| | | 598.53 | LB. | 718.23 | $0.42 | | | | | |
| | CHAMFER STRIP | 135 | LF | 135 | $0.38 | | | | | |
| | EXPANSION JOINT | 8 | SF | 8 | $0.72 | | | | | |
| | SEAL JOINTS | 20 | LF | 20 | $9.25 | | | | | |
| | PICK UP & DELIVER MISC. ITEMS | 1 | | 1.00 | $200.00 | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| 150 | BLANKETS TO COVER CURB | 2.70 | EA. | 3.00 | $32.00 | | | | | |
| | | | | | | | | | | |
| | EXCAVATION TO BE STOCK PILED AND REMOVED AS CONTAMINATED MATERIAL | | | | | | | | | |
| 4 | REMOVE EXCESS TRUCK | 20.00 | | | | | | | | |
| | IMPORTED FILL  TAG M  FOR BACK FILL | | | | | | | | | |
| | | 20.00 | CY | 25.00 | $24.00 | | | | | |
| | | | | | | | | | | |
| | CREW TO INSTALL WALL & FOOTING AND STONE BASE | | | | HILL | days | hours | Rate per hour | LABOR | |
| | EXCAVATE WALL AND STOCK PILE EXCESS MATERIAL | | | | | | | per hour | | |
| | Foreman | | | 1 | 4HRS | 1.00 | 8.00 | $74.38 | $595.04 | |
| | Back hoe | | | 1 | 4 HRS | 1.00 | 8.00 | $17.96 | | |
| | fuel | | | 20 | gal per day | 1.00 | 20.00 | $3.00 | | |
| | Operator | | | 1 | 4 HRS | 1.00 | 8.00 | $89.33 | $714.64 | |
| | labor | | | 2 | | 1.00 | 16.00 | $69.60 | $1,113.60 | |
| | TAMPER | | | 1 | 4 HRS | 1.00 | 8.00 | $5.00 | | |
| | HILL REDUCED TIME TO 1/2 DAY  THIS WILL BE THE ONLY WORK BEING PERFORMED | | | | | | | | | |
| | OUR WORKER ARE PAID FOR A FULL DAY | | | | | | | | | |
| | | | | | | | | | | |
| | COST TO INSTALL FOOTINGS & PLACE CONCRETE | | | | | | | | | |
| | | | | | HILL | | | | | |
| | Foreman | | | 1 | 4HRS | 1.00 | 8.00 | $74.38 | $595.04 | |
| | carpenter foreman | | | 1 | 4 HRS | 1.00 | 8.00 | $103.05 | $824.40 | |
| | carpenter | | | 1 | 4 HRS | 1.00 | 8.00 | $98.56 | $788.48 | |
| | labor | | | 3 | OK | 16 HRS | 1.00 | 16.00 | $69.60 | $1,113.60 |
| | lather | | | 1 | 0 HRS | 1.00 | 8.00 | $93.46 | $747.68 | |
| | HILL REDUCED TIME TO 1/2 DAY  THIS WILL BE THE ONLY WORK BEING PERFORMED | | | | | | | | | |
| | OUR WORKER ARE PAID FOR A FULL DAY | | | | | | | | | |
| | A LATHE INSTALLES THE REBAR IN THE CONCRETE | | | | | | | | | |

WAG 0856

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| COST TO INSTALL WALL FORMS | | | | HILL | | | | |
| Foreman | | | 1 | 4HRS | 1.00 | 8.00 | $74.38 | $595.04 |
| carpenter foreman | | | 1 | 4 HRS | 1.00 | 8.00 | $103.05 | $824.40 |
| carpenter | | | 1 | 4 HRS | 1.00 | 8.00 | $98.56 | $788.48 |
| labor | | | 2 | 16 HRS | 1.00 | 16.00 | $69.60 | $1,113.60 |
| lather | | | 1 | 4 HRS | 1.00 | 8.00 | $93.46 | $747.68 |
| | | | | | | | | |
| HILL REDUCED TIME TO 1/2 DAY  THIS WILL BE THE ONLY WORK BEING PERFORMED | | | | | | | | |
| OUR WORKER ARE PAID FOR A FULL DAY | | | | | | | | |
| A LATHE INSTALLES THE REBAR IN THE CONCRETE AND IS PAID FOR A FULL DAY | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| COST TO  PLACE CONCRETE | | | | HILL | | | | |
| Foreman | | | 1 | 4HRS | 1.00 | 8.00 | $74.38 | $595.04 |
| labor | | | 3 | 8RS | 1.00 | 24.00 | $69.60 | $1,670.40 |
| mason | | | 1 | 4HRS | 1.00 | 8.00 | $86.62 | $692.96 |
| HILL REDUCED TIME TO 1/2 DAY  THIS WILL BE THE ONLY WORK BEING PERFORMED | | | | | | | | |
| OUR WORKERS  ARE PAID FOR A FULL DAY | | | | | | | | |
| THIS IS THE ONLY WORK BEING PERFORMED | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| COST TO COVER CONCRETE AND UNCOVER DUE TO WINTER TEMPERATURE | | | | | | | | |
| 3 HOURS EACH DAY OVERTIME | | | | DAYS | | | | |
| Foreman | | | 1 | 11/2 HOURS OT | 2.00 | 3.00 | $74.38 | $223.14 |
| labor | | | 3 | 11/2 HOURS OT | 2.00 | 9.00 | $69.60 | $626.40 |
| WE AGREED WITH HILL TO 1 1/2 HRS | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| COST TO STRIP  WALL FORMS & CLEAN FORMS  AND RUB WALLS | | | | HILL | | | | |
| carpenter foreman | | | 1 | 4HRS | 1.00 | 4.00 | $103.05 | $412.20 |
| carpenter | | | 1 | | 1.00 | | $98.56 | $0.00 |
| labor | | | 2 | 8HRS | 1.00 | 8.00 | $69.60 | $556.80 |
| return of forms | | | 1 | | 1.00 | | $250.00 | |
| mason | | | 1 | | 1.00 | 8.00 | $86.62 | $692.96 |
| WE WILL ACCEPT THE CHANGE TO 1/2 ONLY IF FORM CAN BE STRIPED THE NEXT DAY | | | | | | | | |
| AND WE CAN WORK ON THE ADJACENT CURB | | | | | | | | |
| A MASON MAY CLAIM THE WORK OF FINISHING AND RUBING THE WALL | | | | | | | | |

WAG 0857

| Description | | | | | | | | | | | | OT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| COST TO COVER CONCRETE AND UNCOVER DUE TO WINTER TEMPERATURE | | | | | | | | | | | | |
| 1/5 HOURS EACH DAY OVERTIME | | | | | | | | | | | | |
| Foreman | 1 | | | 2.00 | 3.00 | $71.38 | $223.14 | | | | $27.79 | $83.37 |
| labor | 3 11/2 HOURS OT | | | 2.00 | 9.00 | $69.60 | $626.40 | | | | $25.39 | $228.57 |
| WE AGREED TO 11/2 HOURS TO COVER | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| COST TO STRIP WALL FORMS & CLEAN FORMS AND RUB WALLS | | | | | | | | | | | | |
| | | HILL | | | | | | | | | | |
| carpenter foreman | 1 | 4HRS | | 1.00 | 8.00 | $103.05 | $824.40 | | | | | |
| carpenter | 1 | 4HRS | | 1.00 | 8.00 | $98.56 | $788.48 | | | | | |
| labor | 1 | 4HRS | | 1.00 | 8.00 | $69.60 | $556.80 | | | | | |
| return of forms | 1 | $300.00 | | 1.00 | | $500.00 | | $500.00 | | | | |
| mason | 1 | 4HRS | | 1.00 | 8.00 | $86.62 | $692.96 | | | | | |
| | | | | | | | | | | | | |
| THE CREW IS PAID FOR A FULL WORK DAY THIS WILL BE THE ONLY WORK BEING PERFORMED | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| BACK FILL CURB WALL | | | | | | | | | | | | |
| USING IMPORTED MATERIAL | | HILL | | | | | | | | | | |
| Foreman | 1 | 4HRS | | 1.00 | 8.00 | $74.38 | $595.04 | | | | | |
| Back hoe | 1 | 4HRS | | 1.00 | 8.00 | $17.86 | | $142.88 | | | | |
| fuel | 20 gal per day | | | 1.00 | 20.00 | $3.00 | | $60.00 | | | | |
| Operator | 1 | 4HRS | | 1.00 | 18.00 | $89.33 | $714.64 | | | | | |
| labor | 2 | 8HRS | | 1.00 | 16.00 | $69.60 | $1,113.60 | | | | | |
| TAMPER | 1 | 4HRS | | 1.00 | 8.00 | $5.00 | | $40.00 | | | | |
| | | | | | | | | | | | | |
| CONCRETE CURB AT NORTH SIDE @ TREES | (6SK-4) | | | | | | | | | | | |
| | 220 | LF | | | | | | | | | | |
| | | | | | | | | | | | | |
| CONCRETE CURB | 7.09 CY | 8.00 | | $119.00 | | | | $952.00 | | | | |
| COLOR PIGMENTED CONCRETE | 7.09 BAGS | 8.00 | | $92.00 | | | | $736.00 | | | | |
| FORMS | 660.00 SF | 660.00 | | $1.00 | | | | $660.00 | | | | |
| STONE | 4.07 CY | 5.50 | | $25.50 | | | | $140.25 | | | | |
| PICK UP OF STONE | | 5.50 | | $100.00 | | | | $100.00 | | | | |
| CHAMFER STRIP | | 30.00 | | $0.38 | | | | $0.00 | | | | |
| EXPANSION JOINT | 27.64 SF | 2.00 | | $0.72 | | | | $21.60 | | | | |
| SEAL JOINTS | 38.5 LF | | | $9.25 | | | | $18.50 | | | | |
| REINF STEEL | 880 LF | | | | | | | $0.00 | | | | |
| | 587.84 LB. | 705.41 | | $0.42 | | | | $296.27 | | | | |
| PICK UP & DELIVER MISC. ITEMS | | 1.00 | | $200.00 | | | | $200.00 | | | | |
| EXCAVATION | 30.56 CY | | | | | | | $0.00 | | | | |
| EXCAVATION TO BE STOCK PILED AND REMOVED AS CONTAMINATED MATERIAL | | | | | | | | | | | | |
| REMOVE EXCESS TRUCK | 6.112 | 13.19 | 19.79 | | | | | $0.00 | | | | |
| BLANKETS TO COVER CURB | 150 | 8.80 EA. | 8.00 | $32.00 | | | | $288.00 | | | | |
| IMPORTED FILL TAG M FOR BACK FILL | 24.44 CY | 30.56 | | $24.00 | | | | $0.00 | | | | |

| Description | Qty | HILL | Num | Hours | Rate per hour | LABOR | EQUIP | OT |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | $33.37 |
| CREW TO INSTALL CURB   220 LF | | | | | | | | |
| EXCAVATE CURB AND STOCK PILE EXCESS MATERIAL | | | | | | | | |
| Foreman | 1 | 4HRS | 1.00 | 8.00 | $74.38 | $595.04 | | |
| Back hoe | | 4HRS | 1.00 | 8.00 | $17.86 | | $142.88 | |
| fuel | 20 gal per day | 80 GAL | | 20.00 | $3.00 | | $60.00 | |
| Operator | 1 | 4HRS | 1.00 | 8.00 | $89.33 | $714.64 | | |
| labor | 2 | 8HRS | 1.00 | 16.00 | $69.60 | $1,113.60 | | |
| TAMPER | 1 | 4HRS | 1.00 | 8.00 | $5.00 | | $40.00 | |
| ASSUMING THAT WE WILL STILL IN COUNTER FROST IN THE GROUND | | | | | | | | |
| IT WILL TAKE AT LEAST A DAY AND HALF TO EXCAVATE CURB | | | | | | | | |
| THE 4 HOURS FROM THE BACK FILL OPERATION OF THE CURB ABOVE IS CONSIDERED | | | | | | | | |
| COST TO INSTALL CURB FORMS   220 LFCURB | | 400 LF FORMS | | | | | | |
| | | HILL | | | Rate per hour | LABOR | EQUIP | |
| Foreman | 1 | 4HRS | 2.00 | 16.00 | $74.38 | $1,190.08 | | |
| carpenter foreman | 1 | 4HRS | 2.00 | 16.00 | $103.05 | $1,648.80 | | |
| carpenter | 1 | | 2.00 | | $98.56 | $0.00 | | |
| labor | 3 | 8HRS | 2.00 | 48.00 | $69.60 | $3,340.80 | | |
| lather | 1 | 4HRS | 2.00 | 16.00 | $93.46 | $1,495.36 | | |
| HILLS TIME TO INSTALL 400LF OF CQUB FORM IS TO LOW | | | | | | | | |
| ESPICALLY DURING THE WINTER MONTHS | | | | | | | | |
| WE HAVE SWITCHED A LABOR FOR A CARPENTER | | | | | | | | |
| COST TO PLACE CONCRETE | | HILL | | | | | | |
| Foreman | 1 | 4HRS | 1.00 | 8.00 | $74.38 | $595.04 | | |
| labor | 3 | 8HRS | 1.00 | 24.00 | $69.60 | $1,670.40 | | |
| mason | 1 | 4HRS | 1.00 | 8.00 | $86.62 | $692.96 | | |
| HILL REDUCED TIME TO 1/2 DAY  THIS WILL BE THE ONLY WORK BEING PERFORMED | | | | | | | | |
| OUR WORKERS ARE PAID FOR A FULL DAY | | | | | | | | |
| THIS IS THE ONLY WORK BEING PERFORMED | | | | | | | | |
| COST TO COVER CONCRETE AND UNCOVER DUE TO WINTER TEMPERATURE | | | | | | | | |
| 1 1/2 HOURS EACH DAY OVERTIME | | | | | | | | |
| Foreman | 1 | | 2.00 | 3.00 | $74.38 | $223.14 | | $27.79 |
| labor | 3 | 1 1/2 HOURS OT | 2.00 | 9.00 | $69.60 | $626.40 | | $25.39 |
| | | | | | | | | $228.51 |
| AGREED WITH HILL ON 1 1/2 HRS | | | | | | | | |

7

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| COST TO STRIP  WALL FORMS & CLEAN FORMS  AND RUB CURB | | | | | | | | |
| | | 220 LFCURB | | | 400 LF FORMS | | | |
| | | | | HILL | | | | |
| carpenter foreman | | 1 | | 4HRS | 1.00 | 8.00 | $103.05 | $824.40 |
| carpenter | | 1 | | | 1.00 | | $98.56 | $0.00 |
| labor | | 1 | | 8HRS | 2.00 | 16.00 | $69.60 | $1,113.60 |
| return of forms | | 1 | | $200.00 | 1.00 | | $200.00 | |
| mason | | 1 | | | 1.00 | 8.00 | $86.62 | $692.96 |
| HILLS TIME TO STRIP 400 LN FT OF CURB FORMS IS TO LOW FOR WORK | | | | | | | | |
| BEING PERFORMED IN THE WINTER | | | | | | | | |
| THE MASON STILL HAS TO RUB CONCRETE | | | | | | | | |
| WE WILL ACEPT 300.00 TO RETURN FORMS | | | | | | | | |
| | | | | | | | | |
| BACK FILL CURB WALL | | 220 LFCURB | | | 400 LF FORMS | | | |
| USING IMPORTED  MATERIAL | | | | HILL | | | | |
| Foreman | | 1 | | 2HRS | 1.00 | 4.00 | $74.38 | $297.52 |
| Back hoe | | 1 | | 4HRS | 1.00 | 8.00 | $17.86 | |
| fuel | | 20 | gal per day | | 1.00 | 20.00 | $3.00 | |
| Operator | | 1 | | 4HRS | 1.00 | 8.00 | $89.33 | $714.64 |
| labor | | 2 | | 8HRS | 1.00 | 8.00 | $69.60 | $556.80 |
| TAMPER | | 1 | | 4HRS | 1.00 | 4.00 | $5.00 | |
| | | | | | | | | |
| HILL REDUCED TIME BY HALF | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| CONCRETE CURB AT SOUTH SIDE @ STEPS | | | REV NO 5 | | | | | |
| | | 104 | LF | | | | | |
| | | | | | | | | |
| TOTAL COST FOR 220 LF | | 220 | | | | | | |
| LABOR | $18,106.18 | $82.30 | | | 104.00 | | $82.30 | $8,559.29 |
| EQUIPMENT | $405.76 | $1.84 | | | 104.00 | | $1.84 | |
| MATERIAL | $3,672.62 | $16.69 | | | 104.00 | | $16.69 | |
| | | | | | | | | |
| | | | | | | | | |
| STEEL EDGE CURB @ PRECAST PAVERS | | | | | | | | |
| | | 230 | LF | | | | | |
| | | | | | | | | |
| STEEL EDGE 20' LENGTHS | | 230 | | | 240.00 | | $10.95 | |
| SHIPPING OF STEEL EDGE | | 1 | | | 1.00 | | $350.00 | |
| | | | | | | | | |
| LABOR TO INSTALL | | 230 | LF | | | | | |
| | | 120 | LF PER DAY | | | | | |
| | | 1.92 | DAYS | | | | | |
| Foreman | | 1 | | | 2.00 | 16.00 | $74.38 | $1,190.08 |
| labor | | 2 | | | 2.00 | 32.00 | $69.60 | $2,227.20 |

8

| # | Description | Qty | Unit | No. | Unit2 | Price | | HILL | Rate per hour | LABOR |
|---|---|---|---|---|---|---|---|---|---|---|
| | PRE CAST PAVERS PC-1 | | ( 6/SK-4 ) | | | | | | | |
| | | 2400 | SF | | | UNIT | | | | |
| | | | | | | | | HILL | | |
| ****** | PRE CAST PAVERS | 2400.00 | SF | | | | | | | |
| | DELIVERY OF PRE CAST PAVERS | | | | | | | | | |
| | FROM HANNOVER | 1.00 | | 1.00 | | $5,973.13 | | $0.00 | | |
| | see invoice from Hanoved for delivery | | | | | | | | | |
| | | | | | | | | | | |
| | trucking from wagca yard | 1.00 | | 1.00 | | $300.00 | | $0.00 | | |
| | WAG had to bring pre cast pavers back to our yard for storage | | | | | | | | | |
| | and the return pavers to jop site | | | | | | | | | |
| | | | | | | | | | | |
| | SAND 1" | 7.11 | CY | 10.00 | | $35.00 | | $0.00 | | |
| 200 | CEMENT | 1.33 | BAGS | 2 | | $10.00 | | $0.00 | | |
| | SAND FOR JOINTS | 3.56 | | 4 | | $35.00 | | $0.00 | | |
| | | | | | | | | | | |
| | HIL;L DID NOT ALLOW ANY OF T6HESE CHARGES | | | | | | | | | |
| | THE TRUCKING CHARGE FROM HANNOVER IS FOR THE ADDITIONAL COST TO | | | | | | | | | |
| | TRUCK THE PAVERS AT THIS TIME | | | | | | | | | |
| | WAG HAD TO REMOVE SOME OF THE PRE CAST PAVER TO ARE YARD AND STORE THEM | | | | | | | | | |
| | THEY NOW HAVE TO BE RETURNED | | | | | | | | | |
| | | | | | | | | | | |
| | COST TO RE HANDLE PRE CAST PAVERS ON SITE & | | | | | | | | | |
| | UNLOADING PAVERS | | | | | | | | Rate per hour | LABOR |
| | Foreman | | | 1 | | | 2.00 | 16.00 | $74.38 | $1,190.08 |
| | labor | | | 1 | | | 2.00 | 16.00 | $69.60 | $1,113.60 |
| | faulk lift truck | | | 1 | | | 2.00 | 16.00 | $43.75 | |
| | fuel | | | 20 | gal per day | | 2.00 | 40.00 | $3.00 | |
| | Operator | | | 1 | | | 2.00 | 16.00 | $89.33 | $1,429.28 |
| | | | | | | | | | | |
| | CREW TO SAW CUT PRE CAST PAVERS TO FIT | 200 | LF | | | | | | | |
| | labor | | | 2 | | | 1.00 | 16.00 | $69.60 | $1,113.60 |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | CREW TO INSTALL SAND | 2400.00 | BLOCK | | | | | | | |
| | BLOCK PER DAY PER CREW | 400.00 | | 6.00 | | | | | | |
| | Foreman | | | 1 | | | 6.00 | 48.00 | $74.38 | $3,570.24 |
| | Back hoe | | | 1 | | | 3.00 | 24.00 | $17.86 | |
| | fuel | | | 20 | gal per day | | 3.00 | 60.00 | $3.00 | |
| | Operator | | | 1 | | | 3.00 | 24.00 | $89.33 | $2,143.92 |
| | labor | | | 4 | | | 6.00 | 192.00 | $69.60 | $13,363.20 |
| | TAMPER | | | 1 | | | 6.00 | 48.00 | $5.00 | |
| | | | | | | | | | | |
| | INSTALL MORTAR @ TREE PIT EDGE | 200 | LF | | | | | | | |
| | | | 610 | BLOCK | | | | | | |
| | labor | | | 2 | | | 3.00 | 48.00 | $69.60 | $3,340.80 |

WAG 0861

9

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| SWEEP SAND INTO JOINTS | | | | | | | | | |
| labor | | 2 | | | | 1.00 | 16.00 | $69.60 | $1,113.60 |
| | | | | | | | | | |
| ADDITIONAL PRECAST PAVERS TO REPLACE FOOTINGS | | | | | | | | | |
| | 300 | SF | | | | | | | |
| NEW QUOTE | | | | | | | | | |
| NEW PRECAST PAVERS | 300 | SF | | | | 300.00 | | $11.03 | |
| DELIVERY OF PRE CAST | 1 | EA. | | | | 1.00 | | $1,200.00 | |
| | | | | | | | | | |
| UNIT COST TO INSTALL PRECAST PAVERS | | | | | | NEW PAVERS | | | |
| | 2400 | | | | | | | | |
| LABOR | $28,378.32 | $11.82 | | | | 300.00 | SF | $11.82 | $3,547.29 |
| EQUIPMENT | $1,668.64 | $0.70 | | | | 300.00 | SF | $0.70 | |
| MATERIAL | | | | | | | | | |
| | | | | | | | | | |
| HILL DID NOT ADDRESS ANY COST FOR THE PRE CAST PAVERS | | | | | | | | | |
| | | | | | | | | | |
| MULCH 3" | 767.00 | SF | | | HILL | | | | |
| MULCH | 7.10 | CY | 9.23 | $35.00 | ? | | | | |
| PICK UP & DELIVER | 1 | | 9.23 | $40.62 | | | | | |
| WAG has to pick up small quantities of mulch. we normally have bulk | | | | | | | | | |
| delivies of 50-100 cy | | | | | | | | | |
| WAG truck had to go to nassau cty. pick up the required mulch and delivered it to the court house +/-4 hours | | | | | | | | | |
| | | | | | | | | | |
| CREW TO INSTALL MULCH | | | | | | | | | |
| | | | | | HILL | | | | |
| Foreman | | 1.00 | | | 2 HRS | 1.00 | 8.00 | $74.38 | $595.04 |
| Back hoe | | 1.00 | | | 4HRS | 1.00 | 8.00 | $17.86 | |
| fuel | | 20.00 | gal per day | | | 1.00 | 20.00 | $3.00 | |
| Operator | | 1.00 | | | 4HRS | 1.00 | 8.00 | $89.33 | $714.64 |
| labor | | 2.00 | | | 4HRS | 1.00 | 16.00 | $69.60 | $1,113.60 |
| TAMPER | | 1.00 | | | 4HRS | 1.00 | 8.00 | $5.00 | |
| | | | | | | | | | |
| THE MULCH GOES IN THE AREA BEHIND THE NEW WALLS IN THE NEW PLANT AREA | | | | | | | | | |
| WE WILL USE A MIN. OF 3" OF MULCH AS PER PLANS | | | | | | | | | |
| THE MULCH IS HEHIND THE CONCRETE CURB ANS WALL AND WILL HAVE TO BE SPREAD BY HAND | | | | | | | | | |
| | | | | | | | | | |
| TOPSOIL 12" | 767 | SF | | | HILL | | | | |
| TOPSOIL | 28.41 | | 37.00 | | ? | 32.00 | | | |
| TRANSITION LAYER 6" | 14.20 | | 19.18 | | ? | 32.00 | | | |
| SAME AS TOPSOIL | | | | | | | | | |
| | | | | | | | | | |
| THE TOPSOIL GOES IN THE AREA BEHIND THE NEW WALLS IN THE NEW PLANT AREA AS PER REVISED PLANS | | | | | | | | | |
| | | | | | | | | | |
| EXCAVATION FOR PLANTER AREA BETWEEN WALL AND BUILDING  IS PART | | | | | | | | | |
| OF CROSS SECTION | | | | | | | | | |

WAG 0862

10

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| SUB GRADE AREA FOR TRANSITION LAYER | | | | | | | | |
| | | | | HILL | | | | |
| Foreman | | 1.00 | | 4HRS | 1.00 | 8.00 | $74.38 | $595.04 |
| Back hoe | | 1.00 | | 8HRS? | 1.00 | 8.00 | $43.75 | |
| fuel | | 20.00 | gal per day | 20 GAL? | 1.00 | 20.00 | $3.00 | |
| Operator | | 1.00 | | 8HRS? | 1.00 | 8.00 | $89.33 | $714.64 |
| labor | | 2.00 | | 8HRS? | 1.00 | 16.00 | $69.60 | $1,113.60 |
| TAMPER | | 1.00 | | 4HRS | 1.00 | 8.00 | $5.00 | |
| | | | | | | | | |
| CREW TO INSTALL TRANSITION LAYER | | | | | | | | |
| | | | | HILL | | | | |
| Foreman | | 1.00 | | 0 HRS ? | 0.50 | 4.00 | $74.38 | $297.52 |
| Back hoe | | 1.00 | | 0 HRS ? | 0.50 | 4.00 | $17.86 | |
| fuel | | 20.00 | gal per day | 0 HRS ? | 0.50 | 10.00 | $3.00 | |
| Operator | | 1.00 | | 0 HRS ? | 0.50 | 4.00 | $89.33 | $357.32 |
| labor | | 2.00 | | 0 HRS ? | 0.50 | 8.00 | $69.60 | $556.80 |
| TAMPER | | 1.00 | | 0 HRS ? | 0.50 | 4.00 | $5.00 | |
| | | | | | | | | |
| CREW TO INSTALL TOPSOIL | | | | | | | | |
| | | | | HILL | | | | |
| Foreman | | 1.00 | | 4HRS | 1.00 | 8.00 | $74.38 | $595.04 |
| Back hoe | | 1.00 | | 4HRS | 1.00 | 8.00 | $17.86 | |
| fuel | | 20.00 | gal per day | | 1.00 | 20.00 | $3.00 | |
| Operator | | 1.00 | | 4HRS | 1.00 | 8.00 | $89.33 | $714.64 |
| labor | | 2.00 | | 8HRS | 1.00 | 16.00 | $69.60 | $1,113.60 |
| TAMPER | | 1.00 | | 4HRS | 1.00 | 8.00 | $5.00 | |
| | | | | | | | | |
| THE TOPSOIL GOES IN THE AREA BEHIND THE NEW WALLS IN THE NEW PLANT AREA AS PER REVISED PLANS | | | | | | | | |
| THE TOPSOIL IS HEHIND THE CONCRETE CURB ANS WALL AND WILL HAVE TO BE SPREAD BY HAND | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| GROUND COVER | | | | | | | | |
| | | | | HILL | | | | |
| HEADER HELIX " BALTICA" 4" POTS | 1963 | EA. | 1963 | $1.32 | | | | |
| DELIVERY OF PLANTS | 1 | | 1 | $300.00 | $300.00 | | | |
| | | | | | | | | |

WAC
0863

HILL REDUCED THE DELIVERY CHARGE WITH OUT A QUOTE

CREW TO INSTALL GROUND COVER

| Description | Qty | Unit | | | Hrs | Rate | Amount | |
|---|---|---|---|---|---|---|---|---|
| ****** Foreman | 1.00 | HILL 12HRS | | 3.00 | 24.00 | $74.38 | $1,785.12 | |
| 54.53 labor | 2.00 | 24HRS | | 3.00 | 48.00 | $69.60 | $3,340.80 | |

REMOVE EMPTY POTS

| Description | Qty | Unit | | | | | | |
|---|---|---|---|---|---|---|---|---|
| TRUCK & DUMP | 1 | HILL | 1 | $300.00 | $300.00 | | | $300.00 |

HILL REDUCED THE HOURS BY HALF

HILL IS ASSUMING 55 PLANTS PER MAN HOUR WHICH IS A UNRLISTIC PRODUCTION

ALSO THE PERSONAL ARE PAID A FULL DAY

THE PLANT WILL NOT BE INSTALLED UNTIL SPRING AS A ASEPERATE OPERATION

THE PLANTS MUST BE UNLOADED FROM THE DELIVERY TRUCK THEN PLACED OVER THE CONCRETE CURB AND WALL

4" PIGMENTED CONCRETE PAVEMENT    3895 SF    REVISED

EXCAVATION FOR PAVEMENT AREAS IS PART OF CROSS SECTIONS

CONCRETE PAVEMENTS ARE BEING INSTALLED OUT OF SEQUENCE AND AS A

INDIVIDUAL OPERATION. RATHER THAN WITH THE PLAZA PAVEMENTS

ALSO THE PAVEMENTS MAY BE INSTALLED UNDER WINTER CONDITIONS WHICH ADDS TO THE COST

THE PRODUCTION GOES DOWN AND THE TIME TO FINISH THE PAVEMENT GOES UP

MATERIALS

| Item | Qty | Unit | | Unit Price | Amount |
|---|---|---|---|---|---|
| CONCRETE | 47.61 | CY | 52.37 | $119.00 | $6,231.57 |
| ADDED COST WINTER CONCRETE | | | 53.00 | $15.00 | $795.00 |
| COLOR PIGMENTED CONCRETE | 47.61 | BAGS | 63.00 | $92.00 | $4,876.00 |
| FORMS | 264.00 | SF | 264 | $1.00 | $264.00 |
| STONE | 72.13 | CY | 97.38 | $25.50 | $2,483.06 |
| EXPANSION JOINT | 214.50 | SF | 225.23 | $0.72 | $162.16 |
| SEAL JOINTS | 650 | LF | 2 | $9.25 | $18.50 |
| REINF MESH | 3895 | SF | 4479.25 | $0.17 | $761.47 |
| 150 BLANKETS TO COVER CURB | 25.97 | EA. | 20.00 | $32.00 | $640.00 |
| PICK UP & DELIVER MISC. ITEMS | | | 1.00 | $200.00 | $200.00 |
| SAW CUT JOINTS | 998 | | 998.00 | $3.50 | $3,493.00 |

SUB GRADE AREA FOR STONE    3895

| SF PER DAY | 1500 | 2.60 | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | HILL | | | | | | |
| Foreman | 1 | 12HRS | 2.60 | 20.80 | $74.38 | $1,547.10 | | $371.49 |
| Back hoe | 1 | 12HRS | 2.60 | 20.80 | $17.86 | | | |
| fuel | 20 gal per day | | 2.60 | | $3.00 | $52.00 | | $156.00 |
| Operator | 1 | 12HRS | 2.60 | 20.80 | $89.33 | $1,858.06 | | |
| labor | 2 | 20HRS | 2.60 | 41.60 | $69.60 | $2,895.36 | | |
| TAMPER | 1 | 12HRS | 2.60 | 20.80 | $5.00 | | | $104.00 |

HILL REDUCED THE HOURS BY HALF

11

| Description | Qty/Unit | Type | Hrs/Days | Total Hrs | Rate | Amount | Amount (Equip) | Other |
|---|---|---|---|---|---|---|---|---|
| COST TO INSTALL STONE | 97.38 CY | HILL | | | | | | $212.32 |
| Foreman | 1 | 8HRS | 2.00 | 16.00 | $74.38 | $1,190.08 | | $1,218.72 |
| Back hoe | 1 | 8HRS | 2.00 | 16.00 | $17.86 | | $285.76 | $27.79 |
| fuel | 20 gal per day | | 2.00 | 40.00 | $3.00 | | $120.00 | $25.39 |
| Operator | 1 | 8HRS | 2.00 | 16.00 | $89.33 | $1,429.28 | | |
| labor | 2 | 24HRS | 2.00 | 32.00 | $69.60 | $2,227.20 | | |
| TAMPER | 1 | 8HRS | 2.00 | 16.00 | $5.00 | | $80.00 | |
| HILL REDUCED THE HOURS BY HALF | | | | | | | | |
| STONE WILL BE INSTALLED BEHIND CURB | | | | | | | | |
| THE BACKHOE WILL DROP STONE BEHIND CURB AND THEN IT WILL BE SPREAD BY HAND | | | | | | | | |
| COST TO SUB GRADE STONE | 3895 | 1750 PER DAY | 2.23 DAYS | | | | | |
| Foreman | 1 | 8HRS | 2.25 | 18.00 | $74.38 | $1,338.84 | | |
| Back hoe | 1 | 8HRS | 2.25 | 18.00 | $17.88 | | $321.48 | |
| fuel | 20 gal per day | | 2.25 | 45.00 | $3.00 | | $135.00 | |
| Operator | 1 | 8HRS | 2.25 | 18.00 | $89.33 | $1,607.94 | | |
| labor | 2 | 18HRS | 2.25 | 36.00 | $69.60 | $2,505.60 | | |
| TAMPER | 1 | 8HRS | 2.25 | 18.00 | $5.00 | | $90.00 | |
| HILL REDUCED THE HOURS BY HALF | | | | | | | | |
| COST TO INSTALL CONCRETE | 53.00 CY | 25 | 2.12 | | HILL | | | |
| Foreman | 1 | | 2.00 | 16.00 | $74.38 | $1,190.08 | | |
| labor | 6 | | 2.00 | 96.00 | $69.60 | $6,681.60 | | |
| mason | 2 | | 2.00 | 32.00 | $86.62 | $2,771.84 | | |
| WE ASSUME HILL AGREED NO CHANGES MADE | | | | | | | | |
| COST TO COVER CONCRETE AND UNCOVER DUE TO WINTER TEMPERATURE | | | | | | | | |
| 4 HOURS EACH DAY OVERTIME | | | | | | | | |
| Foreman | 1 | | 2.00 | 8.00 | $74.38 | $595.04 | | |
| labor | 6 | | 2.00 | 48.00 | $69.60 | $3,340.80 | | |
| ADDITIONAL CONCRETE BECAUSE FENCE BEING DELETED | 65.5 SF | | | | | | | |
| UNIT COST TO INSTALL 4" CONCRETE PAVEMENT | 3895 | ADD CONC. PAVT | | | | | | |
| LABOR | $31,178.83 | | | 65.50 | $8.00 | $524.32 | | |
| EQUIPMENT | $1,663.73 | | | 65.50 | $0.43 | | $27.98 | |
| MATERIAL | $19,924.76 | | | 65.50 | $5.12 | $335.06 | | |

12

| 7" PIGMENTED CONCRETE PAVEMENT | | 7396 | SF | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| EXCAVATION FOR PAVEMENT AREAS IS PART OF CROSS SECTIONS | | | | | | | | | |
| | | | | | | | | | |
| CONCRETE PAVEMENTS ARE BEING INSTALLED OUT OF SEQUENCE AND AS A | | | | | | | | | |
| INDIVIDUAL OPERATION, RATHER THAN WITH THE PLAZA PAVEMENTS | | | | | | | | | |
| ALSO THE PAVEMENTS MAY BE INSTALLED UNDER WINTER CONDITIONS WHICH ADDS TO THE COST | | | | | | | | | |
| THE PRODUCTION GOES DOWN AND THE TIME TO FINISH THE PAVEMENT GOES UP | | | | | | | | | |
| | | | | | | | | | |
| MATERIALS | | | | | | | | | |
| 210 CONCRETE | 158.88 | CY | 174.76 | $119.00 | | | | | $20,797.00 |
| COLOR PIGMENTED CONCRETE | 158.88 | BAGS | 175.00 | $92.00 | | | | | $16,100.00 |
| FORMS | 440.00 | SF | 440 | $1.00 | | | | | $440.00 |
| STONE | 136.96 | CY | 184.90 | $25.50 | | | | | $4,714.95 |
| EXPANSION JOINT | 1085.00 | SF | 1085 | $0.72 | | | | | $781.20 |
| SEAL JOINTS | NIC | LF | | | | | | | $0.00 |
| REINF MESH | 7396 | SF | 8505.4 | $0.17 | | | | | $1,445.92 |
| SAW CUT JOINTS | 2260 | | 2260.00 | $3.50 | | | | | $7,910.00 |
| PICK UP & DELIVER MISC. ITEMS | 1 | | 1.00 | $200.00 | | | | | $200.00 |
| | | | | | | | | | |
| NOTE EXPANSION JOINT ARE NOT SEALED | | | | | | | | | |
| AND OR CAULKED | | | | | | | | | |
| 150 BLANKETS TO COVER CURB | 49.31 | EA. | 49.00 | $32.00 | | | | | $1,568.00 |
| | | | | | | | | | |
| SUB GRADE AREA FOR STONE | 7396 | | 3.698 | | | | | | |
| | 2000 | | | | | | | | |
| Foreman | | | HILL 15HRS | 3.75 | 30.00 | $74.38 | $2,231.40 | | |
| Back hoe | 1 | | | 3.75 | 30.00 | $17.86 | | $535.80 | |
| fuel | 20 gal per day | | | 3.75 | 75.00 | $3.00 | | $225.00 | |
| Operator | 1 | | | 3.75 | 30.00 | $89.33 | $2,679.90 | | |
| labor | 2 | | | 3.75 | 60.00 | $69.60 | $4,176.00 | | |
| TAMPER | 1 | | | 3.75 | 30.00 | $5.00 | | $150.00 | |
| | | | | | | | | | |
| WE ASSUME HILL ONLY REDUCED THE FOREMAN TIME | | | | | | | | | |
| | | | | | | | | | |
| COST TO INSTALL STONE | 184.90 | CY | 2.47 | 75 | | | | | |
| Foreman | | | HILL 8HRS | 2.50 | 20.00 | $74.38 | $1,487.60 | | |
| Back hoe | 1 | | | 2.50 | 20.00 | $17.86 | | $357.20 | |
| fuel | 20 gal per day | | | 2.50 | 50.00 | $3.00 | | $150.00 | |
| Operator | 1 | | | 2.50 | 20.00 | $89.33 | $1,786.60 | | |
| labor | 2 | | | 2.50 | 40.00 | $69.60 | $2,784.00 | | |
| TAMPER | 1 | | | 2.50 | 20.00 | $5.00 | | $100.00 | |
| | | | | | | | | | |
| WE ASSUME HILL ONLY REDUCED THE FOREMAN TIME | | | | | | | | | |

13

| Item | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| COST TO SUB GRADE STONE | 7396 | | | | | | | | | | |
| | 2000 | 3.698 | | | | | | | | $555.80 | |
| | | | | | | | | | | $3,046.80 | |
| Foreman | | 1 | | HILL 10HRS | 3.75 | 30.00 | $74.38 | $2,231.40 | | | |
| Back hoe | | 1 | | | 3.75 | 30.00 | $17.86 | $535.80 | | | |
| fuel | | 20 gal per day | | | 3.75 | 75.00 | $3.00 | $225.00 | | | |
| Operator | | 1 | | | 3.75 | 30.00 | $89.33 | $2,679.90 | | | |
| labor | | 2 | | | 3.75 | 60.00 | $69.60 | $4,176.00 | | | |
| TAMPER | | 1 | | | 3.75 | 30.00 | $5.00 | $150.00 | | | |
| WE ASSUME HILL ONLY REDUCED THE FOREMAN TIME | | | | | | | | | | | |
| COST TO INSTALL CONCRETE | 175.00 | 4.38 | | | | | | | | | |
| Foreman | 40 | 1 | | HILL 16HRS | 7.00 | 56.00 | $74.38 | $4,165.28 | | | |
| labor | | 6 | | | 7.00 | 336.00 | $63.60 | $23,385.60 | | | |
| mason | | 2 | | | 7.00 | 112.00 | $86.62 | $9,701.44 | | | |
| concrete pump rental | | 1 | | not used | | | | | $0.00 | | |
| SALES TAX HAS TO BE ADDED | | | | | | | | | | | |
| add Power Buggy | | 1 | | | | | | | $585.23 | | |
| COST TO COVER CONCRETE AND UNCOVER DUE TO WINTER TEMPERATURE | | | | | | OT RATE | | | | | |
| Foreman | | 1 | | 4 HRS OT | 5.00 | 20.00 | $74.38 | $1,487.60 | | $27.79 | |
| labor | | 6 | | 4 HRS OT | 5.00 | 120.00 | $69.60 | $8,352.00 | | $25.39 | |
| TRENCH DRAIN TOP OF RAMP | 40 LF | | REVISED | HILL | | | | | | | |
| PREPARATION OF SHOP DRAWINGS | | 1 | $2,000.00 | $2,000.00 | | | | | $2,000.00 | | |
| CAST IRON GRATE | 40 LF | 40 | $91.00 | $60.00 | | | | | $3,640.00 | | |
| CUSTOM BUILT FRAME | | 40 | $42.00 | $35.00 | | | | | $1,680.00 | | |
| DELIVERY OF FRAME & GRATE | | 1 | $400.00 | $200.00 | | | | | $200.00 | | |
| WE ATTACHED OUR QUOTES FOR THESE ITEMS | | | | | | | | | | | |
| CONCRETE | 2.22 | | | | | | | | $0.00 | | |
| BASE | 12.41 | | | | | | | | $0.00 | | |
| WALLS | 14.64 | | | | | | | | $0.00 | | |
| TOTAL CONCRETE | 14.64 | 16.00 | $119.00 | | | | | | $1,904.00 | | |
| SHORT LOAD | 1.00 | | $100.00 | | | | | | $100.00 | | |
| COLOR PIGMENTED CONCRETE | 12.41 | 13.00 | $92.00 | | | | | | $1,196.00 | | |
| FORMS | 40.00 | | | | | | | | $0.00 | | |
| BASE | 670.40 | 40 | $1.00 | | | | | | $40.00 | | |
| WALLS | 670.40 | | $1.20 | | | | | | $804.48 | | |
| REBAR | NO DETAIL | | | | | | | | | | |
| BLANKETS TO COVER CURB | 2.00 EA | 2.00 | $32.00 | | | | | | $64.00 | | |
| EXCAVATE TRENCH DRAIN | 40.00 CY | | | | | | | | | | |
| EXCAVATION TO BE STOCK PILED AND REMOVED AS CONTAMINATED MATERIAL | | | | | | | | | | | |
| EXCESS EXCAVATE MATERIAL | 26.67 | 36.00 | | | | | | | | | |

14

| Description | Qty/Unit | | | Factor | Hours | Rate | Amount | | Total |
|---|---|---|---|---|---|---|---|---|---|
| IMPORTED FILL  TAG M FOR BACK FILL | 26.67 CY | 33.33 | | | | $24.00 | | | $800.00 |
| COST TO EXCAVATE AND STOCKPILE EXCESS MATERIAL | | | | | | | | | |
| Foreman | 1 | | HILL 4HRS | 1.00 | 8.00 | $74.38 | $595.04 | | |
| Back hoe | 1 | | 4HRS | 1.00 | 8.00 | $17.86 | | $142.88 | |
| fuel | 20 gal per day | | | 1.00 | 20.00 | $3.00 | | $60.00 | |
| Operator | 1 | | 4HRS | 1.00 | 8.00 | $89.33 | $714.64 | | |
| labor | 2 | | 8HRS | 1.00 | 16.00 | $69.60 | $1,113.60 | | |
| TAMPER | 1 | | 4HRS | 1.00 | 8.00 | $5.00 | | $40.00 | |
| | | | | | | | | | |
| HILL REDUCED TIME BY ONE HALF | | | | | | | | | |
| | | | | | | | | | |
| COST TO INSTALL CONCRETE | | | | | | | | | |
| COST TO INSTALL BASE & PLACE CONCRETE | | | | | | | | | |
| Foreman | 1 | | HILL 4HRS | 1.00 | 8.00 | $74.38 | $595.04 | | |
| carpenter foreman | 1 | | 4HRS | 1.00 | 8.00 | $103.05 | $824.40 | | |
| carpenter | 1 | | 4HRS | 1.00 | 8.00 | $98.56 | $788.48 | | |
| labor | 3 | | 12HRS | 1.00 | 24.00 | $69.60 | $1,670.40 | | |
| lather | | | | 1.00 | 0.00 | $93.46 | $0.00 | | |
| | | | | | | | | | |
| COST TO INSTALL WALL FORMS | 670.40 | | | | | | | | |
| Foreman | 1 | | HILL 2HRS | 3.00 | 24.00 | $74.38 | $1,785.12 | | |
| carpenter foreman | 1 | | 2HRS | 3.00 | 24.00 | $103.05 | $2,473.20 | | |
| carpenter | 1 | | 2HRS | 3.00 | 24.00 | $98.56 | $2,365.44 | | |
| labor | 2 | | 8HRS | 3.00 | 48.00 | $69.60 | $3,340.80 | | |
| lather | NO REBAR | | | 3.00 | | $93.46 | $0.00 | | |
| | | | | | | | | | |
| A TOTAL OF 120 LF OF WALL FORMS WILL HAVE TO BE INSTALLED | | | | | | | | | |
| THE INSIDE WALL IS A ONE SIDED FORM | | | | | | | | | |
| THE FRAME FOR THE TRENCH GRATE WILL BE INSTALLED INTO THE FORM WORK | | | | | | | | | |
| | | | | | | | | | |
| COST TO  PLACE CONCRETE BASE | 2.22 CY | | HILL | | | | | | |
| Foreman | 1 | | 2HRS | 0.50 | 4.00 | $74.38 | $297.52 | | |
| labor | 3 | | 4HRS | 0.50 | 12.00 | $69.60 | $835.20 | | |
| | | | | | | | | | |
| HILL REDUCED TIME BY HALF OF WAG AND NUMBER OF LABORS | | | | | | | | | |
| LABOR REQUIRED LABOR OB CHUTE, 2 LABORS WITH SHOVELS AND 1 LABOR ON VIBRATOR | | | | | | | | | |
| WE HAD CONSTRUCTED OTHER TRENCH DRAINS AS EXTRAS AND HAD SIGNED WORK SHEET | | | | | | | | | |
| THE THIM WE HAVE USED IS BASED UPON HISTORY | | | | | | | | | |
| | | | | | | | | | |
| COST TO  PLACE CONCRETE WALLS | 13.00 CY | | HILL | | | | | | |
| Foreman | 1 | | 4HRS | 0.75 | 6.00 | $74.38 | $446.28 | | |
| labor | 3 | | 8HRS | 0.75 | 18.00 | $69.60 | $1,252.80 | | |

16

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| TOTAL OF 2 LOADS OF CONCRETE REQUIRED FOR WALLS | | | | | | | | |
| CONCRETE SUPPLIER WILL NOT SEND TO TRUCKS AT THE SAME TIME | | | | | | | | |
| THEIR WILL BE A TIME IN BETWEEN TRUCKS | | | | | | | | |
| | | | | | | | | |
| COST TO STRIP  WALL FORMS & CLEAN FORMS | | | | | | | | |
| | | | | HILL | | | | |
| carpenter foreman | | 1 | | 2HRS | 1.00 | 8.00 | $103.05 | $824.40 |
| carpenter | | 1 | | 2HRS | 1.00 | 8.00 | $98.56 | $788.48 |
| labor | | 2 | | 4HRS | 1.00 | 16.00 | $69.60 | $1,113.60 |
| return of forms | | 1 | | | 1.00 | | $500.00 | |
| | | | | | | | | |
| COST TO INSTALL  GRATE AND DRILL AND TAP FRAME TO SECURE GRATE | | | | | | | | |
| | | | | HILL | | | | |
| Foreman | | 1 | | 4HRS | 1.00 | 8.00 | $74.38 | $595.04 |
| labor | | 3 | | | 1.00 | 24.00 | $69.60 | $1,670.40 |
| | | | | | | | | |
| COST TO BACK FILL WITH IMPORTED MATERIAL | | | | | | | | |
| | | | | HILL | | | | |
| Foreman | | 1 | | 2HRS | 1.00 | 4.00 | $74.38 | $297.52 |
| Back hoe | | 1 | | 2HRS | 1.00 | 4.00 | $17.86 | |
| fuel | | 20 | gal per day | 10 GAL | 1.00 | 10.00 | $3.00 | |
| Operator | | 1 | | 2HRS | 1.00 | 4.00 | $89.33 | $357.32 |
| labor | | 2 | | 4HRS | 1.00 | 4.00 | $69.60 | $278.40 |
| TAMPER | | 1 | | 2HRS | 1.00 | 4.00 | $5.00 | |
| | | | | | | | | |
| WAG WILL ADJUST TO 4 HOURS ONLY IF WE CAN START ON THE DRAIN PIPE | | | | | | | | |
| | | | | | | | | |
| COST TO INSTALL DRAIN PIPE FROM | | 120 | LF | REVISED | | | | |
| TRENCH DRAIN TO CATCH BASIN | | | | | | | | |
| WE ARE ASSUMING THE LENGTH BECAUSE THE DRAWING IS NOT TO SCALE | | | | | | | | |
| 8" DIP | 120 | | 120 | $145.99 | | | | |
| STONE | 6.67 | 9 | 12.15 | $25.50 | | | | |
| DELIVERY OF STONE | 6.67 | 11.25 | 15.19 | $19.75 | | | | |
| the minimum quantity of stone delivered by a supplier is +/-18-20 cy | | | | | | | | |
| WAG had to pick up required stone | 4 hours for truck | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| THE DETAILS SHOW STONE UNDER DRAIN PIPE | | | | | | | | |
| DEP AND DOT ALSO REQUIRE STONE UNDER DRAIN PIPE | | | | | | | | |
| | | | | | | | | |
| EXCAVATION | 66.67 | CY | | | | | | |
| REMOVE EXCESS TRUCK | 88.89 | | 133.33 | | | | | |
| IMPORTED FILL  TAG M  FOR BACK FILL | | | | | | | | |
| | 88.89 | CY | 111.11 | $24.00 | | | | |

| Description | Qty | Unit | Days | Hours | Rate | Amount |
|---|---|---|---|---|---|---|
| WE ARE NOW DIGGING IN THE WINTER WITH FROZEN GROUND | | | | | | |
| EXCAVATE AND INSTALL | 120 LF | | | | | |
| AND STOCK PILE | | HILL | | | | |
| Foreman | 1 | | 3.00 | 24.00 | $74.38 | $1,785.12 |
| HYD EXCAVATOR | 1 | | 3.00 | 24.00 | $53.75 | $1,290.00 |
| fuel | 35 gal per day | $80.00 | 3.00 | 105.00 | $3.00 | $315.00 |
| Operator LOCAL 14 | 1 | | 3.00 | 24.00 | $89.33 | $2,143.92 |
| labor | 2 | | 3.00 | 48.00 | $69.60 | $3,340.80 |
| TAMPER | 1 | | 3.00 | 24.00 | $5.00 | |
| ADDED BECAUSE OF FROST IN GROUND | | | | | | |
| compressor and jack hammers | 1 | | 3.00 | 24.00 | $31.25 | $750.00 |
| fuel | 20 gal per day | | 3.00 | 60.00 | $3.00 | $180.00 |
| Operator | 1 | | 3.00 | 24.00 | $89.33 | $2,143.92 |
| labor | 3 | | 3.00 | 72.00 | $69.60 | $5,011.20 |
| TRENCK FOR THE DRAIN PIPE WILL BE SLOW BECAUSE OF LACK OF INFORMATION ON THE | | | | | | |
| EXISTING UTILTIES | | | | | | |
| BACK FILL OF PIPE WITH INPORTED FILL | | HILL | | | | |
| Foreman | 1 | 8HRS | 2.00 | 16.00 | $74.38 | $1,190.08 |
| Back hoe | 1 | 8HRS | 2.00 | 16.00 | $17.86 | $285.76 |
| fuel | 20 gal per day | 20GAL | 2.00 | 40.00 | $3.00 | $120.00 |
| Operator | 1 | 8HRS | 2.00 | 16.00 | $89.33 | $1,429.28 |
| labor | 2 | 16HRS | 2.00 | 32.00 | $69.00 | $2,227.20 |
| TAMPER | 1 | 8HRS | 2.00 | 16.00 | $5.00 | |
| HILL REDUCED TIME BY HALF OF WAG | | | | | | |
| COST TO PENETRATE EXISTING MANHOLE FOR NEW PIPE | | | | | | |
| AND BRICK IN PIPE | | HILL | | | | |
| Foreman | 1 | 4HRS | 1.00 | 8.00 | $74.38 | $595.04 |
| labor | 2 | | 1.00 | 16.00 | $69.60 | $1,113.60 |
| COMPRESSOR | 1 | | 1.00 | 8.00 | $31.25 | $250.00 |
| Operator | 1 | | 1.00 | 8.00 | $89.33 | $714.64 |
| COST TO INSTALL CONCRETE FOOTINGS | REVISED | DELETED | | | | |
| FOR FENCE | | | | | | |
| COST OF NEW STEEL PICKED FENCE | | | | | | |
| GOOD TO APRIL | | | | | | |
| THE ORIGINAL CONTRACT DRAWINGS HAD THE MAJORITY OF THE | | | | | | |
| STEEL FENCE BEING LEVEL | | | | | | |
| COST OF SHOP DRAWINGS | 1 | | | | $3,000.00 | $3,000.00 |

I7

| Item | Qty | Unit | Crew # | Note | Price | Qty2 | HILL | Hours | Rate per hour | LABOR | Subtotal | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **STEEL FACE CURB TO COMPLETE STREET ENDS** | | | | | | 100 | LF | | | | | |
| **APROX 50' ON EACH STREET** | | | | | | | | | | | | |
| CONCRETE CURB | 3.22 | CY | | | $119.00 | 4.00 | | | | | | $476.00 |
| SHORT LOAD CHARGE | 1.00 | | | | $100.00 | 1.00 | | | | | | $100.00 |
| COLOR PIGMENTED CONCRETE | 3.22 | BAGS | | | $92.00 | 4.00 | | | | | | $368.00 |
| FORMS | 300.00 | SF | | | $1.00 | 300.00 | | | | | | $300.00 |
| 12.32 STEEL CURB | 100.00 | | | | | 110.00 | WE HAVE | | | | | $0.00 |
| EXPANSION JOINT | 27.64 | SF | | | $0.72 | 30.00 | | | | | | $21.60 |
| SEAL JOINTS | 38.50 | LF | | | $9.25 | 2.00 | | | | | | $18.50 |
| PICK UP & DELIVER MISC. ITEMS | 1.00 | | | | $200.00 | 1.00 | | | | | | $200.00 |
| EXCAVATION | 30.56 | CY | | | | | | | | | | |
| REMOVE EXCESS TRUCK | 7.41 | | | | | 11.12 | | | | | | |
| BLANKETS TO COVER CURB | 10.00 | EA. | | | | 10.00 | | | | | | $0.00 |
| | | | | | | | | | | | | |
| IMPORTED FILL  TAG M  FOR BACK FILL | | | | | | | | | | | | |
| | 7.41 | CY | | | $24.00 | 9.26 | | | | | | $222.22 |
| | | | | | | | | | | | | |
| **HILL DID NOT MAKE ANY CHAGES** | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| **CREW TO INSTALL STEEL FACED CURB** | | | | | | | | | | | | |
| EXCAVATE CURB AND STOCK PILE | | | | | | | HILL | | | | | |
| Foreman | | | 1 | | | 2.00 | | 16.00 | $74.38 | $1,190.08 | | |
| Back hoe | | | 1 | | | 2.00 | | 16.00 | $17.86 | | $285.76 | |
| fuel | | | 20 | gal per day | | 2.00 | | 40.00 | $3.00 | | | $120.00 |
| Operator | | | 1 | | | 2.00 | | 32.00 | $89.33 | $1,429.28 | | |
| labor | | | 2 | | | 2.00 | | 32.00 | $69.60 | $2,227.20 | | |
| TAMPER | | | 1 | | | 2.00 | | 16.00 | $5.00 | | $80.00 | |
| | | | | | | | | | | | | |
| **COST TO INSTALL CURB FORMS** | | | | | | | HILL | | | | | |
| Foreman | | | 1 | | | 2.00 | | 16.00 | $74.38 | $1,190.08 | | |
| carpenter foreman | | | 1 | | | 2.00 | | 16.00 | $103.05 | $1,648.80 | | |
| carpenter | | | 1 | | | 2.00 | | 16.00 | $98.56 | $1,576.96 | | |
| labor | | | 2 | | | 2.00 | | 32.00 | $69.60 | $2,227.20 | | |
| | | | | | | | | | | | | |
| **COST TO PLACE CONCRETE** | | | | | | | HILL | | | | | |
| Foreman | | | 1 | | | 1.00 | | 8.00 | $74.38 | $595.04 | | |
| labor | | | 3 | | | 1.00 | | 24.00 | $69.60 | $1,670.40 | | |
| mason | | | 1 | | | 1.00 | | 8.00 | $86.62 | $692.96 | | |
| | | | | | | | | | | | | |
| **COST TO STRIP  CURB FORMS & CLEAN FORMS** | | | | | | | HILL | | | | | |
| carpenter foreman | | | 1 | | | 1.00 | | 8.00 | $103.05 | $824.40 | | |
| carpenter | | | 1 | | | 1.00 | | 8.00 | $98.56 | $788.48 | | |
| labor | | | 1 | | | 2.00 | | 16.00 | $69.60 | $1,113.60 | | |
| return of forms | | | 1 | | | 1.00 | | | $500.00 | $500.00 | | $500.00 |

18

**ADJUST EXISTING CASTINGS TO GRADE**

DUE TO LACK OF INFORMATION WE ARE ASSUMING  ADJUSTING 8 FRAMES AND GRATES — 8 EA.

| Item | Qty | Units | Unit | Unit Price | Days | Hours | Rate | Amount |
|---|---|---|---|---|---|---|---|---|
| BRICK | | 8 | 5 | $80.00 | | | | $400.00 |
| SAND AND CEMENT | | 8 | 5 | $50.00 | | | | $250.00 |
| HILL DID NOT MAKE ANY CHAGES | | | | | | | | |
| **HILL** | | | | | | | | |
| Foreman | 1 | | | | 2.00 | 16.00 | $74.38 | $1,190.08 |
| Back hoe | 1 | | | | 2.00 | 16.00 | $17.86 | $285.76 |
| fuel | 20 gal per day | | | | 2.00 | 40.00 | $3.00 | $120.00 |
| Operator | 1 | | | | 2.00 | 16.00 | $89.33 | $1,429.28 |
| labor | 2 | | | | 2.00 | 32.00 | $69.60 | $2,227.20 |
| TAMPER | 1 | | | | 2.00 | 16.00 | $5.00 | $80.00 |
| COMPRESSOR | 1 | | | | 2.00 | 16.00 | $31.25 | $500.00 |
| Operator | 1 | | | | 2.00 | 16.00 | $89.33 | $1,429.28 |

HILL DID NOT MAKE ANY CHAGES

**COST TO INSTALL TREES AND CU SOIL**

| Item | Qty | Units | Unit | Unit Price | Days | Hours | Rate | Amount |
|---|---|---|---|---|---|---|---|---|
| TREES | 9 | | EA. | | | | | |

THE TREES WOULD HAVE BEEN DELIVERED AT THE SAME TIME
ALL THE TREES FOR THIS PROJECT WOULD HAVE BEEN INSTALLED BY THE LANDSCAPE CREW AT THE
AT THE SAME
WE ARE NOW DIGGING IN THE WINTER WITH FROZEN GROUND

| Item | Qty | Units | Unit | Unit Price | Days | Hours | Rate | Amount |
|---|---|---|---|---|---|---|---|---|
| TREES | | 9 | | $325.00 | 9.00 | | | $2,925.00 |
| TRUCKING TO PICK UP TREES | | 1 | | $600.00 | 9.00 | | | $600.00 |

TOTAL DISTANCE FROM YARD MANORVILLE 51.4 AND MANORVILLE TO BRONX 67.3
TOTAL 118.7 MILES

| Item | Qty | Units | Unit | Unit Price | Days | Hours | Rate | Amount |
|---|---|---|---|---|---|---|---|---|
| MULCH | 2.08 | | | $35.00 | 2.50 | | | $87.50 |
| TRUCKING TO PICK UP MULCH | | | | $50.00 | 2.50 | | | $125.00 |
| CU SOIL | 111.00 | | CY | $58.00 | 138.75 | | | $6,706.25 |
| | | | TONS | | 115.625 | | | |

WE ARE NOR DIGGING IN THE WINTER WITH FROZEN GROUND
COST TO EXCAVATE FOR CU SOIL

| Item | Qty | Units | Unit | Unit Price | Days | Hours | Rate | Amount |
|---|---|---|---|---|---|---|---|---|
| Foreman | 1 | | | | 3.00 | 24.00 | $74.38 | $1,785.12 |
| HYD EXCAVATOR | 1 | | | | 3.00 | 24.00 | $53.75 | $1,290.00 |
| fuel | 35 gal per day | | | | 3.00 | 105.00 | $3.00 | $315.00 |
| Operator LOCAL 14 | 1 | | | | 3.00 | 24.00 | $89.33 | $2,143.92 |
| labor | 2 | | | | 3.00 | 48.00 | $69.60 | $3,340.80 |
| TAMPER | 1 | | | | 3.00 | 24.00 | $5.00 | $120.00 |
| compressor and jack hammers | 1 | | | | 3.00 | 24.00 | $31.25 | $750.00 |
| fuel | 20 gal per day | | | | 3.00 | 60.00 | $5.00 | $180.00 |
| Operator | 1 | | | | 3.00 | 24.00 | $89.33 | $2,143.92 |
| labor | 3 | | | | 3.00 | 72.00 | $69.60 | $5,011.20 |

**CREW TO  UNLOAD AND INSTALL TREES**

| Item | Qty | Units | Unit | Unit Price | Days | Hours | Rate | Amount |
|---|---|---|---|---|---|---|---|---|
| Foreman | 1 | | | | 1.50 | 12.00 | $74.38 | $892.56 |
| Back hoe | 1 | | | | 1.50 | 12.00 | $17.86 | $214.32 |
| fuel | 20 gal per day | | | | 1.50 | 30.00 | $3.00 | $90.00 |
| Operator | 1 | | | | 1.50 | 12.00 | $89.33 | $1,071.96 |
| labor | 3 | | | | 1.50 | 36.00 | $69.60 | $2,505.60 |
| HILL DID NOT MAKE ANY CHAGES | | | | | | | | |

19

| Description | | Qty | Unit | Rate | Amount | Amount | Amount |
|---|---|---|---|---|---|---|---|
| REMOVE ELECTRICAL VAULT | 1 | | | | | | |
| all electric line have been disconnected | | | | | | | |
| exclude removal of underground electrical conduits | | | | | | | |
| Foreman | 1 | | 1.00 | 8.00 | $74.38 | $595.04 | |
| Back hoe | 1 | | 1.00 | 8.00 | $17.86 | $142.88 | |
| fuel | 20 gal per day | | 1.00 | 20.00 | $3.00 | | $60.00 |
| Operator | 1 | | 1.00 | 8.00 | $89.33 | $714.64 | |
| labor | 3 | | 1.00 | 24.00 | $69.60 | $1,670.40 | |
| dumpster 30 cy | 1 | | 1.00 | | $900.00 | | $900.00 |
| LIGHT POLE FOUNDATIONS AND TRENCHING | | | | | | | |
| NORMAL SWEEPS WERE USED | | | | | | | |
| DEPTH 3' TO 4' | | | | | | | |
| HILL REMARKS WERE THAT THE WORK INVOLVED FOR THE LIGHT POLE FOUNDATION AND TRENCHING IS 90% COMPLETE | | | | | | | |
| THIS IS NOT THE FACTS | | | | | | | |
| WORK STARTED ON THURSDAY 2/01/07 EXCAVATING FOR 11 LIGHT POLE FOUNDATIONS (NO ELECTRICANS ON SITE ) | | | | | | | |
| ON FRIDAY 2/02/07 SET FORM FOR 11 POLE FOUNDATIONS AND PLACED CONCRETE IN 7 FOUNDATIONS (WHAT ELEC HAD READY) | | | | | | | |
| TRENCHED FOR 150 LN FT ON CONDUIT | | | | | | | |
| WORK REMAINING | | | | | | | |
| EXCAVATE FOR 7 MORE FOUNDATIONS | | | | | | | |
| RE EXCAVATE 4 FOUNDATIONDS BECAUSE OF FROZEN GROUND AND BACKFILL AND COMPACT NEW FILL | | | | | | | |
| TRENCH ADDITIONAL 255 LN FEET OF CONDUIT | | | | | | | |
| STRIP FORMS AND SET FORMS FOR REMAINING 11 FOUNDATIONS | | | | | | | |
| BACKFILL POLE FOUNDATIONS WITH CLEAN FILL | | | | | | | |
| LIGHT POLES FOUNDATIONS | 18 EACH | | | | | | |
| TRENCHING OF CONDUITS | 410 LF | | | | | | |
| CONCRETE | 7.44 CY | 8.00 | $119.00 | | | $952.00 | |
| SHORT LOAD CHARGE | | 2.00 EA. | $150.00 | | | $300.00 | |
| COLOR PIGMENTED CONCRETE | 7.44 BAGS | 8.00 | $92.00 | | | $736.00 | |
| FORMS | 467.60 SF | 467.60 | $2.00 | | | $935.20 | |
| BLANKETS TO COVER FOUND | 20 EA. | 20.00 | $32.00 | | | $640.00 | |
| PICK UP & DELIVER MISC. ITEMS | | 1.00 | $200.00 | | | $200.00 | |
| MOVE EQUIPMENT | 1 | 1 | $782.00 | | | $782.00 | |
| ZANO MOVED CAT 320 HYD EXC TO JOP SITE | | | | | | | |
| ZANO MOVED CAT 320 HYD EXC OUT OF JOP SITE | | | $753.00 | | | $753.00 | |
| SEE INVOICE | | | | | | | |
| IMPORTED FILL  TAG M  FOR BACK FILL | 188.15 CY | 235.19 | $24.00 | | | $5,644.44 | |

66.67

LABOR TO INSTALL
BECAUSE OF WINTER CONDITIONS AND
GROUND IS FROZEN WE HAVE TO BREAK UP FROST TO DIG

| Description | Qty | Unit | HILL | | | Rate | Amount | Amount |
|---|---|---|---|---|---|---|---|---|
| **EXCAVATE FOUNDATIONS** | | | **HILL** | | | | | |
| Foreman | 1 | | | 3.00 | 24.00 | $74.38 | $1,785.12 | |
| HYD EXCAVATOR | 1 | 16HRS | | 3.00 | 24.00 | $53.75 | $1,290.00 | |
| fuel | 35 | gal per day | $100.00 | 3.00 | 105.00 | $3.00 | | $315.00 |
| Operator LOCAL 14 | 1 | 16HRS | | 3.00 | 24.00 | $89.33 | $2,143.92 | |
| labor | 3 | 48HRS | | 3.00 | 72.00 | $69.60 | $5,011.20 | |
| compressor and jack hammers | 1 | 16 HRS | | 3.00 | 24.00 | $31.25 | $750.00 | |
| fuel | 20 | gal per day | | 3.00 | 60.00 | $3.00 | | $180.00 |
| Operator | 1 | 16HRS | | 3.00 | 24.00 | $89.33 | $2,143.92 | |
| | | | | | | | | |
| **SET FORMS** | | | **HILL** | | | | | |
| carpenter | 2 | 16HRS | | 4.00 | 64.00 | $98.56 | $6,307.84 | |
| labor | 2 | 16HRS | | 4.00 | 64.00 | $69.60 | $4,454.40 | |
| | | | | | | | | |
| **BACK FILL FOUNDATIONS** | | | **HILL** | | | | | |
| Back hoe | 1 | 16HRS | | 2.00 | 16.00 | $17.86 | $285.76 | |
| fuel | 20 | gal per day | 40 GAL | 2.00 | 40.00 | $3.00 | | $120.00 |
| Operator | 1 | 16HRS | | 2.00 | 16.00 | $89.33 | $1,429.28 | |
| labor | 3 | 32HRS | | 2.00 | 48.00 | $69.60 | $3,340.80 | |

BECAUSE OF WINTER CONDITIONS AND
GROUND IS FROZEN WE HAVE TO BREAK UP FROST TO DIG
EXCAVATE FOR CONDUITS    404 LF
100 LF PER DAY

| Description | Qty | Unit | | | | Rate | Amount | Amount |
|---|---|---|---|---|---|---|---|---|
| HYD EXCAVATOR | 1 | | | 2.00 | 16.00 | $53.75 | $860.00 | |
| fuel | 35 | gal per day | | 2.00 | 70.00 | $3.00 | | |
| Operator LOCAL 14 | 1 | | | 2.00 | 16.00 | $89.33 | $1,429.28 | |
| labor | 3 | | | 2.00 | 48.00 | $69.60 | $3,340.80 | |
| compressor and jack hammers | 1 | | | 2.00 | 16.00 | $31.25 | $500.00 | |
| fuel | 20 | gal per day | | 2.00 | 40.00 | $3.00 | | $120.00 |
| Operator | 1 | | | 2.00 | 16.00 | $89.33 | $1,429.28 | |
| | | | | | | | | |
| **BACK FILL CONDUITS** | | | | | | | | |
| HYD EXCAVATOR | 1 | | | 3.00 | 24.00 | $53.75 | $1,290.00 | |
| fuel | 35 | gal per day | | 3.00 | 105.00 | $3.00 | | $315.00 |
| Operator LOCAL 14 | 1 | | | 3.00 | 24.00 | $89.33 | $2,143.92 | |
| labor | 3 | | | 3.00 | 72.00 | $69.60 | $5,011.20 | |

21

# EXHIBIT E

Electronic Filing
ECF 1:07-cv-10639

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X

WILLIAM A. GROSS CONSTRUCTION                     07-CV-10639-LAK
ASSOCIATES, INC.,

                                Plaintiff,

                - against -                        **Answer**

AMERICAN MANUFACTURERS MUTUAL
INSURANCE COMPANY,

                                Defendant.
----------------------------------------------------------------------X

Defendant, **American Manufacturers Mutual Insurance Company,** answers the amended

complaint in this action as set forth below.  The amended complaint will hereinafter be

referred to simply as the "complaint"; the parties referred to therein, as "Gross",

"American", "Cauldwell", and "DASNY".

### Denials/Admissions

         **First**   American denies it has knowledge or information sufficient to form

a belief as to any of the allegations made in the paragraphs of the complaint numbered 1,

2, 3, 5, or 6; except American admits it is incorporated and headquartered in Illinois, and

American believes DASNY is a New York public-benefit corporation.

         **Second**   American admits the allegations made in the paragraphs of the

complaint numbered 4 and 31.

         **Third** American denies it has knowledge or information sufficient to form

a belief as to any of the allegations made in the paragraphs of the complaint numbered 7

or 8; except American believes Cauldwell entered into a contract with DASNY for certain work at the new Bronx Criminal Court Complex, the full text of that contract being the best evidence of its contents.

**Fourth**  American denies the allegations of paragraphs 9 and 35 of the complaint; except American admits American was Cauldwell's surety on the labor-and-material bond referred to, but refers to the full text of that bond for its actual terms and conditions.

**Fifth**  American denies it has knowledge or information sufficient to form a belief as to any of the allegations made in the paragraphs of the complaint numbered 10 through 22 or 24 through 27; except that Cauldwell (the principal obligor on the bond for which American was surety) has denied those allegations, has denied due and complete performance by Gross, has denied Gross is entitled to payment as claimed, and has specifically denied that all conditions precedent for any further payment to Gross have occurred, in that, among other things - -

- DASNY has not approved Gross's work as satisfactory and complete but has in fact found Gross's work to be defective and incomplete;

- DASNY has not agreed to pay for any of the change-orders or extra-work items claimed by Gross;

- DASNY has made price reductions, for items not furnished by Gross but deleted from work Gross was previously obligated to furnish;

- DASNY has allowed no additional compensation for the delays and disruptions claimed by Gross.

**Sixth**  American denies it has knowledge or information sufficient to form a belief as to the allegations of paragraphs 23, 30, or 32, but denies receiving a sworn proof

2

of claim requested from Gross, and otherwise admits receiving written notice of Gross's claim and copies of various documents purporting to be for change-orders, etc.

**Seventh** American denies each and every allegation made in the paragraphs of the complaint numbered 28, 29, and 37.

**Eighth** American denies the allegations of paragraphs 33 and 34 of the complaint, except admits American has made no payment to Gross, Gross's claims having been rejected by the principal obligor on the bond, namely, Cauldwell, who communicated its objections to Gross.

**Ninth** American denies it has knowledge or information sufficient to form a belief as to the allegations of paragraph 36 of the complaint, and respectfully requests that Gross be put to its proof as to due and timely compliance with all the terms and conditions of the labor-and-material payment bond, including with respect to the following:

- That, notwithstanding the objections stated by Cauldwell, and the lack of requisite DASNY approvals (referred to in paragraph "Fifth" above), Gross nevertheless became entitled to payment from Cauldwell as claimed;

- That Cauldwell failed promptly to pay Gross in full all that was actually due, owing, and payable;

- That suit was commenced against American within the time-limits for suit under the bond; and

- That Gross's claim against American is truly for labor or materials within the meaning of the labor-and-material payment bond.

3

## First Affirmative Defense

**Tenth** According to Cauldwell, Gross agreed not to claim any additional compensation or price increases, for delays or otherwise, except to the extent such additional compensation or price increases were recognized by and paid for by DASNY, and DASNY has not approved or paid for any of the additional compensation or price increases claimed by Gross in this action.

## Second Affirmative Defense

**Eleventh** American reserves the right to assert all other defenses, and all recoupments and set-offs, that may be available to Cauldwell, the principal obligor on the payment bond, for which American was merely the surety.

## Counterclaim

**Twelfth** American reserves the right to seek an award of counsel fees at the close of this case, under New York State Finance Law §137, or other provisions of law that may be applicable, in the event the claims made by plaintiff Gross prove to be without substantial basis in law or fact, whether as to entitlement, amount, or because premature.

## Request for Judgment

Wherefore, American respectfully requests judgment dismissing the claims against it in this

action and awarding American costs, disbursements, and counsel fees.

Dated:  New York, NY
         December 17, 2007

                     ZICHELLO & McINTYRE, LLP
                     Attorneys for Defendant, American Manufacturers
                      Mutual Insurance Company

By: /s/           Vincent J. Zichello
                 Vincent J. Zichello (VZ-3487)
                 Office & P.O. Address
                 420 Lexington Avenue
                 New York, NY 10170
                 Tel. 212-972-5560
                 E-mail  zimc@msn.com

# EXHIBIT F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————————x

WILLIAM A. GROSS CONSTRUCTION
ASSOCIATES, INC.,                                    07-CV-10639 (LAK)(AJP)

                              Plaintiff,

                                                     **ANSWER TO FOURTH-
                                                     PARTY COMPLAINT
                                                     <u>AND COUNTERCLAIMS</u>**

              - against -

AMERICAN MANUFACTURER'S MUTUAL
INSURANCE COMPANY,
                              Defendant.
————————————————————————————x
AMERICAN MANUFACTURER'S MUTUAL
INSURANCE COMPANY,

                       Third-Party Plaintiff,

              – against –

CAULDWELL WINGATE COMPANY, LLC,

                       Third-Party Defendant.
————————————————————————————x
CAULDWELL WINGATE COMPANY, LLC,

                       Fourth-Party Plaintiff,

              – against –

DORMITORY AUTHORITY OF THE STATE OF
NEW YORK,

                       Fourth-Party Defendant.
————————————————————————————x

          Fourth-Party Defendant, the DORMITORY AUTHORITY OF THE STATE OF NEW

YORK (hereinafter "DASNY"), by its attorney, MICHAEL A. CARDOZO, Corporation

Counsel of the City of New York,  hereby Answers the Fourth-Party Complaint, as follows:

## AS AND FOR DASNY'S RESPONSE TO THE
## ALLEGATIONS CONCERNING JURISDICTION

1.      Denies the allegations set forth in paragraph "1" of the Fourth-Party Complaint.

## AS AND FOR DASNY'S RESPONSE TO THE
## ALLEGATIONS CONCERNING THE PARTIES

2.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "2" of the Fourth-Party Complaint.

3.      Denies the allegations set forth in paragraph "3" of the Fourth-Party Complaint, except admits that DASNY is a public benefit corporation organized and existing under the Public Authorities Law of the State of New York.

## AS AND FOR DASNY'S RESPONSE TO THE
## ALLEGATIONS SUMMARIZING THE CASE

4.      Denies knowledge or information sufficient to for a belief as to the truth of the allegations set forth in paragraph "4" of the Fourth-Party Complaint, except admits that DASNY awarded a contract to Cauldwell Wingate and that contract was one of seventeen individual prime contracts awarded by DASNY for the construction of the new Bronx County Criminal Court Complex.

5.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "5" of the Fourth-Party Complaint.

6.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "6" of the Fourth-Party Complaint.

7.      Denies the allegations set forth in paragraph "7" of the Fourth-Party Complaint.

8.      Denies the allegations set forth in paragraph "8" of the Fourth-Party Complaint.

9.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "9" of the Fourth-Party Complaint.

10.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "10" of the Fourth-Party Complaint.

11.     Denies the allegations set forth in paragraph "11" of the Fourth-Party Complaint.

12.     Denies the allegations set forth in paragraph "12" of the Fourth-Party Complaint.

13.     Denies the allegations set forth in paragraph "13" of the Fourth-Party Complaint.

14.     Denies the allegations set forth in paragraph "14" of the Fourth-Party Complaint.

15.     Denies the allegations set forth in paragraph "15" of the Fourth-Party Complaint.

16.     Denies the allegations set forth in paragraph "16" of the Fourth-Party Complaint.

17.     Denies the allegations set forth in paragraph "17" of the Fourth-Party Complaint.

18.     Denies the allegations set forth in paragraph "18" of the Fourth-Party Complaint.

19.     Denies the allegations set forth in paragraph "19" of the Fourth-Party Complaint.

20.     Denies the allegations set forth in paragraph "20" of the Fourth-Party Complaint.

21.     Denies the allegations set forth in paragraph "21" of the Fourth-Party Complaint.

22.     Denies the allegations set forth in paragraph "22" of the Fourth-Party Complaint.

23.     Denies the allegations set forth in paragraph "23" of the Fourth-Party Complaint.

24.     Denies the allegations set forth in paragraph "24" of the Fourth-Party Complaint, except denies knowledge or information sufficient to for a belief as to the allegation that Gross's claim constitutes part of the damages sought by Cauldwell Wingate against DASNY.

25.     Denies the allegations set forth in paragraph "25" of the Fourth-Party Complaint, except admits that Bovis Lend Lease was the initial construction manager and that Hill International was hired by DASNY to replace Bovis.

## AS AND FOR DASNY'S RESPONSE TO THE ALLEGATIONS CONCERNING THE BACKGROUND

26.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "26" of the Fourth-Party Complaint, except admits that Cauldwell Wingate and DASNY entered into a contract on December 20, 2002 and respectfully refers the Court to the documents annexed to the Fourth-Party Complaint as Exhibits A and B thereto for a full and complete statement of their contents.

27.    Admits the allegations set forth in paragraph "27" of the Fourth-Party Complaint.

28.    Admits the allegations contained in paragraph "28" of the Fourth-Party Complaint.

## AS AND FOR DASNY'S RESPONSE TO THE ALLEGATIONS CONCERNING DELAYS ENCOUNTERED BY CAULDWELL WINGATE

29.    Denies knowledge or information sufficient to form a belief as to the allegations set forth in paragraph "29" of the Fourth-Party Complaint.

30.    Denies the allegations set forth in paragraph "30" of the Fourth-Party Complaint.

31.    Denies knowledge or information sufficient to form a belief as to the allegations set forth in paragraph "31" of the Fourth-Party Complaint.

32.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "32" of the Fourth-Party Complaint.

33.    Denies the allegations set forth in paragraph "33" of the Fourth-Party Complaint, except admits that the various floor finishes were within Cauldwell-Wingate's scope of work.

34.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "34" of the Fourth-Party Complaint.

35.    Denies the allegations set forth in paragraph "35" of the Fourth-Party Complaint, except admits that the work required under the contract between the parties was completed after the original scheduled completion date.

36.    Denies knowledge or information sufficient to for a belief as to the truth of the allegations set forth in paragraph "36" of the Fourth-Party Complaint.

37.    Denies the allegations set forth in paragraph "37" of the Fourth-Party Complaint, except admits that the MEPS coordination phase started in 2002.

38.    Denies the allegations set forth in paragraph "38" of the Fourth-Party Complaint, except admits that DASNY required Cauldwell Wingate to repair and replace ceiling tiles.

39.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "39" of the Fourth-Party Complaint.

40.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "40" of the Fourth-Party Complaint.

41.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "41" of the Fourth-Party Complaint, except denies that DASNY failed to provide coordinated drawings.

42.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "42" of the Fourth-Party Complaint.

43.    Denies the allegations set forth in paragraph "43" of the Fourth-Party Complaint.

44.    Denies the allegations set forth in paragraph "44" of the Fourth-Party Complaint.

45.    Denies the allegations set forth in paragraph "45" of the Fourth-Party Complaint.

46.    Denies the allegations set forth in paragraph "46" of the Fourth-Party Complaint, except denies knowledge or information sufficient to form a belief as to the truth of

the allegation that Cauldwell Wingate expected a complete, coordinated and constructible set of contract documents.

<u>**AS AND FOR DASNY'S RESPONSE TO THE
ALLEGATIONS THAT DASNY REFUSED TO PAY FOR EXTRA WORK**</u>

47. Denies the allegations set forth in paragraph "47" of the Fourth-Party Complaint.

48. Denies the allegations set forth in paragraph "48" of the Fourth-Party Complaint.

49. Denies the allegations set forth in paragraph "49" of the Fourth-Party Complaint.

50. Denies the allegations set forth in paragraph "50" of the Fourth-Party Complaint.

51. Denies the allegations set forth in paragraph "51" of the Fourth-Party Complaint.

52. Denies the allegations set forth in paragraph "52" of the Fourth-Party Complaint

53. Denies the allegations set forth in paragraph "53" of the Fourth-Party Complaint.

54. Denies the allegations set forth in paragraph "54" of the Fourth-Party Complaint.

55. Denies the allegations set forth in paragraph "55" of the Fourth-Party Complaint.

## AS AND FOR DASNY'S RESPONSE TO THE ALLEGATIONS
## THAT DASNY REFUSED TO PAY RETAINAGE AND THE CONTRACT BALANCE

56.    Denies the allegations set forth in paragraph "56" of the Fourth-Party Complaint.

57.    Admits the allegations set forth in paragraph "57" of the Fourth-Party Complaint, except denies that '[o]nce Cauldwell Wingate had substantially completed its work, DASNY was required to reduce the retainage amount, less two times the value of the work remaining to be done."

58.    Denies the allegations set forth in paragraph "58" of the Fourth-Party Complaint, except admits that DASNY assessed Cauldwell Wingate for backcharges.

59.    Denies the allegations set forth in paragraph "59" of the Fourth-Party Complaint.

60.    Denies the allegations set forth in paragraph "60" of the Fourth-Party Complaint.

61.    Denies the allegations set forth in paragraph "61" of the Fourth-Party Complaint.

62.    Denies the allegations set forth in paragraph "62" of the Fourth-Party Complaint, except admits that DASNY levied a back charge against Cauldwell Wingate.

63.    Denies the allegations set forth in paragraph "63" of the Fourth-Party Complaint.

64.    Denies the allegations set forth in paragraph "64" of the Fourth-Party Complaint.

65.    Denies the allegations set forth in paragraph "65" of the Fourth-Party Complaint, except admits that DASNY presented Cauldwell Wingate with a punch list.

66.    Denies the allegations set forth in paragraph "66" of the Fourth-Party Complaint.

67.    Denies the allegations set forth in paragraph "67" of the Fourth-Party Complaint.

68.    Denies the allegations set forth in paragraph "68" of the Fourth-Party Complaint.

69.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "69" of the Fourth-Party Complaint.

70.    Denies the allegations set forth in paragraph "70" of the Fourth-Party Complaint.

## AS AND FOR DASNY'S RESPONSE TO ALLEGATIONS CONCERNING ALLEGED PROBLEMS ENCOUNTERED BY CAULDWELL WINGATE'S SUBCONTRACTORS

### *Drywall And Ceiling Work*

71.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "71" of the Fourth-Party Complaint, except admits that Cauldwell Wingate subcontracted with Component Assembly Systems ("CAS").

72.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "72" of the Fourth-Party Complaint.

73.    Denies the allegations set forth in paragraph "73" of the Fourth-Party Complaint.

74.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "74" of the Fourth-Party Complaint, except denies that there was poor work coordination by DASNY.

*Architectural Metal And Glass Work*

75.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "75" of the Fourth-Party Complaint.

76.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "76" of the Fourth-Party Complaint, except admits that Fourth-Party Plaintiff's subcontractor for the architectural metal and glass work was UAD Group ("UAD").

77.     Denies the allegations set forth in paragraph "77" of the Fourth-Party Complaint.

78.     Denies the allegations set forth in paragraph "78" of the Fourth-Party Complaint, except denies knowledge or information sufficient to form a belief as to the truth of the allegation that "Cauldwell Wingate generated almost 200 RFIs on behalf of UAD."

79.     Denies the allegations set forth in paragraph "79" of the Fourth-Party Complaint, except admits that work on the project extended to over 36 months.

80.     Denies the allegations set forth on paragraph "80" of the Fourth Party Complaint, except admits that UAD delivered glass panels to the work site.

81.     Denies the allegations set forth in paragraph "81" of the Fourth-Party Complaint, except admits that the completion date of the project was revised to November 30, 2005.

82.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "82" of the Fourth-Party Complaint.

83.     Denies the allegations set forth in paragraph "83" of the Fourth-Party Complaint.

84.    Denies the allegations set forth in paragraph "84" of the Fourth-Party Complaint.

85.    Denies the allegations set forth in paragraph "85" of the Fourth-Party Complaint, except admits that DASNY raised concerns that the five-inch steel plate used to construct the primary connection assemblies was improperly certified, that the weld connecting the five-inch plates was cracking and unacceptable and that DASNY decided to remove the canopy and to back charge Cauldwell Wingate for that work.

86.    Denies the allegations set forth in paragraph "86" of the Fourth-Party Complaint.

87.    Denies the allegations set forth in paragraph "87" of the Fourth-Party Complaint.

88.    Denies the allegations set forth in paragraph "88" of the Fourth-Party Complaint, except admits that DASNY complained that the welds used to attach the upper Canopy supports did not conform to shop drawings.

89.    Denies the allegations set forth in paragraph "89" of the Fourth-Party Complaint, except admits that DASNY inspected the Canopy in or about April 2007 and concluded that a controlled load test was required.

### *Site Work/Landscaping*

90.    Admits the allegations set forth in paragraph "90" of the Fourth-Party Complaint.

91.    Denies the allegations set forth in paragraph "91" of the Fourth-Party Complaint, except admits that the original schedule called for Gross's work to be completed by June 30, 2005.

92.     Denies the allegations set forth in paragraph "92" of the Fourth-Party Complaint.

93.     Denies the allegations set forth in paragraph "93" of the Fourth-Party Complaint.

94.     Denies the allegations set forth in paragraph "94" of the Fourth-Party Complaint.

95.     Admits the allegations set forth in paragraph "95" of the Fourth-Party Complaint.

96.     Denies the allegations set forth in paragraph "96" of the Fourth-Party Complaint, except admits that DASNY was entitled to a credit.

97.     Denies the allegations set forth in paragraph "97" of the Fourth-Party Complaint.

98.     Denies the allegations set forth in paragraph "98" of the Fourth-Party Complaint.

99.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "99" of the Fourth-Party Complaint.

100.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "100" of the Fourth-Party Complaint.

101.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "101" of the Fourth-Party Complaint.

*Masonry Work*

102. Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "102" of the Fourth-Party Complaint, except admits that Cauldwell Wingate engaged Commodore Construction for masonry work.

103. Denies the allegations set forth in paragraph "103" of the Fourth-Party Complaint.

*Tile and Marble*

104. Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "104" of the Fourth-Party Complaint, except admits that Cauldwell Wingate engaged Port Morris Tile & Marble Corp. for tile and stone work.

105. Denies the allegations set forth in paragraph "105" of the Fourth-Party Complaint.

*Hollow Metal and Hardware Work*

106. Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "106" of the Fourth-Party Complaint, except admits that Cauldwell Wingate subcontracted with Long Island Fire Proof Door for general hollow metal and hardware work.

107. Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "107" of the Fourth-Party Complaint.

108. Denies the allegations set forth in paragraph "108" of the Fourth-Party Complaint.

109. Admits the allegations set forth in paragraph "109" of the Fourth-Party Complaint.

110.    Denies the allegations set forth in paragraph "110" of the Fourth-Party Complaint.

111.    Denies the allegations set forth in paragraph "111" of the Fourth-Party Complaint.

***Finish Painting***

112.    Admits the allegations set forth in paragraph "112" of the Fourth-Party Complaint.

113.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "113" of the Fourth-Party Complaint.

114.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "114" of the Fourth-Party Complaint.

## AS AND FOR DASNY'S RESPONSE TO CAULDWELL WINGATE'S CLAIM FOR AN EQUITABLE ADJUSTMENT

115.    Denies the allegations set forth in paragraph "115" of the Fourth-Party Complaint, except admits that Cauldwell Wingate submitted the Adjustment Claim to DASNY.

116.    Admits the allegations set forth in paragraph "116" of the Fourth-Party Complaint.

117.    Denies the allegations set forth in paragraph "117" of the Fourth-Party Complaint.

118.    Denies the allegations set forth in paragraph "118" of the Fourth-Party Complaint.

119.    Denies the allegations set forth in paragraph "119" of the Fourth-Party Complaint.

120.    Denies the allegations set forth in paragraph "120" of the Fourth-Party Complaint, except admits that DASNY's experts tested the panels.

121.    Denies the allegations set forth in paragraph "121" of the Fourth-Party Complaint.

122.    Denies the allegations set forth in paragraph "122" of the Fourth-Party Complaint.

## AS AND FOR DASNY'S RESPONSE TO THE FIRST CLAIM
### (Breach Of Contract – Unpaid Balance)

123.    DASNY repeats and realleges the above responses the allegations set forth in paragraphs "1" through "122" of the Fourth-Party Complaint with the same force and effect as though fully set forth at length herein.

124.    Denies the allegations set forth in paragraph "124" of the Fourth-Party Complaint.

125.    Denies the allegations set forth in paragraph "125" of the Fourth-Party Complaint.

126.    Denies the allegations set forth in paragraph "126" of the Fourth-Party Complaint, except admits that DASNY has paid Cauldwell Wingate approximately $48.6 million.

127.    Denies the allegations set forth in paragraph "127" of the Fourth-Party Complaint.

128.    Denies the allegations set forth in paragraph "128" of the Fourth-Party Complaint.

## AS AND FOR DASNY'S RESPONSE TO THE SECOND CLAIM
### (Breach Of Contract – Extra Work Performed)

129.     DASNY repeats and realleges the above responses the allegations set forth in paragraphs "1" through "128" of the Fourth-Party Complaint with the same force and effect as though fully set forth at length herein.

130.     The allegations set forth in paragraph "130" of the Fourth-Party Complaint constitute a legal conclusion and thus require no response.  However, to the extent that a response is deemed to be required, DASNY denies the allegations.

131.     Denies the allegations set forth in paragraph "131" of the Fourth-Party Complaint.

132.     Denies the allegations set forth in paragraph "132" of the Fourth-Party Complaint, except admits that Cauldwell Wingate submitted written change orders.

133.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "133" of the Fourth-Party Complaint.

134.     Denies the allegations set forth in paragraph "134" of the Fourth-Party Complaint.

135.     Denies the allegations set forth in paragraph "135" of the Fourth-Party Complaint.

## AS AND FOR DASNY'S RESPONSE TO THE THIRD CLAIM
### (Impact/Delay)

136.     DASNY repeats and realleges the above responses the allegations set forth in paragraphs "1" through "135" of the Fourth-Party Complaint with the same force and effect as though fully set forth at length herein.

137.     Denies the allegations set forth in paragraph "137" of the Fourth-Party Complaint.

138.    Denies the allegations set forth in paragraph "138" of the Fourth-Party Complaint.

139.    Denies the allegations set forth in paragraph "139" of the Fourth-Party Complaint.

140.    Denies the allegations set forth in paragraph "140" of the Fourth-Party Complaint.

141.    Denies the allegations set forth in paragraph "141" of the Fourth-Party Complaint.

142.    Denies the allegations set forth in paragraph "142" of the Fourth-Party Complaint.

143.    Denies the allegations set forth in paragraph "143" of the Fourth-Party Complaint.

## AS AND FOR DASNY'S RESPONSE TO THE FOURTH CLAIM
### (Constructive Acceleration)

144.    DASNY repeats and realleges the above responses the allegations set forth in paragraphs "1" through "143" of the Fourth-Party Complaint with the same force and effect as though fully set forth at length herein.

145.    Denies the allegations set forth in paragraph "145" of the Fourth-Party Complaint.

146.    Denies the allegations set forth in paragraph "146" of the Fourth-Party Complaint.

147.    Denies the allegations set forth in paragraph "147" of the Fourth-Party Complaint.

148.    Denies the allegations set forth in paragraph "148" of the Fourth-Party Complaint.

149.    Denies the allegations set forth in paragraph "149" of the Fourth-Party Complaint.

150.    Denies the allegations set forth in paragraph "150" of the Fourth-Party Complaint.

## AS AND FOR DASNY'S RESPONSE TO THE FIFTH CLAIM
## (Breach of the Implied Covenant of Good Faith and Fair Dealing)

151.    DASNY repeats and realleges the above responses the allegations set forth in paragraphs "1" through "150" of the Fourth-Party Complaint with the same force and effect as though fully set forth at length herein.

152.    Denies the allegations set forth in paragraph "152" of the Fourth-Party Complaint.

153.    Denies the allegations set forth in paragraph "153" of the Fourth-Party Complaint.

154.    Denies the allegations set forth in paragraph "154" of the Fourth-Party Complaint.

155.    Denies the allegations set forth in paragraph "155" of the Fourth-Party Complaint.

## AS AND FOR A FIRST DEFENSE

156.    The Fourth-Party Complaint fails to state a cause of action upon which relief can be granted.

### AS AND FOR A SECOND DEFENSE

157.    Pursuant to 28 U.S.C. § 1367, this Court lacks jurisdiction under over the claims asserted in the Fourth-Party Complaint.

### AS AND FOR A THIRD DEFENSE

158.    Cauldwell Wingate, for valuable consideration received and accepted, executed and delivered to DASNY a written release which released DASNY from any and all liability for the claims asserted in the Fourth-Party Complaint, except as to retainage.

159.    As a result, each of Cauldwell-Wingate's claims herein, except for retainage, is barred by release.

### AS AND FOR A FOURTH DEFENSE

160.    Cauldwell Wingate has been paid and has accepted all monies due and owing for the work it performed.

### AS AND FOR A FIFTH DEFENSE

161.    Cauldwell Wingate has waived some or all of its claims under the Cauldwell Wingate Contract.

### AS AND FOR A SIXTH DEFENSE

162.    Cauldwell Wingate has failed to mitigate any damages it may have suffered as a result of any of the actions it attributes to others as described in the Fourth-Party Complaint.

### AS AND FOR A SEVENTH DEFENSE

163.    Cauldwell Wingate has failed to duly perform and complete all the work in accordance with and as required under the Cauldwell Wingate Contract.

164.    Cauldwell Wingate therefore has breached the Cauldwell Wingate Contract.

165.    As a result, Cauldwell Wingate may not maintain the claims asserted in the Fourth-Party Complaint.

## AS AND FOR AN EIGHTH DEFENSE

166.    The damages, if any, sustained by Cauldwell Wingate were the result of Cauldwell Wingate's own culpable conduct

167.    As a result, Cauldwell Wingate may not maintain the claims asserted in the Fourth-Party Complaint.

## AS AND FOR A NINTH DEFENSE

168.    Article 8, Section 8.01 of the General Conditions of the Cauldwell Wingate Contract ("Changes") provides as follows:

A.    Without invalidating the Contract, the Owner may order Extra Work or make changes by altering, adding to, or deducting from the Work, the contract consideration being adjusted accordingly. No claims for Extra Work shall be allowed unless such Extra Work is ordered in writing by the Owner. No changes in the Work shall be made unless such Work is ordered in writing by the Owner or Owners Representative. If the time for completion is affected by this change the revised time for completion shall be included in the change order. The Owner may order the Contractor to perform the Extra Work and proceed under the Dispute Article.

*    *    *

D.    Regardless of the method used by the Owner in determining the value of a change order, the Contractor shall, within the time-frame given by the Owner, submit to the Owner or

Owner's Representative a detailed breakdown of the Contractor's estimate of the value of the omitted or Extra Work.

E.     Unless otherwise specifically provided for in a change order, the compensation specified therein for Extra Work includes full payment for the Extra Work covered thereby, and Contractor waives all rights to any other compensation for said Extra Work, damage or expense.

F.     The Contractor shall furnish satisfactory bills, payrolls and vouchers covering all items of cost and when requested by the Owner shall give the Owner access to all accounts and records relating thereto, including records of subcontractors and material suppliers.

169.     Section 8.01 is referred to and incorporated herein with the same force and effect as though fully set forth at length.

170.     Upon information and belief, Cauldwell Wingate has failed to comply with some or all of the requirements imposed under Section 8.01 of the General Conditions.

171.     Therefore, Cauldwell Wingate cannot maintain any claim based upon any allegation that there were changes to the work required under the Cauldwell Wingate Contract.

## AS AND FOR A TENTH DEFENSE

172.     Article 9, Section 9.01(F) of the General Conditions of the Cauldwell Wingate Contract ("Time of Completion") provides that, within ten (10) days "from the beginning" of any delay in the completion of the Contract, the contractor shall "notify the Owner, in writing, of the causes of the delay."

173.     Section 9.01(F) is referred to and incorporated herein with the same force and effect as though fully set forth at length.

174.    Upon information and belief, to the extent Cauldwell Wingate is asserting any claims for delay, it has waived some or all of its delay claims by failing to comply with the requirements of Section 9.01(F) of the General Conditions.

175.    Therefore, Cauldwell Wingate may not maintain any claim based upon any allegation that DASNY caused any delays to the work required under the Cauldwell Wingate Contract.

## AS AND FOR AN ELEVENTH DEFENSE

176.    Article 10, Section 10.03 of the General Conditions of the Cauldwell Wingate Contract ("Owner's Right to do Work") provides as follows:

> The Owner may, after notice to the Contractor, without terminating the Contract and without prejudice to any other right or remedy the Owner may have, perform or have performed by others all of the Work or any part thereof and may deduct the cost thereof from any moneys due or to become due the Contractor.

177.    At various times during the course of the Contract, DASNY notified Cauldwell Wingate of its concerns about Cauldwell Wingate's defective work and lack of progress on the project.

178.    DASNY further notified Cauldwell Wingate that it would invoke the Owner's Right to do Work unless such problems were remedied within the timeframes specified in the notices.

179.    Cauldwell Wingate was provided with ample opportunity to remedy the problems with the quality and progress of its work.

180.    Cauldwell Wingate failed to remedy the problems.

181.    Accordingly, DASNY acted within its rights under Article 10, Section 10.03 in hiring alternate contractors to complete and/or correct Cauldwell Wingate's work and back charging Cauldwell Wingate.

182.    Therefore, Cauldwell Wingate may not maintain a cause of action for breach of contract or impact/delay.

### AS AND FOR A TWELFTH DEFENSE

183.    Article 11, Section 11.01(A) of the General Conditions of the Cauldwell Wingate Contract ("Claims for Extra Work") provides that:

A.    If the contractor claims that any Work which the Contractor has been ordered to perform will be Extra Work, or that any action or omission of the Owner is contrary to the terms and provisions of the Contract and will require the Contractor to perform Extra Work the Contractor shall:

1.    Promptly comply with said order.

2.    File with the Owner within fifteen (15) working days after being ordered to perform the Work claimed by the Contractor to be Extra Work or within fifteen (15) working days commencing performance of the Work whichever date shall be earlier; or within fifteen (15) working days after the said action or omission on the part of the Owner occurred, a written notice of the basis of the Contractor's claim, including estimated cost, and request for a determination thereof.

3.    Proceed diligently, pending and subsequent to the determination of the Owner with respect to any said disputed matter, with the performance of the Work in

accordance with all instruction of the
Owner.

184.    Section 11.01(A) is referred to and incorporated herein with the same
force and effect as though fully set forth at length.

185.    Upon information and belief, Cauldwell Wingate has failed to comply
with some or all of the requirements imposed under Section 11.01(A) of the General Conditions.

186.    Therefore, Cauldwell Wingate may not maintain any claim that it
performed extra work under the Cauldwell Wingate Contract.

## AS AND FOR A THIRTEENTH DEFENSE

187.    Article 11, Section 11.01(B) of the General Conditions of the Cauldwell
Wingate Contract ("Claims for Extra Work") provides that:

> B.    No claim for Extra Work shall be allowed
> unless the same was done pursuant to a
> written order of the Owner. The
> Contractor's failure to comply with any or
> all parts of this Article shall be deemed to
> be:
>
> 1.    a conclusive and binding
> determination on the part of the
> contractor that said order, Work,
> action or omission does not involve
> Extra Work and is not contrary to the
> terms and provisions of the Contract,
>
> 2.    a waiver by the Contractor of all
> claims for additional compensation
> or damages as a result of said order,
> Work, action or omission.

188.    Section 11.01(B) is referred to and incorporated herein with the same
force and effect as though fully set forth at length.

189.    Upon information and belief, Cauldwell Wingate has failed to comply
with some or all of the requirements imposed under Section 11.01(B) of the General Conditions.

190.    Therefore, Cauldwell Wingate may not maintain any claim for charges for extra work.

## AS AND FOR A FOURTEENTH DEFENSE

191.    Article 11, Section 11.02 of the General Conditions of the Cauldwell Wingate Contract ("Claims for Delay") provides that:

> No claims for increased costs, charges, expenses or damages of any kind shall be made by the Contractor against the Owner for any delays or hindrances from any cause whatsoever; provided that the Owner, in the Owner's discretion, may compensate the Contractor for any said delays by extending the time for completion of the Work as specified in the Contract.

192.    Section 11.02 is referred to and incorporated herein with the same force and effect as though fully set forth at length.

193.    Therefore, Cauldwell Wingate may not maintain any claims for delay damages.

## AS AND FOR A FIFTEENTH DEFENSE

194.    Article 11, Section 11.03 of the General Conditions of the Cauldwell Wingate Contract ("Finality of Decisions") provides:

> A.    Any decision or determination of the Consultant, Owner or the Owner's Representative shall be final, binding and conclusive on the Contractor unless the Contractor shall, within ten (10) working days after said decision, make and deliver to the Owner a verified written statement of the Contractor's contention that said decision is contrary to a provision of the Contract. The Owner shall determine the validity of the contractor's contention. Pending the decision of the Owner, the Contractor shall proceed in accordance with the original decision.

B.     Whenever it is required in the Contract that an application must be made to the Owner or a determination made by the Owner, the decision of the Owner on said application or the determination of the Owner under the contract shall be final, conclusive and binding upon the Contractor unless the Contractor, within ten (10) working days after receiving notice of the Owner's decision or determination, files a written statement with the Owner that the Contractor reserves the Contractor's rights in connection with the matters covered by said decision or determination.

195.    Section 11.03 is referred to and incorporated herein with the same force and effect as though fully set forth at length.

196.    Numerous decisions in this case were made by the Owner or its Representative and, upon information and belief, Cauldwell Wingate has failed to comply with the provisions of Section 11.03 of the General Conditions.

197.    Therefore, Cauldwell Wingate may not maintain any of its claims.

## AS AND FOR A SIXTEENTH DEFENSE

198.    Article 13, Section 13.01 of the General Conditions of the Cauldwell Wingate ("Cooperation with Other Contractors") provides in relevant part that:

A.     During the progress of the Work, other contractors may be engaged in performing work. The Contractor shall coordinate the Contractor's Work with the work of said other contractors in such a manner as the Owner may direct.

\*     \*     \*

C.     If the Contractor notifies the Owner, in writing, that another contractor on the Site is failing to coordinate the work of said contractor with the Work, the Owner shall investigate the charge. If the Owner finds it to be true, the Owner shall promptly issue

      such directions to the other contractor with respect thereto as the situation may require. The Owner shall not be liable for any damages suffered by the Contractor by reason of the other contractor's failure to promptly comply with the directions so issued by the Owner, or by reason of another contractor's default in performance.

D.      Should the Contractor sustain any damage through any act or omission of any other contractor having a contract with the Owner or through any act or omission of any Subcontractor of said other contractor, the Contractor shall have no claim against the Owner for said damage.

       \*      \*      \*

F.      The Owner cannot guarantee the responsibility, efficiency, unimpeded operations or performance of any Contractor. The Contractor acknowledges these conditions and shall bear the risk of all delays including, but not limited to, delays caused by the presence or operations of other contractors and delays attendant upon any construction schedule approved by the Owner and the Owner shall not incur any liability by reason of any delay.

199.    Section 13.01 is referred to and incorporated herein with the same force and effect as though fully set forth at length.

200.    Other contractors were involved in various stages of the project. Upon information and belief, some or all of these other contractors caused the damages of which Cauldwell Wingate complains.

201.    Section 13.01 of the General Conditions bars Cauldwell Wingate from recovering against DASNY for damages caused in whole or in part by other contractors.

202.    Therefore, Cauldwell Wingate may not maintain any of its claims.

## AS AND FOR A SEVENTEENTH DEFENSE

203.    Article 13, Section 13.02 of the General Conditions of the Cauldwell

Wingate Contract ("Separate Contracts") provides in relevant part:

A.    The Owner may award other contracts, work under which may proceed simultaneously with the execution of the Work. The Contractor shall coordinate the Contractor's operations with those of other contractors as directed by the Owner. Cooperation shall be required in the arrangements for access, the storage of material and in the detailed execution of the Work

B.    The Contractor shall keep informed of the progress and workmanship of other contractors and any Subcontractors and shall notify the Owner in writing immediately of lack of progress or defective workmanship on the part of other contractors or subcontractors, where said delay or defective workmanship may interfere with the Contractor's operations.

C.    Failure of a Contractor to keep so informed and failure to give notice of lack of progress or defective workmanship by others shall be construed as acceptance by the Contractor of said progress and workmanship as being satisfactory for proper coordination with the Work.

204.    Section 13.02 is referred to and incorporated herein with the same force

and effect as though fully set forth at length.

205.    Upon information and belief, Cauldwell Wingate has waived its claims in

whole or in part by failing to comply with the requirements of Section 13.02 of the General

Conditions.

206.    Therefore, Cauldwell Wingate may not maintain any of its claims.

## AS AND FOR AN EIGHTEENTH DEFENSE

207.    Article 20, Section 20.16 of the General Conditions of the Cauldwell

Wingate Contract ("Waiver of Certain Causes of Action") provides as follows:

> No action or proceeding shall lie or shall be
> maintained by the Contractor, nor anyone claiming
> under or through the Contractor, against the Owner
> upon any claim arising out of or based upon the
> Contract, relating to the giving of notices or
> information.

208.    Upon information and belief, Cauldwell Wingate's claims in this action

relate, in whole or in part, to the giving of notices or information.

209.    Therefore, Cauldwell Wingate may not maintain any of its claims.

## AS AND FOR A NINETEENTH DEFENSE

210.    On or about December 27, 2002, the defendant in the main action,

American Manufacturers Mutual Insurance Company ("American"), as surety, issued Labor and

Material Payment Bond No. 3SEO30676 (the "Labor and Material Payment Bond") naming

Cauldwell Wingate as principal and DASNY as obligee.

211.    To the extent that, in the Fourth-Party Complaint, Cauldwell Wingate

seeks indemnification against claims asserted in the Amended Complaint of William A. Gross

Construction Associates, Inc. ("Gross"), the plaintiff in the main action, against the Labor and

Material Payment Bond issued by American as surety, the Fourth-Party Complaint is barred for

the reasons set forth in the affirmative defenses in American's Answer to the Amended

Complaint.

## AS AND FOR A FIRST COUNTERCLAIM

212.    DASNY is a public benefit corporation organized and existing under the Public Authorities Law of the State of New York, and maintains a place of business at 515 Broadway, Albany, New York.

213.    Upon information and belief, Cauldwell Wingate is a limited liability company organized under the laws of the State of Delaware, has its principal place of business at 380 Lexington Avenue, New York, New York, and provides general construction services.

214.    To the extent that it is deemed that this Court has jurisdiction over the claims asserted in the Fourth-Party Complaint, this Court has jurisdiction over DASNY's counterclaims in this fourth-party action pursuant to 28 U.S.C. § 1367, in that they are directly related to the claims in the main action and in the third-party action and therefore form part of the same case or controversy.

215.    On or about December 20, 2002, the parties entered into a written contract designated as "General Construction #2 – Fitout Work" (the "Cauldwell Wingate Contract") under which Cauldwell Wingate, as general contractor, would render services to DASNY in connection with the construction of the Bronx Criminal Court Complex in Bronx, New York.

216.    The Cauldwell Wingate Contract is referred to and incorporated herein with the same force and effect as though fully set forth at length herein.

217.    The Cauldwell Wingate Contract is legally binding upon both parties.

218.    The Cauldwell Wingate Contract required Cauldwell Wingate to "perform all Work of every kind or nature whatsoever required and all other things necessary to complete in a proper and workmanlike manner" the construction of the Bronx Criminal Court Complex in

strict accordance with the documents forming the Cauldwell Wingate Contract and with such changes ordered and approved by DASNY pursuant to the Cauldwell Wingate Contract.

219.    DASNY has complied with, and fully performed its obligations under, the Cauldwell Wingate Contract.

220.    Cauldwell Wingate failed to perform its obligations under, and thereby breached, the Cauldwell Wingate Contract by, *inter alia*, (i) failing to perform its work in accordance with the contract documents; (ii) performing defective work; (iii) failing to provide adequate manpower; (iv) failing to properly coordinate its work with the work of other contractors on the project; (v) delaying completion of its work and the work of other contractors on the project; and (vi) failing to comply with directives issued by the construction manager.

221.    As a result of Cauldwell Wingate's breach, DASNY has sustained damages in an amount to be determined at trial.

## AS AND FOR A SECOND COUNTERCLAIM

222.    DASNY repeats and realleges each and every allegation set forth in paragraphs "212" to "220" as if fully set forth at length herein.

223.    Article 9, Section 9.01 of the General Conditions of the Cauldwell Wingate Contract ("Time of Completion") states in relevant part as follows:

> D.    If the Contractor shall neglect, fail or refuse to complete the Work within the time specified, or any proper extension thereof granted by the Owner, the Contractor agrees to pay to the Owner for loss of beneficial use of the structure an amount specified in the Contract, not as a penalty, but as liquidated damages, for each and every calendar day that the Contractor is in default. Default shall include abandonment of the Work by the Contractor.

31

224.    As set forth in the Cauldwell Wingate Contract, Cauldwell Wingate is liable to DASNY for liquidated damages for each and every day that Cauldwell Wingate is in default after the date set forth therein for completion of the project.

225.    Cauldwell Wingate failed to complete its work by the completion date specified in the Cauldwell Wingate Contract.

226.    Accordingly, DASNY is entitled to recover from Cauldwell Wingate liquidated damages in an amount to be determined at trial.

## AS AND FOR A THIRD COUNTERCLAIM

227.    DASNY repeats and realleges each and every allegation set forth in paragraphs "212" to "220" as if fully set forth at length herein.

228.    Article 9, Section 9.01 of the General Conditions of the Cauldwell Wingate Contract ("Time of Completion") states, in relevant, part as follows:

> H.    The foregoing liquidated damages are intended to compensate the Owner only for the loss of beneficial use of the structure. In addition, the Contractor shall be liable to the Owner, to the fullest extent permitted by law, for whatever actual damages (other than actual loss of beneficial use) the Owner may incur as a result of any actions or inactions of the Contractor or its Subcontractors including, without limitation, interest expense and carrying costs, liabilities to other Contractors working on the project or other third parties, job extension costs, and other losses incurred by the Owner....

229.    As a consequence of Cauldwell Wingate's breaches of its obligations under the Cauldwell Wingate Contract, DASNY has incurred and/or will incur additional costs. These costs include, but are not limited to: (i) additional funds paid to other contractors as a result of delays caused by Cauldwell Wingate; (ii) additional funds paid to other contractors to

perform work that Cauldwell Wingate was required to perform but failed to perform pursuant to the Contract; (iii) additional construction management and general conditions fees paid to or owed to DASNY's construction manager; (iv) additional architectural and engineering fees paid to or owed to DASNY's architect/engineer; (iv) additional consultants' fees; (v) additional owner's fees; (vi) additional insurance fees; and (vi) other costs.

230.     Accordingly, DASNY is entitled to recover its actual damages from Cauldwell Wingate in an amount to be determined at trial.

## AS AND FOR A FOURTH COUNTERCLAIM

231.     DASNY repeats and realleges each and every allegation set forth in paragraphs "212" to "217" as if fully set forth at length herein.

232.     To the extent that DASNY is finally determined to be liable to any individual or entity for any act or omission of Cauldwell Wingate, DASNY shall be entitled to recover any such sum or sums from Cauldwell Wingate in amounts to be determined at trial.

## DEMAND FOR A JURY TRIAL

233.     DASNY demands a trial by jury as to all issues in the above matter.

## CONCLUSION

**WHEREFORE,** DASNY respectfully requests judgment in its favor:

(1)    dismissing the Fourth-Party Complaint, with prejudice, in its entirety;

(2)    awarding to DASNY all damages with respect to its counterclaims in amounts to be determined at trial;

(3)    awarding to DASNY its costs and disbursements; and

(4)    granting to DASNY such other and further relief as the Court may deem appropriate.

Dated:    New York, New York
        June 13, 2008

                        MICHAEL A. CARDOZO
                        Corporation Counsel of the
                          City of New York
                        Attorney for the Dormitory Authority
                          of the State of New York
                        100 Church Street, Room 3-241
                        New York, New York 10007
                        (212) 788-1185

                        By: _____
                          EDWIN M. LEVY (EL-7792)
                          Assistant Corporation Counsel