1

# ORIGINAL

1    IN THE UNITED STATES DISTRICT COURT

2    SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - -X
3    WILLIAM A. GROSS CONSTRUCTION,
     ASSOCIATES, INC.,
4
                    Plaintiff,
5
           - against -
6
     AMERICAN MANUFACTURERS MUTUAL
7    INSURANCE COMPANY,

8                   Defendant.

9    Case No.:  07-CV-10639 (LAK) (AJP)
- - - - - - - - - - - - - - - - - - - - - - - - - - -X
10   And Successive Actions
- - - - - - - - - - - - - - - - - - - - - - - - - - -X
11

12

13                          303 Lippincott Drive
                            Marlton, New Jersey
14

15                          March 20, 2009
                            10:05 a.m.
16

17        Deposition of Non-Party Witness, ROBERT

18   DIETERLE, taken pursuant to 30(b)(6) Notice, before

19   Rita Persichetty, a Notary Public of the State of

20   New Jersey.

21

22

23        ELLEN GRAUER COURT REPORTING CO. LLC
            126 East 56th Street, Fifth Floor
24             New York, New York 10022
                    212-750-6434
25                  REF: 89704

2

```
 1    A P P E A R A N C E S:

 2

 3    INGRAM YUZEK GAINEN CARROLL & BERTOLOTTI, LLP

 4    Attorneys for Caldwell Wingate

 5         250 Park Avenue

 6         New York, New York 10177

 7    BY:  PATRICIA HEWITT, ESQ.

 8         - and -

 9         CAITLIN BRONNER, ESQ.

10         PHONE:  212.907.9661

11         FAX:  212.907.9681

12         EMAIL:  Phewitt@ingramllp.com

13

14

15    LEWIS BRISBOIS BISGAARD & SMITH LLP

16    Attorneys for the Witness

17         199 Water Street, 25th Floor

18         New York, New York 10038

19    BY:  JAMES A. CARDENAS, ESQ.

20         PHONE:  212.232.1374

21         FAX:  212.232.1399

22         EMAIL:  Jcardenas@lbbslaw.com

23

24

25
```

3

```
 1   A P P E A R A N C E S:   (Cont'd)

 2

 3   MILBER MAKRIS PLOUSADIS & SEIDEN, LLP

 4   Attorneys for Rafael Vinoly Architects

 5       3 Barker Avenue

 6       White Plains, New York 10601

 7   BY:   KEVIN L. SPAGNOLI, ESQ.

 8       EMAIL:  Kspagnoli@milbermakris.com

 9

10

11   NEW YORK CITY LAW DEPARTMENT

12   OFFICE OF CORPORATION COUNSEL

13       100 Church Street

14       New York, New York 10007

15   BY:   EDWIN LEVY, ESQ.

16       - and -

17       NORMA LEVY, ESQ.

18       PHONE:  212.788.1185

19       FAX:  212.788.8872

20       EMAIL:  Elevy@law.nyc.gov

21

22

23

24

25
```

4

1    A P P E A R A N C E S:   (Cont'd)

2

3    GOGICK, BYRNE & O'NEILL, LLP

4    Attorneys for Sith Party Defendants Israel A.l

5    Sinuk, PC, Mueser Rutledge Engineering

6    Consultants & Signe Nielsen Landscape

7    Architects

8         11 Broadway, Suite 1560

9         New York, New York 10004-1314

10   BY:   EYAL S. EISIG, ESQ.

11        PHONE:  212.422.9424

12        FAX:  212.422.9429

13

14

15   McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP

16   Attorneys for Stonewall Contracting

17        1300 Mount Kemble Avenue

18        Morristown, New Jersey 07962-2075

19   BY:   KEVIN BROTSPIES, ESQ.

20        PHONE:  973.425.0161

21        FAX:  973.425.0161

22        EMAIL:  Kbrotspies@mdmc-law.com

23

24

25

5

```
 1    A P P E A R A N C E S:   (Cont'd)

 2

 3    MURTAGH, COHEN & BYRNE, ESQ.

 4    Attorneys for Heritage Mechanical

 5         100 North Park Avenue

 6         Rockville Centre, New York 11570

 7    BY:   EDWARD T. BYRNE, ESQ.

 8         PHONE:  516.766.3200

 9         FAX:  516.766.3402

10         EMAIL:  Mcb50@msn.com

11

12

13    McCARTER & ENGLISH, LLP

14    Attorneys for Beaubois and Tractel, Ltd

15         245 Park Avenue

16         New York, New York 10167

17    BY:   ROBERT S. BERNSTEIN, ESQ.

18         PHONE:  212.609.6834

19         FAX:  212.645.0853

20         EMAIL:  Rbernstein@mccarter.com

21

22

23

24

25
```

6

```
1    A P P E A R A N C E S:   (Cont'd)

2

3    KRIEG ASSOCIATES, P.C.

4    Attorneys for Future Tech Consultants

5         5 Heather Court

6         Dix Hills, New York 11746

7    BY:  RANDI J. KRIEG, ESQ.

8         PHONE:  631.499.8409

9         FAX:  631.493.0763

10

11

12   ZETLIN & DE CHIARA, LLP

13   Attorneys for Flack & Kurtz and VDA

14        801 Second Avenue

15        New York, New York 10017

16   BY:  BILL P. CHIMOS, ESQ.

17        PHONE:  212.682.6800

18        FAX:  212.682.6861

19        EMAIL:  Bchimos@zdlaw.com

20

21

22

23

24

25
```

7

1    A P P E A R A N C E S:   (Cont'd)

2

3    ARTHUR J. SEMETS, P.C.

4    Attorneys for Bovis Lend Lease

5         286 Madison Avenue

6         New York, New York 10017

7    BY:   MICHAEL J. McDERMOTT, ESQ.

8         PHONE:   212.557.5055

9

10

11   ALSO PRESENT:   AILEEN SCHWARTZ, ESQ., Hill

12   International

13

14

15

16

17

18

19

20

21

22

23

24

25

8

1  ------------------ I N D E X --------------------

2  WITNESS                    EXAMINATION BY    PAGE

3  ROBERT DIETERLE 30(b)(6)   MS. HEWITT         10

4

5  DIRECTIONS:  33, 39

6

7  ----------------- E X H I B I T S -----------------

8  CWC          DESCRIPTION                 FOR I.D.

9  Exhibit 4    Document Bates stamped

10             DASNY-E 00812094-98              34

11 Exhibit 5    Document Bates stamped

12             DASNY-P 0001151803-04           59

13 Exhibit 6    Document Bates stamped

14             DASNY-P 000271485-90            60

15 Exhibit 7    Document Bates stamped

16             DASNY-P 0001152635-40           66

17 Exhibit 8    Document Bates stamped

18             DASNY-P 0001153011              74

19 Exhibit 9    Document Bates stamped

20             DASNY-E 02249225-26 and

21             additional two pages not

22             Bates stamped                   76

23 Exhibit 10   Document Bates stamped

24             DASNY-E 00221439-45 and 448-456  80

25        (Ms. Hewitt retained the exhibits)

9

S T I P U L A T I O N S

IT IS STIPULATED AND AGREED by and between
the attorneys for the respective parties herein
that the filing, sealing, and certification of
the within deposition be waived.

IT IS FURTHER STIPULATED AND AGREED that
all objections, except as to the form of the
question, shall be reserved to the time of the
trial.

IT IS FURTHER STIPULATED AND AGREED that
the within deposition may be sworn to and signed
before any officer authorized to administer an
oath, with the same force and effect as if
signed to before the court.

- oOo -

10

1    R O B E R T    D I E T E R L E,

2         called as a witness, having been sworn

3         by the Notary Public, was examined and

4         testified as follows:

5

6    EXAMINATION BY

7    MS. HEWITT:

8         Q    Good morning, Mr. Dieterle.  My name

9    is Patricia Hewitt and I'm representing

10   Caldwell Wingate in this litigation.  I'm going

11   to be asking you some questions this morning.

12         Have you ever been deposed before?

13         A    Yes, I have.

14         Q    So you're familiar with the drill

15   giving your answers orally, waiting until I

16   finish my question before you answer, that kind

17   of thing?

18         A    Yes.

19         Q    If you have any questions, if you

20   don't understand a question of mine, just let

21   me know and I will try to rephrase it.  And if

22   at any time you want a break, just let me know

23   that as well.

24         Mr. Dieterle, by whom are you

25   currently employed?

11

```
 1                      DIETERLE 30(b)(6)
 2        A      Hill International.
 3        Q      How long have you been employed by
 4   Hill?
 5        A      I started with Hill in October of
 6   1980 and have been employed by Hill since then
 7   with the exception of a one and a half year
 8   window in the early '90's.
 9             MR. CARDENAS:  Patricia, if I can
10        just interrupt for one second, I just want
11        to make the record clear that this is a
12        30(b)(6) deposition and there's a limited
13        focus to the deposition, so the questions
14        of this witness are really concerning the
15        circumstances of his employer's retention,
16        the timing of such and who he dealt with,
17        but the actual conclusions and opinions
18        that he came to are not going to be talked
19        about at this deposition, and any
20        questions which lead into that area are
21        going to be objected to and I'm going to
22        instruct the witness not to answer at that
23        time.
24             So with that initial statement on the
25        record, feel free to go ahead.
```

12

DIETERLE 30(b)(6)

1
2          MS. HEWITT:  Thank you.  Hopefully
3     there won't be any problems, but if there
4     are, counsel will have to address them.
5          Q    And Mr. Dieterle, as long as we're
6     doing some introductions, you understand that
7     other parties are -- there are multiple parties
8     in this case, they're represented by counsel,
9     many, although not of all their counsel are
10    here today, but I'm the only one that will
11    actually be asking the questions.
12         A    Okay.
13         Q    Mr. Dieterle, during the window that
14    you talked about in the early '90's, were you
15    employed somewhere else?
16         A    Yes, I was.
17         Q    Where was that?
18         A    A company called Environmental
19    Resources Management, Inc., ERM, as it is
20    referred to.
21         Q    What is your current position with
22    Hill?
23         A    Vice president.
24         Q    And what are your particular
25    responsibilities as vice president?

13

1                    DIETERLE 30(b)(6)

2        A    Well, I guess generally my

3   responsibilities are to assist clients in the

4   evaluation of construction matters,

5   construction disputes and things of that

6   nature.

7        Q    Are you in a particular department?

8        A    I am in the -- I guess something

9   called to the effect of the claims group.

10       Q    How long have you been a vice

11  president here, Mr. Dieterle?

12       A    Since probably about 1996, something

13  like that.

14       Q    And have you been in the claims group

15  that entire time?

16       A    Yes.

17       Q    Could you just tell me your

18  educational background since high school?

19       A    Yes, I have a bachelor of science in

20  electrical engineering technology from Spring

21  Garden College, Philadelphia.  I have an MBA

22  concentration in finance from La Salle

23  University, also in Philadelphia.

24       Q    Now, Mr. Dieterle, in your capacity

25  as vice president of Hill International, have

14

1                    DIETERLE 30(b)(6)

2     you had any responsibilities with respect to

3     the construction of the Bronx criminal

4     courthouse?

5                    MR. CARDENAS:  Objection to the form.

6                    You can answer.

7          A     Not to the construction, no.

8          Q     Have you had any responsibilities

9     whatsoever with respect to anything having to

10    do with the Bronx criminal courthouse?

11         A     Yes, I have.

12         Q     Can you tell me what those

13    responsibilities have been?

14         A     My responsibilities for the Bronx

15    courthouse, I think, would be generally

16    considered claims analysis work.

17         Q     During what period of time did you do

18    that claims analysis work?

19         A     From the -- I would say, I think it

20    was some time in September, late summer, early

21    fall, until probably about January of the next

22    year, '08.

23         Q     So late summer, early fall of '07?

24         A     Yes.

25         Q     To January of '08?

1                    DIETERLE 30(b)(6)

2        A    Yes.

3        Q    So is it fair to say, Mr. Dieterle,

4    that the claims work that you did was limited

5    to maybe six months at most?

6             MR. CARDENAS:  Objection to the form.

7        A    Yeah, generally maybe a little less

8    than that, but, you know, maybe four to five

9    months.

10       Q    Do you have any responsibilities

11   relating to the Bronx criminal courthouse

12   today?

13       A    Yes.

14       Q    Other than having to be deposed?

15       A    Yes, I do.

16       Q    And what is that?

17       A    We are currently doing a forensic

18   audit for one of the contractors.

19       Q    Which contractor is that?

20       A    O'Kane Electric.

21       Q    And other than the work that you're

22   doing for O'Kane Electric, do you currently

23   have any other responsibilities with respect to

24   the Bronx criminal courthouse?

25       A    No.

16

DIETERLE 30(b)(6)

1

2        Q     Now, when you did the claims analysis

3   that you did in '07 and '08, who else from Hill

4   worked on that project with you?

5        A     Two other people primarily assisted

6   in the evaluation, there may have been a few

7   others providing minor support that I don't

8   recall, but two gentlemen, one by the name of

9   Jim McKay and another by the name of Ed Vella,

10  V E L L A.

11       Q     Did Mr. McKay and Mr. Vella work

12  during that same time period that you worked?

13       A     Yes.

14       Q     Mr. Dieterle, it may be that I may

15  refer to this project as either BCC or just the

16  project; is that okay with you, you'll know I'm

17  referring to the Bronx criminal courthouse?

18       A     Yes.

19            MS. HEWITT:   I'm going to be showing

20       the witness a document that was previously

21       marked as CWC 2.

22       Q     Mr. Dieterle, have you seen the

23  document that's been marked as CWC 2 before?

24       A     Yeah, I think I recall just referring

25  to it, but I mean, I don't have a real direct

17

                    DIETERLE 30(b)(6)

1    recollection of it because it was some time

2    ago, but I'm pretty sure I've seen this at the

3    time we were getting engaged for this task that

4    we did.

5              MS. HEWITT:  Off the record.

6              (Discussion held off the record.)

7         Q    Well, let me ask you this,

8    Mr. Dieterle:  If you can turn to the signature

9    page of the document, which is before you get

10   to the various appendices, they're not marked,

11   unfortunately I can't -- can you just tell me

12   if you recognized who signed on behalf of Hill

13   International?

14        A    Yes, that's Maury Masucci's

15   signature.

16        Q    Whose is that, Mr. Masucci?

17        A    Yes.

18        Q    Who is that?

19        A    He's here in the New Jersey office in

20   the claims group.

21        Q    Did you have a general understanding,

22   Mr. Dieterle, as to what the purpose of this

23   contract was?

24             MR. CARDENAS:  Objection to the form.

18

DIETERLE 30(b)(6)

1     

2    MS. HEWITT:  Well, he said he doesn't

3    have a direct recollection, but he thinks

4    he saw it at the time we were getting

5    engaged.

6    MR. CARDENAS:  That's fine.

7    You can answer.

8    A    Can you repeat the question, please?

9    Q    Sure.  Do you have a general

10   understanding as to what the purpose of this

11   contract was?

12   A    Yes, a general understanding.

13   Q    And what was your general

14   understanding?  I understand you're not a

15   lawyer, I'm not asking for your legal

16   interpretation.

17   A    I think it would be considered in

18   general terms in my understanding was a task

19   order contract for claims analysis services.

20   Q    Now, if you can go a little further

21   into the document, Mr. Dieterle, to work

22   authorization No. 6, which is actually after

23   work authorization No. 8 and almost at the end

24   of the document.

25   A    Okay.

19

1         DIETERLE 30(b)(6)

2         Q    If you go to just about the next to

3    the last page, there's a signature and a date

4    of 9/13/07, is it your understanding that this

5    work authorization was approved in

6    approximately September '07?

7         A    Yeah, that's about when, I think, we

8    got started, in that range.

9         Q    And was it pursuant to this work

10   authorization that you did the claims work that

11   you testified about earlier?

12        A    On the courthouse?

13        Q    Yes.

14        A    Yes.

15        Q    I'm only going to be asking you about

16   the courthouse, that, I can promise you.

17             And to your knowledge, was this work

18   authorization No. 6 the first work

19   authorization that Hill performed in connection

20   with the courthouse?

21             MR. LEVY:   Objection.

22        Q    Sorry, let me step back for a minute.

23             Mr. Dieterle, if you could go to the

24   very first page of CWC 7, this contract is a

25   claim and auditing services contract; is that

20

```
 1                    DIETERLE 30(b)(6)
 2    correct?
 3         A     Are you reading somewhere?
 4         Q     Yes, at the top right.
 5         A     Yes, it is.
 6         Q     So if you go back to work
 7    authorization No. 6, my question more properly
 8    is, is work authorization No. 6, to your
 9    knowledge, the first work authorization that
10    Hill performed in connection with this claim
11    and auditing services contract?
12         A     As far as I understand, yes.
13         Q     And Mr. Dieterle, to your knowledge,
14    was this work in September 2007 the first time
15    that Hill undertook to do any work at all in
16    connection with the Bronx criminal courthouse?
17              MR. LEVY:  Objection.
18              MR. CARDENAS:  Objection to form.
19         A     When you say Hill, are you speaking
20    Hill as a company or you said Hill?
21         Q     Hill International.
22         A     I knew at that time that we were on
23    site with our project management group.
24         Q     So at that time, Hill International
25    was also serving as the construction manager;
```

21

```
1                    DIETERLE 30(b)(6)
2    is that correct?
3         A    Yes.
4         Q    Now, if you will, in work
5    authorization No. 6 under the project
6    description, it says, provide for preliminary
7    claim analysis for the New York City Corporate
8    Counsel in order to identify project delays and
9    responsibilities at the Bronx County Hall of
10   Justice.
11              Do you see that?
12        A    Yes.
13        Q    Do you know, Mr. Dieterle, whether
14   Hill International entered into any contracts
15   directly with the New York City Corporation
16   Counsel?
17              MR. CARDENAS:  Objection to the form
18         to the extent it requires the witness to
19         perform a legal analysis, but you're free
20         to answer the question.
21        A    I'm not aware of any on this matter
22   at least.
23        Q    Mr. Dieterle, I'm sorry to keep
24   making you go back and forth between pages, but
25   again, towards the end of work authorization
```

22

1                    DIETERLE 30(b)(6)

2     No. 6 where there is the signature 9/13/07, it

3     says that the work performed shall be completed

4     on or about before November 6, 2007.

5              Do you see that?

6         A    Yes.

7         Q    Was the work, in fact, completed by

8     November 6, 2007?

9         A    No, it wasn't.

10        Q    Was a subsequent work authorization

11    issued?

12             MR. CARDENAS:  Or something else.

13        A    As far as I know, I mean, we -- I

14    don't know what contractually was done, but we

15    worked beyond that date, so I assume that there

16    was some contract mechanism to extend that

17    date.

18        Q    Mr. Dieterle, you testified earlier

19    that in addition to you working on the claims

20    part of the work, Mr. Vella and Mr. McKay

21    worked on it.  Did Mr. Zaretsky do any work in

22    connection with the claims --

23        A    No.

24        Q    -- part of the work?

25             MR. LEVY:  Objection to the form of

23

DIETERLE 30(b)(6)

the question.  When you say claims part of

the work, you're talking about this

specific contract?

      MS. HEWITT:  I'm talking about

anything under the claim audit and

services contract.

      A    He did nothing directly, no.

      Q    Are either Mr. Vella or Mr. McKay

attorneys?

      A    No.

      Q    And Mr. Vella and Mr. McKay are based

here; is that correct, here in New Jersey?

      A    Yes.  Well, I -- just to clarify,

Mr. Vella doesn't work here anymore, but at the

time he was.

      Q    Now, during the four, five, six-month

period that you worked on the project,

Mr. Dieterle, did you interact with anybody

from the Dormitory Authority?

      A    Oh, yeah, absolutely.

      Q    And if I refer to the Dormitory

Authority as DASNY, you'll understand the

reference?

      A    Yes.

24

DIETERLE 30(b)(6)

Q    With whom at the Dormitory Authority
did you interface?

A    At the site, I guess the person that
we had some interface with was Jim Hall and we
also interfaced with, I guess, people that are
stationed in Albany, Chuck Bartlet, I think a
gentleman by the name of Wayne Morris, there
may have been others.  And I also had some
interaction with George Weissman and perhaps
others on his staff.  I think they would be the
primary ones that come to mind.

Q    Was there somebody from DASNY that
was supervising your work?

        MR. LEVY:  Objection to the form of
    the question.

        MR. CARDENAS:  Objection to the form
    of the question.

A    Yeah, I'm not sure what you mean by
supervising.

Q    Well, let me ask it in a different
way.  Who was the principal person at DASNY to
whom you reported?

        MR. LEVY:  Objection to the form of
    the question.

```
1                    DIETERLE 30(b)(6)
2        A    Well, on a day-to-day --
3             MR. CARDENAS:  I'll join in that
4        objection.
5             MS. HEWITT:  That's fine, the
6        objections are on the record.
7        Q    You can answer.
8        A    Can you repeat that again, please?
9        Q    Sure.  To whom at DASNY -- I'm sorry,
10   who was the principal person at DASNY to whom
11   you reported?
12       A    Well, on a contractual level, I think
13   the person that I interacted with most would
14   have been Chuck Bartlet, but I don't think on a
15   day-to-day basis, we really reported to
16   anybody.
17            We were asked to look at the
18   information, they showed us where the
19   information was, and we worked on doing our
20   analysis, so there wasn't really any day-to-day
21   supervision or reporting.
22       Q    And when you completed your analysis,
23   was there a particular person at DASNY to whom
24   you provided it?
25       A    Yes.
```

26

1                    DIETERLE 30(b)(6)

2       Q    And who was that?

3       A    George Weissman.

4       Q    Mr. Weissman is in Albany?

5       A    I think that's his permanent station,

6  is Albany, but I think he spends a lot of time

7  in the New York City office.

8       Q    Mr. Dieterle, of you and Mr. McKay

9  and Mr. Vella, can you describe, just very

10  generally, your respective responsibilities?

11      A    Sure.

12      Q    On this project, obviously.

13      A    I would say in general terms, even

14  though we overlapped a little bit, Jim McKay

15  was responsible for I guess what you would

16  generally refer to as schedule analysis or

17  schedule review or delay review or something to

18  that effect.  I was responsible for the damages

19  and financial side of our analysis, and Ed

20  Vella supported both myself and Jim McKay.

21      Q    Mr. Dieterle, during your work on the

22  project, did you interface with anybody at the

23  corporation counsel's office?

24      A    No, not directly.  The only time I

25  think I may have had any dealings -- I'm not

1               DIETERLE 30(b)(6)

2 sure they were -- there was -- at an initial

3 meeting, they may have been there, I don't

4 recall, but once we got working on it, I didn't

5 have any involvement with corporation counsel

6 directly.

7       Q     To your knowledge, did either

8 Mr. McKay or Mr. Vella have any direct dealings

9 with anybody from corporation counsel's office?

10       A     No, they wouldn't have had any

11 connections.

12       Q     During your work on the project, did

13 you have any dealings with any city agency

14 other than -- or state agency other than DASNY?

15       A     I don't believe so, nothing comes to

16 mind.

17       Q     For example, not the office of court

18 administration?

19           MR. CARDENAS:   Belated objection to

20      the form of that question. If you're

21      seeking -- I don't want to have a speaking

22      objection, but it just seems confusing to

23      me what you mean by interaction with OCA.

24      I mean, he clearly could have gone to the

25      courthouse and they let him in. I don't

1                    DIETERLE 30(b)(6)
2       know what you're looking for.
3             MS. HEWITT:  Okay.  I do object to
4       speaking objections.  If there's an
5       objection, it's on the record.  If he
6       doesn't understand a question, I've asked
7       him to tell me he doesn't understand the
8       question.
9             MR. CARDENAS:  That's fine.
10        A    I mean, I don't recall having any
11      dealings with them, I'm not really quite sure
12      who they are.
13        Q    Did you have any dealings with any of
14      the prime contractors, and when I say dealings,
15      I mean direct dealings with any of the prime
16      contractors on the job?
17        A    Not in our initial review, no.
18        Q    And when you say your initial review,
19      is there some later point at which you did have
20      dealings with some of the contractors?
21        A    Only in a more recent evaluation that
22      I mentioned earlier with O'Kane forensic audit.
23        Q    But during the late '07, early '08
24      period, no one among the contractors; is that
25      correct?

1                    DIETERLE 30(b)(6)

2        A     That's correct.

3        Q     Now, Mr. Dieterle, could you describe

4    generally the work that you and your team did

5    in connection with the claims audit work that

6    you did on this project?

7        A     Well, in general terms, I think we, I

8    guess, performed a preliminary evaluation of

9    the claims as submitted.  I'm -- I guess they

10   were referred to by some kind of a change order

11   request number or something like that, but

12   there were essentially claims, and we reviewed

13   the information that was provided in support of

14   the contractor's request for payment on these

15   claims, we analyzed the schedules, the damages,

16   you know, what happened on the job, the project

17   record, things of that nature.

18       Q     When you say the claims as submitted,

19   you mean claims by individual contractors; is

20   that right?

21       A     Yes.

22       Q     Were there more than -- withdrawn.

23             Was there more than one contractor

24   that had submitted claims?

25       A     Well, just to clarify, the use of the

30

DIETERLE 30(b)(6)

1

2     term "claim," I think, is probably a little bit

3     not exactly true.  I think some of them

4     submitted a change order request, so to take

5     into account if you include in the word claims

6     change order requests, when that information

7     came in, it was given a change order request

8     number, yes, we looked at more than one.

9          Q    Well, I think it's important to

10    clarify that, and you used the word "claims,"

11    so I want to make sure I understand it the way

12    that you used it.

13               When you analyzed claims, as you've

14    used that term, was it ever for anything other

15    than a change order request?

16          A    No.

17          Q    If somebody submitted a request for

18    equitable adjustment, was that deemed to be a

19    change order request and you then analyzed it?

20               MR. CARDENAS:  Objection to form.

21          A    I'm not sure if any of them utilized

22    those terms at this point, some may have used

23    that term, I'm not sure even what that term

24    means legally, if anything, but we looked at

25    all of them as a claim even though it may have

31

DIETERLE 30(b)(6)

1
2  been a request for additional compensation or
3  something like that in terms of what it was
4  called by the contractor.
5      Q    But ultimately you deemed them for
6  your own purposes as change orders; is that
7  correct?
8      A    No, no, just the opposite, I deemed
9  them claims even though it was assigned some
10  kind of a numbering system so it didn't get
11  lost, they were all deemed by us to be claims.
12      Q    And were those claims for more than
13  one contractor?
14      A    Yes.
15      Q    Mr. Dieterle, were there any reports
16  prepared as a result of the analysis that you
17  did, any written reports?
18      A    Yes.
19      Q    And to whom were those reports --
20  well, withdrawn.
21          Was there more than one report?
22      A    Well, that's a tough question to
23  answer.  Every time you update your report,
24  it's another report, so to speak.  I'm not sure
25  if we submitted, formally submitted one draft

32

1                    DIETERLE 30(b)(6)

2    or two drafts, but it was no more than two

3    but...

4          Q    And to whom were those reports

5    submitted?

6          A    George Weissman.

7          Q    Anybody else?

8          A    No.

9          Q    To your knowledge, were they, at

10   least by Hill, were they submitted to the

11   corporation counsel's office?

12          MR. CARDENAS:  Objection, asked and

13      answered, but you can answer it again.

14          A    I didn't submit anything to

15   corporation counsel.

16          Q    Did the reports contain any legal

17   analysis?

18          MR. CARDENAS:  Objection -- I

19      think --

20          MR. LEVY:  Objection.

21          MR. CARDENAS:  I think that's

22      really -- I don't know what you want to

23      do, but I think that's getting very close

24      to the contents of the report, and

25      clearly, I don't even think it's debatable

33

DIETERLE 30(b)(6)

1

2          that the contents of his report are not to

3          be disclosed for several reasons, but can

4          you read the question back.

5              (Record read.)

6              MR. CARDENAS:  I stand by the

7          objection.  He's not here to answer that

8          today.

9              MS. HEWITT:  Are you directing him

10         not to answer?

11  DI       MR. CARDENAS:  I am directing him not

12         to answer at this point.

13         Q    Mr. Dieterle, the reports that were

14     submitted were authored by whom?

15         A    The Hill project team, primarily

16     myself and Jim McKay.

17         Q    Were they in a particular form?

18         A    I'm not sure what you mean by form.

19         Q    Did DASNY ask you to use a particular

20     form in presenting the information to them?

21         A    In part.

22         Q    And what did DASNY provide you with?

23         A    A form that was kind of a template

24     for certain aspects of what we were reviewing,

25     and I believe we may have included those as

34

DIETERLE 30(b)(6)

1

2   like an appendix or something like that.

3          MS. HEWITT:  I'll ask this be marked

4      as CWC 4.

5          (CWC Exhibit 4, Document Bates

6      stamped DASNY-E 00812094-96, marked for

7      identification.)

8          MS. HEWITT:  For the record, CWC 4 is

9      a three-page document with Bates Nos.

10     DASNY and then dash E 00812094 through 96.

11     Q    Mr. Dieterle, I'm going to ask you

12   about the E-mail that's on the first page of

13   CWC 4 in a minute, but I'm first going to ask

14   you about the second page which is -- appears

15   to be a form, and it's called Preliminary Claim

16   Analysis.

17          Have you seen that document before?

18     A    Yes, I have.

19     Q    Is that the form that DASNY provided

20   you to use in connection with your claims work?

21     A    Yes.

22     Q    If I can just go back to the first

23   page, there's an E-mail from Mr. Hall to you,

24   and it's dated June 22, 2007?

25          MR. CARDENAS:  Objection to the form.

35

```
 1                    DIETERLE 30(b)(6)
 2         Just for clarification, the E-mail is
 3         actually to Bob and Marc Zaretsky.
 4              MS. HEWITT:  I was going to get to
 5         Mr. Zaretsky.
 6              MR. CARDENAS:  I figured you would.
 7         Q    The E-mail is from Mr. Hall, it's
 8    dated June 22, 2007.  Do you see that?
 9         A    Yes.
10         Q    And that was before Hill was formally
11    involved in the claims work; is that correct?
12         A    That's correct.
13         Q    Can you explain to me the context in
14    which Mr. Hall provided this form to you?
15         A    I think the primary context was so
16    that we could understand the type of
17    information that DASNY was hoping to get in
18    addition or derived from our analysis so that
19    would help us to develop a budget to do the
20    work.
21         Q    And can you tell me why -- if you
22    know, why Mr. Zaretsky was included in this
23    E-mail?
24         A    Well, I think in the early aspects
25    prior to actually getting engaged, Marc kind of
```

36

DIETERLE 30(b)(6)

introduced me to the DASNY team. I had never

worked for those people, and I think it was

essentially a courtesy on Jim's part to provide

the communication since we hadn't been engaged

yet.

        Q    And is the form that's attached here,

is that something you used once you actually

started doing the claims work for DASNY?

        A    Well, eventually once we got going,

we completed the form. I mean, we had to do

our analysis before we could complete the form,

so it wasn't initially used but...

        Q    So at some point, this form was

filled out or in some way, shape or form; is

that correct?

        A    To the extent we could, yes.

        Q    If I can just ask you about the

second page, and Mr. Cardenas has made it very

clear and I do not dispute that I have -- I

cannot ask you about the content, but I just

want to ask you generally, did -- well, let me

ask you first: Was a form like this filled out

for each individual contractor?

        A    The ones we looked at, yes.

37

DIETERLE 30(b)(6)

1

2       Q     And in the boxes that appear in the
3  bottom half of the document for those
4  individual contractors, did you include the
5  first -- or did you fill out the first box
6  which was the amount and the description of the
7  alleged damages?

8       A     Yeah, again, to the extent we could,
9  I'm not sure how much we actually -- there was
10  another form that we filled out that had like a
11  breakdown of the change orders.  I don't recall
12  precisely to the extent that we filled this
13  form out per se as a form, as opposed to being
14  put in some other format, so I really don't
15  recall right now whether we completely filled
16  this out in this manner or not.

17      Q     Well, let me ask you more generally
18  as part of what you ultimately provided to
19  DASNY, did that include an amount and a
20  description of the alleged damages?

21      A     Somewhere in our analysis, yes.

22      Q     And the second box here says, alleged
23  impacts which would include delay,
24  acceleration, escalation, excessive change
25  orders, et cetera, was that provided in some

38

1                 DIETERLE 30(b)(6)
2    form to DASNY with respect to individual
3    contractors?
4         A    To the extent we could glean that,
5    yes.
6         Q    And the next box says, Assessment of
7    Liability.  Was the information that's listed
8    there, which is the responsible party or
9    parties for each impact with explanation and
10   percentage of liability, was that presented in
11   some form to DASNY?
12        A    I'm not sure if it was by individual
13   contractor per se, not necessarily in this
14   form, but I guess we attempted to describe what
15   we found on the job, and whether we call it
16   assessment or liability, I don't recall.
17        Q    But when you say what you found on
18   the job, you mean with some adjustment of
19   liability?
20        A    Potentially.
21        Q    Now, other than reports,
22   Mr. Dieterle, that you provided to DASNY, did
23   you provide them with any other tangible
24   things, and if you need me to give you
25   examples, I will do that, in other words, like

39

1                    DIETERLE 30(b)(6)

2       a data compilation?

3            A    No, I don't believe so.  There may

4       have been some spreadsheets that were included

5       in the -- as an appendix to the report, but I

6       don't believe we gave them anything separate

7       from that, at least I don't recall any.

8            Q    Did you do -- or did you conduct any

9       interviews in connection with the work that you

10      did?

11           A    Yeah.

12           Q    And who did you interview?

13                MR. CARDENAS:  Objection.

14           Q    Did you --

15                MS. HEWITT:  Are you directing him

16           not to answer?

17      DI        MR. CARDENAS:  I am directing him not

18           to answer.

19           Q    Did you interview people other than

20      people who work for DASNY?

21           A    No.  I would say primarily we talked

22      to the DASNY people when we interviewed people.

23           Q    When you say primarily, Mr. Dieterle,

24      other than anybody at DASNY, and I'm not asking

25      you for names, but did you interview any people

40

```
 1                    DIETERLE 30(b)(6)
 2    other than people who work for DASNY?
 3         A    No, I don't believe from a standpoint
 4    of what was going on the job.  The only other
 5    communication may have been people, like could
 6    have been Marc Zaretsky showing us where the
 7    documents were and, you know, explaining this
 8    is how the filing system worked or something
 9    like that.  He couldn't give us any -- much
10    factual information on the job because he
11    wasn't there, so Hill didn't come on at that
12    point in time until later, so anybody that had
13    any relevant information would have been DASNY
14    people, and that's what I meant by primarily.
15         Q    Did Hill, again, in connection with
16    your claims work, did you take any -- do any
17    videos?
18              MR. McDERMOTT:  Video interviews or
19         videos of the site?
20         Q    I meant videos of the site, did you
21    take any videos of the site?
22         A    No.
23              MR. CARDENAS:  Just for
24         clarification, did you take any videos,
25         period?
```

41

DIETERLE 30(b)(6)

THE WITNESS:  No.

MS. HEWITT:  Anybody else?

Q    Mr. Dieterle, if you could go back to
CWC 2.  As your counsel indicated earlier,
there's a work authorization 8 which precedes
work authorization No. 6.  If you could go to
work authorization No. 8, if you go to Page 3,
that one, thankfully, has page numbers.

If you go to Page 3, it says, the
professional services described in this work
authorization have been completed and, it's
dated January 14, 2008.

Do you see that?

A    Yes.

Q    And is that when the work -- your
claims work was completed by January 14, 2008;
is that correct?

A    I know it was after Christmas at some
point, I don't recall any specific date, but it
was after the holidays.

Q    And Mr. Dieterle, since January 2008,
has Hill carried out any other claims and audit
service work related to this project on DASNY's
behalf?

42

                    DIETERLE 30(b)(6)

1

2     A     Yes, I mentioned we were doing a

3  forensic audit.

4     Q     But that's on O'Kane's behalf,

5  correct?

6     A     No, that's on DASNY's behalf.

7     Q     I misunderstood that.

8           So the forensic audit for O'Kane is

9  being done on DASNY's behalf?

10    A     This is correct.

11    Q     And other than that, since January of

12 2008, has Hill done any claims and audit

13 services work for DASNY?

14    A     No.  On this project.

15    Q     Right, understood.

16          MR. LEVY:  The question is, there's a

17     follow-up question that I don't know if

18     you're going to ask that has to do -- you

19     know, he is not all of Hill?

20          MS. HEWITT:  Right, I'm not going to

21     ask him that now, but I'm definitely going

22     to get to that.

23    Q     Mr. Dieterle, in connection with the

24 work that you did, did you create a chronology

25 or you or any of your team create a chronology

43

DIETERLE 30(b)(6)

1
2     of events for DASNY?

3          A     Not formally, no.

4          Q     When you say not formally, what do

5     you mean by that?

6          A     I guess our report would be some form

7     of a type of a chronology but not as something

8     that was called a chronology.

9          Q     But it included dates and schedules;

10    is that correct?

11         A     Yes.

12         Q     Mr. Dieterle, I could direct you to

13    it, but to save time, the claims and audit

14    services contract that Hill has with DASNY

15    provides for the hiring of subconsultants by

16    Hill.

17              Did Hill, in fact, hire any

18    subconsultants in connection with the claims

19    and audit services work that it did for DASNY?

20         A     Not that I recall.

21         Q     Mr. Dieterle, then if you could go

22    back to work authorization No. 6, Page 1, under

23    scope of services, Mr. Dieterle, it says, the

24    professional shall provide an analysis of

25    delays encountered on the project and provide

Case 1:07-cv-10639-LAK-AJP   Document 484-3   Filed 09/08/09   Page 44 of 103

44

DIETERLE 30(b)(6)

1              DIETERLE 30(b)(6)
2   an assessment of damages claimed by
3   contractors.
4         Do you see that?
5     A   Yes.
6     Q   Did Hill, in fact, provide that
7   analysis and the assessment?
8     A   Yes.
9     Q   And it goes on to say, to develop a
10  scope of work once the circumstances clarifying
11  the specific allegations, delays and damages
12  have been determined.
13        Did Hill do that?
14    A   As I sit here right now, I don't
15  recall anything specific addressing that
16  particular line.
17    Q   And it goes on to say, provide a
18  claims prosecution and defense strategy using a
19  phased approach as follows, and I'll go into
20  some of the things that follow, but did Hill,
21  in fact, provide a claims prosecution and
22  defense strategy?
23    A   Not formally.  We may have talked
24  about things but not in a formal written way.
25    Q   When you say you may have talked

45

1                    DIETERLE 30(b)(6)
2      about things, you mean with various DASNY
3      people?
4           A     Yes.
5           Q     I'd like to go through the items that
6      are listed in Phase 1, it mentions here a
7      kick-off meeting.  Was there, in fact, a
8      kick-off meeting, Mr. Dieterle?
9           A     Yes.
10          Q     And did you attend that meeting?
11          A     Yes.
12          Q     And various people from DASNY
13     attended?
14          A     Yes.
15          Q     Other than people from Hill and
16     people from DASNY, did anybody else attend that
17     meeting?
18          A     I'm not sure, as I sit here right
19     now, whether that kick-off meeting is a meeting
20     that occurred early on before we were engaged
21     or it's the kick-off meeting that occurred some
22     time around September.
23               As I recall, the September meeting,
24     which since this was when we were engaged and
25     in April we weren't, it was just Hill staff,

DIETERLE 30(b)(6)

myself and I think Jim McKay, perhaps even Ed
Vella and two or three DASNY people.

    Q   Were there any meetings, whether they
were in April or September or later, that you
recall where people other than people from Hill
and DASNY attended?

    A   No, although it's possible that in
the April meeting, there may have been someone
from corporation counsel there, I don't recall
specifically, but there may have been, but
other than that, no.

    Q   Now, under No. 2 of the Phase 1, it
says, discuss the project in detail through
interviews of key project personnel.  And I
realize I've asked you this already, but I just
want to make sure, there were interviews
conducted, they were only with personnel from
DASNY; is that correct?

    A   That's correct.

    Q   Now, in Point No. 3 under preliminary
assessment, it says, provide a preliminary
evaluation of the cause and responsibility for
critical delays.

    Do you see that?

47

DIETERLE 30(b)(6)

A      Yes.

Q      Do you have an understanding,
Mr. Dieterle, as to what was meant by critical
delays?

A      Yes.

Q      What is that?

MR. LEVY:   Objection, this is going
beyond the scope of the 30(b)(6)
deposition.

MS. HEWITT:   I disagree.   I disagree.
I'm asking him about the contract and the
work that was done in the contract, I'm
not asking --

MR. LEVY:   You're asking him for
interpretation of what the contract means.
The 30(b)(6) deposition is supposed to go
into the scope of the contract and the
work that was performed under the
contract, not an analysis of what the
contract terms mean and the work that
was -- and essentially you're asking him
to reveal what work was actually performed
pursuant to the contract and offer an
insight into the kinds of analysis and

48

                    DIETERLE 30(b)(6)

1

2      conclusions that were drawn by asking for

3      his interpretation.

4           MS. HEWITT:  But that's absolutely

5      not correct, and I'm using the contract as

6      a way of going through more expeditiously

7      the various items that I have a right to

8      ask him about anyway.

9           Mr. Cardenas, are you going to object

10     or direct your witness not to answer that

11     question?

12          MR. CARDENAS:  Not to this question.

13     I do think that the question can be taken

14     as seeking kinds of work.  If it goes at

15     all into conclusions, I will absolutely

16     enforce my right to object.

17          MS. HEWITT:  I am not going into

18     conclusions or I don't mean to, and I'm

19     sure somebody will let me know if they

20     think I am.

21     Q    Mr. Dieterle, you can answer the

22     question.  Do you want it read back?

23          MR. CARDENAS:  Can you please read

24     the question back to the witness.

25          (Record read.)

49

1                    DIETERLE 30(b)(6)

2        A     Yeah, critical delays would mean

3   critical path delays, delays that would have

4   caused a delay to the overall completion of the

5   project.

6        Q     Hill, in fact, provided that

7   analysis; is that correct?

8        A     To the extent we could, yes.

9        Q     If you go to No. 5, Mr. Dieterle,

10  that analysis was performed for each contractor

11  or at least for more than one contractor; is

12  that correct?

13       A     Yes.

14       Q     No. 7 says, meet to present the

15  preliminary findings.

16             Was there such a meeting?

17       A     As I sit here now, I don't recall a

18  specific meeting, but there may have been, but

19  I just don't recall at this point right now

20  sitting somewhere talking about things.

21       Q     Mr. Dieterle, if you'll go to No. 10,

22  it says, at the completion of Phase 1

23  preliminary assessment, the professional shall

24  work with the owner to develop a scope of work

25  and budget for a detailed review and evaluation

50

1                          DIETERLE 30(b)(6)
2     of the claims.
3               Do you see that?
4        A     Yes.
5        Q     Was that done?
6        A     I don't recall.
7        Q     Mr. Dieterle, the amount listed for
8     work authorization No. 6 to be paid to Hill is
9     158,000.
10              Do you see that?
11       A     Yes.
12       Q     And if we go back to work
13    authorization No. 8 at Page 2, the amount paid
14    to Hill was an additional 49,500.
15              Do you see that?
16       A     Yes.
17       Q     To your recollection, whatever the
18    sum of those two numbers is, is that the total
19    amount that was paid to Hill in connection with
20    its claim and audit services work on this
21    project?
22       A     Well, it certainly wasn't the amount
23    that was paid.  I think, but I haven't looked
24    recently and it's been a while, that we spent
25    less than that and billed less than that, that

51

DIETERLE 30(b)(6)

1   was kind of our authorization, not a lump sum

2   billing amount, so I think it was something

3   somewhat less than that, you know, it's almost

4   significantly less somewhere between the

5   original authorization and the sum of those two

6   numbers, but i don't recall specifically.

7         MR. BYRNE:  Is this a good place to

8      take a moment?

9         MS. HEWITT:  Sure.  Let's take five

10      minutes.

11         (Short recess taken.)

12    Q    Mr. Dieterle, I wanted to ask you a

13   couple follow-up questions before I move on.

14   Looking back at work authorization No. 6, under

15   No. 5, for example, which I asked you about

16   whether the analysis was performed for each

17   contractor.  Was the analysis performed for any

18   entities other than the contractors, for

19   example, for the previous construction manager?

20    A    No.

21    Q    How about the architect?

22    A    No.

23         MR. LEVY:  Objection to the form of

24      the question, it's not a speaking

52

1          DIETERLE 30(b)(6)
2      objection, Pat --
3          MS. HEWITT:  It's Patricia.
4          MR. LEVY:  Sorry.  When you say
5      performed for, are you saying performed on
6      behalf of or?
7          MS. HEWITT:  No, no, no.
8          MR. LEVY:  Okay, because it's not
9      clear.
10     Q    Did you understand that,
11  Mr. Dieterle, I meant did you do a review of
12  the work of the construction manager, did you
13  understand that?
14     A    Yes.
15     Q    And the answer is the same?
16     A    For what?
17     Q    Your answer would be the same?
18     A    Yes, I understood your question.
19         MS. HEWITT:  Thank you.  I appreciate
20     the clarification.
21     Q    Mr. Dieterle, the reports that were
22  prepared by your team and given to DASNY in
23  connection with the claims work, was there any
24  input into those reports from anyone in Hill's
25  legal department?

53

1                   DIETERLE 30(b)(6)

2        A    No.

3             MS. HEWITT:   I'm going to show the

4        witness a document that was previously

5        marked as CWC 1.

6        Q    Mr. Dieterle, have you seen the

7   document that's been marked as CWC 1 before?

8        A    No.

9        Q    And you're aware, however, that at

10  some point in time, Hill became the

11  construction manager on the BCC project; is

12  that correct?

13       A    That's correct.

14       Q    And are you familiar with the time at

15  which Hill began that work?

16       A    I knew at the time when I was working

17  on when that transition was, I don't recall the

18  specific dates at this point.

19       Q    Was it before Hill did its claims

20  audit work?

21       A    Yes, yes, definitely before that.

22  They were on site when I was there so...

23       Q    Now, Mr. Dieterle, did you do any

24  work whatsoever with respect to the

25  construction management aspect of Hill's work?

54

DIETERLE 30(b)(6)

1

2      A     No.

3      Q     Mr. Dieterle, prior to the time that

4   you became involved and your team became

5   involved with the project, had Hill done work

6   reviewing change orders, to your knowledge?

7      A     I think, but I am not 100 percent

8   sure.  That may have been something that was

9   part of the scope, but I don't recall precisely

10  what they were working on.

11     Q     Well, let me ask you this:  At the

12  time that you did the work that you described

13  earlier with respect to change orders, did you

14  reference any of the -- any earlier work that

15  Hill had done with respect to change orders?

16     A     No, not -- the claims that we looked

17  at that may have had a change order designation

18  to it for tracking purposes were not evaluated

19  at all by the Hill CM staff other than looking

20  at them perhaps and putting them in the file.

21  There was nothing in there that appeared to be

22  any type of an evaluation by the CM staff that

23  was in the file.

24     Q     Mr. Dieterle, I understand that you

25  haven't looked at the or haven't seen the

55

DIETERLE 30(b)(6)

1

2    construction management contract before.  I'm

3    just going to ask you about some aspects of it

4    just to generate questions, not because I

5    believe you are or should be familiar with the

6    document.

7            If you could turn to work

8    authorization No. 12 in CWC 1.

9        A    Is it somewhere in the back, in the

10   front?

11       Q    I'd say about -- it's about halfway

12   through, it's after the contract as a whole,

13   the work authorizations tend to be towards the

14   back.

15       A    Yeah, I think I'm coming up on it.

16           Yup, I got it.

17       Q    Now, Mr. Dieterle, in work

18   authorization No. 12, Paragraph 2 talks about

19   change orders, and it says, the construction

20   manager will continue with the resolution of

21   change orders pursuant to the owner-approved

22   procedure set forth in the September 25, 2006

23   memorandum between the owner and the

24   construction manager.

25           Do you see that?

56

DIETERLE 30(b)(6)

1

2      A    Yes.

3      Q    And do you have any knowledge

4  whatsoever about work done by Hill in the 2006

5  period with respect to the resolution of change

6  orders?

7      A    No.

8      Q    If you go a little further in that

9  paragraph, the last sentence says, as of the

10  date hereof, there are approximately 700 change

11  orders remaining to be processed, not including

12  additional program changes.

13         Do you see that?

14      A    Yes.

15      Q    Do you know, Mr. Dieterle, if any of

16  the change orders that your team reviewed were,

17  if you will, left over or among the remaining

18  change orders that are referenced here?

19         MR. CARDENAS:  Objection to the form

20      of the question.

21         You can answer the question if you

22      understand.

23      A    Well, I think I understand your

24  question, but I have no knowledge as to what

25  the 700 change orders actually meant or which

57

1                      DIETERLE 30(b)(6)

2   ones were included.

3        Q    Mr. Dieterle, do you know whether

4   Hill did any claims audit work under the

5   construction management contract?

6        A    No.

7             MR. CARDENAS:  Objection, asked and

8        answered as well, but that's fine.

9        Q    I asked the question poorly too.

10            To your knowledge, did Hill

11   International do any claims and auditing work

12   under the construction management contract?

13        A    Not to my knowledge.

14        Q    Mr. Dieterle, if you don't mind

15   turning back to work order No. 9, which is just

16   a few pages before what we were just looking   .

17   at, on Page 1 of work authorization No. 9 under

18   No. 6, it's called claims support, and it says,

19   the professional will inform the owner in a

20   timely manner of any potential claims and will

21   proactively try and settle such issues.

22            Do you see that?

23        A    Yes, I do.

24        Q    To your knowledge, did Hill do any

25   work under this contract as described there

58

1                    DIETERLE 30(b)(6)

2    that is claim support?

3              MR. CARDENAS:  Form objection.

4              You can answer if you understand.

5         A    No, I have no knowledge of what they

6    were doing.

7         Q    If you -- on that same page, if you

8    go up to the paragraph that talks about change

9    orders.

10        A    Okay.

11        Q    The last sentence says, as necessary,

12   the professional will perform schedule analysis

13   in order to confirm and/or support certain

14   change order requests and entitlement for

15   noncompensatory time extensions.

16             Do you see that?

17        A    Yes.

18        Q    Do you know whether Hill

19   International did that work under this

20   contract, Mr. Dieterle?

21        A    I have no idea what they did.

22        Q    When you -- and J understand

23   Mr. McKay may have done more of the scheduling

24   work, but when you did the schedule analysis

25   work that you did under -- by your team, were

59

DIETERLE 30(b)(6)

1

2   you provided with any of the work that Hill had

3   done under the construction management

4   contract?

5      A    Well, even assuming that they even

6   did any that I'm not aware of, no, we didn't

7   utilize anything that they had, and I don't

8   recall that they gave us anything anyway so...

9         MS. HEWITT:  This is going to be

10      CWC 5, and for the record it's a two-page

11      document with the Bates No. DASNY-P

12      0001151803 and 04.

13      (CWC Exhibit 5, Document Bates

14      stamped DASNY-P 0001151803-04, marked for

15      identification.)

16      Q    Mr. Dieterle, have you seen the

17   document that has been marked as CWC 5 before?

18      A    I saw the original, I don't recall

19   seeing it with the markups on it, but...

20      Q    Understood.  And maybe it might have

21   been marked up by DASNY, for all I know, but

22   the original document was submitted by your

23   office; is that correct?

24      A    That's correct.

25      Q    And it lists the professionals who

60

DIETERLE 30(b)(6)

1

2    worked on the project in the month of

3    September 2007, correct?

4         A    Yes.

5         Q    And this was in connection with the

6    claims and auditing services work; is that

7    correct?

8         A    That's correct.

9         Q    Now, I know you testified earlier

10   that Mr. Zaretsky had nothing to do with this

11   project.  I see that he's billed for an hour

12   and a half of his time.

13             Do you remember what, if any, role he

14   might have had in the month of September 2007?

15        A    He may have charged some time in

16   terms of identifying where things were on the

17   project.  He facilitated a -- getting an office

18   built for us so we could have a separate little

19   enclave with which to work unfettered from the

20   rest of the project.  That would be my guess as

21   to what he may have included on that.

22             (CWC Exhibit 6, Document Bates

23        stamped DASNY-P 000271485-90, marked for

24        identification.)

25             MS. HEWITT:  CWC 6 is a six-page

61

                    DIETERLE 30(b)(6)

1

2      document with the Bates Nos. DASNY-P

3      000271485 through 90.

4          Q    Again, Mr. Dieterle, I understand

5      that some of the markups you haven't seen

6      before, but have you seen the document -- the

7      underlying document that has been marked as

8      CWC 6 before?

9          A    Yes.

10         Q    And is this a billing backup for the

11     time spent by various Hill personnel in

12     October 2007?

13         A    Yes.

14         Q    I want to ask you about a couple of

15     the -- or a few of the entries.  On the first

16     page, about halfway down from Mr. McKay,

17     there's an entry on October 19, 2007 which

18     says, review schedules and claims, and then it

19     says, prepare overall progress over time

20     graphic.

21             Do you see that?

22         A    Yes.

23         Q    Can you tell me what the time graphic

24     is or was?

25         A    Well, I can only guess at what that

62

1                    DIETERLE 30(b)(6)
2    may mean.
3              MR. CARDENAS:  Don't guess.  If you
4         know, you can answer any question she
5         poses to you.  Don't guess.
6         A    I can't say with certainty.  I would
7    have an idea what it might mean but not without
8    absolute certainty.
9         Q    Well, you testified earlier that
10   Mr. McKay was doing the schedule work; is that
11   right?
12        A    Yes.
13        Q    Did Mr. McKay prepare at some point,
14   or people working with him, some sort of a
15   graphic that charted out the schedule?
16        A    The schedule?
17        Q    Well, the time line on the project.
18        A    Well, I don't think that even says --
19   I don't know.  I guess it could be -- he may
20   have.  I don't recall exactly what that would
21   be referring to.
22        Q    A couple of entries down it says,
23   revise progress efficiency graphic.
24              Do you see that?
25        A    Yes.

63

DIETERLE 30(b)(6)

Q    Do you know what the progress
efficiency graphic was?

A    He prepared some graphs, I don't
recall exactly what that one would have
entailed, but I believe he did prepare some
graphics.

Q    And how were those graphics used,
were they given to DASNY?

A    They may have been incorporated into
our report, I don't know.  They may have been
something that we did just from an analytical
standpoint to see something pictorially and not
made its way directly into our report.  That's
the best I can answer that.

Q    Mr. Dieterle, you testified earlier
that there were some individuals other than
yourself and Mr. Vella and Mr. McKay who worked
on this project.  Was Kevin Kreitzer one of
those people?

A    Yes.

Q    And on the second page, there are
numerous entries for Mr. Kreitzer, many of
which say research and analyze PCO's.  PCO's
means preliminary change orders or proposed

64

1                    DIETERLE 30(b)(6)

2   change orders?

3        A    Proposed or potential, something like

4   that, yeah.

5        Q    Were those PCO's that Mr. Kreitzer

6   reviewed the change orders that you referred to

7   earlier when you said you were analyzing

8   claims?

9        A    They were the claims, yes.

10       Q    The claims that you were analyzing in

11   your aspect of the work; is that right?

12       A    That's correct.

13       Q    Now, if you turn to Page 3, about

14   maybe two-thirds of the way down, on

15   October 19th, there's an entry for Mr. Vella

16   which says, review contractor's claims for

17   damages and input pertinent information into

18   spreadsheets.

19            Do you see that?

20       A    Yes.

21       Q    Were spreadsheets, in fact, prepared

22   by Mr. Vella showing the various contractor's

23   claims for damages?

24       A    Yes.

25       Q    If you go to the next page, there's

65

DIETERLE 30(b)(6)

1

2    some entries for Mr. Dunnigan.  Is Mr. Dunnigan

3    another individual who worked on this project

4    for Hill?

5         A    Yes.

6         Q    And there's an entry on October 19th

7    that says, replicate manhour reports.

8              Do you see that?

9         A    Yes.

10        Q    Can you tell me what a manhour report

11   is?

12        A    I can tell you generically what a

13   manhour report might be, you know, just a

14   listing of the manhours expended on the job

15   perhaps by work activity, perhaps by time,

16   things of that nature.

17        Q    There's an entry a couple of entries

18   down for Dierks Heating.  It says Dieks, but I

19   think it's meant to be Dierks, which is D I E R

20   K S.

21             Do you know what that work done by

22   Mr. Dunnigan was with respect to Dierks

23   Heating?

24        A    Probably part of something we asked

25   him to do in terms of analyzing the Dierks

1              DIETERLE 30(b)(6)

2      claim.

3          Q    A couple of lines down, there's

4      another entry for Mr. Zaretsky, and

5      Mr. Zaretsky is referred to as a senior project

6      manager.

7              Was he a senior project manager on

8      the claims project?

9          A    No.

10         Q    Is that his title with respect to the

11     construction management work?

12         A    Yes.

13             (CWC Exhibit 7, Document Bates

14             stamped DASNY-P 0001152635-40, marked for

15             identification.)

16         Q    Mr. Dieterle -- sorry, let me

17     identify for the record --

18             MS. HEWITT:   CWC 7 is a five-page

19             document with the Bates Nos. DASNY-P

20             0001152635 through 2640.

21         Q    Mr. Dieterle, have you seen the

22     document that's been marked as CW 7 before?

23         A    I -- again, with the proviso that

24     there's some markings on it, that that part I

25     didn't see.   Obviously I sent this out.

67

1                    DIETERLE 30(b)(6)

2    However, it does not appear that the document

3    is complete as submitted, so when you say did I

4    see this document, I saw it in its entirety and

5    not...

6         Q    What is missing from this,

7    Mr. Dieterle?

8         A    There would be a summary page for

9    the -- after the letter of the entire invoice,

10   and it appears that it may have cut off on

11   Page 4, seems like it kind of abruptly cut off

12   there, maybe not, but I think there would be

13   another subtotaling on that, so it looks like

14   it may be missing the last page or so.

15        Q    I want to ask you about some of the

16   entries on the first page of the billing

17   backup.  The very first entry for Mr. McKay

18   says, review documents to assemble bid

19   schedule.

20             Do you see that?

21        A    Yes.

22        Q    Can you tell me what the bid schedule

23   was?

24        A    Not as I sit here.

25        Q    The next entry says, review BLL.  I

68

1                      DIETERLE 30(b)(6)

2    assume BLL means Bovis Lend Lease; is that

3    correct?

4          A      Probably.

5          Q      Review BLL monthly reports and

6    schedules to analyze early delays.

7                 Do you see that?

8          A      Yes.

9          Q      Did you have any input, Mr. Dieterle,

10   into the analysis of early delays.

11                MR. McDERMOTT:   Objection to form.

12         A      Well, Jim McKay was responsible for

13   the review of the delays, and that was his

14   primary responsibility.  When you say did I

15   have any input, we may have talked about

16   things, but it was Jim McKay's responsibility

17   for the prime analysis of the delays on the job

18   regardless of when they occurred.

19         Q      Whether they were early or later; is

20   that correct?

21         A      Yes.

22         Q      A couple of entries down on

23   November 15, 2007, it says, compare Bovis

24   schedules to claim schedules.

25                Do you see that?

69

DIETERLE 30(b)(6)

1

2          A     Yes.

3          Q     Can you tell me what Bovis schedules

4     that refers to?

5          A     I'm not 100 percent sure, but

6     probably the schedules in the monthly reports.

7          Q     And you're comparing -- or he was

8     comparing the Bovis schedules to the claim

9     schedules, the claim schedules are those from

10    the contractors; is that correct?

11         A     That's the way I would interpret

12    that.

13         Q     A few entries down on November 21,

14    2007, it says, continue analysis of project

15    schedules to examine relationship between

16    structural steel and GC No. 1 contracts.

17               Do you see that?

18         A     Yes.

19         Q     Did you have any input into that

20    work, Mr. Dieterle?

21         A     Not in detail.

22         Q     To your knowledge, was an analysis

23    done examining the relationship between

24    structural steel and GC No. 1 contracts?

25         A     I don't recall as I sit here, but

70

DIETERLE 30(b)(6)

1  based on that description, I think that I would

2  probably conclude there must have been.

3      Q    If you go to the second page,

4  Mr. Dieterle, going to the entries for

5  Mr. Kreitzer, starting on November 1, 2007, it

6  says, review Caldwell pending change orders.

7          Do you see that?

8      A    Yes.

9      Q    Were Caldwell pending change orders

10 among the change orders that Hill International

11 reviewed in connection with its claims work?

12     A    Only those that were a claim as we

13 saw them.  I don't recall, some contractors had

14 more than one claim, in other words, it may

15 have been the subject of two PCO's, but it's

16 not an overall review of the PCO's, just the

17 PCO's that were determined to be claims that we

18 evaluated.

19     Q    Mr. Dieterle, it may only be me, but

20 can you explain to me what the difference

21 between a regular PCO -- again, as we're

22 talking about this project, not generically, a

23 regular PCO and something that you all

24 determined to be a claim?

71

DIETERLE 30(b)(6)

MR. CARDENAS:  Objection to the form

of that question, but you can certainly

explain the basis for your answer.

A    Well, a regular PCO would be a

request to be paid for an extra, perhaps for a

change to the dry wall or something like that,

you know, couple thousand, 10,000, something

relatively minor.

Each change request that came in was

given a PCO number, and there was a lot of them

from the whole job, but the reason we're

referring to them as PCO's is because the

claims, that is, is because the P -- they had

PCO numbers assigned to them, so we -- when we

tried to track down information regarding a

claim, we needed to look at it as a PCO number,

and it was a unique number for that particular

claim, and generally it was an item associated

with a request for time extension or a request

for delay damages or request for lost

productivity and a significant volume of --

dollarwise.

Q    Is it fair to say then that -- well,

withdrawn.

72

DIETERLE 30(b)(6)

When you say they were assigned a PCO
number, that was by Hill?

A    Yes, well, it may have started out by
Bovis and continued on by Hill as the second
CM.

Q    But they were assigned a PCO number
for the purpose of keeping track of them; is
that correct?

A    Yes.

Q    And they were determined to be --
withdrawn.

As I understand what you're saying,
they were then determined to be claims if they
were somehow out of the ordinary of what would
be a regular PCO; is that correct?

A    Yeah.

Q    So either if it was an unusually high
amount of money, it would be then considered a
claim; is that right?

A    I don't know that that was completely
determined as to what was a claim, but more
than likely, that would be a -- one way to
determine what would represent a claim or there
could have been reasons that there were other

73

DIETERLE 30(b)(6)

PCO's that had larger volumes.

Q     But if it was a request -- if it was
a delay claim, that would be considered a
claim; is that correct?

A     That would be probably one of the
higher levels of criteria to -- in addition to
dollar volume to establish --

Q     To make it into a claim?

A     -- whether it was a claim, yes.

Q     Getting back to the entries for
Mr. Kreitzer, he was reviewing pending change
orders to the extent that they were deemed to
be claims; is that correct?

A     That's correct.

Q     If you go down to the first entry for
Mr. Vella on November 1, 2007, it says, travel
to and from project site and collect and review
documents related to contractor's claim for
equitable adjustment.

       Do you see that?

A     Yes.

Q     Do you know which contractor that
was?

A     No.

74

```
 1                    DIETERLE 30(b)(6)
 2              (CWC Exhibit 8, Document Bates
 3         stamped DASNY-P 0001153011, marked for
 4         identification.)
 5              MS. HEWITT:   CWC 8 is a two-page
 6         document with the Bates Nos. DASNY-P
 7         0001153011.
 8         Q    Mr. Dieterle, I'm going to ask you
 9    about Page 1 of CWC 8.  Did you send that
10    letter to the Dormitory Authority in or about
11    January 10, 2008?
12         A    Yes.
13         Q    In the first paragraph of your letter
14    it says, during this period, Hill
15    representatives completed its review and
16    analysis of contractor claims.  We attended a
17    meeting in New York City and prepared and
18    submitted a draft report of our preliminary
19    findings.
20              Do you see that?
21         A    Yes.
22         Q    To whom did you give your draft
23    report of preliminary findings?
24              MR. CARDENAS:   He can answer.
25         Objection, asked and answered.
```

1                    DIETERLE 30(b)(6)

2       A    George Weissman.

3       Q    Other than George Weissman, did you

4    give it to anybody else?

5       A    No.

6       Q    Was the draft report ever turned into

7    a final report?

8       A    No.

9       Q    And Mr. Dieterle, the second page of

10   CWC 8 is a compliance report.  Can you just

11   explain briefly what the purpose of this

12   document -- was this a form that you had to

13   fill out for DASNY?

14      A    Yes.

15      Q    And you submitted it each month with

16   your payment requisitions?

17      A    Yes.

18      Q    Mr. Dieterle, did you deal with

19   somebody named Paul LaJoy?

20      A    Paul LaJoy, yes, the answer is yes.

21           MS. HEWITT:  Off the record.

22           (Discussion held off the record.)

23      Q    Is Mr. LaJoy also at DASNY?

24      A    Yes, he is.

25      Q    And what was the nature of the

76

DIETERLE 30(b)(6)

1
2     interaction you had with Mr. LaJoy?
3          A    I would say two components of
4     interaction with Paul LaJoy, one was he
5     provided me some financial information that
6     DASNY may have had about certain things related
7     to the project, and then he, I think, as the
8     project accountant or something to that effect,
9     also was involved in, I don't know necessarily
10    the approval, but in terms of cutting the check
11    or getting the process of us getting paid for
12    our services.
13              (CWC Exhibit 9, Document Bates
14         stamped DASNY-E 02249225-26 and additional
15         two pages not Bates stamped, marked for
16         identification.)
17              MS. HEWITT:  CWC 9 is a four-page
18         document, the first two pages are Bates
19         numbered DASNY-E 02249225 and 26.  The
20         second two documents, as 1 -- second two
21         pages, as I mentioned briefly to Mr. Levy
22         earlier, are not Bates stamped, but they
23         are from DASNY's production and appear to
24         be text associated with the first page of
25         the exhibit.

77

1                    DIETERLE 30(b)(6)

2        Q     Mr. Dieterle, do you -- did you -- do

3    you recall sending Mr. LaJoy, on February 4,

4    2008, a construction contract and budget

5    information?

6        A     Not as I sit here, no.

7        Q     Well, do you have any reason to

8    believe, looking at this E-mail, that you

9    didn't send construction contract and budget

10   information to Mr. LaJoy on February 2008 --

11   sorry, that Mr. LaJoy sent you -- you know

12   what, let's start all again.

13            The first page of CWC 9 is an E-mail

14   string, Mr. Dieterle.  Apparently you sent an

15   E-mail to Mr. LaJoy on February 1, 2008 and he

16   responded on February 4, 2008.

17            Do you see that?

18       A     Yes, I do.

19       Q     And he sent you an Excel workbook

20   with the requested information.

21            Do you see that?

22       A     Yes.

23       Q     Do you recall what Excel -- excuse

24   me, what requested -- information you had

25   requested?

78

DIETERLE 30(b)(6)

1

2      A    Well, based on the two sheets that

3   aren't Bates stamped -- well, I can only guess

4   that it's related to that, but I --

5      Q    We'll get to that eventually.   I

6   understand Mr. Cardenas only wants you to

7   answer what you've been asked, but we are going

8   to get to it.   But independently of what is on

9   the last two pages, do you recall having asked

10  him for an Excel workbook?

11     A    No, I don't.

12     Q    Mr. Dieterle, Mr. LaJoy's E-mail

13  talks about pending PCO's and 25 percent of

14  submitted claim value.

15          Do you see that?

16     A    Yes.

17     Q    Do you know why he's referencing

18  25 percent of submitted claim value?

19     A    No, I don't.

20     Q    If you look at the last two pages,

21  and I think it's fair to say that this is

22  something that originally appeared in Excel

23  format, and it's harder to read the way it is

24  here, but ·  and the first item says,

25  construction budgets with original construction

79

DIETERLE 30(b)(6)

1
2  budget and then current construction budget.
3          Do you recall seeing a document like
4  that?
5      A    I have a vague recollection in terms
6  of just the status of the contractors, where
7  they started and what the current value was
8  just so I knew where the current value of the
9  contract was.
10     Q    Can you tell me why in February of
11 2008 you wanted that information, Mr. Dieterle?
12     A    Not specifically, no.
13     Q    And the reason I'm asking the
14 question particularly is, because if, in fact,
15 Hill had finished its work in January of '08, I
16 just wonder if you have any recollection of
17 continuing to do work as late as February 4th
18 of '08?
19     A    I don't have a particular
20 recollection, but I think it's obvious there
21 must have been something that someone asked me
22 about at DASNY to look into, and perhaps that
23 was what was done, but obviously there's
24 something there because of the date, it was
25 after the January time period.

80

DIETERLE 30(b)(6)

1

2          MS. HEWITT:   CWC 10 are two different

3     E-mails, both dated Friday January 18,

4     2008, and the Bates numbers are DASNY

5     E-00221439 through 445, and then they pick

6     up again at 448 through 456.

7          (CWC Exhibit 10, Document Bates

8     stamped DASNY-E 00221439-45 and 446-456,

9     marked for identification.)

10         Q     Mr. Dieterle, did you receive these

11    two E-mails from Mr. Morse in January of 2008?

12         A     Appears to be.

13         Q     And these are documents that are

14    showing that DASNY had approved certain change

15    orders; is that correct?

16         A     Appears to be, yeah.

17         Q     And were those change orders that had

18    been reviewed by Hill in the course of its

19    claims work?

20         A     Well, they would be claims that we

21    reviewed not, you know, not outside of what

22    would be considered a claim, but I believe that

23    some of these may have been things that had

24    already been, as is noted, previously approved

25    and processed, so we were getting some

81

1                    DIETERLE 30(b)(6)

2    information on that apparently, but I don't

3    have any direct recollection.

4         Q    Well, I see.  So these are claims

5    that had been -- or excuse me, change orders

6    that had been processed and approved prior to

7    Hill's involvement in the project; is that

8    correct?

9         A    Yes.

10        Q    Do you know why Mr. Morse was sending

11    you those in January of 2008?

12        A    As opposed to some other date or?

13        Q    Well, again, my understanding is that

14    you were pretty much finished with your work by

15    January 18th of 2008?

16        A    Well, based on that one document we

17    had with DASNY, it appeared that there was

18    something going in like mid January that we

19    were completed.  Now, as I'm looking, we must

20    have issued a draft in December and perhaps the

21    next one was actually not issued until early

22    February some time.

23        Q    The next draft?

24        A    The next draft.  I thought it might

25    have been January, but it may have actually

82

1                     DIETERLE 30(b)(6)

2       trickled into February despite the language

3       that the work was completed in mid January.  We

4       were cleaning up things including what appears

5       to be maybe something that we received from

6       this E-mail on January the 18th, so I may have

7       been off a month.

8               Q    And in any event, if you did a draft

9       in late January or early February of 2008, you

10      did not do a final report to DASNY; is that

11      correct?

12              A    That is correct.

13              Q    Mr. Dieterle, to your knowledge, has

14      DASNY ever released any of Hill's findings

15      publicly?

16              A    I have no knowledge of what they did.

17              Q    At all?

18              A    With anyone, yeah.

19              Q    Mr. Dieterle, if you could go back to

20      CWC 2, which is the claim and audit services

21      contract.  Appendix A of that document, which

22      is A1 --

23              A    Okay.

24              Q    This is not one of the work

25      authorizations this is Appendix A to the

83

1                    DIETERLE 30(b)(6)

2       general contract, but I just want to ask you a

3       couple of questions, and I realize I may have

4       already asked you some of these.

5                    Under No. 5, with respect to the BCC,

6       did Hill -- and again, the work that you worked

7       on, Mr. Dieterle, did Hill do an evaluation of

8       the architect, the engineer or the construction

9       manager performance in connection with the BCC?

10           A    No.

11           Q    With respect to No. 6, which relates

12      to contractor performance, did Hill do an

13      analysis of actual manpower versus planned and

14      required?

15           A    I don't recall specifically what we

16      did in those areas, and it may have been a

17      difference for different contractors too if we

18      did do it so...

19           Q    So do you recall whether Hill did

20      anything with respect to labor productivity

21      analysis?

22           A    Well, to the extent that a claim had

23      an analysis of productivity as part of its

24      claim, we were analyzing that, that issue.

25           Q    And similarly, you would have

84

```
 1                    DIETERLE 30(b)(6)
 2    analyzed labor and material cost if a claim had
 3    that as part of the component?
 4         A    Yes, to the extent we could.
 5         Q    Mr. Dieterle, other than contractors,
 6    do you remember -- let me say it differently.
 7    Other than contractors, did Hill analyze the
 8    work of any subcontractors?
 9         A    To the extent --
10              MR. CARDENAS:  Objection to form.
11              Go ahead and answer.
12              Just a form objection.
13         A    To the extent that a contractor claim
14    included the -- a claim or a request for
15    additional compensation, that was wrapped
16    within the prime contractor's claim, yes.
17         Q    As we sit here today, do you recall
18    who any of those subcontractors might have
19    been?
20         A    Yes.
21         Q    And who are they?
22         A    The only one that I can recall here
23    as I sit here today is -- because it was
24    somewhat recent, was O'Kane, their sub that
25    included a claim was named Danco, but I don't
```

85

```
1                   DIETERLE 30(b)(6)
2      recall specifically any of the other subs.
3           (Discussion held off the record.)
4              MR. CARDENAS:  The witness has
5           indicated, given the colloquy of counsel,
6           that something wants -- something has
7           spurred him to amend his answer slightly.
8           A    Just to make the clear record, we
9      were not asked to look at the CM, the architect
10     or the engineer directly, but if there was
11     something in our report factually that we saw
12     that would have in any way described actions,
13     inactions or anything of any of the parties,
14     then it might be something in the report.
15              In other words, it wasn't a formal
16     request like we did with the contractors, but
17     obviously, all parties on the job were involved
18     in the job, and so I just want to make sure,
19     there might be something that we said, well,
20     this guy did this or this guy did that or maybe
21     didn't do this, but it wasn't in the context of
22     being posed the question analyze the CM, the
23     engineer, the architect.
24          Q    Okay.  Mr. Dieterle, if you don't
25     mind going back to CWC 7.  I'm going to ask you
```

86

                    DIETERLE 30(b)(6)
1
2   about Page 2 of the billing backup which I
3   asked you about before, the reference to
4   Mr. Kreitzer review of Caldwell pending change
5   orders.

6                 And I wanted to ask you,
7   Mr. Dieterle, whether Hill prepared any
8   financial analyses of the payment request by
9   Caldwell Wingate either by Mr. Kreitzer or by
10  you or anybody?

11       A    Can you repeat that so I understand?
12       Q    Sure.  Did Hill, in the course of its
13  claims work, prepare any financial analyses of
14  the payment requests by Caldwell Wingate?

15       A    I don't believe we did, no, although
16  we may have looked at it just to get an
17  understanding of things, but we didn't do a
18  specific analysis of the payment request.

19            I'm not sure what you mean by
20  analysis particularly, but in terms of a
21  separate analysis of that, I don't believe, to
22  answer your question, that we did anything like
23  that.

24       Q    And to the extent that I can be
25  clearer, I meant a financial analysis or I

87

DIETERLE 30(b)(6)
1
2 think I said that but...

3      A     Even then, I'm not exactly sure what

4 financial analysis means.  I mean, it could

5 mean a lot of things in the context of a

6 payment application, so it doesn't sound like

7 anything that we did, but I'm not 100 percent

8 sure what you mean by financial analysis or

9 analysis of any kind.

10      Q     Is it fair -- well, withdrawn.

11           Did Hill do any analysis of

12 claims-related materials from Caldwell Wingate?

13      A     Well, again, I'm not sure what you

14 mean by claims related material.  Unless you're

15 referring to that as meaning the backup that

16 was provided by Caldwell Wingate or any

17 contractor, that's what I would infer from your

18 question that you're asking me.

19      Q     That's correct.

20      A     Well, yeah, in any of the contractors

21 that we reviewed, we analyzed the claim in the

22 context of what was being provided from the

23 basis of the information that was in the

24 package and what else from the project record

25 would be available to evaluate it.

88

1                 DIETERLE 30(b)(6)

2         (Short recess taken.)

3     Q    Mr. Dieterle, I just have a couple

4  more questions.

5         Does the name JD Edwards mean

6  anything to you?

7     A    I think they're some kind of an

8  investment house, as I recall.

9     Q    But in connection with this project,

10  does it mean anything to you?

11     A    I think there may be -- it may be a

12  software program that DASNY uses for its

13  financial reporting on projects.

14     Q    And Mr. Dieterle, can you tell me

15  the -- to the extent that you know it, the

16  background, Mr. McKay's background?

17     A    Mr. McKay is a registered architect

18  and a professional engineer.

19     Q    And Mr. Vella?

20     A    Mr. Vella has a -- I think he has

21  like an associate's degree in some kind of

22  construction technology or something like that.

23        MS. HEWITT:  I have no further

24    questions.

25        I would like to say on the record to

89

DIETERLE 30(b)(6)

1
2  thank you and your colleagues for being
3  extremely gracious, we don't get this kind
4  of treatment for every deposition, and I
5  know we're not going to get this type of
6  treatment for every deposition and
7  particularly from a nonparty, so we do
8  appreciate it.
9       MR. CARDENAS:  You are welcome.
10  Thank you for doing it way down here.
11      THE WITNESS:  We try to make our
12  guests, even though they're trying to ask
13  tough questions, to make them comfortable.
14      (Time noted: 12:20 p.m.)
15
16
17
18
19
20
21
22
23
24
25

90

```
1              A C K N O W L E D G M E N T
2
3    STATE OF NEW JERSEY        )
4                              :ss
5    COUNTY OF                  )
6
7        I, ROBERT DIETERLE, hereby certify that I have
8    read the transcript of my testimony taken under
9    oath in my deposition of March 20, 2009; that the
10   transcript is a true, complete and correct record
11   of my testimony, and that the answers on the record
12   as given by me are true and correct.
13
14
15                          ROBERT DIETERLE
16
17
18   Signed and subscribed to before me
19   this _____ day of _____, 2009
20
21   _____
22   Notary Public, State of New Jersey
23
24
25
```

91

```
1                    C E R T I F I C A T E
2
3       STATE OF New Jersey)
4                             :ss
5       COUNTY OF Monmouth)
6
7           I, RITA M. PERSICHETY, a Notary Public within
8       and for the State of New Jersey, do hereby certify:
9           That ROBERT DIETERLE, the witness whose
10      deposition is hereinbefore set forth, was duly
11      sworn by me and that such deposition is a true
12      record of the testimony given by such witness.
13          I further certify that I am not related to any
14      of the parties to this action by blood or marriage;
15      and that I am in no way interested in the outcome
16      of this matter.
17          IN WITNESS WHEREOF, I have hereunto set my
18      hand this 31st day of March, 2009.
19
20
21              _____
22                 RITA M. PERSICHETTY
23
24
25
```

92

```
 1              *** ERRATA SHEET ***

 2        ELLEN GRAUER COURT REPORTING CO. LLC
          126 East 56th Street, Fifth Floor
 3              New York, New York 10022
                    212-750-6434
 4

 5   NAME OF CASE:  Gross v American, et al
     DATE OF DEPOSITION:  March 20, 2009
 6   NAME OF WITNESS:  ROBERT DIETERLE 30(b)(6)

 7   PAGE   LINE      FROM        TO        REASON

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22   Subscribed and sworn before me
     this ___ day of _____,2009.
23

24

25   (Notary Public)        My Commission Expires:
```

WILLIAM A. GROSS

BSA (GMAX)(1)
ROBERT DIETERLE 30(b)(6) - 3/20/09

VS. AMERICAN MANUFACTURERS

| | | | |
|---|---|---|---|
| **Concordance Report** | 79:15, 18 | 11:6 | 8:12 |
| Unique Words: 1,251 | | 199 [1] | |
| Total Occurrences: 4,683 | **\* \* 1 \* \*** | 2:17 | **\* \* 6 \* \*** |
| Noise Words: 382 | | 1996 [1] | |
| Total Words In File: | 1 [14] | 13:12 | 6 [24] |
| 12,634 | 43:22; 45:6; 46:13; 49:22; | 19th [2] | 1:18; 8:3, 13; 11:12; 18:22; |
| | 53:5, 7; 55:6; 57:17; 69:16, | 64:15; 65:6 | 19:18; 20:7, 8; 21:5; 22:2, |
| Single File Concordance | 24; 70:6; 73:17; 74:9; 77:15 | | 4, 8; 41:7; 43:22; 47:9, 17; |
| Case Insensitive | 10 [6] | **\* \* 2 \* \*** | 50:6; 51:15; 57:18; 60:22, |
| Noise Word List(s): | 8:3, 23; 49:21; 74:11; 80:2, | | 25; 61:8; 83:11, 92:6 |
| NOISE NO! | 7 | 2 [9] | 60 [1] |
| | 10,000 [1] | 16:21, 23; 19:24; 41:5; | 8:14 |
| Cover Pages = 0 | 71:8 | 46:13; 50:13; 55:18; 82:20, | 631.493.0763 [1] |
| Includes ALL Text | 100 [5] | 86:2 | 6:9 |
| Occurrences | 3:13; 5:5; 54:7; 69:5; 87:7 | 20 [3] | 631.499.8409 [1] |
| | 10004-1314 [1] | 1:14; 90:9; 92:5 | 6:8 |
| Dates ON | 4:9 | 2006 [2] | 66 [1] |
| | 10007 [1] | 55:22; 56:4 | 8:16 |
| Includes Pure Numbers | 3:14 | 2007 [13] | |
| Possessive Forms ON | 10017 [2] | 20:14; 22:4, 8; 34:24; 35:6; | **\* \* 7 \* \*** |
| | 6:15; 7:6 | 60:3, 14; 61:12, 17; 68:23; | |
| **\* \* DATES \* \*** | 10022 [2] | 69:14, 70:6; 73:17 | 7 [6] |
| | 1:24; 92:3 | 2008 [15] | 8:15; 49:14; 66:13, 18, 22; |
| 9/13/07 [2] | 10038 [1] | 41:13, 17, 22; 42:12; 74:11; | 85:25 |
| 19:4; 22:2 | 2:18 | 77:4, 10, 15, 16; 79:11; | 700 [2] |
| | 10167 [1] | 80:4, 11; 81:11, 15; 82:9 | 56:10, 25 |
| **\* \* 0 \* \*** | 5:16 | 2009 [6] | 74 [1] |
| | 10177 [1] | 1:14; 90:9, 19; 91:18; 92:5, | 8:18 |
| 0001151803 [1] | 2:6 | 23 | 76 [1] |
| 59:12 | 10601 [1] | 21 [1] | 8:22 |
| 0001151803-04 [2] | 3:6 | 69:13 | |
| 8:12; 59:14 | 10:05 [1] | 212-750-6434 [2] | **\* \* 8 \* \*** |
| 0001152635 [1] | 1:15 | 1:24; 92:3 | |
| 66:20 | 11 [1] | 212.232.1374 [1] | 8 [9] |
| 0001152635-40 [2] | 4:8 | 2:20 | 8:17; 18:23; 41:6, 9; 50:13; |
| 8:16; 66:14 | 11570 [1] | 212.232.1399 [1] | 74:2, 5, 9; 75:10 |
| 0001153011 [3] | 5:6 | 2:21 | 80 [1] |
| 8:18; 74:3, 7 | 11746 [1] | 212.422.9424 [1] | 8:24 |
| 000271485 [1] | 6:6 | 4:11 | 801 [1] |
| 61:3 | 12 [2] | 212.422.9429 [1] | 6:14 |
| 000271485-90 [2] | 55:6, 18 | 4:12 | 89704 [1] |
| 8:14; 60:23 | 126 [2] | 212.557.5055 [1] | 1:25 |
| 00221439-45 [2] | 1:23; 92:2 | 7:8 | |
| 8:24; 80:8 | 12:20 [1] | 212.809.6834 [1] | **\* \* 9 \* \*** |
| 00812094 [1] | 89:14 | 5:18 | |
| 34:10 | 1300 [1] | 212.645.0853 [1] | 9 [6] |
| 00812094-96 [2] | 4:17 | 5:19 | 8:19; 57:15, 17; 76:13, 17; |
| 8:10; 34:6 | 14 [2] | 212.682.6800 [1] | 77:13 |
| 02249225 [1] | 41:13, 17 | 6:17 | 9/13/07 [2] |
| 76:19 | 15 [1] | 212.682.6861 [1] | 19:4; 22:2 |
| 02249225-26 [2] | 68:23 | 6:18 | 90 [1] |
| 8:20; 76:14 | 1560 [1] | 212.788.1185 [1] | 81:3 |
| 04 [1] | 4:8 | 3:18 | 90's [2] |
| 59:12 | 158,000 [1] | 212.788.8872 [1] | 11:8; 12:14 |
| 07 [4] | 50:9 | 3:19 | 96 [1] |
| 14:23; 16:3; 19:6; 28:23 | 18 [1] | 212.907.9661 [1] | 34:10 |
| 07-cv-10639 [1] | 80:3 | 2:10 | 973.425.0161 [2] |
| 1:9 | 18th [2] | 212.907.9681 [1] | 4:20, 21 |
| 07962-2075 [1] | 81:15; 82:6 | 2:11 | |
| 4:18 | 19 [1] | 22 [2] | **\* \* A \* \*** |
| 08 [6] | 61:17 | 34:24; 35:8 | |
| 14:22, 25; 16:3; 28:23; | 1980 [1] | 245 [1] | a.l [1] |
| | | | 4:4 |

WILLIAM A. GROSS

BSA XMAX(2)
ROBERT DIETERLE 30(b)(6) - 3/20/09

VS. AMERICAN MANUFACTURERS

---

a.m. [1]
1:15
a1 [1]
82:22
abruptly [1]
67:11
absolute [1]
62:8
absolutely [3]
23:21; 48:4, 15
acceleration [1]
37:24
account [1]
30:5
accountant [1]
76:8
action [1]
91:14
actions [2]
1:10; 85:12
activity [1]
65:15
actual [1]
11:17; 83:13
addition [3]
22:19; 35:18; 73:7
additional [6]
8:21; 31:2; 50:14; 56:12;
76:14; 84:15
address [1]
12:4
addressing [1]
44:15
adjustment [3]
30:18; 38:18; 73:20
administer [1]
9:13
administration [1]
27:16
agency [2]
27:13, 14
agreed [3]
9:3, 7, 11
aileen [1]
7:11
ajp [1]
1:9
al [1]
92:5
albany [3]
24:7; 26:4, 6
allegations [1]
44:11
alleged [3]
37:7, 20, 22
amend [1]
65:7
american [2]
1:6; 92:5
amount [8]
37:6, 19; 50:7, 13, 19, 22;

51:3; 72:19
analyses [1]
86:8, 13
analysis [42]
14:16, 18; 16:2; 18:19;
21:7, 19; 25:20, 22; 26:16,
19; 31:16; 32:17; 34:16,
35:18; 36:12; 37:21; 43:24;
44:7; 47:20, 25; 49:7, 10;
51:17, 18; 58:12, 24; 68:10,
17; 69:14, 22; 74:16; 83:13,
21, 23; 86:18, 20, 21, 25;
87:4, 8, 9, 11
analytical [1]
63:12
analyze [4]
63:24; 68:6; 84:7; 85:22
analyzed [5]
29:15; 30:13, 19; 84:2;
87:21
analyzing [4]
64:7, 19; 65:25, 83:24
answer [28]
10:16, 11:22; 14:6; 18:7;
21:20; 25:7; 31:23; 32:13;
35:7, 10, 12; 39:16, 18;
48:10, 21; 52:15, 17; 56:21;
58:4; 62:4; 63:15; 71:4;
74:24; 75:20; 76:7; 84:11;
85:7; 86:22
answered [3]
32:13; 57:8; 74:25
answers [4]
10:15; 90:11
anybody [11]
23:19; 25:16; 26:22; 27:9;
32:7; 39:24; 40:12; 41:3;
45:16; 75:4; 86:10
anymore [1]
23:15
anyway [2]
48:8; 59:8
apparently [1]
77:14; 81:2
appear [3]
37:2; 67:2; 76:23
appeared [1]
54:21; 78:22; 81:17
appears [5]
34:14; 67:10; 80:12, 16;
82:4
appendices [1]
17:11
appendix [4]
34:2, 39:5; 82:21, 25
application [1]
87:6
appreciate [1]
52:19; 89:8
approach [1]
44:19

approval [1]
76:10
approved [4]
19:5; 80:14, 24, 81:6
approximately [2]
19:6; 56:10
april [3]
45:25; 46:5, 9
architect [5]
51:22; 83:8; 85:9, 23; 86:17
architects [2]
3:4; 4:7
area [1]
11:20
areas [1]
83:16
aren't [1]
78:3
arthur [1]
7:3
asking [12]
10:11; 12:11; 18:15; 19:16;
39:24; 47:12, 14, 15, 22;
48:2; 79:13; 87:18
aspect [2]
53:25; 64:11
aspects [3]
33:24; 35:24; 55:3
assemble [1]
67:18
assessment [6]
38:6, 16; 44:2, 7; 46:22;
49:23
assigned [4]
31:9; 71:15; 72:2, 7
assist [1]
13:3
assisted [1]
16:5
associate's [1]
88:21
associated [2]
71:19; 76:24
associates [2]
1:3; 6:3
assume [2]
22:15; 68:2
assuming [1]
59:5
attached [1]
36:7
attempted [1]
38:14
attend [2]
45:10, 16
attended [3]
45:13; 46:7; 74:16
attorneys [12]
2:4, 16; 3:4; 4:4, 16; 5:4,
14; 6:4, 13; 7:4, 9.4; 23:10
audit [14]

15:16; 23:6; 28:22; 29:5;
41:23; 42:3, 8, 12; 43:13,
19; 50:20; 53:20; 57:4;
82:20
auditing [4]
19:25; 20:11; 57:11; 60:6
authored [1]
33:14
authority [4]
20:23, 23; 24:2; 74:10
authorization [25]
18:22, 23; 19:5, 10, 18, 19;
20:7, 8, 9; 21:5, 25; 22:10;
41:6, 7, 8, 12; 43:22; 50:8,
13; 51:2, 6, 15; 55:8, 18;
57:17
authorizations [2]
55:13; 82:25
authorized [1]
9:13
available [1]
87:25
avenue [7]
2:5; 3:5; 4:17; 5:5, 15; 6:14;
7:5
aware [3]
24:21; 53:9; 59:6

* * B * *

bachelor [1]
13:19
background [3]
13:18; 88:16
backup [4]
61:10; 67:17; 86:2; 87:15
barker [1]
3:5
bartlet [2]
24:7; 25:14
based [4]
23:12; 70:2; 78:2; 81:18
basis [3]
25:15; 71:4; 87:23
bates [25]
8:9, 11, 13, 15, 17, 19, 22,
23; 34:5, 9; 59:11, 13;
60:22; 61:2; 66:13, 19;
74:2, 6; 76:13, 15, 18, 22;
78:3; 80:4, 7
bcc [1]
16:15; 53:11; 83:5, 9
bchlmos [1]
6:19
beaubois [1]
5:14
behalf [6]
17:13; 41:25; 42:4, 6, 9;
52:6
belated [1]
27:19
believe [11]

27:15; 33:25; 39:3, 6; 40:3;
55:5; 63:6; 77:6; 80:22;
86:15, 21
bernstein [1]
5:17
bertolotti [1]
2:3
best [1]
83:15
bid [2]
67:18, 22
bill [1]
6:16
billed [2]
50:25; 60:11
billing [4]
51:3; 61:10; 67:16; 86:2
bisgaard [1]
2:15
bit [2]
26:14; 30:2
bli [3]
67:25; 68:2, 5
blood [1]
91:14
bob [1]
35:3
bovis [6]
7:4; 68:2, 23; 69:3, 8, 72:5
box [3]
37:5, 22; 38:6
boxes [1]
37:2
break [1]
10:22
breakdown [1]
37:11
briefly [2]
75:11; 76:21
brisbois [1]
2:15
broadway [1]
4:8
bronner [1]
2:9
bronx [8]
14:3, 10, 14; 15:11, 24;
16:17; 20:16; 21:9
brotsples [1]
4:19
budget [6]
35:19; 49:25; 77:4, 9; 79:2
budgets [1]
78:25
built [1]
60:18
byrne [4]
4:3; 5:3, 7, 51:8

* * C * *

caitlin [1]

WILLIAM A. GROSS

BSA XMAX(3)
ROBERT DIETERLE 30(h)(6) - 3/20/09

VS. AMERICAN MANUFACTURERS

2:9
**caldwell** [9]
2:4; 10;10; 70:7, 10; 86:4,
9, 14, 87:12, 16
**call** [1]
38:15
**capacity** [1]
13:24
**cardenas** [38]
2:19; 11:9; 14:5; 15:6;
17:25; 18:6; 20:18; 21:17;
22:12; 24:17; 25:3; 27:19;
28:9; 30:20, 32:12, 18, 21;
33:6, 11; 34:25; 35:6;
36:19; 39:13, 17; 40:23;
48:9, 12, 23; 56:19; 57:7,
58:3; 62:3; 71:2; 74:24;
78:6; 84:10; 85:4; 89:9
**carpenter** [1]
4:15
**carried** [1]
41:23
**carroll** [1]
2:3
**case** [3]
1:9; 12:8; 92:5
**caused** [1]
49:4
**centre** [1]
5:6
**certainty** [2]
62:6, 8
**certification** [1]
9:5
**certify** [3]
90:7; 91:8, 13
**cetera** [1]
37:25
**change** [35]
29:10; 30:4, 5, 7, 15, 19;
31:6; 37:11, 24; 54:6, 13,
15, 17; 55:19, 21; 56:5, 10,
16, 18, 25; 58:8, 14; 63:25;
64:2, 6; 70:7, 10, 11; 71:7,
10; 73:12; 80:14, 17; 81:5;
86:4
**changes** [1]
56:12
**charged** [1]
60:15
**charted** [1]
62:15
**check** [1]
76:10
**chiara** [1]
6:12
**chimos** [1]
6:16
**christmas** [1]
41:19
**chronology** [4]

42:24, 25; 43:7, 8
**chuck** [2]
24:7; 25:14
**church** [1]
3:13
**circumstances** [2]
11:15; 44:10
**city** [6]
3:11; 21:7, 15; 26:7; 27:13;
74:17
**claim** [38]
19:25; 20:10; 21:7; 23:6;
30:2, 25; 34:15; 50:20;
58:2; 66:2; 68:24; 69:8, 9;
70:13, 15, 25; 71:17, 19;
72:20, 22, 24, 73:4, 5, 9,
10, 19; 78:14, 18; 80:22;
82:20; 83:22, 24; 84:2, 13,
14, 16, 25; 87:21
**claimed** [1]
44:2
**claims** [63]
13:9, 14; 14:16, 18; 15:4;
16:2; 17:21; 18:16; 19:10;
22:19, 22; 23:2; 29:5, 9, 12,
15, 18, 19, 24; 30:5, 10, 13;
31:9, 11, 12; 34:20; 35:11;
36:9; 40:16; 41:17, 23;
42:12; 43:13, 18; 44:18, 21,
50:2, 52:23; 53:19; 54:16;
57:4, 11, 18, 20; 60:6;
61:18; 64:8, 9, 10, 16, 23;
66:8; 70:12, 18; 71:14;
72:14; 73:14, 74:16; 80:19,
20; 81:4; 86:13; 87:14
**claims-related** [1]
87:12
**clarification** [3]
35:2; 40:24; 52:20
**clarify** [3]
23:14; 29:25; 30:10
**clarifying** [1]
44:10
**cleaning** [1]
82:4
**clear** [4]
11:11; 36:20; 52:9; 85:8
**clearer** [1]
86:25
**clients** [1]
13:3
**cm** [5]
54:19, 22; 72:6; 85:9, 22
**co** [2]
1:23; 92:2
**cohen** [1]
5:3
**colleagues** [1]
89:2
**collect** [1]
73:18

**college** [1]
13:21
**colloquy** [1]
85:5
**comfortable** [1]
89:13
**coming** [1]
55:15
**communication** [2]
36:5; 40:5
**company** [3]
1:7; 12:18; 20:20
**compare** [1]
68:23
**comparing** [2]
69:7, 8
**compensation** [2]
31:2; 64:15
**compilation** [1]
39:2
**complete** [3]
36:12; 67:3; 90:10
**completed** [9]
22:3, 7, 25;22; 36:11;
41:12, 17, 74:15; 81:19;
82:3
**completely** [2]
37:16; 72:21
**completion** [2]
49:4, 22
**compliance** [1]
75:10
**component** [1]
84:3
**components** [1]
76:3
**concentration** [1]
13:22
**concerning** [1]
11:14
**conclude** [1]
70:3
**conclusions** [4]
11:17; 48:2, 15, 18
**conduct** [1]
39:8
**conducted** [1]
46:18
**confirm** [1]
58:13
**confusing** [1]
27:22
**connection** [16]
19:19; 20:10, 16; 22:22;
29:5; 34:20; 39:9; 40:15;
42:23; 43:18; 50:19; 52:23,
60:5; 70:12; 93:9; 88:9
**connections** [1]
27:11
**considered** [5]
14:16, 18, 17, 72:19; 73:4,

:80:22
**construction** [24]
1:3; 13:4, 5; 14:3, 7; 20:25;
51:20; 52:12; 53:11, 25;
55:2, 19, 24; 57:5, 12; 59:3;
66:11; 77:4, 9; 78:25; 79:2,
83:8; 88:22
**consultants** [2]
4:6; 6:4
**contain** [1]
32:16
**content** [1]
36:21
**contents** [2]
32:24; 33:2
**context** [5]
35:13, 15; 85:21; 87:5, 22
**continue** [2]
55:20; 69:14
**continued** [1]
72:5
**continuing** [1]
79:17
**contract** [30]
17:24; 18:11, 19; 19:24, 25;
20:11; 22:16; 23:4, 7;
43:14; 47:12, 13, 16, 18,
20, 21, 24; 48:5; 55:2, 12;
57:5, 12, 25; 58:20; 59:4;
77:4, 9; 79:9; 82:21; 83:2
**contracting** [1]
4:16
**contractor** [14]
15:19; 29:23; 31:4, 13;
36:24; 38:13; 49:10, 11;
51:18; 73:23; 74:16; 83:12;
84:13; 87:17
**contractor's** [5]
29:14; 64:16, 22; 73:19,
84:16
**contractors** [16]
15:18; 28:14, 16, 20, 24;
29:19; 37:4; 38:3; 44:3;
51:19; 69:10; 70:14; 79:6;
83:17; 84:5, 7; 85:16; 87:20
**contracts** [3]
21:14; 69:18, 24
**contractual** [1]
25:12
**contractually** [1]
22:14
**corporate** [1]
21:7
**corporation** [8]
3:12; 21:15, 26:23, 27:5, 9;
32:11, 15; 46:10
**cost** [1]
64:2
**counsel** [11]
3:12; 12:4, 8, 9; 21:8, 16;
27:5; 32:15. 41:5; 46:10;

85:5
**counsel's** [3]
26:23; 27:9; 32:11
**county** [3]
21:9; 80:5; 91:5
**couple** [9]
51:14; 61:14; 62:22; 65:17;
66:3; 68:22; 71:8; 83:3;
88:3
**course** [2]
80:18; 86:12
**court** [6]
1:1, 23; 6:5; 9:15; 27:17;
92:2
**courtesy** [1]
36:4
**courthouse** [11]
14:4, 10, 15; 15:11, 24;
16:17; 19:12, 16, 20; 20:16;
27:25
**create** [2]
42:24, 25
**criminal** [6]
14:3, 10; 15:11, 24; 16:17;
20:16
**criteria** [1]
73:7
**critical** [4]
46:24; 47:4; 49:2, 3
**current** [4]
12:21; 79:2, 7, 8
**currently** [3]
10:25; 15:17, 22
**cut** [2]
67:10, 11
**cutting** [1]
76:10
**cw** [1]
66:22
**cwc** [31]
8:8; 16:21, 23; 19:24; 34:4,
5, 8, 13; 41:5; 53:5, 7; 55:8;
59:10, 13, 17; 60:22, 25;
61:9; 66:13, 18; 74:2, 5, 9;
75:10; 76:13, 17; 77:13;
80:2, 7; 82:20; 85:25

**＊＊D＊＊**

**damages** [9]
26:18; 29:15; 37:7, 20;
44:2, 11; 64:17, 23; 71:21
**danco** [1]
84:25
**dash** [1]
34:10
**dasny** [46]
23:23; 24:13, 22; 25:9, 10,
23; 27:14; 33:19, 22; 34:10,
19; 35:17; 36:2, 9; 37:19;
38:2, 11, 22; 39:20, 22, 24;
40:2, 13; 42:13; 43:2, 14,

WILLIAM A. GROSS     ASA XMAX(4)     VS. AMERICAN MANUFACTURERS
ROBERT DIETERLE 30(b)(6) - 3/20/09

19; 45:2, 12, 18; 46:3, 7, 19; 52:22; 59:21; 63:9; 5:13, 23; 76:6; 79:22; 80:4, 14; 81:17; 82:10, 14; 88:12

**dasny's** [4] 41:24; 42:6, 9; 76:23

**dasny-e** [2] 8:10, 20, 24; 34:6, 76:14, 19; 80:8

**dasny-p** [12] 8:12, 14, 16, 18; 59:11, 14; 60:23; 61:2; 66:14, 19; 74:3, 6

**data** [1] 39:2

**date** [8] 10:3; 22:15, 17, 41:20; 56:10; 79:24; 81:12; 92:5

**dated** [4] 34:24; 35:8; 41:13; 80:3

**dates** [2] 43:9; 53:18

**day** [3] 90:19; 91:18; 92:23

**day-to-day** [3] 25:2, 15, 20

**de** [1] 6:12

**deal** [1] 75:18

**dealings** [8] 26:25; 27:8, 13; 28:11, 13, 14, 15, 20

**dealt** [1] 11:16

**debatable** [1] 32:25

**december** [1] 81:20

**deemed** [5] 30:18; 31:5, 8, 11; 73:13

**defendant** [1] 1:8

**defendants** [1] 4:4

**defense** [2] 44:18, 22

**definitely** [2] 42:21; 53:21

**degree** [1] 88:21

**delay** [5] 26:17, 37:23; 49:4, 71:21; 73:4

**delays** [12] 21:8, 43:25, 44:11; 46:24; 47:5; 49:2, 3; 68:6, 10, 13, 17

**iepartment** [3] 3:11; 13:7; 52:25

**deposed** [2] 9:12; 15:14

**deposition** [14] 1:17; 9:6, 12; 11:12, 13, 19; 47:10, 17; 89:4, 6; 90:9; 91:10, 11; 92:5

**derived** [1] 35:18

**describe** [3] 28:9; 29:3; 38:14

**described** [4] 41:11; 54:12; 57:25; 85:12

**description** [5] 8:8; 21:6; 37:6, 20; 70:2

**designation** [1] 54:17

**despite** [1] 82:2

**detail** [2] 46:14; 69:21

**detailed** [1] 49:25

**determine** [1] 72:24

**determined** [6] 44:12; 70:18, 25; 72:11, 14, 22

**deutsch** [1] 4:15

**develop** [3] 35:19; 44:9; 49:24

**di** [2] 33:11; 39:17

**dieks** [1] 65:18

**dierks** [4] 65:18, 19, 22, 25

**dieterle** [82] 1:18; 8:3; 10:8, 24; 12:5, 13; 13:11, 24; 15:3; 16:14, 22, 17:9, 23; 18:21; 19:23; 20:13; 21:13, 23; 22:18; 23:19; 26:6, 21; 29:3, 31:15; 33:13; 34:11; 38:22; 39:23; 41:4, 22; 42:23; 43:12, 21, 23; 45:8; 47:4; 48:21; 49:9, 21; 50:7, 51:13; 52:11, 21; 53:6, 23; 54:3, 24; 55:17; 56:15; 57:3, 14; 58:20; 59:16; 61:4; 63:16; 66:16, 21; 67:7; 58:9; 69:20; 70:5, 20; 74:8; 75:9, 18; 77:2, 14; 78:12; 79:11; 80:10; 82:13, 19; 83:7; 84:5; 85:24; 86:7; 88:3, 14; 90:7, 16; 91:9, 92:6

**difference** [2] 70:21; 83:17

**differently** [1] 84:6

**direct** [7] 16:25; 18:3; 27:8; 28:16; 43:12; 48:10; 81:3

**directing** [4] 33:9, 11; 39:15, 17

**directions** [1] 8:5

**disagree** [2] 47:11

**disclosed** [1] 33:3

**discuss** [1] 46:14

**discussion** [3] 17:7; 75:22; 85:3

**dispute** [1] 38:20

**disputes** [1] 13:5

**district** [2] 1:1, 2

**dix** [1] 6:6

**document** [41] 8:9, 11, 13, 15, 17, 19, 23; 16:20, 23; 17:10; 18:21, 24; 34:5, 9, 17; 37:3; 53:4, 7; 55:6; 59:11, 13, 17, 22; 60:22; 61:2, 6, 7; 66:13, 19, 22; 67:2, 4; 74:2, 6; 75:12; 76:13, 18; 79:3; 80:7; 81:16; 82:21

**documents** [5] 40:7; 67:19; 73:19; 76:20; 80:13

**doesn't** [5] 18:2; 23:15; 28:6, 7; 67:6

**dollar** [1] 73:8

**dollarwise** [1] 71:23

**dormitory** [4] 23:20, 22; 24:2; 74:10

**draft** [6] 21:25; 74:18, 22; 75:6; 81:20, 23, 24; 82:8

**drafts** [1] 32:2

**drawn** [1] 48:2

**drill** [1] 10:14

**drive** [1] 1:12

**dry** [1] 71:7

**duly** [1] 91:10

**dunnigan** [3] 65:2, 22

**e-00221439** [1] 80:5

**e-mail** [10] 34:12, 23; 35:2, 7, 23; 77:8, 13, 15; 78:12; 92:6

**e-mails** [2] 80:3, 11

**early** [12] 11:8; 12:14; 14:20, 23; 28:23; 35:24; 45:20; 68:6, 10, 19; 81:21; 82:9

**east** [2] 1:23; 92:2

**ed** [3] 16:9; 26:18; 46:2

**educational** [1] 13:18

**edward** [1] 6:7

**edwards** [1] 88:5

**edwin** [1] 3:15

**effect** [4] 9:14; 13:9; 26:18; 76:9

**efficiency** [2] 62:23; 63:3

**elslg** [1] 4:10

**electric** [2] 15:20, 22

**electrical** [1] 13:20

**elevy** [1] 3:20

**ellen** [2] 1:23; 92:2

**email** [8] 2:12, 22; 3:8, 20; 4:22; 5:10, 20; 6:19

**employed** [4] 10:25; 11:3, 6; 12:15

**employer's** [1] 11:15

**enclave** [1] 60:19

**encountered** [1] 43:25

**end** [2] 16:23; 21:25

**enforce** [1] 48:16

**engaged** [6] 17:4, 18:5; 35:25; 36:5; 45:20, 24

**engineer** [4] 83:8; 85:10, 23, 88:18

**engineering** [2] 4:5; 13:20

**english** [1] 5:13

**entailed** [1] 63:6

**entered** [1] 21:14

**entirety** [1] 67:4

**entities** [1] 51:19

**entitlement** [1] 58:14

**entries** [10] 61:15; 62:22; 63:23; 65:2, 17; 67:18; 68:22; 69:13, 70:5; 73:11

**entry** [8] 61:17; 64:15; 65:6, 17, 66:4; 67:17, 25; 73:16

**environmental** [1] 12:18

**equitable** [2] 30:18; 73:20

**erm** [1] 12:19

**errata** [1] 92:1

**escalation** [1] 37:24

**esq** [15] 2:7, 9, 19; 3:7, 15, 17 4:10, 19; 5:3, 7, 17; 6:7, 16, 7:7, 11

**essentially** [3] 29:12; 36:4; 47:22

**establish** [1] 73:6

**et** [2] 37:25; 92:5

**evaluate** [1] 67:25

**evaluated** [2] 54:18; 70:19

**evaluation** [6] 13:4; 16:8; 28:21; 29:6; 46:23; 49:25; 54:22; 83:7

**event** [1] 82:8

**events** [1] 43:2

**eventually** [2] 36:10; 78:5

**exactly** [4] 30:3; 62:20; 53:5; 87:3

**examination** [2] 8:2; 10:6

**examine** [1] 89:15

**examined** [1] 10:3

**examining** [1]

From dasny's to examining     www.ellengrauer.com     Ellen Grauer Court Reporting (212) 750-6434

WILLIAM A. GROSS

BSA XMA7[5]
ROBERT DIETERLE 30(b)(6) - 3/20/09

VS. AMERICAN MANUFACTURERS

69:23
**example** [3]
27:17; 51:16, 20
**examples** [1]
38:25
**excel** [4]
77:19, 23; 78:10, 22
**except** [1]
8:8
**exception** [1]
11:7
**excessive** [1]
37:24
**excuse** [2]
77:23; 81:5
**exhibit** [15]
8:9, 11, 13, 15, 17, 19, 23;
34:5; 59:13; 60:22; 66:13;
74:2; 76:13, 25, 80:7
**exhibits** [1]
8:25
**expeditiously** [1]
48:6
**expended** [1]
66:14
**explain** [4]
35:13; 70:21; 71:4; 75:11
**explaining** [1]
40:7
**explanation** [1]
38:9
**extend** [1]
22:16
**extension** [1]
71:20
**extensions** [1]
58:15
**extent** [13]
21:18; 36:17; 37:8, 12;
38:4; 49:8; 73:13; 83:22;
84:4, 9, 13; 86:24; 88:15
**extra** [1]
71:5
**extremely** [1]
89:3
**eyal** [1]
4:10

* * F * *

**facilitated** [1]
60:17
**fact** [8]
22:7; 43:17; 44:6, 21; 48:7;
49:6; 64:21; 79:14
**factual** [1]
40:10
**factually** [1]
85:11
**fair** [4]
15:3; 71:24; 78:21; 87:10
**fall** [2]

14:21, 23
**familiar** [3]
10:14; 53:14; 55:5
**fax** [9]
2:11, 21; 3:19; 4:12, 21;
5:9, 19; 6:9, 18
**february** [9]
77:3, 10, 15, 16; 79:10, 17;
81:22; 82:2, 9
**feel** [1]
11:25
**fifth** [2]
1:23; 92:2
**figured** [1]
35:6
**file** [2]
54:20, 23
**filing** [2]
9:5; 40:8
**fill** [2]
37:5; 75:13
**filled** [5]
36:15, 23; 37:10, 12, 15
**final** [2]
75:7; 82:10
**finance** [1]
13:22
**financial** [8]
28:19; 76:5; 86:6, 13, 25;
87:4, 8; 88:13
**findings** [4]
49:15; 74:19, 23; 82:14
**fine** [4]
18:6; 25:5; 28:9; 57:8
**finish** [1]
10:16
**finished** [2]
79:15; 81:14
**first** [19]
19:18, 24; 20:9, 14; 34:12,
13, 22; 36:23; 37:5; 61:15;
67:16, 17; 73:16; 74:13;
76:18, 24; 77:13; 78:24
**five** [3]
15:8; 23:17; 51:10
**five-page** [1]
66:18
**flack** [1]
6:13
**floor** [3]
1:23; 2:17; 92:2
**focus** [1]
11:13
**follow** [1]
44:20
**follow-up** [2]
42:17; 51:14
**follows** [2]
10:4; 44:19
**force** [1]
9:14

**forensic** [4]
15:17; 28:22; 42:3, 8
**form** [41]
9:8; 14:5; 15:6; 17:25;
20:16; 21:17; 22:25; 24:15,
17, 24; 27:20; 30:20; 33:17,
18, 20, 23; 34:15, 19, 25;
35:14; 36:7, 11, 12, 14, 15,
23; 37:10, 13; 38:2, 11, 14;
43:6; 51:24; 56:19; 58:3;
68:11; 71:2; 75:12; 84:10,
12
**formal** [2]
44:24; 65:15
**formally** [5]
31:25; 35:10; 43:3, 4; 44:23
**format** [2]
37:14; 78:23
**forth** [3]
21:24; 55:22; 91:10
**found** [2]
38:15, 17
**four** [2]
15:8; 23:17
**four-page** [1]
76:17
**free** [2]
11:25; 21:19
**friday** [1]
80:3
**front** [1]
55:10
**future** [1]
6:4

* * G * *

**gainen** [1]
2:3
**garden** [1]
13:21
**gave** [2]
39:6; 59:8
**gc** [2]
89:16, 24
**generate** [1]
55:4
**generically** [2]
65:12; 70:23
**gentleman** [1]
24:8
**gentlemen** [1]
16:8
**george** [5]
24:10; 26:3; 32:6; 75:2, 3
**give** [4]
38:24; 40:9; 74:22; 75:4
**given** [7]
30:7; 52:22; 63:9; 71:11;
85:5; 90:12; 91:12
**giving** [1]
10:15

**glean** [1]
38:4
**goes** [3]
44:9, 17; 48:14
**gogick** [1]
4:3
**gracious** [1]
89:3
**graphic** [5]
61:20, 23; 62:15, 23; 63:3
**graphics** [2]
63:7, 8
**graphs** [1]
63:4
**grauer** [2]
1:23; 92:2
**gross** [2]
1:3; 92:5
**group** [4]
13:9, 14; 17:21; 20:23
**guess** [15]
13:2, 8; 24:4, 6; 26:15;
29:6, 9; 38:14; 43:6; 60:20;
61:25; 62:3, 5, 19; 78:3
**guests** [1]
89:12
**guy** [2]
85:20

* * H * *

**hadn't** [1]
36:5
**half** [3]
11:7; 37:3; 60:12
**halfway** [2]
55:11; 61:16
**hall** [5]
21:9; 24:5; 34:23; 35:7, 14
**hand** [1]
91:18
**harder** [1]
78:23
**haven't** [4]
50:23; 54:25; 61:5
**he's** [4]
17:20; 33:7; 60:11; 78:17
**heather** [1]
6:5
**heating** [2]
65:18, 23
**held** [3]
17:7; 75:22; 85:3
**help** [1]
35:19
**hereby** [2]
90:7; 91:8
**herein** [1]
9:4
**hereinbefore** [1]
91:10
**hereof** [1]

55:10
**hereunto** [1]
91:17
**heritage** [1]
5:4
**hewitt** [35]
2:7; 8:3, 25; 10:7, 9; 12:2;
16:19; 17:6; 18:2; 23:5;
25:5; 26:3; 33:9; 34:3, 9;
35:4; 39:15; 41:3; 42:20;
47:11; 48:4, 17; 51:10;
52:3, 7, 19; 53:3; 59:9;
60:25; 66:18; 74:5; 75:21;
76:17; 80:2; 88:23
**high** [2]
13:18; 72:18
**higher** [1]
73:7
**hill** [67]
7:11; 11:2, 4, 5, 6; 12:22;
13:25; 16:3; 17:13; 19:19;
20:10, 15, 19, 20, 21, 24;
21:14; 32:10; 33:15; 35:10;
40:11, 15; 41:23; 42:12,
19; 43:14, 16, 17; 44:6, 13,
20; 45:15, 25; 46:6; 49:6;
50:8, 14, 19; 53:10, 15, 19;
54:5, 15, 19; 56:4; 57:4, 10,
24; 58:18; 59:2; 61:11;
65:4; 70:11; 72:3, 5; 74:14;
79:15; 80:18; 83:6, 7, 12,
19; 84:7; 86:7, 12; 87:11
**hill's** [4]
52:24; 53:25; 81:7; 82:14
**hills** [1]
6:6
**hire** [1]
43:17
**hiring** [1]
43:15
**holidays** [1]
41:21
**hopefully** [1]
12:2
**hoping** [1]
35:17
**hour** [1]
60:11
**house** [1]
88:8

* * I * *

**i'd** [2]
45:5; 55:11
**i've** [3]
17:3; 28:6; 46:16
**i.d.** [1]
8:8
**idea** [2]
58:21; 62:7
**identification** [7]
From example to identification

WILLIAM A. GROSS

85AXMAX(6)
ROBERT DIETERLE 30(b)(6) - 3/20/09

VS. AMERICAN MANUFACTURERS

34:7; 59:15; 60:24; 66:15;
74:4; 76:16; 80:9
'identify [2]
21:8; 66:17
identifying [1]
80:16
impact [1]
38:9
impacts [1]
37:23
important [1]
30:9
inactions [1]
85:13
inc [2]
1:3; 12:19
include [4]
30:5; 37:4, 19, 23
included [8]
33:25; 35:22; 38:4; 43:9;
57:2; 60:21; 64:14, 25
incorporated [1]
63:10
independently [1]
78:8
indicated [2]
41:5; 85:5
individual [6]
29:19; 38:24; 37:4; 38:2,
12; 65:3
individuals [1]
63:17
infer [1]
87:17
inform [1]
57:19
information [19]
25:18, 19; 29:13; 30:6;
33:20; 35:17; 38:7; 40:10,
13; 64:17; 71:16; 76:5;
77:5, 10, 20, 24; 79:11;
81:2; 87:23
ingram [1]
2:3
ingramllp.com [1]
2:12
initial [4]
11:24; 27:2; 28:17, 18
initially [1]
36:13
input [5]
52:24; 64:17; 66:9, 15;
69:19
insight [1]
47:25
instruct [1]
11:22
insurance [1]
1:7
nteract [1]
23:19

interacted [1]
25:13
interaction [4]
24:10; 27:23; 76:2, 4
interested [1]
91:15
interface [3]
24:3, 5; 26:22
interfaced [1]
24:6
international [10]
7:12; 11:2; 13:25; 17:14;
20:21, 24; 21:14; 57:11;
58:19; 70:11
interpret [1]
69:11
interpretation [3]
18:16; 47:16; 48:3
interrupt [1]
11:10
interview [3]
39:12, 19, 25
interviewed [1]
39:22
interviews [4]
39:9; 40:18; 46:15, 17
introduced [1]
36:2
introductions [1]
12:6
investment [1]
88:8
invoice [1]
87:9
involved [5]
35:11; 54:4, 5; 76:9; 85:17
involvement [2]
27:5; 31:7
israel [1]
4:4
issue [1]
83:24
issued [3]
22:11; 81:20, 21
issues [1]
57:21
item [2]
71:19; 78:24
items [2]
45:5; 48:7

** J **

james [1]
2:19
january [16]
14:21, 25; 41:13, 17, 22,
42:11; 74:11; 79:15, 25;
80:3, 11; 81:11, 15, 18, 25;
82:3, 6, 9
jcardenas [1]
2:22

jd [1]
86:5
jersey [9]
1:13, 20; 4:18; 17:20;
23.13; 90:3, 21; 91:3, 8
jim [8]
16:9; 24:5; 26:14, 20;
33:16; 46:2; 68:12, 18
jim's [1]
36:4
job [11]
28:16; 29:16; 38:15, 18;
40:4, 10; 65:14; 68:17;
71:12; 85:17, 18
join [1]
25:3
june [2]
34:24; 35:8
justice [1]
21:10

** K **

kbrotspies [1]
4:22
keep [1]
21:23
keeping [1]
72:8
kemble [1]
4:17
kevin [3]
3:7; 4:19; 63:19
key [1]
46:15
kick-off [4]
45:7, 8, 19, 21
kinds [2]
47:25; 48:14
knowledge [15]
19:17; 20:9, 13, 27:7; 32:9;
54:6; 56:3, 24; 57:10, 13,
24; 58:5; 69:22; 62:13, 16
kreitzer [7]
63:19, 23; 64:5; 70:6;
73:12; 86:4, 9
krieg [2]
6:3, 7
kspagnoli [1]
3:8
kurtz [1]
6:13

** L **

la [1]
13:22
labor [2]
33:20; 84:2
lajoy [8]
75:19, 20, 23; 76:2, 4; 77:3,
10, 11, 15

lajoy's [1]
78:12
lak [1]
1:9
landscape [1]
4:6
language [1]
82:2
larger [1]
73:2
last [6]
19:3; 56:9; 58:11; 67:14;
78:9, 20
late [5]
14:20, 23; 28:23; 79:17;
82:9
law [1]
3:11
law.nyc.gov [1]
3:20
lawyer [1]
18:15
lbbslaw.com [1]
2:22
lead [1]
11:20
lease [2]
7:4; 68:2
legal [4]
18:15; 21:19; 32:16; 52:25
legally [1]
30:24
lend [2]
7:4; 68:2
let's [2]
51:10; 77:12
letter [3]
67:9; 74:10, 13
level [1]
25:12
levels [1]
73:7
levy [15]
3:15, 17; 19:21; 20:17;
22:25, 24:15, 24; 32:20;
42:16; 47:8, 15; 51:24;
52:4, 8; 76:21
lewis [1]
2:15
liability [4]
38:7, 10, 16, 19
limited [2]
11:12, 15:4
line [3]
44:16; 62:17; 92:7
lines [1]
66:3
lippincott [1]
1:12
listed [3]
38:7; 45:6; 50:7

listing [1]
65:14
lists [1]
59:25
litigation [1]
10:10
llc [2]
1:23; 92:2
llp [7]
2:3, 15; 3:3; 4:3, 15; 5:13;
6:12
looks [1]
67:13
lost [2]
31:11; 71:21
lot [3]
26:6; 71:11; 87:5
ltd [1]
5:14
lump [1]
51:2

** M **

madison [1]
7:5
makris [1]
3:3
management [8]
12:19; 20:23; 53:25; 55:2;
57:5, 12; 59:3; 66:11
manager [9]
20:25; 51:20; 52:12; 53:11;
55:20, 24; 66:6, 7; 83:9
manhour [3]
65:7, 10, 13
manhours [1]
65:14
manner [2]
37:16; 57:20
manpower [1]
83:13
manufacturers [1]
1:6
marc [3]
35:3, 25; 40:6
march [4]
1:14; 90:9; 91:18; 92:5
marked [17]
18:21, 23; 17:11; 34:3, 6;
53:5, 7; 59:14, 17, 21;
60:23; 61:7; 66:14, 22;
74:3; 76:15; 80:9
markings [1]
66:24
markups [2]
59:18; 61:5
marlton [1]
1:13
marriage [1]
91:14
masucci [1]

From identify to masucci
www.ellengrauer.com
Ellen Grauer Court Reporting
(212) 750-6434

WILLIAM A. GROSS

BSAXMAX(7)

ROBERT DIETERLE 30(b)(6) - 3/20/09

VS. AMERICAN MANUFACTURERS

17:17
**masucci's** [1]
17:15
**material** [2]
84:2; 87:14
**materials** [1]
87:12
**matter** [2]
21:21; 91:16
**matters** [1]
13:4
**maury** [1]
17:15
**mba** [1]
13:21
**mcb50** [1]
5:10
**mccarter** [1]
5:13
**mccarter.com** [1]
5:20
**mcdermott** [3]
7:7, 40:16; 68:11
**mcelroy** [1]
4:15
**mckay** [19]
16:9, 11; 22:20; 23:9, 12;
26:8, 14, 20; 27:8; 33:16;
46:2; 58:23; 61:16; 62:10,
13; 63:18; 67:17; 68:12;
88:17
**mckay's** [2]
68:16, 88:16
**mdmc-law.com** [1]
4:22
**mean** [25]
16:25; 22:13; 24:19; 27:23,
24; 28:10, 15; 29:19; 33:18;
36:11; 38:18; 43:5; 45:2;
47:21; 48:18; 49:2; 62:2, 7;
86:19; 87:4, 5, 8, 14; 88:5,
10
**meaning** [1]
87:15
**means** [5]
30:24; 47:16; 63:25; 68:2;
87:4
**meant** [7]
40:14, 20; 47:4; 52:11;
56:25; 65:19; 86:25
**mechanical** [1]
5:4
**mechanism** [1]
22:16
**meet** [1]
49:14
**meeting** [13]
27:3; 45:7, 8, 10, 17, 19,
21, 23; 46:9; 49:16, 18;
74:17
**meetings** [1]

46:4
**memorandum** [1]
55:23
**mentioned** [3]
28:22; 42:2; 76:21
**mentions** [1]
45:6
**michael** [1]
7:7
**mid** [1]
81:18; 82:3
**milber** [1]
3:3
**milbermakris.com** [1]
3:8
**mind** [4]
24:12; 27:16; 57:14; 85:25
**mine** [1]
10:20
**minor** [2]
16:7; 71:9
**minute** [2]
19:22; 34:13
**minutes** [1]
51:11
**missing** [2]
67:6, 14
**misunderstood** [1]
42:7
**moment** [1]
51:9
**money** [1]
72:19
**monmouth** [1]
91:6
**month** [4]
60:2, 14; 75:15; 82:7
**monthly** [2]
65:5; 89:6
**months** [2]
15:5, 9
**morning** [2]
10:8, 11
**morris** [1]
24:8
**morristown** [1]
4:18
**morse** [2]
80:11; 81:10
**mount** [1]
4:17
**move** [1]
51:14
**mr** [185]
10:8, 24; 11:9; 12:5, 13,
13,11, 24; 14:5; 15:3, 6,
16:11, 14, 22; 17:9, 17, 23,
25; 18:6, 21; 19:21, 23;
20:13, 17, 18; 21:13, 17,
23; 22:12, 18, 20, 21, 25;
23:9, 12, 15, 19; 24:15, 17,

24; 25:3; 26:4, 8, 9, 21;
27:8, 19; 28:8; 29:3; 30:20;
31:15; 32:12, 18, 20, 21;
33:6, 11, 13; 34:11, 23, 25;
35:5, 6, 7, 14, 22; 36:19;
38:23; 39:13, 17, 23; 40:18,
23; 41:4, 22; 42:16, 23,
43:12, 21, 23; 45:8; 47:4, 8,
15; 48:9, 12, 21, 23; 49:9,
21; 50:7; 51:8, 13, 24; 52:4,
8, 11, 21; 53:6, 23; 54:3,
24; 55:17; 56:15, 19; 57:3,
7, 14; 58:3, 20, 23; 59:16;
60:10; 61:4, 16; 62:3, 10,
13; 63:16, 18, 23; 64:5, 15,
22; 65:2, 22, 66:4, 5, 16,
21; 67:7, 17; 68:9, 11;
69:20; 70:5, 6, 20; 71:2;
73:12, 17, 74:8, 24; 75:9,
18, 23; 76:2, 21; 77:2, 3,
10, 11, 14, 15; 78:6, 12;
79:11; 80:10, 11; 81:10;
82:13, 19; 83:7; 84:5, 10;
85:4, 24; 86:4, 7, 9; 88:3,
14, 16, 17, 19, 20; 89:9
**ms** [33]
8:3, 25; 10:7, 12:2; 16:19;
17:6, 18:2; 23:5; 25:5; 28:3;
33:9; 34:3, 8; 35:4; 39:15;
41:3; 42:20; 47:11; 48:4,
17; 51:10; 52:3, 7, 19; 53:3;
58:9; 60:25; 66:18; 74:5;
75:21; 76:17; 80:2; 88:23
**msn.com** [1]
5:10
**mueser** [1]
4:5
**multiple** [1]
12:7
**mulvaney** [1]
4:15
**murtagh** [1]
5:3
**mutual** [1]
1:8
**myself** [3]
26:20; 33:16; 46:2

** * N * **

**name** [7]
10:8; 18:8, 9; 24:8; 88:5;
92:5, 6
**named** [2]
75:19; 84:25
**names** [1]
39:25
**nature** [4]
13:6; 29:17; 65:16; 75:25
**nielsen** [1]
4:6
**non-party** [1]

1:17
**noncompensatory** [1]
58:15
**nonparty** [1]
89:7
**norma** [1]
3:17
**north** [1]
5:5
**nos** [4]
34:9; 61:2; 66:19; 74:6
**notary** [4]
1:19; 10:3; 90:21; 91:7
**noted** [2]
80:24; 89:14
**notice** [1]
1:16
**november** [6]
22:4, 8; 68:23, 69:13; 70:6,
73:17
**number** [7]
29:11; 30:8; 71:11, 17, 18;
72:3, 7
**numbered** [1]
76:19
**numbering** [1]
31:10
**numbers** [5]
41:9; 50:16; 51:7; 71:15;
80:4
**numerous** [1]
63:23

** * O * **

**o'kane** [5]
15:20, 22; 28:22; 42:8;
84:24
**o'kane's** [1]
42:4
**o'neill** [1]
4:3
**oath** [2]
9:14; 90:9
**object** [3]
28:3; 48:9, 16
**objected** [1]
11:21
**objection** [33]
14:5; 15:6; 17:25; 19:21;
20:17, 18; 21:17; 22:25;
24:15, 17, 24; 25:4; 27:19,
22; 28:5; 30:20; 32:12, 18,
20; 33:7; 34:25; 39:13;
47:8; 51:24; 52:2; 58:19;
57:7; 58:3; 68:11; 71:2;
74:25; 84:10, 12
**objections** [3]
9:8; 25:6; 28:4
**obvious** [1]
79:20
**obviously** [4]

26:12; 66:25; 79:23; 85:17
**oca** [1]
27:23
**occurred** [3]
45:20, 21; 68:18
**october** [5]
11:9; 61:12, 17; 64:15; 65:6
**offer** [1]
47:24
**office** [9]
3:12; 17:20; 26:7, 23; 27:9,
17; 32:11; 59:23; 60:17
**officer** [1]
9:13
**oh** [1]
23:21
**okay** [8]
12:12; 16:16; 18:25; 28:3;
52:8; 58:10; 62:23; 85:24
**ones** [1]
24:12; 36:25; 57:2
**ooo** [1]
9:18
**opinions** [1]
11:17
**opposed** [2]
37:13; 81:12
**opposite** [1]
31:8
**orally** [1]
10:15
**order** [12]
18:19; 21:8; 29:10; 30:4, 6,
7, 15, 19; 54:17; 57:15;
58:13, 14
**orders** [25]
31:6; 37:11, 25; 54:6, 13,
15; 55:19, 21; 56:6, 11, 16,
18, 25; 58:9; 63:25; 64:2, 6;
70:7, 10, 11; 73:13; 80:15,
17; 81:5; 86:5
**ordinary** [1]
72:15
**original** [4]
51:6; 59:18, 22; 78:25
**originally** [1]
78:22
**outcome** [1]
91:15
**outside** [1]
80:21
**overall** [3]
49:4; 61:19; 70:17
**overlapped** [1]
26:14
**owner** [3]
49:24; 55:23, 57:19
**owner-approved** [1]
55:21

**  * * P * * **
p.c. [2]
6:3; 7:3
p.m. [1]
69:14
package [1]
87:24
page [30]
8:2; 17:10; 19:3, 24; 34:12,
14, 23; 36:19; 41:8, 9, 10;
43:22; 50:13; 57:17; 59:7;
61:16; 63:22; 64:13, 25;
67:8, 11, 14, 18; 70:4; 74:9;
75:9; 76:24; 77:13; 85:2;
92:7
pages [8]
8:21; 21:24; 57:16; 76:15,
18, 21; 78:9, 20
paid [6]
50:8, 13, 19, 23; 71:6;
76:11
paragraph [4]
55:18; 56:9; 58:8; 74:13
park [3]
2:5; 5:5, 15
part [11]
22:20, 24; 23:2; 33:21;
36:4; 37:18; 54:9; 65:24;
66:24; 83:23; 84:3
parties [7]
9:4; 12:7; 38:9, 85:13, 17;
91:14
party [2]
4:4; 36:8
pat [1]
52:2
path [1]
49:3
patricia [4]
2:7; 10:9; 11:9; 52:3
paul [3]
75:19, 20; 76:4
payment [6]
29:14; 75:16; 86:8, 14, 18;
87:6
pc [1]
4:5
pco [9]
70:22, 24; 71:5, 11, 15, 17;
72:2, 7, 16
pco's [9]
63:24; 64:5; 70:16, 17, 18;
71:13; 73:2; 76:13
pending [5]
70:7, 10; 73:12; 78:13; 86:4
people [20]
16:5; 24:6; 36:3; 39:19, 20,
22, 25; 40:2, 5, 14; 45:3,
12, 15, 18; 48:3, 6; 62:14,
63:20

From p.c. to ref

percent [5]
54:7; 69:5; 76:13, 18; 87:7
percentage [1]
38:10
perform [2]
21:19; 58:12
performance [2]
83:9, 12
performed [11]
19:19; 20:10; 22:3; 29:8;
47:19, 23; 49:10; 51:17, 18;
52:5
period [8]
14:17; 16:12; 23:18; 28:24;
40:25; 56:5; 74:14; 79:25
permanent [1]
28:5
persichetty [3]
1:19; 91:7, 21
person [5]
24:4, 22; 25:10, 13, 23
personnel [3]
46:15, 18; 61:11
pertinent [1]
64:17
phase [3]
45:6; 46:13; 49:22
phased [1]
44:19
phewitt [1]
2:12
philadelphia [1]
13:21, 23
phone [10]
2:10, 20; 3:18; 4:11, 20;
5:8, 18; 6:8, 17; 7:8
pick [1]
80:5
pictorially [1]
63:13
place [1]
51:8
plains [1]
3:6
plaintiff [1]
1:4
planned [1]
83:13
please [3]
18:8; 25:8; 48:23
plousadis [1]
3:3
point [3]
28:19; 30:22; 33:12; 36:14;
40:12; 41:20; 48:21; 49:19;
53:10, 18; 62:13
poorly [1]
57:9
posed [1]
85:22
poses [1]

www.ellengrauer.com

62:5
position [1]
12:21
potential [2]
57:20; 64:3
potentially [1]
38:20
precedes [1]
41:6
precisely [1]
37:12; 54:9
preliminary [10]
21:6; 29:8; 34:15; 46:21,
22; 49:15, 23; 63:25; 74:18,
23
prepare [4]
61:19; 62:13; 63:6; 66:13
prepared [6]
31:16; 52:22; 63:4; 64:21;
74:17; 86:7
present [2]
7:11; 49:14
presented [1]
38:10
presenting [1]
33:20
president [4]
12:23, 25; 13:11, 25
pretty [2]
17:3; 81:14
previous [1]
51:20
previously [3]
16:20; 53:4; 80:24
primarily [5]
16:5; 33:15; 39:21, 23;
40:14
primary [3]
24:12; 35:15; 68:14
prime [4]
28:14, 15; 68:17; 84:16
principal [2]
24:22; 26:10
prior [3]
35:25; 54:3; 81:6
proactively [1]
57:21
problems [1]
12:3
procedure [1]
55:22
process [1]
78:11
processed [3]
56:11; 80:25; 81:6
production [1]
76:23
productivity [3]
71:22; 83:20, 23
professional [6]
41:11; 43:24; 49:23; 57:18;

58:12; 88:18
professionals [1]
59:25
program [2]
56:12; 88:12
progress [3]
61:19; 62:23; 63:2
project [40]
16:4, 15, 16; 20:23; 21:5, 8;
23:18; 26:12, 22; 27:12;
29:6, 16; 33:15, 41:24;
42:14; 43:25; 46:14, 15;
49:5; 50:21; 53:11; 54:5;
60:2, 11, 17, 20; 62:17;
63:19; 65:3; 66:5, 7, 8;
69:14; 70:23; 73:18; 76:7,
8; 81:7; 87:24; 88:9
projects [1]
88:13
promise [1]
19:16
properly [1]
20:7
proposed [2]
63:25; 64:3
prosecution [2]
44:18, 21
provide [16]
21:6; 33:22; 36:4; 38:23;
43:24, 25; 44:6, 17, 21;
46:22
provided [12]
25:24; 29:13; 34:19; 35:14;
37:18, 25; 39:22; 49:6;
59:2; 76:5; 87:16, 22
provides [1]
43:15
providing [1]
16:7
proviso [1]
66:23
public [1]
1:19; 10:3; 90:21; 91:7
publicly [1]
92:15
purpose [4]
17:23; 18:10; 72:8; 75:11
purposes [2]
31:6; 54:18
pursuant [4]
1:18; 19:6; 47:24; 55:21
putting [1]
54:20

**  * * Q * * **
question [34]
9:3; 10:16, 20; 18:8; 20:7;
21:20; 23:2; 24:16, 18, 25;
27:20; 28:6, 8; 31:22; 33:4;
42:16, 17; 48:11, 12, 13,
22, 24; 51:25; 52:18; 56:20,

21, 24; 57:9; 62:4; 71:3;
79:14; 85:22; 86:22; 87:18
questions [11]
10:11, 19; 11:13, 20; 12:11;
51:14; 55:4; 83:3; 88:4, 24;
89:13

**  * * R * * **
rafael [1]
3:4
randi [1]
6:7
range [1]
19:9
rbernstein [1]
5:20
read [7]
33:4, 5; 48:22, 23, 25;
78:23; 90:8
reading [1]
20:3
real [1]
16:25
realize [2]
46:16; 83:3
reason [4]
71:12; 77:7; 79:13; 92:7
reasons [2]
33:3; 72:25
recall [36]
16:8, 24; 27:4; 28:10;
37:11, 15; 38:16; 39:7;
41:20; 43:20; 44:15; 45:23;
46:6, 10; 49:17, 19; 50:6;
51:7; 53:17; 54:9; 59:6, 18;
62:20; 63:5; 69:25; 70:14;
77:3, 23; 78:9; 79:3; 83:15,
19; 84:17, 22; 85:2; 88:8
receive [1]
80:10
received [1]
82:5
recent [2]
28:21; 84:24
recently [1]
50:24
recess [2]
51:12; 88:2
recognized [1]
17:13
recollection [7]
17:2; 18:3; 50:17; 79:5, 16,
20; 81:3
record [21]
11:11, 25; 17:6, 7; 25:6;
20:5; 29:17; 33:5; 34:8;
48:25; 59:10; 66:17; 75:21,
22; 85:3, 8; 87:24; 88:25;
90:10, 11; 91:12
ref [1]
1:26

WILLIAM A. GROSS

**BSA XMAK(3)**
ROBERT DIETERLE 30(b)(6) - 3/20/09

VS. AMERICAN MANUFACTURERS

refer [3]
16:15; 23:22; 28:16
reference [3]
23:24; 54:14; 86:3
referenced [1]
58:18
referencing [1]
78:17
referred [4]
12:20; 29:10; 64:6; 66:5
referring [5]
16:17, 24; 62:21; 71:13;
87:15
refers [1]
69:4
regarding [1]
71:16
regardless [1]
68:18
registered [1]
88:17
regular [4]
70:22, 24; 71:5; 72:16
related [6]
41:24; 73:19; 76:6; 78:4;
87:14; 91:13
relates [1]
83:11
relating [1]
15:11
relationship [2]
69:15, 23
relatively [1]
71:9
released [1]
82:14
relevant [1]
40:13
remaining [2]
56:11, 17
remember [2]
60:13; 64:6
repeat [3]
18:8; 25:8; 86:11
rephrase [1]
10:21
replicate [1]
85:7
report [19]
31:21, 23, 24; 32:24; 33:2;
39:5; 43:6; 63:11, 14;
65:10, 13; 74:18, 23; 75:6,
7, 10; 82:10; 85:11, 14
reported [3]
24:23; 25:11, 15
reporting [4]
1:23; 25:21; 88:13; 92:2
reports [12]
31:15, 17, 19; 32:4, 16;
33:13; 38:21; 52:21, 24;
65:7; 68:5; 69:6

represant [1]
72:24
representatives [1]
74:15
represented [1]
12:8
representing [1]
10:9
request [18]
29:11, 14; 30:4, 7, 15, 17,
19; 31:2; 71:6, 10, 20, 21;
73:3; 84:14; 85:16; 86:8, 18
requested [3]
77:20, 24, 25
requests [3]
30:6; 58:14; 86:14
required [1]
83:14
requires [1]
21:18
requisitions [1]
75:16
research [1]
63:24
reserved [1]
9:9
resolution [2]
55:20; 56:5
resources [1]
12:19
respect [13]
14:2, 9; 15:23; 38:2; 53:24;
54:13, 15; 56:5; 65:22;
66:10; 83:5, 11, 20
respective [2]
9:4; 26:10
responded [1]
77:16
responsibilities [10]
12:25; 13:3; 14:2, 8, 13, 14;
15:10, 23; 21:9; 26:10
responsibility [3]
46:23; 68:14, 16
responsible [4]
26:15, 18; 38:8; 69:12
rest [1]
60:20
result [1]
31:16
retained [1]
8:25
retention [1]
11:15
reveal [1]
47:23
review [17]
26:17; 28:17, 18; 49:25;
52:11; 61:18; 64:16; 67:18,
25; 68:5, 13; 70:7, 17;
73:18; 74:15; 86:4
reviewed [7]

29:12; 56:16; 64:6; 70:12;
80:18, 21; 87:21
reviewing [1]
33:24; 54:6; 73:12
revise [1]
62:23
right [13]
20:4; 29:20; 37:15; 42:15,
20; 44:14; 45:18; 48:7, 18;
49:19; 62:11; 64:11; 72:20
rita [1]
1:19; 91:7, 21
robert [7]
1:17; 5:17; 8:3; 90:7, 15;
91:9; 92:6
rockville [1]
5:6
role [1]
60:13
rutledge [1]
4:5

**＊＊S＊＊**

salle [1]
13:22
save [1]
49:13
saying [2]
57:5; 72:13
schedule [9]
26:15, 17; 58:12, 24; 62:10,
15, 16; 67:19, 22
schedules [12]
29:15; 43:9; 61:18; 68:6,
24; 69:3, 6, 8, 9, 15
scheduling [1]
58:23
school [1]
13:18
schwartz [1]
7:11
science [1]
13:19
scope [6]
43:23; 44:10; 47:9, 18;
49:24; 54:9
se [2]
37:13; 38:13
sealing [1]
9:5
second [11]
6:14; 11:10; 34:14; 36:19;
37:22; 63:22; 70:4; 72:5;
75:9; 76:20
seeking [2]
27:21; 48:14
seiden [1]
3:3
semets [1]
7:3
send [2]

74:9; 77:9
sending [2]
77:3; 81:10
senior [2]
66:5, 7
sentence [2]
56:9; 58:11
separate [3]
39:6; 60:18; 86:21
september [9]
14:20; 19:6; 20:14; 45:22,
23; 46:5; 55:22; 60:3, 14
service [1]
41:24
services [13]
18:19; 19:25; 20:11; 23:7;
41:11; 42:13; 43:14, 19, 23;
50:20; 60:6; 76:12; 82:20
serving [1]
20:25
settle [1]
57:21
shape [1]
36:15
sheet [1]
92:1
sheets [1]
78:2
show [1]
53:3
showing [4]
16:19; 40:6; 84:22; 80:14
signature [4]
17:9, 16; 19:3; 22:2
signe [1]
4:6
signed [4]
9:12, 15; 17:13; 90:18
significant [1]
71:22
significantly [1]
51:5
sinuk [1]
4:5
sit [8]
44:14; 45:18; 49:17; 67:24;
69:25; 77:6; 84:17, 23
site [7]
20:23; 24:4; 40:19, 20, 21;
53:22; 73:18
sith [1]
4:4
sitting [1]
49:20
six [1]
15:5
six-month [1]
23:17
six-page [1]
60:25
slightly [1]

85:7
smith [1]
2:15
software [1]
86:12
somebody [4]
24:13; 30:17; 48:19; 75:19
somehow [1]
72:15
someone [2]
46:9; 79:21
somewhat [2]
81:4; 84:24
somewhere [6]
12:15; 20:3; 37:21; 49:20,
51:5; 55:9
sorry [6]
19:22; 21:23; 25:9; 52:4;
66:16; 77:11
sort [1]
62:14
sound [1]
87:6
southern [1]
1:2
spagnoli [1]
3:7
speak [1]
31:24
speaking [4]
20:19; 27:21; 28:4; 51:25
specific [7]
23:4; 41:20; 44:11, 15;
49:18; 53:18; 86:18
specifically [5]
46:11; 51:7; 79:12; 83:15;
85:2
spends [1]
26:6
spent [2]
50:24; 61:11
spreadsheets [3]
39:4; 64:16, 21
spring [1]
13:20
spurred [1]
85:7
ss [2]
90:4; 91:4
staff [4]
24:11; 45:25; 54:19, 22
stamped [18]
8:9, 11, 13, 15, 17, 19, 22,
23; 34:6; 59:14; 60:23;
66:14; 74:3; 76:14, 15, 22;
78:3; 80:8
stand [1]
33:6
standpoint [2]
40:3; 63:13
start [1]

WILLIAM A. GROSS

BSA XMAX(16)
ROBERT DIETERLE 30(b)(6) - 3/20/09

VS. AMERICAN MANUFACTURERS

77:12
**started** [5]
11:5; 19:8; 36:9; 72:4; 79:7
**starting** [1]
70:6
**state** [6]
1:19; 27:14; 90:3, 21; 91:3, 8
**statement** [1]
11:24
**states** [1]
1:1
**station** [1]
26:5
**stationed** [1]
24:7
**status** [1]
79:6
**steel** [2]
89:16, 24
**step** [1]
19:22
**stipulated** [3]
9:3, 7, 11
**stonewall** [1]
4:16
**strategy** [2]
44:18, 22
**street** [4]
1:23; 2:17; 3:13; 92:2
**string** [1]
7:14
**structural** [2]
89:16, 24
**sub** [1]
84:24
**subconsultants** [2]
43:15, 18
**subcontractors** [2]
84:8, 18
**subject** [1]
70:16
**submit** [1]
32:14
**submitted** [16]
29:9, 18, 24; 30:4, 17; 31:25; 32:5, 10; 33:14; 59:22; 67:3; 74:16; 75:16; 78:14, 18
**subs** [1]
85:2
**subscribed** [2]
90:16; 92:22
**subsequent** [1]
22:10
**subtotaling** [1]
67:13
**successive** [1]
1:10
**uite** [1]
4:8

**sum** [3]
50:18; 51:2, 6
**summary** [1]
67:8
**summer** [2]
14:20, 23
**supervising** [2]
24:14, 20
**supervision** [1]
25:21
**support** [5]
16:7; 29:13; 57:18; 58:2, 13
**supported** [1]
26:20
**supposed** [1]
47:17
**sworn** [4]
9:12; 10:2; 91:11; 92:22
**system** [2]
31:10; 40:8

**＊ ＊ T ＊ ＊**

**talked** [6]
11:18; 12:14; 39:21; 44:23, 25; 68:15
**talking** [4]
23:3, 5; 49:20; 70:23
**talks** [3]
55:18; 58:8; 78:13
**tangible** [1]
38:23
**task** [2]
17:4; 18:18
**team** [8]
29:4; 33:15; 36:2; 42:25; 52:22; 54:4; 56:16; 58:25
**tech** [1]
6:4
**technology** [2]
13:20; 88:22
**template** [1]
33:23
**tend** [1]
55:13
**term** [4]
30:2, 14, 23
**terms** [11]
18:18; 26:13; 29:7; 30:22; 31:3; 47:21; 60:18; 65:25; 76:10; 79:5; 86:20
**testified** [6]
10:4; 19:11; 22:18; 60:9; 62:9; 63:16
**testimony** [3]
90:8, 11; 91:12
**text** [1]
76:24
**thank** [4]
12:2; 52:19; 89:2, 10
**thankfully** [1]
41:9

**there's** [14]
11:12; 19:3; 28:4; 34:23; 41:6; 42:16; 61:17; 64:15, 25; 65:6, 17; 66:3, 24; 79:23
**they're** [4]
12:8; 17:11; 88:7; 89:12
**thousand** [1]
71:8
**three** [1]
46:3
**three-page** [1]
34:9
**timely** [1]
57:20
**timing** [1]
11:16
**title** [1]
66:10
**top** [1]
20:4
**total** [1]
50:18
**tough** [2]
31:22; 89:13
**towards** [2]
21:25; 55:13
**track** [2]
71:16; 72:8
**tracking** [1]
54:18
**tractel** [1]
5:14
**transcript** [2]
90:9, 10
**transition** [1]
53:17
**travel** [1]
73:17
**treatment** [2]
89:4, 8
**trial** [1]
9:10
**trickled** [1]
82:2
**true** [4]
30:3; 90:10, 12; 91:11
**turning** [1]
57:15
**two-page** [2]
59:10; 74:5
**two-thirds** [1]
64:14
**type** [4]
35:16; 43:7; 54:22; 89:5

**＊ ＊ U ＊ ＊**

**ultimately** [2]
31:5; 37:18
**underlying** [1]
61:7

**understand** [20]
10:20; 12:5; 18:14; 20:12; 23:23; 28:6, 7; 30:11; 35:16; 52:10, 13; 54:24; 56:22, 23; 58:4, 22; 61:4; 72:13; 78:6; 88:11
**understanding** [9]
17:22; 18:10, 12, 14, 18; 19:4; 47:3; 61:13; 86:17
**understood** [3]
42:15; 52:18; 59:20
**undertook** [1]
20:15
**unfettered** [1]
60:19
**unfortunately** [1]
17:12
**unique** [1]
71:18
**united** [1]
1:1
**university** [1]
13:23
**unusually** [1]
72:18
**update** [1]
31:23
**uses** [1]
88:12
**utilize** [1]
59:7
**utilized** [1]
30:21

**＊ ＊ V ＊ ＊**

**vague** [1]
79:5
**value** [4]
78:14, 18; 79:7, 8
**vda** [1]
6:13
**vella** [16]
16:9, 11; 22:20; 23:9, 12, 15; 26:9, 20; 27:8; 46:3; 63:16; 64:15, 22; 73:17; 88:19, 20
**versus** [1]
83:13
**vice** [4]
12:23, 25; 13:10, 25
**video** [1]
40:18
**videos** [5]
40:17, 19, 20, 21, 24
**vinoly** [1]
3:4
**volume** [2]
71:22; 73:8
**volumes** [1]
73:2

**＊ ＊ W ＊ ＊**

**waiting** [1]
10:15
**waived** [1]
9:6
**wall** [1]
71:7
**wanted** [3]
51:13; 79:11; 85:6
**wants** [2]
78:6; 85:6
**water** [1]
2:17
**wayne** [1]
24:8
**we'll** [1]
78:5
**we're** [4]
12:5; 70:22; 71:12; 89:5
**weissman** [6]
24:10; 26:3, 4; 32:6; 75:2, 3
**welcome** [1]
88:9
**weren't** [1]
46:25
**whatsoever** [3]
14:9; 53:24; 56:4
**whereof** [1]
91:17
**white** [1]
3:6
**william** [1]
1:3
**window** [2]
11:6; 12:13
**wingate** [6]
2:4; 10:10, 86:9, 14; 87:12, 16
**withdrawn** [5]
29:22; 31:20; 71:25; 72:12; 87:16
**witness** [18]
1:17; 2:16; 8:2; 10:2; 11:14, 22; 15:20; 21:18; 41:2; 48:10, 24; 53:4; 85:4; 89:11; 91:9, 12, 17; 92:6
**won't** [1]
12:3
**wonder** [1]
79:16
**word** [2]
30:5, 10
**words** [3]
30:25; 70:15; 85:15
**work** [103]
14:16, 18; 15:4, 21; 16:11; 18:21, 23; 19:5, 9, 10, 17, 18; 20:6, 8, 9, 14, 15; 21:4, 25; 22:3, 7, 19, 20, 21, 24; 23:3, 15, 24:14, 26:21;

WILLIAM A. GROSS

BSA XMAX(1)
ROBERT DIETERLE 30(b)(6) - 3/20/09

VS. AMERICAN MANUFACTURERS

27:12; 29:4, 5; 34:20;
35:11, 20; 36:9; 39:9, 20;
40:2, 16; 41:6, 7, 8, 11, 16,
17, 24; 42:13, 24; 43:19,
22; 44:10; 47:13, 19, 21,
23; 48:14; 49:24; 50:8, 12,
20; 51:15; 52:12, 23; 53:15,
20, 24, 25; 54:5, 12, 14;
55:7, 13, 17; 56:4; 57:4,
11, 16, 17, 25; 58:19, 24,
25; 59:2; 60:6, 19; 62:10;
64:11; 65:16, 21; 66:11;
69:20; 70:12; 79:15, 17;
80:18; 81:14; 82:3, 24;
83:6; 84:6; 86:13

**workbook** [2]
77:19, 78:10

**worked** [12]
16:4, 12; 22:15, 21; 23:18;
25:19; 36:3; 40:8; 60:2;
63:18; 65:3; 83:6

**working** [5]
22:19; 27:4; 53:16; 54:10;
62:14

**wouldn't** [1]
27:10

**wrapped** [1]
84:15

**written** [2]
31:17; 44:24

      * * Y * *

**yeah** [14]
15:7; 16:24; 19:7; 23:21;
24:19; 37:8; 39:11; 49:2;
55:16; 64:4; 72:17; 80:16;
82:18; 87:20

**year** [2]
11:7; 14:22

**york** [27]
1:2, 24; 2:6, 18; 3:6, 11, 14;
4:9; 5:6, 16; 6:6, 15; 7:6;
21:7, 16; 26:7; 74:17; 92:3

**you'll** [3]
16:16; 23:23; 49:21

**you've** [2]
30:13; 78:7

**yourself** [1]
63:18

**yup** [1]
55:16

**yuzek** [1]
2:3

      * * Z * *

**zaretsky** [8]
22:21; 35:3, 5, 22; 40:6;
60:10; 66:4, 5

**zdlaw.com** [1]
6:19

**zetlin** [1]
6:12

From workbook to zetlin