UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

WILLIAM A. GROSS CONSTRUCTION              :
ASSOCIATES, INC.,
                                           :    07 Civ. 10639 (LAK) (AJP)
                   Plaintiff,
                                           :    **OPINION AND ORDER**
            -against-
                                           :
AMERICAN MANUFACTURERS MUTUAL
INSURANCE COMPANY,                         :

                   Defendant.              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

>              The background to this litigation is set forth in my three prior decisions in this case,
familiarity with which is assumed.  William A. Gross Constr. Assoc., Inc. v. American Mfrs. Mut.
Ins. Co., 07 Civ. 10639, 2009 WL 427280 (S.D.N.Y. Feb. 23, 2009) (Peck, M.J.); William A. Gross
Constr. Assoc., Inc. v. American Mfrs. Mut. Ins. Co., 600 F. Supp. 2d 587 (S.D.N.Y. 2009); and
William A. Gross Constr. Assoc., Inc. v. American Mfrs. Mut. Ins. Co., 256 F.R.D. 134 (S.D.N.Y.
2009).

>              Presently before the Court is the motion (Dkt. No. 476) of fifth-party defendants and
sixth-party plaintiffs Rafael Vinoly Architects, P.C., DMJM H&N, Inc. and  Rafael Vinoly
Architects/DMJM Architects and Engineers, a Joint Venture (collectively, "RVA/DMJM") to compel
production of certain documents involving claims analysis performed by non-party Hill International,
Inc., a company retained by fourth-party defendant and fifth-party plaintiff Dormitory Authority of

the State of New York ("DASNY").[1]  In the alternative, RVA/DMJM seeks in camera review of the documents to determine if privilege was properly asserted.  (Dkt. No. 476: RVA/DMJM Motion; see Dkt. No. 477: RVA/DMJM Br. at 1.)

For the reasons set forth below, RVA/DMJM's motion is DENIED.

## FACTS

This case involves a multi-million dollar dispute over alleged defects and delays in the construction of the Bronx County Hall of Justice, also known as the Bronx Criminal Court Complex.  The Dormitory Authority of the State of New York ("DASNY") was the "owner" of the project.  DASNY retained non-party Hill under two different contracts to perform two different services:  (a) to provide construction management services, and (b) to assist counsel by reviewing and analyzing claims submitted by various contractors.  DASNY has produced documents relating to the former but withheld the latter as privileged.

In the mid-1990's, the City of New York, in conjunction with the New York State Office of Court Administration, determined that a new criminal justice facility was required in the Bronx.  (Dkt. No. 485: Weissman Aff. ¶ 3.)  The approximately 775,000 square foot facility, consisting of courtrooms, offices, a jury assembly building, and a parking garage, had an anticipated initial cost of approximately $325 million and was initially slated to open in 2005.  (Weissman Aff. ¶ 4.)  DASNY assumed control over the project in 2000 and shortly thereafter entered into several

---

[1]     The specific privilege log entries relating to the documents withheld are listed by RVA/DMJM's attorney, Leonardo D'Alessandro.  (See Dkt. No. 479: D'Alessandro Aff. ¶ 52.)

contracts for the design and construction of the facility.  (Weissman Aff. ¶ 5.)  "DASNY contracted with at least 17 different prime contractors for construction of the Project . . . . [and,] each agreement contained General Conditions that were either identical or substantially similar."  (Dkt. No. 479: D'Alessandro Aff. ¶ 18 & Ex. J: General Conditions.)

Article 8 of the General Conditions governs "Changes in the Work."  (See D'Alessandro Aff. Ex. J: General Conditions Art. 8.)  Section 8.01(A) provides that "[w]ithout invalidating the Contract, the Owner [i.e., DASNY] may order Extra Work or make changes by altering, adding to, or deducting from the Work, the Contract consideration being adjusted accordingly."  (General Conditions § 8.01(A).)  Section 8.01(B) provides:

The amount by which the Contract consideration is to be increased or decreased by any change order may be determined by the Owner [DASNY] by one (1) or more of the following methods:

1.  By applying the applicable unit price or prices contained in the Contract.

2.  By estimating the fair and reasonable cost of the extra work . . . .

3.  By determining the actual cost of the Extra Work . . . .

(General Conditions § 8.01(B).)

Article 11 of the General Conditions addresses the procedure by which contractors' claims for extra work or delays will be addressed by DASNY.  (General Conditions at Art. 11.)  Under Section 11.01, a contractor who claims that DASNY ordered extra work beyond the terms of the contract must:

1.  Promptly comply with the [work] order.

> 2.  File with [DASNY] . . . a written notice of the basis of the Contractor's claim, including estimated cost, and request for a determination thereof.

> 3.  Proceed diligently, pending and subsequent to the determination of [DASNY] with respect to any said disputed matter, with the performance of the Work in accordance with all instructions of [DASNY].

(General Conditions § 11.01(A).)  Section 11.02 of the General Conditions deals with delay claims,

as follows:

> No claims for increased costs, charges, expenses or damages of any kind shall be made by the Contractor against [DASNY] for any delays or hindrances from any cause whatsoever, provided that [DASNY], in [DASNY]'s discretion, may compensate the Contractor for any said delays by extending the time for completion of the Work as specified in the Contract.

(General Conditions § 11.02.)  Section 11.03 of the General Conditions provides:

> Any decision or determination of the Consultant, [DASNY] or [DASNY's] Representative shall be final, binding and conclusive on the Contractor unless the Contractor shall, within ten (10) working days after said decision, make and deliver to [DASNY] a verified written statement of the Contractor's contention that said decision is contrary to a provision of the Contract.  [DASNY] shall determine the validity of the Contractor's contention.

(General Conditions § 11.03.)[2]

---

[2]   Section 1.01 defines "Consultant" as a "person, persons, firm, partnership or corporation providing Architectural, Engineering, or other professional services, and so designated" by DASNY.  (General Conditions at § 1.01.)  Section 1.01 defines "Owner's Representative" as a "person, persons, firm, partnership or corporation so designated" by DASNY.  (General Conditions § 1.01.)  Section 1.01 defines "Construction Manager" as a "person, persons, firm, partnership or corporation, regularly engaged in the management of construction projects, and so designated" by DASNY.  (General Condtitions § 1.01.)

Commencing in 2002, DASNY contracted with fifth party defendant Bovis Lend Lease, LMB, Inc. for construction management services.  The services Bovis was required to provide as construction manager included:

> 10.   <u>Claims</u>
>
> Analyze and evaluate all claims for Contract time extension or cost adjustment. Make recommendations to [DASNY] for resolution, approval, or disapproval.

(Dkt. No. 478: Semetis Aff. ¶ 3 & Ex. 1: Bovis Construction Mgmt. Contract Appendix A, Scope of Services, ¶ 10.) "Bovis indeed provided this service to DASNY during the time that Bovis performed work on the Project."  (Semetis Aff. ¶ 4; <u>see also</u> <u>id</u>. ¶ 6.)  "Bovis has produced all of this discovery, which includes records relating to Bovis' claims analysis pursuant to its Contract, without any claim of privilege."  (Semetis Aff. ¶ 6.)

In September 2006, DASNY replaced Bovis as Construction Manager with Hill's Construction Management Group.  (Weissman Aff. ¶ 7; Dkt. No. 484: Levy Aff. Ex. A: Koopman Dep. at 26-30.)[3/]  Article II of the Hill Construction Management Contract incorporates Appendix A, covering the "Scope of Services of Construction Manager," which requires Hill to "[i]mplement and enforce [DASNY's] procedure for the processing of Change Orders" and to "[a]nalyze and evaluate all claims for Contract time extension or cost adjustment [and m]ake recommendations to [DASNY] for resolution, approval, or disapproval."  (D'Alessandro Aff. Ex. K: Hill Construction

---

[3/]   DASNY had contracted with Hill on a term, or "standby," basis to be available to serve as a construction manager on any DASNY project, not limited to the Bronx Courthouse, if DASNY chose to utilize Hill's services.  (Weissman Aff. ¶ 7; Koopman Dep. at 26-30; D'Alessandro Aff. Ex. M: Hill Contract.)

Mgmt. Contract at A6-A7, ¶¶ 9-10.)  Work Authorization No. 9 specified that Hill would "take over the change order process and initiate resolution as promptly as possible by evaluating such change order requests and making recommendations" to DASNY and "inform [DASNY], in a timely manner, of any potential claims and will proactively try and settle such issues . . . ."  (D'Alessandro Aff. Ex. L: Work Authorization No. 9, ¶¶ 1-6.)  Similarly, Work Authorizations Nos. 12 (February 12, 2007), 13 (May 2, 2007), 14 (June 18, 2007), 15 (October 9, 2007), 16 (November 30, 2007), 17 (undated), 18 (May 9, 2008), and 19 (July, 29, 2008) all specified that "[t]he Construction Manager will continue with the resolution of change orders . . . ." and that "[s]hould further detailed delay analysis be required for compensatory delay damages, the Construction Manager would perform such work as directed" by DASNY.  (D'Alessandro Aff. Ex. M: Work Authorizations, ¶¶ 2, 8.)

"Due to project delays, disruption and contractor claims for disputed extra work, a temporary certificate of occupancy [for the Courthouse] was not issued until August 2006 . . . ." (Weissman Aff. ¶ 8.)  By that time and continuing into 2007, contractors had submitted "requests for equitable adjustment" totaling approximately $72 million.  (Weissman Aff. ¶ 9.)  The size of those requests led DASNY's Managing General Counsel, George Weissman, "to conclude that litigation was imminent." (Weissman Aff. ¶ 11.) "In anticipation of that litigation, DASNY decided to hire a consultant to assist DASNY's Counsel's office in developing a legal strategy."  (Weissman Aff. ¶ 12.)

On September 13, 2007, DASNY retained Hill's "Claims Analysis Group" to perform "claims analysis." (Weissman Aff. ¶ 14; D'Alessandro Aff. Ex. N: Hill Claims Analysis Contract & Work Authorization No. 6; Levy Aff. Ex. B: Dieterle Dep. at 19.)[4/] Robert A. Dieterle, Vice President of the Hill Claims Analysis Group, testified that Work Authorization No. 6 "requires that Hill's Claims Group provide DASNY with a preliminary claims analysis in order to identify project delays and damage claims at the Bronx County Hall of Justice." (D'Alessandro Aff. Ex. I: Dieterle Aff. ¶ 7.) More specifically, Work Authorization No. 6 required the Hill Claims Analysis Group to provide DASNY's counsel with services including the following:

> 3. Provide a preliminary evaluation of the cause and responsibility for critical delays and a preliminary assessment of the delays claimed by individual Contractors and the claimed damages methodology and causal association with alleged impacts and issues.

> 4. Based upon the analysis, the completion of the Phase I – Preliminary Assessment shall provide the Owner [DASNY] with preliminary observations and opinions regarding the strengths of the case and the merit, probable outcome, and likely range of monetary exposure to damages.

---

[4/]    DASNY's counsel  had hired the Hill Claims Analysis Group in November 2005 on a term, or standby, basis to be "available to provide . . . pre-litigation analysis on several specified DASNY projects, including the [Bronx] Courthouse Project, upon execution of a project-specific 'work authorization.'" (Weissman Aff. ¶ 13.) The Hill Claims Analysis Contract contemplated Hill providing services that might include any of the following: (a) "Delay analysis and characterization including identification of: Excusable delays[,] Non-excusable delays[,] Compensable delays[,] Non-Compensable delays[, and] Actual progress v. planned progress"; (b) "Damage Analysis and Validation [including]: Contract evaluation and interpretation, Analysis of home and field overhead costs[,] Analysis of general conditions costs[, and] Analysis of labor and material escalation costs"; (c) "Liability Assessment"; and (d) "Litigation Support [including] Exhibit preparation, Expert testimony." (D'Alessandro Aff. Ex. N:  Hill Claims Analysis Contract and Work Authorizations at A1-A2, ¶¶ 3, 7-9.)

. . .

> 6. [Hill] shall recommend the best strategy to defend the claims, and any additional tasks that may be required in that regard.
>
> 7.  Meet to present its preliminary findings and provide such presentation as a written report.

(D'Alessandro Aff. Ex. N: Hill Claims Analysis Contract & Work Authorization No. 6.)  Dieterle testified that "the claims that [the Hill Claims Analysis Group] looked at . . . were not evaluated at all by the Hill [Construction Management] staff other than looking at them perhaps and putting them in the file.  There was nothing in there that appeared to be any type of an evaluation by the [Hill Construction Management] staff that was in the file."  (Dkt. No. 484: Dieterle Dep. at 54.)  In the course of performing its claims analysis and preparing its reports to DASNY's counsel, the Hill Claims Analysis Group had no contact with the contractors on the Bronx Courthouse project. (Dieterle Dep. at 28-29.)  "The [Hill] Claims Group performed no construction management work and did no claims audit work under the construction management contract."  (D'Alessandro Aff. Ex. I: Dieterle Aff. ¶ 13.)

Paul Koopman, DASNY's current director of construction administration and former chief of professional services contracting, testified that claim services "means providing analysis of potential contractor claims, scheduling delays and so forth to support – to help [DASNY] in resolving disputes and so forth with contractors, consultants, et cetera . . . The consultant would also help in litigation matters . . . [and] prelitigation as well."  (Levy Aff. Ex. A: Koopman Dep. at 35-37.)   Koopman added that "included in that is reviews of schedules and potential causes of

scheduling delays." (Koopman Dep. at 37.) When asked if it was correct that scheduling "delay issues may or may not be issues that have arisen in the context of a litigation or a threatened litigation," Koopman answered, "Yes." (Koopman Dep. at 37-38.)

The substantive work of the Hill Claims Analysis Group was performed by Dieterle, Jim McKay and Ed Vella. (Levy Aff. Ex. B: Dieterle Dep. at 16, 33; Weissman Aff. ¶ 20.) "DASNY has not called upon the Hill Claims Group to provide any construction management services, and would not have hired it if DASNY had not been facing litigation. Similarly, DASNY did not call upon the Hill [Construction Management] Group, which continues to serve[] as [Construction Manager] on the Courthouse Project, to provide any pre-litigation claims analysis." (Weissman Aff. ¶ 19.)

Work Authorization No. 6 provided that the Hill Claims Analysis Group would complete its work by November 6, 2007, "[s]ince DASNY expected litigation to commence very shortly. . . ." (Weissman Aff. ¶ 15; see D'Alessandro Aff. Ex. N: Hill Claims Analysis Contract & Work Authorization No. 6.) This action commenced on November 28, 2007. (Weissman Aff. ¶ 16.)

In mid-December 2007, the Hill Claims Analysis Group delivered its preliminary evaluation of contractor claims to DASNY Managing General Counsel Weissman. (Weissman Aff. ¶ 17; Levy Aff. Ex. B: Dieterle Dep. at 25-26, 32-33, 74-75; D'Alessandro Aff. Ex. I: Dieterle Aff. ¶ 10.)

As of January 14, 2008, pursuant to Work Authorization No. 8, the Hill Claims Analysis Group's work was deemed to be complete, and Weissman received a follow-up report in

January or early February 2008.  (Weissman Aff. ¶ 18.)  The final report included "an analysis of damages due to delays, . . . excessive change orders, and related matters," "an assessment of liability as to the responsible party or parties," and "identification of contractor[s] responsible for delays to the critical path that would have caused delay to the overall completion of the project."  (Dieterle Aff. ¶ 10.)

DASNY will not call any member of the Hill Claims Analysis Group as a fact or expert witness at trial, and instead continues to rely upon it solely as a non-testifying consultant. (Weissman Aff. ¶¶ 20-21; Levy Aff. ¶ 3.)

## ANALYSIS

## I.    THE WORK PRODUCT DOCTRINE

### A.    The Work Product Doctrine

The work product doctrine, codified in Fed. R. Civ. P. 26(b)(3), provides that "[o]rdinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)" unless it can demonstrate a "substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means."  The work product doctrine

> is intended to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy "with an eye toward litigation," free from unnecessary intrusion by his adversaries . . . Were the attorney's work accessible to an adversary, . . . "much of what is now put down in writing would remain unwritten" for fear that the attorney's work would redound to the benefit of the opposing party. Legal advice might be marred by "[i]nefficiency, unfairness and sharp practices," and

> the "effect on the legal profession would be demoralizing."  Neither the interests of
> clients nor the cause of justice would be served . . . if work product were freely
> discoverable.

United States v. Adlman, 134 F.3d 1194, 1196-97 (2d Cir. 1998) (quoting Hickman v. Taylor, 329

U.S. 495, 510-11, 67 S. Ct. 385, 393-94 (1947)); accord, e.g., In re Grand Jury Subpoenas Dated

Mar. 19, 2002 & Aug. 2, 2002, 318 F.3d 379, 383-84 (2d Cir. 2003).  Thus, while the work product

doctrine protects both factual and opinion work product, the latter "receive[s] special protection not

accorded to factual material," United States v. Adlman, 134 F.3d at 1197, because "'[a]t core its core,

the work-product doctrine shelters the mental processes of the attorney, providing a privileged area

within which he can analyze and prepare his client's case,'" id., (quoting United States v. Nobles, 422

U.S. 225, 238, 95 S. Ct. 2160, 2170 (1975).  The Supreme Court has called this rationale for the

work product doctrine "strong public policy."  See United States v. Nobles, 422 U.S. at 236, 95 S. Ct.

at 2169; accord, e.g., Upjohn Co. v. United States, 449 U.S. 383, 398, 101 S. Ct. 677, 687 (1981).

Three conditions must be fulfilled in order for work product protection to apply:

"'The material must (1) be a document or a tangible thing, (2) that was prepared in anticipation of

litigation, and (3) was prepared by or for a party, or by or for his representative.'" A.I.A. Holdings,

S.A. v. Lehman Bros., Inc., 97 Civ. 4978, 2002 WL 31556382 at *4 (S.D.N.Y. Nov. 15, 2002);

accord, e.g., S.R. Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC, 01 Civ. 9291, 2002 WL

1455346 at *2 (S.D.N.Y. July 3, 2002).

      **1.**    **"Document or Tangible Thing Prepared by or for a Party, or by His Representative"**

      Two of the three conditions required for work product protection – that the material is a "document or tangible thing" and is "prepared by or for a party, or by his representative" – are relatively straightforward. "The doctrine extends to notes, memoranda, witness interviews, and other materials, whether they are created by an attorney or by an agent for the attorney." Granite Partners L.P. v. Bear, Stearns & Co., 184 F.R.D. 49, 52 (S.D.N.Y. 1999).[5/]   As the Supreme Court has explained,

> the [work product] doctrine is an intensely practical one, grounded in the realities of litigation in our adversary system. One of those realities is that attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial. It is therefore necessary that the doctrine protect material prepared by agents for the attorney as well as those prepared by the attorney himself.

United States v. Nobles, 422 U.S. 225, 238-39, 95 S. Ct. 2160, 2170 (1975); see also, e.g., Weinhold v. Witte Heavy Lift, Inc., 90 Civ. 2096, 1994 WL 132392 at *2 (S.D.N.Y. Apr. 11, 1994) ("The definition of the term 'representative' in Fed. R. Civ. P. 26(b)(3) goes beyond attorney work product and includes the work product prepared on an attorney's behalf.").

      **2.**    **"In Anticipation of Litigation"**

      The other condition necessary for work product protection is that the material at issue was prepared "in anticipation of litigation." "Analysis of one's case 'in anticipation of litigation' is

---

[5/]    See, e.g., Carter v. Cornell Univ., 173 F.R.D. 92, 95 (S.D.N.Y.1997) (Cornell's Associate Dean of Human Resources who interviewed university employees at counsel's request "certainly qualifies as a 'party representative'" under the work product doctrine).

a classic example of work product, . . . and receives heightened protection under Fed. R. Civ. P. 26(b)(3)." United States v. Adlman, 134 F.3d 1194, 1196-97 (2d Cir. 1998).  The Second Circuit has held that a document is prepared "in anticipation of litigation" if "'in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation.'"  United States v. Adlman, 134 F.3d at 1202 (quoting Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, 8 Federal Practice & Procedure § 2024 at 343 (1994)).  Under the work product doctrine, if "a document is created because of the prospect of litigation, analyzing the likely outcome of that litigation, it does not lose protection . . . merely because it is created in order to assist with a business decision."  United States v. Adlman, 134 F.3d at 1202.  However, there is no work product protection for

> documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation. . . .Even if such documents might also help in preparation for litigation, they do not qualify for protection because it could not fairly be said that they were created "because of" actual or impending litigation.

United States v. Adlman, 134 F.3d at 1202.[6/]  "Where a document was created because of anticipated litigation, and would not have been prepared in substantially similar form but for the prospect of that litigation, it falls within Rule 26(b)(3)."  United States v. Adlman, 134 F.3d at 1195.

---

[6/]      Accord, e.g., Allied Irish Banks v. Bank of America, N.A., 240 F.R.D. 96, 106 (S.D.N.Y. 2007); Int'l Design Concepts, Inc. v. Saks Inc., 05 Civ. 4754, 2006 WL 1564684 at *1 (S.D.N.Y. June 6, 2006); Gulf Islands Leasing, Inc. v. Bombardier Capital, Inc., 215 F.R.D. 466, 474-75 (S.D.N.Y.2003); SEC v. Credit Bancorp, Ltd., 99 Civ. 11395, 2002 WL 59418 at *2 (S.D.N.Y. Jan.16, 2002).

Where the threat of litigation is accompanied by a non-litigation purpose for the generation of the documents at issue, "[w]hether there is work product protection turns on whether the material 'would have been prepared irrespective of the expected litigation . . . .'" <u>Allied Irish Banks</u> v. <u>Bank of America, N.A.</u>, 240 F.R.D. at 106.  In other words, the pertinent question is "what 'would have' happened had there been no litigation threat–that is, whether [the party seeking work product protection] 'would have' generated these documents if it were acting solely for its 'business-related purposes.'" <u>Allied Irish Banks</u> v. <u>Bank of America, N.A.</u>, 240 F.R.D. at 106.  Although "it is not easy for a factfinder to determine what 'would have' happened in some hypothetical situation . . . this is the question that the <u>Adlman</u> test requires [courts] to answer and it is an exercise that courts have regularly performed." <u>Allied Irish Banks</u> v. <u>Bank of America, N.A.</u>, 240 F.R.D. at 106.[7]

### B.    **Burden of Proof**

The party claiming work product protection has the burden of establishing that it applies.  <u>E.g.</u>, <u>In re Grand Jury Subpoenas Dated Mar. 19, 2002 & Aug. 2, 2002</u>, 318 F.3d 379, 384 (2d Cir. 2003).[8]  "It is axiomatic that the burden is on a party claiming the protection of a privilege

---

[7]    <u>See also</u>, <u>e.g.</u>, <u>DeBeers LV Trademark Ltd.</u> v. <u>DeBeers Diamond Syndicate Inc.</u>, 04 Civ. 4099, 2006 WL 357825 at *1 (S.D.N.Y. Feb. 15, 2006); <u>MSF Holding Ltd.</u> v. <u>Fiduciary Trust Co. Int'l</u>, 03 Civ. 1818, 2005 WL 3046287 at *2 (S.D.N.Y. Nov. 10, 2005); <u>Otal Invs. Ltd.</u> v. <u>Capital Bank Pub. Ltd. Co.</u>, 03 Civ. 4304, 2005 WL 1473925 at *1 (S.D.N.Y. June 22, 2005); <u>Verizon Directories Corp.</u> v. <u>Yellow Book USA, Inc.</u>, No. 04-CV-251, 2004 WL 4054842 at *2 (E.D.N.Y. July 22, 2004).

[8]    <u>See also</u>, <u>e.g.</u>, <u>A.I.A. Holdings, S.A.</u> v. <u>Lehman Bros., Inc.</u>, 97 Civ. 4978, 2002 WL
(continued...)

H:\OPIN\GROSS

to establish those facts that are the essential elements of the privileged relationship, . . . a burden not 'discharged by mere conclusory or ipse dixit assertions.'" In re Grand Jury Subpoena Dated Jan. 4, 1984, 750 F.2d 223, 224-25 (2d Cir. 1984); see, e.g., 2 Michael C. Silverberg, Civil Practice in the Souther District of New York § 14.2 (2009 ed.).[9]

"Just as the party seeking to assert a claim of privilege bears the burden of establishing the existence of the privilege, that same party has the burden of establishing nonwaiver." Granite Partners, L.P. v. Bear, Stearns & Co., 184 F.R.D. 49, 54 (S.D.N.Y.1999).[10]

**C.    Waiver**

Work product protection may be waived by the conduct of a party.  The Second Circuit has stated "that fairness considerations arise when [a] party attempts to use [a] privilege both as 'a shield and a sword.'" In re Grand Jury Proceedings, 219 F.3d 175, 182 (2d Cir. 2000); see also,

---

[8]    (...continued)
31556382 at *4 (S.D.N.Y. Nov. 15, 2002); SEC v. Credit Bancorp, Ltd., 99 Civ. 1395, 2002 WL 59418 at *3 (S.D.N.Y. Jan. 16, 2002); Granite Partners, L.P. v. Bear, Stearns & Co., 184 F.R.D. 49, 52 (S.D.N.Y. 1999); Minebea Co. v. Minebea Co., 143 F.R.D. 494, 499 (S.D.N.Y. 1992).

[9]    See also, e.g., In re Pfohl Bros. Landfill Litig., 175 F.R.D. 13, 20 (W.D.N.Y. 1997); Magee v. Paul Revere Life Ins. Co., 172 F.R.D. 627, 640 (E.D.N.Y. 1997); Itoba Ltd. v. LEP Group PLC, 930 F. Supp. 36, 43 (D. Conn. 1996);  Redvanly v. NYNEX Corp., 152 F.R.D. 460, 465 (S.D.N.Y. 1993); Bowne of N.Y.C., Inc. v. AmBase Corp., 150 F.R.D. 465, 472-73 (S.D.N.Y. 1993); P. & B. Marina, Ltd. P'ship v. Logrande, 136 F.R.D. 50, 57 (E.D.N.Y. 1991), aff'd mem., 983 F.2d 1047 (2d Cir. 1992).

[10]    See also, e.g., RLS Assocs., LLC v. United Bank of Kuwait, PLC, 01 Civ.1290, 2003 WL 1563330 at *3 (S.D.N.Y. Mar. 26, 2003); Bank of America, N.A. v. Terra Nova Ins. Co., 212 F.R.D. 166, 169 (S.D.N.Y. 2002); Resolution Trust Corp. v. Mass. Mut. Life Ins. Co., 200 F.R.D. 183, 188 (W.D.N.Y. 2001).

e.g., United States v. Bilzerian, 926 F.2d 1285, 1292 (2d Cir.), cert. denied, 502 U.S. 813, 112 S. Ct. 63 (1991); In re von Bulow, 828 F.2d 94, 103 (2d Cir. 1987).  Courts applying this "fairness doctrine" have found, that "[f]or example, where a party selectively discloses certain privileged or work product material, but withholds similar (potentially less favorable) material, principles of fairness may require a more complete disclosure." RLS Assocs., LLC v. United Bank of Kuwait, PLC, 01 Civ.1290, 2003 WL 1563330 at *2 (S.D.N.Y. Mar. 26, 2003).  "What constitutes a waiver with respect to work-product materials depends, of course, upon the circumstances." United States v. Nobles, 422 U.S. 225, 239-40 n.14, 95 S. Ct. 2160, 2171 n.14 (1975).

Work product protection also may be waived by voluntary disclosure to an adverse party.  E.g., In re Steinhardt Partners, L.P., 9 F.3d 230, 235 (2d Cir.1993).[11/]  However, where work product is disclosed to a third party, the claim of work product protection may be maintained if the third party is "aligned in interest with the author" of the work product.  RLS Assocs., LLC v. United Bank of Kuwait, PLC, 01 Civ.1290, 2003 WL 1563330 at *2 (S.D.N.Y. Mar. 26, 2003); see also, e.g., United States v. Adlman, 134 F.3d 1194, 1199-200 (2d Cir. 1998) (work product may be shown to others "simply because there was some good reason to show it," without necessarily destroying the work product nature of the document).

--------

[11/]    See also, e.g., ECDC Envtl., L.C. v. N.Y. Marine & Gen'l Ins. Co., 96 Civ. 6033, 1998 WL 614478 at *4 (S.D.N.Y. June 4, 1998) ("Disclosure of material protected by the work-product doctrine . . . . results in a waiver of the protection afforded by that doctrine only when the disclosure is to an adversary or materially increases the likelihood of disclosure to an adversary.").

D.  **Work Product Protection for Non-Testifying Experts**

Fed. R. Civ. P. 26(b)(4)(B) extends work product protection to "facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial." The Advisory Committee Notes to the 1970 Amendment to the Federal Rules of Civil Procedure, which added subdivision (b)(4), distinguished between experts for the purposes of litigation and experts as ordinary witnesses:

> It should be noted that [Fed. R. Civ. P. 26(b)(4)(B)] does not address itself to the expert whose information was not acquired in preparation for trial but rather because he was an actor or viewer with respect to transactions or occurrences that are part of the subject matter of the lawsuit. Such an expert should be treated as an ordinary witness.

Fed. R. Civ. P. 26(b), Advisory Committee Notes to the 1970 Amendment.[12] But where an expert is employed for "dual purposes," both to prepare for litigation and for some non-litigation purpose, work product protection still applies. See, e.g., Hermsdorfer v. American Motors Corp., 96 F.R.D. 13, 14 (W.D.N.Y. 1982) ("There is no reason a party should be deprived of the protection of rule 26(b)(4)(B) merely because he or she economically makes double use of expensive expert consultation.").

---

[12]  See, e.g., Battle v. Memorial Hosp., 228 F.3d 544, 551-52 (5th Cir. 2000) (researcher who conducted medical tests on plaintiff considered an ordinary witness for purposes of Rule 26); Turner v. Delta Air Lines, Inc., No. 06 CV 1010, 2008 WL 222559 at *2 (E.D.N.Y. Jan. 25, 2008) (plaintiff's treating physician considered fact witness in personal injury litigation); Hodge v. City of Long Beach, No. CV 02-5851, 2006 WL 1211725 at *4-5 (E.D.N.Y. May 4, 2006) (treating psychiatrist considered fact witness); North Shore Concrete & Assocs., Inc. v. City of New York, No. 94-CV-4017, 1996 WL 391597 at *1, 3-5 (E.D.N.Y. July 10, 1996) (author of study commissioned in regular course of business considered a fact witness).

E.      **The "Substantial Need" / "Undue Hardship" Exception**

"[A]lthough a finding . . . that a document is prepared because of the prospect of litigation warrants application of Rule 26(b)(3), this does not necessarily mean that the document will be protected against discovery.  Rather, it means that a document is <u>eligible</u> for work-product privilege.  The district court can then assess whether the party seeking discovery has made an adequate showing of substantial need for the document and an inability to obtain its contents elsewhere without undue hardship."  <u>United States</u> v. <u>Adlman</u>, 134 F.3d 1194, 1202-03 (2d Cir. 1998).[13]  Even in ordering discovery of such materials when the required substantial need showing has been made, "the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." <u>United States</u> v. <u>Adlman</u>, 134 F.3d at 1197 (quoting Fed. R. Civ. P. 26(b)(3)).

II.     **APPLICATION OF THE WORK PRODUCT DOCTRINE TO THE PRESENT MOTION**

    A.      **Hill's Claims Analysis Documents Were Prepared in Anticipation of This Litigation**

Applying the three part test (<u>see</u> page 11 above), we are dealing with documents (or ESI), that were prepared by the Hill Claims Analysis Group at the request of DASNY's counsel.

---

[13]   <u>See</u>, <u>e.g.</u>, <u>In re Grand Jury Subpoenas Dated Dec. 18, 1981 & Jan. 4, 1982</u>, 561 F. Supp. 1247, 1257 (E.D.N.Y.1982) (McLaughlin, D.J.) ("Once these conditions are satisfied, the party seeking discovery must establish a substantial need for the material and a practical inability to secure the substantial equivalent thereof by alternative means."); <u>Execu/Search Group, Inc.</u> v. <u>Nichols</u>, 06 Civ. 3646, 2008 WL 5050177 at *1 (S.D.N.Y. Nov. 25, 2008); <u>Hendrick</u> v. <u>Avis Rent A Car Sys., Inc.</u>, 916 F. Supp. 256, 261 (W.D.N.Y. 1996).

(See page 6 above.)  Moreover, DASNY's counsel hired the Hill Claims Analysis Group in September 2007 to perform claims analysis at a time DASNY was faced with $72 million in adjustment requests that, in DASNY's counsel's opinion, made litigation imminent.  (See page 6 above.)  Indeed, litigation began about two months after DASNY's counsel hired the Hill Claims Analysis Group, and Hill's Claims Analysis Group completed its analyses and presented its final report to DASNY's counsel in January or early February 2008.  (See page 9 above.)  The Court preliminarily concludes, therefore, that DASNY satisfied its burden to show Hill's Claims Analysis work was prepared "because of the prospect of litigation."  United States v. Adlman, 134 F.3d 1194, 1202 (2d Cir. 1998).  The remaining issue, however, is whether, as movants claim, the material loses its protection because "prepared in the ordinary course of business of that would have been created in essentially similar form irrespective of the litigation."  United States v. Adlman, 134 F.3d at 1202; see pages 13-14 above.

RVA/DMJM asserts that the Hill Claims Group was performing the same sort of ordinary business review of contractor claims that the Hill Construction Management Group (and before it, Bovis) had performed as Construction Manager.  (See, e.g., Dkt. No. 477: RVA/DMJM Br. at 6.)  RVA/DMJM's argument fails to recognize that the Hill Claims Group and the Hill Construction Management Group are two different entities, operating under different contracts and performing different services.  (See pages 2-6 above.)  The Hill Claims Analysis Contract/Work Authorization No. 6, unlike the Hill Construction Management Contract/Work Authorization No. 9, contemplated pre-litigation analysis.  For instance, the Claims Analysis Contract required that the

Hill Claims Group perform "Liability Assessment," "Damage Analysis" and "Litigation Support." (Dkt. No. 479: D'Alessandro Aff. Ex. N at A-1; <u>see</u> page 7 n.4 above.)   In addition, Work Authorization No. 6 required that the Hill Claims Group "provide [DASNY] with preliminary observations and opinions regarding the strengths of the case and the merit, probable outcome, and likely range of monetary exposure to damages . . . . [and] recommend the best strategy to defend the claims, and any additional tasks that may be required in that regard." (D'Alessandro Aff. Ex. N: Hill Claims Analysis Contract & Work Authorizations; <u>see</u> pages 7-8 above.)

The Hill Claims Group and the Hill Construction Management Group performed different services.  The ordinary review of contractor payment requests performed by the Hill Construction Management Group (and Bovis before it) involved contact with the contractors.  (<u>See</u> D'Alessandro Aff. Exs. Q, R & S.)  By contrast, the claims analysis performed by the Hill Claims Group involved no construction management work and no contact with contractors.  (<u>See</u> page 8 above.) Unlike the Hill Construction Management Group, the Hill Claims Analysis Group's analysis was provided directly to DASNY's general counsel.  (<u>See</u> page 9 above.)  The Hill Construction Management Group performed services that were ongoing for the duration of the construction project; by contrast, the Hill Claims Group's work involved a short-term assignment that was scheduled to end by November 6, 2007, about six weeks after the work authorization and about three weeks before this litigation commenced.  (<u>See</u> page 9 above.)

RVA/DMJM asserts that "the testimony of Rule 30(b)(6) witnesses make it clear that claims analysis was performed under [the Hill Claims Analysis] contract in lieu of analysis of the

same claims by the construction manager, and not necessarily in anticipation of litigation." (RVA/DMJM Br. at 13.)  The Hill Claims Group did not perform the same analysis that the Hill Construction Management Group would have performed absent the prospect of litigation.  As DASNY correctly points out, "[i]t is precisely because the [Construction Management's] day-to-day review of contractor payment requests lack the analysis required for DASNY's counsel to formulate a legal position that DASNY engaged the services of the Hill Claims Group."  (Dkt. No. 486: DASNY Br. at 13.)

Citing G.M. Hartson Construction Co. v. City of Chicago as a case directly on point, RVA/DMJM suggests (RVA/DMJM Br. at 9-10) that DASNY is attempting to cloak in work product protection documents that would have been prepared in essentially similar form irrespective of litigation. G.M. Harston Constr. Co. v. City of Chicago, No. 01 C 268, 2001 WL 817855 (N.D. Ill. 2001).  In G.M. Harston, the court held that where documents prepared for Chicago by an independent auditor would have been created in essentially similar form irrespective of litigation, work product protection does not apply even though the City may have believed that the contractor's claims might end up in litigation and may have considered that the auditor's evaluation had the dual purposes of determining what was due and owing and to assess the strength of the City's position in litigation.  G.M. Harston Constr. Co. v. City of Chicago, 2001 WL 817855 at *1-2.  While it was "clear that [the City] sought to evaluate [the] claims in a manner that would protect that evaluation from disclosure. . . . it is equally obvious that the City had to work cooperatively with plaintiffs to determine the extent to which the parties could agree that amounts were due and owing."  G.M.

Harston Constr. Co. v. City of Chicago, 2001 WL 817855 at *2.  Indeed, the construction company there "supplied various records" to the auditors, and "plaintiffs and the auditing firm have met from time to time respecting the ongoing review." Id., 2001 WL 817855 at *1.  The court found that while a dual purpose does not necessarily forfeit work product protection, such protection was forfeited in that case because "the evaluation had to be made in any event. . . . just as insurance companies will, in the normal course, investigate possible claims."  G.M. Harston Constr. Co. v. City of Chicago, 2001 WL 817855 at *2.  The court found that routing the evaluations through the City's attorneys did not confer work product protection because the evaluations were merely the auditor's "best judgment on the basis of the records of the parties as to what it believes is and is not due and owning" and did not "reveal[] the thought processes or litigation strategies of attorneys."  G.M. Harston Constr. Co. v. City of Chicago, 2001 WL 817855 at *2.  However, the court added a caveat that the documents would be immune from disclosure if they were "the result of an attorney's request for an analysis of a particular possible litigation position . . . ." G.M. Harston Constr. Co. v. City of Chicago, 2001 WL 817855 at *2.

Here, unlike in G.M. Harston, the documents at issue are the result of requests by DASNY's attorneys for claims analysis including a particular possible litigation position.  Moreover, unlike in G.M. Harston, the Hill Claims Analysis Group did not communicate with or obtain information from the construction companies; rather, it performed a litigation analysis of documents in DASNY's possession.  The Court believes the G.M. Harston case is distinguishable.  Moreover, the G.M. Harston case has never been cited by a court within the Second Circuit.  Indeed, the

decision has never been cited by any court for any reason.  That decision is not binding on this Court, and for the reasons set forth in this Opinion, the Court declines to apply it to this case.  Indeed, the Court suspects that if DASNY's counsel (in-house or outside) had themselves performed the type of claims analysis that the Hill Claims Group performed, RVA/DMJM never would have challenged work-product designation.

   RVA/DMJM cites additional cases denying work product protection, but those cases also are distinguishable.  (RVA/DMJM Br. at 10-12.)  For example, in <u>Procter & Gamble Co.</u> v. <u>Ultreo, Inc.,</u> 574 F. Supp. 2d 334, 337-38  (S.D.N.Y. 2008), the Court found that clinical studies that Ultreo's counsel sought to portray as undertaken in anticipation of litigation should be denied work product protection because they were required, in the ordinary course of business, for a research grant application and for marketing purposes.  Although DASNY was obligated to review contractor claims, unlike in <u>Procter & Gamble Co.</u> v. <u>Ultreo, Inc.,</u> the documents would have been created by a different entity, the Hill Construction Management Group rather than the Hill Claims Group, and in a different form absent the prospect of litigation.  In <u>De Beers L.V. Trademark Ltd.</u> v. <u>De Beers Diamond Syndicate, Inc.,</u> 04 Civ. 4099, 2006 WL 357825 at *1 (S.D.N.Y. Feb. 15, 2006), the Court found that documents created by a management consultant concerning the plaintiff's prospective new business plan and potential business opportunities, five years before litigation commenced, were not work-product, even though plaintiff "contemplated the possibility that litigation would arise out of the decisions it was preparing to make. . . ."  Here the Hill Claims Group was retained, and completed its analysis, shortly before litigation commenced.  (<u>See</u> page 9 above.)

RVA/DMJM also argues that the documents at issue were "the same type of claims analyses [that] were prepared by Bovis, which preceded Hill International as construction manager on the Project, and DASNY did not claim any privilege with regard to the materials prepared by Bovis." (RVA/DMJM Br. at 12.)  RVA/DMJM also argues that

> [t]he fact that DASNY has produced in discovery claims analyses similar to the claims analyses that have been withheld establishes that the documents in general are not protected from disclosure by the work product privilege.  These documents establish that Hill International in fact created claims analyses for DASNY's use in reaching a business determination.

(RVA/DMJM Br. at 13.)  The Court is not persuaded by these arguments.  DASNY produced the Bovis Construction Management documents both because it is suing Bovis and because the Bovis and Hill Construction Management documents were prepared for business purposes and not for litigation purposes.  DASNY never claimed such documents were protected work product.  In contrast, DASNY is asserting work product protection as to the Hill Claims Group documents because those documents contain analysis in anticipation of litigation.

Rule 26(b)(4)(B) extends work product protection to "facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial."  Fed. R. Civ. P. 26(b)(4)(B).  RVA/DMJM argues that "[i]n participating in the business determinations that are the subject of this lawsuit, Hill International clearly was an actor or viewer with respect to the transactions or occurrences that are the subject of this lawsuit . . . .  Indeed, upon information and belief, Hill International's analyses were the only analyses relied upon by DASNY in reaching its

business determinations for each request." (Dkt. No. 477: RVA/DMJM Br. at 16.)  This argument confuses analyses done by Bovis and the Hill Construction Management Group, which DASNY relied on in reaching business determinations, with the separate litigation analysis done by the Hill Claims Group.  The Hill Claims Analysis Group is not an "actor or viewer," any more than any specially retained expert.

RVA/DMJM has not made an adequate showing of substantial need or undue hardship.  Nowhere in its motion does RVA/DMJM address, let alone make any showing of, "substantial need" for, or resulting "undue hardship" in the absence of the Hill Claims Group's materials.  Indeed, since it appears that the Hill Claims Group performed its analysis by relying on documents produced by all parties in this litigation, no such need could be shown.

## CONCLUSION

For the reasons discussed above, RVA/DMJM's motion (Dkt. No. 476) to compel production of DASNY's privileged Hill Claims Group documents is DENIED.

SO ORDERED.

Dated:      New York, New York
            November 2, 2009

                                        _____
                                        **Andrew J. Peck**
                                        United States Magistrate Judge

Copies **by ECF** to:    All Counsel
                         Judge Lewis A. Kaplan

H:\OPIN\GROSS